**EXHIBIT A**

Ira Brad Matetsky (IM1881)
GANFER & SHORE, LLP
360 Lexington Avenue
New York, New York 10017
(212) 922-9250
(212) 922-9335 (facsimile)
*Attorneys for Plaintiffs*
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

STEPHEN M. WILSON, BRW ENGINEERING LTD.,
WIS PARTNERS LTD., MOSHE BAR-LEV, PATRICK
ROSENBAUM, MICHAEL MORRIS, HAIM YIFRAH,
TOP DOWN PARTNERS, LLC, JOEL LEVINE,
MORRIS TALANSKY, ABRAHAM MOSHEL,
MAGMA INTERNATIONAL SERVICES, LTD.,
ALBERT REICHMANN, HEXAGRAM & CO., and
POLYBUTES COMPANY,

                        Plaintiffs,

               -against-

IMAGESAT INTERNATIONAL N.V., ISRAEL
AEROSPACE INDUSTRIES LTD., ELBIT SYSTEMS
LTD., MOSHE KERET, IZHAK NISSAN, JACOB
WEISS, MENASHE BRODER, SHIMON ECKHAUS,
MICHAEL FEDERMAN, ESTATE OF JACOB TOREN,
JOSEPH ACKERMAN, JOSEPH GASPAR, GINO
PIPERNO-BEER, JAMES DEPALMA, DAVID ARZI,
YOAV CHELOUCHE, and YEHOSHUA ELDAR,

                      Defendants.

--------------------------------------------------------------X



JUDGE SWAIN

**07** Civ. **CIV** **6176**

**COMPLAINT**

*ECF CASE*

    Plaintiffs, STEPHEN M. WILSON, BRW ENGINEERING LTD., WIS PARTNERS

LTD., MOSHE BAR-LEV, PATRICK ROSENBAUM, MICHAEL MORRIS, HAIM YIFRAH,

TOP DOWN PARTNERS, LLC, JOEL LEVINE, MORRIS TALANSKY, ABRAHAM

MOSHEL, MAGMA INTERNATIONAL SERVICES LTD., ALBERT REICHMANN,

HEXAGRAM & CO., and POLYBUTES COMPANY, by their attorneys, GANFER & SHORE, LLP, for their Complaint, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are minority shareholders of, as well as holders of bridge warrants and/or employee stock options to acquire stock in, ImageSat International N.V ("ImageSat" or "Company").  ImageSat is a Netherlands Antilles (Curacao) company that is now headquartered in Israel but has regularly conducted business in New York.  ImageSat's principal business is the sale of exclusive regional rights, under Satellite Operating Partner ("SOP") agreements, to the use of its two "EROS" high-resolution earth observation satellites.

2.      Among the Plaintiffs are the members of the founding management of ImageSat and others who received stock in the Company, and/or stock options, as part of their compensation during years of loyal service.  Others among the Plaintiffs are individuals and entities that invested millions of dollars in cash in ImageSat during the Company's highest-risk start-up and development stages and at times that the Company was in financial crisis, for which they received common or preferred shares or bridge warrants.  Plaintiffs were minority shareholders, option holders, and warrant holders who collectively owned an estimated 10.7% of ImageSat's fully diluted issued and outstanding shares, prior to certain dilutive transactions that took place in or about March 2006.  (As used herein, the term "minority shareholders" also includes the option holders and warrant holders where the context so requires.)

3.      Instead of properly recognizing the rights of ImageSat's minority shareholders, Defendants have deprived them of their voice in the operation of the Company and have engaged in a series of actions and transactions characterized by multiple breaches of fiduciary duty, self-dealing, and other willfully fraudulent, deceptive, and oppressive acts, the net effect of which,

individually and cumulatively, has been to strip hundreds of millions of dollars of shareholder value from ImageSat and to further and wrongfully dilute and devalue or destroy each of the Plaintiffs' ownership interests in the Company.

4.     ImageSat's largest shareholders have been and are Defendant Israel Aerospace Industries, Ltd., formerly known as Israel Aircraft Industries, Ltd. ("IAI") and Defendant Elbit Systems Ltd. ("Elbit"), the successor to Electro Optical Systems ("ElOp").   IAI is a 100% Israeli-government-owned corporation and is the principal Israeli defense and aerospace company, whose business includes, among other things, developing and manufacturing the "EROS" earth observation satellites.   Elbit is the second-largest Israeli defense company, is publicly traded on the NASDAQ stock exchange ("ESLT"), and manufactures, among other things, electro-optical and related components for earth-observation satellites such as the imaging payload implemented in ImageSat's EROS A and B satellites.

5.     IAI and Elbit personnel have always played a substantial role in ImageSat's operations because financing, building and deploying the Company's initial satellites consumed a majority of the Company's human and financial resources.   However, it was always understood, and represented to investors including Plaintiffs, that ImageSat would be run as an autonomous, **apolitical** commercial entity and that its business would be entirely separate and distinct from the businesses of IAI and/or Elbit.   Because the essence of the Company's SOP concept was to provide an autonomous regional satellite operating capability to governments, principally in support of each individual government customer's national security agenda, ImageSat's commercial and political independence was a fundamental, indeed essential, element of its business plan. ImageSat's competitors were (and still are) backed by the largest United States aerospace companies and the U.S. government.   ImageSat's principal competitive

advantage against its financially superior and technically more experienced competitors was its profile as an independent and robustly international company able to sell truly independent high-resolution satellite imaging capabilities to governmental customers worldwide, free from the unwanted influence of a politically motivated regulatory and licensing regime, such as that of the United States.  It was understood that the Company could not project the required profile as a U.S. company and, due to the perceived closeness between the U.S. and Israel, not as an Israeli company either.  Nor could the Company be perceived as dominated by its Israeli industrial partners, including in particular government-owned IAI.  The founding management team, with the support of the earliest financial investors, including Plaintiffs, went to great lengths to ensure that the extensive business contemplated among ImageSat, IAI and Elbit would be characterized by arm's-length transactions, free from the inherent and obvious potential conflicts of interest.

6.      Instead, IAI and Elbit have consistently misused their Israeli government connections to enhance their controlling influence over the Company (for example by withholding the bit-stream specifications of the Company's first satellite, "EROS A", from ImageSat to ensure that IAI would control the integration and maintenance of the Company's ground segment)  and by wrongfully exercising that control to obtain inequitable concessions (such as wrongfully obtaining, in July 2000, the exclusive right to supply satellites and payloads to ImageSat without competitive bidding).  Since 2005, existing export licenses to sell SOP systems and services, explicitly acknowledged by the Israeli Ministry of Defense ("IMOD") in writing to be among the most valuable assets of the Company and its financial investors, have been wrongfully suspended or withdrawn to further the business and political interests of the Israeli industrial partners and their IMOD sponsors.  As further discussed below, the foregoing

examples of deception and self-dealing have had disastrous consequences for the Company and its minority shareholders, including Plaintiffs, ever since.

7.      On July 25, 2000, IAI (acting through its MBT division and sometimes known as "IAI/MBT") and ImageSat (then known as "WIS", for West Indian Space) entered into a contract known as the Master Agreement, intended to govern the parties' rights concerning, among other things, exclusivity and first rights to use, commercialize, and otherwise exploit technology that would be created during the parties' relationship.  In the Master Agreement, which was expressly to be governed by New York law, the parties agreed, *inter alia*, that ImageSat would be the "exclusive vehicle" through which IAI would pursue commercialization of IAI's EROS class satellites and accordingly, that IAI would not engage in activities competitive with ImageSat's business, explicitly and particularly including the provision of earth observation services to any party whatsoever, including governments.  IAI also agreed not enter into other earth observation business ventures under which it would compete with ImageSat by offering or providing services from earth observation satellites to customers; IAI and ImageSat agreed to leverage their respective capabilities to facilitate the expansion of ImageSat's earth observation satellite imaging business.  Beyond granting the exclusive right to exploit existing IAI earth observation satellite technology in all but the government-to-government arena, IAI specifically agreed that whenever IAI/MBT was presented with, or independently considered an opportunity for the commercialization of IAI's future earth observation technology, it would propose the exploitation of such opportunity to ImageSat and the parties would make commercially reasonable efforts to negotiate the terms and conditions of such exploitation. Further, IAI agreed that provided ImageSat placed a specified number of satellite orders with IAI, IAI would not offer or sell earth observation satellites based on either party's technology to

any third-party commercial program or other customer (other than to the Israeli government or on a government-to-government basis, and even in a government-to-government sale subject under certain circumstances to payment of royalties to ImageSat).

8.    These and the other terms of the Master Agreement, and of the successive Joint Venture Agreements of 1994, 1995, 1997 and 1998 that preceded it, as well as the Stock Purchase Agreement ("SPA") between ElOp and WIS of 1998 that mirrored precisely IAI's exclusivity and non-compete commitments to the Company, represented key inducements that persuaded many of the Plaintiffs, including but not limited to Wilson, as well as all of the Company's financial investors since the Company's inception, to agree to ImageSat's entry into transactions with IAI and Elbit, or to invest funds into ImageSat.

9.    Although improper and fraudulent financial transactions involving the Company, under the aegis of IAI and Elbit began as long ago as 2000, since June of 2005 a series of events was planned and executed by Defendants that reflect a new and malicious intent to unwind the once highly promising independent business of the Company and to misappropriate its financial, satellite, and launch assets to serve the business purposes of IAI and Elbit, including in particular their independent plans to aggressively pursue the global market for turn-key high-resolution earth-observation satellites and payloads, and the national security and broader geopolitical interests of their most important customer, the IMOD.

10.    Until November 2005, the Company planned to conduct an initial public offering (IPO) of its common stock. The offering was scheduled to commence at the end of November at an estimated total market valuation for the Company of approximately $470 to $500 million, and in turn valuing Plaintiffs' combined interests (including stock, options, and warrants) at approximately $30-40 million. The IPO ultimately did not take place, for reasons including the

announced Israeli governmental investigation of IAI CEO and then ImageSat Chairman and CEO Defendant Keret on charges of bribery and corruption, some of which reported allegations were linked to the sale of earth observation satellites. In addition, Defendants have made or knowingly allowed the Company to make excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere, outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments.

11.    Instead, allegedly motivated by the urgent need, absent an IPO, for alternative financing to launch the Company's second satellite, "EROS B", which had already been delayed by more than two years due entirely to Defendants' fraudulent and deceptive actions, Defendants sought and obtained new senior debt financing from Israeli investors. This purportedly urgent requirement was artificially transformed into a full-blown financial crisis for the explicit purpose of diminishing or eliminating entirely the influence and importance of the minority and financial shareholders and their legitimate business interests and to bring about a fraudulent restructuring of the then non-Israeli senior debt and equity of the Company. Rather than salvaging a troubled Company, Defendants acted deceptively and fraudulently to tighten their control over ImageSat and its by then fully captive minority shareholders and investors and to terminate, rather than to resurrect, the once highly promising and independent business plans of the Company.

12.    Since the IPO process was suspended in November of 2005, those in control of ImageSat have conspired to subordinate the Company's commercial decision-making interests and the financial interests of the minority shareholders, including Plaintiffs, entirely to those of IAI and Elbit and to the political interests of the IMOD. Even the pretext of maintaining

ImageSat as an independent, apolitical and commercial enterprise has since been blatantly abandoned. At least one lucrative SOP contract opportunity was deliberately sabotaged for purely political reasons. Contract obligations to Angola, an existing SOP customer, were knowingly and purposely unfulfilled to conceal Defendants' corrupt business practices and in order to position the Company to serve the preferred Israeli export partner, and historically the principal financial sponsor of Ofeq technology development, South Africa. Additionally, Taiwan, a fully licensed former SOP customer of the Company, was denied previously promised service from EROS B in favor of export partners of greater strategic importance to IAI, Elbit and the IMOD in the region.

13.    Compounding defendants' misconduct and breaches of fiduciary duty, and confirming their intent to effectively give away ImageSat's business without achieving compensation for the shareholders, ImageSat's Board members and senior management (many of whom are in conflicted positions because they were designated by or are otherwise loyal to IAI) have done nothing to protect and enforce the Company's valuable rights under the Master Agreement providing ImageSat with exclusive rights and/or first rights to commercialize and otherwise to exploit IAI's earth observation satellite technology. ImageSat's rights under the Master Agreement represent one of the Company's most valuable assets, which the directors and officers had the duty to preserve and defend. Instead, the defendant directors and officers have not only stood idly by, but affirmatively acquiesced, and in some cases conspired with IAI, as it has wrongfully sought to terminate ImageSat's exclusive rights, breach the non-competition clause, and has ignored ImageSat's first rights under the Master Agreement. They have also failed to negotiate and collect royalties from IAI and Elbit to which ImageSat is entitled for uses of technology developed by IAI and Elbit in connection with their work for ImageSat.

14.    In April 2007, IAI announced that it was entering into a transaction with Northrop Grumman Corporation ("Northrop") under which IAI reportedly would supply to Northrop up to eight earth observation radar satellites at a cost of up to $1.6 billion in the initial implementation of the deal.   Although these satellites are proposed to use synthetic aperture radar ("SAR") imaging, rather than the electro-optical imaging payload developed and supplied by Elbit, in virtually all other respects, the technology underlying IAI's radar satellites is the same as that underlying the existing EROS satellites produced by IAI for ImageSat.   Much of the technology that differentiates the new SAR satellites from EROS satellites was developed by IAI using ImageSat employees and/or in the course of developing the EROS B and C satellites for ImageSat and is accordingly within the scope of the non-compete obligations contained in the Master Agreement.   Moreover, because this proposed transaction represents a commercialization of an extension of IAI's earth observation satellite business, it is, at a minimum, subject to the first right provision under which IAI agreed to discuss any opportunity for commercialization of its present and future earth observation satellite technology with ImageSat and to negotiate a mutually agreeable joint strategy for pursuing such commercialization, before making any such proposal to any other party.

15.    Instead of abiding by its obligations under the Master Agreement, including but not limited to its obligation to accord ImageSat a first right to negotiate terms for the exploitation of IAI earth observation satellite technology before entering into a transaction with another party, IAI negotiated the Northrop transaction without according ImageSat the opportunity to exercise its first right and indeed, upon information and belief, without any advance notice to or discussion with ImageSat at all.   On its face, the IAI-Northrop transaction breaches ImageSat's non-compete right, exclusivity right, and first right under the Master Agreement and threatens

ImageSat with irreparable and immediate injury. Yet, instead of seeking immediate redress for IAI's wrongful conduct by negotiation, litigation, or otherwise, ImageSat's management and board of the directors have accepted IAI's position that the transaction is outside the scope of the Master Agreement and that ImageSat has no remedy. Only the financial and other conflicts of interest of the IAI-designated members of the ImageSat Board and of senior management can explain defendants' condign failure to protect the rights of the Company and the shareholders whom they supposedly serve. Demands by several of the minority shareholders that the Board and management take appropriate action to safeguard the Company's and its shareholders' rights have been ignored. Defendants' apparent lack of interest in preserving and protecting ImageSat's rights, and their acquiescence in accepting IAI's position that the Company no longer has any such rights, is consistent with their overall plan to wrongfully subordinate the interests of ImageSat and its shareholders, particularly including the minority shareholders such as plaintiffs, to those of IAI.

16.     IAI and Elbit have further violated the non-compete provisions of the Master Agreement and the SPA since 2000 by (i) offering and in some cases supplying earth observation satellite and payload systems under commercial tenders without imposing appropriate export control limitations, and (ii) providing and proposing to provide earth observation services to third parties despite the fact that their doing so is explicitly prohibited by prior agreement with the Company. Indeed IAI and Elbit, separately and together with the IMOD, and contrary to the explicit commitments of each of them to ImageSat's investors and shareholders, have openly and vigorously pursued the provision of earth observation services from Ofeq electro optical earth observation satellites. Such earth observation services are a key element in the joint IAI/IMOD R&D funding and sales strategies for the new SAR earth observation "TechSAR" satellite

(which is also the subject of IAI's aforementioned Northrop Grumman deal), in an audacious theft and conversion of ImageSat's proprietary and unique SOP service concept and technology.

17.    IAI's and Elbit's purpose of placing ImageSat's space and launch assets under their full control and in the primary service of the Israeli government, while also commercializing earth imaging satellite technology through partners other than ImageSat, is inconsistent with the Company's original business plans and purpose, or for that matter with any legitimate entrepreneurial or profit-making model.  In fact, ever since the successful financing and deployment of the Company's first (EROS A) satellite in 2000, an undertaking explicitly requested by the IMOD after its failed launch of Ofeq 4 in January 1998 (i.e. the deployment by ImageSat of an "A" class rather than ImageSat's preferred EROS "B" class design), ImageSat's formerly dynamic and robustly international corporate profile has been gradually but irreparably diminished to that of a small and captive (though uniquely valuable) Israeli company based entirely in, and primarily serving constituencies in, Israel.

18.    Between 1998 and 2005, IAI was seemingly and inexplicably unable to deliver to the Company its first EROS B class satellite or even a functional design that met the Company's long-standing commercially competitive requirements.  Although it had paid tens of millions of dollars to IAI and its subcontractor Elbit and continued to do so though successive EROS B Satellite Supply Contracts of 1998, 2000, and 2001, as of 2004 ImageSat had not even received a functional design that met the Company's long standing commercially competitive requirements.  Only as Ofeq 5 (the real technical predecessor to the Company's existing EROS B) approached the end of its anticipated lifespan did IAI and Elbit begin substantive work on an "EROS B class" satellite for ImageSat.  But the "2004 EROS B" was EROS B in name only, as it was based entirely on substantially less stringent IMOD performance requirements rather than

11

on the substantially enhanced design the Company had specified in the aforementioned successive satellite supply contracts of 1998, 2000 and 2001. Although defendants entered into multiple EROS B supply contracts, and exchanged among themselves $100 million of ImageSat, shareholder, and investor resources, they continued to dedicate all available technical and financial resources to the service of their primary client, the IMOD. But the IMOD was not interested in the commercially competitive enhancements embodied in ImageSat's EROS B mission requirements. Instead, it was interested in (i) ensuring the timely deployment of replacements for failed or dying Ofeq satellites and (ii) developing and adding SAR imaging capabilities to its existing Ofeq and EROS electro-optical surveillance satellite constellation. And that is exactly what Defendants deceptively, willfully, and fraudulently brought about.

19.    When the launch of the IMOD's Ofeq 6 satellite (a satellite by then urgently needed by the IMOD to replace the aging Ofeq 5) failed in September 2004 aboard the consistently troubled Israeli Shavit launch vehicle, ImageSat's IMOD-specified 2004 EROS B (and its highly reliable Russian Start launch vehicle) and its still fully functional EROS A, were suddenly recognized as priceless assets by the Israeli defense establishment. As a direct result, ImageSat is no longer in business to provide apolitical earth observation satellite services for the proportional financial benefit of **all** its shareholders, as it was designed to do and as Plaintiffs were assured would always be the case. Rather, the Company now exists for the principal benefit of the Israeli industrial shareholders, IAI and Elbit, and more specifically to support and advance the regional national security interests and global geopolitical agenda of their "anchor" customer, the IMOD. Plaintiffs, as minority shareholders, bear the burden of Defendants' greed and corruption, their misdirected management and their deliberate misuse of the Company for purposes other than achieving the best available return for all its shareholders. Its minority and

financial investors are the victims of a fraudulent and conspiratorial, uncompensated "eminent domain"-style seizure of their assets.

20.    Accordingly, the Plaintiffs bring this action to hold Defendants responsible for their breaches of fiduciary duty, corporate waste, fraud, racketeering activity and violation of the RICO statute, fraudulent conveyances, breaches of contract, corrupt business practices, and other misconduct directed against the minority shareholders and investors.  As set forth below, the wrongful acts were perpetrated by the Company's controlling shareholders and their representatives, including IAI and ElOp (later Elbit).  In doing so, these controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.  As set forth below, many of the acts forming an integral part of Defendants' wrongful acts took place in New York, New York, rendering this Court an appropriate forum to redress Defendants' wrongful conduct.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over the subject-matter of this action under 28 U.S.C. § 1331 because Plaintiffs' claims asserted herein include claims arising under the laws of the United States, namely, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

22.    This Court also has jurisdiction over the subject-matter of this action under 28 U.S.C. § 1332(a)(3) in that Plaintiffs and Defendants are citizens of different States of the United

States together with citizens or subjects of foreign states as additional parties. No Plaintiff is a citizen of the same State of the United States as any Defendant. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23. Venue is proper in this District.

## PARTIES

### Plaintiffs

24. Plaintiff Stephen M. Wilson is a citizen of the United States and of the Commonwealth of Puerto Rico. Wilson was the founding CEO of ImageSat and served in that role from the inception of the Company to 2000. From 2000 to 2006, Wilson has served under a consulting contract between the Company and BRW Engineering, Ltd. Wilson holds 20,000 shares of ImageSat common stock, stock options to acquire an additional 132,077 shares, and bridge warrants permitting him to acquire another 54,000 shares of ImageSat common stock.

25. Plaintiff BRW Engineering Ltd. ("BRW") is a Cayman Islands corporation with its principal place of business in the Cayman Islands. BRW is wholly owned by Plaintiff Wilson. BRW holds 7,810 shares of ImageSat common stock.

26. Plaintiff WIS Partners Ltd. ("WIS Partners") is a Bermuda limited partnership with its principal place of business in Hamilton, Bermuda and maintaining an office in New York City. WIS Partners holds 243,121 shares of ImageSat common stock and bridge warrants permitting it to acquire another 26,000 shares of ImageSat common stock.

27. Plaintiff Moshe Bar-Lev is a citizen and resident of Israel. He is widely regarded as the "driving force" behind the initiation and realization of the Israeli national space program and was the Founding Director of IAI's Space Technologies Directorate. Bar-Lev was the founding chief technical officer (CTO) of ImageSat and President of ImageSat's Israeli

subsidiaries from inception and was the senior technical executive of the Company until 2004. Bar-Lev holds 20,000 shares of ImageSat common stock, and options to acquire another 110,693 shares of ImageSat common stock.

28.    Plaintiff Patrick Rosenbaum is a citizen of Israel and France, presently residing in China.   He was the founding Deputy Director of IAI's Space Technologies Directorate. Rosenbaum was the founding chief operating officer (COO) of ImageSat and served in that position from inception to 2002.   Rosenbaum holds 20,000 shares of ImageSat common stock and stock options to acquire another 110,693 shares of ImageSat common stock.

29.    Plaintiff Michael Morris is a citizen of the United States of the Commonwealth of Massachusetts.   Morris was the founding chief financial officer (CFO) of ImageSat and served in that position until 2000, spending much of his time in New York interfacing with ImageSat's institutional investors.    Morris holds options to acquire another 71,537 shares of ImageSat common stock.

30.    Plaintiff Haim Yifrah is a citizen and resident of Israel.   Yifrah is retired Brigadier General of the Israeli Defense Forces and commander of the IDF Intelligence Corps and was responsible for the integration of the Israeli Ofeq surveillance satellite program subsequent to the successful deployment of Ofeq 3 in 1995.   Immediately upon his retirement in 1999, Yifrah joined ImageSat as its founding Vice President for Defense Systems and served in that position until 2006.   Yifrah holds options to acquire 37,500 shares of ImageSat common.

31.    Plaintiff Top Down Partners, LLC ("Top Down") is a Nevada corporation, with its principal place of business in Pasadena, California.   Top Down holds 4,987 shares of ImageSat common stock.

32.      Plaintiff Joel Levine is a citizen of the United States and of the State of California.  Levine holds 4,986 shares of ImageSat common stock.

33.      Plaintiff Morris Talansky is a citizen of the United States of the State of New York.  Talansky holds bridge warrants entitling him to acquire 25,000 shares of ImageSat common stock.

34.      Plaintiff Abraham Moshel is a citizen of the United States of the State of New York.  Moshel holds bridge warrants entitling him to acquire 20,000 shares of ImageSat common stock.

35.      Plaintiff Magma International Services, Ltd. ("Magma") is a corporation organized under the laws of Switzerland and having its principal place of business in Switzerland.  Magma holds 13,629 shares of ImageSat preferred series B stock.

36.      Plaintiff Albert Reichmann is a citizen and resident of Canada.  Reichmann holds bridge warrants entitling him to acquire 5,000 shares of ImageSat common stock.

37.      Plaintiff Hexagram & Co. ("Hexagram") is a Canadian company with its principal place of business in Ontario, Canada.  Hexagram holds bridge warrants entitling it to acquire 5,000 shares of ImageSat common stock.

38.      Plaintiff Polybutes Company ("Polybutes") is a company organized under the laws of the British Virgin Islands, and having its principal place of business in Bermuda.  Polybutes holds bridge warrants entitling it to acquire 20,000 shares of ImageSat common stock, which it purchased from Hexagram.

**Defendants**

39.      Defendant ImageSat is a public limited liability company ("*naamloze vennootschap*" or N.V.) organized under the laws of the Netherlands Antilles (Curacao) with its

principal place of business located in Israel. Upon information and belief, ImageSat also does business directly in the United States, including in New York. Among other business conducted by ImageSat and the other Defendants in New York, ImageSat's Board of Directors meetings have frequently been held in New York and, upon information and belief, have been held more often in New York, New York, than in any other location. Upon information and belief, each of the individual Defendants herein, many of whom serve as directors and/or officers of ImageSat at the behest of Defendant IAI or Defendant Elbit (successor to ElOp), has attended such meetings in New York in connection with the conduct at issue in this Complaint.

40.     Defendant Israel Aerospace Industries, Ltd., formerly Israel Aircraft Industries, Ltd. (IAI), is an Israeli corporation owned entirely by the government of Israel, which, upon information and belief, regularly does business in New York. IAI operates a U.S. subsidiary known as Israel Aircraft Industries, Ltd. which is a Delaware corporation authorized to do business in New York. IAI's principal place of business located in Israel. IAI owns a substantial block of ImageSat common stock and is ImageSat's largest shareholder.

41.     Defendant Elbit Systems Ltd. is an Israeli corporation with its principal place of business located in Israel. Elbit owns or is affiliated with several U.S. companies and its shares are listed on the NASDAQ stock exchange under the symbol "ESLT". Elbit is the successor to Electrical-Optical Systems ("ElOp"), formerly an Israeli privately held company, which was merged into Elbit in 2000. References in this Complaint to "ElOp" include its successor-in-interest Elbit where the context so requires and vice versa.

42.     Defendant Moshe Keret is a natural person and a citizen of Israel. He served as Chairman of the Board of Directors of ImageSat from 2000 to 2005. He was the chief executive

officer of IAI throughout the entire history of ImageSat's development from inception until November 2005.

43.    Defendant Izhak Nissan is a natural person and a citizen of Israel. He was the General Manager of the MBT division of IAI (including its space directorate) until succeeding Defendant Keret as CEO of IAI in 2005. He served as a member of ImageSat's Board of Directors from 2000 to 2002.

44.    Defendant Jacob Weiss is a natural person and a citizen of Israel and the United States. He served as the corporate Vice President and General Counsel of IAI until becoming CEO of ImageSat from July 2000 until December 2001. Thereafter, Weiss continued as an active consultant to and member of the Board of Directors of ImageSat until 2005.

45.    Defendant Menashe Broder is a natural person and a citizen of Israel and Canada. He served as corporate Vice President and General Counsel of IAI and subsequently as Vice President for International Marketing and Sales of IAI until 2000. He served on the Board of Directors of ImageSat from 1999 until 2005 and as CEO of ImageSat from 2002 to 2005.

46.    Defendant Shimon Eckhaus is a natural person and a citizen of Israel. He served as the corporate Vice President of International Marketing and Sales, and subsequently as Executive Vice President and Deputy Chief Executive of IAI, until becoming CEO of ImageSat in 2005. He continues to serve in that capacity. Eckhaus also served as a member of ImageSat's Board of Directors from 2003 to 2005.

47.    Defendant Michael Federman is a natural person and a citizen of Israel. He is the Chairman of the Board of Directors, and largest shareholder, of Defendant Elbit. He was the former owner of ElOp until that company and its stake in ImageSat became wholly owned assets of Elbit in 2000. He served on the Board of Directors of ImageSat in 2001 and 2002.

48.      Defendant Estate of Jacob Toren is the successor-in-interest to Jacob Toren. Until his death in December 2006, Jacob Toren was a natural person and a citizen of Israel. He was the former chief executive officer of ElOp until its acquisition by Elbit Systems. He served as a director of ImageSat from 1998 to 2001, and most recently served as the Director General of the IMOD between September 2005 and July 2006. References herein to Jacob Toren include his estate where the context so requires.

49.      Defendant Joseph Ackerman is a natural person and a citizen of Israel. He is the chief executive officer of Elbit Systems. He served on the Board of Directors of ImageSat from 2002 until 2005 and was a member of ImageSat's Audit Committee.

50.      Defendant Joseph Gaspar is a natural person and a citizen of Israel. He is the chief financial officer of Elbit Systems. He served as an alternate director of ImageSat for Joseph Ackerman and replaced him as a full member of the ImageSat Board of Directors and the Audit Committee in 2005.

51.      Defendant Gino Piperno-Beer is a natural person and a citizen of Israel and Italy. He has been a member of ImageSat's Board of Directors and Audit Committee since late 2005 or early 2006.

52.      Defendant James DePalma is a natural person and a citizen of the United States and of the State of Connecticut. He has been a member of ImageSat's Board of Directors and Audit Committee since 2003.

53.      Defendant David Arzi is a natural person and a citizen of Israel. He has been a member of ImageSat's Board of Directors since 2006 and has served as its Chairman since his appointment. He concurrently serves as Corporate Vice President of IAI.

54.      Defendant Yoav Chelouche is a natural person and a citizen of Israel. He has been a member of ImageSat's Board of Directors since 2006.

55.      Defendant Yehoshua (Shuki) Eldar is a natural person and a citizen of Israel and is Corporate Vice President of IAI, explicitly responsible for IAI's relationships with affiliates and subsidiaries. Eldar served on ImageSat's Board of Directors in 2000 and 2001. He was the Director of Finance at MBT and participated in the Pegasus investment and related closings of July 2000 and July 2001 and was a signatory to the Master Agreement and other relevant agreements on behalf of IAI/MBT.

## FACTS

### A.    Background

56.      ImageSat was initially organized as a 50%/50% joint venture of IAI and Core Software Technology (CST) in 1994. It was incorporated in the Cayman Islands in 1997 under the name West Indian Space, Ltd. In 2000, concurrent with certain financing transactions described below, the Company's domicile was changed to the Netherlands Antilles, the Company was registered in Curacao as a public limited liability company ("*naamloze vennootschap*" or N.V.), and its name was changed to ImageSat International N.V. The Company's founding management team included Plaintiffs Wilson as chief executive officer, Bar-Lev as chief technical officer, Rosenbaum as chief operating officer, Morris as chief financial officer, and Yifrah as vice president for defense systems.

57.      From its inception, ImageSat's business operations and purpose involved the sale of earth imaging services from high resolution (surveillance) satellites. Prior to ImageSat's creation, governments could obtain such data only by launching their own satellites or by entering into formal or informal agreements with other governments that had such satellites.

20

During the mid-1990's, the geopolitical environment changed so as to permit the commercial sale of high-resolution imagery and services and the launching and operation by commercial companies of privately owned surveillance satellites. Several U.S. aerospace companies applied for and received licenses from the U.S. Government to do so.

58.    In May of 1994, Wilson proposed to IAI to create a robustly "international company", i.e. one dominated by neither American nor Israeli interests, as the most appropriate vehicle for approaching the new market. IAI and the IMOD were already desperately seeking new sources of financing for the Israeli military space program (i.e., the new non-apartheid government of South Africa had broken off formal ties and terminated all joint defense research with Israel including previously substantial financing for corresponding Ofeq and Greensat programs). One such option then under consideration was the possible commercialization of Israel's not-yet-flight-proven Ofeq military satellite technology. Wilson and the other members of the founding management team – among them, the former and founding Director and Deputy Director of IAI's space group, Bar-Lev and Rosenbaum – developed the SOP concept wherein governmental customers would purchase autonomous local control of the satellite's imaging systems within the geographic "footprint" (communication range) of their own ground control station. Each such customer country would operate the Company's satellites exclusively as ImageSat's regional Satellite Operating Partner ("SOP") whenever the satellite overflew its respective portion of the globe. SOP's would receive all equipment and training required to independently define each imaging mission (or "pass" over the ground station) and to transmit the mission directly to the satellite (called "tasking") as well as to process, interpret, archive and control the use of the resulting imagery data acquired within its contractually defined geographic region. In addition to developing and implementing the SOP concept and minor variations

thereof, which have been responsible for well over 90% of the Company's revenue to date, the members of the founding management team were individually and collectively responsible for every successful SOP contract closing from inception through the April 2006 launch of the Company's second ("EROS B") satellite.

59.     From ImageSat's inception, IAI was among its largest shareholders.  However, it was memorialized in the first Memorandum of Understanding between the original joint venturers that IAI, an Israeli government-owned company, could and would never own in excess of 50% of the Company, so as to prevent ImageSat from becoming subject to the Israeli government company regulatory regime.  Indeed, it was explicitly contemplated that IAI's stake in the Company would be gradually and substantially diluted as new partners and investors joined the Company.  Although IAI and its electro-optical payload supplier, ElOp, received special consideration for the award of satellite manufacturing contracts, they were explicitly **not** appointed exclusive satellite suppliers to the Company, which assiduously retained the right between 1994 and 2000 to put satellite contracts out for competitive bidding and thereby to obtain the highest quality satellite manufacturing and services at the lowest available cost.

60.     ImageSat's co-founding U.S.-based joint venturer, CST, and all other future U.S. holders combined, could similarly never own more than 50% of the Company, or it would become subject to the United States remote sensing regulatory regime, which was incompatible with the "independent" and "exclusive" SOP concept.  For a number of business and tax reasons, it was essential that the Company's business would be multinational rather than centered in any one country, but explicitly not in the United States or in Israel, by virtue of the fundamental principles of autonomy, confidentiality, and regional exclusivity, upon which its novel and unique SOP service was based.

61.    ElOp, a privately held Israeli company that manufactures the electro-optical imaging payload for Israel's Ofeq military satellites, resisted the commercialization of Ofeq technology throughout the 1990's. However, when it became apparent, immediately after the failed launch of Ofeq 4 in January 1998, that the IMOD intended to meet the necessary regulatory and competitive requirements that would finally enable ImageSat to enter the market, ElOp insisted on joining the Company. The IMOD, under pressure from Defendants Jacob Toren, then ElOp's CEO, and Michael Federman, ElOp's financially and politically powerful owner and Chairman, directed IAI to share its 50% initial joint venture ownership position with ElOp, resulting in a 37.5%/12.5% ownership distribution respectively. As consideration for their "founders" shares, ElOp agreed to grant to ImageSat the exclusive rights to commercialize its contributions to the collective "Ofeq satellite technology", and not to compete with ImageSat in the exploitation of its satellite earth observation technology, precisely as IAI had done through the initial joint venture agreements in 1994 and 1995. This "one-way" exclusivity arrangement seems extraordinary in retrospect, in that ImageSat had no corresponding exclusivity commitment to the manufacturers. However, when the joint venture was originally formed, "Ofeq" was not yet flight-proven technology, Israel had not yet successfully deployed a high resolution surveillance satellite, and the prevailing view among the (entirely U.S.-based) companies that possessed flight-proven digital surveillance satellite technology was that Ofeq was too small a satellite to be able to deliver real-time high-resolution imagery. Moreover, the history of Israeli launch failures (four of six during the 1990s) and the cost of such failures repeatedly threatened to cause the cancellation of the entire Israeli space program whose survival through the mid to late 1990's became dependent entirely on outside investor financing through ImageSat.

62.    At roughly the same time that ElOp joined the Company, CST agreed to transfer a portion of its 50% initial joint venture stake to the European investor group WIS Partners, creating a 31.25%/18.75% ownership respectively.  As consideration for their "founders" shares, CST and WIS Partners each made proportional cash investments in the Company at a value of $16 per share.

63.    From the outset, it was understood and agreed that ImageSat would be an apolitical, commercial enterprise.  Although it was understood that the Company's commercial activities in the Middle East and globally would be subject to certain narrowly defined limitations by the IMOD (in its role as the export control authority for classified Israeli technology used by the Company) ImageSat's business decision-making, including the selection of the customers (countries) with which ImageSat would do business, was to be completely apolitical.  The sole limitations on its activities, accepted by the Company as a condition to obtaining the IMOD's approval to commercialize the Ofeq technology, was that the Company was not to enter into SOP contracts or otherwise sell to (i) any country or other customer within a 2500-kilometer radius around Israel's own SOP ground station (entirely consistent with the SOP program parameters for all SOP countries), and (ii) "rogue states," which was defined in a written bilateral policy agreement between Israel and the United States as comprising those states that were fully embargoed both commercially and militarily by the U.S. government (a very short list that today is comprised of Iran, Cuba, and North Korea).

64.    In 1998, the IMOD issued approximately 60 SOP export licenses (every country requested including Venezuela, Angola, Taiwan, China and India) as an extraordinary gesture to assure the Company's prospective financial investors of the sincerity and veracity of the "hands off" policy that the IMOD intended to take toward the Company's operations.  Indeed, during the

24

early years of its implementation, the IMOD backed up its policy commitments to the Company and its investors by refusing a partial U.S. embargo request to suspend marketing activities and/or rescind export licenses for India after that nation's initial nuclear test. Wilson requested and Yifrah obtained written assurances from the IMOD of the validity of the Company's export license for India and its policy of non-interference during the full term of any SOP contract India might sign with the Company. Upon Yifrah's further request, the IMOD agreed to provide similar written assurance to other prospective SOP customers of the Company and did so on a number of occasions contingent only upon the existence or future availability, according to then clearly defined guidelines, of a valid export license. The fundamentals of the policy regime under which the Company was to be operated took more than four years to put in place, eventually requiring the negotiation of a formal bilateral policy agreement between Israel and the United States. This policy formed the foundation for the SOP program concept and as an integral and inextricable feature of the program it was one of the Company's most valuable assets. The IMOD's licensing commitments were so valuable that the Company required and the IMOD agreed to memorialize them in writing in 2000, even explicitly acknowledging the asset value of the licenses and extending ownership rights in them to all of the Company's shareholders.

65.    In July 2000, certain investors brought into ImageSat by Pegasus Capital Advisors, L.P. and its affiliates (collectively, "Pegasus") first invested in the Company through a $500 million venture fund raised by Merrill Lynch on Pegasus's behalf. Prior to the Pegasus investment, defendant Federman approached Bank Leumi about the possible availability of a $70 million bank credit facility as an alternative to financing the Company in the private equity and/or institutional risk capital investment market. Presented as an alternative by Federman's

representative to the February 21, 2000 special meeting of the Company's Board of Directors, the bank financing concept, previously undisclosed to ImageSat's management or to the minority designees to the ImageSat board, was to involve financial participation by IAI and ElOp through a joint guarantee of a portion of the Bank Leumi credit line.  Wilson objected to Federman's attempt to derail the equity investment, a transaction the Company had been organizing itself to effect for more than a year, and also objected to Federman's apparent view that it was appropriate for him to seek funding of any kind on the Company's behalf without disclosing or coordinating such efforts with its management and Board of Directors.  Despite the arguments of Federman's attorney, the Board approved a resolution endorsing the term sheet and Pegasus investment.

66.     On July 25, 2000, a Securityholders Agreement was entered into, among others, ImageSat (then known as "West Indian Space"), IAI, ElOp, several Pegasus-related entities, and Plaintiff WIS Partners, governing among other things the composition of the ImageSat Board of Directors, and providing among other things that the Board would include two independent directors who were to be unaffiliated with ImageSat or any of its securityholders.  Despite this provision and subsequent demands that it be adhered to by at least two parties to the Securityholders Agreement, the Company has never appointed the two independent directors as required.

67.     Also on July 25, 2000, contemporaneous with the Pegasus investment, IAI and ImageSat (then known as "WIS", for "West Indian Space") entered into a contract known as the "Master Agreement" to memorialize certain of IAI's industrial rights and its corresponding commitment to other ImageSat shareholders embodied in the original Joint Venture Agreements (which were to be terminated concurrent with the Pegasus closing) and to govern the nature of

the relationship between the two companies going forward. The Master Agreement was intended to govern the parties' rights concerning, among other things, exclusivity and first rights to use the technology that would be created by the parties' relationship. (A copy of the Master Agreement is annexed hereto as Exhibit "A".)

68.     The Master Agreement was subsequently amended by Amendment No. 1 to the Master Agreement dated March 10, 2005 for the purpose of extending certain exclusivity provisions therein. (A copy of Amendment No. 1 to the Master Agreement is annexed hereto as Exhibit "B". References herein to the "Master Agreement" include such amendment where the context so requires.)

69.     Section 1(a) of the Master Agreement provides as follows:

**WIS [ImageSat] shall be the exclusive vehicle through which IAI/MBT pursues the commercialization of the existing IAI/MBT light earth observation satellite (i.e., EROS Class Satellite) technology subject to the provisions of this Section 1, and accordingly, IAI/MBT shall not engage in activities competitive with the business of WIS as defined in this Section 1.** Furthermore, at any time that IAI/MBT is a substantial shareholder in WIS, IAI/MBT will not enter into any venture or business entity, as a shareholder or otherwise as an owner, alone or with any third party, to compete with WIS by offering or providing services from earth observation satellites to customers (herein "Commercialization of IAI Technology"). **In this regard, IAI acknowledges that changing market conditions may result in the expansion of the business activities of WIS in the commercial remote sensing domain, beyond those currently contemplated in the business plan of WIS and it is the interest of both Parties that WIS and IAI/MBT leverage their existing and newly created capabilities to facilitate that expansion and therefore, at any time that IAI/MBT is presented with, or independently considers, an opportunity for the Commercialization of IAI/MBT Technology relevant to the commercial earth observation market, IAI/MBT shall propose the exploitation of such opportunity to WIS and the Parties shall use commercially reasonable efforts to negotiate the terms and conditions, including compensation and other considerations, applicable to such opportunity.**

(Emphasis added).

27

70.     This Section 1(a) of the Master Agreement embodied the parties' intent that, as an inducement to investors to invest in ImageSat, IAI was making broad commitments to ImageSat including the grant of exclusivity, non-competition, and first rights.  The rights conferred upon ImageSat under this section included:

(a)     ImageSat's right to be the exclusive vehicle for the commercialization of existing and derivative IAI satellite technology in the earth observation arena;

(b)     ImageSat's receipt of IAI's promise that it would not engage in competitive activity by either (i) providing satellite earth observation services to **any** party, or (ii) participating in any venture that would be competitive with ImageSat's business; and

(c)     ImageSat's "first right" (*i.e.*, right of first refusal) with respect to the commercialization of any future technology developed by IAI in the earth observation arena.

Significantly, "IAI/MBT Technology" is defined in Section 14 of the Agreement as including technology owned or controlled by IAI/MBT as of November 18, 1998 (roughly the date of the last predecessor "Joint Venture" Agreement between the parties) or technology developed based on such technology at a later time.  While IAI/MBT Technology is defined as **including** technology developed by IAI/MBT under contract with ImageSat, it is **not limited** to such technology and indeed explicitly includes "Technology developed by IAI/MBT under or in connection with a procurement contract with a Government" within its scope.

71.     The "first right" provision contained in the last sentence of Section 1(a) was added to the Master Agreement at the instance of plaintiff Wilson, for the explicit purpose of addressing IAI's anticipated development of a SAR based earth observation satellite and the

corresponding widely anticipated introduction of high-resolution SAR sensors and imagery by commercial satellite operators such as ImageSat.  IAI had initially taken the position in the negotiation that a SAR satellite and/or payload should not be covered by the exclusivity commitments, because although it had long since been designed (to a significant extent by the same members of ImageSat's founding management and staff that designed and developed Ofeq and EROS satellites) it had not yet been developed or even fully financed.  Moreover, IAI argued that third parties might also be involved in joint research and development funding of a SAR satellite and that it was premature to specify the terms of the possible future commercialization of this technology.  Wilson insisted on behalf of ImageSat that SAR technology would definitely become a highly complementary and eventually essential element in the commercial earth observation satellite industry.  As such, it would unquestionably become an important element of the Company's future that needed to be addressed in the Master Agreement.  This issue became even more important to Wilson after defendant Weiss agreed, over Wilson's contemporaneous objections, to add a provision to the Master Agreement under which IAI was designated as ImageSat's exclusive satellite provider for the next six (6) satellites to be ordered, because Wilson knew and stated in the presence of Weiss and others that offering SAR technology would certainly be a competitive necessity well before ImageSat had ordered six additional satellites.  The "first right" provision of the Master Agreement was a compromise solution explicitly created and intended by all parties to address the potential expansion of IAI's and ImageSat's earth observation satellite capabilities to include SAR.

72.    Section 12 of the Master Agreement, captioned "Technology", confirmed and added to ImageSat's right to share with IAI in the commercial exploitation of technology that

was created or enhanced as a result of projects wholly or partly funded by ImageSat, such as the

design and construction of the EROS B and C satellites.  Specifically, Section 12 provided:

> Section 12.    <u>Technology.</u>
>
> (a)    All improvements to IAI/MBT Technology (whether or not patented) shall belong to IAI/MBT whether or not such improvement was developed under or in performance of a purchase contract with WIS.  Notwithstanding the above, **in cases where a major development has been funded by WIS of an improvement to an existing technology or product of IAI/MBT, the Parties will negotiate in good faith a royalty fee to be paid to WIS upon the sale of the improved technology or product to a third party.**
>
> (b)    **It is acknowledged and recognized by IAI/MBT that it will be developing valuable new IAI/MBT Technology that will be partially funded by WIS under the Satellite Supply Contracts.  IAI/MBT agrees, therefore, that WIS will be entitled to a royalty on all sales of EROS Class Satellites containing IAI/MBT WIS Technology to any party other than to the GOI or WIS (or any successor in interest to WIS). The parties shall negotiate in good faith a royalty agreement, associated with all specific Technology development funded by WIS and specified in each Satellite Supply Contract or other development contract, providing for the payment of royalties to WIS, in a mutually agreed to amount, by IAI/MBT for all sales by IAI/MBT (including G to G sales) of:**
>
>> **(i) products containing IAI/MBT/WIS Technology or**
>>
>> (ii) the right to use the IAI/MBT/WIS Technology design or manufacturing know how and data (herein a "Know How Sale/License"), except as otherwise provided for herein. . . .

(Emphasis added.)

73.    Section 8(e) of the Master Agreement provides:

> <u>Governing Law.</u>    The rights and obligations of WIS and IAI/MBT hereunder shall, pursuant to New York General Obligations Law Section 5-1401, be governed by the laws of the State of New York.

74.    Although all material agreements and the terms and conditions thereof were to

have been negotiated jointly on behalf of the Company by Wilson and Weiss acting together

(Wilson as the outgoing CEO and Weiss as the incoming CEO), both prior to and immediately

after the execution of the signature pages of the documents, Weiss (or persons acting at Weiss's direction and on his behalf) caused the Master Agreement and other deal documents to be changed in material respects that were in some cases not coordinated between Wilson and Weiss, as was the intent and explicit directive of the Board, not disclosed at the time to Plaintiffs or, upon information and belief, to the other shareholders (with the exception of ElOp). Specific changes to the terms and conditions of the Master Agreement included certain enhancements to IAI's and ElOp's long standing satellite procurement arrangements (i.e. IAI was suddenly to become the Company's exclusive satellite supplier for its next six satellites), as well as certain attempts to make less clear or otherwise diminish IAI's prior commitments to ImageSat as the "exclusive vehicle" for the commercialization of Ofeq earth observation satellite technology. This very substantial early investment transaction and the various agreements associated with it, symbolized and may have constituted the beginning of an otherwise inexplicable and immediate transition of ImageSat from an independent commercial entity operated for the benefit of all its shareholders to an entity operated for the benefit of IAI, ElOp (succeeded by Elbit), and the IMOD, without regard to the interests of the minority shareholders.  Nonetheless, while some of the last-minute changes appear to have been intended to weaken some of ImageSat's protections under the Agreement, the Master Agreement as executed still conferred upon ImageSat clear and valuable legal rights, which have been subsequently breached by IAI, with the acquiescence of ImageSat's current directors and management, as described below.

75.    The ImageSat Board of Directors as of 2000 consisted of Defendants Keret (chairman of ImageSat and CEO of IAI), Nissan (IAI/MBT Division General Manager), Eldar (Director of Finance for IAI/MBT) and Weiss (outgoing General Counsel of IAI and incoming CEO of ImageSat) and Defendant Toren (ElOp's CEO).  Two additional IAI designees, one CST

designee, and one WIS Partners designee also served on the board. As noted above, the two directors who were to be independent of the Company and any of its securityholders were never appointed.

76.    The Master Agreement, Pegasus's Note Purchase Agreement ("NPA"), and the related deal documents were all solicited and almost all of the related transactions and documents were negotiated, prepared, signed, and closed in the County, City, and State of New York and provide that New York law is to govern them and/or for the jurisdiction of the New York courts to adjudicate disputes arising therefrom.

**B.    The Misdating and Mispricing of the July 2000 Bridge Warrants and Options**

77.    As part of the July 2000 transactions, bridge warrants providing the right to obtain stock in the Company were issued (and/or amended) on behalf of certain investors including Wilson, WIS, Talansky, Moshel, Reichmann, and Hexagram. Hexagram subsequently sold certain of its bridge warrants to Polybutes.

78.    The July 2000 transactions involved the issuance of various classes of incentive securities including the bridge warrants and stock options to numerous recipients, requiring the calculation of a conversion price. Most of the closing documents were "work in progress" and not completed during the days and weeks preceding the closing. Because a concurrent Preferred Series B equity investment was to be made in an amount that had not yet been determined, the conversion price continued to change up to, and even after, the closing.    For this reason, thousands of signature pages were separated for execution prior to the closing from the body (and substance) of the corresponding agreements.

79.    The Company was financing its operations, including the essential EROS A launch preparations, through "bridge loans" throughout the protracted negotiations and closing

process that started in late 1999 and continued through the NPA closing in late July 2000. Wilson was still soliciting these investments in parallel with the Pegasus negotiations and closing process, and the Company was in turn issuing promissory notes and incentive "Bridge Warrants" explicitly linked to the anticipated closing. He raised the issue of the unintended disparity in the terms memorialized in the bridge warrants that had already been issued, relative to the anticipated actual terms of similar securities to be issued in connection with the closing. All of the parties to the NPA and related closing negotiations readily agreed that all the classes of incentive warrants and options, including explicitly the warrants issued to the bridge investors, would reflect the same terms and conditions as of the closing date. The previously issued bridge warrants that predated the closing were to be amended to reflect full parity with the new incentive securities issued at the closing. After securing the agreement of the parties including the Company, Wilson advised the bridge investors that the warrants issued in connection with their bridge investments would be so amended. Absent such agreement and representations by the Company, it would not have been able to continue to fund ImageSat's operations during this period.

80.    Notwithstanding unanimous, though oral, agreement on the foregoing entirely non-controversial point among all the parties to the negotiation including ImageSat, IAI, and ElOp (indeed, IAI and ElOp were to be issued a majority of the bridge warrants), the documents signed at the closing provided for the bridge warrants to expire in five (5) years while all the other incentive securities including the employee stock options issued concurrent with the closing were set to expire in 10 years. Signatories to the agreements, including Wilson, did not notice the discrepancies in the documents at that time (as was the case with the wrongful

amendment of the aforementioned Master Agreement) because the documents were not completed or even present at the time the signature pages were executed en masse.

81.    Also not in keeping with the agreed-upon terms, the execution price of the bridge warrants and the stock options was set at $24.4573 per share instead of $23.2737, which was the final conversion price of the Pegasus Convertible Notes.  The discrepancies in the options and bridge warrants were not negotiated or agreed-upon terms of the transactions; but rather resulted from a mere scrivener's or arithmetic error in preparing the voluminous paperwork memorializing the transactions.

82.    The length of the term of the bridge warrants was a material term of the transactions and none of the Plaintiffs who received such bridge warrants would have participated in the transactions had he or it been duly advised that the terms of the transaction would not reflect the same terms and conditions being offered to others at the same time.

83.    Also during the closing, certain securities previously issued or committed to Wilson were reallocated to others as special recognition by Wilson for their individual contributions to the very difficult start-up phase of the Company's development, including Plaintiffs Bar-Lev, Rosenbaum, Morris, Top Down, and Levine as well as to the former Director General of the Israeli Ministry of Finance, David Brodet.  In connection with this redistribution of his own equity securities, Wilson corresponded with Company counsel, Milbank Tweed, as to any possible implications of redistributing Stock Options as opposed to Bridge Warrants. Wilson was assured by Milbank Tweed that by agreement among all parties to the NPA negotiation, all incentive option and warrant documents would reflect full parity post closing and that therefore, no impact on Wilson's fully diluted equity position would result from the distribution of Stock Options as opposed to Bridge Warrants or vice versa.  As a direct result of

such assurances, Wilson directed Milbank, for the sake of simplicity, to issue all of the Bridge Warrants he was entitled to receive to himself and to redistribute many tens of thousands of Employee Stock Options that he was also entitled to receive to the aforementioned others, obviously a decision he would not have undertaken had he believed that he was retaining an inferior class of security.

84.    Plaintiffs Reichmann and Hexagram notified ImageSat's then-CEO, Defendant Menashe Broder, that the term of the bridge warrants had been set in error at five years and requested correction of the error in late 2003.  Broder reported that he would have to take the matter up with other investors but stated that since IAI and Elbit also held a substantial number of bridge warrants he anticipated that an accommodation would be reached among the three largest shareholders.  He further suggested that IAI and Elbit would probably be inclined to work something out with Reichmann and that Hexagram could "coat-tail" on any such arrangement. In 2004, these Plaintiffs sent a letter directly to the Company requesting the desired correction. ImageSat's CFO, Hagai Goren, contacted Wilson for guidance since at the time of the bridge financing Wilson had been responsible for representing the Company in connection with all its financing activities.  However, when Wilson informed the Company that Hexagram's request conformed to representations made by the Company at the time of the Hexagram and other bridge investments and that the requested correction should be made on behalf of all the bridge warrant holders, ImageSat ultimately refused to correct the term of their warrants.  The final decision of the ImageSat Board that the term of the warrants would not be corrected was not taken by the Company or communicated to Wilson or the other bridge warrant holders among the Plaintiffs until after the purported expiration date of the warrants.  As a result, the warrants expired in late 2004 and 2005, "out of the money" and the bridge warrant holders were

wrongfully deprived of their right to convert the warrants into ImageSat common stock between that time and their rightful expiration in 2009 or 2010.

85.    The Board's decision to negate the Company's prior commitment to the bridge lenders was made for reasons other than those offered by the Company in its eventual explanation. That Defendants IAI and Elbit participated proportionately to their shareholdings in the bridge financing (and therefore held roughly half of all the bridge warrants) was used to support the fairness of the decision to deprive the minority holders of their rights.

86.    The ImageSat Board of Directors as of 2004 consisted of Defendants Keret (chairman), Weiss, and Eckhaus (all IAI designees), Menashe Broder (then CEO of ImageSat and former senior executive of IAI), Joseph Ackerman (the Elbit designee), and James DePalma (the CST designee), as well as Zeev Nahmoni (former Vice President and General Manager of IAI's Electronics Group) and the WIS Partners designee.

87.    The documentation and issuance of the misdated and/or mispriced bridge warrants and options had numerous contacts with the County, City, and State of New York. In the cases of each of the Wilson, Talansky, Moshel, Reichmann, and Hexagram (including Polybutes) bridge investments were solicited and/or transactions were concluded that resulted in the issuance and/or amendment of the bridge warrant agreements in New York City. All option documents issued in connection with the closing were drafted and signed in New York.

**C.    The July 2001 Transactions and the 2001 EROS B Satellite Fraud**

88.    Soon after the July 2000 transactions were completed, ImageSat's new management, led by Weiss, was already working to structure a bank credit facility for the purpose of financing new "satellites." ImageSat's CFO, Ori Ben Amotz, in his July 27, 2001 mailing to Shareholders to announce the closing of transactions that month, confirmed that:

In the last six months, since the Board of Directors meeting in Cyprus on January 22nd, the management team has been working on completing the transaction of purchasing the next two Satellites and securing the funding for this transaction. We brought the company's proposal to the BOD on May 11th in New York, where it was approved in principle, and we brought the finalized deal to the BOD on July 12th, 2001. The transaction the Board approved and that the company signed on July 25 is reflected in the Bank Credit Agreement with Bank Leumi Le-Israel Ltd for $70m, the Note Exchange Agreement with Pegasus and the Purchase Agreement with IAI for the B1 & B2 satellites. As part of the Bank Credit Agreement, the bank had demanded a Shareholder Guarantee of 10% of the loan (i.e. up to $7m) to secure the loan in case of default. IAI and ElOp had agreed to the bank terms and to stand up to that commitment up to that full amount in the event that no other shareholder would accept the terms.

89.    A Second Amended and Restated EROS B Satellites Supply Contract (the "2001 EROS B SSC"), a Note Exchange and Governance ("NEG") Agreement between ImageSat and Pegasus, and a Bank Credit Agreement between ImageSat and Bank Leumi, all closed in late July 2001. Key terms of these transactions were not disclosed to Plaintiffs or, upon information and belief, to many other shareholders at the time or for years afterwards.

90.    In 2000-2001, Wilson wrote a series of memoranda to the attention of ImageSat shareholders related to IAI's failure to resolve the technical problems with its "hardware DAS" (the system IAI had coerced ImageSat into buying to descramble the EROS A bit stream) as well as IAI's continuing and purposeful refusal to deliver the bit stream specifications as it was obliged to do. Weiss improperly threatened Wilson, orally and in writing, informing him that his attempts to communicate with the Company's shareholders were viewed by the Company as damaging and as a breach of Wilson's fiduciary duties to the Company under his consulting contract. Wilson defended his right as a shareholder to discuss all matters associated with the Company's well-being with other shareholders and asserted that right by continuing to keep other shareholders informed of problems he perceived.

91.     In December 2000, ImageSat successfully launched its first satellite, EROS A. The Company's technical management then turned its attention to the manufacture of a next-generation satellite, known as EROS B, planned and already twice contracted with IAI and ElOp to build as of 2000. The deployment of an enhanced higher resolution satellite was contemplated in all three of the Company's existing SOP agreements and a requirement under the terms of two of them, so that the customers were entitled to terminate their SOP agreements if ImageSat failed to deploy such a satellite.

92.     ImageSat contracted with IAI (and its sub-contractor ElOp) to purchase its second satellite, referred to here as the 2000 EROS B satellite, contemporaneous with the NPA in July 2000. The agreed-to purchase price was $82 million. Of this amount, $11 million was to be financed by the satellite vendors (as is customary in the industry) and evidenced through the issuance by the Company of Series A Preferred Shares, the "Vendor Equity". However, in early 2001, it became apparent to IAI and ElOp that their 2000 EROS B satellite design as defined in the satellite contract was flawed. The design did not and would not meet ImageSat's mission requirements as were also specified in the satellite contract. Weiss eventually agreed with the then IAI/MBT Division General Manager, Defendant Nissan, and ElOp CEO, Defendant Toren (all ImageSat Directors at the time), to redesign and procure a substantially more expensive EROS B satellite than had previously been planned and agreed to.

93.     The renegotiation of a new EROS B design and contract was conducted by these individuals, all of whom had loyalties to IAI and/or ElOp that were in conflict from, and which they allowed to be superior to, their loyalty to ImageSat and its shareholders. Moreover, the requirement that the new 2001 EROS B contract would automatically be awarded to ImageSat's exclusive satellite supplier IAI and its principal sub-contractor ElOp (under the terms of the

aforementioned Master Agreement of July 2000) resulted in a contract with considerably less favorable terms and conditions for the Company, including a substantial increase in the cost. The price of the 2001 EROS B satellite increased from $82 million to $101 million (including $21 million of vendor financing in the form of debt, the "Convertible Vendor Notes") bearing interest at 9%, and convertible to Series A Preferred Shares of the Company solely at the discretion of the manufacturers). The down payment was increased from $17 million to $23.5 (of which $15.5 million was paid in cash, and $8 million paid with the 9% convertible vendor notes).

94.     In any event, the new 2001 EROS B contract was a sham designed to allow the Defendants to squeeze more money out of the Company at the expenses of the minority shareholders. The original IAI/ElOp 2000 EROS B design flaw would ostensibly delay the delivery of an EROS B class satellite by at least one year due entirely to the faulty design of the manufacturers. Despite the damage to ImageSat, directly attributable to IAI and ElOp, and the corresponding and obvious increase in the value of the Company attributable to the successful launch of the EROS A satellite in December 2000 and the commencement of revenue generating services under the three existing SOP contracts thereafter, the conversion price of the Convertible Vendor Notes issued to IAI and ElOp was unaccountably set by ImageSat's CEO Weiss at the July 2000 Pegasus conversion price of $23.27 per share.

95.     Bank Leumi required that the new 2001 EROS B SSC be executed as a condition precedent to the closing of the Bank Credit Agreement and the corresponding funding of the Convertible Note redemption under the Note Exchange and Governance (NEG) Agreement. However, less than one month before the closing, it was discovered that the **new** satellite design by IAI and ElOp, like the design of the original 2000 EROS B satellite before it, was also

seriously flawed. Plaintiffs Bar-Lev and Rosenbaum, who were then leading the technical contract negotiations on behalf of the Company, insisted that the manufacturers address the technical problems before proceeding with the satellite procurement negotiations. However, to ensure that the satellite procurement and the NEG and Bank Credit closing proceeded, Defendant Weiss dismissed them from the negotiating team.

96.     This highly material development was not shared with the minority designees to ImageSat's Board, with other important parties to the closing (including Bank Leumi), and certainly not with the minority shareholders. Instead, senior executives and directors of ImageSat, IAI, and ElOp, including Defendants Weiss, Nissan, Eldar, Toren, Federman and Keret, agreed not to disclose the serious design flaws in the new 2001 EROS B satellite and instead agreed to proceed with both the note redemption and the satellite purchase order.

97.     In or about July 2001, ImageSat's CEO Weiss and its CFO, Ori Ben-Amotz, IAI's then-CEO and ImageSat Chairman Keret, IAI/MBT Division General Manager Nissan, and its controller, Shuki Eldar, and ElOp's owner Federman and its CEO, Jacob Toren, agreed to delete all the technical specifications (Exhibit C "System Specifications") from the 2001 EROS B Satellites Supply Contract ("SSC"). They did so because otherwise IAI faced the Hobson's choice of including specifications reflecting the critical design flaws together with ImageSat's mission requirements that it knew the satellite, as specified, would never meet. (A copy of the relevant excerpt of the Second Amended and Restated EROS B Satellites Supply Contract – including the contract's "Exhibit C", which was supposed to contain the "EROS B System Specifications" but instead is **"Intentionally Omitted"** (emphasis in original) – is annexed hereto as Exhibit "C".)

98.    To conceal the design flaws' existence, the explanation was contrived that the Company had asked for a delay in beginning the manufacturing process so that ImageSat could consider possible design modifications.    This was a knowing and willful falsehood used to deceive and defraud Plaintiffs and numerous other persons, including Bank Leumi.

99.    At the Company's Board of Directors meeting held on July 12, 2001, where Weiss presented the various July 2001 transactions for Board approval (including the Satellites Supply Contract complete with **both** IAI/Elbit's "System Specifications" and ImageSat's "Mission Requirements"); the WIS Partners-designated director objected to the significantly higher price of the "new" 2001 EROS B SSC and questioned the Company's decision not to seek competitive proposals.    Weiss explained to WIS Partners and others including observers from among the minority shareholders, for the first time, that the Company had appointed IAI as its exclusive satellite supplier for its first six satellites (pursuant to the aforementioned "Master Agreement") and that it, therefore, did not have the latitude to seek alternative proposals.    Weiss justified the exclusivity arrangement by explaining that this was due to a newly imposed requirement that IAI commit to fixed pricing on the future EROS satellites.    In return, IAI and ElOp had insisted on the new exclusivity provisions reflected in the Master Agreement of July 2000.    In fact, the Company had secured such future pricing caps from IAI prior to the execution of the Master Agreement and the stated justification was a willful deception.    Moreover, despite the future pricing caps, Weiss had just negotiated a new EROS B contract 25% more expensive that the EROS B contract agreed to in July 2000, concurrent with the execution of the Master Agreement.    Weiss willfully neglected to point out to the minority designees that the Company's obligation to purchase satellites exclusively from IAI was predicated on IAI's ability to meet the Company mission requirements, which the 2000 EROS B satellite design the Company

contracted for was known to be incapable of achieving well before the new contract negotiations commenced.

100.    After pocketing its $15.5 million cash down payment (and beginning to accrue an additional $60,000 per month on the Convertible Vendor Notes), IAI agreed to hold off on beginning to manufacture the satellite while ImageSat purportedly reconsidered its mission requirements and desired specifications.  In reality, ImageSat, under IAI's and ElOp's control, was not reconsidering anything.  It was IAI and ElOp that were studying whether and how the design flaws could be overcome.  Contemporaneously, ImageSat's CEO Weiss, its Chairman Keret, MBT General Manager Nissan, and ElOp's CEO Toren all continued to advance the interests of IAI and Elbit over the interests of the Company by insisting that ImageSat relax the mission requirements and performance expectations for the EROS B satellite and that ImageSat accept specifications developed by the IMOD in connection with the manufacture of Ofeq 5, a design the Company had initially rejected in 1998.  Weiss and Toren even tried to extort cooperation from the Company's then senior technical management, Plaintiffs Bar-Lev and Rosenbaum, who declined to cooperate both before and after the closing of the severely flawed, and ultimately financially disastrous, 2001 EROS B SSC.  Such refusal is documented, among other places, in a letter from Plaintiff Rosenbaum to Defendant Weiss dated July 23, 2001, just days before the multiple related closings.  (A copy of Rosenbaum's July 23, 2001 letter is annexed hereto as Exhibit "D".)

101.    Over the following fifteen months, ImageSat reported repeatedly to its shareholders (through the monthly Investor Reports initiated by Defendant Menashe Broder (a former IAI executive who took over as CEO from Weiss on January 1, 2002) that the 2001 EROS B satellite was on schedule for launch in late 2003.  However, in the October 2002

Investor Report, ImageSat reported to some of its shareholders (Wilson and several other minority shareholders were unaccountably deleted from the distribution list that month and thereafter) that:

> [t]he delay in payment [by Angola] has impacted [ImageSat's] ability to draw on the Bank Credit facility and to pay for the B1 project. Since [the Company] ha[d] not been able to pay, IAI had issued [ImageSat] a formal letter regarding work stoppage on the B1.

It bears emphasis that the SOP contract with Angola was not signed until a year or more after the Bank Credit Agreement was closed and that the Company's ability to use the credit facility would be inhibited by a payment delay on a contract signed one year thereafter is either not credible or is an illustration of the unacceptably restrictive and risky circumstances under which the Company and its Board of Directors undertook to abandon convertible equity financing in favor of bank debt to finance the Company's operations including capital acquisitions that were essential to maintain its sole sources of revenue. Despite this initial report of a possible work stoppage by MBT, the Company asserted that work on the 2001 EROS B had proceeded in October, according to the Investor Report. The Company stated that it remained confident – in fact "certain", according to Broder – that the delayed Angola down payment would be received. In November and December 2002, it was reported that "IAI/MBT has announced a Work Stoppage" but that critical work continued to be performed. In January 2003 the Investor Reports stated merely that "MBT is under a Work Stoppage". In February 2003, Broder triumphantly announced that the first payment, under a new payment schedule, was received from Angola. However, no mention whatsoever is made of the 2001 EROS B project, the MBT work stoppage that was allegedly due to Angola's delayed payments, or the implications of either a continued stoppage or resumption of the EROS B project in the context of ImageSat's contractual commitments to its SOP customers. The disclosure to the minority shareholders

including Plaintiffs of the EROS B work stoppage by MBT and its relationship to Angola's late payment was a willful falsehood and a continuation of the deception perpetrated by Defendants through the premature and fraudulent execution of the 2001 EROS B SSC nearly two years before and the willfully false monthly Investor Reports that the satellite was "on schedule" thereafter.

102.    Rumors concerning the satellite's condition and anticipated delivery date were varied during the following year.  It is unclear whether the Company generated the by then routine monthly Investor Reports between March 2003 and May 2004.  If so, Wilson and other Plaintiffs remained off the distribution list. Despite the foregoing, throughout 2003 the minority shareholders were falsely led to believe that a functional EROS B satellite was being manufactured.

103.    Upon information and belief, however, the 2001 EROS B satellite that was to have been manufactured by IAI and ElOp/Elbit was defective by design to their actual knowledge and that IAI and ElOp never performed **any** substantial work on the manufacture of such satellite despite collecting or billing over $60 million under the contract.  Assertions of manufacturing delays due to nonpayment by Angola, and therefore by ImageSat to IAI and ElOp, were merely a façade and a willful deception to which IAI and ElOp and their managers and surrogates among ImageSat's management were all parties.  In May 2004, the Company distributed an Investor Report, through which Broder informed shareholders that the (IAI/Elbit controlled) Board of Directors of ImageSat had approved the purchase of EROS B and authorized the Finance Committee to oversee contract signature by the Company with IAI.  Wilson and other Plaintiffs remained off the distribution list.   No mention was made of the distinction between the 2001 EROS B and what was in fact a **new** satellite (the "2004 EROS B"

satellite), which would turn out to be based on a satellite design that still did not meet ImageSat's mission requirements of 2000 or 2001 and that was, in fact, the same IMOD Ofeq design originally rejected by the Company in 1998. The minority shareholders were merely informed in the report that the satellite was now scheduled for delivery by IAI in 19 months, and that it would be launched in the first quarter of 2006. This was a willfully misleading characterization, implying that the project referred to was a continuation of the prior 2001 EROS B. In fact, it is not possible for IAI and Elbit to manufacture an EROS B class satellite in 19 months. In reality, the 2004 EROS B was not a satellite that was remotely similar in its performance characteristics to any of the "EROS B" satellites specified and ordered by ImageSat in 1998, 2000, or 2001. Indeed, as ImageSat's minority and financial shareholders would learn only many months later, the 2001 EROS B was renamed "EROS C", and EROS B became the IMOD specified Ofeq 5 class satellite that by then the IMOD urgently needed a replacement for.

104. No mention was made in the May 2004 or subsequent Investor Reports of the possible impact of a 2006 EROS B launch on the Company's SOP contracts. Instead the Company repeatedly reports only that "**EROS B is on schedule**" (emphasis added), until in the monthly Investor Report distributed to Shareholders on August 27, 2004 Broder concludes the CEO's report, as if it is a minor detail mentioned only in passing, with the following statement.

> In accordance with our SOP Agreements with SOP 2 [Taiwan] and 3 [India], the Company committed to undertake the launch of additional satellites. These satellites were not launched and both customers have, under certain conditions, the right to terminate their SOP Contracts with us. We have been in discussions with them for the past eight months to avert this possibility. We are making considerable progress with SOP 3 and I hope to travel with Noam Zafrir, our Vice President of Marketing to SOP 3 in order to finalize the Settlement Agreement. As to SOP 2, there has been a recent change in Government and they have launched their own electro-optical satellite known as "ROCSAT". The Government is currently evaluating its future needs for satellite imagery. I anticipate that we will have more information as to their plans in mid-September.

45

In fact, the Company had received notice in August, before the foregoing report was disseminated, that Taiwan intended to terminate its SOP contract due to ImageSat's failure to launch an EROS B class satellite by September 2004 as specified in the SOPTRC, and Taiwan did so terminate effective September 16, 2004.    The Company announced the contract termination in its September 2004 Investor Report.

105.    Upon information and belief, IAI and Elbit billed, and the Company booked, more than $60 million in the manufacture of the 2001 EROS B satellite (subsequently and deceptively renamed "EROS C") between 2001 and 2004.    However, in the Investor Report of March 2005, the Company reported that IAI had agreed to rescind $31.2 million in invoices previously sent to ImageSat in connection with the manufacture of the EROS C satellite.    This is reportedly to occur in connection with an Amendment to the EROS C purchase contract and a revaluation of the asset ordered by the Company's auditors that would be booked retroactively to Q3 2004.    ImageSat also appears to have paid a $4 million penalty for suspending the manufacturing of the 2001 EROS B/C satellite.

106.    ImageSat received nothing of value for this major investment, neither credit for payments made nor title to or credit for the value of the "Work in Progress", as ImageSat was entitled to receive under the Master Agreement of 2000.    In fact, after appointing two new IAI designees to the Board on May 19, 2006, the IAI/Elbit dominated Board voted at its board meeting in New York on May 30, 2006 to write off the entire revalued and remaining 2001 EROS B (renamed EROS C) investment in excess of $33 million without any recourse to ImageSat.

107.    The pervasive deception surrounding the fraudulent 2001 EROS B satellite procurement extended from the date of contract signature in July 2001 right up to and including

the day on which the Company's board voted to write off the entire investment in the 2001

EROS B/C project..  At the finance committee meeting that preceded the meeting of the full

Board on May 30, 2006, the Company's controller reported that the decision to declare the asset

"impaired" was based on the willfully false premise that a new and beneficial strategic alliance

with the IMOD was incompatible with the continued investment and eventual deployment by the

Company of the "EROS C" satellite.  The not-yet-obvious, but profoundly important, implication

of this statement was that the Company planned to launch another satellite instead of EROS C

that would be more compatible with the IMOD's requirements (e.g., an Israeli military satellite).

It was further reported by the Controller that the Company may be subject to an additional $4

million charge by IAI for termination of the contract, however, Eckhaus reported to the

Committee, board members and observers present (including a representative of the Company's

auditors Ernst and Young) that IAI had made a "verbal offer" to waive the $4 million cash

penalty if the Company would agree not to exercise its audit rights in connection with the 2001

EROS B/C satellite project.

108.    Upon information and belief, the Company and the members of its Board of

Directors and senior management have taken absolutely no steps to recoup any or all of the sums

spent on the 2001 EROS B/C satellite, through either negotiations or litigation, with any of the

entities or persons responsible for the fiasco.  Instead, the ultimate result of the satellite fraud

were sustained financial difficulties that, as set forth in detail below, have damaged and at times

threatened to destroy altogether the value of the Company and of Plaintiffs' interests in it.

109.    In addition to the money that ImageSat wasted on building an ultimately non-

existent satellite, at least equally damaging was ImageSat's resulting inability to obtain delivery

of a second satellite.  The deployment of an enhanced EROS B satellite was necessary to fulfill

the requirements of the Company's existing customers and to meet the Company's contractual obligations to them. The SOP contracts were ImageSat's principal source of revenue and the sustained failure of IAI and Elbit to deliver an EROS B class satellite to the Company severely inhibited its ability to secure new SOP contracts, and to remain credible and competitive in the marketplace. Indeed after the SOP contract sale to Angola (SOP 4) in July 2002, led by Plaintiffs Rosenbaum and Yifrah, the Company never succeeded in closing a single additional SOP contract prior to the eventual launch of the 2004 EROS B satellite on April 25, 2006.

110.    The Company and its customers relied for several years on IAI and ElOp to deliver a higher resolution, more capable "EROS B" class satellite that they knew was essential to ImageSat's business plan and competitiveness. The willful falsehoods concerning, and failure to disclose the facts surrounding, the 2001 EROS B satellite contract and manufacture, continuously from 2001 to date, have damaged the Company's credibility and corresponding sales performance, its overall valuation, and the interests of the minority and financial shareholders by hundreds of millions of dollars.

111.    Throughout this period, the directors of ImageSat included Defendants Keret, Weiss, Nissan, Eldar, Toren, Federman, Broder, Ackerman, Gaspar, Eckhaus, Piperno-Beer, Chelouche, Arzi and DePalma. The members of ImageSat's senior management responsible for the willful damage to the minority shareholders' interests in connection with the satellite fraud have included Defendants Keret (Chairman of the Board 2000-2005), Weiss (CEO 2000-2001), Broder (CEO 2002-2005), and Eckhaus (CEO 2005-present), all of whom were former senior executives of IAI.

112.    Defendants' fraudulent conduct with respect to the 2001 EROS B (subsequently renamed EROS C) satellite design and manufacture and their concealment of their wrongful

activities from Plaintiffs and others had numerous contacts with the County, City, and State of New York, including (i) the fundamental transaction that created the closing deadline was the Note Exchange and Governance Agreement that was originated and negotiated in New York by Defendant Weiss, (ii) the Company's Board of Directors and Audit/Finance Committee meetings have been held in New York more often than in any other location, including in particular the meetings relevant to the 2004 revaluation of the asset, and the 2005 and 2006 asset impairment and write off decisions, and (iii) the Company's independent auditor, Ernst & Young, through its New York affiliate prepared the Company's financial information including its financial statements and numerous restatements of information relating to the 2001 EROS B/C satellite procurement and its ultimate impairment and write-off.

**D.**    **Destruction of ImageSat's International Profile and Spurning of SOP Opportunities**

113.    From the outset of the Company's planning and operations, ImageSat's robust international character was central to its business plan, to the regulatory environment created over four years of negotiation with the IMOD, and to its novel and unique SOP Program concept that was its principal source of revenue.  The fundamental importance of the Company's multi-national profile to the successful execution of its business plan was emphasized in all solicitations to investors including Plaintiffs.  ImageSat's extensive global presence that by 2000 included formal associations with the leading remote sensing entities in Canada, Argentina, Australia, Singapore, Taiwan, Japan, Korea, Russia, India, South Africa, Italy, and Sweden and the corresponding good will throughout the "commercial" remote sensing community worldwide was one of the Company's most notable early achievements, a major competitive advantage, and among its most valuable assets.

114.    During the brief 18-month tenure of Defendant Weiss, the first of three senior IAI executives to serve consecutively as CEO of ImageSat, IAI and Elbit abandoned their commitment to maintain ImageSat's international profile, or perhaps more accurately, they abandoned the façade of support for it.  Many of the Company's operations outside of Israel were abruptly terminated, as were virtually all non-Israeli personnel, and the Company commenced a substantial unwinding of its affiliated international ground operations and infrastructure.  The Company's European and Connecticut offices were closed during Weiss's tenure.  The Cyprus Headquarters Office and its global electronic imagery sales and non-SOP service business, which was the electronic central nervous system of the Company's affiliated ground receiving stations and regional imagery archives, was closed during Broder's tenure just one year later.

115.    As Defendants knew or should have known, the Company's international character was an essential part of its operating plans from both a marketing and a regulatory perspective.  Defendants knew that the calculated abandonment of this plan would severely damage the Company's ability to achieve its projected business goals, which in fact it did as reflected in the Company's poor SOP sales performance thereafter.  The decision in 2002 by Broder and the Board of ImageSat to close its Cyprus headquarters office and global electronic distributed electronic archive and imagery distribution business served no valid business purpose for ImageSat or its shareholders.  To the contrary, the decision to deemphasize the entire Acquisition, Archiving and Distribution or "AAD" elements of the Company's combined SOP/AAD business plan was primarily taken for the purpose of concealing IAI's inability to stabilize and deliver the hardware DAS component of the ground reception segment.