116.    CST ultimately resolved this technical problem for the Company by reverse-engineering the EROS A bit-stream (specifications previously committed but denied to the Company by IAI) from data recorded during a maintenance visit to ImageSat's AAD station in Japan.  The resolution of the problem (which had cost the Company millions of dollars in wasted payments to IAI/MBT and inestimable losses of wasted satellite time, good will and credibility) was demonstrated in software by CST within 30 days of recording the raw data bit stream in Hiroshima.  Although the controlling parties continued to resist the obvious solution for nearly one year thereafter (in one instance by distributing a misleading Request For Proposal ("RFP") containing willfully false and inaccurate specifications), ImageSat eventually did award contracts to CST to provide a Software DAS (renamed "DAPS") to avoid losing its SOP customers, but only after CST proved that the specifications distributed to prospective bidders through the Company's RFP were false.

117.    The inherently global nature of the Company's business, including in particular the location of its headquarters, Cyprus, was also the subject of extensive tax planning.  The Company has been notified recently that it is retroactively subject to Israeli VAT taxes, creating financial exposure of as much as $40 million for which an exemption had previously been granted.

118.    ImageSat's international AAD ground receiving station operators and distributors were in most cases the established space and remote sensing programs of the local military or civilian intelligence agencies in those countries.  They were established explicitly to serve as vehicles through which governments dealt with and participated in the pioneering U.S. Landsat and French SPOT "commercial" satellite imaging programs.  As such these entities provided a crucial vehicle for direct interaction between ImageSat and its most knowledgeable

SOP contract prospects. In fact, each of the Company's first three SOP customers, including the IMOD, operated such quasi "commercial" satellite imaging ground stations in support of the aforementioned low-resolution "commercial" space imaging programs.

119.    The Company breached many of its contractual commitments to its AAD's based on decisions and directives of Weiss and his successor, Broder. Wilson and Rosenbaum emphasized the importance of the AAD program to future SOP sales and Defendants knew the Company's failure to meet its commitments to the AAD's could result in failures to obtain new SOP customers, and that financial losses to the Company of tens of millions of dollars in revenue annually could be anticipated.

120.    For example, the Company had entered into a strategic cross-distribution and AAD relationship with the exclusive licensee of the Russian Space Agency, "Sovinformsputnik," for the distribution of all Russian high-resolution military imagery. Like Taiwan (ImageSat's first AAD and subsequently its first SOP customer outside of Israel), Russia was expected to become one of ImageSat's SOP program participants. Defendants Weiss and Toren independently and intentionally decided that the Company would breach its commitments to Sovinformsputnik because a strategic relationship with Russia was perceived as a competitive threat to the conflicted interests of IAI and ElOp that sought to control all of ImageSat's satellite procurements.

121.    The Company also willfully failed to deliver under the terms of its AAD agreement with the Korea Advanced Institute of Science and Technology (KAIST) in South Korea, another of its prime SOP prospects. Although KAIST is a private university, the South Korean national space program was largely incubated by KAIST's Professor Choi, who also was formerly South Korea's Minister of Telecommunications. Choi was among the senior planners

and implementers of, as well as ImageSat's original intermediary with, the target SOP entity (the Korean Remote Sensing Center or "KRSC") in that country. In direct competition with ImageSat's highly promising SOP sales initiative in Korea, and in breach of their contractual non-compete obligations under the Master Agreement and SPA, both IAI and ElOp deceptively and aggressively pursued turn-key satellite and payload sales in Korea, and ElOp eventually did sell an electro optical payload launched in July 2006 aboard the Arirang II satellite in a transaction that violated its exclusivity commitment to ImageSat.

122.    IAI and Elbit, their leaders, and their surrogates at ImageSat have consistently failed to properly and professionally serve the Company's SOP customers and to exploit SOP contract opportunities that were at odds in any way with their individual agendas and, with increasing frequency, also those at odds with the national (including the financial) agenda of the State of Israel and the IMOD in particular.

123.    For example, One of ImageSat's major SOP customers was Taiwan (Republic of China). The Taiwan SOP contract represented revenue to the Company of at least $9 million annually. Under the contract, ImageSat was required to launch a second (EROS B class) satellite to provide service to Taiwan by September 15, 2004. When the Company failed to do so, as a direct consequence of the aforementioned fraudulent 2001 EROS B SSC and its subsequent sustained cover-up, Taiwan terminated its SOP contract. As a further consequence of its non-performance, ImageSat was forced to pay millions of dollars in penalties associated with IAI's and Elbit's delivery default and ImageSat's related performance default and resulting Taiwan contract termination. Even as Taiwan was negotiating the termination of its SOP contract with ImageSat, it indicated an interest in receiving, and the Company committed to provide, SOP

services in the event that ImageSat eventually succeeded in launching a higher resolution EROS B satellite.

124.    For the same reason, failure to timely deploy an EROS B class satellite, ImageSat was forced to accept a $250,000 quarterly discount under the payment terms of the Indian SOP contract.

125.    Eventually ImageSat was forced to order a third EROS B satellite from IAI (having placed unfulfilled EROS B orders in 2000 and 2001), despite IAI's preceding failure to deliver from 1998 to 2004 even a viable design that would satisfy the Company's mission requirements.  The 2004 EROS B satellite was based on the design of Ofeq 5, a design that Plaintiffs among the founding management of the Company had originally rejected in 1998.  The 2004 EROS B was delivered in early 2006 and placed into orbit on April 25, 2006.  Once EROS B became operational, Taiwan reiterated its interest in resuming SOP service from the new satellite.  The Company has failed thus far to exploit this business opportunity.  Instead, Eckhaus reported to the Board of Directors on May 30, 2006 that the resumption of service to Taiwan was facing difficulties within the IMOD.  More recently, the Company has been informed that its license to serve Taiwan will not be renewed, citing the national security interests of Israel as the regulatory justification for the illogical and highly improper license revocation.  It is obvious that Taiwan poses no threat to the "national security interests" of the State of Israel and therefore, consistent with the IMOD's written commitments and IAI's repeated representations to ImageSat's minority and financial shareholders, there is no legitimate basis for revocation of the license originally granted by the IMOD in 1998.  Instead the misappropriation of this valuable asset is but a reflection of the willful attempt to take over the Company and its assets with minimal or no compensation to the minority and financial shareholders.

126.    Upon information and belief, the failure of the ImageSat board and current management to pursue the Taiwan opportunity is at the instance of IAI, Elbit and the IMOD, is a direct reflection of their inappropriate redirection of the Company's business to serve their own conflicted interests and does not represent either a valid business decision or a valid implementation of the policy commitments made by IAI and the IMOD to ImageSat's minority shareholders including Plaintiffs.

127.    As another example of failure to pursue and exploit SOP opportunities, from the time ImageSat executed an SOP contract with Angola in mid-2002 until the contract was terminated in mid-2006, ImageSat never delivered a single day of autonomous SOP service to Angola and even failed to deliver to the Angolan authorities the permanent tasking and reception antenna. Both "full autonomous tasking" and the permanent antenna are program deliverables that normally require no more than 18 to 24 months to fulfill.

128.    The highly suspect circumstances surrounding the Company's non-performance of its obligations under this contract are yet another indication of the misuse and misdirection of the Company as a captive vehicle of IAI, Elbit, and their government sponsors. In effect Defendants have taken over the assets of ImageSat to serve their own corrupt financial interests and/or the financial and political interests of their IMOD sponsors, deliberately impairing the viability of the Company, and subordinating the legitimate financial interests of the minority shareholders, including Plaintiffs.

129.    Defendants further mismanaged the finances, and endangered the well-being, of the Company by paying or knowingly allowing the Company to make excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments or bribes to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola

and possibly elsewhere.    These payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments.    Not only were the Company's funds misappropriated to make these unlawful payments, but upon information and belief, such payments further jeopardized the Company's well-being by creating potential exposure for the Company under applicable corrupt practices legislation or otherwise.

130.    Throughout this period, the directors of ImageSat have included Defendants Keret, Weiss, Nissan, Eldar, Broder, Eckhaus, Toren, Federman, Ackerman, Gaspar, Piperno-Beer and DePalma.  The members of ImageSat's senior management responsible for the willful damage to the minority shareholders' interests have included Weiss, Keret, Broder and Eckhaus.

131.    The conduct described above had numerous contacts with the County, City, and State of New York through the Company's continued financing activities and in particular its efforts in 2003, 2004, and 2005 consecutively to effect an Initial Public Offering of its shares on the NASDAQ stock exchange, including the preparation in New York of its F1 registration filing with the Securities and Exchange Commission (SEC), which was in a near-constant state of preparation in New York throughout 2002, 2003, 2004, and 2005 and was eventually filed in October 2005, and to which all the Company's SOP sales activities, particularly those in Taiwan ("SOP 2") and Angola ("SOP 4"), were highly material.

E.    **ImageSat's Spurning of the SOP and Investment Opportunities in Venezuela**

132.    ImageSat's current Board members and management have continued to spurn lucrative SOP opportunities in order to devalue the Company.  In furtherance of that scheme, these Defendants have, among other things, sabotaged and recently flat-out rejected the opportunity to sell satellite imaging services to Venezuela.

56

133. During the past several years, one of ImageSat's most promising and attractive sales opportunities, as consistently represented by management through its monthly Investor Reports, has been to enter into an SOP contract with Venezuela, a highly solvent potential customer. The proposed SOP contract with Venezuela would yield annual revenue to the Company of $18 million or more.

134. On ImageSat's behalf Wilson, Rosenbaum, and Yifrah began exploratory discussions with the government of Venezuela in 1999. They also pursued discussions with Colombia as an appropriate regional alternative. Subsequent to the launch of EROS A in 2000, Wilson and Yifrah expended substantial effort toward obtaining an SOP contract with Venezuela, Yifrah as a continuing member of ImageSat's management, and Wilson pursuant to a consulting agreement with the Company. Wilson relocated to Caracas in late 2001 and spent virtually his full time attempting to exploit the opportunity from early 2001 to November of 2006. Unfortunately, throughout the same period, forces at IAI, and its surrogate senior managers within the Company, have manipulated ImageSat's SOP program, in one case to enhance the attractiveness of IAI's own sales initiatives in Venezuela, in other cases in direct competition with ImageSat's SOP program for limited budget allocations.

135. The Venezuelan government first budgeted funds for ImageSat's SOP program for 2002. However, ImageSat's effort to close the SOP contract at that time was sabotaged by IAI. IAI's senior international marketing and sales team, then headed by ImageSat's current CEO, Defendant Eckhaus, informed the Venezuelan Air Force that ImageSat's SOP proposal was withdrawn and that instead, the EROS satellite program had been "bundled" with a comprehensive and more expensive high-tech intelligence program proposed by IAI. Wilson was not informed of this "bundling concept", introduced to ImageSat's customer directly and

secretly by IAI, until he returned to Venezuela from an extended holiday break in early 2002. He was even encouraged by IAI's local sales office to delay his 2002 return to Caracas. He was never informed of the 2002 budget assignment to ImageSat's SOP program (despite the existence of a Strategic Joint Marketing Agreement between ImageSat and IAI) until it was confided to him by a Venezuelan Air Force General with whom Wilson worked closely throughout 2003 and 2004 at the Armed Forces headquarters base in Caracas, Fuerte Tiuna.

136.    As a direct result of Eckhaus's and other Defendants' misconduct, Venezuela reallocated the funds that had been budgeted to the SOP program and the Company may have lost the millions in dollars in revenue that could have been obtained from Venezuela every year from 2002 or 2003 to date.

137.    In 2003, ImageSat's efforts to obtain business from Venezuela were again sabotaged by IAI and IAI's senior management. The Venezuelan Air Force again formally requested a $77 million budget to purchase an EROS A SOP program. Without consulting Wilson, who was the Company's principal representative and program manager in Venezuela, IAI personnel again intervened and convinced the Air Force logistics commander to reduce the requested budget allocation for ImageSat from $77 million (the entire projected cost of a seven-year EROS A SOP program at that time) to just $6 million (i.e., the down payment only). Upon information and belief, IAI did so in order to make a greater portion of the Air Force's budget available for allocation to IAI programs (in particular, the anticipated upgrade of the Venezuelan F-16 and Mirage fleets) offered by IAI to the same customer instead of ImageSat's SOP program.

138.    ImageSat's ability to finalize a Venezuelan SOP was further jeopardized by the Company's failure to maintain in good order its contractor registration with the Venezuelan government as required by that government's procurement policies and regulations.

139.    The Venezuelan Army attempted to assign a budget to ImageSat's SOP program in April of 2005 but was unable to budget the funds and thus to commence the contract negotiation and closing process until the Company completed a newly implemented on-line registration process and submitted its audited 2004 financial information (always a requirement that preceded the implementation of the on-line system).    Although the registration was eventually completed in October 2005, as a direct result of ImageSat's inability to provide its 2004 audited financial statements timely, the Company missed the annual budget deadline (September) and lost the Army funding opportunity.

140.    In both 2005 and 2006, submission of at least some of the required documentation to the Venezuelan Registrar was delayed.    Upon information and belief, much of this delay during 2005 was a direct result of the restatement of the Company's incomprehensible and misleading financial information related to the 2001 EROS B/C satellite procurement that was required by ImageSat's auditors in preparation for the SEC Form F-1 filing.

141.    Upon information and belief, the 2006 delay in the preparation and delivery of the required financial information was at least partly deliberate and done with the deliberate intent of ensuring that ImageSat would not be in a position to take advantage of one of the Company's most promising and lucrative SOP opportunities since its founding.    Such deliberate delays were based on the separate financial interests of Defendants and upon impermissible political considerations rather than on the business and financial interests of ImageSat or its minority shareholders.

142.    As a direct result of the 2001 EROS B/C satellite write-off of more than $33 million, and the corresponding loss of capital reflected in the Company's 2005 financial statements, ImageSat once again became technically ineligible for contract award by the Venezuelan government because its 2005 audit reflected a negative net worth.

143.    Despite the fact that Wilson reported the related Venezuelan registration problem to management and the Board immediately upon receiving the 2005 financial statements in June 2006, and despite the existence of a viable plan the Company did nothing to mitigate the problem or the risk of loss.  ImageSat's management refused requests by Wilson to consult with him or with the Company's attorneys in Caracas regarding possible remedial measures that might be taken, including a specific recommendation of the Registrar (which Wilson also reported to ImageSat's management and the Board) to file quarterly updates to its financial information throughout 2006.  In fact, ImageSat's Board and management ignored Wilson's repeated requests, and Eckhaus eventually explicitly refused, to provide Q2 statements that would have reflected an improved capital position for ImageSat, and/or Q3 statements that would have completely mitigated the insolvency problem and restored the Company's contract eligibility.

144.    Throughout 2006, far from taking every possible step to ensure that the Company was in good standing in Venezuela, so as to maximize the chances of winning an SOP contract award, ImageSat's leadership sought either to delay or to destroy the opportunity altogether.  In doing so, ImageSat's Board and its senior management acted for the benefit of persons other than the shareholders of the Company and in a manner that was specifically and purposely detrimental to the Plaintiffs.

145.    On August 9, 2006, representatives of the Government of Venezuela concluded the preparation of a term sheet reflecting the offer of the President of Venezuela to enter into an SOP contract that would pay the Company $18 million per year (and totaling $115 million over the term of the contract) for imaging services from two satellites that were already in earth orbit and as to which the Company's overhead expenses are fixed.  In connection with and as a condition precedent to such proposed SOP contract, the Venezuelan government offered to purchase 20% to 30% of the Company through a "to be negotiated" investment of between $100-150 million.  He did so explicitly to negate claims made by some of his advisors, and based on information obtained through Venezuela's own international information channels, that ImageSat was no longer an apolitical commercial company but instead had become a front for IAI, the IMOD and their counterparts in the US defense establishment.

146.    After a lengthy internal review and approval process in Venezuela, on November 15, 2006, Wilson reported to ImageSat's CEO, Eckhaus, and the Board that the Term Sheet had been signed and he forwarded electronic copies of the executed document in Spanish, together with the certified English translation prepared in August by ImageSat's Caracas lawyers, both versions signed and sealed by the Ministry of Defense.  Between November 15 and November 28, no response whatsoever was forthcoming from ImageSat or its Board.  On November 29, Wilson received a message from the Company's technical operations officer regarding the shipment of the Venezuelan demonstration and database system from Caracas to Tel Aviv, a process previously ordered by Eckhaus but stalled in customs since August.  In light of the signature of the Term Sheet, Wilson again requested that the Company and the Board reconsider the decision to move the system, and also expressed surprise that no response had been forthcoming from the Company regarding the Venezuelan SOP and investment opportunity as

memorialized in the Term Sheet. Soon thereafter, Eckhaus e-mailed Wilson advising that the Board of Directors had decided at a Board meeting held in New York on November 22, 2006 not to pursue further activities in Venezuela and that Wilson was instructed to proceed with the shipping of the Company's equipment out of Venezuela immediately. (Copy of the e-mails between Wilson and Eckhaus from November 29 and December 4, 2006 are collectively annexed as Exhibit "E".)

147.    Upon information and belief, although a meeting of the ImageSat Board was held in New York, New York on November 22, 2006 – attended by, among others, Defendants Eckhaus, Arzi, Chelouche, Piperno-Beer, Gaspar, and DePalma – there was no substantive discussion of either the SOP opportunity with Venezuela or the investment proposal by the President of Venezuela to the Company at that meeting and certainly no formal resolution or action taken or recommended, and no action has been taken by the Company to inform the government of Venezuela of any such decision. Eckhaus's statement that the Board had made a business decision not to proceed with the Venezuela opportunity at the November 22, 2006 meeting was willfully false, as was his entire characterization to the board and board observers of the Venezuelan opportunity, including the President's investment proposal, and the implications of then recent actions by the US Department of State as they related to the validity of ImageSat's IMOD export license and its related right to sell SOP services to Venezuela. In doing so Eckhaus dutifully performed his principal role as surrogate spokesperson for the Israeli defense establishment.

148.    No legitimate business basis exists for management's or the Board's refusal to pursue the lucrative opportunities available in Venezuela and there were no legitimate policy or licensing barriers under the terms of the bilateral IMOD U.S. government remote sensing policy

agreement of 1998. The conduct of IAI's and Elbit's board designees is a reflection of a decision taken in late 2005 and early 2006 during Defendant Toren's tenure as Director General of the IMOD that the fundamental purpose of ImageSat is now and henceforth to serve the strategic defense and export interests of the IMOD, including the commercial interests of IAI and Elbit (that both now prefer to pursue the emerging turn-key earth-observation satellite and payload market), rather than the interests of all the Company's shareholders including Plaintiffs. Emblematic of this transformation are the recent public statements of IAI and the IMOD, who took full public credit for one of ImageSat's few recent successes, the launch of the 2004 EROS B satellite in April 2006. Supported by former IAI executive vice president and current ImageSat CEO, Defendant Eckhaus, these statements repeatedly characterize EROS B as an Israeli government satellite deployed primarily to spy on Iran, and secondarily to provide the IMOD with enhanced, even global, surveillance capabilities, rather than as a commercial satellite owned and operated by the Netherlands Antilles company ImageSat and available for independent, autonomous, and regionally exclusive use by multiple governmental customers through ImageSat's SOP agreements worldwide.

149.    Upon information and belief, in failing to take advantage of the Venezuelan opportunity, ImageSat and its Board of Directors were motivated by geopolitical and strategic concerns of the IMOD and senior IMOD personnel including specifically its then Director General, Defendant Toren. Rather than the legitimate commercial interests of Plaintiffs and similarly situated minority shareholders, Defendants were motivated by the deteriorating international relationship between the United States and Venezuela and Israel's desire to improve and maintain its historically good relations with the United States. This type of consideration, however, is not a valid basis for decision-making within ImageSat, which is an independent

commercial entity, duly licensed by the IMOD since 1998 to pursue an SOP contract with Venezuela, whose customer selection was explicitly not to have been subject to control by the United States Government, let alone the whim of the current or any other U.S. administration, nor of the IMOD or any other branch of either the U.S. or Israeli (or any other) government, except under explicitly defined conditions that are the subject of prior agreement between the United States and Israel and among the IMOD and ImageSat's shareholders, none of which narrow conditions are applicable in this case.

150.    During the period in which the Company has sabotaged and then flatly rejected the lucrative opportunities available in Venezuela, the members of its Board of Directors have included Defendants Arzi, Chelouche, Piperno-Beer, Gaspar, and DePalma, as well as the recent IAI designee Ilan Biran (former Director General of the IMOD, IAI board member, and briefly Chairman of the Board of ImageSat from May 2006 to August 2006 when he resigned). Defendant Eckhaus as a member of the Company's senior management and Defendant Toren in his most recent role of Director General of the IMOD from September 2005 to July 2006 were directly responsible for the willful unwinding of the real commercial business of ImageSat and the wrongful misappropriation of the Company and its assets by the Israeli defense establishment.

151.    Defendants' conduct as described above had numerous contacts with the County, City, and State of New York, such as the holding in New York of Board meetings (including but not limited to the November 22, 2006 meeting discussed above) and meetings between Wilson and directors and other shareholders of the Company, in addition to Wilson's unsuccessful efforts to meet with Defendant Eckhaus, all to discuss the investment proposal of the President of Venezuela with the Company's shareholders between July 2006 and November 2006.

**F.    ImageSat's Failed IPO and the 2006 Transactions**

152.    Beginning in 2002, ImageSat was engaged in virtually continuous preparations to conduct an IPO for the purpose of raising additional capital to finance satellite acquisitions, deployments and operations on behalf of its SOP clients.

153.    Delays in the down payment by Angola in late 2002, the situation surrounding the 2001 EROS B satellite procurement and manufacturing process, and the termination of the Taiwan SOP contract in September 2004 resulted in sequential postponements of the IPO by the Company or its investment bankers throughout the period but by early 2005 ImageSat had announced that it was prepared to proceed with the public equity offering.

154.    ImageSat invested substantial time and effort in the IPO in each year between 2002 and 2005 and millions of dollars, eventually resulting in the filing of a Form F-1 registration statement with the Securities and Exchange Commission in October 2005.

155.    The Company conducted preliminary price negotiations with its underwriter who represented the value of the Company to its board of directors at roughly $470 to $500 million in anticipation of an IPO in 2005.

156.    According to Defendant DePalma, the target IPO price per share was set at $56 (which would have valued Plaintiffs' collective interests at more than $38 million).

157.    The Company's investment bankers, knowing the crucial importance to the Company of completing and financing the launch of the 2004 EROS B, urged management and the board in late February 2005 to complete the Company's audit and file the F-1 on a timely basis in order to ensure that ImageSat could take advantage of a then-favorable IPO market.

158.    However, inconsistencies and possible irregularities in the prior reporting of the 2001 EROS B satellite procurement including its relationship to the 2004 EROS B and the then-

stalled EROS C manufacturing process, could not even be answered to the satisfaction of Ernst and Young's New York staff by the chief financial officer, Hagai Goren. Goren once confided to Wilson that he had been denied access to some of the records relating to the 2001 EROS B transaction and that he was warned by Weiss not to pursue the matter further. Defendant Weiss was then a member of ImageSat's Board of Directors, and receiving consulting fees from both ImageSat and IAI.

159.    The financial statements were not completed and approved until the end of August or September 2005, and the required Form F-1 filing with the Securities and Exchange Commission (SEC) was not made until October. Although already quite late in the year, the IPO proceeded through normal review and clearance of the F-1 by the SEC and the scheduling of "road show" presentations to potential buyers that were to begin on November 30, 2005.

160.    In mid-November 2005, however, the impending IPO was suddenly aborted. Until that point, the minority shareholders had been led to believe that the IPO would provide them with an exit opportunity to sell their interests in the Company by creating a public market in which they could, if they chose, sell their shares. The news of the IPO's suspension implied that the Company could not resume the process until it resolved whatever problem had arisen.

161.    A variety of differing explanations were provided as to why the IPO did not proceed. Wilson enquired, relevant to the announcement on or about 15 November 2005 that Moshe Keret, the then-Chairman of the Board of ImageSat (and chief executive officer of IAI) was the subject of a criminal investigation for corruption and bribery, and ImageSat's CEO, Defendant Shimon Eckhaus, acknowledged to Wilson that the IPO would be delayed as a direct result.

162.    Since the beginning of 2006, however, no further mention has been made of the Keret scandal and his subsequent resignation from ImageSat's Board and from IAI. Instead, the reason most often given for termination of the IPO has been that the Angola SOP customer was withholding payment of SOP service fees, apparently past due since August of 2005, and/or threatening to cancel its SOP contract. This explanation provided to the minority shareholders was false and misleading. The evidence that this explanation was false and misleading includes, but is not limited to, the following:

(a)    The Angolan government had in the past frequently delayed making payments under its contract with the Company but had always eventually paid its obligations;

(b)    The Company's chief financial officer, through the monthly Investor Report distributed to Shareholders on August 23, 2005, reported that the Company had received payment from Angola the day before, August 22,  in the amount of $13.5 million "...per the Customer's commitment...".

(c)    As of August 2005, Angola had paid more than $50 million to ImageSat under its SOP contract in a period of just over 3 years since the contract was executed in July 2002 – a sum nearly double what any of the Company's other SOP customers had paid during the same initial three-year period;

(d)    Angola had paid full SOP service fees despite ImageSat's failure by August 2005 (or at any point thereafter) to deliver full autonomous SOP service as it was obliged to do under the SOP contract;

(e)    Wilson was told by ImageSat's CFO Goren in December 2005 that the problem with Angola was "solvable, if not already solved," and independent sources acquainted with the Angolan customer/user entity confirmed this analysis;

(f)    Angola's performance under the SOP agreement was secured by collateralized assets and obligations, so that there was no real credit risk;

(g)    Angola's performance under the SOP agreement was covered by business contract insurance so that the Company did not face a material risk of loss;

(h)    The Company received assurances directly from its customer, the real Angolan user agency, up to late February 2006 that any contract issues would be amicably resolved;

(i)    Although Eckhaus had repeatedly been invited by the Angolan Minister of Finance to visit Angola to discuss and "amicably" resolve the matter of the possible late payments or contract modification Eckhaus intentionally delayed meeting with ImageSat's customer in order to heighten the perception of a financial crisis within the Company;

(j)    Eckhaus later explained to ImageSat's Board that he purposely delayed meeting with the Minister of Finance in order to increase the pressure on him, a willfully misleading explanation; in fact, the entire matter of the late payments was resolved and the full $15 million alleged past-due payment balance was received by the Company within one week of Eckhaus' meeting with the Minister, a meeting that Eckhaus admittedly and willfully delayed from November 2005 to May 2006. Not coincidentally, November 2005 to May 2006 was the entire period during which the Company (not its investment bankers as was subsequently and deceptively reported) first cancelled its IPO

initiative to avoid embarrassment to IAI over the Keret corruption investigation and to avoid drawing attention to its own deceptive characterization to the Company's investment banker (UBS) and the SEC of its own corrupt business arrangements in Angola;

(k)     Representatives of the Company falsely informed its investment banker that the Angolan government had insisted on keeping the terms and conditions of its SOP contract with the Company confidential, to the point that the Company's investment bankers had already negatively adjusted the Company's financial performance expectations to reflect the disclosure deficiency, which substantially diminished the value of the Company during prior IPO price negotiations, so that the Angola contract had already been substantially discounted by the financial community for purposes of the IPO.  Contrary to the foregoing representations, long-term SOP contracts were primarily designed as a financing vehicle and the Angola SOP contract provided that:

> Notwithstanding any termination of this Agreement, each of ImageSat and the Customer agrees to keep confidential and not to disclose to third-parties (except affiliates, meaning entitles controlling, controlled by or under common control with such party, provided such affiliates agree to the same obligation of confidentiality as applies to ImageSat and the Customer), any proprietary information obtained in connection with the performance by ImageSat or the Customer of their obligations under this Agreement, other than (i) as reasonably required in the performance of their obligations or the enforcement of their rights hereunder; or (ii) to ImageSat's and the Customer's legal counsel, accountants and actual or proposed successors in interest (provided such successors agree to the same obligation of confidentiality as applies to ImageSat and the Customer); or (iii) to the lenders providing and to prospective lenders contemplating providing Project Financing; or (iv) as required by law or legal process or in connection with filings made with the U.S. Securities and Exchange Commission and/or other relevant securities regulatory agencies; or (v) as consented in writing by ImageSat or the Customer, as applicable; or (vi) information that at the time of disclosure is in the public domain not as a result of actions by ImageSat or the Customer in violation of this Agreement.  Neither Party shall issue any public notice or any news

69

release concerning this Agreement or the transactions contemplated herein without the prior approval of the other Party, which approval shall include the right to approve the form, content and timing of any such release, and shall not be unreasonably withheld;

(l)    Angola's alleged non-payment occurred in August 2005 and February 2006, an initial request to renegotiate the SOP contract was made in September 2005, and the initial suggestion that the government might want to terminate or settle the SOP contract was received by the Company prior to IPO price negotiations and the scheduling by the underwriter of the IPO "road show";

(m)    Eckhaus reported to Wilson via telephone on November 5th that the target valuation was set and the IPO road show was scheduled for November 30, 2006, during a meeting between Eckhaus and representatives of UBS on November 4, 2005 in London.

(n)    According to Defendant DePalma, one of the Company's directors, the IPO was still on track until at least November 14, 2005, more than ten days after the ImageSat/UBS meeting in London on November 4. He subsequently reported that the first rumors of a postponement occurred on November 17, per his communication to the CST board of directors; and

(o)    Not only was it always anticipated within the Company that Angola would pay all or substantially all of its obligations under the SOP contract, but ultimately, Angola in fact satisfied its obligations to ImageSat in full, terminating its still unfulfilled SOP contract for convenience and paying, in addition to the $15 million paid in May, the full remaining face value of the contract ($71 million) in two lump-sum cash payments received by the Company prior to the end of August 2006.

163.    The genuine reasons for the Company's aborting of the IPO process included concerns that continuing the IPO process might reveal the Company's excessive, inappropriate,

and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere, which payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments, as well as an announcement that ImageSat's President, Defendant Keret, was under criminal investigation.

164.    Knowing that the IPO might fail as it had in prior years, Hagai Goren, the Company's chief financial officer, prepared a back-up plan to raise sufficient funds to launch and insure the 2004 EROS B through a rated bond offering organized in Israel. When the decision was taken to halt the IPO in mid-November 2005, the Defendants set into motion plans to completely restructure the senior debt and equity of the Company, subordinating the primarily U.S. and E.U.-based senior debt holders to Israeli bondholders and silencing virtually all of the knowledgeable minority opposition by wiping out the fully diluted holdings of the founding and other former management and employees of the Company. The 2006 transactions cemented complete control of the Company by IAI and Elbit and benefited them substantially to the extreme detriment of all other shareholders and positioned the Israeli defense establishment to misappropriate and redirect the space, launch and other assets of ImageSat once and for all.

165.    To effect these transactions, Defendants conspired to create the perception of a financial crisis within the Company that they conveniently attributed to "problems" with the Angolan SOP contract just as they had repeatedly done in the past by manipulating the perception of the Angolan business relationship through an Israeli-based "agency" relationship (LR/Ofek) with the government of Angola. In reality, the "problems" the Company was experiencing, i.e. its persistent undercapitalization and the general inability to adequately

capitalize the business (including ImageSat's third consecutive failure to organize and execute an initial public offering) were a direct reflection of the self-dealing, corruption, and ineptitude of the Defendants. The contrived crisis based on the alleged non-payment by Angola and/or a series of informal communications from the Angolan Minister of Finance were misrepresented to Pegasus to induce Pegasus to deliver a Notice of Default dated January 30, 2006 on its Senior Notes and PIK Notes based on a claim that a "material adverse event" involving ImageSat's SOP contract with Angola had occurred, so that repayment of the approximately $65 million in Senior Notes and accrued interest owed by the Company to Pegasus was immediately due and payable. The ultimate goal was to refinance and subordinate the full principal and interest due to the U.S. and E.U. institutional investors to the new Israeli bonds.

166.    By early 2006, ImageSat was finally ready to launch its second satellite, the 2004 EROS B. The benefits of the new satellite including contract opportunities to sell services from this enhanced, high-resolution satellite should have redounded to the benefit of all shareholders, including the Plaintiff minority shareholders, option holders, and warrant holders. This did not occur and instead, the Company engaged in a series of transactions whose key terms, implications, and rationale were never disclosed by ImageSat or any of the other Defendants to Wilson and the other Plaintiffs, despite repeated demands by Wilson and other minority shareholders for complete information regarding the nature of the proposed financing and related transactions and their impact upon the minority shareholders. The Company's own in-house counsel repeatedly requested and recommended that management respond to shareholder inquiries from Wilson and others to no avail. Instead, Wilson's requests for information were completely ignored until, less than two hours before the meeting in Curacao at which the transactions were to be submitted for approval for the second time, Goren e-mailed

Wilson indicating that he and Defendant Eckhaus would be available, roughly 15 minutes before the meeting was due to commence in Curacao, to discuss any questions Wilson might have. By that time, it was obviously far too late for Wilson to review any disclosure that might have been provided or to discuss matters with other affected shareholders. Additionally, Wilson's requests that shareholders who were unable to travel to Curacao for the various meetings be enabled to participate by telephone were denied.

167.    Just in advance of the series of events and board and shareholder meetings that approved the transactions and related actions, shareholders led by IAI and Elbit purportedly approved a resolution modifying the Company's Articles of Association in order to (i) eliminate preemptive rights for all classes of shares other than Preferred Series B shares, roughly half of which were held by IAI and Elbit; (ii) to purportedly waive any and all claims of conflict of interest involving the directors; and (iii) to appoint (on behalf of IAI) Defendant Gino Piperno-Beer to the Board of Directors.

168.    In proposing the resolution waiving any and all conflicts of interest among the directors, the directors failed to make a full and complete disclosure of the nature and extent of their conflicting interests, as required by applicable law (including Netherlands Antilles law), and such resolution is therefore invalid.

169.    Previously, it had been anticipated that ImageSat's Board of Directors in 2006 would include four IAI-designated directors (Keret as Chairman, Gennaro Clabatistto, Larry Schafran, and Piperno-Beer), one Elbit designee (Gaspar), one CST designee (DePalma), one WIS Partners designee (Heilpern), and at least two independent directors. However, the election of Board members had been quietly dropped from the agenda of the preceding annual ImageSat shareholders meeting on November 25, 2005. The minority shareholders were never informed

that Keret and the other directors had resigned. Rather a new resolution was distributed on February 20, 2006, in the Convocation and Notice of another Extraordinary General Meeting to be held on March 8 so as "[t]o ratify and confirm the appointment of Mr. James A. DePalma, Mr. Joseph Gaspar, Mr. Rahmi Rudolf Heilpern, and Mr. Gino Piperno-Beer as the sole members of the Board of Directors of the Company, and to dismiss each and every other person not listed herein as a member of the [Board], effective immediately."

170.    In connection with the transactions implemented in March 2006, ImageSat obtained a "fairness opinion" that was prepared and presented to the Board of Directors on February 10, 2006 by Morgan Joseph Co., Inc. ("Morgan Joseph"), a third-party investment bank headquartered in the United States, which opined that the transactions were fair to the shareholders of the Company. However, the Morgan Joseph fairness opinion was – as at least three of the four members of the ImageSat Board knew and as IAI and Elbit and their surrogates among ImageSat's management well knew – founded on fundamentally false and flawed disclosures by ImageSat, which unavoidably resulted in flawed assumptions upon which the opinion was predicated.

171.    The fraudulently misleading information that Defendants provided to Morgan Joseph, and which Morgan Joseph relied upon thereby vitiating the value of the fairness opinion, included but was not limited to the following:

(a)    Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that the Company's investment banker UBS had cancelled the IPO and that during December 2005 and January 2006, "[s]ignificant efforts to raise funds (including IPO, bank financing, private equity investment) have been unsuccessful," although after the postponement of the IPO in November 2005 **by the Company** in consultation with

Defendants IAI and Elbit, ImageSat had made no serious effort to raise funds through attempting to revive the IPO or by seeking bank financing, private equity investment, or through any other vehicle other than the bond financing that Goren had been pursuing as a back-up financing plan prior to suspension of the IPO, including in particular a shareholder rights offering as the Company was obliged to do;

(b)    Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that bank financing would be unavailable to the Company, even though bank financing would have been readily available, particularly given that IAI, an Israeli-government-owned corporation, later demonstrated that it was available to guarantee the debt financing that the Company required;

(c)    Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that the Company would likely lose its SOP contract with India were it to delay the 2004 EROS B launch, but in fact, an EROS B launch had already been delayed for more than two years owing to the fraudulent and willfully negligent acts of the Defendants themselves;

(d)    Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that the Company would likely lose the SOP contract with Israel were it to delay the 2004 EROS B launch, but in fact, having failed to launch its Ofeq 6 surveillance satellite in September 2004, the IMOD had only one satellite (Ofeq 5) in space and that satellite was rapidly reaching the end of its anticipated lifespan (which is shorter than that of EROS satellites due to its retrograde launch trajectory and related higher fuel consumption). The IMOD has successfully launched only two satellites out of seven attempts since 1990. It has depended on EROS A during periods when it had no

capability in space of its own and would most **certainly** have continued to do so, with or without EROS B.

(e)    Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that "EROS B needs to be launched by April 30th" because on that date "the Russian rocket scheduled to launch EROS B into space" would become "stale and therefore very difficult to insure." In addition to the generally spurious and technically unsupportable nature of the foregoing claim, the Company previously reported in the July 2004 Investor Report that the launch window negotiated with the launch service provider was from January 1 to June 30, 2006.  It was further suggested that only a narrow temporal window existed for the Company to realize the "substantial new business" opportunities associated with the launch of EROS B.  In general, the urgency of the launch and the damage to the Company from a short delay that would result from seeking far more advantageous transaction terms or the now obviously attainable resolution of the Angolan payment and contract issues, which brought $86 million in cash to the Company within the ensuing few months, were grossly overstated.

172.    In connection with the March 2006 transactions, Defendants ignored persistent written inquiries from Wilson regarding other aspects of the financing and the related transactions.  For example IAI, Elbit, and ImageSat management agreed not to transfer title of the 2004 EROS B satellite to the Company at the time of its delivery and launch. Another feature of the agreements could trigger IAI's assumption of the operational control of the EROS satellites.  Wilson reported to management and the Board that both of these provisions would have a detrimental impact on, if not absolutely prevent, the Company's ability to close the SOP

contract in Venezuela.    Despite these legitimate business concerns, no response from the Company or its board members or senior management was forthcoming.

173.    Immediately after the launch of the 2004 EROS B in late April 2006, Company management arranged to meet with Angola to resolve the SOP contract and related payment matters.  The alleged past-due payments as of February 2006, totaling $15 million, were made in their entirety only days after that May 2006 meeting and it was agreed that a final resolution according to agreement in principle then achieved would be settled by mid July.  In fact the SOP contract was terminated for the convenience of the parties thereto and Angola paid (in addition to the $15 million May payment) $71 million, representing 100% of the remaining face value of the contract, **with no ongoing obligation on the part of ImageSat to deliver the remaining components of the ground system or to render services of any kind.**

174.    Upon information and belief, the transactions undertaken in the spring of 2006 were undertaken at the instance of IAI and Elbit and their designees and their own behalf and on behalf of their IMOD sponsors for the grossly improper purpose of **minimizing** the value of ImageSat and of the minority shareholders' interests in it and facilitating the improper misappropriation of the Company by the Israeli defense establishment.

**G.    IAI's and Elbit's Breaches of Contract and the Failure of the ImageSat Board and Management To Protect the Shareholders' Rights**

175.    Within recent years, changes in the geopolitical, regulatory, and technical environments worldwide have created a more hospitable market for the sale of "turn-key" earth observation satellites (i.e., satellites delivered operational in space).  In mid-year 2005, IAI announced its intentions to pursue this market aggressively and together with Elbit, which was already active and somewhat successful in offering its satellite imaging payloads in the market, unfairly reinterpreted their prior "exclusive commercialization" commitments to the Company on

the basis that industry had made no commitment to ImageSat regarding the commercialization of its next generation (Synthetic Aperture Radar "SAR") military satellite technology. In fact, Defendants planned, together with the IMOD, to offer SOP like SAR satellite services to key international export partners in direct competition with ImageSat based on ImageSat's proprietary business model, while ignoring the prohibition on providing earth observation services embodied in the Master Agreement. With respect to ImageSat's satellite procurement quota, ImageSat had agreed to purchase four separate EROS B satellites from IAI in 1998, 2000, 2001, and 2004, none of which had been delivered to the Company by the time that IAI and Elbit threatened to terminate or blatantly violated their commitments. Two of the relevant non-deliveries were known by Defendants IAI and Elbit to have been based on their own defective designs. The 2004 EROS B that was eventually delivered was based upon the Ofeq 5 satellite design of the IMOD that had first been rejected by the Company in 1998. However, an explicit extension of the aforementioned exclusivity commitments to ImageSat was memorialized in the First Amendment to the Master Agreement in connection with the execution of the 2004 EROS B contract.

176.    As such, the termination or reinterpretation and modification of ImageSat's exclusive commercialization rights was unfair to the minority shareholders, extremely detrimental to their financial interests, and undertaken by IAI and ElOp in bad faith based on their preference to pursue their independent manufacturing interests over the interests of the Company, while using ImageSat, its existing satellite assets, and its proprietary SOP business model as a highly valuable demonstration of capabilities and an interim service option for their future satellite customers. Defendant Broder belatedly confronted Defendant Chairman Keret and the members of the Board of Directors over this issue in mid-2005. At the June 22, 2005

Finance committee meeting, Broder reported that meetings were planned for the following day at which IAI, without involving ImageSat management, would discuss the Company's SAR satellite plans and the rescheduling of the EROS B payments. He objected that parties including the major shareholders and suppliers of the satellites (IAI and Elbit) were "discussing such a crucial matter without the participation of the Company." For interfering with Defendants' plans, Broder was promptly given a golden parachute in place of the new two-year employment contract the Company had approved and executed with him only a few months before, and replaced by the then-Executive Vice President and Deputy CEO of IAI, Defendant Eckhaus, who immediately proved, and continues to prove, more obedient to the dictates and agenda of IAI than his predecessor. This abrupt change in leadership disrupted the Company's IPO preparations and damaged its credibility, but more importantly from the perspective of the damage done to ImageSat's minority shareholders, it led directly to the Company's radical change in course, with respect to both its future satellite and operational plans, and with respect to its relationship to the industrial partners, IAI and Elbit, and the IMOD. Despite a letter from Wilson to ImageSat's Board of Directors and Shareholders warning of the **certain negative impact** on the Venezuelan SOP opportunity, as well as on the Company's SOP sales prospects in general, of replacing Broder with a high-profile IAI executive hired directly from IAI, Eckhaus was hired and all internal objections to the radical redirection of the Company and its inappropriate manipulation by IAI and Elbit was suppressed.

177.    In late 2004, Israel's planned launch of its Ofeq 6 surveillance satellite failed. This failed launch, coupled with international relations considerations leave Israel desirous of acquiring enhanced satellite intelligence capabilities over which it can exercise more complete control. At the same time, international relations considerations also leave Israel desirous of not

displeasing the United States by allowing ImageSat to enter into SOP contracts with potentially controversial customers such as Venezuela.

178.    As set forth above, ImageSat's rights explicitly granted under the Master Agreement, the Elbit SPA, and otherwise, including but not limited to its right to be the exclusive vehicle through which both IAI and Elbit pursue the commercialization of the Israeli Defense Establishment's earth observation satellite technology, the right to have IAI, Elbit and the IMOD not compete with ImageSat's business, the first right to negotiate any opportunity for the commercialization of IAI or Elbit technology relevant to the commercial earth observation market, and the right to receive a royalty on the commercial exploitation of any technology developed by IAI or its subcontractor Elbit while under contract with ImageSat, represent some of ImageSat's most valuable legal and commercial rights. The protection and enforcement of such rights is of paramount importance to ImageSat's ability to compete in the marketplace and thus its financial performance and viability. Conversely, IAI and Elbit have long sought to evade their obligations to ImageSat under the Master Agreement, the SPA, and other agreements with the hopes that they would be able to commercialize earth observation satellite technology on terms and with partners and clients of their own choosing. IAI and Elbit have thus sought to enhance their operating control over and financial benefit from the exploitation of commercial opportunities, at the expense of ImageSat and ImageSat's shareholders, particularly including its minority shareholders such as Plaintiffs and all of its financial investors.

179.    The conflicting interests of the controlling faction of ImageSat's Board of Directors, four of whose members are IAI designees, together with Elbit and of many members of ImageSat's senior management, have substantially aided IAI in carrying out its wrongful intentions. For example, at an ImageSat Board of Directors meeting on February 22, 2007, IAI

representatives advanced the theory that ImageSat's exclusive rights under the Master Agreement could be terminated by IAI because ImageSat was supposedly in default on its performance of the EROS C contract and that IAI would only agree to extend the term of such contract on condition that ImageSat consent that the exclusivity period defined in the Master Agreement was no longer in effect. The appropriate response to this is that, as set forth above, it is IAI's and Elbit's collective failure to manufacture the 1998, 2000 and 2001 EROS B and EROS C satellites that ImageSat did order on time and according to specifications, and IAI's and Elbit's other fraudulent and wrongful conduct as set forth herein, that made it impossible or impracticable for ImageSat to proceed with the 2001 EROS B/EROS C contract as scheduled, thereby excusing ImageSat's not having done so and estopping IAI or Elbit from relying on such failure as a basis for seeking to avoid their contractual commitments of exclusivity because they, not ImageSat, were the breaching parties. Instead of advancing this, or any, argument in an attempt to protect the interests of ImageSat and its shareholders, a majority of the ImageSat Board and ImageSat's senior management have purportedly agreed to acquiesce in IAI's position, thereby surrendering valuable rights of the Company and its shareholders and receiving literally nothing in return.

180.    At the February 22, 2007 Board meeting, the Board members were not presented with and did not have before them copies of the Master Agreement or other documentation that would enable them to properly evaluate the Company's options thereunder. The Board members did not have before them and were never provided with an opinion or analysis prepared by the Company's legal counsel or any other qualified person concerning the Company's rights under the Master Agreement or the costs and benefits that would be associated with surrendering such rights. The Board members, and the members of ImageSat's senior management who advised

them, breached their fiduciary duties to the Company and its shareholders, particularly the minority shareholders such as Plaintiffs, by surrendering lucrative rights of ImageSat potentially worth hundreds of millions of dollars without taking the most elementary steps to evaluate, protect, preserve, defend, and enforce the Company's rights.

181.    The reason that IAI was pushing so hard to obtain ImageSat's acquiescence in the position that its exclusivity obligations had terminated became clear in April 2007, when IAI announced that it was entering into a transaction with Northrop Grumman Corporation ("Northrop"), which apparently had been under discussion or negotiation between IAI and Northrop wholly unbeknownst to ImageSat for up to two years.  Under this transaction, it is contemplated that IAI will supply to Northrop on commercial terms up to eight (8) earth observation radar imaging satellites at a total cost of up to $1.6 billion.  Upon information and belief, the contemplated satellites will utilize technology virtually identical to the technology that IAI granted the aforementioned exclusive rights to ImageSat to commercialize, which ImageSat enhanced through the technical participation of its staff and management, and which ImageSat funded through its EROS satellite procurements, including in particular virtually all allocations to non-recurring engineering.  Essentially, the only substantive difference between the TechSAR earth observation system is that it will utilize a synthetic aperture radar imaging payload rather than an electro-optical payload (which optical payload was contributed to the Ofeq/EROS satellites entirely by ElOp rather than by IAI.  Much of the new SAR payload and related technology were developed by IAI using ImageSat employees and/or in the course of developing the EROS B and C satellites for ImageSat and is accordingly within the scope of IAI's non-compete and exclusivity obligations contained in the Master Agreement.

182.    Moreover, because this proposed transaction represents a commercialization of an extension of IAI's earth observation satellite technology, it is, at a minimum, subject to the first right provision contained in the last sentence of Section 1(a) of the Master Agreement, under which IAI agreed to discuss any opportunity for commercialization of its earth observation satellite technology with ImageSat and to negotiate a mutually agreeable relationship.

183.    Instead of abiding by its obligations under the Master Agreement before entering into a transaction with Northrop, upon information and belief, long before IAI negotiated the Northrop transaction without any advance notice to or discussion with ImageSat at all, it was proposing various strategies for the commercialization of its SAR satellite technology and satellites and the use of its electro-optical and SAR earth observation through the provision of services to governments similar to the proprietary SOP services conceived of and offered by ImageSat.    By doing so, and by denying the existence and/or the applicability of the non-compete, exclusivity, and first right provisions of the Master Agreement, IAI flagrantly breached the Master Agreement and IAI, Elbit, and the IMOD all reneged on these seminal prior commitments to ImageSat in a fashion that threatens to cost the Company's minority shareholders and financial investors hundreds of millions of dollars in lost shareholder value.

184.    Faced with unlawful conduct by its contract partners that threatens ImageSat with irreparable and immediate financial injury from which ImageSat may never recover, ImageSat should have sought immediate redress, whether through negotiation with IAI, litigation, or otherwise.    Instead, the directors and senior officers of ImageSat have done the precise opposite and have affirmatively chosen to accept IAI's insistence that ImageSat's contractual rights under the Master Agreement are no longer in effect.    This proposed relinquishment of ImageSat's extremely valuable contractual rights has never been the subject of

any considered analysis by the Board of Directors based upon a complete review of all of the surrounding facts and documents. Rather, it appears that ImageSat has done nothing to protect its rights or the rights of its shareholders with respect to this matter, whether through researching and, where relevant, protesting IAI's and Elbit's violations of their contractual and fiduciary obligations to ImageSat, vindicating the rights of ImageSat and its shareholders through legal means, or seeking to negotiate an appropriate financial participation.

185.    Defendants' apparent lack of interest in preserving and protecting ImageSat's rights, and their acquiescence in accepting IAI's and Elbit's position that the Company no longer has any exclusive rights or protection from competition by its controlling industrial shareholders, is consistent with their overall plan to wrongfully subordinate the interests of ImageSat and its shareholders, particularly including the minority shareholders such as plaintiffs, to those of IAI, even in the wake of the announced transaction between IAI and Northrop Grumman which illustrates how valuable to the future of ImageSat these rights can and should be.

186.    At a Board of Directors meeting held on May 8, 2007, a majority of the Board of Directors purported to ratify a set of minutes of the Board of Directors meeting held on February 22, 2007 at which it is recited that the Board had unanimously agreed to IAI's demand that ImageSat acknowledge the termination of its exclusivity with IAI, even though this statement was false and misleading in that, among other things, not all Board members had agreed with the proposal made at the February 22 meeting and even though, as set forth above, the action taken at such meeting was based upon incomplete and misleading presentations by Board members and members of senior management with conflicting interests, in the absence of copies of the relevant documentation or of an opinion by the Company's legal counsel or another qualified

person concerning the scope of the Company's rights and the potential costs and benefits of surrendering them.

187.    Demands by several of the minority shareholders, including Plaintiffs, that the Board and management of ImageSat take appropriate action to safeguard the rights of the Company and its shareholders under the Master Agreement were ignored for a period of weeks, and the limited responses provided were inaccurate and evasive.

188.    On June 19, 2007, the Company gave notice of an extraordinary meeting of shareholders to be convened in Curacao on July 5, 2007, whose agenda includes, in substance, the ratification of ImageSat's action in accepting that ImageSat's exclusive rights under the Master Agreement are null and void, thereby purporting to cure the conflicts of interests heretofore ignored by the directors in violation of applicable Curacao law.  Upon information and belief, the controlling shareholders of ImageSat, IAI and Elbit, will use their controlling block of stock to adopt this resolution, thus purportedly extinguishing the Company's rights under the Master Agreement once and for all and costing ImageSat and its shareholders hundreds of millions of dollars.

189.    The Defendant directors and officers have also failed to negotiate and collect royalties to which ImageSat is entitled from IAI and Elbit for uses of technology developed by IAI and Elbit in connection with their work for ImageSat, and IAI and Elbit have failed to pay such royalties.

190.    Throughout this period, in order to avoid scrutiny of their mismanagement and sabotaging of ImageSat and their diversion of the Company's principal assets and contractual rights, Defendants have among other things continued to refuse to designate the at least two independent directors who are supposed to serve on the ImageSat Board of Directors pursuant to

the July 2000 Securityholders Agreement to which Plaintiff WIS Partners is a party and subsequent contractual agreements under which the ImageSat Board is to include independent directors and such independent directors are to include a majority of the Finance Committee of the Board. Demands by at least two parties to the Securityholders Agreement, WIS Partners and Pegasus, that independent directors to be added to the Board as required have been disregarded.

191.    Defendants' conduct as described above had numerous contacts with the County, City, and State of New York including, among things, that the Master Agreement and other contracts at issue were negotiated and entered into in New York and provide that they are to be governed by New York law and/or enforced by New York courts, as well as the holding in New York of Board meetings and other meetings at which the Master Agreements and other agreements and their continued applicability and the Company's rights under them were discussed. Additionally, upon information and belief, meetings and communications relating to the transactions by which IAI and Elbit breached their contractual obligations also took place in New York.

192.    As the cumulative result of defendants' misconduct, including but not limited to ImageSat's intentional refusal to take advantage of SOP opportunities, the Company's decision essentially to abandon its business, and the Company's failure to enforce its contractual rights under the Master Agreement, the Elbit SPA, and other agreements, the value of the minority shareholders' stock in the Company, stock options, and warrants has been virtually destroyed. Defendants' conduct in all respects has breached their fiduciary duties to the minority shareholders, has constituted fraud, constituted a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, and has violated the minority shareholders' rights in multiple respects.

193.    In all of these matters, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (Against Defendants ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Eldar, and Toren For Breach of Fiduciary Duty in the 2000 Transactions)

194.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

195.    As directors and/or officers of the Company, Defendants Weiss, Keret, Nissan, Eldar, and Toren owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

196.    As majority and/or controlling shareholders of the Company, IAI and ElOp (now succeeded by Elbit) owed Plaintiffs, as shareholders of the Company, the highest fiduciary duties of loyalty, due care, candor, and good faith.

197.    ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

198.    In connection with the 2000 transactions, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)    Inappropriately conspiring and agreeing to modify the "Master Agreement" so as to accord IAI and its subcontractor ElOp (now succeeded by Elbit) the status

of "Exclusive Vendor" for ImageSat's next six satellite orders, thus eliminating an important control mechanism that the shareholders had previously agreed to so as to minimize the inherent conflicts of interest among the Company's financial and industrial shareholders, and thus disserving the best interests of the Company and its shareholders but serving the interests of the Defendants;

      (b)    Failing to disclose their intent to bring about this material change to Plaintiff Wilson or the directors designated by the minority shareholders prior to privately convincing Pegasus that the change was justified and in the best interests of the Companyt;

      (c)    Despite conflicts of interest, giving IAI the ability to manipulate satellite pricing as well as to control the award and pricing of related ground systems which IAI proceeded to do with impunity and to the extreme detriment of the minority shareholder's interests; and

      (d)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, causing ImageSat to be an entity dominated by IAI, and ElOp/Elbit, and surrogates among the Company's management and Board, operating wholly without regard to the interests of the minority shareholders.

199.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

200.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

201.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

202.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

## AS AND FOR A SECOND CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Weiss, Keret, Eldar, Nissan, Toren, Federman, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma For Breach of Fiduciary Duty Concerning the EROS B Satellite Fraud)**

203.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

204.    As directors and/or officers of the Company, Defendants Weiss, Keret, Eldar, Nissan, Toren, Federman, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

205.    As majority and/or controlling shareholders of the Company, IAI and ElOp (now succeeded by Elbit owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

206.    ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

207.    In connection with the purchase and manufacture of the 2001 EROS B satellite, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)    Despite conflicts of interest, requiring that the new 2001 EROS B purchase agreement automatically be awarded to ImageSat's exclusive satellite supplier, IAI, and IAI's principal subcontractor, ElOp, under the terms of the Master Agreement of July 2000, resulting in a substantial increase in the cost of the new 2001 EROS B satellite design;

(b)    Agreeing to procure a substantially more expensive EROS B satellite than had previously been planned and agreed to;

(c)    Upon learning that the actual satellite performance characteristics of the 2001 EROS B satellite did not meet the Company's requirements as specified in the satellite contract, failing to take appropriate and reasonable actions to minimize the negative consequences of the errors that had been discovered and failing to advise Plaintiffs and others parties with a right to know of the existence and consequences of the errors that had been found;

(d)    Negotiating the terms of the satellite contract based entirely on their own self-interest and not in the best interests of ImageSat and all its shareholders, including

90

the minority shareholders, with the result that ImageSat ultimately agreed to pay IAI and ElOp an additional $20 million more than the amount that was originally agreed to be paid for the EROS B satellite as memorialized in the 2000 EROS B satellite purchase contract;

(e)    Willfully and fraudulently withholding information concerning the known design flaws in the 2001 EROS B satellite from the minority shareholders' designees to the Board of Directors and from many of the Company's investors including Bank Leumi, who required that the 2001 EROS B SSC be closed as a condition precedent to the closing of the bank line of credit for more than $70 million;

(f)    Agreeing not to disclose the serious design flaws in the new 2001 EROS B satellite, and instead agreeing to proceed with both the Convertible Note redemption and the satellite purchase order;

(g)    Paying a $23.5 million down payment, including $15.5 million in cash to IAI despite the complete lack of technical specifications that would meet ImageSat's Mission Requirement and making subsequent payments under and in relation to the satellite contract, under circumstances rendering each such payment a fraudulent conveyance;

(h)    Agreeing to delete all the technical specifications from the 2001 EROS B Satellites Supply Contract (SSC), thereby willfully concealing the technical flaws and design defects in the satellite while impairing ImageSat's ability to ensure that the satellite as manufactured and delivered complied with ImageSat's and its customers' requirements;

(i)     Proffering the contrived excuse that the Company had asked for a delay in beginning the manufacturing process so that ImageSat could consider possible design modifications;

(j)     Fraudulently conveying $15.5 million, the cash portion of the down payment for the satellite, to IAI despite the knowledge that the Company would not be receiving reasonably equivalent value for such payment; and

(k)     Insisting that ImageSat relax the specifications and performance expectations for the satellite and trying to extort cooperation from the Company's then senior technical management, Plaintiffs Bar-Lev and Rosenbaum;

(l)     Not causing or allowing ImageSat to pursue, through negotiation or litigation, claims against IAI, ElOp, and others for fraud, negligence, breach of contract, or other claims arising from the series of issues arising from the successive satellite contracts; and

(m)     Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing.

208.     Throughout the history of the 2001 EROS B satellite, Defendants consistently placed their own self-interests ahead of those of ImageSat and its stockholders, including Plaintiffs.  As a result of Defendants' misconduct, IAI and ElOp received tens of millions of dollars to build a satellite that was never to be delivered and that never was delivered in any form, even as work in progress.

209.     Even though a functional B class satellite, the 2004 EROS B, was ultimately delivered nearly two years after ImageSat's contractual commitments to its SOP customers

stipulated, the 2004 EROS B design was a design that was repeatedly rejected by the Company when it was originally proposed by IAI and ElOp in 1998 and 2000.

210.    At no time did any of the Defendants take the appropriate action of candidly disclosing to all interested parties, including the minority shareholders, that there were serious problems with the satellite or that its construction and delivery would be seriously, perhaps indefinitely, delayed and that, if the satellite were ever built, it would be far more expensive than originally budgeted even under the onerous terms of the 2001 EROS B SSC.

211.    Instead, as time progressed and the 2001 EROS B satellite was not being constructed in accordance with the specifications, Defendants continued to fail to disclose the relevant facts to the minority shareholders or their representatives on the Board of Directors, continued to fail to take reasonable steps to protect the interests of ImageSat and its minority shareholders, and continued to breach their fiduciary duties to the minority shareholders. In so doing, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)    Conspiring to agree to delay, deceptively, the manufacture of the satellite while ImageSat purportedly reconsidered the satellite's requirements and specifications and/or purportedly because ImageSat failed to make timely payment for invoices submitted;

(b)    Leading the Plaintiff minority shareholders to believe that the Company was manufacturing an EROS B satellite that met the Company's published mission requirements when it was not;

(c)    Removing certain of the minority shareholders from the distribution list for the Company's investor reports and/or ceasing altogether to issue such investor

reports for the purpose of withholding disclosure concerning the problems with the satellite;

(d)    Issuing a Stop Work order for the 2001 EROS B manufacturing process, purportedly due to non-payment by ImageSat;

(e)    Falsely informing the minority shareholders including Plaintiffs that IAI/MBT's and Elbit's suspension of the EROS B manufacturing was due to non-payment of the down payment by the new Angolan SOP and ImageSat's associated inability to access the Bank Leumi credit facility;

(f)    Misleadingly renaming or redesignating the name of the satellite at the time the 2004 EROS B satellite supply contract was entered into for the purpose of further concealing the problems with the satellite;

(g)    Falsely booking more than $33 million or more invested in the manufacture of the 2001 EROS B satellite between 2001 and 2005 as an asset on the Company's books and records while knowing that ImageSat had received nothing of value for such expenditures;

(h)    Providing to ImageSat's auditors and board the willfully false pretense that a new and beneficial strategic alliance with the IMOD was incompatible with the continued investment and eventual deployment of the 2001 EROS B (by then renamed "EROS C") satellite by the Company and that the asset was therefore impaired and must be written off;

(i)    Agreeing to write off as of year-end 2005, without reparation or recourse of any kind to ImageSat, the EROS B/C investment in its entirety, and in doing so

rendering the Company insolvent, all by resolution of ImageSat's Board of Directors, dominated by a majority of designees of IAI and Elbit;

(j)     Failing to ensure that a conforming EROS B satellite was launched and providing service to Taiwan by September 2004, causing the cancellation of the Taiwan SOP, with a resulting revenue loss to the Company of more than $9 million per year as well as the payment of penalties;

(k)     Failing to ensure that a conforming EROS B satellite was launched on a timely basis, causing the reduction of revenues under the India SOP, with a resulting revenue loss to the Company of $1 million per year;

(l)     Fraudulently and inequitably claiming and causing the Company to incur expenses for the 2001 EROS B contract suspension of $4 million;

(m)     Failing to take adequate steps to recoup all the moneys spent on the 2001 EROS B/C satellite through either negotiations with or litigation against any of the entities or persons responsible for the fiasco;

(n)     Failing to adequately inform the designees of the minority shareholders to the Board, shareholders, investors, and the Company's own auditors of the highly significant link between the Master Agreement as amended and the satellite supply contracts;

(o)     Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing. and

(p)     Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, stating willful falsehoods

concerning, and failing to disclose the facts surrounding the 2001 EROS B/C satellite that damaged the company's credibility, corresponding sales performance, its overall valuation, and the interests of the minority shareholders by hundreds of millions of dollars.

212.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

213.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

214.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

215.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

## AS AND FOR A THIRD CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Eldar, Broder, Eckhaus,
Toren, Federman, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi and DePalmar
For Breach of Fiduciary Duty Concerning the
Destruction of the Company's International Operations)**

216.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

217.    As directors and/or officers of the Company, Defendants Weiss, Keret, Nissan, Eldar, Broder, Eckhaus, Toren, Federman, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

218.    As majority and/or controlling shareholders of the Company, IAI and ElOp (now succeeded by Elbit), owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, and good faith.

219.    ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

220.    In connection with the Company's international operations, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)    Causing many of the Company's operations outside of Israel to be terminated, as were virtually all non-Israeli personnel, causing the Company to be retroactively subject to Israeli VAT taxes for which an exemption had previously been granted and thereby creating a financial exposure of as much as $40 million;

(b)     Abandoning the Company's robust international character that was essential to its credibility as an independent and apolitical commercial entity, the loss of which was reflected in the Company's poor SOP sales performance thereafter;

(c)     Causing several of the Company's contractual commitments to its AAD's to intentionally not be met;

(d)     Deciding to act willfully in default of a strategic cross-distribution and AAD relationship with Sovinformsputnik, the exclusive licensee of the Russian Space Agency for the distribution of Russian high-resolution military imagery, one of ImageSat's prime SOP prospects;

(e)     Willfully failing to deliver under the terms of its AAD agreement with "KAIST" in South Korea, another of the Company's prime SOP prospects;

(f)     Manipulating ImageSat's SOP program sales in Korea and elsewhere to enhance the attractiveness of IAI's and Elbit's own turn-key satellite and payload sales initiatives and in doing so putting IAI's, Elbit's, and the other Defendants' own interests ahead of and in direct competition with ImageSat's SOP program;

(g)     Failing to properly and professionally serve the Company's SOP customers to exploit SOP contract opportunities on a purely commercial, nondiscriminatory, and apolitical basis;

(g)     Willfully failing to deliver, over a four-year period between July 2002 and July 2006 (when the Angolan SOP contract was terminated) even a single day of autonomous SOP service to Angola or even to deliver to the Angolan authorities the permanent tasking and reception antenna, both of which were program deliverables that should have required no more than 18 to 24 months to fulfill;

(h)    Mismanaging the finances, and endangering the well-being, of the Company by paying or knowingly allowing the Company to make excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere, which payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments, thus misappropriating the Company's funds and further jeopardizing its well-being by creating potential exposure under applicable corrupt practices legislation or otherwise;

(i)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing; and

(j)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts that damaged the Company's credibility, its corresponding sales performance, its overall valuation, and the interests of the minority shareholders by hundreds of millions of dollars.

221.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

222.    Defendants' acts and omissions in these respects foreseeably had a devastating effect on ImageSat's business and future prospects.   Defendants caused and allowed the Company to willfully default on its obligations to ImageSat's largest customers and prospective customers, whose confidence formed the foundation of any future success ImageSat would be able to have.   Defendants also damaged the Company by endangering its status as a truly international Company, thus creating numerous grave risks to ImageSat's future arising from geopolitical as well as legal (export licensing and taxation) factors.   By doing all of this, Defendants abandoned ImageSat's entirely apolitical and commercial agenda for reasons wholly unrelated to ImageSat's legitimate business and financial objectives and the corresponding legitimate financial objectives of the minority shareholders including Plaintiffs.

223.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

224.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

225.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.