## AS AND FOR A FOURTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Keret, Nissan, Eckhaus, Federman, Toren, Weiss, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma for Breach of Fiduciary Duty in Connection with the Company's SOP and Investment Opportunity in Venezuela)**

226.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

227.     As present, former, and/or acting directors and/or officers of the Company, Defendants Keret, Nissan, Eckhaus, Weiss, Toren, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

228.     As majority and/or controlling shareholders of the Company, IAI and ElOp (now succeeded by Elbit), and Federman, owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

229.     ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

230.     In connection with ImageSat's lucrative Satellite Operating Program (SOP) opportunity with, and opportunity to obtain a sizable investment of capital from, the Government of Venezuela, Defendants breached their fiduciary duties of loyalty, due care, and good faith in numerous respects, including but not limited to the following:

(a)     Manipulating ImageSat's SOP program to enhance the attractiveness of IAI's own sales initiatives in Venezuela, and in doing so putting IAI's and the other Defendants' own interests ahead of and in direct competition with ImageSat's SOP program for limited budget allocations;

(b)     Falsely informing Venezuela in 2001 that ImageSat's independent SOP proposal was withdrawn, and that instead, the satellite program had been "bundled" with a comprehensive and more expensive high-tech intelligence program offered by IAI;

(c)     Losing millions of dollars of revenue for the Company as the direct result of IAI's bait-and-switch tactics, because the Venezuelan Air Force had already allocated funds in its 2002 budget for the entire seven-year SOP program but later reallocated the funds when falsely informed by IAI that the Company's independent proposal was withdrawn;

(d)     Jeopardizing ImageSat's ability to finalize a Venezuelan SOP by the Company's failure to maintain in good order its contractor registration with the Venezuelan government, as required by that government's procurement policies and regulations;

(e)     Failing to complete and submit to the Venezuelan contractor registrar the Company's audited 2004 financial information until October 2005, as a direct result of the continuing cover-up of the 2001 EROS B satellite fraud, causing the Company to miss the September budget deadline and thereby to lose a requested budget allocation from the Venezuelan Army;

(f)     Once a decision had been made among the majority shareholders in early 2006 that the independent international business of ImageSat would be subordinated to the political interests of the IMOD, willfully causing ImageSat to lose its eligibility to be awarded one of the Company's most promising SOP and revenue opportunities since its founding;

(g)    Causing ImageSat to become technically ineligible for a contract award in Venezuela because its 2005 financial results rendered the Company insolvent as a direct result of the 2001 EROS B/C satellite write-off approved by ImageSat's Board of Directors in May 2006;

(h)    Failing to take any action and continuing to fail to act to mitigate the risk of loss, by refusing to consult with Wilson or with the Company's attorneys in Caracas regarding possible remedial measures that might be taken, including measures recommended by the Venezuelan Registrar, despite repeated persistent attempts by Wilson to inform management and the Board commencing immediately upon receipt of the 2005 financial statements in June 2006, as well as the continued failure to do anything to mitigate the problem or the risk of loss;

(i)    Failing to approve and submit 2006 quarterly financial statements for the second and third quarters reflecting the more than $85 million in cash payments by Angola between May and August 2006 that would have mitigated the insolvency from the perspective of the Venezuelan Registrar;

(j)    Failing to respond in any way to a term sheet reflecting the offer of the President of Venezuela to enter into an SOP contract paying the Company $18 million per year for imaging services and, as a condition precedent to such proposed SOP contract, to purchase a large block of stock in the Company (20% to 30%) for an investment of between $100-150 million;

(k)    Failing to even have a substantive discussion, formal resolution, or any action taken or recommended at the November 22, 2006 Company board meeting regarding the above activities in Venezuela and then falsely advising Wilson by e-mail

that the Board of Directors had decided at a Board meeting held in New York on November 22, 2006 not to pursue further activities in Venezuela and that Wilson was instructed to have all of the Company's equipment located in Venezuela for demonstration and marketing purposes shipped out of Venezuela immediately;

(l)    Allowing IAI, Elbit, and the IMOD to have the power to decide that the fundamental purpose of ImageSat is now and henceforth to serve the military and strategic interests of Israel, rather than the interests of all the Company's shareholders including Plaintiffs;

(m)    Making the willfully deceptive and damaging public statements through which IAI and the IMOD took full public credit for the recent launch of the 2004 EROS B satellite in April 2006, falsely creating the impression that EROS B was an Israeli government owned (rather than a commercial) satellite at a time that ImageSat, its management, board of directors, and controlling shareholders including IAI and Elbit knew or should have known that the impression of Israeli government control of ImageSat's satellites was a particularly, and perhaps "deal breaking" issue in Venezuela;

(n)    Failing to take advantage of the Venezuelan opportunity for reasons unrelated to the best interests of the Company and its shareholders;

(o)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing. and

(p)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, reducing the Company's value in anticipation of a potential strategic transaction such as a further re-capitalization or the

undervalued acquisition or wrongful appropriation of ImageSat or its principal assets by IAI, Elbit, the IMOD, and/or others.

231.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants.  Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

232.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

233.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Two Hundred Fifteen Million Dollars.

234.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Two Hundred Fifteen Million Dollars.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Keret, Eckhaus, Broder, Weiss, Federman, Ackerman, Gaspar, Piperno-Beer, Chlouche, Arzi, and DePalma for Breach of Fiduciary Duty Concerning ImageSat's Recent Financial Affairs)**

235.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

236.    As directors and/or officers of the Company, Defendants Keret, Eckhaus, Broder, Weiss, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, the highest fiduciary duties of loyalty, due care, and good faith.

237.    As majority and/or controlling shareholders of the Company, IAI and Elbit together with its Chairman, Federman, owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, and good faith.

238.    In connection with the financial affairs of ImageSat, Defendants breached their fiduciary duties of loyalty, due care, and good faith in numerous respects, including but not limited to the following:

(a)    Failing in 2002, 2003 and 2004 to account properly for prior reporting irregularities related to the fraudulent 2001 EROS B satellite procurement, as well as the perpetually stalled 2001 EROS B/C manufacturing process;

(b)    Inducing the minority shareholders to believe throughout 2002, 2003, 2004 and 2005 that IPO preparations were proceeding according to a defined schedule and that it would provide them with an exit opportunity to sell their interests in the Company;

(c)     Inducing some of the Plaintiffs to believe that the Company would arrange a buyout of certain of the minority interests in exchange for Plaintiffs' cooperation subsequent to the final suspension in November 2005 of the IPO process;

(d)     Falsifying and misrepresenting the circumstances relevant to Angola's payment delay and/or possible contract problems and their relevance to the suspension of the IPO process;

(e)     Intentionally delaying the Company's efforts to resolve the possible payment and/or SOP contract problems with Angola between November 2005 and May 2006;

(f)     Failing to disclose the key terms or reasons for important financial transactions to the minority shareholders, despite repeated demands by Wilson and other minority shareholders for complete information regarding, among other things, the nature of the proposed financing and related transactions and their impact upon the minority shareholders, and in the process, rejecting the Company's own in-house counsel's repeated requests that management respond to shareholder inquiries from Wilson and others;

(g)     Completely restructuring the senior debt and equity of the Company, subordinating the primarily United States and European Union-based senior debt holders to Israeli bondholders and silencing virtually all of the knowledgeable minority opposition by wiping out the fully diluted holdings of the founding and other former management and employees of the Company, thus cementing complete control of the Company by IAI and Elbit and benefiting them substantially to the detriment of the

Company's other shareholders while positioning the Israeli defense establishment to misappropriate ImageSat's space, launch, and other assets;

(h)    Approving a resolution modifying the Company's Articles of Association that purportedly waived any and all claims of conflict of interest involving the directors, a majority of whom were and are affiliated with the Company's controlling shareholders;

(i)    Failing to adhere to the legal and statutory requirements regarding the existence of conflicts of interest among the directors of the Company, failing to make complete disclosure of such conflicts of interest, and thereby violating their legal obligations to the Company under Netherlands Antilles law and other law;

(j)    Intentionally providing false, misleading, and incomplete information and documentation to Morgan Joseph, causing that firm's fairness opinion with respect to the transactions to be founded on fundamentally false and flawed disclosures and then misrepresenting the nature and content of such fairness opinion to Plaintiffs and others;

(k)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing; and

(l)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, breaching their fiduciary duties to the minority shareholders and to ImageSat, acting in some cases for the grossly improper purpose of deliberately seeking to **minimize**, rather than maximize, the value of the shareholders' investments.

239.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the

Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

240.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

241.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

242.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

### AS AND FOR A SIXTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Keret, Nissan, Eckhaus, Weiss, Federman, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma for Breach of Fiduciary Duty Concerning the Failure To Enforce ImageSat's Exclusivity, First Right, and Royalty Rights)**

243.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

244.     As directors and/or officers of the Company, Defendants Keret, Nissan, Eckhaus, Weiss, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, the highest fiduciary duties of loyalty, due care, candor, and good faith.

245.     As majority and/or controlling shareholders of the Company, IAI and Elbit together with its Chairman, Federman, owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

246.     ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

247.     As set forth above, IAI has breached its Master Agreement and other contractual commitments to ImageSat by, among other things:

(a)     Entering into the announced transaction with Northrop under which it is proposed that IAI will supply to Northrop up to eight earth observation satellites in the initial phase of the deal at a cost of up to $1.6 billion;

(b)     Negotiating such transaction with Northrop for up to two years and publicly announcing the transaction before discussing the matter with ImageSat and seeking to negotiate a mutually agreeable joint strategy for pursuing such commercialization before making any such proposal to any other party;

(c)     Falsely claiming that the Northrop transaction is not within the scope of ImageSat's rights under the Master Agreement and that ImageSat's rights under the Master Agreement have expired and misrepresenting the parties' understanding of the agreement;

(d)    Offering and in some cases supplying earth observation satellite and payload systems under commercial tenders without imposing appropriate export control limitations relevant to their further commercialization or use in a manner that could be competitive with the business of ImageSat;

(e)    Providing and proposing to provide earth observation services to third parties despite the explicit prohibition against doing so under the Master Agreement; and

(f)    Causing its representatives and proxies, including its designees to ImageSat's Board of Directors and members of senior management, to support ImageSat's waiver or relinquishment of its contractual rights for reasons motivated by their conflicts of interest and divided loyalties rather than based upon a genuine analysis of ImageSat's legal rights and the best interests of the Company.

248.    Elbit has also breached its contractual obligations to ImageSat under its Stock Purchase Agreement and otherwise by offering and in some cases supplying earth observation satellite and payload systems under commercial tenders without imposing appropriate export control limitations and by providing and proposing to provide earth observation services to third parties in violation of ImageSat's contractual rights.

249.    ImageSat's rights explicitly granted under the Master Agreement and otherwise, including but not limited to its right to be the exclusive vehicle through which both IAI and Elbit pursue the commercialization of the Israeli Defense Establishment's earth observation satellite technology, the right to have IAI, Elbit and the IMOD not compete with ImageSat's business, the first right to negotiate any opportunity for the commercialization of IAI or Elbit technology relevant to the commercial earth observation market, and the right to receive a royalty on the

commercial exploitation of any technology developed by IAI while under contract with ImageSat, represent some of ImageSat's most valuable legal and commercial rights.

250.    In connection with the IAI's and Elbit's breaches of their contractual obligations and related matters, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)    Taking no meaningful action to protect ImageSat's exclusivity rights, non-compete rights, first rights, and royalty rights under the Master Agreement and ImageSat's other contractual rights against the existing and threatened future breaches by IAI and Elbit, including but not limited to the Northrop transaction, including without limitation by protesting IAI's and Elbit's violations of their contractual and fiduciary obligations to ImageSat, vindicating the rights of ImageSat and its shareholders through legal means, or seeking to negotiate an appropriate financial participation for ImageSat;

(b)    Taking and recommending corporate actions for the purpose and with the intent of deliberately surrendering ImageSat's rights under the Master Agreement or otherwise, while obtaining nothing of value for ImageSat in return;

(c)    Taking and recommending corporate actions effectively surrendering ImageSat's rights under the Master Agreement and otherwise without the benefit of an opinion from legal counsel or another qualified person regarding the Company's legal rights and obligations;

(d)    Misrepresenting the circumstances under which the Board of Directors purportedly took action effectively surrendering certain rights under the Master Agreement at its February 22, 2007 meeting;

(e)    Taking the foregoing actions consistent with their overall wrongful plan to subordinate the interests of ImageSat and its shareholders, particularly including the minority shareholders such as plaintiffs, to those of IAI, Elbit, and the IMOD;

(f)    Failing to meaningfully address demands by several of the minority shareholders that ImageSat take appropriate action to safeguard ImageSat's and its shareholders' rights;

(g)    Failing to negotiate and collect royalties to which ImageSat is entitled for uses of technology developed by IAI and Elbit in connection with their work for ImageSat.

(h)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing;

(i)    Taking the foregoing actions as the result of their conflicting interests and as an expression of their primary loyalty to parties other than ImageSat, including IAI, Elbit, and the IMOD, rather than out of loyalty to ImageSat and its shareholders, including the minority shareholders such as plaintiffs;

(j)    Failing to adhere to the legal and statutory requirements regarding the existence of conflicts of interest among the directors of the Company, failing to make complete disclosure of such conflicts of interest, and thereby violating their legal obligations to the Company under Netherlands Antilles law and other law; and

(k)    Giving notice of an extraordinary meeting of shareholders to be convened in Curacao on July 5, 2007, whose agenda includes, in substance, the purported ratification of ImageSat's action in accepting that ImageSat's exclusive rights under the

Master Agreement are null and void, at which meeting, upon information and belief, the controlling shareholders of ImageSat, IAI and Elbit, will use their controlling block of stock to adopt this resolution, thus purportedly purporting to extinguish the Company's rights under the Master Agreement once and for all and costing ImageSat and its shareholders hundreds of millions of dollars.

251.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

252.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

253.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

254.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or

exemplary damages, in an amount to be determined by the Court, but not less than Three

Hundred Million Dollars.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Eldar, Toren, Federman, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, and DePalma for Corporate Waste in Connection with the 2001 EROS B Satellite Contract)**

255.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth

herein.

256.    As set forth above, Defendants caused ImageSat to enter into an unreasonably

expensive contract for procurement of the 2001 EROS B satellite, failed to take action after

learning that IAI and ElOp/Elbit were unable to provide a satellite that met the Company's

requirements and later that the construction was not progressing according to any reasonable

standard of contract performance throughout its entire duration beginning in July 2001.

Defendants failed to take any action to ensure that any functional EROS B satellite under the

2001 design was being constructed at all, or to discover or disclose that no B class satellite of

any kind whatsoever was being constructed until 2004 and that the satellite that then was

constructed was an "EROS B" in name only, so named for the explicit purpose of deceiving and

defrauding plaintiffs.  Defendants took no action to attempt to recoup any of more than $33

million that the Company expended on a satellite contract for which it never received any form

of value and which was ultimately written off the Company's balance sheet in its entirety, and

for which it failed to pursue any damage claims against IAI and/or ElOp.

257.    ImageSat paid substantial moneys to IAI and ElOp (now succeeded by Elbit) in

connection with the procurement of the 2001 EROS B satellite, including but not limited to a

$23.5 million downpayment including $15.5 million in cash on the manufacturing of the satellite,

additional payments to a total in excess of $33 million, and so-called "penalties" of approximately $4 million imposed under the satellite contract for no justifiable reason. Each of these payments was approved by IAI's and Elbit's representatives on the ImageSat Board of Directors despite their obvious conflicts of interest with respect thereto.

258.     The financial and other terms of the 2001 EROS B satellite contract, as originally drafted and especially as applied as the continuing problems with the satellite continued to come to light, and the obligations of ImageSat thereunder were so grossly disproportionate and unfair to ImageSat and its shareholders that no reasonable corporate director or officer would have believed that the contract and the payments made thereunder were fair and in the best interests of the shareholders.     Accordingly, the transactions constituted corporate waste to the severe damage of ImageSat's minority shareholders.

259.     In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

260.     By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

261.     Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or

exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Keret, Eckhaus, Broder, Federman, Toren, Weiss, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma for Corporate Waste in Connection with the Company's Squandering of SOP Opportunities and Related Matters)**

262.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

263.    As set forth above, Defendants have grossly mismanaged the business and affairs of the Company by, among other things, (i) squandering the Company's position as the only viable international, apolitical provider of earth observation satellite services, (ii) failing and refusing to pursue, consummate, provide services under, and/or attempt to avoid the termination of the Company's SOP's, and (iii) failing almost entirely to pursue seriously the business of the Company, and instead, allowing the Company to be managed, dominated, and effectively taken over by representatives of controlling shareholders IAI and Elbit and the IMOD.

264.    Defendants further mismanaged the finances, and endangered the well-being, of the Company by paying or knowingly allowing the Company to make excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere.  These payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments.   Not only were the Company's funds misappropriated to make these unlawful payments, but upon information and belief, such

payments further jeopardized the Company's well-being by creating exposure for the Company under applicable corrupt practices legislation or otherwise.

265.    Through their conduct as set forth above, Defendants have engaged in or caused ImageSat to engage in transactions whose impact on the Company was so grossly disproportionate and unfair to ImageSat and its shareholders that no reasonable corporate director or officer would have believed that the contract and the payments made thereunder were fair and in the best interests of the shareholders.  In other instances, Defendants have prevented ImageSat from engaging in transactions whose impact on the Company would have been clearly and substantially beneficial, such that no reasonable corporate director or officer, free from conflicts of interest, would have sought to prevent or interfere with such proposed transactions. Accordingly, each of these transactions, or failures to engage in proposed transactions, constituted corporate waste to the severe damage of ImageSat's minority shareholders.

266.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

267.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

268.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or

exemplary damages, in an amount to be determined by the Court, but not less than Three

Hundred Million Dollars.

## AS AND FOR A NINTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Toren,
Federman, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche,
Arzi, and DePalma in Connection with the Company's Failure To Enforce
Its Exclusivity, First Right, and Royalty Rights)**

269.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth

herein.

270.    As set forth above, IAI and Elbit have breached their contractual commitments

to ImageSat including commitments of exclusivity, non-competition, first rights, and/or royalty

rights as set forth in the July 2000 Master Agreement (as to IAI) and the SPA of December 1998

(as to Elbit), including but not limited to IAI's negotiation of and entry into the Northrop

transaction.

271.    ImageSat's rights explicitly granted under the Master Agreement and otherwise,

including but not limited to its right to be the exclusive vehicle through which both IAI and Elbit

pursue the commercialization of the Israeli Defense Establishment's earth observation satellite

technology, the right to have IAI, Elbit and the IMOD not compete with ImageSat's business, the

first right to negotiate any opportunity for the commercialization of IAI or Elbit technology

relevant to the commercial earth observation market, and the right to receive a royalty on the

commercial exploitation of any technology developed by IAI while under contract with

ImageSat, represent some of ImageSat's most valuable legal and commercial

272.    As set forth above, Defendants have caused or purported to cause ImageSat to

waive and relinquish its rights under the Master Agreement and the SPA, without performing

any meaningful review of the Company's legal rights under the agreements and motivated in

large measure by their conflicting interest and loyalties to persons, including IAI and Elbit, other than ImageSat and all of its shareholders. Defendants have also failed to negotiate and collect royalties to which ImageSat is entitled for uses of technology developed by IAI and Elbit in connection with their work for ImageSat.

273.     Defendants have effectively given or attempted to give away ImageSat's valuable contractual rights for little or no consideration in a transaction or bargain whose terms were so grossly disproportionate and unfair to ImageSat and its shareholders that no reasonable corporate director or officer would have believed that the relinquishment of such rights was fair and in the best interests of the shareholders. Accordingly, Defendants' conduct constituted corporate waste to the severe damage of ImageSat's minority shareholders.

274.     In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

275.     By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

276.     Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

## AS AND FOR A TENTH CLAIM FOR RELIEF

### (Against All Defendants For Self-Dealing)

277.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

278.    In connection with each of the transactions and acts described above, each of the Defendants wrongfully placed his or its own personal interests ahead of the interests of the Company's shareholders, including Plaintiffs, and the Company. In doing so, Defendants were motivated by personal interests of self-interest and self-dealing, including but not limited to the desires of IAI and Elbit to maximize their contract revenue on satellite manufacturing and construction, to the point of demanding payments far exceeding the reasonable value of the various satellites manufactured; the desires of the individual Defendants affiliated with IAI and Elbit to secure maximum revenue for IAI and Elbit, to which they gave their primary allegiance, and thereby to obtain bonuses, consulting fees, commissions, advancement, or other personal benefits.

279.    Defendants have further engaged in a persistent and varied pattern of misconduct intended to conceal their wrongdoing from Plaintiffs and others, including but not limited to failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of their wrongdoing.

280.    As fiduciaries for ImageSat and its shareholders, each of the Defendants owed ImageSat the highest fiduciary duties of care, loyalty, candor, and good faith. Time and time again over a period of six years, in numerous transactions including but not limited to those described above, Defendants routinely turned their back on the interests of ImageSat's minority shareholders, including Plaintiffs, and took actions and caused ImageSat to enter into

commitments detrimental to the shareholders.  In each instance, Defendants engaged in self-dealing in a fashion that disserved the interests of the Company and its minority shareholders, including Plaintiffs, for the personal benefit of themselves or the other entities with which they were affiliated.  Defendants' pattern and practice of self-dealing has been to the severe detriment of Plaintiffs.

281.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

282.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

283.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

### AS AND FOR AN ELEVENTH CLAIM FOR RELIEF

### (Against All Defendants for Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))

284.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

285.    Defendants, acting jointly, severally, and in concert together, have engaged in unlawful acts, practices, and courses of conduct constituting violation of the federal mail fraud and wire fraud statutes of the United States, 18 U.S.C. §§ 1341 and 1343.

286.    Defendants have engaged in a "pattern of racketeering activity" as proscribed by the Racketeer Influenced and Corrupt Organizations Action, 18 U.S.C. § 1961 et seq.

287.    Each of the Plaintiffs is a "person" as defined in 18 U.S.C. § 1961(3).

288.    Defendants, acting jointly, severally and in concert together, have engaged in unlawful acts, practices and courses of conduct that constitute violations of 18 U.S.C. §§ 1341 and 1343.

289.    Defendants have engaged in "racketeering activity" as defined in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1) ("RICO").

290.    Plaintiffs and Defendants are each persons as defined in 18 U.S.C. § 1961(3).

291.    At times relevant hereto, each of the Defendants has been associated, as a director and/or officer and/or employee and/or in a contractual relationship, with an "Enterprise," as such term is defined in 18 U.S.C. § 1961(4).

292.    The Enterprise consisted of (i) ImageSat, and/or (ii) the named Defendants each acting in association and concert with one another within the meaning of 18 U.S.C. § 1962.

293.    The Enterprise as alleged herein was engaged in foreign and interstate commerce and its activities affected foreign and interstate commerce.

294.    In furtherance of its acts as described herein, the Enterprise engaged in interstate mail and wire transactions.

295.    In furtherance of the scheme, Defendants, jointly and severally and in concert together conducted the business of the Enterprise through a pattern of racketeering activity.

296.    While committing and engaging in the acts and practices described herein, the Enterprise and the Defendants engaged in acts of mail and wire fraud in violation of the laws of the United States, 18 U.S.C. §§ 1341 and 1343.

297.    Defendants conspired to perpetrate and did in fact perpetrate fraud and fraudulent schemes upon Plaintiffs.  In doing so, Defendants caused certain mail matter to be delivered through the United States Postal Service, caused certain communications to be conveyed through foreign or interstate wires in or at least partially within the United States, and caused certain payments to be wire transferred through the United States banking system, all as part of their pattern of fraudulent acts.

298.    The mail communications, wire communications, and wire transfers perpetrated by the Defendants in their conduct of the Enterprise as part of their fraudulent schemes included, but were not limited to, the following:

    (a)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, in addition to hundreds of other instances, each of the documents listed in Exhibit "F" annexed hereto which is incorporated as part of this Complaint for all purposes, and each of which was mailed and/or wired by one or more of the Defendants in connection with one or more of the fraudulent schemes described herein;

    (b)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents relating to the July 2000 transactions described above, in which transactions numerous material facts were falsely represented to Plaintiffs and material facts necessary to render the disclosures that were made not misleading were not disclosed;

(c)     Wire transferring and/or mailing the funds involved in the 2000 transactions and the legal, professional, and other fees associated with concluding such transactions;

(d)     Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents calculated to mislead Plaintiffs as to the Company's intention to adjust the errors that had been committed in calculating the conversion price of the options and warrants issued in 2001 and in setting the length of the bridge warrants as five (5) years rather than ten (10) years;

(e)     Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents relating to the 2001 EROS B satellite, including but not limited to the false and deliberately highly misleading monthly "Investor Reports" issued by the Company and other documents concerning or constituting part of Defendants' scheme to conceal the fact that the functional satellite was not being constructed and that the books and records of the Company in connection therewith were false and misleading;

(f)     Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents relating to the Company's proposed initial public offering, including but not limited to documents in which the Company's books, records, business prospects, and other highly material facts were falsified or presented in a false, misleading, and misleadingly omissive fashion to numerous persons including Plaintiffs, prospective investors, the Company's investment banker and other professionals, and the Securities and Exchange Commission;

(g)     Mailing, faxing, e-mailing, or otherwise transmitting by use of the United

States mails and/or by foreign or interstate wires, numerous documents relating to the transactions consummated in March-April 2006, including but not limited to documents in which the Company's books, records, business prospects, and other highly material facts were falsified or presented in a false, misleading, and misleadingly omissive fashion (including but not limited to the Morgan Joseph opinion) to numerous persons including Plaintiffs, prospective investors, and the Company's investment banker and other professionals;

(h)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous communications in which the Company misrepresented its intentions with regard to the prospective Satellite Operating Program agreement and/or potential equity investment available from the Government of Venezuela, thereby fraudulently misstating its business prospects to numerous persons including Plaintiffs;

(i)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous communications in which the Company and others made false and misleading statements with regard to ImageSat's contractual rights under the July 2000 Master Agreement with ImageSat and the 1998 SPA with ElOp and the Company's relinquishment or abandonment of such rights in relation to, among other things, the IAI-Northrop transaction, including but not limited to communications between IAI and Northrop in which IAI made false and misleading statements concerning or failed to disclose its obligations to ImageSat;

(j)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous communications relating to

the Company's making excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere.

299.    The number of specific mailings and wirings engaged in by Defendants in connection with their schemes extended into the hundreds or thousands.

300.    The acts of mail and wire fraud engaged in by Defendants were not isolated or sporadic, but involved regular and repeated violations of law to accomplish Defendants' desired ends in the course of conducting and participating in the business of the Enterprise. These acts, upon information and belief, occurred over a period of at least seven (7) years, are continuing through the present, and upon information and belief, will continue to take place in the future.

301.    Defendants' acts were related by virtue of common participants and planning in the conduct of the Enterprise. Upon information and belief, Defendants ImageSat, IAI, Elbit (including ElOp), Weiss, Nissan, and Federman participated in the conduct of the Enterprise including the pattern of racketeering activity set forth herein from 2000 through the present; Defendant Keret participated from 2000 to 2005; Defendant Broder participated from 1999 to 2005; Defendant Eckhaus participated at least from 2003 through the present; Defendant Ackerman participated from 2002 to 2005; Defendants Gaspar and DePalma participated from in or about 2003 through the present; and Defendant Piperno-Beer participated from late 2005 or early 2006 through the present.

302.    Through their violations of 18 U.S.C. § 1962, and as a consequence of the aforesaid predicate acts, Defendants jointly and severally caused Plaintiffs injury in their business and property.

303.    As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962, Plaintiffs have been damaged in an amount to be determined at trial but not less than Three Hundred Million Dollars, which Plaintiffs are entitled to recover threefold together with their costs and expenses of this action, including attorneys' fees and disbursements, pursuant to 18 U.S.C. § 1964(c).

### AS AND FOR A TWELFTH CLAIM FOR RELIEF

**(Against All Defendants for Conspiracy To Violate the Racketeer
Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d))**

304.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

305.    Defendants, acting jointly, severally, and in concert together, all as set forth above, have conspired together to engage in conduct constituting a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act.

306.    Through their violations of 18 U.S.C. § 1962(c), and as a consequence of the aforesaid predicate acts and conspiracy, Defendants jointly and severally caused Plaintiffs injury in their business and property.

307.    As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962(d), Plaintiffs have been damaged in an amount to be determined at trial but not less than Three Hundred Million Dollars, which Plaintiffs are entitled to recover threefold together with their costs and expenses of this action, including attorney's fees and disbursements, pursuant to 18 U.S.C. § 1964(c).

## AS AND FOR A THIRTEENTH CLAIM FOR RELIEF

### (Against All Defendants for Common-Law Fraud)

308.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

309.    From at least 2000 to date, ImageSat has been operated in a fashion designed to serve the best interests of its controlling shareholders, including IAI and Elbit, and the IMOD, rather than those of all of its shareholders including the minority shareholders such as Plaintiffs.

310.    From at least 2000 to date, Defendants have made numerous false and misleading statements of material fact to Plaintiffs in connection with the business, operations, legal rights, and future prospects for ImageSat, and have failed to disclose material facts necessary to render facts that were disclosed, not misleading.    The false, misleading, and misleadingly omissive statements made by defendants have included, but not been limited to, the following:

(a)    The false and misleading statements made by IAI, Elbit, Weiss, Keret, Nissan, Eldar, Eckhaus, Arzi, Toren, and Federman in connection with the Pegasus investment and the Master Agreement of July 2000 from in or about 2000 to date, including but not limited to each of the statements and omissions described in the Second and Eleventh Claims for Relief above;

(b)    The false and misleading statements made by ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Eldar, Toren, Federman, Broder Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma, from in or about 2001 to date, including but not limited to the statements contained in ImageSat's monthly investor reports, to the effect that the originally contracted EROS B satellite was being constructed, was on schedule

and/or was being delayed for reasons other than the true reasons for such delay, and was in conformity with the specifications that had been discussed at the time the satellite was ordered, including but not limited to each of the statements and omissions described in the Second and Eleventh Claims for Relief above;

(c)     The false and misleading statements made by ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Eldar, Toren, Federman, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma from in or about 2001 to date concerning ImageSat's financial affairs, including but not limited to each of the statements and omissions described in the Third and Eleventh Claims for Relief above;

(d)     The false and misleading statements made by ImageSat, IAI, Elbit, Toren, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma from in or about 2004 to date concerning ImageSat's SOP and investment opportunity in Venezuela, including but not limited to each of the statements and omissions described in the Fourth and Eleventh Claims for Relief above;

(e)     The false and misleading statements made by ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Toren, Federman, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma from in or about 2004 to date concerning ImageSat's recent financial affairs, including but not limited to each of the statements and omissions described in the Fifth and Eleventh Claims for Relief above;

(f)     The false and misleading statements made by ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Toren, Federman, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, and Arzi from in or about 2005 to date concerning ImageSat's rights under the Master Agreement with IAI and SPA with Elbit, including but not limited to each of

the statements and omissions described in the Sixth and Eleventh Claims for Relief above.

311.    Each of the plaintiffs relied upon the false and misleading statements and omissions of the defendants by, among other things, continue to invest his productive working time and efforts into ImageSat and/or by forbearing from bringing litigation against defendants that would have been commenced at a substantially earlier time had truthful and accurate disclosure of the relevant facts been made to them.

312.    Defendants have further engaged in a persistent and varied pattern of misconduct intended to conceal their wrongdoing from Plaintiffs and others, including but not limited to failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of their wrongdoing.

313.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have himself or itself made materially false or misleading fraudulent statements to Plaintiffs or the Company, such Defendant is liable for aiding the fraud of the other named Defendants.  Each such Defendant knew of the fraud being perpetrated by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with such fraud.

314.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury

would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

315.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

316.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

### AS AND FOR A FOURTEENTH CLAIM FOR RELIEF

**(Against IAI and Elbit for Breach of the Satellite Supply Contracts)**

317.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

318.    IAI and ImageSat are parties to a series of Satellite Supply Contracts relating to the EROS B and EROS C satellites and assumed contractual obligations to perform under those agreements.    ElOp/Elbit was a subcontractor under the Satellite Supply Contracts and also assumed contractual obligations to perform thereunder.

319.    As set forth above, in connection with the EROS B and EROS C Satellite Supply Contracts and satellites, IAI and Elbit breached their contractual commitments to ImageSat by, among other things:

(a)    Failing to construct an EROS B satellite for ImageSat in accordance with the agreed-upon design specifications required for the satellite to serve ImageSat's customers;

(b)    Failing to disclose to ImageSat and/or to the minority shareholders of ImageSat that they were unable to construct a satellite in accordance with the specifications;

(c)    Failing to disclose to ImageSat and/or to the minority shareholders of ImageSat that work on the EROS B satellite was well behind schedule and that, in fact, no useful work had been accomplished at all;

(d)    Issuing a Stop Work order for the 2001 EROS B manufacturing process, purportedly due to non-payment by ImageSat;

(e)    Falsely informing the minority shareholders including Plaintiffs that IAI/MBT's and Elbit's suspension of the EROS B manufacturing was due to non-payment of the down payment by the new Angolan SOP and ImageSat's associated inability to access the Bank Leumi credit facility;

(f)    Misleadingly renaming or redesignating the name of the satellite at the time the 2004 satellite manufacturing contract was entered into for the purpose of further concealing the problems with the satellite;

(g)    Demanding and receiving tens of millions of dollars in payments under the Satellite Supply Contracts although no moneys were due and owing, while preventing ImageSat from conducting the audit that it was contractually entitled to conduct of ImageSat's and Elbit's performance under the agreements; and

(h)    Through IAI's own wrongful, deceitful, and breaching conduct in violation of the Satellite Supply Contracts, causing ImageSat to fail to order a sufficient number of satellites as was contemplated under the Master Agreement and then misusing the consequences of its own breaches of contract to seek to purportedly terminate

ImageSat's exclusive rights, non-compete rights, first rights, and/or royalty rights under the Master Agreement.

320.    IAI's and Elbit's breaches of the various Satellite Supply Contracts and their other contractual obligations to ImageSat have cost the Company hundreds of millions of dollars in both direct and consequential damages including the loss of numerous actual and potential SOP customers and other business opportunities.

321.    In relation to the breaches of contract and other acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including IAI, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

322.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

### AS AND FOR A FIFTEENTH CLAIM FOR RELIEF

### (Against IAI for Breach of the Master Agreement)

323.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

324.    IAI and ImageSat are parties to the Master Agreement dated July 25, 2000.

325.    As set forth above, IAI has breached its Master Agreement and other contractual commitments to ImageSat by, among other things:

(a)    Entering into the announced transaction with Northrop under which it is proposed that IAI will supply to Northrop up to eight earth observation satellites in the initial phase of the deal at a cost of up to $1.6 billion;

(b)    Negotiating such transaction with Northrop for up to two years and publicly announcing the transaction before discussing the matter with ImageSat and seeking to negotiate a mutually agreeable joint strategy for pursuing commercialization of IAI's new SAR earth observation satellite technology before making any such proposal to any other party;

(c)    Falsely claiming that the Northrop transaction is not within the scope of ImageSat's rights under the Master Agreement and that ImageSat's rights under the Master Agreement have expired and misrepresenting the parties' understanding of the agreement;

(d)    Offering and in some cases supplying earth observation satellites under commercial tenders without imposing appropriate export control limitations;

(e)    Providing and proposing to provide earth observation services to third parties despite the explicit prohibition against doing so under the Master Agreement;

(f)    Failing to pay royalties to which ImageSat is entitled for uses of technology developed by IAI in connection with its work for ImageSat; and

(g)    Causing its representatives and proxies, including its designees to ImageSat's Board of Directors and members of senior management, to support ImageSat's waiver or relinquishment of its contractual rights for reasons motivated by their conflicts of interest and divided loyalties rather than based upon a genuine analysis of ImageSat's legal rights and the best interests of the Company.

326.    IAI's past, present, impending, and contemplated breaches of the Master Agreement and its other contractual obligations to ImageSat threaten to cost the Company hundreds of millions of dollars.

327.    IAI's present, impending, and contemplated breaches of the Master Agreement threaten the solvency and viability of ImageSat as a going concern and subject ImageSat and its shareholders, including the plaintiffs as minority shareholders, to substantial, immediate, and irreparable harm.

328.    In relation to the breaches of contract and other acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including IAI, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

329.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

330.    Further, by reason of the foregoing, Plaintiffs should also be awarded declaratory and injunctive relief, declaring that the exclusivity and first right and other provisions of the Master Agreement remain in full force and effect, and enjoining IAI and its directors, officers, employees, agents, and all persons working in concert with it, from any act in breach of the Master Agreement, including but not limited to proceeding with the Northrop transaction.

331.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A SIXTEENTH CLAIM FOR RELIEF

### (Against Elbit for Breach of the Stock Purchase Agreement)

332.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

333.    Elbit and ImageSat are parties to the Stock Purchase Agreement (SPA) dated December 7, 1998.

334.    As set forth above, Elbit has breached such Agreement and other contractual commitments to ImageSat by, among other things, offering and in some cases supplying earth observation payload systems under commercial tenders without imposing appropriate export control limitations.

335.    Elbit's past, present, impending, and contemplated breaches of the SPA and its other contractual obligations to ImageSat threaten to cost the Company hundreds of millions of dollars.

336.    Elbit's present, impending, and contemplated breaches of the SPA threaten the solvency and viability of ImageSat as a going concern and subject ImageSat and its shareholders, including the plaintiffs as minority shareholders, to substantial, immediate, and irreparable harm.

337.    In relation to the breaches of contract and other acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including Elbit, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

338.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

339.    Further, by reason of the foregoing, Plaintiffs should also be awarded declaratory and injunctive relief, declaring that the exclusivity and first right and other provisions of the SPA remain in full force and effect, and enjoining Elbit and its directors, officers, employees, agents, and all persons working in concert with it, from any act in breach of the SPA, including but not limited to requiring them to notify all clients that have purchased earth observation payload systems from Elbit in violation of Elbit's commitments to ImageSat of the end-user limitations that apply to such payload systems.

340.    Plaintiffs have no adequate remedy at law.

### AS AND FOR A SEVENTEENTH CLAIM FOR RELIEF

**(Against ImageSat for Reformation of
the Options and Bridge Warrants)**

341.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

342.    Plaintiffs Wilson, WIS, Talansky, Moshel, Reichmann, and Hexagram were issued bridge warrants in 1999 and 2000, as amended by the transactions of July 2000, which entitled each of them to acquire shares of ImageSat common stock.  Plaintiff Polybutes subsequently acquired bridge warrants from Hexagram.

343.    Plaintiffs Wilson, Bar-Lev, Rosenbaum, Morris, and Yifrah were issued employee stock options in July 2000 and thereafter, entitling them to acquire shares of ImageSat common stock.

344.    The transactions included the issuance of various classes of warrants and stock options to numerous recipients.  Most of the closing documents were "work in progress" and not

completed during the days and weeks preceding the closing. It was agreed that all the classes of warrants and options issued, including the warrants previously issued to the bridge investors, would have the same terms and conditions as of the anticipated closing. Existing bridge warrants issued in 1999 and 2000, predating the closing, were to be amended to reflect full parity with the new options and warrants issued at the closing. The foregoing was fully understood by all parties to the transactions and there was no disagreement or dispute on what the term of the warrants and options was supposed to be.

345.    Notwithstanding agreement on the foregoing entirely non-controversial point among all the parties to the negotiation including ImageSat, IAI, and ElOp, the documents signed at the closing provided for the bridge warrants to expire in five (5) years while all the other options and warrants issued concurrent with the closing were set to expire in ten (10) years.

346.    Also not in keeping with the agreed-upon terms, the execution price of the bridge warrants and the stock options was set at $24.4573 per share instead of $23.2737, which was the final conversion price of the Pegasus Convertible Notes.

347.    The foregoing discrepancies were not negotiated or agreed-upon terms of the transactions; but rather resulted from a mere scrivener's or typographical error in preparing the voluminous paperwork memorializing the transactions and as such constituted mistakes in the documentation of an agreement whose terms had been agreed upon between the parties.

348.    The length of the term of the bridge warrants, as well as the exercise price for the bridge warrants and stock options, were material terms of the transactions and the Plaintiffs who received such bridge warrants and/or options would have participated in the transactions had they or it been duly advised that the terms of the transaction would not reflect the same terms and conditions being offered to others at the same time.

349.    As set forth above, the Company entertained discussion with certain of the Plaintiffs regarding correcting the inadvertent errors that had been made in documenting the terms of the bridge warrants and stock options, but ultimately has failed and refused to correct such terms.

350.    By reason of mistake, equity compels reformation of the terms of the bridge warrants and employee stock options held by Plaintiffs such that (i) each of the bridge warrants will be valid for ten (10) years from the date of issuance as agreed, consistent with the terms of all other classes of warrants and options issued in the transactions, and (ii) the execution price of the bridge warrants and the stock options will be set at $23.2737 rather than $24.4573 per share.

351.    In the alternative, each of the Plaintiffs holding bridge warrants and/or stock options should be awarded monetary damages against ImageSat in an amount equal to the amount of money such Plaintiff has lost by reason of being wrongfully deprived of the right to exercise his or its bridge warrants and/or stock options at the agreed-upon execution price.

## AS AND FOR AN EIGHTEENTH CLAIM FOR RELIEF

**(Against ImageSat, IAI, and Elbit for Fraud
Relating to the Options and Bridge Warrants)**

352.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

353.    Plaintiffs Wilson, WIS, Talansky, Moshel, Reichmann, and Hexagram are were issued bridge warrants in 1999 and 2000 as amended in July 2000, which entitled each of them to acquire shares of ImageSat common stock.  Plaintiff Polybutes subsequently acquired bridge warrants from Hexagram.

354.    Plaintiffs Wilson, Bar-Lev, Rosenbaum, Morris, and Yifrah were issued employee stock options in July 2000, entitling each of them to acquire shares of ImageSat common stock.

355.    As set forth above, it was represented to Plaintiffs that the terms of all the classes of warrants and options issued in the July 2000 transaction would be identical, but in the final documentation of the transaction, there were discrepancies between the terms of Plaintiffs' bridge warrants and stock options and the terms of other securities issued.

356.    As set forth above, Plaintiffs' understanding of the reason for the discrepancies is that they were inadvertent and resulted from scrivener's errors in documenting the terms of the 2000 transactions given that the terms were being negotiated and changing until immediately before the transactions closed.

357.    In the alternative, however, if the discrepancies in the documentation of the transactions did not result from mistake, then they were the result of fraudulent representations to Plaintiffs concerning the terms of the transactions, made by or on behalf of Defendants including ImageSat, IAI, and ElOp (now succeeded by Elbit).

358.    If this is the case, then by reason of fraud, equity compels reformation of the terms of the bridge warrants and employee stock options held by Plaintiffs such that (i) each of the bridge warrants will be valid for ten (10) years from the date of issuance as agreed, consistent with the terms of all other classes of warrants and options issued in the transactions, and (ii) the execution price of the bridge warrants and the stock options will be set at $23.2737 rather than $24.4573 per share.

359.    In the alternative, each of the Plaintiffs holding bridge warrants and/or stock options should be awarded monetary damages against ImageSat, IAI, and Elbit in an amount

equal to the amount of money such Plaintiff has lost by reason of being wrongfully deprived of the right to exercise his or its bridge warrants and/or stock options at the agreed-upon execution price.

### AS AND FOR A NINETEENTH CLAIM FOR RELIEF

**(Against IAI and Elbit for Fraudulent Conveyance
in Connection with the 2001 EROS B Satellite Contract)**

360.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

361.    As set forth above, Defendants caused ImageSat to enter into an unreasonably expensive contract for procurement of the 2001 EROS B satellite, failed to take action after learning that the design of the satellite was flawed and IAI and Elbit would be unable to meet the Company's mission requirements, failed to take any action even to ensure that any functional EROS B satellite under the 2001 design was being constructed at all, and took no action to attempt to recoup any of more than $33 million that the Company expended on a satellite contract for which it never received any form of value and which was ultimately written off the Company's balance sheet in its entirety.

362.    ImageSat paid substantial moneys to IAI and ElOp (now succeeded by Elbit) in connection with the procurement of the 2001 EROS B satellite, including but not limited to a $23.5 million downpayment, $15.5 million of which was paid in cash concurrent with the execution of the contract, and the procurement of a satellite, both of which were known by Defendants to be defective. The Company made additional payments to a total in excess of $33 million, and paid so-called "penalties" of approximately $4 million imposed under the satellite contract for no justifiable reason.

363.    The 2001 EROS B satellite contract was entered into and the sums paid by ImageSat to IAI and Elbit under and in connection with such satellite contract were paid with the actual intent to hinder, delay, or defraud the present and future creditors of ImageSat, including Plaintiffs.

364.    ImageSat did not receive reasonably equivalent value for the moneys it paid to IAI and ElOp under and in connection with the 2001 EROS B satellite contract.

365.    ImageSat sustained severe cash-flow impairments and, upon information, became unable to pay certain of its creditors and suppliers as its debts became due as a result of the payments it made under and in connection with the 2001 EROS B satellite contract.

366.    As a result of the ultimate write-off of the moneys invested by the Company in the 2001 EROS B satellite, upon information and belief, ImageSat was rendered insolvent in a balance-sheet sense.

367.    As a result of the 2001 EROS B satellite contract and the payments made thereunder, ImageSat was left with unreasonably small capital relative to the nature and scope of its business and operations.

368.    In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

369.    By reason of each of the foregoing, the payments made by ImageSat under and relating to the 2001 EROS B satellite contract and the 2001 EROS B satellite constituted fraudulent conveyances pursuant to applicable law, including but not limited to New York Debtor & Creditor Law §§ 273, 274, 275, and 276, and should be set aside and vacated and the parties placed in the position they would have enjoyed had such transactions not taken place.

370.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including IAI, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

371.    Accordingly, the Court should enter an order directing Defendants, to the maximum possible extent, to rescind the effects of the 2001 EROS B satellite contracts and transactions, requiring Defendants to disgorge any funds they received in connection with such transactions, and should also order them to pay all damages, including consequential damages, suffered by Plaintiffs and by the Company by reason of such transactions.

372.    Additionally, to the extent that the Court determines that the EROS B satellite transactions were undertaken with the actual intent to defraud, Plaintiffs are entitled to their attorneys' fees and costs of suit pursuant to Debtor & Creditor Law § 276-a..

## AS AND FOR A TWENTIETH CLAIM FOR RELIEF

**(Against Keret, Nissan, Eldar, Weiss, Broder, Eckhaus,
Toren, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma
for Disgorgement of Compensation)**

373.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

374.     As set forth above, each of Defendants Keret, Nissan, Eldar, Weiss, Eckhaus, Toren, Ackerman, Gaspar, Piperno-Beer, and Chelouche, Arzi, and DePalma was a director and/or officer and/or employee of ImageSat at times relevant hereto.

375.     Upon information and belief, each of such Defendants was compensated by the Company for the performance of his duties as a director and/or officer and/or employee, including through the payment of salary, bonuses, directors' fees, commissions, stock options, or otherwise.

376.     As set forth above, each of such Defendants breached his fiduciary duties to the shareholders of the Company and to the Company.

377.     As a matter of equity, fiduciaries of a business entity such as directors, officers, and employees will not be permitted to retain compensation and other things of value earned from a corporation during a period of time in which they were in breach of their fiduciary duties to the shareholders and the company.

378.     In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury

would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

379.    Accordingly, Defendants should each be required to disgorge all moneys and other things of value received from ImageSat beginning on the date of each Defendant's first breach of his fiduciary duties to the shareholders of the Company and to the Company.

### AS AND FOR AN TWENTY-FIRST CLAIM FOR RELIEF

**(Against All Defendants For
Conversion and Misappropriation of Corporate Assets)**

380.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

381.    In connection with each of the transactions and acts described above, each of the Defendants wrongfully caused assets, property, funds, and other things of value belonging to ImageSat to be diverted to themselves or their own use.

382.    Defendants have further engaged in a persistent and varied pattern of misconduct intended to conceal their wrongdoing from Plaintiffs and others, including but not limited to failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of their wrongdoing.

383.    In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

384.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

385.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

### AS AND FOR A TWENTY-SECOND CLAIM FOR RELIEF

**(Against All Defendants for
Unjust Enrichment and Restitution)**

386.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

387.    By reason of all the acts and omissions set forth above, each of the Defendants has been unjustly enriched at the expense of the Plaintiffs and has received money, ownership interests in the Company, and/or other things of value that should be right belong to Plaintiffs.

388.    In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

389.    Accordingly, Defendants should be ordered to turn over to Plaintiffs or otherwise disgorge all moneys and other things of value that they have inequitably received by reason of their misconduct as set forth above.

WHEREFORE, Plaintiffs respectfully demand judgment:

A.      On the First Claim for Relief, against Defendants ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Eldar, and Toren, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

B.      On the Second Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

C.      On the Third Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

D.      On the Fourth Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $215 million, and punitive damages in an amount to be determined at trial, but not less than $215 million;

E.      On the Fifth Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

F.      On the Sixth Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

G.      On the Seventh Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

H.    On the Eighth Claim for Relief, against all Defendants, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

I.    On the Ninth Claim for Relief, against all Defendants, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

J.    On the Tenth Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

K.    On the Eleventh Claim for Relief, against all Defendants, jointly and severally, for damages to Plaintiffs' business or property in an amount to be determined at trial but not less than $300 million, to be trebled pursuant to 18 U.S.C. § 1964(c);

L.    On the Twelfth Claim for Relief, against all Defendants, jointly and severally, for damages to Plaintiffs' business or property in an amount to be determined at trial but not less than $300 million, to be trebled pursuant to 18 U.S.C. § 1964(c);

M.    On the Thirteenth Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

N.    On the Fourteenth Claim for Relief, against IAI and Elbit for compensatory damages in an amount to be determined at trial, but not less than $300 million;

O.    On the Fifteenth Claim for Relief, against IAI for compensatory damages in an amount to be determined at trial, but not less than $300 million, and granting declaratory and injunctive relief as set forth therein;

P.      On the Sixteenth Claim for Relief, against Elbit for compensatory damages in an amount to be determined at trial, but not less than $100 million, and granting declaratory and injunctive relief as set forth therein;

Q.      On the Seventeenth Claim for Relief, ordering reformation of the terms of Plaintiffs' bridge warrants and stock options as described herein, or in the alternative awarding damages in lieu thereof, in an amount to be determined at trial;

R.      On the Eighteenth Claim for Relief, ordering reformation of the terms of Plaintiffs' bridge warrants and stock options as described herein, or in the alternative awarding Plaintiffs compensatory and punitive damages in lieu thereof, in an amount to be determined at trial;

S.      On the Nineteenth Claim for Relief, ordering Defendants, to the maximum possible extent, to rescind the effects of the 2001 EROS B satellite contracts and transactions, requiring Defendants to disgorge any funds they received in connection with such transactions, and awarding Plaintiffs compensatory damages, in an amount to be determined at trial, together with Plaintiffs' attorneys' fees and costs of suit pursuant to Debtor & Creditor Law § 276-a;

T.      On the Twentieth Claim for Relief, against Defendants Keret, Nissan, Eldar, Weiss, Broder, Eckhaus, Toren, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma, directing that they disgorge and make restitution of compensation and other things of value received from ImageSat during any period during which they are adjudicated to have breached their fiduciary duties to the Company and its shareholders, including Plaintiffs;

U.      On the Twenty-First Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than