**88** _____

**SUPREME COURT**
2 December 1994, nr. 15511
(Mr. Martens, Mr. Roelvink, Mr. Korthals Altes, Mr. Nieuwenhuis, Mr. Swens-
Donner, Mr. A-G Hartkamp, Masters of Law; with annotation by Ma)
RvdW 1994, 265

**Civil Code Section 2:3, 5, 64, 175, 6:162, 163**

(Essence) Decrease in value of shares as a result of an unlawful act or breach of
contract towards the company; question as to whether the individual shareholders can
claim compensation. Question as to whether the unlawful act towards the company
constitutes at the same time an unlawful act towards the single director/shareholder.
Obligation to furnish facts.

If a third party inflicts financial losses on a company by not properly performing
contractual obligations towards the company or by actions which are unlawful
towards the company, the company alone will be entitled on account of this to claim
compensation from the third party for these losses inflicted on them. These financial
losses of the company will - for as long as they are not reimbursed - cause a decrease
in the value of the shares in the company. However, pursuant to this (initial) financial
loss created for the shareholders they can in principle not realise their own claim for
damages against the said third party. There are no grounds to make a distinction on
this point between the case of a company with several shareholders and that of a
company the shares of which are held by one person. In this connection it is also
irrelevant to what extent at a company with a single shareholder this latter controls as
the (sole) director the comings and goings of the company.

"Rendering the shares worthless" by causing the bankruptcy cannot be regarded as
the infringement of the personal rights of the single shareholder/director which
infringement would be unlawful, even if there was no infringement of a duty of care
towards the latter.

The rule that an act or omission is unlawful when it is in contravention of what is
befitting in society according to unwritten law, relates to the care which ought to be
observed in a certain relationship towards one or more specific others and is therefore
by its nature not a standard purporting to protect the interests of all who suffer losses
as result of the fact that the required care towards those specific others was not
observed. Therefore the Appeal Court assumed rightly that the single
shareholder/director as the claimant should have put forward which specific standard
of due care should have been observed towards him in his private capacity and it was
not sufficient that he put forward a breach of contract or a negligent act towards the
Group.

[Text] Arnoldus Franciscus Poot, in Nuenen, Appellant in cassation, Counsel R.V.
Kist, Master of Law,
versus
The legal entity by virtue of Section 1, subsection 1, of the Public Servants
Superannuation Act, the General Pension Fund for Public Employees [*Algemeen*

*Burgerlijk Pensioenfonds*: 'ABP'], in Heerlen, Respondents in Cassation, Counsel R.S. Meijer, Master of Law.

Appeal Court:

(…)

6.2 Liability of the ABP towards Poot in his private capacity?

6.2.1 The Appeal Court states first and foremost - and insofar as this is necessary determines further - that the co-operation existed between the ABP and the Poot Group and not between the ABP and Poot in his private capacity. The term 'Poot Group' is understood by the Appeal Court as one or more companies directly or indirectly under the control of Poot. As regards these companies, the Appeal Court refers to the report of L.A.B.M. Schelbergen dated 15 June 1984 submitted to the examining magistrate entrusted with preparing criminal cases in the Maastricht District, which report was lodged in the proceedings and in which Schelbergen (on page 4-6) gave a summary - uncontested by the parties - of the various companies from which and with which Poot carried out those of his activities complained of. It also appears from the correspondence between the ABP and "Poot" that at all times Poot dealt with the ABP from and via these companies.

In first instance Poot took the position that the ABP had a contractual relationship in the first place with him, Poot privately. In addition, the ABP also acted in contravention of their contractual obligations with the various companies affiliated with the Poot Group. On the other hand the ABP took the position that the joint venture only existed with the Poot Group and not with Poot in his private capacity. The District Court recalled this point of dispute between the parties in Ground for Decision 22, first paragraph, of the appealed Judgment but is, according to the opinion of the Appeal Court, unacceptably ambiguous in its judgment (in Ground for Decision 23) that there was a joint venture between Poot and the ABP, because as appears from the first Ground for the Decision the District Court understood "Poot" to mean the party Poot and/or one or more companies fully or partly controlled by him". In appeal Poot did not maintain his first claim in first instance, namely that the District Court give a declaratory judgment that the ABP was in breach of contract or committed an unlawful act to Poot in his private capacity, which claim was given a primary classification. The Appeal Court deduces from this that Poot is also of the opinion in appeal that

the joint venture existed between the ABP and the Poot Group, so that this is currently an established fact between the parties.

6.2.2 Poot claims firstly that the Appeal Court give a declaratory judgment that the ABP is in breach of contract or committed an unlawful act towards the Poot Group and secondly that the said breach of contract or unlawful act also constitutes an unlawful act towards Poot in his private capacity. The District Court did not get down to an assessment of the grounds for this second claim, which is also caused by the fact that both these claims were in first instance of an alternative nature. In appeal - since the primary claim in first instance has no longer been maintained - this is different. After all, in the opinion of the Appeal Court, any judgment - even though the ABP would have been in breach of contract or committed an unlawful act towards the Poot Group - that the said breach of contract or unlawful act does not constitute at the same time an unlawful act towards Poot in his private capacity, entails that Poot's claims are immediately available for rejection and that the Appeal Court does not have to consider all the facts and circumstances alleged by Poot which according to him constitute a breach of contract or an unlawful act of the ABP to the Poot Group. In other words, the assessment of the second claim as having a greater scope than the first claim, should be regarded as being of a preliminary nature.

6.2.3. Poot blames the ABP for being in breach of contract and for having acted unlawfully towards the Poot Group, namely 1) by making doubtful the purchase of projects or by stopping purchasing them, 2) by holding on to deposit monies and 3) by withholding the CBR resolution of 7 December 1979. This - according to Poot - caused the bankruptcy of his Group. So the actions complained of relate to actions by the ABP towards the Poot Group. According to Poot these actions also constitute an unlawful act towards him in his private capacity because it was foreseeable that by these actions his shares would become worthless.

Poot argues in particular that the ABP knew
- that Poot privately was the single director/shareholder of the Poot Group,
- that the Poot Group was not financially strong and was financially dependent on the ABP,
- that ABP's actions complained of would irrevocably lead to the bankruptcy of the Group and thereby to the shares of Poot privately becoming worthless.

6.2.4. Regardless of the fact that thereafter with regard to the Albaca transactions it is considered that the Poot Group has no rights pursuant to the breach(es) of contract and unlawful act complained of, the Appeal Court holds the view that the single fact - which is any way disputed - that the ABP knew or ought to have known or could foresee that Poot's shares would become worthless, is insufficient to define the ABP's actions towards the Poot Group also as an unlawful act to the single shareholder of the Group. For the latter opinion it is required that the ABP in acting should not only be led by its legal obligation(s) or duty of care towards the Poot Group, but in addition also by a duty of care with regard to the persons involved in the Group such as for instance the single shareholder. Poot has not put forward which (extra) duty of care - apart from the duty of care to be observed towards the Group - the ABP should in this case have observed towards him personally as the single shareholder. Poot suffced with reproaches that the ABP failed in their legal obligations and duty of care with regard to the Group. That is why Poot has not complied with his obligation to furnish facts of why the actions of the ABP complained of also constitute an unlawful act towards him privately. The circumstances indeed put forward by Poot cannot lead to

the opinion that the ABP is liable to him personally while the losses alleged by Poot coincide - in a material sense - fully with the losses which according to him the respective companies had suffered.

The conclusion must be drawn that Poot in his private capacity has no cause of action against the ABP.

6.3. Albaca transactions render the rights as lapsed?

6.3.1 In the period after 10 September 1980 various discussions were held between the ABP, the Poot Group and the NMB as Poot Group's company bank. In the course of these discussions the ABP took the position that the Poot Group was in actual fact bankrupt. In the closing speeches in appeal Poot admitted this position as correct. During these discussions it was evident for Poot that the ABP would not purchase the seven new projects offered by the Poot Group in a letter dated 17 July 1980. At that stage it also became evident that the NMB was no longer prepared to have the Poot Group financed. In this situation - Poot speaks of a "split-up into viable and non-viable units phase" - the respective parties were looking for a modus to emerge as undamaged as possible from the situation. In the end these consultations resulted - at the proposal of NMB - in the so-called Albaca transactions of 21 November 1980.

6.3.2. The most important elements with regard to these Albaca transactions of 21 November 1980 are the following:

a. On 12 November 1980 the NMB was the single shareholder of Beleggingsmaatschappij Albaca BV in Amsterdam. The issued share capital in Albaca BV consisted at that time of 250 shares each with a nominal value of NLG 100. On 12 November 1980 NMB and the ABP reached agreement with regard to the transfer of 238 shares in Albaca BV from the NMB to the ABP. This share transfer was effected on 20 November 1980.

b. Until 20 November 1980 the NMB was the sole director of Albaca BV. On 12 November 1980 an extraordinary general meeting of the shareholders of Albaca BV was held in Amsterdam. During this meeting of shareholders the NMB was unanimously dismissed as the managing director of Albaca BV and the ABP was appointed as the managing director of this company. After this appointment the ABP

decided to establish Albaca BV's offices in Heerlen.

c. On 21 November 1980 Poot, acting as the managing director of Sport en Spel Aalsmeer BV, sold and transferred to Abaca BV the ground lease of a parcel of land and the appurtenances erected on it, situated in Aalsmeer in Hommeer sports park. On the same date similar transactions followed between the same parties with regard to Sport en Spel Bergen op Zoom BV, Sport en Spel Dordrecht BV and Sport en Spel Etten-Leur BV.

d. the fixtures and fittings and the stocks of the indoor tennis courts in Aalsmeer, Bergen op Zoom, Dordrecht, Etten-Leur, Deurne and Waalwijk were transferred to Albaca BV. The indoor tennis courts in Deurne and Waalwijk were leased by the ABP to Albaca BV.

e. Albaca BV took over (on 10 November 1980) the balance of the companies' current financial obligations with regard to the said six indoor tennis courts.

f. After setting off the claims of the ABP on the said six companies against the amount which Albaca BV owed by virtue of the transfers to these companies, the ABP paid on balance the amount of NLG 2,880,028.04, of which the amount of  NLG 2,303,319.59 was paid into the account of Systar BV specified by Poot, with the NMB in Eindhoven. The difference between both these amounts was paid to the tax authorities and the land registry.

6.3.3. The Appeal Court will now deal with the first Ground for Appeal X in the cross-appeal because this Ground for Appeal relates to the (first) preliminary defence of the ABP.

6.3.4. This defence entails that the Albaca transactions of 21 November 1980 were the implementation of an arrangement made by the parties in the period from 10 September until 21 November 1980 which was of a final and discharging nature. Although the latter had not been expressed in so many words, this ensues - according to the ABP - from the circumstances of the case, namely:

a) when the financial problems of the Poot Group became apparent on 10 September 1980, the parties as well as the NMB as the bank of the Poot Group sought a joint solution in proper consultation and with discussions of everything regarded as necessary by any one, and this solution was indeed achieved;

b) during this period the Poot Group did not at all insist on the ABP purchasing the seven projects offered on 17 July 1980 despite the fact that according to Poot the ABP could have prevented the downfall of his Group by purchasing those projects while at that time the Poot Group did not hold the ABP liable in this respect either.

c. the ABP deliberately did not exercise their rights as the first mortgagee of the indoor tennis courts in Aalsmeer, Bergen op Zoom, Dordrecht and Etten-Leur but took over these indoor tennis courts far above the forced-sale value current at that time.

d) the ABP deliberately waived the contractual penalties for non-payment.

Under those circumstances - as the ABP continued - it should have been up to the Poot Group to make reservations during the settlement due to the alleged liability of the ABP. By refraining from doing so, the final and discharging nature of the arrangement is emphasised, at any rate the Poot Group forfeited their further right to sue the ABP.

6.3.5. The District Court rejected this defence considering that the facts and circumstances put forward by the ABP do not justify the inference that the ABP could

understand that the party Poot had waived any further rights, including the right currently exercised in this lawsuit.

6.3.6. In the explanation of the Ground for Appeal it has firstly been put forward rightly that this decision by the District Court was not, or at any rate insufficiently, justified. After all, the consideration of the District Court does not make clear why the facts and circumstances put forward by the ABP are not effective.

6.3.7. Contrary to the District Court, the Appeal Court regards this preliminary defence of the ABP as indeed effective.

In the period from 10 September 1980 onwards, the parties held intensive consultations and in the end reached an arrangement which was concluded on 21 November 1980 in the form of the Albaca transactions. The starting point in this connection was to find a solution in connection with the financial problems of the Poot Group. That solution was - with the full and free agreement of Poot, acting in this connection on behalf of the Poot Group - not found in the ABP (partly) purchasing the projects offered in the letter of 17 July 1980, nor in the release by the ABP of the deposit monies held by the ABP, nor in a compensation of the project development costs made in vain by the Poot Group. The Appeal Court regards this as being of decisive importance because points are involved here which all, separately or jointly, could have prevented the bankruptcy of his Group according to Poot's allegations in these proceedings. That solution was - without any reservation on the part of Poot or his Group - indeed found in the form of selling off the six projects already realised to Beleggingsmaatschappij Albaca BV in which the ABP had the (overwhelming) majority of the shares and of which company the ABP is the managing director. After setting off all the debts with regard to the mortgage interest, the ground rent and the lease whereby the ABP waived any contractual penalties, the ABP paid the Poot Group for this transaction the amount of NLG 2,303,319.59, which amount is based on the all-in construction costs of the indoor tennis courts and is therefore not based on their (much lower) forced-sale value. It is not disputed and therefore it is an established fact between the parties that the arrangement entailed that the joint venture between the Poot Group and the ABP, whereby the former developed projects which, after acceptance, were financed by the latter, was terminated.

The facts and circumstances mentioned above, according to the opinion of the Appeal Court, entail that the ABP was allowed to interpret the Albaca transactions reasonably as a statement from the Poot Group aimed at the ABP purporting

that the Poot Group waived all rights under the joint venture which existed between them. After all, the arrangement made between the parties purported to discontinue the existing legal relationship between the parties. In this connection a financial settlement took place in connection with which both parties waived (financial) rights in order to reach a solution for the financial problems of the Poot Group. For instance the ABP did not exercise their rights as the first mortgagee and did not demand any contractual penalties while the Poot Group did not table any rights with regard to the non-purchase of the projects offered, holding on to the deposit monies and not claiming any compensation for project development costs incurred (in vain), even thought this would have been exactly quite obvious from the point of view of the Poot Group.

Moreover, it is important that even after the Albaca transactions the Poot Group did not protest or invoke (within due time) the nullity of this due to vitiated consent such as for instance by being in a forced situation of which the ABP made use in an unlawful manner.

6.3.8. Insofar as Poot alleges (written summary of the argument in appeal page 10) that, when in the unlikely event that the Appeal Court does not regard the ABP as liable due to breach of contract (making the project acceptance doubtful or stopping it and holding on to the deposit monies), the ABP remains notwithstanding liable on the basis of the obvious unlawful withholding of the CBR resolution of 7 December 1979 as a result of which the Poot Group incurred in vain at least 4 to 5 million Dutch guilders of project development costs, the Appeal Court also rejects this argument. Firstly the Appeal Court is of the opinion that, as has already been considered above, this right also lapsed by the Albaca transactions. These project development costs were made for the projects to be purchased by the ABP. When in the period of September and November 1980 the parties were negotiating and reached an arrangement entailing that the ABP would no longer purchase projects, not even the projects already developed and offered in a letter of 17 July 1980 for which therefore costs had already been incurred, which arrangement served to terminate the joint venture and in which a financial settlement took place in connection with which the Poot Group did not table rights relating to project development costs made in vain, the ABP could reasonably understand that the Poot Group relinquished such rights. Secondly - this is perhaps considered by the Appeal Court as unnecessary - the ABP disputed with good reasons that the CBR resolution entailed that the ABP would for the time being no longer purchase projects. According to the ABP this resolution did not preclude that the ABP would suffice with purchasing not more than four projects per year. The latter, namely that the ABP would purchase four projects each year, was communicated to Poot by the ABP in the beginning of 1980, as this has been admitted by Poot during the closing speeches in appeal. In that case it is not all the case that the ABP withheld the CBR resolution and thereby wrong-footed the Poot Group.

6.3.9. The conclusion is that the effect of the Albaca transactions of 21 November 1980 was to render the rights lapsed as regards the rights of the Poot Group to the ABP on account of breach(es) of contract and an unlawful act. Since the Poot Group has no rights in this respect, it can neither be the case that the said actions of the ABP constituted an unlawful act to Poot in his private capacity.

Therefore the Ground for Appeal has been brought forward rightfully. The success of the said defence also entails that Poot's claims have to be denied.

(etc.)

Ground for Appeal in cassation:

Misapplication of the law and/or non-compliance with procedural requirements, the observance of which has been threatened by nullity because the Arnhem Appeal Court considered and judged as represented in the appealed judgement of 29 June 1993, the contents of which should be regarded as repeated and incorporated herein, this being wrongly for the following reasons:

I 1 The ABP's breach of contract or unlawful act towards the Poot Group of which Poot was the single shareholder/director, through which the bankruptcy of that Group was caused and through which Poot's shares in that Group became worthless, can constitute an unlawful act to Poot even though there is no special legal obligation or duty of care for the ABP with regard to the sole shareholder.

After all, making Poot's shares worthless is, or at any rate can be, an infringement of Poot's personal rights which of course constitutes an unlawful act.

The single shareholder must be, or at any rate can be, regarded as a post-ordinary creditor of and/or co-title holder in and/or interested party in the company or the Group, so that to that extent his rights are also prejudiced by that breach of contract or unlawful act by the ABP.

At any rate the obligation is not vested in Poot to explain why the actions by the ABP complained of towards him in his private capacity, namely as the single shareholder, also constitute an unlawful act because a legal standard purports in principle to protect everybody who can suffer losses as a consequence of its violation, and namely to protect all losses which can be attributed to the ABP as a result of the violation, so that it is up to the ABP to furnish facts and if necessary to prove that the violated standard does not serve at the same time to protect the single shareholder whose shares have become worthless by these actions complained of.

2. At any rate the opinion of the Appeal Court that Poot did not comply with his obligation to furnish facts and that the circumstances indeed furnished and/or proved in the course of the proceedings cannot lead to the opinion that

the ABP without any further justification is indeed liable to Poot in his private capacity, has not been sufficiently reasoned according to the legal requirements, all the more where it has been indeed alleged - and is also an established fact - that Poot's shares in the Group became worthless as a result of those actions by the ABP to the Group and the shares becoming worthless must be, at any rate can be, regarded as a form of infringement of Poot's personal rights, if any.

II 1 The facts and circumstances mentioned by the Appeal Court in Ground for Decision 6.3.4, namely in short:

a. all the involved parties were looking for a joint solution and found it;

b. the Poot Group did not protest and urged the ABP to fulfil their obligations and did not hold them liable either;

c. the ABP did not exercise their rights as mortgagee and acquired the indoor tennis courts for a price above the forced-sale value;

d. the ABP relinquished contractual penalties,

are sufficient grounds to assume an agreement with the purport of discontinuing the existing cooperation and/or legal relationship, which also had the purport that the Poot Group relinquished all their rights under that joint venture which existed.

2. If the Appeal Court would have meant that this entails a waiver of rights, being a legal act, the Appeal Court ignored that acts and/or statements to this end on the part of the Poot Group are required which could reasonably be regarded as a statement directed to the ABP, that the Poot Group relinquished their rights under the existing joint venture. Such a statement is not at all the case, so that the only act can be that co-operation was given in the transfer of title of the indoor tennis courts with payment to NMB. Acts by the ABP can hardly lead to a statement by the Poot Group. To that extent the opinion of the Appeal Court is not reasoned according to the legal requirements either, after all the judgment does not make clear what other acts and/or statements by the Poot Group were sufficient reasons for the ABP to be able and be allowed to consider reasonably that all the rights were relinquished.

And if the Appeal Court had meant that the Poot Group had forfeited their right to sue the ABP, the Appeal Court has ignored that this can only be the case if claiming compensation is unacceptable according to the principles of reasonableness and fairness with a view to their prior actions which are inconsistent with this.

3. At any rate the opinion of the Appeal Court that the said facts and circumstances could have reasonably be interpreted by the ABP as a statement by the Poot Group directed towards the ABP which had the effect that they relinquished all the rights under the legal relationship which had existed, is not understandable just like that since Poot alleged that the Albaca transactions were not entered into with their full and free consent, but on the contrary that he and the Group were under duress or in an emergency situation created by the ABP, in which case the ABP on the contrary should not reasonably interpret the said facts and circumstances as a statement that the Poot Group relinquished all their rights under the legal relationship that had existed. And since the Appeal Court did not examine whether Poot and the Group were under duress or in an emergency situation as a result of actions and/or omissions attributable to the ABP in which case the ABP was not reasonably allowed to interpret the facts and circumstances as a statement waiving their rights, this possibility at any rate exists, the Appeal Court did not sufficiently justify its opinion according to the legal requirements. At any rate it is not understandable just like that, that the ABP was reasonably allowed to interpret the facts and circumstances as a statement including a

waiver of rights when their own actions and/or omissions were the reason that Poot and/or the Group were under duress or in an emergency situation, so that the Appeal Court did not reason its decision according to the legal requirements.

4. With regard to the duress or emergency situation alleged by Poot please refer to:

- Statement of Reply page 53 to 59
- Statement dated 7 March 1990 page 10 to 12
- Written summary of the argument in first instance page 18 to 26
- Statement of Appeal, Chapter VIII
- Written summary of the argument in appeal, Chapter I.

Insofar as is necessary this will be further explained in a written explanation.

5 Shortly after the Albaca transactions the Poot Group was declared bankrupt and as has been alleged, the receiver did lodge a protest. Please refer to the Statement of Defence in the principal claim pages 25 and 26 and to the letter submitted with it dated 5 May 1982 (Exhibit 29). In the proceedings the ABP did not put forward the defence that the receiver had not protested, so that to that extent this is a prohibited addition of factual defences. Therefore the Poot Group was not able to undertake any action against the ABP in this respect. The opinion of the Appeal Court that in addition it is also important that the Poot Group did not protest against the transactions or invoked their nullity, is therefore legally inaccurate and incomprehensible without any further justification and therefore not reasoned according to the legal requirements.

6 The soundness of these grievances has the result that the opinion of the Appeal Court in Ground for Decision 6.3.8 cannot be maintained either. The opinion of the Appeal Court that and why the ABP did not withhold the CBR resolution and did not wrong-foot the Poot Group is perhaps a superfluous consideration and therefore does not support the decision meant in that Ground for the Decision.

The Supreme Court:

1. The dispute in the instances deciding on the facts

The Appellants in cassation - further to be called: Poot - summoned the Respondents in Cassation - further to be called: the ABP - in a writ of summons dated 18 February 1988

before Zwolle District Court and claimed what has been described below in 3.2. The ABP put forward a defence against these claims whereby the ABP lodged counterclaims.

In a judgment of 19 December 1990 the District Court denied the claims in the principal action and the counterclaims.

Poot appealed from this judgment to Arnhem Appeal Court after which the ABP lodged a cross-appeal.

In the principal action and the cross-appeal the Appeal Court confirmed in its judgment of 29 June 1993 the judgment of the District Court.

(…)

3. Assessment of the ground for appeal in cassation

3.1 In cassation the following can be taken as a starting point.

(i) In the years between 1978 and 1980 there was a joint venture between the Poot Group and the ABP with regard to the development and exploitation of indoor tennis courts. The ABP purchased indoor tennis courts developed by the Poot Group and then leased them to the companies affiliated to the Poot Group. In this connection the Poot Group also cooperated with Sportfondsen Nederland NV.

(ii) In the middle of 1979 the latter company withdrew from the co-operation with the Poot Group. As a result of this, the manner of co-operation between the Poot Group and the ABP had been changed at the suggestion of the ABP.

(iii) On 7 December 1979 the Central Investment Board [*Centrale Beleggingsraad: 'CBR'*] of the ABP agreed with the amended setup of the transactions with regard to four indoor tennis courts.

(iv) The funds borrowed by the Poot Group secured by mortgage with regard to two projects were deposited with the ABP in order to be withdrawn for the erection of the structures. The mortgage sum with regard to another project was deposited with the civil-law notary also in order to be withdrawn for the structures to be built.

(v) On 17 July 1980 the Poot Group offered seven new projects to the ABP and they communicated on 6 August that in connection with an internal policy reorientation they would only be able to respond further to this offer at the end of August. On 28 August 1980 the ABP wrote a letter saying that they could still not take a decision after the reorientation and that they wanted more information.

(vi) During the discussions held thereafter on and after 10 September 1980 - whereby the NMB was involved as the company bank of the Poot Group - the ABP took the position that the Poot Group was in actual fact bankrupt. The ABP did not purchase the projects offered in the letter of 17 July 1980.

(vii) Next, the Poot Group and the ABP negotiated about the settlement. The NMB was also involved in these negotiations. These negotiations resulted in a full take-over by the Beleggingsmaatschappij Albaca BV, specially acquired for this purpose by the ABP, of the assets of the Poot Group with regard to the projects already acquired by the ABP. This take-over was effected on 21 November 1980.

(viii) The various companies belonging to the Poot Group were declared bankrupt in the period from 19 December 1980 to 21 April 1981.

(ix) Poot reproaches the ABP with the following actions

(a) making the purchase of the projects doubtful or stopping the purchase of them from 6 August 1980 onwards;

(b) holding on to the deposit monies deposited with the civil-law notary and the ABP;

(c) withholding from Poot the resolution passed by the Central Investment Board of the ABP on 7 December 1979 according to Poot, which included that for the time being no more indoor tennis courts would be purchased by the ABP from the Poot Group and that firstly it would be considered how the projects already started at that time would pan out, which withholding according to Poot had the result that the Poot Group continued in vain with developing projects for the ABP and with investing millions in this.

(x) Poot holds the position that the bankruptcy of his Group was caused by the actions of the ABC complained of and that he suffered losses in his private capacity because he was the sole shareholder and because of the bankruptcy all his shares became worthless.

3.2 In first instance Poot claimed principally a declaratory judgment that the ABP committed breach of contract or an unlawful act to Poot privately. In the alternative he claimed a declaratory judgment (1) that the ABP committed a breach of contract or unlawful act to the Poot Group, and (2) that this breach or unlawful act constitute also a breach or unlawful act to Poot in his private capacity. He linked to this claim a claim on the ABP for compensation of the losses he suffered estimated at an amount of NLG 24,000,000, at any rate an amount to be determined at the discretion of the District Court.

The District Court rejected the claims on the basis of its opinion in short that there was no causal link between any breach or unlawful act of the ABP and the bankruptcy of the Poot Group".

In appeal Poot did not maintain his principal claim as this was considered by the Appeal Court in Ground for Decision 6.2.2 of its judgment which is not contested in cassation. The Appeal Court rejected the alternative claim on two different grounds each supporting the rejection independently. So the argument can only lead to cassation if it contests both these grounds successfully.

3.3.1 For the time being the Appeal Court considered (in Ground for Decision 6.2.1) – unchallenged in cassation – that the co-operation did exist between the ABP and the Pool Group and not between the ABP and Poot in his private capacity, moreover that the Appeal Court understands the Poot Group to be one or more companies controlled directly or indirectly by Poot and that it also appears from the correspondence between the ABP and "Poot" that Poot did act with the ABP at all times from and via these companies.

3.3.2 Next, the Appeal Court put first and foremost in Ground for Decision 6.2.2 that Poot's claims are immediately available for rejection if it should be considered that – even though the ABP had committed breach of contract or an unlawful act towards the Poot Group – this breach or unlawful act does not also constitute an unlawful act towards Poot privately.

3.3.3 Within the scope of its consideration of the question as to whether the latter is the case, the Appeal Court further determined (Ground for Decision 6.2.3) that the actions of the ABP complained of by Poot related to actions towards the Poot Group which according to Poot also constitute an unlawful act to him in his private capacity because it was foreseeable that because of this his shares became worthless and moreover, that Poot argues in particular that the ABP knew that:
- Poot privately was the single shareholder and director of the Poot Group;
- the Poot Group was not financially strong and financially dependent onthe ABP;
- the actions by the ABP complained of would irrevocably lead to a bankruptcy of the Group and thereby to the shares privately held by Poot becoming worthless.

3.3.4 The Appeal Court reached the opinion in Ground for Decision 6.2.4 that no legal claim on the ABP accrues to Poot in his private capacity. This opinion was based on the following considerations:

(i) The single – albeit disputed – fact that the ABP knew or ought to have known that it could indeed be foreseen that the shares held by Poot would become worthless, is insufficient to define the actions of the ABP towards the Poot Group also as an unlawful act to the single shareholder of the Group.

(ii) For the latter it is required that the ABP in performing their actions should not only have been led by their legal obligation(s) or duty of care to the Poot Group, but in addition by a duty of care also to the persons involved in that Group such as for instance the single shareholder.

(iii) Poot sufficed by reproaching the ABP for the fact that they failed in their legal obligations and duty of care with regard to the Group; therefore Poot did not comply with his obligation to furnish facts with regard to the alleged unlawfulness of the actions of the ABP complained of towards him in his private capacity.

(iv) The circumstances which were indeed put forward by Poot cannot lead to the opinion that the ABP is liable to him personally, while the losses alleged by Poot fully coincide – in a material sense - with the losses which according to him were suffered by the respective companies.

3.4.1 Part 1 of the ground for appeal in cassation is aimed against Ground for Decision 6.2.4 of the judgment of the Appeal Court.
Under 1 the part of the ground for appeal in cassation has put forward some legal grievances. In assessing these, the following should be taken as a starting point. Companies limited by shares and private companies with limited liability are legal entities taking part in legal transactions independently as carriers of their own rights and obligations, even if they are controlled by a single person, as in the present case

(sole director and single shareholder). The assets of a company are separated from those of its shareholders. If a third party inflicts financial losses on a company by not properly fulfilling contractual obligations to the company or by actions which are unlawful to the company, the company alone has on account of this a right to claim from the third party compensation for these losses inflicted on them.

This financial loss by the company will, for as long as it has not been reimbursed, involve a decrease in the value of the shares in the company. However, on the basis of this loss created (initially) for them, the shareholders cannot in principle bring an action for their own claim for damages against the said third party. It is up to the company to claim damages from the third party for the protection of everybody who has an interest in preserving its assets; if the company is successful, the drop in value of the shares corresponding with this loss should be regarded as having been undone. If the company refrains from claiming damages, the interested parties do not have to acquiesce in this; in that case the Dutch legal system offers sufficient options to urge the management board of the company still to bring the action.

There are no grounds to make a distinction on this point between the case of a company with a number of shareholders and a company the shares of which are held by one person. In this connection it is neither relevant to what extent, at a company with only a single shareholder, the latter as the (single) director also controls the comings and goings of the company.

3.4.2 Poot has alleged that the actions of ABP complained of have resulted in the bankruptcy of the Group and thereby to his shares becoming worthless. He also alleged that the ABP knew that these actions would have these consequences. Therefore the question arises as to whether – if these allegations were correct - the present case can be put completely on a par with the normal type of cases as described above under 3.4.1.

However, the answer to this question can be left aside since the Appeal Court based the contested decision on its opinion that Poot did not put forward any facts and circumstances from which it would ensue

that the ABP not only acted unlawfully to the Poot Group but also in violation of the care required towards Poot privately which opinion, as will appear below, is disputed in vain.

3.4.3 Contrary to what has been pleaded in part I under 1, the "rendering worthless" of the shares by the alleged causing of the bankruptcy cannot be regarded as an infringement of Poot's personal rights which infringement would be unlawful even without a duty of due care to Poot being violated. It is true that a share in a company is a property right but inflicting losses on the company cannot - however much though this constitutes an infringement on the rights of the company - at the same time also be regarded, also in view of what has been considered in 3.4.1, as an infringement of this property right to be exercised by the shareholder to the company.

The part argues further under 1 that a legal standard purports in principle to protect all those who as a result of its violation can suffer losses, so that it is up to the ABP to furnish facts and if necessary furnish evidence that the standard violated in this respect does not purport to protect the single shareholder. This plea fails because according to Poot's own allegations this does not involve the violation of a specific legal provision but the rule currently laid down in Section 6:162, subsection 2, and also in force before 1 January 1992 that an action or omission is unlawful when it is contrary to what is befitting in society according to unwritten law. This standard relates to the care which should be observed in a certain relationship towards one or more specific others and is therefore by its nature not a standard purporting to protect the interests of everybody suffering losses as a result of the fact that the required care was not observed towards those specific others. Therefore the Appeal Court rightly assumed that Poot as the plaintiff ought to have alleged which specific standard of due care should have been observed by the ABP towards Poot privately and that it was not sufficient for him to allege a breach of contract or negligent actions by the ABP towards the Group.

3.4.4 It follows from the above that the legal grievances put forward in the part under 1 have failed.

The justification grievance raised in the part under 2 has also been put forward in vain. The Appeal Court justified properly in its Ground for Decision 6.2.4, read in conjunction with the considerations set out in Ground for Decision 6.2.3, why it considered that the allegations put forward by Poot were not sufficient to deduce from these that the ABP is liable to Poot in his private capacity.

3.5 Since the opinion disputed in vain in part I supports the decision of the Appeal Court independently, part 2 of the ground for appeal in cassation can remain undiscussed.

4 Decision

The Supreme Court

Rejects the appeal;

Orders Poot to pay the costs of these proceedings in cassation, on the part of the ABP estimated up to this decision at NLG 7057.20 for disbursements and NLG 3000 for fees.

[Opinion] Conclusion of A-G Hartkamp, Master of Law:

Facts and development of the proceedings

1) For the facts established I refer to Ground for Decision 4.2 – 4.8 of the judgment of the Appeal Court contested in cassation. In the years between 1978 and 1980 there

was a joint venture between the Group of the appellant in cassation, Poot, and the respondents in cassation, the ABP, with regard to the development and exploitation of indoor tennis courts. Poot alleged that the ABP committed breach of contract or an unlawful act towards the Group thereby causing the bankruptcy of the Group (completely dependent on the ABP) and that this also entailed an unlawful act towards him, Poot in his private capacity, since the bankruptcy resulted in his shares becoming worthless and the ABP knew that he was the single director/shareholder.

2) In short the actions of the ABP complained of  by Poot boil down to the following (see also Ground for Decision 6.2.3 of the judgment of the Appeal Court, unchallenged in cassation, and the initial writ, page S-2):

1) making the purchase of the projects doubtful or stopping this, commencing with the letters of 6 August 1980 and 28 August 1980 and moreover in the discussions on and after 10 September

2) holding onto the deposit monies held by the civil-law notary and by the ABP (see the initial writ page III-3 up to III-17);

3) withholding from Poot a resolution passed on 7 December 1979 by the Central Investment Board ('CBR') of the ABP which included that they would for the time being no longer purchase any indoor tennis courts from Poot and that it would first be considered how the six projects already started up would pan out, so that Poot continued in vain with developing and investing millions in projects for the ABP.

3) As said above, according to Poot these actions constituted a breach of contract or an unlawful act to the Poot Group and also to Poot in his private capacity. Poot alleged that he suffered losses privately because he was the single shareholder of the Poot Group and because all his shares had become worthless in one blow as a result of the bankruptcy of the Group caused by the ABP. According to Poot the unlawfulness towards him in his private capacity was based on the breach of contract or unlawful act towards the Poot Group in combination with the following circumstances (see initial writ page VI-10):

- The ABP knew that Poot privately was the single director/shareholder of the Poot Group;

- The ABP knew that the Poot Group was not financially strong and financially dependent on the ABP;

- The ABP knew that ABP's complained of actions would lead irrevocably to a bankruptcy of the Group and thereby of the shares of Poot held privately becoming worthless.

4) the ABP put forward a number of (meritorious and preliminary) defences against Poot's claims.  In addition, the ABP lodged a counterclaim which however is no longer relevant for the appeal in cassation.

The meritorious defence of the ABP boils down to the fact that that the ABP cannot reproached with breach of contract or an unlawful act; Poot himself created the downfall of his Group by irresponsibly undertaking many obligations while the Group's equity was much too low.

In cassation only two of the ABP preliminary defences are relevant:

A) (see the response in the further Statement in the principal claim in first instance page 20/21:).  Since Poot bases his claim on the losses suffered by him as the shareholder, the '*Schutz standard requirement*' has not been complied with because the standard allegedly violated by the ABP, namely  the obligation to fulfil an agreement, or to honour the expectations created of entering an agreement, is only applicable to the protection of the interests of the person with whom the agreement was made, or whose expectations were created – in this case the Poot Group – and not to the protection of third parties such as in this case Poot who was not involved with the companies as a creditor but as a shareholder.

B) (see Statement of Defence in the principal claim also counterclaim page 23/24:) The transactions of 21 November 1980 whereby Albaca BV took over the assets of the Poot Group with regard to the six projects already purchased by the ABP (see Ground for Decision 4.7 of the judgment of the Appeal Court), were the execution of an arrangement made by the parties in the period from 10 September until 21 November 1980 which was of a final and discharging nature. This was never expressed in so many words, but according to the ABP this ensues from the circumstances of the case, namely:

- that the parties were searching in this period for a joint solution in proper consultation and discussing everything that was regarded as necessary by anyone and also reached this solution;
- that Poot in that period did not at all urge the ABP to purchase the seven projects offered on 17 July 1980;
- that the ABP intentionally did not exercise their rights as the first mortgagee of the indoor tennis courts in Dordrecht, Bergen op Zoom, Etten-Leur and Aalsmeer, but acquired these courts for a price far above the forced-sale price applicable at that time;
- that the ABP refrained from collecting the contractual penalties in default of payment.

Under these circumstances the arrangement made should be given a final and discharging character since Poot did not make a reservation of the rights currently asserted by him, at any rate Poot forfeited his right to exercise these rights, as this was argued by the ABP.

5) The District Court rejected Poot's claims. The District Court considered – in short – that there was no causal link between any breach of contract or unlawful act by the ABP and the bankruptcy of the Poot Group. It is true that the District Court considered that the ABP withholding the deposit monies (in the court file indicated as the "WIR Extortion") constituted a breach of contract or was at any rate an unlawful act, as well as not informing Poot of the CBR resolution of December 1979, but these

actions by the ABP did not according to the District Court lead to the bankruptcy of the Poot Group.

On the basis of the financial figures of the various companies affiliated to the Poot Group the District Court concluded that the bankruptcy of the Group was already unavoidable before the actions by ABP complained of took place, because the Group showed a deplorable financial structure (the District Court speaks for instance (in Ground for Decision 28, second paragraph) of a "a situation that had seriously gone wrong in that sense that a part of the fixed assets and moreover start-up losses were financed by short-term debts"). The District Court held the view that the NMB would have withdrawn in any event, whether or not the ABP would have purchased the seven new projects offered in July 1980. Under these circumstances according to the District Court the ABP was not obliged to purchase the seven projects, so that ceasing to purchase the projects did not constitute a breach of contract towards the Poot Group.

6) The Appeal Court confirmed the judgment of the District Court, albeit on other grounds. The Appeal Court examined the two preliminary defences of the ABP, mentioned under 4 and considered as being well-founded. The honouring of each or both defences can support the rejection by the Appeal Court of Poot's claims independently.

A. Unlawful act to Poot in his private capacity? The Appeal Court considered that the single fact that the ABP knew or ought to have known or could have foreseen that Poot's shares would become worthless, is insufficient to define the actions of the ABP towards the Poot Group also as an unlawful act to the single shareholder of the Group. The Appeal Court considered that for this it is necessary that the ABP should be led in their actions by a duty of care towards persons involved in the Group such as for instance the single shareholder. Poot did not allege which (extra) duty of care – apart from the duty of care to be observed towards the Group -  the ABP should in this case have observed towards him in his private capacity as the single shareholder, according to the Appeal Court.

B. Albaca Transactions: rendering the rights as lapsed? The Appeal Court considered that the ABP could reasonably interpret the Albaca Transactions as a statement by the Poot Group aimed at the ABP purporting that the Poot Group waived all rights under the joint venture which had existed. After all, according to the Appeal Court the arrangement made between the parties purported to discontinue the existing legal relationship between the parties. In this scope a financial settlement took place in connection with which both parties relinquished (financial) rights in order to reach a solution to the financial problems of the Poot Group.

7) The ground for appeal in cassation presented within due time includes two parts indicated by Roman numerals. Part I consisting of two sub-sections, is aimed at the ground represented above under A; part II, consisting of six sub-parts, disputes the ground mentioned under B. The parties gave a written explanation of their case and submitted a Statement of Reply and a statement of Rejoinder.

When assessing the appeal in cassation it should be presupposed that the ABP acted unlawfully and/or was in breach of contract towards the Poot Group and that this unlawful act and/or breach of contract resulted in the bankruptcy of the Poot Group. After all, the Appeal Court left this aside (albeit that the Appeal Court declared the complaint with regard to the actions of the ABP mentioned above under nr. 2 under 3 as unfounded in Ground for the Decision 6.3.8. i.f.).

Discussion of the ground for cassation

8) Part I attacks Ground for the Decision 6.2.4 of the judgment of the Appeal Court in which the Appeal Court considered that no legal claim against the ABP accrues to Poot in his private capacity.

Sub-part I, 1 includes a legal grievance entailing that the Appeal Court has ignored that a breach of contract or unlawful act by the ABP towards the Poot Group, of which Poot was the single shareholder/director, by which the bankruptcy of that Group was caused and by which Poot's shares in that Group became worthless, can constitute an unlawful act towards Poot even though there is for the ABP no special legal duty or duty of care towards the single shareholder. It is argued that rendering Poot's shares worthless is, or at any rate could be, an infringement of Poot's personal rights. According to the sub-part there is no obligation on Poot to explain why the actions of the ABP complained of also constitute an unlawful act against him in his private capacity, namely as the single shareholder, since a legal standard purports in principle to protect everybody who can suffer losses as a result of its violation. So it is up to the ABP to allege, and if necessary to prove, that the violated standard did not also purport to protect the single shareholder whose shares have become worthless because of those actions complained of, according to the sub-part.

In part I.1 a justification grievance was added to this, entailing that the opinion of the Appeal Court is incomprehensible that Poot did not furnish sufficient facts in order to conclude an unlawful act towards him in his private capacity.

9) I discuss the complaint first against the background of the nature of the legal entity and of the system of company law.

The Appeal Court considered as insufficient the mere unlawful act to the Group of which Poot was the sole director and single shareholder as a result of which he suffered losses privately because his shares became worthless, in order to assume that the ABP also acted unlawfully to Poot in his private capacity. I think this opinion is correct. A private company with limited liability or company limited by shares is a legal entity (Section 2:3 of the Civil Code), which participates in legal transactions as an independent carrier of rights and obligations (Section 2:5 of the Civil Code) and the assets of which are separated from the private assets of the shareholders. A shareholder is not personally liable for the debts of the company (Section 2:64 and 2:175 of the Civil Code). It ensues from the system of company law that the company is not merely a cluster of shareholders' interests (see for instance P. van Schilfgaarde, "Van de BV en NV" (1992), page 26 et seq. and Mohr, "De dubbelrol aandeelhouder-bestuurder", in "De dubbelrol in het vennootschapsrecht" (1993), page 81), but it is a separate, autonomous legal entity independent to a certain extent from the

shareholders (institutional opinion). See Van der Heijden/Van der Grinten, "Handboek voor de naamloze en besloten vennootschap" (1992), numbers 48 and 52 and Cahen "De invloed van de belangenverbreding op het handelen van de aandeelhouder, in: Honderd jaar rechtsleven, NJV 1870-1970" (1970), page 71 et seq. About the shift from the contractual to the institutional opinion of the company limited by shares and the private company with limited liability, see Van Schilfgaarde, quoted work page 19 and in "Tot vermaak van Slagter" (1988), page 253 et seq. It is true that Lowenstein, "De naamloze vennootschap als raakpunt van contraire belangen, in: Honderd jaar rechtsleven, NJV 1870-1970" (1970), page 85 etc. holds the view that the interest of the company is nothing other than the shareholders' profit interest, but he does not connect to it the conclusion that the company and shareholder(s) can be identified.

The consequence of this should in my view be that a shareholder cannot in principle bring an action to protect his interest in the company. The shareholder enjoys the benefits of the institute of the company as a legal entity (limited liability); he should also carry the burdens of it and leave the representation of the company's interests to the company itself or in the event of a bankruptcy to the receiver. See Bloembergen, "Schadevergoeding bij onrechtmatige daad" (diss. 1965), page 310: it ensues from the nature of the legal entity that the shareholder cannot bring an action and that the legal entity the rights or interests of which are prejudiced, ought to act itself; should the legal entity refrain from doing so, the parties who have a right or interest in its assets should try to induce the legal entity internally to take action. This is likewise in Belgian law according to Dirix, "Het begrip schade" (1984), page 100, who comments that the losses of the members of a legal entity, caused because the legal entity is prejudiced in its interests, only results from their capacity as a member. Moreover, an opinion to the contrary, certainly in the case of more than one shareholder,  would lead to chaotic situations: individual shareholders' could claim damages in proportion to their shareholding which would lead to many lawsuits running concurrently on the basis of the same complex of facts with all the associated complications. See also Bloembergen loc.cit.

The only case law in which, as far as I know, the legal question under discussion here was answered, is formed by three judgments of lower courts: The Hague District Court 1 December 1927, NJ 1928, page 208 et seq.; Utrecht District Court 28 January 1953, NJ 1954, 97 and Utrecht District Court 17 March 1954, NJ 1955, 89. In all these decisions the claim of the shareholder in his private capacity has been rejected; in the decisions in 1927 and 1953 on the basis of the nature of the company as a legal entity and in the decision of 1954 via the doctrine of adequate cause: a decrease in the share value is not regarded as an element of damage which is a foreseeable, adequate consequence of the unlawful act towards the company limited by shares. In my opinion the latter construction is not very obvious: if a company has suffered losses because of an unlawful act, a decrease in the value of the shares in that company is on the contrary a very adequate consequence of the unlawful act.

See for a negative answer of the question as to whether a breach of contract towards a company constitutes an unlawful act towards the person who is involved in the company as the director/shareholder/ surety, Zutphen District Court  9 March 1989, NJ 1990, 207, in which it was considered that the violated standard, namely the obligation to fulfill an arrangement made which is binding by law, only applies in our legal system as a protection of the interests of those with whom the arrangement was made – in this case the company – and not to protect third parties such as the person who is involved in the company as director/shareholder/surety. See also Amsterdam Appeal Court 21 June 1934, NJ 1935 page 595:

"that in general no obligation to behave befittingly rests on the party who undertook to furnish advances to another, which is enforceable via the courts, to indeed fulfill this undertaking at all towards the persons who as a creditor or shareholder or official of that other party have a direct interest in the furnishing of those advances indeed taking place; (…)".

10) I now give attention to some aspects more specifically relating to the doctrine of the unlawful act.

a) If one translates what has been said above with regard to the law on legal entities and company law into the law on tort, it ensues from this that not every unlawful act of a third party towards the company with a consequential (foreseeable to that third party) decrease in value of the shares in that company or their becoming worthless, automatically constitutes an unlawful act towards the shareholder(s). One could base this both on the consideration that in this case the relativity requirement has not been complied with (the violated standard does not purport to protect the interest the shareholder has in a flourishing company and therefore not to protect against damage consisting of a decrease in the value of the shares), as on the consideration that there have been no actions that were negligent in society towards the shareholder, so that the requirement of unlawfulness is not met. The Appeal Court apparently followed the latter approach, considering its consideration (Ground for Decision 6.2.4 see also above) that Poot had not alleged which duty of care should have been observed by the ABP towards Poot in his private capacity as a sole shareholder. So the Appeal Court is looking directly for a duty of care in the relationship between the ABP and Poot privately and then establishes that this is lacking since Poot did not furnish facts and circumstances which could lead to the assumption of such a duty. About the question as to whether the doctrine of relativity misses its meaning when the duty of due care in society has been violated because the relativity is already incorporated into the

standard, see Schut, diss. (1963), p.136/137 and the same writer in "Onrechtmatige daad volgens BW en NBW" (1990), p.44 and Asser-Hartkamp III (1994), nr. 99.

b) It appears to me that the doctrine of the causal link is less suitable to achieve the result pleaded: no action on the grounds of an unlawful act for the shareholder in his private capacity (see the judgment mentioned above of Utrecht District Court of 17 March 1954, NJ 1955, 89). That the attribution according to reasonableness has in the meantime replaced the doctrine of adequacy makes no difference in my opinion. With regard to the attribution according to reasonableness it will depend on the circumstances of the case (for instance the type of standard which was violated, the nature of the liability, the foreseeability of the loss) whether the decrease in value of the shares has a causal link with the unlawful act towards the company. In my view the person who acted unlawfully towards a company should however in principle for that single reason not be liable to the shareholder(s), regardless of the nature of the violated standard and regardless of the nature of the liability. Say for instance a third party violates an unwritten traffic or safety standard by which a fire originates in a factory of a company so that the company suffers losses. The circumstance that this involves a violation of a traffic or a safety standard entails that the attribution should be ample. Suppose that a heavy culpability of the injuring party is involved, this circumstance also points in the direction of liability, also for consequences that are further distant from the act. The losses suffered by the company because its factory building was burned down, is a typical and foreseeable consequence of the violation of the unwritten standard of due care, for instance that you should not throw a burning cigarette away in a factory. The losses suffered by shareholders as a result of a loss by the company is in my view also a typical and therefore foreseeable consequence of the act. In this example it would in my view give a somewhat forced impression to reject liability because one cannot say that the losses of the shareholder(s) cannot reasonably be attributed to the culprit as the result of the unlawful act.  After all, all relevant points of view lead in the direction of attribution. That the injuring party ought not to be liable to the shareholder, is not so much – instinctively – because of the fact that the loss of the shareholder is not a (sufficiently direct) consequence of his act but that the direction of the unlawfulness was

different namely unlawful towards the company, who owns the factory building and not unlawful to the shareholders of the company.

So it is better to assume that the violated standard of due care does not purport to protect the shareholders of the company which owns the premises. Anyway probably in most cases the same result can be achieved via both doctrines. About the relation between the limitation of liability by attribution according to reasonableness and by application of the relativity requirement see G. Lankhorst "De relativiteit van de onrechtmatige daad", (diss. 1992), page 145 et seq. and Asser-Hartkamp III (1994), nr. 108.

c) Poot's argument that his personal rights have been infringed by making his shares worthless, should in my opinion also be rejected. A share in a company can in my opinion not be regarded as a right within the sense of the criterion of the unlawful act "violation of a right" (currently codified in Section 6:162 of the Civil Code). For the question which rights are eligible as "personal rights", see the Loose-leaf "Onrechtmatige Daad I" (Jansen), nr. 37 et seq. This shows that in principle this should involve an absolute property right or a personal right. A share is a relative property right namely a right that can be exercised against the company. See Van der Heijden/Van der Grinten, "Handboek" nrs. 161, 173 and 201, Van Schilfgaarde, "Van de BV en de NV" (1992), page 97 et seq. For instance the transfer of a registered share, if Book 2 would not include a provision to the contrary (Section 2:86, 86c and 196) be governed by Section 3:94 of the Civil Code with regard to the transfer of "rights to be exercised against one or more specific persons". And even if one would view this differently because one wants to emphasise more the nature of the share as an asset of the shareholder, the said relative aspect of the right would nevertheless remain so important that committing an act by which someone's shares become worthless, is in my opinion a case in which the question as to whether a violation occurred, will in the end be determined by the question whether a standard of due care has been violated. So this route also leads to the result that a shareholder only has an action arising from an unlawful act if a third party acted negligently to him; in my opinion in such a case as the present one no independent meaning can be given to the criterion "violation of a right". See in this respect Asser-Hartkamp III (1994), nr. 41 and nr. 54.

11) Now some comments about the loss claimed in this case.

The Appeal Court determined - not challenged in cassation - that the damage alleged by Poot coincides in a material sense fully with the damage which according to him was suffered by the respective company (Ground for Decision 6.2.4, at the end). This formulation reminds me of the comment made by Bloembergen (quoted work page 309) that in most cases the individual shareholder will not be able to bring an action because he did not suffer losses in his private capacity because the assets of the company did not decrease when the company itself can bring an action based on an unlawful act. See also Dirix, who comments loc. cit. that the losses of the members of the legal entity coincide with the losses suffered by the legal entity within the sense that remedying the losses of the legal entity also stops at the same time the losses of the members.

However, contrary to what Counsel Meijer, Master of Law, argued on behalf of the ABP in his written explanation (page 12 et seq.) I would not assume that the said consideration can already support the opinion of the Appeal Court independently and that because of this, part I of the ground for appeal lacks an interest. The fact the

Poot's losses coincide fully in a material sense with the losses of the companies does not necessarily in my opinion mean that Poot in his private capacity did not suffer losses. The latter was therefore not determined by the Appeal Court. Initially the receiver refrained from bringing an action for reasons of his own (probably because the estate only contained liabilities; see the specification of facts in the statement preceding the ruling of the Supreme Court of 5 June 1992, NJ 1992, 601, and in the ruling itself). In such a case the private loss of the shareholder will not at all be reduced by the fact that the estate has a claim arising from an unlawful act. Apparently (as this appears from the assertions of the ABP in the instances deciding on the facts, unchallenged by Poot) at a later stage the receiver  assigned the claim of the estate to Poot in his private capacity. However, even then it can also not be said just like that, that Poot has to try to get his losses reimbursed in that way. If it must be assumed that an unlawful act was also committed towards Poot privately, Poot will in my opinion be free to claim reimbursement for his own losses; this is not a matter of circumventing the bankruptcy at all since Poot in his private capacity is after all not bankrupt.

See in this connection the annotation of Van Schilfgaarde in Ars Aequi under a ruling of the Supreme Court of 14 January 1983 (<u>NJ 1983, 597</u>, Peeters/Gatzen), AA 1984, page 222. He discusses the case up for discussion in that ruling that the receiver brings an action arising from an unlawful act against a third party for the benefit of the joint creditors of the bankrupt company. The rights of the individual creditors to bring an action based on Section 1401 are not automatically suspended because of the bankruptcy; but the principle of due process might be contrary to a creditor bringing or continuing an action when the receiver brings an action on behalf of the estate on the same grounds. Next, Van Schilfgaarde wonders (page 223) whether the receiver has in this case an exclusive power so that the claim of the individual creditors is cancelled by payment to the receiver. This question is answered negatively by Van Schilfgaarde for which he puts forward as an argument that because of the bankruptcy indeed the assets of the bankrupt company but not the rights of its creditors against a third party are put under administration. From what would the receiver derive the right to dispose of the claim of individual creditors to a third party? comments Van Schilfgaarde. But he does comment that by the payment to the receiver the individual creditor will in general no longer have any losses as a result of the unlawful act:

"If in such a case the third party pays his resultant debt to the receiver and this amount as part of the credit balance is then divided according to the bankruptcy rules, individual creditors will have received

an amount that is in principle equal to the amount they could personally claim from the third party by way of compensation. (…)"

About the concurrence of an action of the receiver arising from an unlawful act and of an individual creditor against a third party see also the annotation of Wachter in the NJ under this ruling (NJ 1983, 597, page 1881, right column and page 1882 left column). He mentions that in French law only the receiver can bring an action but that the claims of the individual creditors revive if the receiver does not bring an action.

12) Exceptions to the rule. In my opinion it is not impossible that in certain cases special circumstances can occur involving an unlawful act or breach of contract against the company also constituting an unlawful act against the shareholder(s) in their private capacity.

a) Under certain circumstances it is possible that someone forming part of a body of a company is sued in his private capacity by a third party on the grounds of an unlawful act, although his actions took place in his capacity as part of that body, and is therefore primarily regarded as an unlawful act or breach of contract of the company itself towards this third party (managing director's liability, liability breakthrough). For the personal liability of a managing director on the grounds of an unlawful act, see for instance the recent ruling of the Supreme Court of 10 June 1994, RvdW 1994, 130 (NJ 1994, 766, with annotation of Ma; edit. staff). Also a shareholder (which itself can be again a legal entity) can under certain circumstances act unlawfully against a third party by which he will held liable "in his private capacity". The "liability breakthrough" in corporate relationships comes to mind which was assumed by the Supreme Court in the well-known Osby ruling (Supreme Court 25 September 1982, NJ 1982, 443, with annotation of Ma.), repeated in the ruling of the Supreme Court of 19 February 1988, NJ 1988, 487, with annotation of G (Albada Jelgersma). See also the ruling of the Supreme Court of 8 November 1991, NJ 1992, 174, with annotation by Ma. Cases in which the sued party was the managing director and single shareholder: Supreme Court 2 November 1984, NJ 1985, 446, with annotation by Ma and the Supreme Court 3 April 1992, NJ 1992, 411 with annotation by Ma. Liability of a managing director/single shareholder in his private capacity on the grounds of identification is an exception; it must be justified by special circumstances (see Mohr in connection with the latter ruling "De dubbelrol aandeelhouder-bestuurder, in: De dubbelrol in het vennootschapsrecht" (1984), page 84 as well as the ruling by the Supreme Court of 2 November 1984 mentioned above, NJ 1985, 446 and the conclusion of A-G Franx before and the annotation of Maeijer under that ruling). See further about identification issues Roelvink "Door rechtspersonen heenkijken", consultative report NJV 1977.

In cases where the other way around, i.e. at the expense of persons belonging to a body of the company, a "lifting/piercing of the corporate veil" can occur under special circumstances, this should under certain circumstances in my view also be possible for the benefit of those persons. Roelvink considers this probably also in this sense, quoted work page 138/139.

b) For accepting such special circumstances it is in my view not sufficient that one natural person is (directly or indirectly) the single shareholder of a corporate group, not even if the other party is aware of the fact that the actions complained of will result in the bankruptcy of the group and thereby to the shares becoming worthless. In my view there is in principle no difference between the case in which there is a sole shareholder or principal shareholder and the case in which the shares are held by

thousands of anonymous shareholders. Bloembergen ditto, quoted work page 308, annotation 3. In all these cases the argument against assuming an unlawful act towards the shareholder(s) in his(their) private capacity derived from the system of company law and the nature of the legal entity set out above applies similarly.

The fact that the shareholder is also the sole director, constitutes in my opinion neither a special circumstance resulting in the liability to the shareholder in his private capacity; it appears to me absurd that it would make a difference for the liability to the shareholder in his private capacity whether the third party knows the shareholder personally because by chance he is also the single director of the company and acts in public in that capacity on behalf of the company.

Also the circumstance that the other party is aware of the fact that the shares will become worthless does not constitute in my opinion a special circumstance which justifies a deviation from the principle formulated since this is inherent in the institution of the private company with limited liability or the company (limited by shares). After all, at all times when someone commits an unlawful act against a private company with limited liability or a company limited by shares by which that company suffers losses, he will (ought to) understand that this loss insofar it is not reimbursed, will be expressed in a decrease in the value of the shares or the shares becoming worthless. This is different in the reverse case where a third party commits an unlawful act against a natural person while this third party does not know that a company is also involved which suffers losses as a result of that unlawful act; see 's-Hertogenbosch Appeal Court of 14 May 1980, NJ 1981, 652.

Even if the unlawful act was committed deliberately and in the knowledge that the company will suffer serious losses or will go bankrupt because of this, the nature of the corporate relationships or the purport of the violated standard will preclude in my opinion accepting the liability to the shareholder(s) in his(their) private capacity.

Apart from that: that there was malice from the side of the ABP, at any rate that the actions of the ABP were grossly unlawful, was indeed put forward by Poot in the instances deciding on the facts (see for instance the initial writ page I-8. last paragraph; page VI-3, last paragraph; page VI-7, last paragraph; page VI-8, last paragraph; Statement of Reply in the principal claim also of Defence in the counterclaim page 64 under 5.23, last sentence; page 70, under 5.42; written summaries of the argument on the part of Poot in first instance page 33, last paragraph and page 34; Statement of Appeal page 27 at the bottom; written summary of the argument in appeal page 17 first paragraph; page 31 last paragraph), but denied by the ABP (Statement of Rejoinder in the principal claim and of Reply in the counterclaim

page 191, page 205; written summary of the argument in appeal page 28). The fact was not mentioned by the Appeal Court in its representation of the circumstances on which Poot relies to substantiate his argument that the ABP is liable to Poot in his private capacity. In cassation this representation of Poot's allegations is not disputed as incomplete, see also below in the treatment of sub-part 1.2. Therefore Poot no longer relies in appeal on the seriousness of the unlawfulness or the extent of the culpability/intention on the part of the ABP as a special circumstance. So this circumstance cannot count in cassation as a (presumed) established fact so that the question whether the person who commits the unlawful act is also not liable to the shareholder in the event that the unlawful act was committed intentionally to harm the company, can in my opinion be left aside in this case.

Neither do I see a basic difference between the shares becoming completely worthless as a result of the bankruptcy of the company and a decrease in the value of the shares because damage is only inflicted on the company which did not result in a bankruptcy (on which difference Poot relies).

c) A special circumstance with the effect that a breach of contract or an unlawful act against a company constitutes at the same time an unlawful act against the shareholder(s) privately, occurs in my opinion for instance in the event that the unlawful act or the breach is committed against the company with the preconceived aim of hitting the shareholder(s) in his(their) private capacity, so whereby the company is used as it were to hit the person(s) "behind the scenes". See the judgment mentioned above of Zutphen District Court of 9 March 1989, <u>NJ 1990, 207</u>: circumstances which might give rise to deviate from the rule that a breach of contract towards the company cannot constitute an unlawful act against the director/shareholder and surety, are according to Zutphen District Court for instance intention to inflict harm and knowledge of this harm to the director/shareholder/surety. As I said above, the mere knowledge of inflicting harm is in my opinion insufficient. The presence of the intention to inflict harm on Poot privately was neither put forward nor proved.

d) As appears from what has been said above, I hold the view that in order for an action by a shareholder in his private capacity arising from an unlawful act to be successful, stricter requirements should be put than for a successful action based on an unlawful act of an "ordinary" creditor of the company. In the ruling of the Supreme Court of 28 June 1957, NJ 1957, 54 with annotation by L.E.H.R. (Erba) the Supreme Court decided that a creditor of a company can under certain circumstances successfully bring an action arising from an unlawful act against a bank which provided a large credit facility to a company for which the company had to transfer all its assets by way of security to the bank or attach them otherwise by way of security:

" That it is in contravention with what is befitting in society with regard to someone else's property, that a bank granting credit against the stipulation of a security to the extent as supposed above, either knowingly and wilfully, or by a lack of care for the interests of others (italics ASH) - who are still confronted by the debtor as a buyer only as a result of his business being held viable through the bank credit and who trusting in his apparent creditworthiness supply to him - will be paid at the expense of new suppliers (…)"

The Supreme Court does not require intention in order to prejudice the creditor(s). The mere lack of care for the interests of creditors can already be unlawful according to the Supreme Court. That is different with respect to shareholders, can be justified

because a shareholder is not a creditor of the company, at any rate has a special position with regard to the other creditors which position results from the special relationship between shareholders and the company (the shareholder is sometimes characterised in the literature as a "post-ordinary creditor").

13) For completeness sake I mention the following cases from case law and literature in which a shareholder in his private capacity can bring a claim for damages.

Firstly defamation of a private company with limited liability or a company limited by shares can also constitute defamation of the director and/or single or principal shareholder in his private capacity: Van der Heijden/Van der Grinten, "Handboek" nr. 61 and Bloembergen, Diss. page 310, annotation 3. In this connection not only is a loss involved consisting of the determination of the value of the shares but also a loss consisting of a defamation (in his private capacity) so that this case is not comparable with the present case.

See also the rulings quoted by Roelvink, quoted work page 116/117 concerning compulsory purchase where the question arose each time as to whether a company limited by shares and its single shareholder can be identified when the former suffers a loss and the latter is the expropriated party or the other way around. In this case the loss suffered by the single shareholder in his private capacity does not (only) consist in a decrease in value of his shares.

Finally the Supreme Court on 6 December 1957, NJ 1958, 40. In the case that led to the ruling a breach of contract was involved with regard to the construction of a ship against a certain Goekoop who then contributed the ship to a company limited by shares of which he was the single shareholder. Goekoop claimed damages in his private capacity alleging that because of the close relationship between him and the company he should be regarded as having suffered personally and directly the damage which was the consequence of the breach of contract. According to the Supreme Court the Appeal Court rightly rejected Goekoop's claim because the damage could not be regarded as Goekoop's own personal damage. However, the Supreme Court considered explicitly that Goekoop did not claim compensation for damage consisting of a decrease in the value of his shareholding as a result of the loss suffered by the company limited by shares. The difference from the present case is obviously in the fact that Goekoop himself was a party in the agreement in respect of the performance of which the breach of contract was committed.

14) Sub-part 1.2 puts forward that the opinion of the Appeal Court, that Poot furnished insufficient facts in order to conclude that an unlawful act was committed towards him in his private capacity, is incomprehensible. The Appeal Court represented in Ground for Decision 6.2.3 - which was not contested in cassation – the circumstances which Poot put forward in particular to support his allegation that the ABP committed an unlawful act towards him in his private capacity. These circumstances are (see the initial writ page VI-10 and above, nr. 3):

- The ABP knew that Poot privately was the single director/shareholder of the Poot Group;
- The ABP knew that the Poot Group was not financially strong and was financially dependent on the ABP;
- The ABP knew that ABP's actions complained of would lead irrevocably to a bankruptcy of the Group and thereby the shares Poot held privately becoming worthless.

From what has been commented in the treatment of sub-part I.1 it ensues that the justification grievance of sub-part I.2 is not effective because the opinion of the Appeal Court that the special circumstances put forward by Poot are insufficient to accept the legal consequence required by him, does not display an incorrect conception of law and is not incomprehensible.

15) Since the considerations contested by part I, independently support the decision of the Appeal Court to deny Poot's claim, in my line of reasoning part II does not need to be dealt with. Insofar as your Supreme Court has a different opinion about this, I will nevertheless deal with this part. It is aimed against Ground for Decision 6.3.4 to 6.3.7 of the judgment of the Appeal Court, in which the Appeal Court considered that by co-operating with the Albaca transactions Poot relinquished any financial claims on the ABP.

16) Sub-part II.1 includes the grievance that the facts and circumstances mentioned by the Appeal Court in Ground for the Decision 6.3.4 (concisely represented in the sub-part) constitute insufficient grounds to accept an agreement with the purport that a) the existing co-operation and/or legal relationship would be discontinued and b) the Poot Group waived all its rights under this joint venture which existed.

It should be put first and foremost that the Appeal Court assumed as an established fact (Ground for Decision 6.3.7) that the Albaca transactions entailed that the joint venture between the Poot Group and the ABP whereby the former was developing projects which, after acceptance, were financed by the latter, was terminated. The Appeal Court assumed this in the absence of challenge, against which decision no justification grievance was entered either in this sub-part or elsewhere in the ground for appeal in cassation. The written explanation to part II of the ground for appeal in cassation indeed includes such a grievance (page 13/14) but, certainly with regard to such an extensive case as the present one, new grievances in the written explanation should in my opinion not be taken into account, considering the interest of the opposing party in knowing what defences he has to bring forward. For these reasons I will therefore not deal with the grievances against the factual findings of the Appeal Court found in the explanation on page 9-15.

Thus I assume that the grievances of part II, sub-parts 1-4, are only aimed against the Appeal Court granting the purport to the Albaca transactions just mentioned above under b, namely that the Poot Group waived all the rights under the joint venture

which existed between the parties. Moreover, I assume that sub-part 1, which itself does not include any details, only has an introductory nature in this respect.

17) The first grievance of sub-part II.2 entails that the Appeal Court ignored the fact that for a waiver of rights by the Poot Group, actions and/or statements on the part of the Poot Group are required which could reasonably be regarded as a statement directed at the ABP that the ABP (wrong in source text??, translator) relinquished their rights under the joint venture which existed. As appears from Ground for Decision 6.3.7, in which the Appeal Court (as said above) considers that the ABP could reasonably interpret the Albaca transactions as a statement by the Poot Group directed towards the ABP purporting that the Poot Group waived all their rights which existed between them under the joint venture, the Appeal Court did not at all misjudge this, so that this grievance fails. In my opinion the other grievances of this sub-part also lack any factual basis.

18) Sub-part II.3 again contests with a justification grievance the opinion already often mentioned that the ABP could reasonably interpret the Albaca transactions as a statement by the Poot Group directed to them and purporting that the Poot Group waived all their rights under the legal relationship that existed between them. In the sub-part it is put forward that Poot alleged that he decided to enter the Albaca transactions not with his full and free consent, but on the contrary that he and the Group were under pressure or in an emergency situation created by the ABP, in which case the ABP should on the contrary not reasonably interpret the said facts and circumstances as a waiver as mentioned above.

This allegation - that the Poot Group was under duress or in an emergency situation through the actions of the ABP - had not been examined by the Appeal Court; at any rate the opinion of the Appeal Court was incomprehensible that the ABP was allowed to expect a waiver if they had brought the Group into that position.

In sub-part II.4 a number of locations are mentioned in the (monstrous) court file from which it is evident that Poot alleged that there was duress or an emergency situation with regard to the Albaca transactions.

19) I think that the sub-parts are presented in vain. The Appeal Court decided that the solution in the form of the Albaca transactions was found with the full and free agreement of Poot (acting on behalf of the Poot Group) and that the ABP could raise a certain expectation on this. These decisions are of a factual nature; they are in my opinion not incomprehensible considering the positions adopted by the parties to each other. For the convenience of Your Supreme Court I attach Appendix 1 to this Statement including in my opinion the relevant statements in the court file.

It is true that from these statements it appears that Poot alleged that he was in an emergency situation, but that is

in itself inherent in the situation of a group which is actually in a bankruptcy situation, negotiating with its major creditors. It appears from the judgment of the Appeal Court that the Appeal Court did not ignore this fact. The decision must be regarded against this background. Apparently from the positions adopted by the parties towards each other the Appeal Court deduced that Poot had furnished insufficient facts in order to accept that the ABP - due to what they were reproached with regarding the situation which the Poot Group was in, or for other reasons - should not have entered into the said agreement (see Section 3:44, subsection 4) or should not have had the said expectations. I don't find that decision, as noticed, incomprehensible.

20) Sub-part II.5 is directed against the consideration of the Appeal Court in the last paragraph of Ground for Decision 6.3.7, that after the Albaca transactions the Poot Group either did not protest against this or did not (or not within due time) invoke the nullity of this due to vitiated consent, such as for instance their being under duress being used in an improper manner by the ABP. According to the sub-part, Poot brought forward in the instances deciding on the facts that the receiver, after the Poot Group became bankrupt shortly after the Albaca transactions, did indeed lodge a protest. Moreover, the ABP did not put forward the defence in the instances deciding on the facts that the receiver did not lodge a protest, so that this is inasmuch a prohibited addition of factual defences, according to the sub-part.

The first grievance fails in my opinion, because the objections of the receiver with regard to the Albaca transactions which were discussed in the court file in the instances deciding on the facts, related to the possible fraudulent nature of the transactions in respect of the creditors and did not entail that these transactions were entered into under duress or in an emergency situation and were subject to annulment due to abuse of circumstances. In the instances deciding on the facts an action to be brought by the receiver on behalf of the estate on the grounds of breach of contract or an unlawful act also came up for discussion, but that is different from the receiver adopting the position that the Albaca transactions are subject to annulment due to abuse of circumstances. See the passages from the court file included in Appendix 2 attached to this Statement.

The second grievance fails on the basis of the fact that the Appeal Court was free to link this conclusion to what the parties brought forward about the legal action considered or taken by Poot or the coordinating receiver, which did not include the invocation of vitiated consent.

21) Sub-part II.6 has no independent meaning.

Conclusion

The conclusion is to deny the appeal in cassation.

Annotation:

1. In our law the doctrine of liability breakthrough is known whereby under special circumstances the corporate veil can be pierced for the benefit of the creditors of the company and at the expense of other companies or natural persons associated with that company who will then be held liable for the debts of that company on the grounds of an unlawful act. This liability breakthrough is aimed in particular at the managing directors or shareholders. This case involved a case of reversed breakthrough of liability for the benefit of a shareholder and at the expense of a debtor of the company. Does liability to the company on the grounds of a breach of contract

or an unlawful act automatically constitute the liability to the shareholder on the grounds of the unlawful act?

After a short lecture about the character of the company limited by shares and the private company with limited liability the Supreme Court answers this question negatively in Ground for Decision 3.4.1. Does the shareholder not suffer losses himself because the value of his shares have decreased because of the financial loss of the company? The Supreme Court does not follow the view of Bloembergen in "Schadevergoeding bij onrechtmatige daad" (diss. 1965), page 309: that if the company can bring a claim, its assets have not decreased and therefore the shareholder does not suffer losses. The Supreme Court follows another line of reasoning. For as long as the financial loss of the company has not (in actual fact) been reimbursed, there is indeed a decrease in the value of the shares. However, it is up to the company to claim damages. Should the company fail to do so, the Dutch legal system offers sufficient options to urge the management board of the company still to bring the claim.

What does the Supreme Court mean with the latter? In my opinion not only a (pure) internal (see Bloembergen quoted work page 310) urge to act for instance via a dismissal of the unwilling managing director(s) which is after all reserved at ordinary companies to a (sometimes qualified) majority of the general meeting of shareholders and at statutory two-tier companies to the supervisory board. Eliciting an inquiry into the company affairs can come to mind because there will then be good reasons to doubt the proper policy in connection with which immediate relief can be sought pursuant to Section 2:349a, subsection 2, of the Civil Code which has become effective on 1 January 1994. See in this respect Asser-Maeijer, nr. 2, III nr. 518. This immediate relief consisting of an order to bring a claim can be justified in connection with "the condition of the company" (see opening sentence of Section 349a, subsection 2).

However, this route also offers insufficient solace if a small minority shareholder does not represent sufficient capital to be able to bring an action for an inquiry under Section 2:346 of the Civil Code and the principal shareholder fails to claim compensation on behalf of the company. While the Supreme Court says in the last paragraph of Ground for Decision 3.4.1 that there are no grounds to make a distinction between companies so different from each other in this respect. That is why in such a case and for that matter it will in general be possible, I think, to obtain an injunction or order for bringing such a claim in provisional injunction proceedings before the president of the district court.

This is not only possible by means of an order measure but this is also required because of the legal relationship between the company and the shareholder. After all, in this respect there is, as considered by the Supreme Court, a duty of care for the interests of everybody who has an interest in preserving the assets of the company.

2. It appears from the continuation of this ruling in Ground for Decision 3.4.3 that a shareholder can indeed hold a third party liable on the grounds of an unlawful act if this third party did not observe to him a specific standard of due care, whereby he cannot suffice with alleging a breach of contract or negligent act of that third party to the company. In this connection two further considerations by the Supreme Court require attention.  In the grounds of appeal in cassation it was alleged that rendering the shares worthless by the actions of the third party against the company which had led to the bankruptcy, infringes the personal rights of the shareholder which constitutes automatically an unlawful act. The idea behind this is: that with the existence of such a personal right the interests of the party entitled are in principle raised above and withdrawn from a weighing of interests by the court which is inherent to the application of the standard of due care. A personal right within this sense must be respected by the other and to that extent has an absolute effect. The Supreme Court said that the share is a property right. I would like to add: of a private nature; it is not a real right and neither an ordinary right of action: see Asser-Maeijer 2, III nr. 180. The Supreme Court emphasises the relative nature of this property right: to be exercised by the shareholder against the company. From this automatically ensues that on inflicting loss to the company, the act should be reviewed as to the standard of due care - and namely a specific standard of due care - with regard to the holder of the share.

This latter expression is connected to the second consideration of the Supreme Court which on the face of it reminds one of the relativity requirement. The standard of what is befitting in society relates to the care which ought to be observed in a specific relationship towards one or more specific others and is therefore by its nature not a standard purporting to protect the interests of everybody suffering losses as a result of the fact that this required care towards those specific others was not observed. If I am right, then with this approach the standard of what is befitting in society is however in any event a relative one, bound to a certain relationship to one or more specific others. Only on violation of the standard of due care relating to and therefore specifying that relationship, can it be a matter of unlawfulness. The relativity requirement appears to me to be absorbed to that extent by this specific standard of due care to be observed. In this connection I want to recall the environment rulings of the Supreme Court of 30 September 1994, RvdW 1994, 185 et seq. (NJ 1996, 196 to 199, edit. staff) in which it was considered, in short (in Ground for Decision 3.8.4) that unwritten standards of due care exclusively purport to protect the interests of others which the third party should have been aware of. If this is not the case, the relativity requirement has not been met; according to the Supreme Court one could as well, if not better, say that the third party did not (insomuch) act unlawfully.

3. Is it absolutely out of the question that a breach of contract or unlawful act to the company constitutes at the same time an unlawful act to the shareholder? The Supreme Court said that in the "normal type" of the cases (see Ground for Decision 3.4.2 end of first paragraph) as indicated by them, this is not possible. See above under 1 Ground for Decision 3.4.1 second paragraph, the second sentence reads: in

principle shareholders cannot realise their private claim for damages against a third party.

When, in what abnormal case could this then be done? AG-Hartkamp mentions in his Statement under 12 under c the case of a breach of contract or unlawful act against the company with the preconceived aim of hitting the shareholder in his private capacity. In this connection he speaks of an intention to harm or the knowledge of this.

However, in such a case too the shareholder will have to allege that through the breach of contract or unlawful act against the company a specific standard of due care in force with respect to him and to be indicated by him was violated at the same time. See about this ruling also Timmerman in TVVS 1995, page 18.

**References by the editorial staff**

_____

(T) BNB 1998/158 c*
(T) DJ 1997/2511
(T) DJ 1997/2512
(T) DJ 1997/2693
(T) DJ 1997/3400
(T) DJ 1998/2008
(T) DJ 1998/2333
(T) FED 1998/279
(T) NJ 1996/215
(T) NJ 1996/375
(T) NJ 1997/178
(T) NJ 1997/662
(T) NJ 1998/348
(T) NJ 1999/194

Document page (database: *Nederlandse Jurisprudentie* (NJ))                    Page 17 of 18

(T) NJ 1999/598
(T) NJ 1999/69
(T) RVDW 1994/265 c
(T) RVDW 1996/239 c
(T) RVDW 1997/118 c
(T) RVDW 1997/255 c
(T) SES 1997/74
(T) VR 1997/73
(T) VR 1998/136