UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, | 07 Civ. 6176 (LTS)(DME) |
| Plaintiffs, | ECF CASE |
| -against- | **DECLARATION OF** |
| IMAGESAT INTERNATIONAL N.V., *et al.*, | **STEPHEN WILSON** |
| Defendants. | |

STEPHEN WILSON declares as follows:

1.      I am one of the Plaintiffs in this action.  I own 20,000 shares of the common stock of Defendant ImageSat International, N.V. ("ImageSat" or the "Company"), stock options to acquire an additional 132,077 shares, and bridge warrants that should permit me to acquire another 54,000 shares.

2.      I am the sole owner of BRW Engineering Ltd. ("BRW"), which is also a Plaintiff in this action and holds 7,810 shares of ImageSat common stock.

3.      I respectfully submit this Declaration in opposition to Defendants' motions to dismiss the Complaint on various grounds including *forum non conveniens*, alleged lack of *in personam* jurisdiction over most of the Defendants, and alleged failure to state a claim as to all of the Claims for Relief asserted in the Complaint.

4.      After raising approximately one hundred million dollars in New York from Plaintiffs and others in order to fund the commercialization of an Israeli military space program, which had literally been facing termination for lack of continued Israeli government funding,  Defendants now invoke a variety of procedural and non-substantive

grounds in order to avoid accountability, in a United States court and under United States law, for a series of acts and omissions that have intentionally destroyed ImageSat and Plaintiffs' investments in it. For the reasons set forth below, as well as in the accompanying Declarations of other Plaintiffs and of third parties and in the accompanying memorandum of law, it is submitted that Defendants' motions to dismiss should be denied and this action should proceed to merits discovery and trial in this Court.

A.    **A Majority of the Plaintiffs are Either American
      Citizens or Are Owned by American Citizens,
      Entitling Plaintiffs to Deference to Their Choice of Forum**

5.    All but one of the Defendants have joined in a motion to dismiss this action under the doctrine of *forum non conveniens*, arguing that the matter should be heard in a court located in Israel. In support of their *forum non conveniens* argument, Defendants advance a series of contentions that are either factually incorrect or, at a minimum, are presented out of context and are misleading.

6.    The 15 Plaintiffs in this action are securityholders (holders of stock, stock options, and/or bridge warrants) in ImageSat. Plaintiffs are aggrieved by the wrongful acts and omissions of ImageSat, of ImageSat's industrial shareholders Israel Aerospace Industries Ltd. (formerly Israel Aircraft Industries Ltd.) ("IAI") and Elbit Systems Ltd. (with its subsidiaries and affiliates, "Elbit"), and the individual Defendants affiliated with them.

7.    A majority of the 15 Plaintiffs either are citizens and residents of the United States or are corporations that are beneficially owned by United States citizens and residents. These Plaintiffs are:

2

(a)    Stephen Wilson (myself). I am a citizen of the United States and have been throughout my life since my birth in 1948. I am currently a resident of the Commonwealth of Puerto Rico. Throughout the relevant time period I have also maintained residences in at least one of California, New York and Puerto Rico.

(b)    BRW is a personal holding company of which I am the sole owner, through which I was engaged as a consultant to ImageSat between 2000 and 2006, subsequent to the termination of my formal employment with the Company. Although BRW is nominally a Cayman Islands corporation, its primary business activity today consists of holding a portion of the ImageSat common stock that was issued for my benefit and certain other real estate assets. The sole beneficial owner of BRW is thus a citizen of the United States and a resident of Puerto Rico.

(c)    WIS Partners, L.P. ("WIS Partners"). As attested in the accompanying Declaration of Natalia Hercot, the ultimate beneficial owner of 78.33% of WIS Partners is The Fairchild Corporation ("Fairchild"). Fairchild a Delaware corporation with offices in Virginia and New York, where decisions concerning WIS Partners are made. Fairchild's shares are publicly traded on the New York Stock Exchange (NYSE:FA). WIS Partners' other beneficial owners are located in the United States, Bermuda, and France. None is located in Israel.

(d)    As attested by his accompanying Declaration, Plaintiff Michael Morris is a citizen of the United States, with residences in Massachusetts and Florida. During the entire relevant period Mr. Morris' primary residence and place of business was in the State of Connecticut, in the greater New York metropolitan area.

(e)    As attested by the accompanying Declaration of Robert Miller,

Plaintiff Top Down Partners, LLC is a Nevada corporation with its principal place of business in California. The sole owner of Top Down is Mr. Miller, a citizen of the United States and a resident of California.

(f)     As attested by the accompanying Declaration of Plaintiff Joel Levine, Dr. Levine is a citizen of the United States and a resident of California.

(g)     As attested by his accompanying Declaration, Plaintiff Morris Talansky is a citizen of the United States and a resident of New York.

(h)     As attested by his accompanying Declaration, Plaintiff Abraham Moshel is a citizen of the United States and a resident of New York.

All of these Plaintiffs either are, or are beneficially owned by, citizens and residents of the United States. They have chosen to litigate their claims against the Defendants in a United States forum for valid and legitimate reasons.

8.     Three of the remaining Plaintiffs, Albert Reichmann, Hexagram & Co., and Polybutes Company, are either citizens of Canada or are beneficially owned by citizens of Canada and/or the United States. As attested in the accompanying Declaration of Philip Siller, who is an attorney living in New York who has represented these Plaintiffs for several years, Mr. Reichmann is a citizen of Canada and the two companies (one a Canadian corporation and the other a Bermuda corporation) are beneficially owned by Canadians and/or Americans. The Court can take judicial notice that residents of Toronto would have legitimate reasons to prefer litigating a claim in New York, which is located approximately two hours away, rather than in Israel, particularly where the claim arises from investments that were solicited and made in New York.

9.     Of the four remaining Plaintiffs, one (Magma International Services), Ltd.

is located in Switzerland. The remaining three – Moshe Bar-Lev, Patrick Rosenbaum, and Haim Yifrah – are Israeli citizens who received ImageSat stock or options as consideration for their efforts as founding senior officers of the company. As discussed below and as attested in their own accompanying Declarations, these Plaintiffs participated in a series of meetings and investment presentations in New York that led to several of the other Plaintiffs investing in ImageSat. Plaintiffs Rosenbaum and Bar-Lev are employed by Pierson Capital LLP, a United States private consulting firm, and they work and travel out of Pierson's New York office frequently. Plaintiff Rosenbaum presently resides in Beijing, China but until October 2007 maintained a leased apartment in New York City. Plaintiff Yifrah is presently working primarily in South America and is married to a dual Israeli/Canadian citizen and has immediate family members living in Toronto, Canada.

10. The claims of all the Plaintiffs – including the majority of the Plaintiffs who are United States citizens or are beneficially owned by United States citizens, as well as those Plaintiffs who are citizens of other countries – are substantially the same and should be adjudicated in a single litigation. Efforts to relocate all or any portion of this litigation to Israel or the Netherlands Antilles are but a transparent attempt by Defendants to deny Plaintiffs a just, speedy, and cost-effective hearing in a U.S. court, in direct contravention of every agreement the enterprise entered into with each and every U.S. investor between 1994 and 2000. All of the Plaintiffs selected this United States District Court for the Southern District of New York as the appropriate forum for this litigation based upon connections that Plaintiffs, Defendants, and the underlying claims have with the United States in general and New York in particular.

11.     Based on the foregoing, it is submitted that the Court should reject
Defendants' suggestion that Plaintiffs have no legitimate connection with the United
States court system and that Plaintiffs' choice of a United States court in New York as the
forum for litigating their claims is arbitrary and is not entitled to deference.

**B.      Plaintiffs Were Induced to Invest in ImageSat in
         New York and Made Their Investments Here**

12.     A majority of the Plaintiffs are financial investors who invested in
ImageSat or its predecessor, West Indian Space, Ltd., after having been induced to do so
in New York, through meetings and presentations held in New York with the
participation and support of several of the Defendants and the not infrequent use of IAI's
former New York office and related communications infrastructure.

13.     West Indian Space (name changed to ImageSat International in 2000) was
originally founded in 1994 as a joint venture (the "Joint Venture") between a company
known as Core Software Technology, Inc. ("CST"), a California corporation of which I
was then President and CEO, and IAI, which is a commercial business entity but was and
is 100% owned by the Government of Israel. I led the formation of the Joint Venture on
behalf of CST. I had overall responsibility for the business planning and organizational
activities on behalf of the Joint Venture and between 1994 and 2000 led all private capital
financing of the enterprise which was IAI's principal motivation for the formation of the
Joint Venture.

14.     In 1997 I incorporated and became the Chairman and Chief Executive
Officer of West Indian Space, Ltd., ("WIS") which position I held until 2000. I was the
principal architect of the Company's business model, including its unique Satellite
Operating Partner (SOP) concept that entitled customer governments to exclusive and

6

autonomous earth observation services in their region at a fraction of the cost of an indigenous military space program. From its inception, the Company sought to combine Israeli military earth surveillance satellite technology, CST's networking and ground system technology, and approximately 70% of the existing international commercial earth-observation ground stations worldwide to create a robustly international, apolitical, commercial company.

15.    During lengthy discussions, conducted between 1995 and 1998, I facilitated agreement between the Governments of the United States and Israel on crucial commercial remote sensing policy issues that were essential prerequisites to raising the substantial investment capital the Company required to be successful. Our business, the "commercial spy satellite business", was obviously an inherently complex one from the standpoint of international politics. The extended policy and regulatory negotiations never sought, nor does this litigation seek, to abrogate the sovereign rights of the State of Israel (as suggested by Defendants IAI and Eldar). Rather, I had (as did each and every fiduciary of the enterprise) a responsibility to protect the financial interests of the investors that were solicited on behalf of the Israeli private and public defense establishment. Defendants failed to discharge those responsibilities in a variety of different ways in connection with a variety of international sales activities in Korea, Taiwan, Singapore, Venezuela, India, and the United States, as will be revealed in detail as this case proceeds to merits-based discovery and to trial.

16.    Through an initial Memorandum of Understanding signed in June 1994, the Joint Venturers, IAI and CST, sought to finance the commercialization of Israeli military earth-observation satellite technology through primarily United States investors.

This came about after the Israeli Ministry of Defense ("IMOD") and IAI suffered a series of setbacks in the Israeli military space program during the early and mid 1990's. Several successive launches from Israel of "Ofeq" earth-observation satellites were unsuccessful due to the difficulty of launching satellites from Israel's geographical location. Satellites are normally launched toward the east (the direction of the earth's rotation), but an eastward launch from Israel would cause the satellite to immediately overfly Jordan, Iraq, and Iran, which was not practicable for obvious reasons. Israel's Ofeq launches are necessarily via a retrograde trajectory to the west, which was nearly impossible given the weight of the satellites and the corresponding thrust capability of Israel's own Shavit launcher. In light of the Shavit's shortcomings, and repeated launch failures, the ability of the enterprise to act as a "commercial" intermediary to procure launch services in the global market (not available to governments launching military satellites under long standing international space conventions) was among the earliest and most effective arguments in support of commercialization of the Israeli military satellite program. This concept is now being implemented by IAI in its competitive bid to commercialize both "TECSAR" (Synthetic Aperature Radar), and "OPSAT", both of which are Ofeq derivatives. The first TecSar satellite (to be commercialized in the U.S. by Northrop Grumman in direct contravention of ImageSat exclusive commercialization rights) was launched from India as a "commercial" earth observation satellite on January 21, 2008.

17.    By June of 1994 when I was negotiating the original Joint Venture Memorandum of Understanding ("MOU"), the Government of Israel was determined to terminate the country's military space program altogether if an Ofeq satellite then in final

integration and scheduled for launch in November 1994 was unsuccessful. IAI argued that the program should be commercialized rather than to abandon the technology altogether. The IMOD agreed provided that two conditions were satisfied. The first condition was that the United States Government change the remote sensing policy applicable to the U.S. aerospace industry concerning the commercialization of U.S. high resolution earth observation satellite technology. In March of 1994 the United States did effectuate the anticipated policy changes that were required by the IMOD precedent to the pursuit by IAI of a commercial "Ofeq" program, by then called "EROS" in its commercial incarnation.

18.    The second condition demanded by the IMOD was that the commercialization of IAI's space earth observation technology must be 100% financed by private capital sources explicitly excluding the use of Israeli government (including government owned IAI) funds. The Joint Venture was formed for this purpose under my leadership. The availability of 100% "outside investment capital" as an IMOD mandated prerequisite to "commercialization" was stressed repeatedly by IAI management including Defendants Moshe Keret, Jacob Weiss, Itzhak Nissan and others. This specific requirement remained in place until until 1999, at which point IAI and ElOp (which joined the enterprise in December of 1998) indicated their initial interest, and ability, to invest in the Company that became ImageSat soon thereafter. Although the founding management team and I engaged in significant other organizational activities throughout the period, including the development of the international ground reception and distribution infrastructure, the entire purpose of the Joint Venture, and later of West Indian Space and ImageSat, from the perspective of IAI and later ElOp (succeded by

Elbit) was to raise the money that was needed to buy and launch Israeli satellites, and we did so raise approximately $100 million, at their behest and with their full physical on-site support, from U.S. and principally New York investors between 1994 and 2000.

19.     In July 2000 ImageSat closed financing and related agreements in New York providing for approximately $91 million in private capital investments, primarily from U.S. and in particular New York based investors, that enabled ImageSat to pay IAI and ElOp for the balance due on the EROS A satellite and to launch and insure it. Immediately thereafter they reneged on agreements with CST aand many of the Company's Acquisition, Archiving and Distribution ("AAD") ground receiving stations worldwide.  Within a few years of that financing IAI and ElOp (through the ImageSat management and board they controlled) closed all non Israeli offices (in the U.S., Italy, and Cyprus), effectively terminated the AAD program, and proceeded to develop their own competitive commercialization earth observation satellite strategies in direct contravention of their commitments to ImageSat's predominantly U.S. based investors. The overriding and consistent focus of the enterprise, fund raising in New York, predated the July 2000 financial closing and continued thereafter, as the Company engaged in a nearly continuous effort to conduct an Initial Public Offering on the NASDAQ stock exchange between 2002 and 2005.

20.     IAI's then Deputy General Counsel, Defendant Weiss[1], was assigned to negotiate the terms of the commercialization initiative that began as a Joint Venture that evolved into ImageSat.  CST's principal business was networking software to support imagery and geographic information management and distribution for the U.S. government military and intelligence community which is by far the largest potential

---

[1] Weiss was subsequently promoted to Corporate Vice President and General Counsel.

customer for commercial satellite imagery products and services in the world. Since 1991 I had been developing and implementing a strategy to apply CST's technology to the international commercial satellite imaging industry and to move the Company into the service, rather than strictly the high-tech software and systems sector. Due to my expertise in the commercial satellite imaging domain, I was invited to one of three initial presentations that IAI made to potential investors by IBM Israel. These presentations were triggered by and were scheduled immediately after the United States Government decided in March 1994 to permit the commercialization of its own satellite surveillance technology, which decision, as noted above, was one of the two major Israeli governmental prerequisites to commercialization of the Ofeq technology. IAI quickly selected CST as its joint venture partner because I was willing to commit immediately on behalf of CST, its investors and investment banker, to provide the initial $16 million in financing that IAI was soliciting and because Plaintiff Bar Lev and Defendant Weiss recognized the obvious benefits of teaming with an American company, especially one with a non-competitive industrial agenda (i.e. CST was not in the satellite manufacturing business like other possible U.S. partners).

21.    Through the 1994 Memorandum of Understanding, CST became the initial financing vehicle for the start-up. I brought a commitment letter from CST's investment banker at that time, D.H. Blair Investment Banking Corp., 44 Wall Street, New York, NY, to raise a total of $16 million for CST that it would then re-invest in the start-up of the Joint Venture. I was presented by IAI executives to officials of the Israeli Ministry of Defense as "IAI's American investor", and characterized in the Israeli press as "an American entrepreneur with Wall Street connections."

11

22.    At the time the Joint Venture began, IAI had never succeeded at putting a surveillance payload in space, and in fact had failed in three consecutive attempts due to the inability of the IAI-built Shavit launcher to put the additional weight of the payload into orbit.[2] Neither IAI's integrated Ofeq high-resolution surveillance satellite nor the electro-optical camera system supplied by ElOp were yet flight-proven in space. Moreover, the prevailing view among industry experts at that time was that IAI's satellite design was too small to deliver ground resolution better than 15 meters, while the Joint Venture sought to compete in a newly developing market for one meter imagery (one hundred times superior to the prior commercial 10 meter global policy standard).

23.    In my very first conversations with Weiss, in which he spelled out for me the fundamental requirements of the Government of Israel as well as IAI's industrial agenda, we discussed many of the issues that would define the parties' relationship and that, years later, are fundamental to Plaintiffs' lawsuit. The initial plan was for IAI to contribute an existing, nearly completed "spare" earth observation satellite already in its possession, which would be launched on a reliable Russian launcher. CST would raise $16 million to pay the costs of launching and insuring the satellite and for preliminary business planning and the development of the international ground segment required to download, archive and distribute the satellite imagery data.

24.    I stated to Weiss immediately that in order to raise the $16 million, new financial investors would have to be brought in to the deal. I emphasized the special prerequisites to raising, and responsibilities associated with using, "Other People's Money," including fiduciary and legal accountability. It was Weiss, himself an

---

[2] IAI had successfully launched Ofeq 1 in 1988 and Ofeq 2 soon thereafter, both on Shavit launchers, but neither of the initial Ofeq satellites carried an imaging payload.

American-trained lawyer, who, at or near the very outset of our relationship, raised the issue of what choice-of-law provisions should be included in the documentation of the Joint Venture. I insisted that United States investors would never invest in a faltering, classified IAI-IMOD program (that the IMOD refused to continue to finance itself) without extraordinary assurances, including the promise that any disputes would be resolved in a United States court pursuant to United States law. Moreover, I specifically stated to Weiss that a provision providing for dispute resolution under Israeli law or in Israel would be a "non-starter" for the United States investors we were trying to attract.

25.     Because CST was a California corporation, we discussed providing for dispute resolution under California law in the initial agreement. Weiss responded that although U.S. customers accounted for a large percentage of IAI's revenue, he had no specific familiarity with California law. He instead suggested New York as a legal system that IAI and other Israeli firms were very familiar and comfortable with. Because CST had raised millions of dollars in start-up capital in New York, and was actively raising capital through D.H. Blair in New York, and because I anticipated raising the $16 million to support CST's participation in the Joint Venture in New York through the same investment bank, I immediately agreed.

26.     From the inception of the Joint Venture, that the financial investors in ImageSat would not be willing to adjudicate possible disputes in Israel or elsewhere was a "first principle" that I articulated on behalf of all of the prospective non-Israeli investors and that IAI agreed to through the office of its General Counsel. ElOp subsequently agreed to a preference for New York law and dispute resolution in New York through a side agreement between it and IAI, negotiated on IAI's behalf by Defendant Weiss, and

subsequently through the Share Purchase Agreement of 1998 between ElOp and WIS. The Memorandum of Understanding of 1994 articulated the selection of New York law. This preference was reinforced in every agreement among the Joint Venture (and its successors West Indian Space and ImageSat), its industrial shareholders, and its financial investors thereafter. This included each of the Joint Venture Agreements of 1995, 1997, and 1998, the Stock Purchase Agreement of 1998, the Stock Purchase Agreements and Shareholders' Agreement of 1999, the Master Agreement of 2000 (which superseded elements of the Joint Venture Agreements), the Series C Preferred Convertible Note Purchase Agreement of 2000, the Series B Preferred Stock Purchase Agreements of 2000, the Security Holders' Agreement of 2000, and the Note Exchange and Governance Agreement and Security Holders' Agreement of 2001 among others (collectively, the "Agreements").

27.    Moreover, beginning in 1999, the choice of New York law and jurisdiction in the various Agreements was made even more clear and specific in that, not only did the Agreements contain "choice of law" provisions providing that New York law would govern the construction and interpretation of the documents, but they also included "choice of forum" provisions under which the parties expressly covenanted that any litigation arising out of the Agreements would be resolved in the federal or state courts located in New York, New York and that the parties to the various Agreements – including ImageSat, IAI, and ElOp/Elbit – would waive any objection to the jurisdiction of the New York federal and state courts in any such dispute as well as any defense of *forum non conveniens* relating to such litigation. As attested in the accompanying Hercot

Declaration, Plaintiff WIS Partners is a party to two of these Agreements.[3]  Other Agreements also providing for the New York federal and state courts to enjoy jurisdiction over disputes and for a waiver of *forum non conveniens* defenses were entered into by ImageSat, IAI, and ElOp in connection with an investment in ImageSat by entities affiliated by Pegasus Capital Advisors ("Pegasus") discussed below.  In connection with that investment, the New York law firm of Milbank, Tweed, Hadley & McCloy LLP – which was ImageSat's counsel in all of the Company's financing transactions and is ImageSat's counsel in corporate matters as well as this litigation today – provided its formal written legal opinion that the jurisdictional clauses contained in the Pegasus Agreements were valid and enforceable.

28.     Consistent with my explicit fundraising "mission", immediately after the execution of the MOU, I traveled to New York to raise the initial $16 million.  Despite the risky nature of the new Joint Venture, based as it was upon unproven high resolution satellite imaging technology, within two weeks I obtained a $16 million financing commitment letter from D.H. Blair in Manhattan.  When Blair became concerned over the delayed public announcement of the Joint Venture, as was supposed to occur under the terms of the MOU, I introduced senior IAI executives including its Chief Executive Officer, Defendant Moshe Keret, to Mr. Davis (D.H. Blair's owner) in New York and a group of us had lunch at the New York Stock Exchange where Defendants Keret and

---

[3] Although I was the beneficial owner of 100,000 of the Common Shares held by CST when the Shareholders' Agreement of 1999 was signed, and although I had committed to transfer some of my shares to others (those currently held by Plaintiffs Bar-Lev, Rosenbaum, Top Down Partners and Levine) from my holdings, the administrative share transfer process was not completed until much later (concurrent with the financial closing of July 2000) because L-3 Communications, a significant source of CST's investments in the enterprise, was holding the CST common stock certificate as security on some of the financing it had provided.  As such the five of us were not parties to the Shareholders' Agreement, however, we certainly expected that the general obligations among the shareholders that were memorialized in that Agreement would apply to us and the Company's other security holders.

Weiss offered reassurances of IAI's sincere intentions and definitive plans to proceed with the commercialization initiative through, and exclusively through, the Joint Venture.

29.    An important early step in the development of the Joint Venture was to secure a formal launch slot and launcher with the then current Russian commercial launch representative in Paris, France. CST provided the cash required to close the initial EROS satellite launch contract with the Russians in December 1994 through a cash investment of $170,000 obtained from Plaintiff Joel Levine, then a CST board member. Reflecting this investment, a formal Joint Venture Agreement, also drafted by Defendant Weiss and negotiated primarily by us was executed on behalf of IAI by its CEO Moshe Keret and CFO Schmuel Peretz, and by me on behalf of CST, on January 1, 1995.

30.    After the incorporation of West Indian Space in January of 1997, I hired Andrew Plevin (the New York-based venture capital executive at D.H. Blair with whom I had worked to fund CST's financial contributions to the enterprise up to that point) as President of CST to lead the completion of its fundraising commitment to the Joint Venture. A total of $11.2 million dollars intended and utilized by Core for reinvestment in the Joint Venture and West Indian Space/ImageSat was raised. The investors in this phase of the fundraising included at least seven of the Plaintiffs – Morris Talansky, Abraham Moshel, Joel Levine, Robert Miller (Top Down), Albert Reichmann, Hexagram & Co., and me. For example, in November 1998, Mr. Talansky and I agreed to lend CST $250,000 each of our personal funds, and by doing so convinced Morty Davis, the President of D.H. Blair & Co., to lend Core an additional $1.5 million in order to enable Core to fund the closing of the last of four Joint Venture Agreements in November 1998. Thus, from the outset, the investment funding for West Indian Space/ImageSat came

from investors located in the United States, and the investment funding was solicited and raised primarily in New York. In support of these early capital raising efforts, Defendants Weiss and Keret, among other IAI executives, traveled to New York to meet with prospective investors and shareholders.

31.    As mentioned briefly above, among the largest investors that participated in CST's efforts to finance the start up of the Joint Venture, and subsequently WIS, was L-3 Communications, a spin off of the Lockheed/Loral merger that was organized and financed at that time by Lehman Brothers and based in New York City. L-3 invested millions of dollars in CST to support CST's pass-through investments in the enterprise, as did its President, Mr. Robert LaPenta. L-3 was already involved in the new emerging high resolution satellite imaging industry through its ownership of a leading ground station manufacturer and it invested in CST explicitly because of CST's related industrial rights per the JVA to develop the entire ImageSat ground segment. Plaintiff Morris Talansky made the initial introduction to Mr. LaPenta in New York. CST's President Andrew Plevin led the L-3 investment negotiations and closing, also held entirely in New York City. ImageSat CEO Weiss later refused to honor IAI's prior commitments to CST, commitments that Weiss himself, and Keret, had negotiated with me in 1994 and1995. These rights were memorialized again through the three party Joint Venture Agreements among IAI, CST and WIS in 1997 and 1998 which terms and conditions were verified by Mr. Weiss in person in New York in meetings arranged by CST with Robert LaPenta and other senior L-3 management personnel that I attended and witnessed. Irreparable harm was done to CST's investors and shareholders including me and many of the other Plaintiffs that invested in CST to support the start-up of ImageSat. As a direct result of

the wrongful acts of both IAI and Elbit and many of the individual Defendants, LaPenta replaced CST management with members of his own management team beginning in 2001, first Larry Schwartz and subsequently Defendant James DePalma. Eventually LaPenta and DePalma, with CST in financial crisis explicitly related to its investment in (and contract breaches by) ImageSat, effected a radical capital restructuring through which LaPenta/DePalma and affiliates now own or control over 85% of the fully diluted equity of CST. CST's ImageNet business was ultimately terminated by them when ImageSat terminated its own ImageNet based electronic cataloguing, browsing, and distribution system, along with most of CST's staff and other business and software development programs. CST today exists, (much like ImageSat) as a vehicle to service contracts sold prior to 2000 and to hold, primarily on behalf of LaPenta and DePalma, whatever residual value may reside in its ImageSat shares.

32.    By 1996, it seemed apparent that the Joint Venture would not be permitted to use the existing "EROS A" (Ofeq spare) and that it therefore required substantial capital in addition to that which CST would be able to provide, and so I also sought financing directly from U.S. institutional investors in the U.S. I originally engaged Lehman Brothers in New York to act as the Company's investment banker. After preliminary due diligence, by early 1997 I obtained a commitment from them to raise approximately $60 million on behalf of the Company. However, in two consecutive attempts, IAI failed to meet the Lehman Brothers team's fundamental due diligence requirements related to the still undocumented Israeli export and regulatory regimes as would apply to ImageSat, as well as fears of possible future competition with the

enterprise by the Israeli government and IAI.[4]  As a result Lehman withdrew its support for the Company leaving the Company without a satellite or an investment banker. Lehman's withdrawal underscored the importance of non-competition by the sponsoring industrial partners and (through IAI), effective competition by the sponsoring sovereign. This was not a new concept for IAI or the IMOD as I had emphasized this issue repeatedly from the inception of the enterprise in 1994.  Similarly, IAI repeatedly represented that they would produce a formal policy document and that other than satellite sales to the IMOD and in limited "government to government" turn key satellite sales, there would be no competion from industry or the IMOD.  These concepts were also memorialized and agreed to in the earliest agreements among the parties.

33.    West Indian Space was incorporated in January 1997 to create a legal entity through which the Joint Venture could be financed and developed.  The Cayman Islands was selected as the site of incorporation at the recommendation of the Company's counsel in New York (Peter Nesgos of Winthrop Stimson and subsequently of Milbank Tweed) primarily for tax reasons.  In 2000, the Company was redomiciled in Curacao, Netherlands Antilles, and its name was changed to ImageSat.  The relocation of the Company's formal place of incorporation to the Netherlands Antilles was again based on the advice of N.Y counsel for ImageSat (Milbank Tweed), and N.Y. counsel for Pegasus Capital Advisors, LLC, also primarily for tax purposes as I understood it.  It was not in any way based on any other relationship that ImageSat, ImageSat's business, or anyone affiliated with ImageSat had or was expected to have with the Netherlands Antilles.  To

---

[4] At that time the IMOD was prohibiting the Company from engaging in SOP marketing activities in Turkey and Singapore.  In both cases the prohibition was not because either country posed a threat to the national security Israel but rather because each was perceived as an attractive "customer" and/or source of joint R&D financing for the military satellite program, inherently at odds with the exclusive commercialization strategy that the enterprise was pursuing.

the best of my knowledge, only I (as a consultant to ImageSat based a couple of hundred miles away in Venezuela) and ImageSat's in-house counsel, Efrat Klein, esq., ever traveled to Curacao, and each of us only once in the seven year history of the Company's registration there.   My purpose in doing so was to expedite long-delayed corporate document certifications that were threatening the loss of the Venezuelan SOP contract opportunity.   While coordinating my trip with the Company, ImageSat's CFO and Corporate Secretary, Hagai Goren, informed me that he wasn't even certain of the name, telephone, or address of Company's corporate services agent in Curacao or an individual person that I should contact there.

34.    In light of IAI's second failure in due diligence with Lehman, and in particular to remove the long standing public policy and other barriers facing the enterprise, I reinitiated direct negotiations with the IMOD that included a proposal to purchase the EROS A (Ofeq spare) that IAI had been unable or unwilling to deliver to the Company.   Through a "sale-leaseback" arrangement, West Indian Space would have a "first to market" satellite for SOP program sales outside of the Middle East; the IMOD would use the satellite exclusively in the geographic communication range of its own ground station, also through an SOP contract with the Company.   The IMOD was surprisingly receptive to the proposal (in light of what I had been told by IAI about the need to buy and build a new satellite of our own).

35.    In late 1997 negotiations between U.S. based Orbital Sciences Corporation (OSC) and IAI, and directly between Orbital Imaging Corporation (an OSC subsidiary based in Fairfax, VA) and WIS, sought to define a business combination between Orbital Imaging and WIS.   In addition to financing the "sale-leaseback" arrangement with the

IMOD, in light of Lehman's recent withdrawal of its offer to finance the Company, the deal was intended to give the Company better access to U.S. government customers, acknowledged to be the largest single market for high resolution satellite imagery of the sort we sought to acquire with EROS A and subsequent satellites. I pursued this opportunity explicitly at the request of senior IAI corporate management. Although OSC was also a satellite manufacturer, it had little experience and no "flight proven" capability in the high resolution earth observation domain at that time. IAI's agenda was to commercialize the Shavit launcher through Orbital, a field in which it was vastly more experienced and qualified. Senior IAI personnel including Defendants Weiss, Nissan, & Eldar participated in these negotiations, some of which were held in the U.S., primarily in the Washington D.C. area.

36.    The IMOD attempted to launch the EROS A (Ofeq spare) that IAI had originally committed to contribute to the Joint Venture in January 1998. Since the IMOD insisted on launching the satellite from Israel, the launch faced the same physical constraints of prior unsuccessful Ofeq launches, but it also was ineligible for launch insurance which the Company had proposed to provide. After that launch failed Orbital Imaging withdrew from further merger negotiations. But, I was approached soon thereafter by Defendant Keret who informed me that then Director General of the IMOD, General Ilan Biran, had requested IAI's, and ImageSat's, assistance in financing and launching an "EROS A" class satellite as a back-up for its Ofek 3 satellite.[5] In exchange

---

[5] Ofeq 3 was launched successfully in April 1995 and was still fully operational in 1998, however, it was running out of hydrazine and would expire before the IMOD could secure government funding for (if indeed it could fund) and manufacture a replacement satellite. After the EROS A/Ofeq 4 failure, there was no longer a "first-to-market" advantage associated with launching an "A" class satellite and the Company had already decided to go directly to an enhanced "EROS B" design that would be more competitive with the satellites the U.S. aerospace companies were planning to launch in 1999, 2000 and beyond.

for Biran's commitment to resolve the still outstanding policy and licensing issues that had aborted the Lehman financing, and a commitment by the IMOD to purchase SOP services from ImageSat over the long term, I agreed.

37.    In late 1998, I engaged Merrill Lynch, through the head of its international satellite and telecommunications group in New York, Mr. Omar Jaffrey. Jaffrey, a well known investment banker specializing in this sector, led the Company through its fundraising activities in 1999 & 2000, and was later called upon beginning in 2002 when the Company sought to make an initial public offering (IPO) of its shares, as discussed below. Although Mr. Jaffrey worked closely with ImageSat and its shareholders, including Israeli government-owned IAI, he consistently declined all invitations to visit Israel. Although we provided assurances that he would receive VIP treatment in connection with his arrival and departure, Mr. Jaffrey informed me that as a Muslim of Pakistani national origin, despite his U.S. citizenship he simply would not feel comfortable in Israel.

38.    Merrill Lynch kicked off its own due diligence in Tel Aviv in late 1998. Senior executives of IAI and ElOp, including Defendants Keret, Nissan, Eldar, Weiss, Federman, Toren, and Ackerman, supported the Company's presentations and made representations to the Company's New York investment bankers that are fundamental to the claims enumerated in the Complaint. Subsequent to the successful completion of due diligence by Merrill Lynch, numerous meetings were held with, and presentations made to, potential investors, primarily in New York but also in Connecticut and New Jersey. These presentations highlighted ImageSat's unique business model, exclusive technology (licensing and non-competition commitments from IAI, Elbit and the government of

Israel, its financial prospects and all operational issues (including governmental policy). The Company, at the request of its Merrill Lynch advisors, assessed the investment risk for prospective investors in these presentations in the four major risk categories relevant to our industry (i) regulatory/political, (ii) financing, (iii) technical, and (iv) market risks in their order of importance according to the assessment of the Company's management. Supported by senior representatives of its industrial shareholders and satellite manufacturers (IAI and ElOp) the Company emphasized the political sensitivity of the business, explicitly pointing out that while the "political risk" for commercial electro optical high resolution satellites had been "managed", political risk associated with the industry's and the Company's plans to deploy synthetic aperture radar systems had "not yet" been managed but "would be" in time. The Company highlighted Israel's by then "flight proven" and uniquely cost effective light high resolution technology and, supported by its industrial shareholders who attested to the hundreds of million of dollars of investments required to develop their combined high resolution earth observation capabilty, ImageSat's enormous competitive advantage as the "exclusive licensee" and commercialization vehicle for existing and future derivatives. Presentations were made both to major institutional investors who we hoped would become significant stakeholders in ImageSat, as well as individuals who could provide interim bridge financing until the major Merrill Lynch led, "Pegasus" institutional investments could be closed.

39.    I hired Plaintiff Michael Morris in early 1999 to assist me to manage and coordinate our capital-raising activities in the United States. Morris, a United States citizen then resident in Connecticut, became the Company's first Chief Financial Officer.

We established a corporate office for the Company in Norwalk, Connecticut (within the New York metropolitan area), which office was managed by Mr. Morris on a daily basis. This regularly operated corporate office of West Indian Space/ImageSat had bank accounts located in Connecticut coordinated with the New York offices of Chase Manhattan Bank, telephone and facsimile service, and all the other indicia of a company doing business in the New York metropolitan area. From the corporate office in Connecticut, Mr. Morris regularly traveled to and worked in New York, New York as a frequent and fundamental component in the performance of his duties.

40.    Between late 1994 and mid 2000, I spent much of my time in New York business planning and fundraising for the Joint Venture and later West Indian Space, as did Plaintiff Patrick Rosenbaum (initially a senior officer of IAI's space directorate and subsequently as the Chief Operating Officer of West Indian Space/ImageSat), and to a lesser extent Plaintiffs Moshe Bar-Lev and Haim Yifrah. Other senior officers of West Indian Space/ImageSat, as well as IAI and ElOp executives and designees to the ImageSat board were frequent visitors in New York in support of the Company's financing activities. In 2001 I relocated my principal U.S. base of operations to New York and maintained an apartment there until early 2004, by which time my full time SOP sales activities in Venezuela rendered Puerto Rico a more logical U.S. base. During that period I met several times with ImageSat management personnel, that were already trying to organize an Initial Public Offering in New York.

41.    Merrill Lynch's capital-raising efforts in the United States were performed by professionals from the New York office of that firm, led by Managing Director Omar Jaffrey, and a large team of specialists including Stanley Lai (managing director and head

of the private equity placement group), Tom Watts (managing director for equity research in the satellite and telecommunications field), and many others. The Company continued to work with Omar Jaffrey after the successful Pegasus financial closing of July 2000, moving with him to UBS in New York as the Company engaged in a nearly continuous effort to go public in the United States between 2002 and 2005.

42.    During this period, in addition to Lehman Brothers and Merrill Lynch, ImageSat was served by many other professionals in New York. I originally engaged the New York law firm of Winthrop, Stimson, Putnam & Roberts as outside corporate counsel to assist in the preparation of the Company's "template" SOP agreement, an agreement that was purposely and explicitly written to support "project financing" by New York - based institutional investors and banks to fund the substantial long term satellite and launch service procurements. Winthrop Stimson also engaged in extensive tax planning on behalf of West Indian Space/ImageSat. When Peter Nesgos, Esq., who was the senior attorney that I worked with at Winthrop Stimson, relocated his practice to the New York office of Milbank, Tweed, Hadley & McCloy, I moved West Indian Space/ImageSat's legal work to that firm which has represented ImageSat continuously ever since (including in this litigation). Michael Morris engaged the New York office of Arthur Andersen LLP with regard to certain aspects of the company's accounting and audits and representatives from Arthur Andersen's New York office oversaw the initial audit of the Company's financial statements from inception.

43.    Among other prospective investors who attended presentations in New York were Plaintiff WIS Partners and Loyds (Aerospace) Ltd. (which is now known as Harbinger International and is the Intervenor Plaintiff in this case). Both of these

concerns became minority shareholders of ImageSat, with WIS Partners taking over from Core as the lead investor in the second-stage financing that closed in September 1999 and July of 2000. Many more meetings and due diligence sessions were held in New York at which participation by these new investors and other potential investors were discussed and negotiated. Financier Bagatelle, a French company and a wholly owned subsidiary of a company known as Euris, agreed to invest and negotiated the terms and conditions of common stock, Series B Preferred and bridge loan investments primarily at the Euris office in New York, New York.

44.    As CFO, one of Mr. Morris' principal responsibilities was to ensure that the Company's financial statements were fairly presented in accordance with U.S. GAAP (generally accepted accounting principles) and that they met all SEC requirements in anticipation of the Company's initial public offering in the United States. One issue that arose in this connection was whether ImageSat had appropriately allocated a $16 million valuation to IAI's and ElOp's contribution pursuant to contractual agreements with ImageSat of certain exclusive licensing and first rights to commercialize the satellite and payload technology developed in connection with the IMOD's Ofeq program. To address this issue, with the assistance of Arthur Andersen, Mr. Morris wrote to the accounting staff of the Securities and Exchange Commission in Washington, D.C., seeking and obtaining the staff's concurrence in the company's accounting treatment of this asset. This asset was carried on the Company's books until after my employment as a full time executive with ImageSat, until sometime after the closing in July 2000. We expect to better understand the motivation behind the reversal of this legitimate accounting entry during Mr. Weiss' tenure as CEO through merits-based discovery.

During my tenure, the accounting treatment of ImageSat's extraordinary exclusive commercialization and related rights were represented to all investors in ImageSat as IAI's and ElOp's contribution to capital, for which they received half (1,000,000) of the founders' (Common) shares.[6] Although Weiss represented to prospective investors that the investments in the technology amounted to many hundreds of millions of dollars, the first two JV agreements that defined the rights and responsibilities of the parties were executed before the technology, in its intended application as a high resolution surveillance satellte, was "flight proven".

45.    In late 1999 Merrill introduced the Company to a private equity firm known as Pegasus Capital Advisors ("Pegasus"), with offices located in New York, New York and Greenwich, Connecticut.  Pegasus agreed in February 2000 to become a substantial investor in ImageSat through an investment fund that Merrill Lynch had raised for them and invested in, together with Morgan Stanley, Goldman Sachs, **the New York State Pension Fund,** and other high-profile institutional investors.  Presentations, directly supported by IAI and Elbit representatives and Merrill Lynch, were made to these and dozens of other institutional investors in New York regarding all aspects of the Company's business plan, financial condition, and financial prospects.

46.    A series of transactions, including the Pegasus investment, the concurrent Series B "co-investment" and a substantial protracted bridge debt financing (associated with the issuance of the bridge warrants held by some of the Plaintiffs), closed simultaneously on or about July 25, 2000 in the New York, New York offices of Milbank, Tweed (counsel for ImageSat) and McDermott, Will & Emery (counsel for

---

[6] There were 2,000,000 Common founders shares issued, half to IAI and ElOp as consideration for the exclusive technology license, and half to CST, WIS Partners, and Financier Bagatelle for the initial $16 million cash investment.

Pegasus) and Pegasus. WIS Partners representatives Jeffrey Steiner, Donald Miller, Esq., Judas Azuelos, and Jean-Mehdi Azuelos and Christophe Bejach (on behalf of Financier Bagatelle) attended various negotiations and meetings associated with the closing on behalf of WIS Partners. Defendant Jacob Weiss was present continuously on behalf of IAI (as its Corporate Vice President and General Counsel) and on behalf of ImageSat (as my board appointed "co-negotiator" on behalf of the Company's "Executive Committee") and incoming ImageSat CEO. Also present in some of the closing negotiations and meetings were certain of the other individual Defendants in this action including Yehoshua Eldar (on behalf of Itzhak Nissan, General Manager of MBT Division of IAI, and as his alternate as an IAI designated director of ImageSat), and Jacob Toren (CEO) and/or Joseph Ackerman (CFO), alternatively as Elbit's designee to the ImageSat board and/or on behalf of Elbit itself. Obviously the role of each of these executives was highly conflicted because each was fundamentally in attendance to support an ImageSat financial transaction that also would result in the payment of tens of millions of dollars to their respective employers (IAI and ElOp). It was most certainly not my intent or understanding, nor was it the intent or understanding of the Company's other financial investors, that these executives were present to engage in self dealing, i.e. to redefine ImageSat as their captive customer, committing it to approximately one half of a billion dollars in exclusive future satellite procurements, which is what they did. As a direct result of these improper actions, precisely one year after the July 2000 closing, the 2000 EROS B Satellites Supply Contract (that was closed concurrently but later deemed to not meet the performance requirements specified in the contract) was replaced by yet another "Restated" 2001 EROS B Satellites Supply Contract (SSC) that

Defendants knew would **ALSO** not meet the specified performance requirements but that was sold to the Company by Defendants at a 25% increase in price (i.e. an increase of approximately $20 million). Compounding the fraudulent concurrent interdependent closings of the 2001 Note Exchange and Governance Agreement, the Bank Leumi "Bank Credit" Agreement, and the 2001 EROS Satellites Supply Contract on or about July 25, 2001, Defendants never corrected the design deficiency in the EROS B satellite and never performed any significant work on it. But they have conspired to, and have stripped tens of millions of dollars from the Company's captive minority and financial shareholders through direct payments and still compounding dividends (at 9% per annum) on under priced Preferred Series C securities they issued to themselves under the contract for $14 million of the $20 million unjustified mark-up on the EROS B (later renamed EROS C) satellite. As recently as 2007 IAI and ElOp, with the support of the individual Defendants among ImageSat's management and board, terminated certain of the Company's exclusive rights under the Master Agreement on the contrived and absurd basis that the Company had not performed its obligations under the same 2001 EROS B/C Satellites Supply Contract. Even today, in January 2008, as I prepare this Declaration, Defendants are actively engaged in the continued manipulation of the Company's captive security holders including myself and other Plaintiffs by threatening to impose additional tens of millions of dollars in contract termination penalties.

47.     The documents executed at the closing in New York included a contract known as the Master Agreement between ImageSat and IAI, under which IAI agreed that ImageSat was to be the exclusive vehicle for the commercialization of IAI's military earth observation space technology and IAI reaffirmed its and ElOp's prior grant of

certain exclusive rights, non-compete rights, and "first rights" to commercialize existing and future derivatives of its earth observation satellite technology. It is important to understand that the exclusive and related first rights of ImageSat under the Master Agreement represented long standing commitments to ImageSat's outside investors, by IAI that dated back to 1994, and subsequently by ElOp (succeeded by Elbit), memorialized first in a "side agreement" between IAI and ElOp, and subsequently through the 1998 Stock Purchase Agreement between ElOp and WIS. These same commitments were memorialized in the Company's Arthur Anderson audited financial statements as an "exclusive technology license" granted in exchange for IAI's and ElOp's 1,000,000 founders' shares. The accounting treatment of these capital assets was deemed GAAP compliant by Arthur Anderson and approved by the SEC. The Company's audited financial statements were approved by the IAI, ElOp dominated board of directors and the shareholders of West Indian Space. These financial statements were presented to all prospective investors thereafter by the Company, and validated by IAI and ElOp senior managers during presentations to investors and in connection with the Pegasus et al closing of July 2000. IAI's and Elbit's subsequent breaches of this Agreement and other contractual obligations to ImageSat, which caused and continue to cause significant financial harm to the Company's financial investors including Plaintiffs – and the purposeful breaches, or failure to take effective action to combat such breaches, by ImageSat's directors and senior management – are among the key issues raised in the Complaint.

**C.     This United States District Court in New York
          Is the Appropriate Forum for this Action**

48.     Each of the Plaintiffs who invested in ImageSat did so in reliance upon

representations made by and on behalf of ImageSat in or from the United States (most often New York but in a few instances, Connecticut, New Jersey, and California). The representations included that ImageSat would operate as an international, apolitical, commercial company with the freedom to enter into SOP satellite service contracts with virtually any country in the world, with the explicit exception of countries within a 2500-kilometer radius of Israel (defined as the area relevant to the "the national security interests of the State of Israel") and a very small number of other countries such as Cuba or North Korea upon which the U.S. government had imposed or might in the future impose a full commercial trade embargo, all based on clear and pre-defined criteria as agreed-upon between the United States and Israeli governments.

49.    From the point of view of most of the Plaintiffs and other financial investors, ImageSat solicited their money or their services in New York to make an investment in or to solicit further investments in New York, as part of a series of transactions that closed in New York in which ImageSat – that was created and was supposed to be maintained as an *international* company, not an Israeli one – ultimately accessed approximately one hundred million dollars through New York private capital sources, all subject to their expressed preference for New York law and forum should a dispute arise.

50.    Beginning almost immediately after the July 2000 closing, Defendants began to break virtually every one of the promises upon which Plaintiffs had relied, in the process breaching in numerous respects their fiduciary and/or contractual obligations to ImageSat and to ImageSat's minority shareholders and securityholders such as Plaintiffs. Every agreement among the parties dating back to the initial Joint Venture agreements of

1994, 1995, 1997, and 1998, as well as the financing agreements of 1999, 2000, and 2001, contemplated substantial capital raising in New York and anticipated the need to accept New York law to govern the Agreements and, beginning in 1998, attended to an appropriate level of detail including explicit consent to the federal and state courts of New York as the appropriate forum in which any disputes would be resolved. Today, however, faced with the prospect of accountability for their civil and criminal acts and omissions, Defendants claim that New York is not an appropriate forum for this litigation because "this lawsuit stems from [Plaintiffs'] investment in a foreign company."

51.    The selection of New York as the appropriate forum in which to engage counsel and initiate this litigation was by prior agreement of all of the parties to the relevant agreements between the Company and its shareholders, not a matter of personal convenience. When I first became aware of the urgent need to act, I was living and working for the Company, primarily in Venezuela. My primary U.S. residence was in Puerto Rico. During the latter half of 2006 and 2007 I have spent the majority of my time separated from my wife living either alone in our Puerto Rico apartment or in hotels in New York (at my own considerable expense) researching relevant events between 2001 and the present and organizing the injured parties including Plaintiffs and others that either are or that I believe eventually will become parties to this or similar litigatons in New York. Defendants arguments that New York is not a convenient forum in which to litigate the grievances of the vast majority of ImageSat's financial investors is not only ludicrous but irrelevant. New York was the preferred venue of Defendants when they needed the funds to resurrect the Israeli space program. It was their preferred venue to register the Company's securities in order to finance the ongoing satellite and other self

serving capital procurements by their captive customer ImageSat.  New York was the preferred location to assemble the board and other agents to cover up their egregious ongoing civil and criminal acts and, finally, it was the venue to which they consented in the unlikely event that they should ever be held to account, and that fact is memorialized in every relevant agreement dating back to 1994. Were there a legitimate argument related to convenience, it obviously would be far less "inconvenient" for Defendants to litigate their claims in New York than for Plaintiffs to litigate them in Israel.  All of the Defendants have counsel in New York.  For example, ImageSat and the ImageSat directors and officers are represented by Milbank Tweed, which has served as United States counsel to ImageSat and its predecessors for more than a decade.  Ironically, the majority of the legal expense to defend all corporate and individual Defendants against the Complaint is provided by the Company and/or its D&O insurance carrier.  IAI, which has not challenged the Court's *in personam* jurisdiction over it, also would not be inconvenienced by litigating this case in New York.  IAI has substantial operations in the United States including its existing Empire Aero subsidiary based in Rome, New York, and IAI's U.S. sales and lobbying subsidiary "IAI, Inc." in Washington, D.C., which facilitates IAI contracts worth hundreds millions of dollars of business with the United States Government annually (and that until recently maintained offices in New York, New York that were used by Plaintiffs and Defendants alike in support of their solicitation of New York and other U.S. investors).  Similarly, Elbit is an international company with its securities listed on the NASDAQ Stock Exchange in New York.  It is fully capable of litigating this action in the United States.  By contrast, many of the Plaintiffs are small investors, have no regular counsel in Israel or anywhere else, and are

already inconvenienced by the requirement to enforce their legitimate claims through litigation, but would be substantially more egregiously "inconvenienced" if they were required to litigate their claims in Israel or not at all.

52.     I represented to Merrill Lynch and Pegasus representatives that New York jurisdiction had been agreed to in 1994 and subsequently memorialized in all agreements between the corporate defendants and the Company's investors. If my own level of legal expertise was lacking with respect to the written characterization of the jurisdictional intent of the parties as memorialized in the legacy agreements, IAI and Elbit, WIS Partners, and every individual or entity involved in the Pegasus July 2000 $91 million closing in New York clarified, once and for all, any possible inadvertent omission of ignorance that I may have previously been guilty of. All parties involved during the protracted Pegasus closing agreed that at least some litigation relating to ImageSat should take place in this District – indeed, *exclusively* in this District. At the closing on July 25, 2000, a Securityholders Agreement was entered into among ImageSat, IAI, Electro-Optics Industries Ltd. (a corporate affiliate of or predecessor to defendant Elbit Systems, Inc.), WIS Partners, Loyd's, and several other parties (Copies of the relevant portions of this Agreement and several of the prior and contemporaneous agreements are annexed to my counsel's accompanying Declaration.) The Securityholders Agreement expressly provides:

> **Section 4.4    Governing Law; Jurisdiction.    (a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to principles of conflicts of law.**
>
> **(b)    Each party hereto (other than the Company) hereby irrevocably submits to the exclusive jurisdiction, and the Company hereby submits to the non-exclusive jurisdiction, of the courts of the**

**city of New York, State of New York in any action, suit or proceeding arising in connection with this Agreement, and agrees that any such action, suit or proceeding shall be brought only in such court (and waives any objection based on <u>forum</u> <u>non</u> <u>conveniens</u> or any other objection to venue therein).** Service of process upon any party hereto in any action, suit or proceeding arising in connection with this Agreement may be made anywhere in the world. [Emphasis added]

53.    Although I, like the other Plaintiffs that are small common or Series B Preferred Shareholders apart from WIS Partners, was not a named party to the Securityholders Agreement, this Agreement demonstrates that ImageSat, IAI, and Elbit deliberately undertook obligations to their financial partners in ImageSat, which they acknowledged would be enforceable under New York law, obligations that were acknowledged by each of them to me personally and that during my tenure as a leading figure in the organization and financing of the Company I undertook to cause them to acknowledge to each and everyone of the investors that ultimately invested in the enterprise. They recognized that the New York courts, and not the courts of Israel or Curacao or anywhere else, would represent the appropriate forum for resolution of disputes arising from the parties' obligations under the Securityholders Agreement, such as the obligation to provide the parties with timely and accurate financial statements for ImageSat and to appoint two independent individuals to the Board of Directors of the Company (which, despite repeated demands, has not been done after more than seven years).   Agreement to this fundamental prerequisite to capital raising in New York was discussed, understood and agreed to between Jacob Weiss (on behalf of IAI) and myself (then on behalf of CST) during our initial meetings and negotiations dating back to 1994 and was further memorialized in virtually all other agreements relevant to the financing of the Company thereafter.

54.    In light of this agreement by the corporate Defendants, as well as provisions contained in other agreements entered into by ImageSat, IAI, and Elbit in 2000 and 2001 in which the companies also agreed that their commitments, obligations, and formal agreements with investors would be subject to New York law and/or enforceable in courts located in New York, it is disingenuous to maintain that litigating this action in New York would impose an unreasonable burden upon them or that Plaintiffs should be denied a United States forum merely because "this lawsuit stems from [Plaintiffs'] investment in a foreign company."  Splitting this lawsuit so that litigation would proceed in the United States on claims held by WIS Partners relating to the obligations of Defendants under any of the agreements to which WIS Partners alone is a party among Plaintiffs, while the same or remaining claims were relegated to an alternative forum such as Israel would be tantamount to denying all Plaintiffs a fair hearing of their legitimate grievances, and according to my attorney *"...would result in a multiplicity of suits and disserve the interests of judicial economy"*.

55.    It also bears emphasis that as attested in the accompanying Declaration of Plaintiffs' Israeli law expert, Advocate Joseph Tamir, all court proceedings in Israel are conducted in Hebrew.  A majority of the Plaintiffs and their representatives – including me, as the most knowledgeable among the Plaintiffs with regard to the facts and subject-matters of this litigation and as the person that acted to coordinate the litigation on behalf of all of the Plaintiffs – understand and speak little to no substantive Hebrew.  By contrast, all of the Plaintiffs and the representatives of the corporate Plaintiffs, including those residing in the United States, Israel, and elsewhere, speak fluent English. Plaintiffs' primary litigation counsel, who was engaged in October 2006 and has been

working on this matter on Plaintiffs' behalf continuously since that time, is located in New York, New York.

**D.      Many Important Witnesses in this Action Are Located
in the United States or in Locations Other Than Israel**

56.      I am advised that an important factor that the Court may consider in evaluating Defendants' motion to dismiss this action for *forum non conveniens* is the availability and convenience of witnesses, and particularly of non-party witnesses.

57.      In their mandatory disclosures earlier in this litigation, the parties exchanged their lists of persons known or believed to have knowledge of material facts relevant to this action. The lists submitted by Defendants were generally *pro forma* and primarily named a few of each corporate Defendant's own employees. Plaintiffs, on the other hand, assembled a substantive list of persons having knowledge of relevant facts underlying this action. (A copy of Plaintiffs' Mandatory Disclosures, including this list of individuals, is annexed to my counsel's accompanying Declaration.) In that list, excluding Plaintiffs themselves and the Defendants and their employees, Plaintiffs identified 74 persons having relevant knowledge, representing a starting point for the universe of people who are likely to become non-party witnesses in this case. (Additional individuals with relevant knowledge are being identified on an ongoing basis as my own and other Plaintiffs' investigation of the facts of this matter continues.)

58.      Of the 74 people included on Plaintiffs' witness list, more than half (42) are residents of the United States. For each of these witnesses, it would clearly be more convenient if they were called to testify in a United States rather than an Israeli or other foreign forum. Examples of American and other non party individuals that will be important witnesses as this matter proceeds to discovery and trial and that for whom

travel to Israel would be inconvenient or impossible include, but are not limited to;

      (a)    Keith Calhoun-Senghor, who was the representative of the U.S. Department of Commerce to the Interagency Working Group for Remote Sensing Policy and led early remote sensing policy negotiations on behalf of the U.S. with the Israeli Ministry of Defense relevant to the business of ImageSat, is now an attorney in private practice in Washington, D.C. living and practicing law temporarily (for the next one to two years) in Munich, Germany. The German law practice with which Mr. Calhoun-Senghor is associated does a substantial amount of business in the Middle East but exclusively with Arab countries, some of which do not have peace treaties or diplomatic relations with Israel at this time. Travel to or from Israel would be especially inconvenient for him in his current professional capacity;

      (b)    David Satterfield, a U.S. citizen based in Washington D.C. is formerly the Principal Deputy Assistant Secretary of State for Near Eastern Affairs, promoted in 2006 and currently the Special Advisor on Iraq to Secretary Rice. Ambassador Satterfield was the State Department representative to the Interagency Working Group for Remote Sensing Policy during the mid to late 1990s and was directly involved in the policy and regulatory negotiations between the U.S. and Israel that ultimately defined the regulatory regime applicable to ImageSat and its investors' rights thereunder;

      (c)    Omar Jaffrey, a U.S. citizen based in New York, originally from Pakistan, a Muslim American and the former head of the Satellite and Telecommunications Group at Merrill Lynch and subsequently through the present in the same position at UBS involved in a leadership role in the Company's continuous

investment capital raising efforts in New York from 1998 through 2005, as discussed in more detail in paragraphs 36 and 40. above:

(d)    Robert LaPenta, then President of L-3, was responsible for a substantial L-3 investment, and co-invested personally, in Core Software Technology to support CST's investments in WIS. LaPenta resides in Connecticut, is now Chairman and CEO of L1 Identity Systems, is Chairman of CST and together with Defendant, ImageSat director, and CST CEO DePalma owns a substantial majority of CST fully diluted equity as further discussed in paragraph 31 above;

(e)    Major General (ret.) William R. Usher, a U.S. citizen who became the Chairman of the Board and Chief Executive Officer of Core in 1997, playing the important role of working with me to coordinate liaison with senior U.S. government officials responsible for resolving policy issues that were essential prerequisites to the substantive financing of the Company, and which became the basis for the key representations and promises to American investors, including several of the Plaintiffs, upon which the investors relied in investing moneys in ImageSat. Major General Usher is now an elderly retiree that lives in Reston, Virginia;

(f)    Jonathan Berger, formerly a Managing Director of Pegasus, who was involved in all aspects of the relationship between ImageSat and Pegasus, beginning at the time of initial investor presentations, through due diligence and continuing through late 2006 at which time his association with Pegasus was terminated less than amicable circumstances. Mr. Berger served from mid 2000 until late 2006 as Pegasus's principal non-voting observer at ImageSat Board and Board committee meetings, who upon information and belief is a resident of New York or Connecticut, whose testimony will be

crucial to this litigation, and who will very likely appear only under subpoena enforced by the court; and

(g)    General de Brigada (AV ret) Pedro Kruckhans, a senior Venezuelan Air Force officer that was introduced to Mr. Wilson by Cristina Kalen, IAI's sales representative/manager in Caracas, and that was directly involved in the initial decision to procure the SOP program in 2001, as well as the program's withdrawal by IAI representatives after 2002 budgeting for the program was completed.  General Kruckhans worked closely with me in 2003 and 2004 at DIGECAFA (Geography and Cartography Directorate of the Armed Forces) where I learned for the first time that a budget for the SOP program was formally assigned by the Air Force in late 2001.  Like ALL Venezuelan witnesses he may be unable to obtain a visa to travel to Israel due to intermittent suspensions of consular services throughout 2007 both in Caracas and Tel Aviv related to strained diplomatic relations between the two countries.

59.    Additional, critical non-party testimony would come from individuals representing American corporations such as (1) Northrop-Grumman, which announced in April 2007 an agreement with IAI for the commercialization of IAI Synthetic Aperture Radar (SAR) earth-observation satellites, a transaction with an announced first phase value of **$1.6 billion** or more, and (2) Lockheed Martin to which IAI promoted the same independent commercialization strategy for both SAR and electro optical satellites during the past several years, both in violation of IAI's commitments to ImageSat and its shareholders under the Master Agreement.

60.    Compulsory process would be available to compel all of the American witnesses to appear to testify for deposition, and in many cases at trial, if they were

unwilling to appear voluntarily. By contrast, these witnesses could not be compelled to testify if the litigation were brought in Israel, save perhaps through a protracted procedure under the Hague Convention or the equivalent, and even that is questionable. It is submitted that this is a strong factor weighing in favor of this Court's retaining and exercising its rightful jurisdiction over this case.

61. Many of the other knowledgeable individuals and potential witnesses named by Plaintiffs reside outside the United States but within the Western Hemisphere (clearly closer to the United States than to Israel), or in Europe, Africa, and East Asia (for practical purposes, equidistant from New York and Israel). By contrast, only about 10 of the non-party witnesses reside in Israel. Moreover, travel to Israel is notoriously inconvenient (even if for understandable security reasons) for non-Jewish travelers and such travelers, if arriving in Israel to provide testimony that could be damaging or even embarrassing to the Defense industries and the government, may feel and indeed may be vulnerable to harassment by immigration, customs and/or other security personnel. As addressed above, despite his crucial role in the financing of ImageSat, Omar Jaffrey declined multiple invitations beginning with Merrill's due diligence kick-off meetings in 1998 despite promised special handling of his visa, and VIP concierge assistance upon his arrival, and departure.

62. Defendants also contend that relevant witnesses in this action may include Israeli government officials and employees who would not be subject to compulsory process from this Court. In their motion papers, Defendants have not identified these individuals or explained the relevancy of their testimony, making it difficult to respond to this claim. In any event, however, in light of the working relationship between IAI and

the Government of Israel (upon which IAI itself places so much emphasis in its individual motion to dismiss), it can reasonably be inferred that these individuals would probably provide testimony voluntarily if Defendants requested that they do so. By contrast, Plaintiffs have no such assurance with regard to testimony that they may need from many of the witnesses located in the New York area or elsewhere in the United States, including present and past employees of United States Government, whom Plaintiffs will call to testify (among other things) that nothing in U.S. law or government policy mandated Defendants' acts and omissions as alleged in the Complaint.

E.    **Each of the Defendants Can Conveniently Litigate in the United States, and Each Has Engaged in Purposeful Acts in New York and the United States Relating to the Subject-Matters of the Complaint**

63.    All of the Defendants, with the exception of Defendant James DePalma (a United States citizen and resident of Connecticut), have moved to dismiss the Complaint under the doctrine of *forum non conveniens*. In addition, ImageSat, Elbit, and each of the Individual Defendants in this action (with the exception of Defendant Jacob Weiss, who is currently the President of a corporation headquartered in New York, and Mr. DePalma) has moved to dismiss this action based on the allegation that this Court lacks personal jurisdiction over such Defendants. The moving Defendants have submitted Declarations asserting facts that they contend demonstrate the lack of such jurisdiction. These Declarations, however, are as significant for the conduct of Defendants in New York and the United States that they fail to disclose, as they are for what actually is disclosed.

64.    For example, it is absurd for the corporate Defendants ImageSat, IAI, and Elbit to contend that they would suffer material inconvenience through having to litigate

this case in the United States. As discussed above, between 1996 and 2005, ImageSat and its predecessors engaged in a continuous and ongoing course of fundraising activities in New York, through which they raised tens of millions of dollars in New York, primarily from American investors, including many of the Plaintiffs. ImageSat's senior executives and Board members routinely travel around the world, including to New York and elsewhere in the United States, on corporate business. More than a dozen ImageSat Board meetings have been held in New York since 2000 – with New York being chosen, according to the deposition testimony of ImageSat's long-time Chairman of the Board, Moshe Keret, and corroborated by ImageSat's corporate Secretary and CFO, Hagai Goren, because it is a "convenient" location for all of the participants in the Board meetings to meet. ImageSat is represented in this action by one of New York's leading law firms, Milbank Tweed, which has been ImageSat's counsel in substantially all material matters since the 1990's. ImageSat's senior executives are all fluent in English. As discussed above, ImageSat entered into a series of Agreements under which the Company agreed that any disputes would be litigated in the federal and state courts of New York. There is no colorable basis for ImageSat's claim that it could not conveniently litigate this action in this Court.

65.    IAI (which does not move for a jurisdictional dismissal) also joins in Defendants' joint motion to dismiss the Complaint because New York supposedly is not a "convenient" forum in which this case can be litigated and resolved. IAI fails to advise the Court that while headquartered in Israel, it has extremely substantial operations in the United States including the offices of a wholly owned subsidiary located in Washington, D.C., through which IAI contracts hundreds of millions of dollars of business with the

United States Government annually. Indeed, according to testimony of its longtime Chief Executive Officer, of IAI's approximately $2 billion in gross revenue in 2005, some $700 million was earned from sales in the United States. IAI until recently also maintained an office in New York, New York, which supported its U.S. government-contracting activities, and that was extensively used by Plaintiffs and Defendants alike in support of their solicitation of New York and other U.S. based ImageSat investors during the 1990's. Additionally, IAI operates a New York-based subsidiary known as Empire Aero Center located in Rome, New York, of which ImageSat's Chairman, Defendant David Arzi, is Chairman of the Board. IAI's directors and corporate officers frequently travel to the United States and elsewhere around the world. IAI is represented in this action by not one but *two* of New York's major law firms, Paul, Weiss, Wharton, Rifkind & Garrison LLP and Cohen Tauber Spievack & Wagner LLP (which I understand has represented IAI for at least 7 years). IAI would obviously suffer no harm or inconvenience from litigating this action in this Court.

66.     Elbit, too, joins in Defendants' motion to deprive Plaintiffs of their chosen forum on the grounds that it would be highly inconvenient for it to litigate an action in New York. Elbit is a publicly traded corporation whose shares are traded in the United States on the NASDAQ stock exchange. According to its most recent Form 20-F filed with the U.S. Securities and Exchange Commission, during the year ended December 31, 2006, Elbit enjoyed revenues of $1.523 billion dollars, of which $609.5 million or 40% was derived from United States sources. Elbit also reported that in 2006, it had 1,357 employees in the United States. This multinational defense contractor is represented in this action by still another of New York's leading law firms, Greenberg Traurig LLP.

67.    The Individual Defendants (except for DePalma and, as to jurisdiction, Weiss) have also moved to dismiss the Complaint.  Each of their motions is without substance, as all of the Individual Defendants both are readily able to travel to New York as might be necessary to litigate this case or for any other reason, and intentionally took actions in New York and/or that had a an obvious and intentional effect within this jurisdiction such that it is fair for them to be accountable for their actions in this Court.

68.    For example, Defendant *Moshe Keret* claims that he has not had sufficient contacts with New York or the United States to warrant this Court's exercising jurisdiction over him.  However, Keret was a senior IAI executive at the time when IAI agreed to enter into a Joint Venture with an American company (CST) for the purpose of raising millions of dollars in American money on Wall Street for purposes of commercializing Israeli earth-observation satellite technology developed at IAI.  For this purpose, Keret traveled to New York, including one trip to New York as early as 1994 or 1995 for the purpose of reinforcing the commitments of IAI to CST and to the Joint Venture despite IAI's inability to obtain permission from the IMOD to announce publicly the intent of the enterprise to enter the market, as it had committed to do under each of the 1994 and 1995 Joint Venture Agreements.  During that visit Keret, Schmuel Peretz (IAI's CFO) and Weiss lunched with me and Morty Davis of D.H. Blair.  Keret was IAI's signatory on each of the Joint Venture Agreements in 1995, 1997, and 1998 in which the parties agreed to New York choice-of-law in connection with the resolution of any disputes that might arise.  Concurrent with a pre-closing general meeting of the shareholders of West Indian Space in May of 2000, Keret was named as an IAI designee to ImageSat's Board of Directors and elected Chairman of the ImageSat board.

Thereafter he attended a series of Board meetings in New York as identified in the accompanying transmittal affidavit of my counsel, including Board meetings at which many of the wrongful acts and decisions that are the subject of the Complaint were discussed and ratified.

69.     Defendant *Jacob Weiss*, who acknowledges this Court's jurisdiction over him although he appears to join in the other Defendants' application to dismiss for *forum non conveniens*, is a former IAI and ImageSat officer who now serves as the President of Medis, a corporation spun off from IAI with offices in New York, New York. Mr. Weiss conceded at deposition that he spends at least 15% of his time in New York each year, and clearly can readily defend an action pending here.

70.     Defendant *Itzhak Nissan* became General Manager of the MBT Division (responsible for IAI's satellite technology, satellite integration and test facilities, as well as TT&C ground station operations) of IAI in 1995 or 1996. He traveled to New York on several occasions in connection with the fundraising for West Indian Space/ImageSat and attended certain investor meetings in New York, as well as due diligence meetings conducted by New York based Merrill Lynch personnel in Tel Aviv. During the final negotiations leading up to the closing of the financing transactions in New York in July 2000, Nissan was not present in New York to my knowledge but he was frequently on the telephone with Defendants Weiss and Eldar, who were present in New York, Eldar in particular then present on Nissan's behalf in his capacity as a director of ImageSat and as the General Manager of IAI's MBT Division. Nissan consistently pressed Weiss to pursue IAI's interests at the expense of the interests of ImageSat (then still a legitimate business with business interests of its own) and its investors during the protracted closing

negotiations. Each of Nissan, Weiss and Eldar were in a conflicted position in negotiating agreements between ImageSat and IAI because each was a fiduciary of ImageSat, and Weiss in particular was sent by ImageSat's board to participate in the final negotiations with me as a representative of the board and the Company's shareholders and because he therefore had high-ranking positions with both companies at that time. Weiss and Eldar were in a conflicted position in negotiating agreements between ImageSat and its new investors to the extent that they were tasked by Nissan to represent and did represent IAI's individual interests, as was the case in connection with the appointment of IAI under the Master Agreement as ImageSat's exclusive satellite vendor. I understand that Nissan has also been an active participant in soliciting and negotiating agreements with third parties through which IAI has violated its exclusivity, non compete, first rights and other commitments to ImageSat as contained in the July 2000 Master Agreement, among others. He also served as a member of ImageSat's Board of Directors from 2000 to 2002 and attended ImageSat Board meetings in New York. As the current CEO of IAI, Nissan, like his predecessor Moshe Keret before him, presides over a company that conducts business regularly in New York and elsewhere in the U.S., which U.S. based customers account for roughly 1/3 of its total annual revenues.

71. Defendant *Shimon Eckhaus* was a senior executive of IAI throughout the 1990's ascending to the role of Deputy Chief Executive Officer prior to becoming the Chief Executive Officer of ImageSat in July 2005. He served on the board for approximately two years prior to that appointment and as CEO he has attended all ImageSat Board meetings since 2005, including at least four in New York, at which several of the wrongful acts and omissions described in the Complaint took place.

Eckhaus regularly travels around the world, including to New York, in the course of his duties for ImageSat. For example I frequently spoke with him from Venezuela while he was in New York when I was still a consultant for ImageSat seeking to sell an SOP contract to that country and while he was attempting throughout the entire second half of 2005 to complete his predecessor Menashe Broder's work toward the Company's IPO.

72. *Michael Federman, Joseph Ackerman,* and *Joseph Gaspar* are senior officers of Elbit. With respect to their ability to defend an action in New York with reasonable convenience, the biographies of these three international business executives contained in Elbit's most recent Form 20-F (a copy of this which is annexed to my counsel's Declaration) speak for themselves. All were involved in ImageSat's New York financing activities over the relevant period, some more directly than others but all as members of the Board of Directors and in the cases of Mr. Ackerman and Mr. Gaspar as members of the audit and finance committee of the board. In addition, Mr. Ackerman attended and participated actively in the closing of the July 2000 financing transactions in New York as a representative of Mr. Toren and Mr. Federman, all of whom were fiduciaries of ImageSat in that capacity. Mr. Gaspar has attended at least seven ImageSat Board and finance committee meetings held in the City of New York.

68. The *Estate of Jacob Toren* is a party to this action as successor to Jacob Toren, a senior officer of ElOp/Elbit and the Director General of the IMOD between September 2005 and July 2006, but who died in December 2006. With respect to the issue of convenience, it is not contended that any of Mr. Toren's family members will have knowledge regarding the subject-matters of the litigation, and thus these individuals' personal convenience is not a relevant factor one way or the other. With

regard to the issue of jurisdiction, Toren attended a number of presentations to investors and meetings with the investment bankers and others in New York as the Chief Executive Officer of ElOp while West Indian Space/ImageSat was engaged in financing activities during the period from 1998 to 2001 and he was present during the period prior to the closing of the 2000 financing transactions. Mr. Toren reported directly to and coordinated closely all of his actions relevant to ImageSat with Defendant Michael Federman (then sole owner of ElOp) including the negotiation and execution of the Stock Purchase Agreement of December 1998 through which Mr. Toren committed ElOp, and presumably its sole proprietor, to a preference for New York law and to a preference for New York city as the appropriate venue for the resolution of any possible dispute arising from the Agreement which contains provisions relevant to exclusivity and non-competion that are among the subjects of this litigation. Mr. Toren also attended at least seven ImageSat Board meetings in New York.

73.    Defendants *Gino Piperno-Beer*, *Yoav Chelouche*, and *David Arzi* are IAI-designated members of the ImageSat Board (Piperno-Beer since 2005 and Chelouche and Arzi since 2006). They have participated in wrongdoing in New York and the United States by their participation in ImageSat Board meetings in New York, New York at which wrongful acts in violation of the rights of ImageSat's minority shareholders were approved, and they have participated in the breaches of fiduciary duty and other acts of misconduct alleged in the Complaint. Being able routinely to travel to New York for ImageSat Board meetings – and in the case of Arzi, on the business of IAI's subsidiary Empire Aero, located in Rome, New York, of which he is the Chairman – they should be accountable in this Court in New York for their acts of wrongdoing that have injured all

of ImageSat's shareholders and security-holders except for themselves and their corporate sponsors including in particular those resident in New York and elsewhere in the United States.

74.    Finally, ALL of the corporate and individual Defendants are culpable and should be held accountable in this court under the RICO claims asserted in our Complaint for the ongoing criminal fraud, conspiracy, and cover-up associated with the "2001 EROS B" (subsequently renamed "EROS C") Satellites Supply Contract whether or not they were directly or indirectly involved in the original criminal act in July of 2001.  No action whatsoever has been taken by Defendants during six and one half years to rectify or even investigate this egregious deception and ongoing breach of fiduciary duty to Plaintiffs and other similarly positioned securityholders of ImageSat.  Any defense that Defendants acts and omissions in the operation of the enterprise is innocent or even merely negligent is preposterous in light of the following sequence of events related to the 2001 EROS B SSC:

(i) the requirement to enter into a new "EROS B" satellite supply contract in May of 2004 without delivery of the 2001 EROS B satellite, let alone credit for cash payments made, for securities issued, or for interest and dividends still accruing and compounding related to the 2001 EROS B SSC;

(ii) the inexplicable renaming of the the original 2001 EROS B as EROS C and the purposeful naming of the new satellite ordered only in May of 2004 as "EROS B" obviously and transparently, from the substance of the monthly Investor Report, intended to deceive the Company non industrial security holders;

(iii) the loss of the Taiwan SOP contract in September 2004, and tens of millions

of dollars in otherwise secure contract revenue, as a direct result of, and with no recourse to, IAI's and Elbit's non delivery of the 2001 EROS B/C satellite;

(iv) the dramatic E&Y New York mandated write down of the EROS B/C asset by roughly $30 million in connection with the audit of the Company's 2004 financial statements in mid 2005 (roughly half its previously stated and audited value) and the related demand by Menashe Broder and eventual acquiescence by IAI that the industrial partners rescind some $31 million in corresponding bogus invoices:

(v) the write off by the Board of Directors in May 2006 of the entire remaining $34 million EROS B/C asset value;

(vi) the continuing 9% dividend accrual post write off on the Series C Preferred Convertible Notes issued to IAI and Elbit in payment of $8.0 million of the original $23.5 million down payment, and an additional $6.0 million subsequently issued as a progress payment on the 2001 EROS B/C satellite for which there exists no demonstrable work in progress to this date;

(vii) receipt by the Company and the full Board of Directors of Plaintiffs' demand letter of November 2006 detailing some of the alleged wrongdoing;

(viii) receipt by the Company and the full Board of Directors of the Pegasus written demand that it attest to the veracity or lack thereof of Plaintiff's allegations related to the EROS B/C satellites supply contract:

(ix) receipt of service by each of the corporate and individual Defendants of Plaintiffs' Complaint, Case No. 1:07-cv-6176 in July 2007;

(x) repeated demands by minority shareholders, minority designees to the board, and independent investors that an independent audit of IAI's and Elbit's performance

under the 2001 EROS B/C contract as well as ImageSat management's administration of the contract, be conducted.

Despite all of the foregoing not inconsequential events, no independent investigation or contract audit whatsoever has been undertaken.

**Conclusion**

75.    Based on all of the foregoing, as well as the documentary evidence, deposition transcripts, and Declarations submitted herewith, it is respectfully submitted that Defendants' motions to dismiss the Complaint on grounds of *forum non conveniens*, lack of *in personam* jurisdiction, and on various other grounds should be denied in all respects.

I declare under penalty of perjury that the foregoing is true and correct. Executed at New York, New York this 30th day of January, 2008.

STEPHEN WILSON