UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, | 07 Civ. 6176 (LTS)(DME) |
| Plaintiffs, | ECF CASE |
| -against- | **DECLARATION OF <u>MICHAEL MORRIS</u>** |
| IMAGESAT INTERNATIONAL N.V., *et al.*, | |
| Defendants. | |

MICHAEL MORRIS declares as follows:

1.  I am one of the Plaintiffs in this action. I am the owner of stock options entitling me to acquire 71,537 shares of common stock of defendant ImageSat International, N.V. ("ImageSat"). These shares were issued to me as incentive compensation during my tenure as Chief Financial Officer of West Indian Space, Ltd. ("West Indian Space"), the corporate predecessor of ImageSat, and of ImageSat, during the period from December 1998 to January 2001.

2.  I respectfully submit this Declaration in opposition to the motions of various Defendants in this action to dismiss the Complaint for alleged lack of *in personam* jurisdiction, under the doctrine of *forum non conveniens*, and on other grounds.

3.  I am a citizen of the United States and have been since my birth in 1948. I am not a citizen of any other country. I have residences in the States of Massachusetts and Florida. I have resided in the United States for my entire life.

4.  In November or December 1998, I was approached by Plaintiff Stephen Wilson, the President and CEO of West Indian Space, who asked if I would be interested

in becoming the company's CFO. Mr. Wilson advised me that West Indian Space – a company that had been formed several years earlier as a joint venture of Core Software Technology, a California corporation, and Defendant Israel Aerospace Industries Ltd., then known as Israel Aircraft Industries Ltd. ("IAI") – was in the process of seeking to raise substantial institutional capital, and in the interim bridge financing, in New York with the expectation of eventually making an initial public offering (IPO).

5.   After discussions with Mr. Wilson and other officers of West Indian Space, I agreed to take on the position of CFO. To enable me to carry out my duties as CFO, and to provide a platform for West Indian Space's fundraising efforts, I established a corporate office of West Indian Space at 50 Washington Street in Norwalk, Connecticut (within the New York metropolitan area and just over the New York State border). This was a regularly operated corporate office of West Indian Space, which became known as ImageSat in 2000. ImageSat had full-time employees working at this office, bank accounts located in New York and/or Connecticut, telephone and facsimile service, and all the other indicia of a company doing business in the United States.

6.   From the corporate office in Connecticut, I traveled to and worked in New York regularly in the performance of my job duties. These included in particular the engagement of Arthur Andersen, through which we conducted an audit of the company's financial activities since the incorporation of West Indian Space in 1997, working with Merrill Lynch (the company's investment banker), and meeting with existing shareholders and prospective investors located in New York.

7.   During my tenure as CFO, West Indian Space/ImageSat made presentations to numerous potential investors concerning the company's business model,

financial prospects, and operational issues (including governmental policy issues). Presentations were made both to major institutional investors who we hoped would become significant stakeholders in ImageSat, as well as individuals who it was hoped would provide bridge financing for the company until major institutional investments could be closed. Other participants in these presentations, in addition to Mr. Wilson and me, included professionals from the New York office of Merrill Lynch, which was serving as investment banker for West Indian Space/ImageSat. The Merrill Lynch team was under the leadership of Managing Director and head of the Satellite and Telecommunications Group, Omar Jaffrey, and also included Merrill Lynch bankers Stanley Lai (managing director and head of the private equity placement group), Tom Watts (managing director for equity research in the satellite and telecommunications field), and others.

8.   A majority of the investor presentations took place in New York, New York. A few took place in adjoining states such as Connecticut or New Jersey.

9.   The investors who attended presentations that I and other representatives of ImageSat made in New York or the New York metropolitan area included the following:

(a)   Representatives of Core Software Technology, a California corporation with an office in New York, New York, at the direction of Core's President, New York resident Andrew Plevin. Core had invested approximately $5,000,000 (the initial capital invested in the Joint Venture and West Indian Space) between 1994 and the commencement of my tenure, and invested an additional $5,000,000 in early 1999;

(b)   Representatives of WIS Partners, L.P. ("WIS Partners"), an

investment vehicle created by The Fairchild Corporation (a publicly held corporation listed on the New York Stock Exchange) at the direction of Fairchild's CEO and President, New York resident Jeffrey Steiner. WIS Partners ultimately became a substantial investor in ImageSat and is one of the Plaintiffs in this action;

   (c) Representatives of a French company, Financier Bagatelle, and its parent company Euris, at the New York, New York offices of Euris. Financier Bagatelle, together with WIS Partners, invested a total of $6,000,000 to purchase 37.5% of the initial 1,000,000 common shares. Financier Bagatelle also provided $1,000,000 in bridge financing to ImageSat during my tenure.

   (d) Representatives of Loyd's Aerospace (Invest), Ltd., now known as Harbinger International, the Intervenor-Plaintiff in this action, which ultimately invested millions of dollars in ImageSat for a combination of common and Series B preferred securities;

   (e) Representatives of Pegasus Capital Advisors, a private equity firm with offices in New York and Connecticut. Pegasus, through a series of entities known as Imaging Holdings, and on behalf of a large group of institutional investors including Merrill Lynch, Morgan Stanley, Goldman Sachs, and the New York State Pension Fund, all of whom attended presentations made by me, by other representatives of West Indian Space/ImageSat, and by senior representatives of IAI, Elbit, and Core, ultimately invested approximately $70 million in ImageSat in a combined Series C and Series B preferred securities offering in New York, New York, totaling over $90 million;

   (f) I met with countless individual and corporate investors who supported Core's investments in ImageSat at Core's New York offices, including Morris

Talansky and Abraham Moshel, both of whom are New York residents and Plaintiffs in this action; and

   (g)  About one dozen other major New York institutional equity funds that ultimately chose not to invest in ImageSat.

  10.  During the period in which I was CFO, and both before and afterwards as well, ImageSat was served by many other professionals in New York, including the New York law firms of Winthrop, Stimson, Putnam & Roberts and Milbank, Tweed, Hadley & McCloy as the company's outside legal counsel. (For example, the decisions to domicile West Indian Space in the Cayman Islands and later to redomicile ImageSat in Curacao, Netherlands Antilles was driven entirely by tax advice provided by these firms.) Additionally, the New York office of Arthur Andersen LLP with regard to certain aspects of the company's accounting and audits.

  11.  The Winthrop Stimson and Milbank Tweed firms played a particularly extensive role in connection with West Indian Space/ImageSat's tax planning. Extensive efforts were made to ensure that the company would not have a taxable nexus in either Israel or the United States, as doing so would have negative implications both financially and politically. For example, the decisions to domicile West Indian Space in the Cayman Islands and later to redomicile ImageSat in Curacao, Netherlands Antilles was driven entirely by tax advice provided by these firms. The personnel who worked on this matter were located in the New York offices of each of the firms.

  12.  During my tenure as CFO, I worked to ensure that ImageSat's financial statements were fairly presented in accordance with U.S. GAAP (generally accepted accounting principles) and SEC requirements so that they could be used in connection

with the anticipated future public offering in the United States. One issue that arose in this connection was whether ImageSat had appropriately allocated a $16 million valuation to IAI's contribution of certain exclusive satellite technology licensing rights pursuant to contractual agreements originally memorialized in the IAI/Core Joint Venture Agreements and the ElOp (succeeded by Elbit) Stock Purchase Agreements, and subsequently in the 2000 Master Agreement between ImageSat and IAI. To address this issue, with the assistance of Arthur Andersen, I wrote to the accounting staff of the Securities and Exchange Commission in Washington, D.C., seeking and obtaining the staff's concurrence in the company's accounting treatment of this asset.

13. Following the July 2000 financial closing in New York at which roughly $90 million was raised, Defendant Jacob Weiss succeeded Mr. Wilson as CEO of ImageSat. Mr. Weiss immediately advised me that he did not wish to retain me as CFO. I left the company in or about January 2001 and was succeeded by Ori Ben-Amotz who, like Weiss, is a dual U.S.-Israeli citizen.

14. After my departure from ImageSat, I continued to hold my stock options awaiting a time when they would have value and I would be able to exercise them and convert them into ImageSat stock, through the proposed IPO or otherwise. Unfortunately, due in large measure to improper acts and omissions of the Defendants including those described in the Complaint, my options have become valueless.

15. In their joint motion to dismiss the Complaint in this action, Defendants contend that this Court is not a convenient forum for the litigation of this action because a majority of the Plaintiffs are located outside New York. I believe that this assertion is substantially misleading as to me because although I do not reside in New York, I am a

United States citizen with residences in Massachusetts and Florida, and I was a resident of Connecticut (suburban New York City) during my tenure with ImageSat. I and the other Plaintiffs are represented in this matter by counsel in New York who have devoted more than one year to studying this matter. It certainly would be more convenient for me to litigate this action in the Southern District of New York than in Israel, Curacao, or any other location.

16. Moreover, throughout the period in which I was involved in raising money for West Indian Space/ImageSat, it was understood that many New York- and other United States-based investors were investing millions of dollars in ImageSat based on investment solicitations and negotiations conducted in New York. I consider that it is fundamentally inequitable for Defendants such as ImageSat, IAI, and Elbit Systems Ltd. to have extensively solicited American investors to make investments in New York, only now to claim that these investors are not entitled to the protections of United States laws and that any litigation arising out of those investments must be brought in Israel, in Curacao, or not at all.

17. I understand that Defendants also contend that as the holder of options to acquire ImageSat common stock, I lack standing to assert claims against Defendants. However, when I provided my professional services to West Indian Space/ImageSat for more than two years, under a compensation arrangement that provided for incentive options as a substantial part of my compensation, I certainly understood that the directors and stakeholders of ImageSat were, at an absolute minimum, committed not to act or neglect to act in such away that the foreseeable effect of their conduct would ensure that the value of ImageSat common stock would sink and remain so low as to be below the

strike price of the options, thus rendering the options valueless. In fact, the Complaint alleges in over 100 pages of detail that, among other things, certain Defendants have *intentionally* acted in such a way as to minimize, rather than maximize, the value of ImageSat securities. To hold that optionholders and warrant holders lack standing to assert claims against ImageSat and the other Defendants under this scenario would leave me and several other Plaintiffs with no viable remedy for Defendants' intentional unwinding and destruction of ImageSat, the company to which I was induced to devote more than two years of my professional services, to whose early success I contributed materially, and from which I in good faith accepted stock options as an important part of my compensation package.

18.     I ask the Court to deny Defendants' motions to dismiss and to allow this action to proceed to full merits discovery and trial.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Naples, Florida this 23rd day of January, 2008.

_____
MICHAEL MORRIS