UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, | 07 Civ. 6176 (LTS)(DME) |
| Plaintiffs, | ECF CASE |
| -against- | **DECLARATION OF MORRIS TALANSKY** |
| IMAGESAT INTERNATIONAL N.V., *et al.*, | |
| Defendants. | |

MORRIS TALANSKY declares as follows:

1.  I am one of the Plaintiffs in this action. I am the owner of bridge warrants that should entitle me to acquire 25,000 shares of common stock of defendant ImageSat International, N.V. ("ImageSat"). I respectfully submit this Declaration in opposition to the motions of various Defendants in this action to dismiss the Complaint for alleged lack of *in personam* jurisdiction, under the doctrine of *forum non conveniens*, and on other grounds.

2.  I am a citizen of the United States and have been since my birth in 1933. I am not a citizen of any other country. I reside in Woodmere, New York. I have resided in the United States, principally in New York, for my entire life.

3.  For many years, I have been a shareholder of a company known as Core Software, Inc. ("Core"), a California corporation. In 1994, a joint venture of Core and defendant Israel Aerospace Industries Ltd., then known as Israel Aircraft Industries Ltd. ("IAI") that was the predecessor to West Indian Space Ltd., was incorporated in the Cayman Islands in 1997, and later renamed and domiciled in the Netherlands Antilles as

ImageSat International in 2000 (collectively hereafter "ImageSat"). Core's industrial role in the joint venture was to be as provider of the ground stations and systems for the receipt, archiving, and networking of image and related data from the satellites that ImageSat would be placing into orbit.

4.      In 1998, I was asked by Andrew Plevin, the then-President of Core, and plaintiff Stephen Wilson, the then-President and CEO of ImageSat, to provide additional capital to Core for its investment in ImageSat and to assist in raising money for the same purpose from other investors, primarily in New York, with whom I was personally acquainted. I agreed both to invest additional funds of my own in Core and to seek other investors to do so. I believe that my individual investment was approximately $500,000 and that other investors whom I brought into the deal invested between $5 million and $6 million. These investors were primarily United States citizens and residents, also including one Canadian. In addition to these funds that were invested as capital, I advanced additional money to Core in the form of loans, also for the purpose of funding Core's investment in later ImageSat. For example, in November 1998, Stephen Wilson and I agreed to lend Core $250,000 each, and by doing so convinced Morty Davis of the New York investment bank D.H. Blair & Co. to lend Core an additional $1.5 million in order to enable Core to fund the closing of the final Joint Venture Agreement in November 1998. Thus, from the outset, a substantial portion of the investment funding for West Indian Space/ImageSat came from me and other investors located in the United States.

5.      In 1999-2000, I continued to speak and meet regularly with Stephen Wilson, who was still the President and CEO of ImageSat. Mr. Wilson advised me that

he and other members of his management team were negotiating to close a substantial investment in ImageSat through a New York-based fund representing Merrill Lynch, Morgan Stanley, Goldman Sachs, the New York State Pension Fund, and other high-profile institutional investors. Pending the closing of such investment, Mr. Wilson asked me to lend money to ImageSat in the form of bridge financing, i.e., loans that would be repaid at the time the institutional investment closed and from the proceeds of such closing. Highly credible presentations directly supported by IAI and Elbit representatives and Merrill Lynch were made to me in New York regarding ImageSat's business plan and financial prospects. I understood that the bridge financing ImageSat was seeking to raise was essential to the company's future.

6. Based upon the information conveyed to me in New York, I agreed to provide a $250,000 bridge loan to Core for immediate reinvestment in West Indian Space/ImageSat, which remained outstanding for several months. In additional to myself, I arranged for another individual, Abraham Moshel, who is also a United States citizen and New York resident and a Plaintiff in this action, to provide bridge financing to ImageSat.

7. In return for the bridge financing provided by me and other Core investors, it was agreed that Core would receive at the closing of the institutional investment, warrants known as bridge warrants, and Core would distribute to me a proportionate share of its warrants, which would entitle me to purchase 25,000 shares of ImageSat common stock. The terms of these warrants were to be the same as those of all other stock options and warrants that the company would be issuing to various investors, bridge lenders, and employees at the closing. When Core later informed me that the

bridge warrants had been terminated by ImageSat's Board of Directors, with Core's CEO and designee to the ImageSat Board, defendant James DePalma voting in favor of their termination, I called Mr. Wilson. Mr. Wilson assured me that he was in direct communication with ImageSat about the bridge warrants and that he was certain that all parties to the institutional investment of 2000 remembered their agreement at the time that all incentive securities would be reset to reflect the same terms and conditions concurrent with the closing. He further reminded me that each of IAI, Elbit, and Core also held bridge warrants and that for this reason there was no reason to believe that the problem would not be quickly resolved.

8. The transaction in which I lent $250,000 to ImageSat through Core and in return was issued 25,000 bridge warrants in ImageSat took place entirely in New York. I agreed to make the loan in New York, I wired the moneys for the loan from New York, and I received the bridge warrants after a closing of the institutional funding that took place in New York at a New York law office. New York professionals and professional firms, including the New York offices of Winthrop, Stimson, Putnam & Roberts and Milbank, Tweed, Hadley & McCloy as counsel, Arthur Andersen as auditors, and UBS, Bear Stearns, and Merrill Lynch as investment bankers, were involved throughout the early marketing of ImageSat to investors that I was involved in.

9. In their joint motion to dismiss the Complaint in this action, Defendants contend that this Court is not a convenient forum for the litigation of this action because a majority of the Plaintiffs are located outside New York. I believe that this assertion is substantially misleading because in addition to two of the Plaintiffs, Mr. Moshel and myself, being citizens of the United States and residents of New York, several of the

other plaintiffs are United States citizens and/or corporations owned in whole or substantial part by United States citizens. In addition, to my personal knowledge, even those Plaintiffs who invested in ImageSat and are located outside of New York, were solicited to make and did make their investments in New York. For example, Core, ImageSat's first investor, was continuously engaged in raising money to support its $10 million investment in ImageSat through Andrew Plevin's New York office between 1994 and 2000.

10.     The facts relating to my own investment in ImageSat, set forth above, should make it clear that a New York court represents the appropriate location in which this case should proceed. ImageSat representatives, including several of the individual defendants, came to New York and asked me, a New Yorker, to lend needed funds to the company. I agreed to do so, signed documents in New York, and lent funds to ImageSat from New York. Several months later, my loan was repaid from funds obtained from other investors at a closing in New York, and I was issued ImageSat bridge warrants in New York. In short, I made a New York investment of New York money to an international company that had voluntarily chosen, from all the financial markets in the world, to seek capital from United States and specifically New York financial institutions.

11.     Before the institutional investment closing in July 2000, the conversion price of the new preferred securities that were to be issued to the new investors was under negotiation and changing often. However, I was advised that the terms of all options and bridge warrants issued to various investors in and employees of ImageSat were the same. The conversion price for the warrants, I was told, was the same for all participants and all

the warrants would be valid for a period of ten (10) years from the date of the closing, i.e., until July 2010. I later learned that due to an unintended scrivener's error at or around the time of the closing (at which I understand a massive number of different documents were still being negotiated and executed, with many documents being signed on signature pages that were not physically annexed to the underlying documents), and as discussed in further detail in the Complaint, the bridge warrants issued to me and certain other Plaintiffs incorrectly recited the term of the bridge warrants as five (5) years rather than ten years. ImageSat has subsequently seized upon this error in typing up the warrants so as to claim that the warrants are valid for five years only. This is highly inequitable conduct and, at a minimum, the Court should allow discovery to proceed on Plaintiffs' claims for reformation (or, alternatively, fraud) based on the misdating of the warrants.

12. I understand that Defendants also contend that as the holder of warrants to acquire ImageSat common stock, I lack standing to assert claims against Defendants. Most importantly, nobody notified me or other bridge warrant holders with whom I am acquainted of the intended termination by ImageSat's board of directors or that the bridge warrants would expire if not exercised. It was assumed that the bridge warrants would be exercised concurrent with ImageSat's IPO, and it was well known that ImageSat had been engaged in a lengthy effort, also in New York, through which ImageSat was expected to become a New York listed public company sometime in 2005. Moreover, when I lent funds to ImageSat in return for the issuance of bridge warrants convertible into ImageSat common stock, it was surely understood by all concerned that ImageSat and the other Defendants would not act and neglect to act in such away that the

foreseeable effect of their conduct would be to ensure that the value of ImageSat common stock would sink and remain so low as to be below the strike price of the bridge warrants, rendering the bridge warrants valueless. In fact, the Complaint alleges in over 100 pages of detail that, among other things, certain Defendants have *intentionally* acted in such a way as to minimize, rather than maximize, the value of ImageSat securities. To hold that warrant holders and optionholders lack standing to assert claims against ImageSat and the other Defendants under this scenario would leave me and several other Plaintiffs with no viable remedy for Defendants' intentional unwinding and destruction of the company into which I was induced to indirectly invest (through Core) and subsequently to provide bridge financing.

13.   I ask the Court to deny Defendants' motions to dismiss and to allow this action to proceed to full merits discovery and trial.

Executed at New York, New York this 22nd day of January, 2008.

_____
MORRIS TALANSKY