UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, | 07 Civ. 6176 (LTS)(DME) |
| Plaintiffs, | ECF CASE |
| -against- | **DECLARATION OF** <br> **ABRAHAM MOSHEL** |
| IMAGESAT INTERNATIONAL N.V., *et al.*, | |
| Defendants. | |

ABRAHAM MOSHEL declares as follows:

1. I am one of the Plaintiffs in this action. I am the owner of bridge warrants that should entitle me to acquire 20,000 shares of common stock of defendant ImageSat International, N.V. ("ImageSat"). I respectfully submit this Declaration in opposition to the motions of various Defendants in this action to dismiss the Complaint for alleged lack of *in personam* jurisdiction, under the doctrine of *forum non conveniens*, and on other grounds.

2. I am a citizen of the United States and have been since my birth. I am not a citizen of any other country. I reside in Brooklyn, New York. I have resided in the United States, principally in New York, for my entire life.

3. For many years, I have been a shareholder of a company known as Core Software, Inc. ("Core"), a California corporation. In 1994, a joint venture of Core and defendant Israel Aerospace Industries Ltd., then known as Israel Aircraft Industries Ltd. ("IAI") was formed. This Joint Venture was the predecessor to West Indian Space, Ltd., which was incorporated in the Cayman Islands in 1997, and later renamed and domiciled

in the Netherlands Antilles as ImageSat International in 2000 (collectively hereafter "ImageSat"). Core's industrial role in the joint venture was to be as provider of the ground stations and systems for the receipt, archiving, and networking of image and related data from the satellites that ImageSat would be placing into orbit.

4. In 1998, at a meeting at my office in New York, I was asked by Andrew Plevin, the then-President of Core, plaintiff Stephen Wilson, the then-President and CEO of ImageSat, and Morris Talansky, another investor in Core, to provide additional capital to Core for its investment in West Indian Space/ImageSat. I agreed to do so and invested $260,000 for this purpose. A number of other investors (including four other New York residents who invested with me), the majority of whom were United States citizens and residents, also invested in Core during this time for the purpose of its funding its investment in West Indian Space.

5. In 1999-2000, I continued to speak and meet regularly with Andrew Plevin, Stephen Wilson, and Morris Talansky. They advised me that Mr. Wilson and his management team were negotiating to close a substantial investment in ImageSat through a New York-based fund representing Merrill Lynch, Morgan Stanley, Goldman Sachs, the New York State Pension Fund, and other high-profile institutional investors. Pending the closing of such investment, Mr. Wilson asked me to lend money directly to Core for immediate reinvestment in ImageSat in the form of bridge financing, i.e., loans that would be repaid at the time the institutional investment closed and from the proceeds of such closing. Highly credible presentations directly supported by IAI and Elbit representatives and Merrill Lynch were made to me in New York regarding ImageSat's business plan and financial prospects. I understood that the bridge financing ImageSat

was seeking to raise was essential to the company's future.

6. Based upon the information conveyed to me in New York, I agreed to provide a $250,000 bridge loan to Core for immediate reinvestment in West Indian Space/ImageSat, which remained outstanding for several months. In return for the bridge financing provided by me and other Core investors, it was agreed that Core would receive at the closing of the institutional investment, warrants known as bridge warrants, and that Core would distribute to me a proportionate share of its warrants, which would entitle me to purchase 20,000 shares of ImageSat common stock. The terms of these warrants were to be the same as those of all other stock options and warrants that the company would be issuing to various investors, bridge lenders, and employees at the closing.

7. The transaction in which I lent $250,000 to ImageSat through Core and in return received 20,000 bridge warrants in ImageSat took place entirely in New York. I agreed to make the loan in New York, I wired the moneys for the loan from New York, and I received the bridge warrants after a closing of the institutional funding that took place at a New York law office. New York professionals and professional firms, including the New York offices of Milbank Tweed as counsel, Arthur Andersen as auditors, and UBS, Bear Stearns, and Merrill Lynch as investment bankers, were involved throughout the early marketing of ImageSat to investors that I was involved in.

8. In their joint motion to dismiss the Complaint in this action, Defendants contend that this Court is not a convenient forum for the litigation of this action because a majority of the Plaintiffs are located outside New York. I believe that this assertion is substantially misleading because in addition to two of the Plaintiffs, Mr. Talansky and

myself, being citizens of the United States and residents of New York, several of the other plaintiffs are United States citizens and/or corporations owned in whole or substantial part by United States citizens. In addition, to my personal knowledge, even those Plaintiffs who invested in ImageSat and are located outside of New York, were solicited to make and did make their investments in New York. For example, Core, ImageSat's first investor, was continuously engaged in raising money to support its $10 million investment in ImageSat through Andrew Plevin's New York office between 1994 and 2000.

9. The facts relating to my own investment in ImageSat, set forth above, should make it clear that a New York court represents the appropriate location in which this case should proceed. ImageSat representatives, including several of the individual Defendants, came to New York and asked me, a New Yorker, to lend needed funds to the company. I agreed to do so, signed documents in New York, and lent funds to ImageSat from New York. Several months later, my loan was repaid from funds obtained from other investors at a closing in New York, and I was issued ImageSat bridge warrants in New York. In short, I made a New York investment of New York money to an international company that had voluntarily chosen, from all the financial markets in the world, to seek capital from United States and specifically New York financial institutions.

10. Before the institutional investment closing in July 2000, the conversion price of the new preferred securities that were to be issued to the new investors was under negotiation and changing often. However, I was advised that the terms of all options and bridge warrants issued to various investors in and employees of ImageSat were the same.

The conversion price for the warrants, I was told, was the same for all participants and all the warrants would be adjusted to reflect the same terms and conditions as all other similar securities (i.e. options and warrants), including those issued to the new investors and employees of ImageSat. The conversion price for the warrants, I was told, would be the same for all participants as the institutional Note conversion price and that all the options and warrants would be valid for the same period (10 years) from the date of the closing, i.e., until July 2010. I later learned that due to an unintended scrivener's error at or around the time of the closing (at which I understand a massive number of different documents were still being negotiated and executed, with many documents being signed on signature pages that were not physically annexed to the underlying documents), and as discussed in further detail in the Complaint, the bridge warrants issued to me and certain other Plaintiffs incorrectly recited the term of the bridge warrants as five (5) years rather than ten years. ImageSat has subsequently seized upon this error in typing up the warrants so as to claim that the warrants are valid for five years only. This is highly inequitable conduct and, at a minimum, the Court should allow discovery to proceed on Plaintiffs' claims for reformation (or, alternatively, fraud) based on the misdating of the warrants.

11. I ask the Court to deny Defendants' motions to dismiss and to allow this action to proceed to full merits discovery and trial.

Executed at New York, New York this 28th day of January, 2008.

_____
ABRAHAM MOSHEL