UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> IMAGESAT INTERNATIONAL N.V., *et al.*, <br><br> Defendants. | 07 Civ. 6176 (LTS)(DME) <br><br> ECF CASE <br><br> **DECLARATION OF** <br> **MENASHE BRODER** |

MENASHE BRODER declares as follows:

1. From January 2002 to June 2005, I served as the Chief Executive Officer of Defendant ImageSat International, N.V. ("ImageSat" or the "Company").

2. During my tenure as CEO of ImageSat, I frequently traveled to different countries on ImageSat business, including for the purpose of meeting with customers, prospective customers, and the Company's professional advisors, among others. Most of the Company's senior executives and the marketing and sales personnel also engaged in frequent business travel, including trips to New York where the company's attorneys and major investor were located.

3. The Company's Board of Directors meetings were held by conference calls or by meetings in person. In 2002, the Company held four Board Meetings – three in London and one conference call; in 2003, the Company held six Board Meetings – four by conference call, and one in each of London and New York; in 2004, the Company held three Board Meetings – one conference call, one in London and one in New York;



and from January 1, 2005 to July 26, 2005, the Company held four Board Meetings – three by conference call and one in New York.

4. The Company's Finance Committee meetings were usually convened by conference call, except that in 2004 one meeting was held in London and one in New York and in 2005 two meetings were held in New York.

5. New York was the most convenient venue for meetings as the Company's attorneys, underwriters and the Company's major investor, Pegasus Capital Advisors, were located there. The members of the ImageSat Board of Directors, including those who reside in Israel, attended the meetings and no objection was ever voiced to the practice of holding Board of Director meetings in New York. As a matter of policy, Board of Directors meetings were not held in Israel.

6. From 2002 to 2005, and particularly in 2004 and 2005, a major focus of my work as CEO and that of my senior management team was in connection with the ImageSat efforts to launch an initial public offering (IPO) in New York. I attended numerous meetings in New York in connection with the proposed IPO. Work time was also spent in New York by ImageSat personnel, including Jacob Weiss, a director of the Company and a consultant, Hagai Goren, the Chief Financial Officer and Efrat Nadel, the General Counsel..

7. ImageSat's investment bankers were always located in New York – initially Merrill Lynch, under the leadership of Omar Jaffrey, and then UBS after Mr. Jaffrey moved to that firm. The ImageSat primary legal counsel in connection with matters not governed by Israeli law, including the IPO as well as other investor financing activities, was the New York office of Milbank Tweed Hadley & McCloy, located at



1 Chase Plaza in New York City. Accounting and auditing services necessary to prepare the financial statements for the Company's IPO SEC filings was provided by the New York office of Ernst & Young LLP. Work on the IPO took place throughout 2004 and 2005 and was still underway as of the time I left the Company.

8. Prior to serving as the ImageSat CEO, I was employed from 1973 to 1998 by Israel Aircraft Industries, Ltd. (now Israel Aerospace Industries, Ltd. or "IAI") as Deputy Vice President – Legal Department and subsequently as Corporate Vice President of International Marketing and Sales. During my years in these positions, I travelled to many countries in the world, including the United States, which was the largest single source of IAI's revenue. IAI's other senior officers, including Moshe Keret, Shimon Eckhaus, Jacob Weiss, and Itzhak Nissan, also routinely traveled to the United States and throughout the world. IAI through a wholly owned subsidiary maintained offices in the United States in New York and in Washington, D.C. and engaged in transactions with United States customers, valued at hundreds of millions of dollars annually.

9. I first met Mr. Stephen Wilson while I was employed by IAI. During my tenure as IAI Vice President – Marketing and Sales, IAI and Mr. Wilson negotiated a Joint Venture between IAI and Mr. Wilson's California Company, Core Software Technology, for the commercialization of IAI's earth observation satellite program.

10. From 1998 to 2000, I served on the Board of Directors of West Indian Space, Ltd., the entity formed to incorporate the Joint Venture and the corporate predecessor to ImageSat. During this period, Mr. Wilson and the Company were engaged in various financing activities, including in particular an initiative with Merrill Lynch in New York, New York that was ultimately successful, resulting in total



investments by Pegasus Capital Advisors, Merrill Lynch, and others totaling over $90 million.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at TEL AVIV ISRAEL this 28 day of January, 2008.

_____
MENASHE BRODER

I hereby certify that the undersigned is an attorney admitted to practice before the United States Supreme Court, and before me on this 28th day of January 2008 appeared Menashe Broder, who is known to me, and signed the aforesaid declaration in my presence, declaring under the penalties of the perjury that the contents of the declaration are true and accurate.

_____
Arnold Taragin, Esq.