UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> IMAGESAT INTERNATIONAL N.V., *et al.*, <br><br> Defendants. | 07 Civ. 6176 (LTS)(DME) <br><br> ECF CASE <br><br> **DECLARATION OF** <br> **ANDREW PLEVIN** |

ANDREW H. PLEVIN declares as follows:

1. I am a private investment professional and am the founder and/or an officer of several private equity firms including Eastport Capital Corporation, Carnegie Hill Venture Partners, and Spar L.P. I am not a party to this action. (However, Eastport Capital Corp. is now a wholly owned subsidiary of Goldman Sachs & Co., Inc., which is among the institutional investors with holdings in defendant ImageSat International N.V. ("ImageSat").) I respectfully submit this Declaration at the request of Plaintiffs in this action, in opposition to the motions of various Defendants to dismiss the Complaint for alleged lack of *in personam* jurisdiction, under the doctrine of *forum non conveniens*, and on other grounds.

2. I reside and maintain my place of business in New York, New York.

3. From 1993 to 2000, I was affiliated with Core Software Technology Inc. ("Core"). As a venture capitalist, I conducted a private placement for Core prior to its involvement in the joint venture that became ImageSat, and in 1994 my employer issued an initial financing commitment to Core on behalf of that joint venture. From November

1997 to the summer of 2000, I was the President of Core. Core is a California corporation, but during the years in which I was its President, Core maintained a place of business under my direction in New York, New York, primarily for the purpose of raising capital, either for Core to reinvest in ImageSat or in support of ImageSat's direct capital-raising activities in New York (which were extensive and continuous beginning in 1996).

4. Beginning in 1994, Core entered into a series of joint venture agreements with Israel Aircraft Industries Ltd. (now Israel Aerospace Industries Ltd.) ("IAI") for the purpose of combining IAI's earth observation satellite technology and Core's software and ground system designs and making them commercially available to customer governments worldwide. This Joint Venture was incorporated as West Indian Space Ltd. ("West Indian Space), a Cayman Islands company, in 1997, and then re-domiciled and reincorporated as ImageSat International, N.V., a Curacao (Netherlands Antilles) company, in 2000.

5. During the early 1990's, the Israeli Ministry of Defense ("IMOD") and IAI suffered a series of setbacks in the Israeli military space program. Several successive Israeli launches of its "Ofeq" class military earth observation satellites were unsuccessful as the satellites failed to attain earth orbit and were lost in the Mediterranean Sea. In addition, Israel's primary source of international research and development co-financing, South Africa, terminated its own space program and all space budgets during the same time period.

6. By 1994, the Government of Israel took the decision to follow the U.S. lead and permit the commercialization of certain key Israeli space program technologies, i.e., to permit private companies to build and operate military class (spy) satellites. IAI

had proposed commercialization in 1992, but the U.S. policy change reflected in Presidential Decision Directive 23 signed by President Clinton in March 1994 was a prerequisite defined by the IMOD to the pursuit of a commercialization strategy. A second prerequisite was the requirement that 100% of the funding for any commercial venture must be raised from private capital sources outside of Israel. Among other advantages, commercialization would allow the satellite to be commercially launched from a more favorable geographical location and to be insured against failure and loss. The Joint Venture was formed for this purpose under the leadership of Stephen Wilson, an American citizen.

7. IAI officials were committed to taking on a U.S. partner in order to gain access to U.S. capital markets. As early as 1994 or 1995, Moshe Keret (IAI's CEO), Jacob Weiss (IAI's in-house counsel), and Schmuel Peretz (IAI's CFO) traveled to New York to promote and to reinforce IAI's commitment to the Joint Venture among prospective New York investors. With considerable enthusiasm on Wall Street for newly licensed U.S. high-resolution satellite ventures from companies such as Lockheed, Raytheon, Litton, GDE, and others, my colleagues and I were confident that the funding for the new commercial venture could be raised in New York. The initial focus of the leaders of the new Joint Venture was to raise the necessary funds, which would ultimately exceed $100 million, from Wall Street sources.

8. As the other founding joint venturer, Core's role was to raise the needed capital and to provide ground system and software integration. Core agreed to an initial milestone of a $16 million investment into West Indian Space in return for fifty percent ownership of it and key industrial rights. Between 1994 and 2000, Core invested an

initial $10 million in equity capital in the Joint Venture – approximately $5 million between 1994 and 1998, and an additional $5 million in early 1999.

9. As noted above, Core was, and indeed still is, an American (California) corporation. The vast majority of Core's shareholders during this period (as today) were and are United States citizens or companies.

10. Among the many American investors who invested in Core during the 1990's for the purpose of funding Core's investments in West Indian Space/ImageSat were a number of the Plaintiffs in this action, including Stephen Wilson, Morris Talansky, Abraham Moshel, Dr. Joel Levine, and Robert Miller (the beneficial owners of Plaintiff Top Down Partners). All of these investments were solicited in New York, California, or both. Among the largest investors to directly support Core's investments in West Indian Space/ImageSat was New York, New York-based L-3 Communications.

11. In addition to raising $10 million from Core investors that Core re-invested as equity in ImageSat, during late 1999 and 2000, I was active in raising bridge financing for West Indian Space that was necessary to keep the company operating until the company could close a large ongoing institutional investment, also conducted on Wall Street. Approximately $1.2 million was lent directly to ImageSat during this bridge financing by Core and its investors, in return for which the investors received bridge warrants at the closing of the financing. Among the investors who participated in the bridge financing were Plaintiffs Morris Talansky and Abraham Moshel, both of whom are residents of New York, New York, and Plaintiff Albert Reichmann, a resident of Toronto, Ontario. These bridge loan investments were also solicited in New York.

12. During protracted negotiations toward a very substantial private equity

investment in West Indian Space that was led by Pegasus Capital Advisors, LLP in New York from late 1999 through mid 2000, proposed investment terms fluctuated materially relative to the initial Terms and Conditions memorialized in the preliminary Term Sheet. Various bridge investors expressed their concern to me about how this would impact their intended investments. I asked Stephen Wilson what ImageSat intended to do to protect Core's investors (and other bridge investors) who were supporting this interim round of financing. He told me and some of the Core investors (I remember Morris Talansky in particular being concerned about this issue and present during such a discussion) that he had addressed the issue with all of the parties to the Pegasus negotiations and that everyone had readily agreed that the bridge warrants would be adjusted to reflect precisely the same terms and conditions granted to any other holder of similar "incentive" securities (i.e., options or warrants) and that the closing conversion price defined in the senior convertible notes would define the adjusted exercise price of all such incentive securities, including the bridge warrants.

13.    During my tenure as President of Core, as part of my efforts to raise capital for West Indian Space/ImageSat, I participated in numerous presentations together with executives of IAI and ElOp (the predecessor to Defendant Elbit) in support of ImageSat management. These presentations to numerous potential institutional investors concerned West Indian Space's business model, its capital structure, its technology, its competitive position, its financial prospects, and all operational issues (including governmental licensing and other policy issues). Among the most compelling features of these presentations were (i) ImageSat's exclusive license to commercialize Israel's military earth-observation satellite technology, which according to IAI and ElOp

executives represented technology investments totaling hundreds of millions of dollars, and (ii) the company's unique business service concept, for which the company had booked hundreds of millions of dollars in backlogged contract sales in advance of its first satellite launch.

14. The first direct attempts by ImageSat to raise capital on Wall Street had taken place in 1996 and 1997 through Lehman Brothers. (Core solicited and indirectly placed such investments on behalf of the Joint Venture beginning in 1994.) However, after extensive due diligence, unresolved issues at the governmental policy level led Lehman to decide not to proceed with the project.

15. Mr. Wilson subsequently approached Merrill Lynch about leading the investment banking/underwriting effort and in late 1998 West Indian Space did formally engage Merrill Lynch. The Merrill Lynch team was under the leadership of Managing Director and head of the Satellite and Telecommunications Group, Omar Jaffrey, and also included other high-profile Merrill Lynch personnel including the then leading analyst in the satellite and telecommunications industry, Tom Watts, among others. The Merrill Lynch bankers became regular participants in presentations to potential investors.

16. In 1999, Mr. Wilson hired Michael Morris, a United States citizen and resident of Connecticut, to be Chief Financial Officer of West Indian Space. Mr. Morris established a business office for West Indian Space in Norwalk, Connecticut (in the suburban New York metropolitan area) and became a regular participant in the presentations made in and around New York.

17. A majority of the investor presentations took place in New York, New York. A few took place in adjoining states such as Connecticut or New Jersey.

18. Several senior officials of IAI, who then or thereafter became officers of West Indian Space/ImageSat, regularly traveled to New York to work on the capital raising efforts and to answer the questions posed by investors. In addition to Defendants Moshe Keret and Jacob Weiss and Plaintiffs Moshe Bar-Lev and Patrick Rosenbaum (who were the Director and Deputy Director respectively of IAI's Space Technologies Directorate ("STD") at the time the Joint Venture was formed), many Israeli executives from IAI and ElOp came to New York for this purpose. I recall at least one occasion when Mr. Keret came to New York for the purpose of being introduced by Mr. Wilson to Morty Davis, the then-CEO of New York-based private equity firm D.H. Blair Investment Banking Corp., which did subsequently and directly invest millions of dollars in Core in order to fund West Indian Space. This New York-based venture capital firm issued the first substantial financing commitment to the Joint Venture ($16 million in 1994). Mr. Weiss came to New York on countless occasions in connection with all aspects of the fundraising. Messrs. Bar-Lev and Rosenbaum, who were senior operational officials of IAI's space group before joining ImageSat's start-up management team, made numerous early trips to New York as well.

19. The investors who attended presentations that I and other representatives of ImageSat made in New York or the New York metropolitan area included the following:

(a) Representatives of WIS Partners, L.P. ("WIS Partners"), an investment vehicle created by The Fairchild Corporation (a publicly held corporation listed on the New York Stock Exchange) at the direction of Fairchild's CEO and President, New York resident Jeffrey Steiner. WIS Partners ultimately became a

substantial investor in ImageSat, having joined Core in providing the balance of the initial $16 million in equity capital in 1999, and is one of the Plaintiffs in this action;

(b) Representatives of L-3 Communications, the U.S. aerospace and defense company, which made a substantial investment in Core explicitly for the purpose of supporting Core's investment in ImageSat;

(c) Representatives of Pegasus Capital Advisors ("Pegasus"), a private equity firm with offices in New York and Connecticut. Pegasus, through a series of entities known as Imaging Holdings, and on behalf of a large group of institutional investors including Merrill Lynch, Morgan Stanley, Goldman Sachs, and the New York State Pension Fund, all of whom attended presentations made by me, by other representatives of West Indian Space/ImageSat, and supported by senior representatives of IAI and ElOp and by myself, ultimately invested approximately $70 million in ImageSat in a combined Series C and Series B preferred securities offering in New York, New York, totaling over $90 million;

(d) Albert Reichmann, Morris Talansky, and Abraham Moshel, mentioned above; and

(e) Certain European investors who chose to invest in ImageSat as well as about one dozen other major New York institutional equity funds that ultimately chose not to invest in ImageSat.

20. During the period in which I was involved, West Indian Space/ImageSat was served by many other professionals in New York, in addition to Merrill Lynch. These included the law firms of Winthrop, Stimson, Putnam & Roberts and Milbank, Tweed, Hadley & McCloy, which provided extensive tax and corporate law advice to the

company. (For example, the decision to domicile West Indian Space in the Cayman Islands and later to re-domicile ImageSat in Curacao was based on tax advice received from these firms.) Also involved was the New York office of Arthur Andersen LLP with regard to certain aspects of the company's accounting and audits.

21.     The culmination of my efforts and those of many other persons to raise more than $100 million for West Indian Space/ImageSat was a series of transactions that closed at the New York offices of Milbank Tweed and of McDermott, Will & Emery in late July 2000 including, among other things, the closing of the Pegasus investment.

22.     Throughout the period in which I was involved in raising money for West Indian Space/ImageSat, countless New York- and other United States-based investors were solicited and invested millions of dollars in ImageSat, the vast majority of them in New York City. I believe it is fundamentally inequitable for Defendants such as ImageSat, IAI, and Elbit to have extensively solicited American investors to make investments in ImageSat (which they emphatically characterized as an "international" company, as opposed to a primarily Israeli or United States company) in New York, only now to claim that these investors are not entitled to the protections of United States laws and that any litigation arising out of those investments must be brought in Israel, in Curacao, or not at all, all of which is contrary to each and every agreement among New York investors and the Defendants dating back to the earliest Core agreements with IAI in 1994 and 1995.

I declare under penalty of perjury that the foregoing is true and correct. Executed at New York, New York this 28th day of January, 2008.


ANDREW PLEVIN