# POINT IV

## PLAINTIFFS HAVE STANDING TO ASSERT THEIR CLAIMS UNDER NETHERLANDS ANTILLES LAW OR OTHERWISE

Defendants contend in their joint memorandum that Plaintiffs lack standing to assert many of their claims, principally including their key claims for breach of fiduciary duty, under the law of the Netherlands Antilles. Defendants do not, and could not, deny that if their conduct is judged under (for example) New York standards of corporate responsibility and fiduciary duty, Defendants owe fiduciary duties to Plaintiff shareholders, and if the facts pleaded in the Complaint are taken as true (as they must be for purposes of a motion to dismiss), Defendants have flagrantly breached such duties. To avoid this conclusion, Defendants contend that Plaintiffs' standing to sue on these claims must be analyzed under Netherlands Antilles law, pursuant to New York's "internal affairs doctrine," which provides that the law of a corporation's place of incorporation governs claims arising from relationships among the stakeholders of the corporation.

Assuming *arguendo* that Netherlands Antilles law governs Plaintiffs' claims for relief as argued by Defendants, the accompanying Declarations of Plaintiffs' Netherlands Antilles and Netherlands law experts demonstrate that under Netherlands Antilles law, the claims should be permitted to proceed. But in any event, application of a governmental interest analysis in accordance with New York's conflict of laws principles demonstrates that Plaintiffs' claims are sound under the laws of New York and/or Israel, jurisdictions having materially greater contacts with the controversy than the Netherlands Antilles, and that the claims should be sustained on that basis.

## A.    Netherlands Antilles Law Authorizes the Claims

Defendants contend that under the law of the Netherlands Antilles, Plaintiffs lack standing to assert virtually all of their claims. The claims belong to ImageSat rather than its individual security

holders, say Defendants, and if the Company declines to pursue the claims then no one may do so. Defendants' position is that Plaintiffs' claims herein are in the nature of derivative claims, that Netherlands Antilles law does not authorize derivative suits in equity as they are found in the United States and other countries, and therefore Plaintiffs' claims must be dismissed.    Among the things left unmentioned by Defendants is the fact that Defendants IAI and Elbit control ImageSat, their designees (who are also Defendants) control the Board of Directors, and the prospect that Defendants will elect for ImageSat to bring suit against themselves is non-existent.    Moreover, as discussed below, the remedies that Defendants claim would be available to Plaintiffs under Netherlands Antilles law would either be inapplicable or completely ineffectual.    (See infra pp. 73-75)    It is transparent that the result sought by Defendants is that no realistically effective remedies for their years of misconduct in running ImageSat should be available at all.    However, the Court should be loath to assume that a sister jurisdiction such as the Netherlands Antilles would suffer from a legal system that would provide no vindication for Plaintiffs' rights on such egregious facts as those set forth in the Complaint in this case.

Fortunately, the protections enjoyed by corporate shareholders and security holders under the law of the Netherlands Antilles are not so weak as Defendants would portray them.  As set forth in the accompanying Declarations of Professors Frank Kunneman and Geert Raaijmakers, Netherlands Antilles law recognizes that in addition to direct claims for injury caused directly to a shareholder (such as his having been induced to invest in a company through fraudulent representations), under certain circumstances, shareholders and security holders may also bring suit in their own name (as opposed  to a derivative suit) for loss of value of their security holdings through harm to the corporation caused by directors, officers, or controlling shareholders. Netherlands Antilles law will protect the rights of a shareholder or shareholder where there is a breach of a "specific norm of care"

owed to a shareholder or shareholders. (See Kunneman Decl. ¶¶ 20-37; Raaijmakers Decl. ¶¶ 11-12, 14)  The allegations of the Complaint in this case, in Professor Raaijmakers' words, include a "pattern of conflicts, misrepresentations, misinformation, raised expectations, self-dealing and abuses of majority power to the detriment of the interests of the plaintiffs as minority shareholders, without there being realistic possibilities for them to act against that." (Raaijmakers Decl. ¶ 19) Moreover, "in several [Dutch] cases it has been held that there is a specific norm of care towards the minority shareholders in a corporation and that impermissible conflicts of interest should be prevented in this respect." (Id.)  No Netherlands or Netherlands Antilles court decision or statute cited by Defendants' expert excludes the availability of a direct action on facts such as those present here.

The Complaint is replete with allegations that Defendants (IAI and Elbit and the individual Defendants, almost all of whom were placed in their positions at ImageSat by IAI and/or Elbit) have taken corporate actions designed to enrich ImageSat's controlling shareholders while wholly disregarding the interests of minority security holders such as Plaintiffs.  Such acts as (i) causing ImageSat to pay tens of millions of dollars for the "2001 EROS B1" satellite that was never designed in accordance with ImageSat's specifications, built, or delivered, (ii) refusing to investigate the issues surrounding that satellite even after being told that the satellite never existed, (iii) wrongfully allowing IAI and Elbit to compete with ImageSat and to benefit from contracts worth hundreds of millions of dollars that should have gone to ImageSat, (iv) wrongfully cutting off ImageSat's negotiations with potentially lucrative SOP customers in return for concessions to IAI and Elbit on other matters, to choose just some examples – all of these actions directly enriched IAI and Elbit, at the dire expense of ImageSat's minority shareholders and security holders.  Under such circumstances, the presumption of Defendants' Netherlands Antilles law argument – that a

corporation will have an incentive to vindicate its own rights for the benefit of all its shareholders – does not apply.  Rather, these circumstances should accord Plaintiffs a direct claim against those whose conduct was undertaken with the knowledge that it would directly harm the minority shareholders in a fashion different from the controlling shareholders.

Moreover, as discussed in the accompanying Declarations, decisions including a November 2, 2007 decision of the Supreme Court of the Netherlands have recognized claims by minority shareholders holding that the shareholders had sufficiently alleged a breach of duty owed to them directly.  (See Kunneman Decl. ¶¶ 26-32, 43-50; Raaijmakers Decl. ¶ 14)  Contrary to the assertion in the Van Schlifgaard Declaration, Netherlands Antilles law does not require that a shareholder must allege damages other than a diminution in the value of its shares.  (See Kunneman Decl. ¶¶ 38-39; Raaijmakers Decl. ¶ 13)  Under the circumstances, Plaintiffs have standing to pursue their claims under Netherlands Antilles law, against ImageSat's directors and officers as well as IAI and Elbit as controlling shareholders.  In addition, Plaintiffs may pursue their claims for breach of a duty of care against ImageSat itself.  (See Kunneman Decl. ¶¶ 40-42; Raaijmakers Decl. ¶ 15)  Finally, the Plaintiffs who hold stock options and warrants also have standing under Netherlands Antilles law, as their claims are considered direct claims because they do not arise out of current stock ownership. (See Raaijmakers Decl. ¶ 19)

## B.    Netherlands Antilles Law Need Not Govern the Claims

But even assuming *arguendo* that Netherlands Antilles law would not authorize Plaintiffs to pursue their claims against the Defendants – which, as reflected in the submissions of Plaintiffs' experts, is not the case – this would not necessarily mean that the claims must be dismissed.  A review of all the relevant circumstances demonstrates that while Curacao, Netherlands Antilles is ImageSat's nominal place of incorporation, that jurisdiction has no other relevant contacts with

ImageSat, with any of the parties (Plaintiffs or Defendants), or with the subject-matter of any of the claims asserted. Applying a conflict-of-laws interest analysis, a New York court could determine that both New York and Israel have materially greater governmental interests in applying their law to this controversy than does the Netherlands Antilles. Accordingly, the claims may be analyzed under New York or Israeli law, under which they should be sustained.

As Defendants observe, New York courts (and federal courts following New York's conflict-of-law rules as required under Klaxon Co. v. Stentor Elec. Mfg. Corp., 313 U.S. 487 (1941), and its progeny) will generally apply the law of a corporation's place of incorporation in deciding issues such as whether shareholders have standing to assert a claim against the corporation's directors, officers, and controlling shareholders. However, while this rule creates a presumption in favor of applying situs-of-incorporation law, that conclusion is not invariable. New York courts, and federal courts applying New York's conflict-of-laws rules, are free to apply modern conflict-of-laws principles to the choice-of-law analysis – and in some cases, applying these rules yields application of a law other than the place of incorporation. In other words, application of the law of the incorporating state is not automatic. See, e.g., Seybold v. Groenink, No. 06 Civ. 772, 2007 WL 737502, at *5 (S.D.N.Y. Mar. 12, 2007); Stephens v. National Distillers & Chem. Corp., No. 91 Civ. 2901, No. 91 Civ. 2902, 1996 WL 271789, at *4 (S.D.N.Y. May 21, 1996) (declining to follow internal affairs rule where a violation of New York public policy would result); Greenspun v. Lindley, 36 N.Y.2d 473, 478, 369 N.Y.S.2d 123, 126 (1975) (noting that application of state of incorporation's law is not invariable).

For example, although the availability of derivative causes of action is typically governed by the law of the place of incorporation, in Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 263 (2d Cir. 1984), the Second Circuit expressly declined to apply the internal affairs doctrine after finding

that New York had a greater relationship to the claim. In <u>Norlin</u>, shareholders of a Panamanian corporation brought a derivative suit seeking to enjoin members of the company's board of directors from voting shares owned by the corporation's wholly owned subsidiary. Applying New York conflict-of-laws rules, the court found that virtually all the relevant contacts, such as the corporation's principal place of business, were with New York, and virtually none of them were with Panama. Accordingly, the court applied New York law rather than Panamanian law in resolving the case, holding:

> The principles compelling a forum state to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served. Conversely, when the interests of only one state are truly involved, the purported conflict is purely illusory. Thus, there is no reason why the law of the forum state should not control.

<u>Id</u>. at 263 (citations omitted).

Similarly, in <u>Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC</u>, 446 F. Supp. 2d 163, 194 (S.D.N.Y. 2006), investors brought an action against fund administrators and officers seeking to recover losses that they had incurred when two hedge funds incorporated in the British Virgin Islands (BVI) were liquidated. Defendants moved to dismiss the complaint on the grounds that the causes of action asserted by plaintiffs were not recognized under BVI law. The court denied the motion to dismiss, holding that it would apply New York law rather than BVI law to plaintiffs' claims for breach of fiduciary duty and fraud because the parties and their conduct had the greatest relationship with New York, rather than the BVI, and the defendants could reasonably have expected to face suit in New York. <u>See also</u> <u>Drenis v. Haligiannis</u>, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (New York has strong interest "in seeing its law applied when one of its domiciliaries alleges it has been defrauded.") (citations omitted); <u>Schonfeld v. Hilliard</u>, 62 F. Supp. 2d 1062, 1070 (S.D.N.Y. 1999) (although defendant corporation was organized under the laws of

Delaware, New York law applied to determine shareholders' fiduciary liabilities because the parties' choice of New York law in the Shareholders Agreement demonstrated the parties' intention to apply New York law to shareholder claims), rev'd on other grounds, 218 F.3d 164 (2d Cir. 2000); Broida v. Bancroft 103 A.D.2d 88, 91, 478 N.Y.S.2d 333, 335 (2d Dep't 1984) ("The vague principle that courts will not interfere with the internal affairs of a corporation whose foreignness is at best a metaphysical concept, must fall before the practical necessities of the modern business world.") (citation omitted).

In this case, there is little dispute that apart from being formally incorporated in the Netherlands Antilles, ImageSat has no substantive connections with that jurisdiction. The selection of the Netherlands Antilles as the place of incorporation was made on the recommendation of ImageSat's counsel in New York, primarily for tax reasons. (Wilson Decl. ¶ 33; Weiss Dep. 184-86; Keret Dep. 50-51) ImageSat does not conduct any business activities in the Netherlands Antilles; it has no shareholders, directors, officers, or employees in the Netherlands Antilles; it has no customers in the Netherlands Antilles; no Board meetings have ever been held in the Netherlands Antilles; and only twice in the history of ImageSat have representatives of the Company even set foot in the Netherlands Antilles (once to pick up copies of documents and once to meet the lawyer who handles the company's paperwork there). (Wilson Decl. ¶ 33; Weiss Dep. 184-86; Goren Dep. 13-15, 183-85, 190-92)[18] With the exception of being ImageSat's situs of incorporation, none of the parties to this case, corporate or individual, are Netherlands Antilles residents or have any connection to the Netherlands Antilles. Rarely, if ever, has there been a case of a corporation or a set of claims having so little genuine connection to the nominal location of the corporation's place of incorporation as

---

[18] We believe that all of these statements are undisputedly true, but even if there were some dispute as to them, this would create a question of fact sufficient to warrant denial of Defendants' motion to dismiss the claims under Netherlands Antilles law.

ImageSat and this case. The Netherlands Antilles, therefore, has no governmental interest in having its law applied to Plaintiffs' claims.[19]

By contrast, at least two other jurisdictions, New York (and the United States in general) and Israel, have material connections with ImageSat and substantial interests in having their law applied. Plaintiffs have already surveyed above, in the context of their *forum non conveniens* analysis, the robust connections that these parties and their disputes enjoy with New York and with the United States – the location where ImageSat and its predecessors engaged in ongoing fundraising activities continuously from 1994 to at least 2005; where ImageSat, with participation from IAI and Elbit and many of the individual Defendants, raised more than $100 million to finance ImageSat; where several of the key contracts defining the relationships between the parties were negotiated and executed; whose law is expressly adopted and courts are expressly made available in several of such contracts; and where ImageSat held most of its Board meetings at which many of the decisions cited in the Complaint were discussed and voted upon. Individually and cumulatively, these connections between this litigation and New York far outweigh the utterly minimal connection between the litigation and the Netherlands Antilles, such as to warrant application of New York rather than Netherlands Antilles law to the issue of whether Plaintiffs have standing to sue.

New York law would unquestionably authorize Plaintiffs to pursue claims against Defendants for the breaches of fiduciary duty, breaches of contract, racketeering activity, and other torts asserted in the Complaint. To be sure, under New York law, Plaintiffs might be called upon to plead these claims in a derivative capacity, in addition to or instead of on their own behalf, and to establish that it

---

[19]    In fact, it is not even clear that the Netherlands Antilles would regard the claims asserted in this case as ones over which Netherlands Antilles law should apply even if the case were pending in the Netherlands Antilles, so that that jurisdiction may not even claim a governmental interest in the outcome of the controversy. (See Kunneman Decl. ¶¶ 7-12)

would have been futile for Plaintiffs to expect or request the corporation's Board of Directors to bring such claims on behalf of the corporation. See N.Y. Bus. Corp. L. § 626; Fed. R. Civ. P. 23.1. The facts pleaded in the Complaint are sufficient to make out the required showing of "demand futility," in that the Complaint sets forth well-pleaded and non-conclusory claims against a majority of ImageSat's sitting directors, who can hardly be expected to cause the corporation to sue themselves for conduct such as the ongoing cover-up of the "2001 EROS B1" satellite fraud or ImageSat's virtually complete abandonment of its corporate mission to sell SOP contracts. See, e.g.., Bansbach v. Zinn, 1 N.Y.3d 1, 8-9, 769 N.Y.S.2d 175, 180-81 (2003); Marx v. Akers, 88 N.Y.2d 189, 200-01, 644 N.Y.S.2d 121, 128 (1996); Barr v. Wackman, 36 N.Y.2d 371, 378-79, 368 N.Y.S.2d 497, 500-01 (1975). Should the Court determine that the claims may be analyzed under New York law, Plaintiffs are prepared to file an Amended or Supplemental Complaint pleading such claims derivatively, in addition to or in lieu of their current pleading of such claims as direct claims.

Another jurisdiction that has substantially greater contacts with the parties and the controversy than the Netherlands Antilles is Israel. As Defendants stress – albeit, exaggerate – in discussing *forum non conveniens* and personal jurisdiction, some of the parties to this action reside, and some of the conduct alleged has taken place, in Israel. For all the reasons discussed in this memorandum and in the accompanying Declarations, such contacts with Israel are not sufficient to outweigh Plaintiffs' choice of New York as the forum for this litigation, and Defendants are subject to personal jurisdiction in New York. Nonetheless, neither Plaintiffs nor Defendants could reasonably deny that the parties and their disputes have far greater connections with Israel than with the Netherlands Antilles. Accordingly, Israel also enjoys a governmental interest in having its law applied in determining whether Plaintiffs have standing to bring suit on the claims contained in the Complaint. As stated in the accompanying Declaration of Plaintiffs' expert on Israeli law, Israel

recognizes the right of shareholders to pursue claims for breaches of fiduciary duty, either directly or derivatively depending on the circumstances. (See Tamir Decl. ¶ 16)

Because the law of New York and that of Israel is substantially the same in allowing minority security holders to bring suit where a corporation's Board of Directors refuses to do so, all relevant contacts between the parties and the claims and those two jurisdictions are aggregated for choice-of-law purposes. See Restatement (Second) of Conflict of Laws §§ 145 cmt. (i), 186 cmt. (c), 302 cmt. (k) (1971) ("When certain contacts are located in two or more states with identical local law rules on the issue in question, the case will be treated for purposes of that issue as if the contacts were grouped in a single state."). When this is done, it is plain that the contacts with this dispute and governmental interests of New York and of Israel, under whose laws Plaintiffs would be accorded remedies for the injuries they have suffered from Defendants' wrongdoing, outweigh any fleeting interest of the Netherlands Antilles in applying its law to, as Defendants would have it, deny Plaintiffs any meaningful remedy for such wrongs. See Norlin, 744 F.2d at 263.

Finally, as noted above, at least some of Plaintiffs' claims in this action are governed by a series of contractual agreements under which corporate parties ImageSat, IAI, and Elbit *expressly agreed* that any disputes would be governed by *New York law*. (See supra pp. 26-27, 50) To the extent that the parties expressly contracted that New York law would govern – a choice expressly validated by New York's General Obligations Law § 5-1402 – New York law should certainly govern with respect to Plaintiffs' ability to assert their claims.

## C.    Applying Netherlands Antilles Law as Construed by Defendants Would Inequitably Leave Plaintiffs Without Any Meaningful Remedy

Moreover, if Defendants were correct that Netherlands Antilles law denies Plaintiffs standing to pursue virtually all of their claims, then as a matter of equity and public policy the Court should

not apply such law here. If so interpreted, relegating Plaintiffs to their limited remedies under Netherlands Antilles law could effectively violate New York public policy by leaving Plaintiffs with no meaningful remedy against Defendants at all.

Defendants' Netherlands law expert, Peter Van Schilfgaarde, had opined that although Plaintiffs lack standing to pursue any of their claims for damages against Defendants, the Plaintiffs have several other remedies under Netherlands Antilles law open to them. Review of these "remedies," however, confirms the conclusion of Plaintiffs' Netherlands and Netherlands Antilles law experts that such remedies are purely theoretical ones.

The first of the remedies that Defendants suggest Plaintiffs could pursue is to seek to replace the Company's Board of Directors at a shareholders' meeting. (Van Schilfgaarde Decl. ¶ 42) Such a meeting could be called by petition of 10% of the shareholders, but at the meeting itself, a majority vote would be required to effectuate a change of directors. This is not a legal remedy at all, but a business remedy, and it is an unavailable one here given IAI's and Elbit's status as controlling shareholders who can outvote Plaintiffs and the Company's other minority shareholders at any meeting.

Defendants' second proposed remedy for Plaintiffs is that a shareholder meeting could potentially be called for the purpose of voting to direct that the Company initiate legal proceedings against the wrongdoers. (Van Schilfgaarde Decl. ¶ 43) Again, the meeting could be called by 10% of the shareholders, although to actually adopt a resolution, a majority would be required. Once again, the remedy is more theoretical than real, as there is no possibility that IAI and Elbit would vote their shares to cause ImageSat to bring suit against the persons who have destroyed the Company – *i.e.*, against themselves and the individuals whom they have placed in positions of authority as ImageSat's directors and senior officers.

Third, Professor Van Schilfgaarde posits that shareholders objecting to a particular Board resolution may bring suit to void such resolution. (Van Schilfgaarde Decl. ¶ 44) Relatively few of the acts and omissions challenged by Defendants, however, resulted from a particular Board resolution adopted at a particular Board meeting, as opposed to acts or omissions of ImageSat's directors and officers over a prolonged period of time. The matter is far more complex than seeking to annul any one particular Board action. Moreover, this remedy would not compensate Plaintiffs in any fashion for the economic loss they have already suffered as a result of Defendants' acts and omissions.

Finally, Van Schilfgaarde suggests that aggrieved Plaintiffs could bring a proceeding in the Netherlands Antilles seeking a compelled buy-out of the value of their shares. (Van Schilfgaarde Decl. ¶ 46) Among the problems with this proposed remedy, as established in the Declarations of Plaintiffs' Netherlands and Netherlands Antilles law experts, are the fact that this type of proceeding typically takes ten years to resolve, as well as that the Netherlands Antilles court is likely to assess the purchase price for a minority shareholder's shares as the *current* value of such shares – *i.e.*, the value of those shares *after* Defendants' misconduct has reduced such value to practically nothing – rather than the true measure of Plaintiffs' damages which is (at a minimum) what their shares should have been worth had Defendants' wrongdoing not taken place. (See Kunneman Decl. ¶ 53; Raaijmakers Decl. ¶ 8)[20]

"*Ubi jus ibi remediu*" – "where there is a right there is a remedy." <u>Catanzano v. Wing</u>, 103 F.3d 223, 229 (2d Cir. 1996); <u>Schwab v. Philip Morris USA, Inc.</u>, 449 F. Supp. 2d 992, 1020 (E.D.N.Y. 2006). Given the minimal contacts between the parties, their dispute, and the Netherlands

---

[20]    As noted by Professor Raiijmakers and Professor Kunneman, the most common remedy available to minority shareholders in the Netherlands – known as the "inquiry procedure" or "*enquête*" – is *not* codified in the Netherlands Antilles corporation laws and is unknown in that jurisdiction. (Kunneman Decl. ¶¶ 17-19; Raaijmakers Decl. ¶¶ 8, 18)

Antilles, the Court should not apply Netherlands Antilles law to the issue of standing if the effect of doing so would be to deny Plaintiffs the prospect of a meaningful opportunity to seek relief for the damages they have suffered. Accordingly, either the Court should construe Netherlands Antilles law to accord Plaintiffs standing to sue, consistent with the Declarations of Plaintiffs' experts, or the Court should decline to apply such law and instead entertain this suit under the law of New York, whose application was contemplated by the parties from the inception of their relationship and also accords with Israeli law on this issue.

## POINT V

### THE PLAINTIFFS WHO HOLD STOCK OPTIONS AND BRIDGE WARRANTS HAVE STANDING TO SUE

Several of the Plaintiffs were senior executives of ImageSat who were issued stock options as part of their compensation for their services to the Company. Other Plaintiffs received warrants known as bridge warrants as consideration for investments in or loans to ImageSat (or to CST for immediate reinvestment in ImageSat). Because of Defendants' wrongful acts and omissions, the value of ImageSat's common stock is substantially below the strike price so that the options and bridge warrants are presently valueless. As a result, these Plaintiffs have joined this litigation seeking remedies against Defendants for their breaches of fiduciary duty and other torts. But now, having had the benefit of these Plaintiffs' financial investments in ImageSat, years of executive service as the founding management team of ImageSat, or in some cases both, Defendants assert that they owe no fiduciary or other duties to the optionholder or warrant-holder Plaintiffs – much of a piece with all of Defendants' other procedural arguments, whose gravamen is that Defendants are unwilling to be accountable to anyone for the harm they have done to ImageSat's security holders.[21]

---

[21]    Defendants' attempt to use this argument to deny standing to Plaintiff Haim Yifrah is particularly unbecoming

Contrary to Defendants' position, if the standing of the option holders and warrant holders to assert claims against Defendants is governed by Netherlands Antilles law, then the Netherlands Antilles does recognize the standing of such security holders to assert appropriate claims. (See Raaijmakers Decl. ¶ 19)

Moreover, if these Plaintiffs' standing is assessed under New York law, they also have standing to assert such claims. Indeed, to deny holders of stock options and warrants standing to sue, even to challenge deliberate actions by corporate insiders that foreseeably eliminate the value of their warrants, would quickly result in no investor's being willing to accept warrants as a form of investment or stock options as incentive compensation. As Judge Tyler has observed:

> [W]arrants are used . . . as a separate form of equity in corporations. . . . The creation of varied modes of investment – different sized bundles of rights – which are calculated to encourage the total flow of capital into corporate aggregations should be faciliated in a society which depends largely on the gathering of private capital to achieve economic expansion. Therefore, if equity content is poured into the mold of warrants by investors and investment bankers, the courts should not be reluctant to deny [sic] a measure of protection to holders of warrants which is adequate to sustain such use of the form. *In other words some protection should be afforded to a class which provides permanent capital in an enterprise as against wrongful acts by those who manage the enterprise.* The economic function of this protection is to retain and encourage the availability of such capital.

Entel v. Guilden, 223 F. Supp. 129, 132 (S.D.N.Y. 1963) (denying motion to dismiss in an action by a warrant holder against an investment company) (emphasis added).

The New York Court of Appeals has never passed on the question of whether a claim for breach of fiduciary duty may be asserted by option holders and warrant holders, but the trend of recent decisions in New York is to impose fiduciary duties where the parties' relationship is one in

---

because in 2006, Yifrah sought to redeem one of his stock options for a share of ImageSat common stock, and submitted his personal check for the strike price of the share, only for ImageSat to refuse to convert the option without any explanation or justification. (See Yifrah Decl. ¶ 10) ImageSat should certainly be estopped from arguing that General Yifrah lacks standing in this action because he holds only options and not stock, after having failed for no reason to honor his request that one of his options be converted to stock.

which one of the parties must repose trust and confidence in the other. See, e.g., EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 19-20, 799 N.Y.S.2d 170, 175 (2005). Whether a fiduciary duty exists in a given circumstance is often an issue of fact. E.g., Rabin v. MONY Life Ins. Co., No. 06 Civ. 775, 2007 WL 737474, at *3 (S.D.N.Y. Mar. 8, 2007) (Swain, J.). Here, Defendants suggest no policy or other reasons that would exclude the existence of a duty for directors, officers, and controlling shareholders to operate a corporation for the benefit of *all* its security holders – particularly where, as here, the allegations of the Complaint are not that fiduciaries merely acted negligently, but that ImageSat's directors, officers, and controlling shareholders have intentionally engaged in conduct destroying the value of the Company and of the Plaintiffs' securities.[22]

Moreover, even assuming *arguendo* that Defendants owe no fiduciary duty to option holders and warrantholders, that would not mean that they owe them no duty at all. The Plaintiffs' stock options and bridge warrants were entered into pursuant to written contractual agreements between Plaintiffs and ImageSat. (See, e.g., Elman Decl. Ex. "1", "2", "3") Inherent in such contracts is an implied covenant of good faith and fair dealing. See Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979 (1995); Zuckerwise v. Sorceron Inc., 289 A.D.2d 114, 114, 735 N.Y.S.2d 100, 101 (1st Dep't 2001) ("Th[e] allegation . . . [that] [defendant] withheld from [plaintiff] the intended benefits of the parties' agreement, sufficiently states a claim for breach of the implied covenant of good faith and fair dealing"). Accordingly, if the Court determines to dismiss the breach-of-fiduciary-duty claims asserted by these Plaintiffs, then it should allow them to amend

---

[22]    The cases Defendants cite to suggest that the law in this area is settled are inapposite. In Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 490 (S.D.N.Y. 2006), the court merely recited one party's analysis of New York law on the duties owed to optionholders, but never reached the issue or made a ruling. Starkman v. Warner Communications, Inc., 671 F. Supp. 297, 304 (S.D.N.Y. 1987), dealt with a Section 10(b) claim brought by market-traded options (i.e., "puts and calls") in a public company, and its holding turned on the fact that there was never any relationship between the issuer and the optionholder, which certainly is not the case here. Bell v. Leakas, 1993 WL 77320 (S.D.N.Y. 1993), and O'Connor & Associates v. Dean Witter Reynolds, Inc., 529 F. Supp. 1179, 1185 (S.D.N.Y. 1981), similarly concerned options traders in public companies who were not in privity with the issuer, which is not this case.

the Complaint to recast these claims as claims for breach of the implied contractual covenant of good faith and fair dealing.

## POINT VI

### IAI'S SOVEREIGN IMMUNITY AND COMITY DEFENSES ARE MERITLESS

**A.    Defendants IAI and Eldar Are Not Immune From Suit**

Defendant IAI argues that as an "agency or instrumentality of a foreign state," it is immune from suit in the United States pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602 et seq. (the "FSIA").[23]  However, because IAI engaged in substantial commercial activities in and affecting the United States in connection with ImageSat and Plaintiffs, the "commercial activity" exception to the FSIA applies and IAI is amenable to suit.

Congress enacted the FSIA in 1976 to codify a "restrictive theory" of sovereign immunity, which had been commonly accepted under international law and employed by the U.S. Department of State since 1952.  See Ministry of Supply, Cairo v. Universe Tankships, Inc., 708 F.2d 80, 86 (2d Cir. 1983); Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981); Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 290 (S.D.N.Y. 2001).  This theory, and the statute adopted to codify it, disfavor sweeping assertions of sovereign immunity by foreign states and state-owned entities.  Therefore, while foreign states are immune from suit in United States courts on claims arising from their "public acts," they and their instrumentalities (such as government-owned corporations) enjoy no immunity for commercial or private acts.  See Ministry of Supply, 708 F.2d at 86; Leutwyler, 184 F. Supp. 2d at 290.

---

[23]    Defendant Eldar argues that as an officer of IAI, he shares in that company's immunity from suit in the United States.  Because IAI's argument fails and it is not entitled to immunity, Eldar's argument fails derivatively and need not be considered further.

To cabin the scope of immunity, the FSIA specifically lists those circumstances when a foreign state or its agency or instrumentality is not protected by sovereign immunity. See generally 28 U.S.C.A. § 1605. As IAI acknowledges, one of these is the "commercial activity" exception, which provides that a foreign government-owned corporation like IAI enjoys no immunity for causes of action relating to its engaging in (1) commercial activities in the United States, (2) acts in the United States in connection with its commercial activities elsewhere, or (3) commercial activities having a direct effect on the United States. 28 U.S.C. § 1605(a)(2); see Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992); Reiss v. Societe Centrale du Groupe des Assurances Nationales, 235 F.3d 738, 747 (2d Cir. 2000); Hanil Bank v. PT Bank Negara Indonesia (Persero), 148 F.3d 127, 130-31 (2d Cir. 1998); Rosner v. Bank of China, No. 06 Civ. 13562 (VM) , 2007 WL 4468654, at *4 (S.D.N.Y. Dec. 19, 2007).

In Republic of Argentina v. Weltover, the Supreme Court explained that in judging whether a particular activity or conduct is commercial, a Court must determine whether the foreign state "acts, not as a regulator of a market, but in the manner of a private player within it." Republic of Argentina, 504 U.S. at 614; see also United States Fidelity & Guar. Co. v. Braspetro Oil Services Co., 199 F.3d 94, 98 (2d Cir. 1999); Hanil Bank, 148 F.3d at 129-31 (state-owned bank was acting as a "private player in the marketplace," and thus was engaging in a commercial activity, when it issued a letter of credit to finance a corporation's purchase of electronic parts from another); United States Fidelity & Guar. Co. v Petroleo Brasileiro S.A.–Petrobras, No. 98 Civ. 3099 (JGK), 1999 WL 307642, at *5 (S.D.N.Y. May 17, 1999) (no immunity when "the particular actions that the foreign state performs (whatever the motives behind them) are the type of actions by which a private player engages in trade and traffic or commerce") (quoting Republic of Argentina, 504 U.S. at 614). Under this rubric, the causes of action clearly arise from IAI's commercial activities vis-à-vis ImageSat.

Specifically, IAI chose to become a shareholder in, and a supplier to, ImageSat, an international, commercial entity established to raise capital and to do business for profit. To this end, IAI became a joint venture partner with Core Software Technology, a privately owned United States company, and in 1997 became a shareholder of West Indian Space, which in 2000 became ImageSat. (See Cplt. ¶¶ 56-65) All of ImageSat's other shareholders and security holders, including Plaintiffs, were and are private individuals and corporations. Indeed, the very purpose of IAI's participating in the joint venture and ultimately in ImageSat was to obtain funding for a private for-profit commercial enterprise. (Keret Dep. 37)

Further, in connection with establishing and operating the ImageSat enterprise, IAI entered into a series of contracts expressly governed by New York law, and in many instances providing that IAI consented to litigation in the federal and state courts in New York of any disputes arising under such agreements. (See supra pp. 26-27, 50) IAI also entered into Satellite Supply Agreements with ImageSat, as well as a Master Agreement under which IAI granted to ImageSat certain exclusive rights, first rights, and non-compete rights. (See Cplt. ¶ 67 et seq. ) These terms were an integral part of the understanding under which investors, including many of the Plaintiffs, invested millions of dollars into ImageSat. At no time did IAI advise Plaintiffs, or any of the other parties to the ImageSat investments, that it would seek to retreat behind a shield of sovereign immunity if it violated its contractual and fiduciary duties in the deal and was called to account for its behavior.

Moreover, the Complaint charges IAI with a wide variety of tortious and fraudulent acts and breaches of contract, ranging from billing ImageSat for and collecting tens of millions of dollars for the "2001 EROS B1" satellite which was never built or delivered, to causing terms of relevant contracts to be rewritten for its own benefit, to providing or inducing ImageSat to provide false and misleading information to the Company's investors, to wrongful competition with ImageSat in

violation of the Master Agreement and other contractual agreements and understandings (most recently including the announced $1.6 billion transaction with Northrop Grumman).    Thus, Plaintiffs' claims arising from these acts of wrongdoing by IAI plainly arise from the commercial business which IAI was conducting and fall within the commercial activity exception to the FSIA. See, e.g., United States Fidelity & Guar. Co. v. Braspetro Oil Services Co., 199 F.3d at 98; Hanil Bank, 148 F.3d at 131-33.    As this Court previously found, where a foreign state or instrumentality raises money from American investors, even for a governmental purpose such as national resource development, the commercial activity exception applies and the foreign state or instrumentality may be sued in a United States court.    See Daventree v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 750-51 (S.D.N.Y. 2004) (upholding jurisdiction under commercial activity exception where "[t]o raise capital, the Sovereign defendants allegedly solicited buyers in Azerbaijan and the United States and navigated the world of private commerce to achieve their financial goals").    Indeed, IAI does not appear to claim otherwise.    Thus, the commercial activity exception to the FSIA applies in this instance, rendering IAI (and, consequently, Eldar) subject to suit in United States courts.

At most, IAI appears to argue that just one of the many types of wrongdoing alleged against it falls within the scope of immunity.    That activity is IAI's causing or participating in the decision of ImageSat's Board of Directors and senior management not to pursue certain potential customers for lucrative SOP transactions.    In some instances – such as in connection with Singapore and India, and in Venezuela during the period 2002-2005 – IAI has caused ImageSat to lose customers by wrongfully competing with ImageSat's business, so that the customer was induced to purchase an IAI "turnkey" satellite of its own rather than contract with ImageSat for SOP service.    (See, e.g., Cplt. ¶ 325(d))    Even as to these instances, IAI does not appear to claim immunity, nor could it.    In other instances, IAI caused or participated in the decision of the ImageSat Board and senior

management, for political rather than commercial reasons, to refuse to do business with a particular potential customer.  (See, e.g., Cplt. ¶¶ 133-159)  It appears to be as to only these allegations that IAI is actually arguing that it should be immune from suit.

However, even as to these limited allegations, IAI's sovereign immunity argument fails, because in providing direction to ImageSat with respect to what customers the Company should pursue, IAI was clearly acting as a private market participant and not as a sovereign, and thus, these acts are clearly commercial in nature.  IAI attempts to argue that these acts are not commercial because the complaint alleges that IAI forced or allowed ImageSat to turn down business opportunities valued at more than $100 million because IAI wanted to curry favor for political reasons.

However, under the FSIA definition of "commercial activity," the character of a foreign state instrumentality's activates as commercial or non-commercial is to be determined not with reference to the activities' *purpose*, but to its *nature*.  See 28 U.S.C. § 1603(d).  As the Supreme Court has explained:

> [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."

Republic of Argentina v. Weltover, 504 U.S. at 614, 617 (holding that Argentina's bond offering in the United States was a "commercial activity" as to which Argentina did not enjoy immunity regardless of whether the bonds were issued to fulfill sovereign goals of the Argentine government, "it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so.") (emphasis in original; citations omitted).  See also Leutwyler, 184 F.

Supp. at 290 ("the parties' subjective motivations for entering into the transaction are immaterial for the purpose of ascertaining whether it falls within the commercial activity exception"). Thus, regardless of whether IAI did, in fact, take actions for the *purpose* of achieving certain political goals, the fact remains that the *nature* of the activities were as a "private player in the market," and thus commercial.[24]

Indeed, there is nothing uniquely *governmental* about IAI's alleged behavior that could support characterizing it as an act of state or as other than being of a commercial nature. After all, precisely the same allegations that are made against IAI are made against ImageSat's other controlling shareholder, Elbit, which is a privately owned corporation, and against many of ImageSat's directors and senior officers, who are private individuals not claiming immunity. See Wasserstein Perella Emerging Markets Finance, LP v. Province of Formosa, No. 97 Civ. 793 (BSJ), 2000 WL 573231, at *8 (S.D.N.Y. May 11, 2000) ("'a state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens as distinct from those powers peculiar to sovereigns") (citations omitted). Thus, IAI's argument as to why the commercial activity does not apply must fail.

Finally, even if IAI might otherwise have enjoyed sovereign immunity with respect to some aspect of its participation in ImageSat, it waived such immunity by entering into contracts providing

---

[24]    The cases on which IAI relies in support of immunity are readily distinguished. See, e.g., Saudi Arabia v. Nelson, 507 U.S. 349, 361 (1993) (involving plainly governmental activities such as allegedly wrongful arrest and imprisonment); Friedar v. Government of Israel, 614 F. Supp. 395, 397-98 (S.D.N.Y. 1985) (recognizing immunity where plaintiff's claim arose out of a foreign state's contracting with individuals to enter its armed forces, because "a coutnry's internal administrative activity and management of its armed forces" is a "governmental act, over which it would be improper for another country's courts to sit in judgment"); Castro v. Saudi Arabia, 510 F. Supp. 309, 312 (W.D. Tex. 1980) (involving contract for the training of a foreign government's military personnel). These cases are a far cry from our facts, in which IAI expressly contracted to be part of a commercial enterprise selling equipment to customers, for the purpose of raising tens of millions of dollars from American investors to finance the enterprise. Moreover, the vast majority of IAI's cases cited in support of immunity are of questionable authority because they predate Republic of Argentina v. Weltover, the 1992 case in which the Supreme Court interpreted the scope of immunity restrictively and declared that only the nature of the foreign state's activity, and not its subjective purpose, is relevant to

that New York law would govern its obligations and that it consented to be sued in the federal or state courts of New York in matters arising thereunder. See 28 U.S.C. § 1605(c)(1) (immunity of foreign state or instrumentality under FSIA may be waived, "either explicitly or by implication"); H.R. Report 94-1487, 1976 U.S.C.C.A.N. 6604, 6617 ("With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract"); Eckert International, Inc. v. Government of the Sovereign Democratic Republic of Fiji, 32 F.3d 77, 80 (4th Cir. 1994) ("[T]he parties made an agreement to look to Virginia Law. It flies in the face of logic that they would expect to find that guidance in the courts of another country"); Joseph v. Office of the Consulate General of Nigeria, 830 F.2d 1018, 1023 (9th Cir. 1987); Lafarge Canada, Inc. v. Bank of China, No. 00 Civ. 0261 (LMM), 2000 WL 1457012, at *2 (S.D.N.Y. Sept. 29, 2000) (foreign state had implicitly waived sovereign immunity by entering into a guarantee providing that it "is subject to the laws of the United States of America"); Marlowe v. Argentine Naval Commission, 604 F. Supp. 703, 708-09 (D.D.C. 1985) (foreign state had implicitly waived sovereign immunity through contract containing a choice-of-law clause providing that the agreement "shall be governed by and construed in accordance with the laws of the District of Columbia, U.S.A.").[25] For all these reasons, IAI's and Eldar's defense of sovereign immunity should be rejected.

**B.    IAI's "Comity" Argument Does Not Warrant Dismissal**

IAI and Eldar also argue that this Court should abstain from hearing this action on the grounds of international comity. "International comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard

---

an FSIA analysis.

[25]    Such an implied contractual waiver of immunity may also apply to third-party beneficiaries of the contract from which the cause of action arises. See Cargill International S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1020 (2d Cir.

both to international duty and convenience." Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006) (quoting Hilton v. Guyot, 159 U.S. 113, 164 (1895)); Jota v. Texaco Inc., 157 F.3d 153, 159 (2d Cir. 1998); Pravin Banker Associates, Ltd. v. Banco Popular del Peru, 109 F.3d 850, 854 (2d Cir. 1997). Thus, on rare occasions, federal courts will sometimes abstain from reviewing "acts of foreign governments and defer to proceedings taking place in foreign countries." Jota, 157 F.3d at 160 (citation omitted). However, abstention pursuant to international comity "is not an imperative obligation of courts but rather is a discretionary rule of 'practice, convenience, and expediency." Royal & Sun, 466 F.3d at 92 (citation omitted); Pravin, 109 F.3d at 854. "[T]he principle of comity does not limit the legislature's power and . . . has no application where Congress has indicated otherwise." In re Gucci, 309 B.R. 679, 682 (S.D.N.Y. 2004).

Considerations of "comity" do not warrant dismissal of the Complaint in this case, whose allegations reflect the type of conduct by IAI, along with a host of private defendants, that Congress, the Supreme Court, and international law long ago established are subject to the jurisdiction of the United States courts. By enacting the FSIA, Congress has already shed substantial light on when litigation against foreign government-owned entities should be allowed to proceed, because the "jurisdiction imparted by the FSIA is premised upon specific considerations of international comity and non-interference with the executive branch's foreign policy authority." Muspole v. South African Airways (Pty.) Limited, 172 F. Supp. 2d 443, 446 (S.D.N.Y. 2001).

Moreover, any "obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act." Pravin, 109 F.3d at 854 (quoting Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.3d 909, 937 (D.C. Cir. 1984)); Bandes v. Harlow & Jones, Inc., 852 F.2d 661, 667 (2d Cir. 1988); Optics Laboratories Corp. v. Savannah Bank of Nigeria, Ltd., 816 F. Supp. 898,

1993).

906 (S.D.N.Y. 1993). Here, where the detailed allegations of the Complaint include breaches of fiduciary duty, breaches of contract, fraud, and racketeering activity by IAI and the other defendants, targeted against Americans and others who invested in ImageSat in the United States on the strength of promises made by IAI and other Defendants, the public policy of this forum would be affronted by a refusal to entertain the action. See Pravin, 109 F.3d at 855 (refusing to extend comity because "the United States has a strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to United States lenders"); Allied Bank International v. Banco Credito Agricola de Cartago, 757 F.2d 516, 522 (2d Cir. 1985) (court would not abstain on the grounds of comity because the "Costa Rican government's unilateral attempt to repudiate private, commercial obligations is inconsistent with the orderly resolution of international debt problems [and is] contrary to the interests of the United States, a major source of private international credit"). Similarly, the comity doctrine does not call for dismissal or abstention here.

## POINT VII

## DEFENDANT ELBIT IS A PROPER PARTY

Defendant Elbit Systems Ltd. seeks dismissal of all claims asserted against it on the ground that Elbit Systems Ltd. does not own any ImageSat shares and is not a party to any of the agreements mentioned in the Complaint. In his Declaration submitted in support of Defendant Elbit's motion, Elbit's general counsel David Block Temin alleges that, "[t]he company that holds shares in [ImageSat], and which is a party to some of the agreements mentioned in Plaintiffs Original Complaint, is Elbit Systems Electro-Optics Elop Ltd. (formerly Elop Electro-Optics Industries Ltd.)," which is described as "a separate and independent legal entity." (Temin Decl. ¶ 8) The Temin Declaration describes a rather confusing set of corporate transactions under which a company

known as Elbit Systems Electro-Optics Elop Ltd., rather than Elbit Systems Ltd., allegedly became the owner of Elbit's shares in ImageSat as well as the holder of Elbit's rights and obligations under its various contracts involving ImageSat. (Temin Decl. ¶ 8)

Even assuming *arguendo* that Elbit's position is correct, however, Defendant Elbit Systems Ltd. is still a proper party to this action. Insofar as appears from the record, Elbit Systems Ltd. is the entity that has engaged in wrongful competition with ImageSat, in violation of promises that either Elbit's predecessor-in-interest or a wholly owned subsidiary made to ImageSat and its shareholders. (See Cplt. ¶¶ 16, 334-336) Neither Elbit's Declaration nor the minimal documentation that it has produced to date negate Elbit Systems Limited's being a party to the transactions that Plaintiffs argue have violated the rights of ImageSat and its shareholders. Indeed, if Elbit Systems Limited had not been a party to any of such transactions, then presumably Mr. Temin's Declaration would have said so. Thus, there is no basis for dismissal of Elbit Systems Limited as a Defendant at this stage of the proceedings.

However, to address any concern raised by Elbit's allegation that Plaintiffs have identified the wrong Elbit company as the owner of Elbit's shares in ImageSat, an Amended Complaint will be filed naming Elbit Systems Electro-Optics Elop Ltd. as an additional Defendant.

## POINT VIII

## NONE OF PLAINTIFFS' CLAIMS ARE TIME-BARRED

Defendants contend that three of the Complaint's 22 claims for relief – the First, Seventeenth, and Eighteenth Claims – are time-barred under the applicable New York statutes of limitations. In reality, these claims were timely asserted, or at a minimum, issues of fact surround their timeliness so as to preclude resolution at the motion to dismiss stage.

A.    **The First Claim for Relief Is Timely**

Plaintiffs' First Cause of Action asserts that Defendants ImageSat, IAI, Elbit, Weiss, Keret, Nissan, Eldar, and Toren breached their fiduciary duties owed to Plaintiffs in connection with a series of financing and other transactions that closed in July 2000. According to Defendants, this claim accrued in July 2000, and was thus time-barred under either a three-year or six-year statute of limitations before this action was commenced in July 2007.

Defendants overlook, however, that under New York law, Plaintiffs' statutory time to assert claims for breach of fiduciary duty did not begin to run until the fiduciary relationship relied upon comes to an end. As the Second Circuit has explained:

> Under New York law, the limitations period for claims arising out of a fiduciary relationship does not commence "until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated." Westchester Religious Inst. v. Kamerman, 262 A.D.2d 131, 691 N.Y.S.2d 502, 503 (1st Dep't 1999); accord 196 Owners Corp. v. Hampton Mgmt. Co., 227 A.D.2d 296, 642 N.Y.S.2d 316, 316 (1st Dept 1996); Bd. of Educ. v. Thompson Const. Corp., 111 A.D.2d 497, 488 N.Y.S.2d 880, 882 (3d Dep't 1985). In such cases, the "statutory period [is tolled] between the alleged fiduciary misconduct" and the date on which the fiduciary relationship is openly repudiated or otherwise ended, so that any misconduct alleged before that end date "falls within the permissible temporal scope." Kamerman, 691 N.Y.S.2d at 503.

Golden Pacific Bancorp v. F.D.I.C., 273 F.3d 509, 518-19 (2d Cir. 2001). Accordingly, the statute of limitations on claims against corporate directors and officers for breach of fiduciary duty typically does not begin to run until the fiduciary relationship ends at the time the director or officer is no longer in a fiduciary relationship with the corporation. Steele v. Anderson, No. 03-CV-1251, 2004 WL 45527, at *1 (N.D.N.Y. Jan. 8, 2004); Westchester, 691 N.Y.S.2d at 503. Here, the Defendants named in the First Cause of Action have not shown – and cannot show – that their fiduciary relationships as directors, officers, and controlling shareholders of ImageSat terminated more than

six years before this action was commenced on July 2, 2007. Accordingly, their motion to dismiss this claim as time-barred should be denied.

Moreover, the Complaint alleges throughout that Defendants such as IAI have misused the moneys they raised from investors in 1999-2000 and the unduly favorable terms that they wrongfully interpolated into documents such as the Master Agreement signed in July 2000 in an attempt to perpetuate a *continuing pattern* of breaches of fiduciary duty and other misconduct continuously from July 2000 to the present. Although the Complaint separates some of Defendants' major categories of breach of fiduciary duty into separate claims for relief for purposes of convenience, the gravamen of Plaintiffs' allegations in the First through Sixth Claims for Relief is that the Defendants have *continuously* breached their fiduciary, contractual, and other duties to ImageSat's minority shareholders from the beginnings of their relationships with the Company to the present. Such conduct constitutes "continuous wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act." Neufeld v. Neufeld, 910 F. Supp. 977, 982 (S.D.N.Y. 1996) (quoting Leonhard v. United States, 633 F.2d 599, 613 (2d Cir. 1980)); see also Spitzer v. Schussel, 7 Misc. 3d 171, 792 N.Y.S.2d 798 (Sup. Ct. N.Y. Co. 2005) (applying continuous wrong theory to breaches of fiduciary duty where at least some breaches took place within the limitations period). At a minimum, an issue of fact exists as to whether the Defendants' wrongdoing had sufficient continuity to toll the period of limitations. The motion to dismiss the First Cause of Action as time-barred should be denied for this additional reason.

**B.**    **The Seventeenth and Eighteenth Claims for Relief Are Timely**

In the Complaint's Seventeenth Claim for Relief, those Plaintiffs who hold bridge warrants in ImageSat seek reformation of the warrants. According to the Complaint, these warrants were to bear the same terms and conditions as all other stock options and warrants issued by ImageSat in

connection with the closing of financing transactions in July 2000, including that they were to be valid for a term of ten years. (Cplt. ¶¶ 77-87) These documents were executed under chaotic conditions, with literally thousands of signature pages on dozens of different documents separated from the bodies of the documents. (Cplt. ¶¶ 78, 80; see also Weiss Dep. 149-50) Due to an apparently unintended scrivener's error by counsel, however, the warrants were incorrectly issued so as to expire five years from issuance rather than ten years. (Cplt. ¶¶ 79-82) ImageSat has been asked to correct the mistake, but has refused. (Cplt. ¶¶ 84-85)

These are the classic facts of a claim for reformation, in that due to mutual mistake, documents were issued that reflected the true intent of neither side. The warrant-holder Plaintiffs plead this reformation claim against ImageSat as their Seventeenth Claim for Relief, asserting that the warrants contained unintended terms as a result of an inadvertent mistake. (Cplt. ¶¶ 341-351) In the alternative, the warrant-holders assert the Eighteenth Claim for Relief, asserting that if ImageSat and other Defendants actually did know that the warrants had been issued for terms of five years rather than ten years, after having promised to issue ten-year warrants, then a fraud was committed against Plaintiffs by the failure to disclose such facts. (Cplt. ¶¶ 352-359)

A claim for reformation is typically subject to a six-year statute of limitations, but the limitations period is also extended until two years until after the plaintiffs discovered or with reasonable diligence should have discovered the mistake. See 1414 APF, LLC v. Deer Stags, Inc., 39 A.D.3d 329, 330, 834 N.Y.S.2d 133, 134-35 (1st Dep't 2007); Federal Deposit Insurance Corporation v. Five Star Management, Inc., 258 A.D.2d 15, 20, 692 N.Y.S.2d 69, 72-73 (1st Dep't 1999); Davis v. Davis, 95 A.D.2d 674, 674-75, 463 N.Y.S.2d 462, 463 (1st Dep't 1983). Claims for fraud are also subject to this "six and two" statute of limitations under New York law. See N.Y.

CPLR §§ 213(8), 203(g); <u>Triangle Underwriters, Inc. v. Honeywell, Inc.</u>, 604 F.2d 737, 746 (2d Cir. 1979).

At the motion to dismiss stage, the Court cannot ascertain when the mistaken (or fraudulent) terms of the bridge warrant came or should have come to the various Plaintiffs' attention.  Contrary to Defendants' contentions, the Complaint does not allege that each of the Plaintiffs who received bridge warrants was aware of the discrepancy in their term more than two years before this action was commenced.  Rather, who knew or should have known what as of what date is a question of fact, not amenable to resolution on a Rule 12(b)(6) motion to dismiss.  <u>See</u> <u>Bano v. Union Carbide Corp.</u>, 361 F.3d 696, 712 (2d Cir. 2004) (when plaintiffs knew or should have known of an injury was a question of fact); <u>Yatter v. William Morris Agency, Inc.</u>, 268 A.D.2d 335, 336, 702 N.Y.S.2d 243, 243 (1st Dep't 2000) (issue of fact existed regarding date of accrual of plaintiff's claims for fraud and breach of fiduciary duty).

The Complaint does, however, allege that the warrant-holder Plaintiffs were lulled into believing that ImageSat was going to fix the mistake regarding the term of the warrants, but that the Company later refused to do so.  (<u>See</u> Cplt. ¶ 84)  Issues of fact are also present as to whether such promises tolled the statute of limitations on the reformation and fraud claims, under the doctrine of equitable estoppel.  Under this doctrine, "'where the agreement, representations or conduct of a defendant have caused a plaintiff to delay suit on a known cause of action until the statute of limitations has run, the courts will apply the doctrine of estoppel to prevent an inequitable use by the defendant of the statute as a defense.' . . . If the defendant's representations or conduct mislead the [plaintiff] and the plaintiff fails to sue [based] on the representations or conduct, then a court may equitably estop use of the defense, even without there being existence of fraud or intent to deceive." <u>Talarico v. Thomas Crimmins Contracting Co.</u>, No 94 Civ. 0420 (RPP), 1997 WL 30940, at *2

(S.D.N.Y. Jan. 27, 1997) (quoting Robinson v. City of New York, 24 A.D.2d 260, 265 N.Y.S.2d

566, 569-70 (1st Dep't 1965); see generally Simcuski v. Saeli, 44 N.Y.2d 442, 406 N.Y.S.2d 259

(1978) (discussing circumstances under which a defendant may be estopped from pleading the bar of

the statute of limitations); Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157

F.3d 933 (2d Cir. 1998); Century Federal Savings & Loan Ass'n v. Net Realty Holding Trust, 87

A.D.2d 858, 449 N.Y.S.2d 293, 294 (2d Dep't 1982) ("whether defendant should be equitably

estopped from asserting the Statute of Limitations as an affirmative defense to plaintiff's complaint

is not a question of law, but rather a question of fact, which should be fully developed and

determined upon the trial of the action."). Accordingly, the motion to dismiss the Seventeenth and

Eighteenth Causes of Action as time-barred should also be denied.

As to this fraud claim relating to the bridge warrants, Defendants also contend that Plaintiffs

have failed to allege reasonable reliance in connection with their alternative theory of fraud regarding

the bridge warrants. Defendants' theory that as a matter of law Plaintiffs are out of court because

they should have read the warrants before signing founders in view of the well-pleaded allegation

and the testimony that when these and many other documents were signed at a mammoth multi-day

closing, the signature pages were separated from the body of the documents and the participants

signed only the signature pages to be joined to the body of the documents thereafter. (Cplt. ¶¶ 78-80;

Weiss Dep. 148-50) The single case relied upon by Defendants in this regard was resolved in the

context of a motion for summary judgment, after full discovery. See Lazard Freres & Co. v.

Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997) (Def. Mem. at 49). The reasonableness

of reliance is a question of fact, and Defendants cite no cases dismissing a claim analogous to the one

presented here at the pleading stage.

## POINT IX

## PLAINTIFFS' RICO CLAIMS ARE SOUND

The Eleventh and Twelfth Causes of Action in the Complaint assert claims under the RICO statute. Defendants' challenges to the viability of these claims fail.

**A.    Plaintiffs Have Standing To Sue Under RICO**

The RICO statute accords a private cause of action to "[a]ny person injured in his business or property by reason of a violation of [RICO]." 18 U.S.C. § 1964(c). This provision confers standing on all plaintiffs whose damages are proximately caused by a defendant's racketeering activity or conspiracy to engage in such activity. See Baisch v. Gallina, 346 F.3d 366, 374 (2d Cir. 2003) ("RICO standing extends to *all* directly injured plaintiffs, not just the most directly injured among them"). Plaintiffs have standing to assert their claims for RICO violation and RICO conspiracy under the statute.

To establish RICO standing, a plaintiff must establish (1) the defendants' violation of the RICO statute; (2) an injury to plaintiff's business or property; and, (3) proximate cause. Id. at 373, (citing Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120-24 (2d Cir. 2003)). The Second Circuit has developed a two part test to determine whether a plaintiff has adequately pleaded proximate cause. First, the complaint must allege that the injury was caused by the defendants' "racketeering activity" rather than by other conduct that does not violate RICO. Id. at 373. Second, it must be alleged that the plaintiff is an injured party "with respect to whom [the defendants'] acts were 'a substantial factor in the sequence of responsible causation' and (ii) whose injury was reasonably foreseeable or anticipated as a natural consequence.'" Baisch, 346 F.3d at 373-74. See also Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 260 (2d Cir. 2004).

The first element of RICO standing – that a violation of the statute has been pleaded – is established below in our discussion of the "pattern of racketeering activity" that has been more than adequately pleaded against all Defendants. (See infra pp. 97-104) Thus, we turn to the elements of injury and causation.

Defendants argue that Plaintiffs were not specifically targeted by their conduct and that any damages incurred by Plaintiff are based solely upon a loss in the value of their holdings in ImageSat. They then assert that recovery for this type of injury is impermissible under RICO, because the statute would not permit shareholders to bring direct actions against third parties for losses which are derivative in nature. However, while the general rule is that a corporate shareholder may not bring a direct RICO action for injuries suffered by the corporation rather than the shareholder himself or herself, the circumstances here fall within exceptions to this rule and warrant a contrary result.

First, Plaintiffs have standing to assert RICO claims because, as minority shareholders and security holders of ImageSat, they have been damaged, while the Company's controlling shareholders – IAI and Elbit – have not been damaged but have in fact benefited from the wrongdoing in which they have engaged. Under these circumstances, where plaintiffs allege that their injuries are not the same as those to the corporation as a whole, standing will be accorded. See, e.g., Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1101 (2d Cir. 1988). See also Carr v. Equistar Offshore, Ltd., No. 94 Civ. 5567, 1995 WL 562178, at *10 (S.D.N.Y. Sept. 21, 1995) (as targeted securities purchaser, plaintiff was directly injured by the corporation, so that individual claims under RICO were properly pleaded and not derivative of his status as shareholder; "at least some of the duties breached are duties owed by the defendants to Carr as a securities purchaser, not to Carr as a shareholder.").

The standing of security holders to bring RICO claims in circumstances like those obtaining here has been recognized. For example, in Maiz v. Virani, 253 F.3d 641, 655 (11th Cir. 2001), the plaintiffs became investors-partners in general partnerships set up to develop undeveloped real estate. At defendants' urging, plaintiffs transferred their interests in the partnerships to three corporations, whereupon defendants allegedly engaged in a plot to defraud the plaintiffs through four main schemes. On appeal from an $18 million jury verdict, defendants asserted that plaintiffs lacked standing because the damages were incurred by the corporations and not by plaintiffs themselves. The Eleventh Circuit rejected this argument, finding that the plaintiffs themselves, not the corporations, had been the targets of defendants' fraudulent conduct:

> It is plain from this record that Plaintiffs' injuries, before and after formation of the corporations, do not arise "solely" out of a scheme targeting the corporations. The evidence at trial established that, from 1988 through formation of the corporations in late 1991, Defendants targeted their wrongful acts at the individual Plaintiffs. Defendants' scheme was not designed to inflict harm on the corporations, but rather to damage the Plaintiffs.

Maiz, 253 F.3d at 655 (citation omitted). The court also observed that "simply because the Plaintiff is a shareholder of a corporation, it does not necessarily follow that he lacks standing to seek RICO damages in his own right." Id. Moreover, "[t]here is no bright-line rule for determining when an individual who is also a corporate shareholder sues under § 1964 to recover for a RICO violation that affects both the individual and the corporation. The inquiry is inherently fact specific." Id.[26]

Similarly, in Beck v. Prupis, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998), the Court of Appeals held that the plaintiff had standing to bring his RICO claims against defendants even though he was a

---

[26]    Plaintiffs also have standing to assert claims under RICO as a result of Defendants' conduct which led directly to several of the Plaintiffs' making their ill-fated investments in ImageSat, which they would not have made had Defendants disclosed their true intentions regarding the future operation of the Company. See, e.g., BRS Associates, L.P. v. Dansker, 246 B.R. 755, 769 (S.D.N.Y. 2000) (plaintiffs had standing to assert RICO claims for actions leading directly to fraudulently induced investment); Haggiag v. Brown, 728 F .Supp. 286, 295 (S.D.N.Y. 1990) ("[r]egardless of the viability under RICO of plaintiffs' claims of diminution of the value of their shares, plaintiffs also allege that they were

shareholder of the corporation controlled by the defendant directors as well as a director himself. As in our case, the <u>Beck</u> plaintiff was not told about fraudulent conduct by the other directors, and placed reliance on their statements and omissions in making financial decisions such as holding his shares of the corporation. The court held that he had been injured differently from other shareholders and enjoyed standing under RICO. <u>See also</u> <u>Adena, Inc. v. Cohn</u>, 162 F. Supp. 2d 351, 358 (E.D. Pa. 2001) ("[t]he individual Plaintiffs allege that they have suffered personal financial losses separate from the losses incurred by Adena and, therefore, they have standing to pursue their claims against the Cohn Defendants."); <u>Gunter v. Ridgewood Energy Corp.</u>, 32 F. Supp. 2d 166, 175 (D.N.J. 1998) (plaintiffs suffered more than diminution of the value of their investments when partnership was liquidated and dissolved plaintiff suffered property loss); <u>Walco Investments, Inc. v. Thenen</u>, 947 F. Supp. 491, 502 (S.D. Fla. 1996) (plaintiffs had standing to bring RICO action against defendants notwithstanding their status as shareholders where the corporation was a "culpable participant in a scheme to defraud the investors, the investors have standing to raise direct claims against all participants in the fraud.").

The Supreme Court has warned against applying RICO's proximate cause analysis in a mechanical fashion divorced from underlying policy considerations, as Defendants ask the Court to do here. "[T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule [for when plaintiffs enjoy standing under RICO] that will dictate the result in every case." <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258, 274 (1992) (citations omitted). In other words, "policy considerations determine recovery by the plaintiff, rather than epithets such as 'indirect' or 'derivative'"); <u>Information Resources, Inc. v. Dun & Bradstreet Corp.</u>, 260 F. Supp. 2d 659, 667 (S.D.N.Y. 2003). Here, the underlying policy of the RICO statute requires according

---

fraudulently induced into loaning money to Rose Hill and defendants, and that that fraudulent inducement was a part of

standing to Plaintiffs. After all, the rule that shareholders may not sue under RICO for injuries to their companies is founded in part upon a presumption that the company is in a position to vindicate its own rights and that duplicative litigation by the corporation and by its shareholders could result in multiple recoveries. But in our case, it is pellucid that ImageSat's Board of Directors has no intention of vindicating ImageSat's rights – to the contrary, the Board is populated by many of the very same Defendants whom ImageSat should rightly be suing – and accordingly Plaintiffs should be accorded standing to bring the action themselves.[27]

**B.**    **Plaintiffs Have Sufficiently Pleaded a Pattern of Racketeering**

Plaintiffs have pleaded that Defendants engaged in a "pattern" of racketeering activity by the Defendants, sufficient to survive a motion to dismiss pursuant to Fed. R. Civ. P. Rule 9(b) and 12(b). To state a claim for a civil violation of 18 U.S.C. § 1962(c), a plaintiff must allege that he was injured by the defendants' "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (footnote omitted); Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999). In their joint memorandum, Defendants question whether Plaintiffs have sufficiently alleged a "pattern of racketeering activity."

A properly alleged pattern of racketeering activity satisfies three requirements: (1) there must be at least two RICO "predicate acts" committed within ten years of each other; (2) the predicate acts must be related; and (3) the predicate acts must be continuous, so that they must either amount to or pose a threat of continued criminal activity. See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 234-35 (1989). All these elements are satisfied here.

---

the alleged RICO enterprise."). Plaintiffs are prepared to amplify this aspect of their Complaint through repleading.

1.    **Plaintiffs Have Alleged a Sufficient Series of Predicate Acts**

The Complaint alleges a continuous, ongoing series of acts by Defendants including acts of mail fraud and wire fraud, as part of an overall series of schemes by Defendants to defraud Plaintiffs. Acts of mail fraud or wire fraud constitute predicate acts under RICO. See 18 U.S.C. §§ 1341, 1343, 1961.

To sufficiently allege mail or wire fraud, a plaintiff must plead that defendant engaged in "(i) a scheme to defraud, (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." Crawford & Sons, Ltd. Profit Sharing Plan v. Besser, 216 F.R.D. 228, 234 (E.D.N.Y. 2003), (citing U.S. v. Autouori, 212 F.3d 105, 115 (2d Cir. 2000)). A "scheme to defraud" can include any conduct lacking "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general business life of members of society." United States v. Trapillo, 130 F.3d 547, 550 n.3 (2d Cir. 1997). Additionally, there must be a nexus between the acts of mail and wire fraud and interstate commerce, although it need not be of significant impact to establish a mail fraud violation under RICO. See United States v. Miller, 116 F.3d 641, 673 (2d Cir. 1997) (concluding that only a *de minimis* effect on interstate commerce is required under RICO).

The allegations against the Defendants meet this broad standard. Identified in the RICO claims are a series of wrongful and fraudulent purposes that Defendants sought to serve through their false and fraudulent communications to Plaintiffs and others. (Cplt. ¶ 298) The Complaint also identifies with specificity some of the great many communications, made through the U.S. wires and mails (in foreign and/or interstate commerce), by which Defendants accomplished their objectives. For example, the Complaint alleges that the Defendants deliberately provided Plaintiffs with false information in a series of Investor Reports that were disseminated to the Plaintiffs and other

---

[27]    In the alternative, should the Court so direct, Plaintiffs are prepared to plead their RICO claims derivatively.

investors in various locations around the world including within the United States, for the purpose of perpetuating their schemes to defraud the Plaintiffs. (See Cplt. §§ 101-105 & Ex. "F"; see infra pp. 106-07 for further discussion of these fraudulent reports, which are attributable to all of ImageSat's then directors and officers under the "group pleading" doctrine.)

As just a small cross-section of the misuses of the U.S. mails and wires, Plaintiffs have appended to the Complaint a list of more than 70 mailings and e-mails, which are just some of the miscommunications that took place between Defendants and Plaintiffs over a period of some seven years. (See Cplt. Ex. "F") The list includes wirings and mailings from 2000 to 2007 (and if necessary, Plaintiffs could produce a further list with hundreds, if not thousands, of additional such communications). In this regard, it bears emphasis while a wiring or mailing must serve as part of a fraudulent scheme and pattern of wrongdoing to constitute wire or mail fraud, there is no requirement that each individual mailing or wire must contain falsehoods. As the Supreme Court held in Schmuck v. United States, 489 U.S. 705, 714-15 (1989):

> To the extent that Schmuck would draw from these previous cases a general rule that routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense, he misapprehends the Court's precedents. . . . [T]he Court [has] specifically acknowledged that "innocent" mailings – ones that contain no false information – may supply the mailing element. In other cases, the Court has found the elements of mail fraud to be satisfied where the mailings have been routine.

See also Moses v. Martin, 360 F. Supp. 2d 533, 548 (S.D.N.Y. 2004) ("Even mailings that are innocent on their face may be in furtherance of a fraudulent scheme in violation of mail or wire fraud statutes because it is clear that '[t]he mailings themselves need not contain misrepresentations.'") (citation omitted); Miltland Raleigh-Durham v. Myers, 807 F. Supp. 1025, 1056 (S.D.N.Y. 1992) ("The telephone calls or mailings need not have contained misrepresentations themselves. They need only have 'advance[d] the execution of the scheme.' Mailings and telephone calls made to lull and

assure investors after the defendant has fraudulently obtained money, such as those made here by Myers and others acting at his direction, constitute mail and wire fraud.") (citations omitted).

Equally important, where a conspiracy to violate RICO is alleged under 18 U.S.C. § 1962(d), as it is here in the Twelfth Claim for Relief, there is no requirement that each Defendant have personally committed two or more, or a pattern, of the predicate acts himself or itself. Salinas v. United States, 522 U.S. 52, 64 (1997) ("The RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring [proof that] conspirator agreed that he would be the one to commit two predicate acts."). Certain Defendants, such as the Elbit Defendants, argue that they cannot be liable for a primary violation of RICO because the list of wirings and mailings appended to the Complaint does not include documents that the Elbit Defendants personally authored, while implicitly acknowledging that predicates were committed by others, and then argue that they cannot be liable for conspiracy to violate RICO because they did not commit a primary violation. This is an entirely circular and fallacious argument, even apart from the fact that the Elbit-designated director of ImageSat *was* responsible under group pleading for predicate acts such as ImageSat's issuance of the fraudulent investor reports.

Defendants also seek to quibble regarding whether the conduct alleged in the Complaint would be considered a "single scheme" or "multiple schemes" for RICO pleading purposes. The Supreme Court has rejected any specific requirement that RICO plaintiffs plead a minimum number of "schemes" to establish a pattern, finding that the statute embodies "a more natural and commonsense approach" to determining whether a pattern of racketeering activity has been pleaded, "envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued

criminal activity." H.J. Inc., 492 U.S. at 239. Noting that the concept of "scheme" appears nowhere on the face of the statute, the Court also observed that a 'scheme' is hardly a self-defining term and is something viewed "through the eye of the beholder." Id. at 241 n.3. Thus, it would not be fatal to Plaintiffs' RICO claims if the Court determined that Plaintiffs have pleaded but a single "scheme," albeit one with dozens of victims around the world, extending over a period of more than seven years, and continuing through the filing of the Complaint and through the present. See United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir. 1989) (no requirement of multiple schemes); Local 875 I.B.T. Pension Fund v. Pollack, 992 F. Supp. 545, 567 (E.D.N.Y. 1998) (single scheme is sufficient where the scheme is highly complex, involves many participants, and takes place over the course of a substantial period of time). In any event, the Complaint actually pleads a host of separate schemes, ranging from manipulation of ImageSat's financial transactions for insiders' benefit to the "2001 EROS B1" satellite fraud to providing false and misleading financial information to shareholders. Although all of these activities are related in the sense of making clear Defendants' disregard for the rights of ImageSat's minority shareholders and security holders, they can reasonably be regarded as separate schemes of wrongdoing.

Taken as a whole, the Complaint's allegations detailing Defendants' fraudulent conduct are more than sufficient to show a pattern of racketeering activity by the Defendants. The allegations also suffice to satisfy the pleading requirements of Fed. R. Civ. P. Rule 9(b). See City of New York, v. Joseph L. Blakan, Inc., 656 F. Supp. 536, 545 (E.D.N.Y. 1987) (Rule 9(b) does not "require specification of the time, place, and contents of [the] alleged fraud."). Furthermore, as discussed in Point X below, Rule 9(b) must be read in conjunction with Fed. R. Civ. P. Rule 8, in that a plaintiff does not have to prove his case in the Complaint. See, e.g., Credit & Finance Corp. Ltd. v. Warner & Swasey Co., 638 F.2d 563, 566-67 (2d Cir. 1981) (evidence need not be pleaded; it is sufficient

that plaintiff provide an adequate basis for the allegations so that defendants have enough information to put them on notice of the nature of the claim); <u>GLM Corp. v. Klein</u>, 684 F. Supp. 1242, 1247 (S.D.N.Y. 1988) ("Rule 9(b) must be read in accordance with Rule 8, *i.e.*, a plaintiff is not required to prove his case in his complaint."). <u>See also Beth Israel Medical Center v. Smith</u>, 576 F. Supp. 1061, 1071 (S.D.N.Y. 1983) (failure to specify dates or contents of specific mailings or telephone calls "is not fatal to the complaint"). Moreover, in the present matter there has been virtually no discovery (save for minimal jurisdictional discovery), and to the extent that Plaintiffs are unable to set forth further specifics, that inability is largely attributable to the fact that Defendants are in control of much of the documentation and evidence relating to these matters. <u>City of New York</u>, 656 F. Supp. at 545 ("Rule 9(b)'s requirements may be relaxed as to matters particularly within the opposing party's knowledge.").

### 2.    **Defendants' Predicate Acts Were Continuous and Related**

To establish the "continuity" prong of RICO's "pattern" requirement, a plaintiff may show either a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time) or an open-ended pattern of racketeering activity (i.e., past criminal conduct combined with a threat of future criminal conduct). <u>H.J. Inc.</u>, 492 U.S. at 241-42; <u>GICC Capital Corp. v. Technology Finance Group, Inc.</u>, 67 F.3d 463, 465-66 (2d Cir. 1995). To establish the "relatedness" prong of RICO's "pattern" requirement, a plaintiff must show that the defendant's predicate acts were neither isolated nor sporadic. <u>Id.</u> at 467. <u>See also Cosmos Forms Ltd. v. Guardian Life Insurance Co. of Am.</u>, 113 F.3d 308, 310 (2d Cir. 1997) (necessary relationship between predicate acts established if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.") (quoting <u>H.J. Inc.</u>, 492 U.S. at 240). A showing of *either* closed-ended

or open-ended continuity is sufficient to establish a pattern of activity for RICO purposes.  See id.

Here, given the long duration and vast extent of Defendants' predicate acts of racketeering activity

directed towards the Plaintiffs as detailed herein and which continue to the present time, Defendants

conduct can be considered *both* closed-ended and open-ended for the purposes of establishing the

continuity prong of RICO's pattern requirement.

### (a)      Defendants' Predicate Acts Establish Closed-Ended Continuity

To show closed-ended continuity, a plaintiff must plead "a series of related predicates

extending over a substantial period of time." Cofacredit, 187 F.3d, at 242 (quoting H.J. Inc., 492

U.S., at 242).  Courts also consider "factors such as the number and variety of predicate acts, the

number of both participants and victims, and the presence of separate schemes." Id.; accord DeFalco

v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001).

In this case, the Complaint asserts that Defendants continuously and systematically engaged

in numerous acts of mail and/or wire fraud, as part of multiple schemes, during the course of a period

of years.  As such, Plaintiffs have clearly alleged predicate acts that were both continuous, in that

they continued over a "substantial period of time, and related, in that they had "the same or similar

purposes, results, participants, victims, or methods of commission".

### (b)      Defendants' Predicate Acts Establish Open-Ended Continuity

To show open-ended continuity, a plaintiff need only "show that there was a threat of

continued criminal activity beyond the period during which the predicate acts were performed."

Cofacredit, 187 F.3d, at 242.  Predicate acts extending over only a few days, weeks or months are

therefore sufficient to establish open-ended continuity, so long as there is a threat of continued

criminal conduct.  "In this circuit, 'the cases assessing whether a threat of continuity exists have

looked first to the nature of the. . . enterprise at whose behest the predicate acts were performed.'"

DeFalco, 244 F.3d at 323 (citations omitted).  If an enterprise is engaged in a legitimate business, the standard requires evidence supporting an inference that the predicate acts are the regular way of doing business, or that the nature of the predicate acts themselves implies a threat of continuing criminal activity." Cofacredit, 187 F.3d at 243; see also GICC Capital Corp., 67 F.3d, at 466; Jordan (Bermuda) Investment Co., Ltd. v. Hunter Green Investments, Ltd., 154 F. Supp. 2d 682, 694-95 (S.D.N.Y. 2001).  Furthermore, "[i]f the enterprise alleged is engaged in "inherently unlawful" acts, there is a threat of continuing criminal activity and open ended continuity exists." SKS Constructors, Inc. v. Drinkwine, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006) (citations omitted).

In this case, Plaintiffs' allegations regarding the nature of the predicate acts themselves and the relationship between the parties implies a threat of continuing wrongdoing on the part of the Defendants sufficient to state a claim based on open-ended continuity.

## POINT X

### PLAINTIFFS' FRAUD, BREACH OF FIDUCIARY DUTY, AND RICO CLAIMS SATISFY RULES 9(b) AND 8(a)

Defendants argue that Plaintiffs' claims against them for fraud, breach of fiduciary duty, and violation of the RICO statute – contained in a Complaint that contains some 87 pages and 193 paragraphs of *factual* allegations, in addition to the 22 claims for relief – lack sufficient particularity and detail under Fed. R. Civ. P. 9(b).28  At the same time, many of the same Defendants assert that Plaintiffs' Complaint violates Fed R. Civ. P. 8(a)(2) in that it allegedly fails to contain concise allegations adequately describing the claims against them.  These arguments are, to say the least, in

---

[28]     Claims for breach of fiduciary duty must satisfy Rule 9(b) only when they are in the nature of claims for fraud – an apt description of some, but by no means all, of the allegations of the First through Sixth Claims for Relief.  As to other allegations, these claims need only comply with the notice pleading requirement of Rule 8. See, e.g., In re Polaroid ERISA Litig., 362 F. Supp. 2d 461, 470 (S.D.N.Y. 2005); Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp., No. 00 Civ. 8688 (WHP), 2002 WL 362794, *8 (S.D.N.Y. March 6, 2002); Burnett v. Physicians' Online, Inc., No. 94 CIV. 2731 TPG, 1997 WL 470136, at * 11 (S.D.N.Y. Aug. 15, 1997).

tension with each other: Defendants apparently believe the Complaint should be shorter, but at the same time, that it should contain much more information. Neither their objections under Rule 9(b) nor those under Rule 8(a) have merit.

A District Court has analyzed the relationship between Fed. R. Civ. P. 9(b) and 8(a)(2) as follows:

> [I]it is not appropriate to focus solely on the particularity requirement in fraud cases under 9(b), and a balance must be sought with the simplicity required by Fed.R.Civ.P. 8 that the pleadings should contain a "short and plain" statement of the claim or defense and with each averment should be "simple, concise and direct." United States v. Gleb, 783 F. Supp. 748, 757 (E.D.N.Y.1991). Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter. The Second Circuit expresses this same view that "F.R.Civ.P. 9(b) must be reconciled with F.R.Civ.P. 8(a)(2)..." Denny v. Barber, 576 F.2d 465, 469 (2d Cir.1978). See Michael v. Clark Equipment Company, 380 F.2d 351, 352 (2d Cir.1967) (plaintiff pled fraud with sufficient particularity even though plaintiff alleged numerous and inconsistent theories of fraud); Jurban v. Musikahn, 673 F. Supp. 108, 111-12 (E.D.N.Y.1987) (plaintiff pled fraud with sufficient particularity under Security and Exchange Act even though amended complaint did not specify the fraudulent words of corporation president or date they were uttered); Anderson v. Lowery, 667 F. Supp. 105, 108 (S.D.N.Y.1987) (allegations of scienter need not be made with great specificity)."[A]verments of fraud do not have to contain a precise statement of all the elements of the fraud but need only set forth the facts with sufficient particularity to apprise defendant fairly of the charge. Union Mutual Life Insurance Company v. Simon, 22 F.R.D. 186, 187 (E.D.Pa.1958).

> \* \* \*

> An examination of plaintiffs' second amended complaint shows that it has met the essential requirements for detailing defendants' alleged fraud complaint [and is] sufficient to meet the requirements of Rule 9(b). It specifically alleges the contents, representations, the facts misrepresented, the identity of the persons who made the misrepresentations and plaintiffs' reliance upon the representations and consequent damages resulting therefrom. Although plaintiffs may not have pinpointed the exact time and place of every representation, they have given sufficient notice of the time period during which these representations were made. This appears sufficiently specific in the present case to give defendants adequate notice of the claims against them for fraud and fraudulent intent, and to prepare an effective defense. Therefore, the court finds that the second amended complaint complies with the specific pleading requirements of Rule 9(b).

Sears Petroleum & Transport Corp. v. Ice Ban America, Inc., No. 99 Civ. 704, 2004 WL 834849, at *8, 10 (N.D.N.Y. Apr. 15, 2004).

Moreover, the particularity requirement of Rule 9(b) serves to deter the bringing of frivolous claims and to ensure that defendants are on notice of the details of the claims against them. See, e.g., Baena v. Woori Bank, 515 F. Supp. 2d 414, 419 (S.D.N.Y. 2007); In re Initial Public Offering Secs. Litig., 241 F. Supp. 2d 281, 325 (S.D.N.Y. 2003); BRS Assocs., L.P. v. Dansker, 246 B.R. 755, 768 (S.D.N.Y. 2000). However, not all instances of misrepresentation need be alleged. The complaint need only state "the core" of the Plaintiff's claim. See Commercial Property Investments, Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 646 (8th Cir. 1995).

Here, Plaintiffs have detailed a long and sordid history of breaches of fiduciary duty and fraudulent statements and omissions perpetrated by Defendants. Substantial detail is provided about one series of transactions and events after another – such as breaches of fiduciary duty in connection with the Company's financial transactions in 2000 and 2001, the extraordinary and ongoing fraud perpetrated on Plaintiffs and ImageSat in connection with the "2001 EROS B1 satellite contract and write-off, the squandering and deliberate destruction of ImageSat's corporate opportunities to do business with countries such as Venezuela, the virtual abandonment of ImageSat's business altogether as Defendants caused the Company to unravel, and Defendants' causing or acquiescing in ImageSat's abandonment of its exclusivity rights, rights of first refusal, and non-compete rights collectively worth hundreds of millions of dollars under contracts such as the Master Agreement with IAI and the ElOp Stock Purchase Agreement.

Moreover, Plaintiffs have not only identified the transactions that they are challenging, but have described numerous statements that were made to them by various Defendants in the course of such transactions. One particularly egregious series of misrepresentations was contained in a series

of so-called "Investor Reports" issued by ImageSat from approximately 2002 to 2005. These reports were sent, generally by electronic mail attachment, to ImageSat's shareholders and certain other persons in the United States and elsewhere. (Cplt. ¶¶ 101-104; Weiss Dep. 177-80; Keret Dep. 65-67; Goren Dep. 137-46)  They discussed such matters as the status of construction on the "2001 EROS B1" satellite, a matter of enormous importance to the shareholders of and other stakeholders in ImageSat (recall that Plaintiffs allege that this satellite was never designed in accordance with ImageSat's specifications, built, or delivered despite ImageSat's millions of dollars in payments to IAI and Elbit for such satellite).  The Investor Reports were disseminated to ImageSat's Board members, including the IAI and Elbit designees on the Board whom the Complaint alleges were fully aware of the true status (or lack of a status) of the 2001 EROS B1. (Cplt. ¶¶ 101-105) The Investor Reports were official communications from ImageSat to its shareholders, on which the shareholders were intended to rely. (Weiss Dep. 177-180; Keret Dep. 65-67; Goren Dep. 138)  Unfortunately, they were replete with lies.  (See Cplt. ¶ 101-105; see also Cplt. Ex. "F", ¶¶ 18 et seq., where Plaintiffs list numerous wire and mail communications from Defendants including many of the Investor Reports and set forth the false statement or statements contained in each)  Plaintiffs have adequately particularized allegations of fraud – and of wire fraud and mail fraud as predicate acts of racketeering activity – based on the issuance of these documents.

Defendants claim that Plaintiffs have insufficiently identified each specific Defendant's role in the fraud and the breaches of fiduciary duty.  In many instances, contrary to Defendants' contention, Plaintiffs have identified the specific Defendant or Defendants (corporate or individual) responsible for a given action or statement.  In other instances, Plaintiffs have identified an action as having been taken or a statement as having been made by an identifiable group of Defendants, such allegations that ImageSat's Board of Directors made a wrongful decision or issued a document

containing misstatements. An allegation of this nature is a sufficient allegation against each individual Defendant who was a member of the Board at the time of that decision or statement. As one example, the Complaint alleges, for example, that ImageSat's Board members breached their fiduciary duties to the Company when they agreed at a February 22, 2007 Board meeting that ImageSat would not assert its rights against IAI under the Master Agreement. (Cplt. ¶ 180) This paragraph could have alleged that "Defendants Arzi, Chelouche, Piperno-Beer, Gaspar, DePalma, and Eckhaus (ImageSat's then directors and CEO), together with IAI and Elbit, breached their fiduciary duty" in the specified respect. This phrasing, however, would have added little to the Complaint except length, and Rule 9(b) does not require it.

Other allegations of misstatements by "Defendants" fall within the "group pleading" doctrine, under which statements made by a corporate entity may be attributed, at least for purposes of the initial pleading, to the directors and senior officers of the entity.[29] See In re LaBranche Sec. Litig., 405 F. Supp. 2d 333, 352 (S.D.N.Y. 2005) (group pleading applied to group of defendants although alleged misrepresentations were made by one or a few defendants); In re Adelphia Comm Corp. Sec. & Derivative Litig., 398 F. Supp. 2d 244, 250 (S.D.N.Y. 2005) (group pleading doctrine applied to defendants as "holding positions that qualify them as 'corporate insiders with active daily roles' . . . or as members of Board of Directors with equity interests . . . and access to information concerning the company's day-to-day business."); In re Emex Corp. Sec. Litig., 2002 WL 31093612, at *8 (S.D.N.Y. Sept. 18, 2002) ("group pleading" doctrine applicable where defendants' roles have been detailed in the complaint and they attended a certain meeting, and thus the "Complaint establishes a strong inference that the Individual Defendants were aware that [the investment bank] at that meeting

---

[29]    The group pleading doctrine is not limited to federal securities law cases (see Liberty Mutual Ins. Comp. v. Blesinger, 2007 WL 951905 (E.D.N.Y. Mar. 27, 2007); In re Alstom Sec. Litig., 406 F. Supp.2d 433, 448-49 (S.D.N.Y. 2005).

declined a role in the financing."). Here, the "group pleading" doctrine is appropriately relied upon in connection with matters such as the contents of the Investor Reports disseminated to ImageSat's shareholders between 2002 and 2005, which are alleged to have consistently provided the shareholders with false and misleading information concerning ImageSat's financial status and prospects and the status of the "2001 EROS B1" satellite. (See Cplt. ¶¶ 101-104) The same is true as to allegations concerning what was said and done at ImageSat Board meetings, several of which are discussed in the Complaint.

Plaintiffs have more than adequately alleged fraud based on Defendants' misrepresentations and misleading statements. Beyond that, however, none of the Defendants addresses Plaintiffs' numerous allegations that Defendants *failed to disclose* matters that they had a duty to disclose, such as the ongoing "2001 EROS B" satellite fraud. Defendants neither claim that they disclosed the true facts, which the Complaint alleges were known to them, nor do they contend that they lacked a duty to disclose. See generally Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291-92 (2d Cir. 2006) (failure to disclose material information constitutes fraud where there is a duty to disclose such information, such as where non-disclosing party owes a fiduciary duty to the other).

Plaintiffs have sufficiently alleged the remaining elements of fraud – such as *scienter*, reliance, and causation – against all Defendants. Defendants, with the exception of Defendant James DePalma whose arguments are discussed below, say little or nothing about *scienter*, which is understandable because the Complaint amply satisfies this element. Causation and reliance are established through, *inter alia*, the Complaint's allegation that "[e]ach of the plaintiffs relied upon the false and misleading statements and omissions of the defendants by, among other things, continu[ing] to invest his productive working time into ImageSat and/or by forbearing from bringing litigation against defendants that would have been commenced at a substantially earlier time had

truthful and accurate disclosure of the relevant facts been made to them." (Cplt. ¶ 311)[30]  In addition, as noted above, several of the Plaintiffs relied on Defendants' misstatements or misleading omissions in having decided to invest millions of dollars in ImageSat and its predecessors in the first instance.

Finally, Defendants' suggestions that the Complaint is unduly confusing in violation of Rule 8(a) are simply untrue.  The Complaint tells a chronologically organized story and describes the various Defendants' misconduct in a logical and organized fashion.  Its straightforward, albeit lengthy, factual narrative as to Defendants' wrongful acts and omissions, provides ample detail so that Defendants may frame responsive pleadings and defend against the allegations with a reasonable understanding of the wrongs of which they are accused.  If the Complaint is lengthy and complicated, that is only because Defendants' wrongdoings were lengthy and complicated.  In sum, the Complaint satisfies the central purposes animating both Rule 8 and Rule 9(b).  At the pleading stage, and certainly before any merits discovery has taken place, nothing more is required.

## POINT XI

## PLAINTIFFS' REMAINING CLAIMS ARE PROPERLY PLEADED

Defendants' challenges to Plaintiffs' remaining claims also fail.

### A.    Breach of Contract

Plaintiffs assert three breach of contract claims against IAI and/or Elbit.  These include the Fourteenth Claim for Relief against IAI and Elbit for breach of the Satellite Supply Contracts; the Fifteenth Claim for Relief against IAI for breach of the Master Agreement; and the Sixteenth Claim for Relief against Elbit for breach of the Stock Purchase Agreement.

---

[30]    For example, Defendants' fraudulent concealment of relevant facts continued until the five-year outer limitation on certain Plaintiffs' ability to pursue claims under the Securities Act of 1933 and the Securities Exchange Act of 1934, based on investments they made in 1999 and 2000, had expired.  See 28 U.S.C. 1658(b); LC Capital Partners v. Frontier

Elbit (joined by IAI in a cursory footnote) moves to dismiss these claims because Plaintiffs supposedly lack standing to pursue them, in that ImageSat rather than its shareholders was a party to each of these agreements. It would certainly be preferable if ImageSat, through its Board of Directors, had taken appropriate action years ago to vindicate the company's rights against IAI and Elbit. It is, however, not in the least surprising that this failed to occur, given IAI's and Elbit's majority control of ImageSat's Board and shareholder meetings. As a practical matter, these claims have to be brought by Plaintiffs or they will not be brought at all and IAI and Elbit will never be held accountable in any forum for their grave contractual breaches.

In discussing Plaintiffs' standing to assert these contract claims, Elbit acknowledges the Complaint's allegation that these contracts contain provisions that they are to be governed by New York law and state that they will therefore analyze Plaintiffs' standing under New York law. New York authorizes corporate shareholders to bring derivative actions in cases where the corporation has suffered harm and the Board of Directors wrongfully refuses to pursue such claim. A claim for breach of a contract to which the corporation is a party falls within the types of claims that may be, and frequently are, asserted derivatively in New York. See, e.g., Bischoff v. Boar's Head Provisions Co., 38 A.D.3d 440, 834 N.Y.S.2d 22 (1st Dep't 2007). Accordingly, these claims may be regarded, and pursued by Plaintiffs, as derivative in nature. Alternatively, Plaintiffs may pursue these claims directly for substantially the same reasons that they have standing to pursue their RICO claims and any claims that the court analyzes under Netherlands Antilles law – that the minority security holders of ImageSat such as Plaintiffs have been uniquely targeted by Defendants' wrongdoing, and will suffer injury therefrom in a fashion that controlling shareholders IAI and Elbit will not.

---

Ins. Group, 318 F.3d 148, 154 (2d Cir. 1993).

Moreover, under the New York law of contracts, Plaintiffs have standing to assert claims as intended third-party beneficiaries of the cited agreements. Although Plaintiffs are not parties to the Master Agreement or ElOp Stock Purchase Agreement, those contracts were negotiated and entered into at the same time as, and in conjunction with, other agreements to which certain of the Plaintiffs are parties. As such, the agreements should be construed together as part of a unified commercial transaction. See This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."), and cases cited therein. The commitments made by IAI and Elbit in the Master Agreement and Stock Purchase Agreement, respectively – commitments embedded in all of the legacy Joint Venture and other agreements that the Master Agreement was explicitly intended to preserve after the July 2000 closing – were integral parts of the agreements and understandings under which several of the Plaintiffs invested in ImageSat. If necessary, Plaintiffs are prepared to amplify these allegations in repleading their contract claims.

In the alternative, if Plaintiffs' standing to assert their breach of contract claims against IAI and Elbit is viewed as a question of Netherlands Antilles law, then as discussed above Plaintiffs should be accorded standing. (See supra Point IV)

Accordingly, Plaintiffs have standing to assert their breach of contract claims, and as IAI and Elbit do not challenge any other aspect of Plaintiffs' pleading of these claims, they should proceed.

**B.    Fraudulent Conveyance**

Defendants move to dismiss the fraudulent conveyance claim contained in the Nineteenth Claim for Relief. (Cplt. ¶¶ 360-372) In this claim, Plaintiffs allege that by defrauding ImageSat out of tens of millions of dollars in payments on the "2001 EROS B1" satellite that was never fully designed, built, or delivered, IAI and Elbit caused ImageSat to become insolvent, in a transaction that

was undertaken either with the actual fraudulent intent to defraud ImageSat and its minority shareholders, or at least under circumstances giving rise to an inference of constructively fraudulent intent. See N.Y. Debtor & Creditor Law §§ 275, 276. These circumstances include that ImageSat did not receive reasonably equivalent value (and in fact received no value at all) for the money it paid to IAI and Elbit under the supply contract for this satellite.

Defendants contend that Plaintiffs, as shareholders of ImageSat, lack standing to assert this claim under the New York fraudulent conveyance statute. As Defendants note, New York Debtor and Creditor Law § 270 defines a creditor as including "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." However, as Plaintiffs in this very action, in which Plaintiffs seek millions of dollars in damages against ImageSat and the other Defendants, Plaintiffs are, at a minimum, contingent creditors entitled to pursue fraudulent transfer claims. See Drenis v. Haligiannis, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006) ("Plaintiffs here are tort creditors of the Partnership by virtue of their claims against the defrauding defendants in the pending action, and therefore have standing within the meaning of the New York Debtor and Creditor Law to avoid fraudulent transfers made by the Partnership.").[31]

Defendants also argue that Plaintiffs fail to sufficiently explain their contention that ImageSat was rendered insolvent as a result of IAI's and Elbit's conduct in connection with the 2001 EROS B satellite. Contrary to Defendants' assertions, the Complaint contains specific allegations that, among other things, ImageSat became insolvent as of year-end 2005, after the company wrote off its entire investment in this satellite. (Cplt. ¶ 211(i)) For this reason, ImageSat's 2005 audit reflected that the

---

[31] Defendants' argument that ImageSat's shareholders are not "creditors" who may assert fraudulent transfer claims also ignores the existence of several holders of stock options and bridge warrant among the Plaintiffs. As Defendants themselves emphasize in other contexts, option and warrant holders have contractual relationships with ImageSat and are not shareholders.

company had a negative net worth. (Cplt. ¶¶ 142-143) There is, of course, no requirement that to plead a claim for fraudulent conveyance, the Complaint must cite numbers on the company's balance sheet numbers or annex a financial statement (although Plaintiffs are prepared to do so if the Court so directs). Rather, insolvency is generally a question of fact. See Hallinan v. Republic Bank & Trust Co., 519 F. Supp. 2d 340, 350 (S.D.N.Y. 2007). The sole case cited by Defendants, Lippe v. Bairnco Corp., 230 B.R. 906, 915 (S.D.N.Y. 1999), in which "it [was] apparent that [the company] was left with hundreds of millions of dollars after [the disputed] transactions" is plainly inapposite. Plaintiffs have sufficiently pleaded their fraudulent transfer claim.

## C.    **Disgorgement**

Defendants' only objection to Plaintiffs' pleading of their Twentieth Claim for Relief seeking disgorgement of compensation received by Defendants is that Plaintiffs supposedly lack standing to pursue it. This issue has already been addressed at length. (See supra Point IV) Plaintiffs are entitled to standing to pursue the claims that ImageSat's directors and executive officers plainly will not pursue against themselves, on the disgorgement claim as on all the other claims in the Complaint.

## D.    **Conversion**

The Twenty-First Claim for Relief seeks damages against all Defendants for conversion. Defendants' contention that this claim is insufficiently particularized is unsound. Rule 9(b) does not apply to claims for conversion. Consolidated Risk Services, Inc. v. Automobile Dealers WC Self Ins. Trust, No. 06 Civ. 871, 2007 WL 951565 at *4 (N.D.N.Y. Mar. 27, 2007); Parra v. Greenpoint Mort. Co., No. 01 Civ. 2010, 2002 WL 32442231, at *3 (E.D.N.Y. Mar. 26, 2002).

Plaintiffs' cause of action for conversion should be sustained as to all Defendants because each of the Defendants is duly alleged to have wrongfully caused assets, property, funds and other items of value to be intentionally diverted to itself or himself for personal use. For the reasons set

forth above, Plaintiffs have standing to assert this claim either under Netherlands Antilles law or

under forum law.  (See supra Point IV)[32]

## E.    Unjust Enrichment and Restitution

Plaintiffs' Twenty-Second Claim for Relief asserts that by reason of the conduct alleged in

the Complaint, Defendants have been unjustly enriched and should make restitution.  Defendants

challenge this claim as allegedly being duplicative of earlier claims asserted in the Complaint.

However, this claim for relief is properly brought as, at a minimum, an alternative claim for relief in

the event that claims such as breach of fiduciary duty are dismissed in whole or part against any

Defendant.  At the pleading stage, such pleading in the alternative is permitted, and there is no basis

to claim that that the claims are duplicative.  Indeed,

> Rule 8(a) of the Federal Rules of Civil Procedure allows plaintiffs to plead
> alternative claims. Courts have denied motions to dismiss unjust enrichment claims
> as premature for this reason.  See id.; Benigno v. Flatley, No. Civ. A. 01-CV-2158,
> 2001 WL 1132211, *1 (E.D.Pa. Sept.13, 2001) (citation omitted). Furthermore,
> courts should not dismiss an unjust enrichment claim when there is a dispute about
> whether the contract covers the particular controversy. See Envirocon, Inc. v. Alcoa,
> Inc., No. 7:06-cv-0549, 2006 WL 2460640, *2 (N.D.N.Y. Aug.23, 2006) (quotation
> and other citation omitted).
>
> In this case, ADSIP concedes that a contract exists between it and CRS concerning
> trust administration. Ordinarily, the existence of this contract would preclude
> recovery against CRS under an unjust enrichment theory. However, ADSIP also
> asserts that CRS has breached extra-contractual duties so it is unclear at this time
> whether the contract covers all disputes between the parties. Therefore, since Rule
> 8(a) allows a party to plead alternative claims, the Court finds that it is premature to
> dismiss the unjust enrichment counterclaim against CRS at this time.

Consolidated Risk Services, 2007 WL 951565 at *7 (N.D.N.Y. Mar. 27, 2007); see also International

Customs Assocs., Inc. v. Ford Motor Co., 893 F. Supp. 1251, 1256 (S.D.N.Y. 1995).

---

[32]    ImageSat is properly named as a Defendant on these claims together with the other Defendants insofar as it may
have aided and abetted a fiduciary in diverting assets from the company.    Compare Ahles v. Aztec Enter., Inc., 120
A.D.2d 903, 904, 502 N.Y.S.2d 821, 822 (3d Dep't 1986) (assistance and acting in concert with a convertor in defiance
of plaintiff's right resulted in joint tortfeasor liability); see also Grace v. Corn Exchange Bank Trust, 287 N.Y. 94

More specifically, Defendants claim that the unjust enrichment claim cannot stand because the relations between the parties are governed by express contracts. However, Defendants clearly do not mean to suggest that every aspect of the relationship between Plaintiffs and Defendants is governed by the parties' agreements – if they did, they would not be asserting that New York is *forum non conveniens* for this litigation, that the Court lacks personal jurisdiction over them, or that the claims should be dismissed after Netherlands Antilles law, after having entered into a series of contracts containing provisions that they be governed by New York law and that disputes be resolved in New York's federal or state courts. At least to the extent that the contracts do not cover a particular issue, there can be no suggestion of duplication. Moreover, the individual Defendants are not parties to the agreements among ImageSat and its shareholders and therefore the argument of duplicativeness does not apply (unless Defendants are prepared to concede that the individual Defendants are bound by such agreements, including their choice-of-law and choice-of-forum clauses). See Bildstein v. MasterCard International, Inc., No. 03 Civ. 98261, 2005 WL 1324972, at *5 (S.D.N.Y. June 6, 2005) ("Bildstein's agreement with his card issuing bank cannot preclude Plaintiff's unjust enrichment claim against MasterCard, a non-party to that agreement"); Niagara Mohawk Power Corp. v. Freed, 265 A.D.2d 938, 939, 696 N.Y.S.2d 600, 602-03 (4th Dep't 1999).

Defendants wrongly contend that any unjust enrichment claim relating to allegations beyond the agreements must fail because they can only arise out of "some fiduciary duty alleged to be owed to them." There is no requirement that an independent "fiduciary duty" exist before an unjust enrichment claim can be sustained, and, indeed, the cases cited by Defendants' themselves contain no such requirement. See, e.g., Bildstein, 2005 WL 1324972, at *5 (S.D.N.Y. June 6, 2005).

---

(1941).

Defendants further assert that Plaintiffs have "not specifically alleged their claims for unjust enrichment." However, Fed. R. Civ. P. Rule 9(b) does not apply to common-law unjust enrichment claims, and the allegations contained in the Complaint are sufficient to support this cause of action. See Kingdom 5-KR-41, Ltd v. Star Cruises PLC, No. 01 Civ. 2946, 2002 WL 432390, at *9 (S.D.N.Y. Mar. 20, 2002); Mayatextil, 1993 WL 51094, at *6 (S.D.N.Y. Feb. 24, 1993). Accordingly, Plaintiffs have properly alleged a cause of action for unjust enrichment and restitution.

## POINT XII

### THE COMPLAINT STATES A CLAIM
### AGAINST DEFENDANT DePALMA

In his separate memorandum, Defendant James DePalma asserts that the Complaint fails to state a claim for relief against him based on any of its causes of action.

Contrary to DePalma's suggestion, the Complaint sufficiently sets forth a series of claims against him for breach of fiduciary duty based on the ImageSat Board of Directors' failure to disclose or properly address the ongoing "2001 EROS B1" satellite fraud (see also Wilson Decl. ¶ 74); failure to take action against IAI or Elbit for their ongoing breaches of exclusivity, first right, and non-compete obligations; and acquiescence in ImageSat's spurning of SOP opportunities from customers such as Venezuela and in the effective unwinding and destruction of ImageSat's entire business. DePalma, who has served not only as a director of ImageSat but also as a member of the Audit/Finance Committee since 2003 (Cplt. ¶ 52), owed the Plaintiff minority shareholders and security holders a duty to appropriately protect their interests.

The Complaint sufficiently alleges against DePalma – as against all the other ImageSat Directors, none of whom have challenged the adequacy of the pleading of the breach of fiduciary duty claims beyond denying that Plaintiffs have standing to assert such claims – that he has been part

of a Board of Directors that has done nothing to vindicate ImageSat's rights and corporate opportunities, and that at times has affirmatively decided to abandon such rights and opportunities. No matter what law is applied to the matter, these facts make out a claim for breach of fiduciary duty or breach of a norm of care owed to the shareholders. The fact that DePalma served as a director designated by non-party CST, rather than IAI and Elbit, does not negate the existence of DePalma's duty to protect ImageSat's minority security holders and his fellow investors.

DePalma challenges the claims against him for waste and for disgorgement of compensation, claiming that they fail because the related breach-of-fiduciary-duty claims fail. Because the fiduciary duty claim is in fact sufficient, these additional claims are sufficient as well. The RICO and fraud claims are sufficiently pleaded against DePalma as they are against all Defendants. (See supra Points IX, X) Accordingly, the claims against DePalma should be sustained, or in the alternative, Plaintiffs will amend their Complaint to provide further particulars of DePalma's wrongful acts and omissions in the four years since he joined the ImageSat Board in 2003.

## POINT XIII

### IF THE COURT FINDS ANY ASPECT OF THE COMPLAINT DEFICIENT, PLAINTIFFS SHOULD BE GRANTED LEAVE TO REPLEAD

For all the reasons set forth above, it is submitted that Plaintiffs have properly alleged the elements of each of their clams for relief, in ample detail to give the Defendants notice of the acts and omissions with which they are charged, and that accordingly this action should proceed to merits discovery and trial as against all Defendants.

If, however, the Court were to find the Complaint factually or legally insufficient as to any claim for relief or as against any Defendant, Plaintiffs should be accorded leave to replead. As this Court has observed:

Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given when justice so requires." "[T]his mandate is to be heeded." Foman v. Davis, 371 U.S. 178, 182 (1962).

If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he [or she] ought to be afforded an opportunity to test his [or her] claim on the merits. In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.'

Lovely H. v. Eggleston, 2006 WL 3333084, at *1 (S.D.N.Y. Nov 16, 2006) (Swain, J.) (leave to replead granted); accord Fagan v. First Security Investments, Inc., 2006 WL 2671044, at *3 (S.D.N.Y. Sept. 15, 2006) (Swain, J.) ("Although leave to amend is not automatic, a plaintiff generally is to be afforded an opportunity to test his claim on the merits if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief"); Sedona Corp. v. Ladenburg Thalmann & Co., Inc., 2005 WL 1902780, at *24 (S.D.N.Y. Aug. 9, 2005) (Swain, J.) ("The aforementioned defects in the Complaint may be cured if Plaintiff repleads certain claims for relief in accordance with the applicable pleading requirements."). It is noteworthy that in *every* case cited by Defendants in connection with their arguments under Rule 9(b) and 8(a), the court granted leave to replead at least once.

Moreover, insofar as Defendants alleged that the Complaint does not plead its allegations with sufficient particularity (despite its 87 pages of factual detail), Plaintiffs submit that they have made a reasonable showing of sufficient merit to their claims that the action should proceed to merits discovery before Plaintiffs are required to file their Amended Complaint. Accordingly, although Plaintiffs are prepared to replead their allegations in accordance with any decision the Court may render and within such period of time as the Court may direct, it is submitted that the most reasonable course would be to allow this action to proceed to a period of merits discovery so that

Plaintiffs may obtain additional documents and testimony to be used in refining the factual allegations of their pleading.  See OSRecovery, Inc. v. One Groupe Int'l., Inc., 354 F. Supp. 2d 357, 364 (S.D.N.Y. 2005) ("The Court granted Lateko's motion to dismiss the second amended complaint on the ground that it failed adequately to allege *scienter*, but granted leave to amend and ordered that discovery continue.").  At a minimum, however, Plaintiffs request a period of 30 days in which to submit any amended pleading that the Court may authorize.

## CONCLUSION

For all the foregoing reasons, Defendants' motions to dismiss the Complaint should be denied in all respects.  To the extent that the Court may grant any portion of any Defendant's motion to dismiss, Plaintiffs respectfully request leave to replead.

Respectfully submitted,

GANFER & SHORE, LLP

By: _____

      Ira Brad Matetsky (IM1881)
      Mark A. Berman
      William A. Jaskola
360 Lexington Avenue
New York, New York  10017
(212) 922-9250
(212) 922-9335 (facsimile)
imatetsky@ganshore.com
*Attorneys for Plaintiffs*