UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                    :

STEPHEN M. WILSON, BRW ENGINEERING   :
LTD., WIS PARTNERS LTD., MOSHE BAR-LEV,   :
PATRICK ROSENBAUM, MICHAEL MORRIS,   :
HAIM YIFRAH, TOP DOWN PARTNERS, LLC,   :   Filed Electronically
JOEL LEVINE, MORRIS TALANSKY,   :
ABRAHAM MOSHEL, MAGMA   :   07 Civ. 6176 (LTS)
INTERNATIONAL SERVICES, LTD., ALBERT   :
REICHMANN, HEXAGRAM & CO., and   :
POLYBUTES COMPANY,   :
   :   ORAL ARGUMENT
                Plaintiffs,   :   AND/OR EVIDENTIARY
   :   HEARING REQUESTED
       -against-   :
   :
IMAGESAT INTERNATIONAL N.V.,  ISRAEL   :
AEROSPACE INDUSTRIES LTD., ELBIT   :
SYSTEMS LTD., MOSHE KERET, IZHAK   :
NISSAN, JACOB WEISS, MENASHE BRODER,   :
SHIMON ECKHAUS, MICHAEL FEDERMAN,   :
ESTATE OF JACOB TOREN, JOSEPH   :
ACKERMAN, JOSEPH GASPAR, GINO   :
PIPERNO-BEER, JAMES DEPALMA, DAVID   :
ARZI, YOAV CHELOUCHE, and YEHOSHUA   :
ELDAR,   :
   :
              Defendants.   :
   :
-------------------------------------------------------------------X

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

GANFER & SHORE, LLP
360 Lexington Avenue
New York, New York 10017
(212) 922-9250
(212) 922-9335 (facsimile)
*Attorneys for Plaintiffs*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................v

PRELIMINARY STATEMENT ....................................................................1

FACTUAL BACKGROUND ........................................................................9

ARGUMENT ...............................................................................................10

POINT I    THIS COURT REPRESENTS THE APPROPRIATE FORUM
FOR THIS LITIGATION AND DISMISSAL UNDER THE
DOCTRINE OF *FORUM NON CONVENIENS* IS NOT WARRANTED ...........10

A.    The Applicable Standards ........................................................11

B.    Plaintiffs' Choice of This Court as the Forum
Is Entitled to a Full Measure of Deference ...............................12

1.    This Court Is Plaintiffs' Home Forum ...........................12

2.    Plaintiffs' Choice of Forum was Motivated by
Genuine Considerations of Convenience.......................14

(a)    The Southern District of New York is the Most
Geographically Convenient Forum for the Plaintiffs.........15

(b)    Witnesses and Evidence Are
Readily Available in this District......................16

(c)    Defendants Are Amenable to Suit in this District ............24

(d)    Legal Assistance Is Available to
All Parties in This District ................................24

3.    Plaintiffs' Choice of Forum Was
Not Motivated By Forum-Shopping.............................25

C.    The Balancing of Private and Public Interest Factors
Favors This District as the Appropriate Forum for This Action................28

1.    The Private Interest Factors Weigh
In Favor of Litigating in New York..............................28

2.    The Public Interest Factors Weigh
In Favor of Litigating in New York..............................30

D.   Any Dismissal for *Forum Non Conveniens* Should Be
Conditioned on Appropriate Protections for Plaintiffs ............................32

POINT II    THE COURT HAS SUBJECT-MATTER
JURISDICTION OVER THIS ACTION ...............................................................34

POINT III   DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION .................37

A.   Plaintiffs' Limited Burden of Proof.........................................................38

B.   The Standards for Determining Jurisdiction.............................................38

C.   Defendants' Contacts Are Sufficient To Establish Jurisdiction ...............42

a.   ImageSat ........................................................................46

i.   Investment Solicitation Activities.........................................46

ii.  Board Meetings................................................................48

iii. Negotiating and Entering Into Agreements ........................50

b.   The ImageSat Directors and Officers .............................................52

c.   Yehoshua Eldar................................................................58

d.   The Elbit Defendants .....................................................59

D.   The Court's Exercise of Personal Jurisdiction
Comports with Due Process........................................................................61

POINT IV    PLAINTIFFS HAVE STANDING TO ASSERT THEIR CLAIMS
UNDER NETHERLANDS ANTILLES LAW OR OTHERWISE......................63

A.   Netherlands Antilles Law Authorizes the Claims.....................................63

B.   Netherlands Antilles Law Need Not Govern the Claims..........................66

C.   Applying Netherlands Antilles Law as
Construed by Defendants Would Inequitably
Leave Plaintiffs Without Any Meaningful Remedy ..................................72

POINT V     THE PLAINTIFFS WHO HOLD STOCK OPTIONS
AND BRIDGE WARRANTS HAVE STANDING TO SUE ...............................75

POINT VI      IAI'S SOVEREIGN IMMUNITY AND
              COMITY DEFENSES ARE MERITLESS ........................................................78

      A.      Defendants IAI and Eldar Are Not Immune From Suit........................78

      B.      IAI's "Comity" Argument Does Not Warrant Dismissal .........................84

POINT VII     DEFENDANT ELBIT IS A PROPER PARTY.................................................86

POINT VIII    NONE OF PLAINTIFFS' CLAIMS ARE TIME-BARRED ...............................87

      A.      The First Claim for Relief Is Timely .......................................................88

      B.      The Seventeenth and Eighteenth Claims for Relief Are Timely ..............89

POINT IX      PLAINTIFFS' RICO CLAIMS ARE SOUND ..............................................93

      A.      Plaintiffs Have Standing To Sue Under RICO .........................................93

      B.      Plaintiffs Have Sufficiently Pleaded a Pattern of Racketeering ...............97

              1.    Plaintiffs Have Alleged a Sufficient Series of Predicate Acts.......98

              2.    Defendants' Predicate Acts Were Continuous and Related.........102

                    (a)    Defendants' Predicate Acts
                           Establish Closed-Ended Continuity .................................103

                    (b)    Defendants' Predicate Acts
                           Establish Open-Ended Continuity....................................103

POINT X       PLAINTIFFS' FRAUD, BREACH OF FIDUCIARY DUTY,
              AND RICO CLAIMS SATISFY RULES 9(b) AND 8(a)....................................104

POINT XI      PLAINTIFFS' REMAINING CLAIMS
              ARE PROPERLY PLEADED ....................................................................110

      A.      Breach of Contract ..................................................................................110

      B.      Fraudulent Conveyance ...........................................................................112

      C.      Disgorgement..........................................................................................114

      D.      Conversion ..............................................................................................114

      E.      Unjust Enrichment and Restitution..........................................................115

POINT XII    THE COMPLAINT STATES A CLAIM
             AGAINST DEFENDANT DePALMA ..............................................................117

POINT XIII   IF THE COURT FINDS ANY ASPECT OF
             THE COMPLAINT DEFICIENT, PLAINTIFFS
             SHOULD BE GRANTED LEAVE TO REPLEAD...........................................118

CONCLUSION.................................................................................................................120

TABLE OF AUTHORITIES

<u>Cases</u>                                                                            <u>Page</u>

<u>1414 APF, LLC v. Deer Stags, Inc.,</u>
39 A.D.3d 329, 834 N.Y.S.2d 133 (1st Dep't 2007) ...................................................90

<u>196 Owners Corp. v. Hampton Mgmt. Co.,</u>
227 A.D.2d 296, 642 N.Y.S.2d 316 (1st Dep't 1996) .................................................88

<u>Accordia Northeast, Inc. v. Thesseus International Asset Fund, N.V.,</u>
205 F. Supp. 2d 176 (S.D.N.Y. 2002)........................................................................23

<u>In re Adelphia Comm. Corp. Sec. & Derivative Litig.,</u>
398 F. Supp. 2d 244 (S.D.N.Y. 2005).......................................................................108

<u>Adena, Inc. v. Cohn,</u>
162 F. Supp. 2d 351 (E.D. Pa. 2001) .........................................................................96

<u>Advisor Ltd. v. Daewoo Engineering & Construction Co.,</u>
375 F. Supp. 2d 257 (S.D.N.Y. 2005).........................................................................22

<u>Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,</u>
98 F.3d 25 (2d Cir. 1996)................................................................................ 43-44, 54

<u>Ahles v. Aztec Enter., Inc.,</u>
120 A.D.2d 903, 502 N.Y.S.2d 821 (3d Dep't 1986) ...............................................115

<u>Ainbinder v. Potter,</u>
282 F. Supp. 2d 180 (S.D.N.Y. 2003).........................................................................50

<u>Allied Bank International v. Banco Credito Agricola de Cartago,</u>
757 F.2d 516 (2d Cir. 1985)........................................................................................86

<u>In re Alstom Sec. Litig.,</u>
406 F. Supp. 2d 433 (S.D.N.Y. 2005).......................................................................108

<u>American Dredging Co., v. Miller,</u>
510 U.S. 443 (1994)....................................................................................................11

<u>American Home Assurance Co. v. Insurance Corp. of Ireland Ltd.,</u>
603 F. Supp. 636 (S.D.N.Y. 1984) .............................................................................31

<u>Anderson v. Lowery,</u>
667 F. Supp. 105 (S.D.N.Y.1987) ............................................................................105

Anglo-American Insurance Group v. Calfed, Inc.,
940 F. Supp. 554 (S.D.N.Y. 1996) ............................................................................17, 29

Asahi Metal Industry Co. v. Superior Court,
480 U.S. 102 (1987) ..................................................................................................62

Baena v. Woori Bank,
515 F. Supp. 2d 414 (S.D.N.Y. 2007) ..........................................................................106

Baisch v. Gallina,
346 F.3d 366 (2d Cir. 2003) ........................................................................................93

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
902 F.2d 194 (2d Cir. 1990) ........................................................................................38

Bandes v. Harlow & Jones, Inc.,
852 F.2d 661 (2d Cir. 1988) ........................................................................................85

Bankers Trust Co. v. Rhoades,
859 F.2d 1096 (2d Cir. 1988) ......................................................................................94

Bano v. Union Carbide Corp.,
361 F.3d 696 (2d Cir. 2004) ........................................................................................91

Bansbach v. Zinn,
1 N.Y.3d 1, 769 N.Y.S.2d 175 (2003) ..........................................................................71

Barr v. Wackman,
36 N.Y.2d 371, 368 N.Y.S.2d 497 (1975) ....................................................................71

Beatie & Osborn LLP v. Patriot Scientific Corp.,
431 F. Supp. 2d 367 (S.D.N.Y. 2006) ....................................................................52, 53

Beck v. Prupis,
162 F.3d 1090 (11th Cir. 1998) ....................................................................................95

Bell v. Leakas,
No. 90 Civ. 7981 (LMM), 1993 WL 77320 (S.D.N.Y. 1993) ........................................77

Benigno v. Flatley,
No. 01 CV 2158, 2001 WL 1132211 (E.D.Pa. Sept.13, 2001) ......................................115

Beth Israel Medical Center v. Smith,
576 F. Supp. 1061 (S.D.N.Y. 1983) ............................................................................102

Bildstein v. MasterCard International, Inc.,
2005 WL 1324972 (S.D.N.Y. June 6, 2005) ................................................................116

Bischoff v. Boar's Head Provisions Co.,
38 A.D.3d 440, 834 N.Y.S.2d 22 (1st Dep't 2007) ...................................................111

Bd. of Educ. v. Thompson Const. Corp.,
111 A.D.2d 497, 488 N.Y.S.2d 880 (3d Dep't 1985) ..................................................88

Bodner v. Banque Paribas,
114 F. Supp. 2d 117 (E.D.N.Y. 2000) .........................................................................22

Broida v. Bancroft,
103 A.D.2d 88, 478 N.Y.S.2d 333 (2d Dep't 1984) ...............................................68-69

BRS Assocsiates, L.P. v. Dansker,
246 B.R. 755 (S.D.N.Y. 2000)..........................................................................95, 106

Burger King Corp. v. Rudzewicz,
471 U.S. 462 (1985).........................................................................................50, 62

Burnett v. Physicians' Online, Inc.,
No. 94 CIV. 2731 TPG, 1997 WL 470136 (S.D.N.Y. Aug. 15, 1997).........................104

Cargill International S.A. v. M/T Pavel Dybenko,
991 F.2d 1012 (2d Cir. 1993).............................................................................84-85

Carr v. Equistar Offshore, Ltd.,
No. 94 Civ. 5567, 1995 WL 562178 (S.D.N.Y. Sept. 21, 1995)..................................94

Castro v. Saudi Arabia,
510 F. Supp. 309 (W.D. Tex. 1980)............................................................................83

Catanzano v. Wing,
103 F.3d 223 (2d Cir. 1996)......................................................................................74

Century Federal Savings & Loan Ass'n v. Net Realty Holding Trust,
87 A.D.2d 858, 449 N.Y.S.2d 293 (2d Dep't 1982) ...................................................92

City of New York v. Joseph L. Blakan, Inc.,
656 F. Supp. 536 (E.D.N.Y. 1987) ...................................................................101, 102

Clarendon Nat'l Ins. Co. v. Lan,
152 F. Supp. 2d 506 (S.D.N.Y. 2001)..........................................................................51

Cofacredit, S.A. v. Windsor Plumbing Supply Co.,
187 F.3d 229 (2d Cir. 1999).....................................................................97, 103, 104

Commercial Property Investments, Inc. v. Quality Inns Int'l, Inc.,
61 F.3d 639 (8th Cir. 1995) ....................................................................................106

Consolidated Risk Services, Inc. v. Automobile Dealers WC Self Ins. Trust,
No. 06 Civ. 871, 2007 WL 951565 (N.D.N.Y. Mar. 27, 2007)..............................114, 115

Cooper, Robertson & Partners, LLP v. Vail,
143 F. Supp. 2d 367 (S.D.N.Y. 2001)...........................................................................44

Cosmos Forms Ltd. v. Guardian Life Insurance Co. of America,
113 F.3d 308 (2d Cir. 1997)..............................................................................102, 103

Courtroom Television Network v. Focus Media, Inc.,
264 A.D.2d 351, 695 N.Y.S.2d 17 (1st Dep't 1999)....................................................53

Crawford & Sons, Ltd. Profit Sharing Plan v. Besser,
216 F.R.D. 228 (E.D.N.Y. 2003)..................................................................................98

Credit & Finance Corp. Ltd. v. Warner & Swasey Co.,
638 F.2d 563 (2d Cir. 1981)................................................................................101-102

CutCo Indus., Inc. v. Naughton,
806 F.2d 361 (2d Cir. 1986).................................................................................39-40

Cybertech Communications Corp. v. Quad Int'l, Inc.,
262 A.D.2d 44, 691 N.Y.S.2d 460 (1st Dep't 1999) ..............................................49, 50

Dalton v. Educational Testing Serv.,
87 N.Y.2d 384, 639 N.Y.S.2d 977 (1995) ...................................................................77

D'Angelo v. Amtrak Railways,
No. 03 Civ. 2560, 2004 WL 2049262 (S.D.N.Y. Sept. 13, 2004)...............................29

Daventree Ltd. v. Republic of Azerbaijan,
349 F. Supp. 2d 736 (S.D.N.Y. 2004)...............................................................40-41, 81

Davis v. Davis,
95 A.D.2d 674, 463 N.Y.S.2d 462 (1st Dep't 1983) ...................................................90

Day's Inn of Am. v. L.A., Inc.,
No. 97 Civ. 5476, 1998 WL 765182 (S.D.N.Y. Nov. 3, 1998) ...................................50

DeFalco v. Bernas,
244 F.3d 286 (2d Cir. 2001)...............................................................................103, 104

Denny v. Barber,
576 F.2d 465, 469 (2d Cir.1978)................................................................................105

Deutsche Bank Securities, Inc. v. Montana Board of Investments,
21 A.D.3d 90, 797 N.Y.S.2d 439 (1st Dep't 2005) .....................................................42

Do Rosario Veiga v. World Meteorological Organization,
486 F. Supp. 2d 297 (S.D.N.Y. 2007).................................................................33

Drenis v. Haligiannis,
452 F. Supp. 2d 418 (S.D.N.Y. 2006)........................................................68, 113

EBC I, Inc. v. Goldman Sachs & Co.,
5 N.Y.3d 11, 799 N.Y.S.2d 170 (2005).............................................................77

Eckert International, Inc. v. Government of the Sovereign Democratic Republic of Fiji,
32 F.3d 77 (4th Cir. 1994).................................................................................84

Eclaire Advisor Ltd. v. Daewoo Engineering & Construction Co.,
375 F. Supp. 2d 257 (S.D.N.Y. 2005)..........................................................22, 32

In re Emex Corp. Sec. Litig.,
No. 01 Civ. 4886, 2002 WL 31093612 (S.D.N.Y. Sept. 18, 2002)...................108-109

Entel v. Guilden,
223 F. Supp. 129 (S.D.N.Y. 1963).....................................................................76

Envirocon, Inc. v. Alcoa, Inc.,
No. 06 Civ. 0549, 2006 WL 2460640 (N.D.N.Y. Aug.23, 2006)..............................115

Fagan v. First Security Investments, Inc.,
No. 04 Civ. 1021, 2006 WL 2671044 (S.D.N.Y. Sept. 15, 2006).............................119

Farber v. Zenith Laboratories, Inc.,
777 F. Supp. 244 (S.D.N.Y. 1991)................................................................38, 43

Federal Deposit Insurance Corporation v. Five Star Management, Inc.,
258 A.D.2d 15, 692 N.Y.S.2d 69 (1st Dep't 1999)..............................................90

First Union National Bank v. Paribas,
135 F. Supp. 2d 443 (S.D.N.Y. 2001)................................................................34

Fischbarg v. Doucet,
9 N.Y.3d 375, 2007 WL 4438979 (Dec. 20, 2007)........................................53, 54

Foman v. Davis,
371 U.S. 178 (1962)........................................................................................119

Friedar v. Government of Israel,
614 F. Supp. 395 (S.D.N.Y. 1985)....................................................................83

Georgiadis v. First Boston Corp.,
No. 90 Civ. 7672, 1994 WL 392229 (S.D.N.Y. July 24, 1994).............................22-23

GICC Capital Corp. v. Technology Finance Group, Inc.,
67 F.3d 463 (2d Cir. 1995)................................................................102, 103, 104

Gilstrap v. Radianz Ltd.,
443 F. Supp. 2d 474 (S.D.N.Y. 2006).........................................................77

GLM Corp. v. Klein,
684 F. Supp. 1242 (S.D.N.Y. 1988)...........................................................102

Golden Pacific Bancorp v. F.D.I.C.,
273 F.3d 509 (2d Cir. 2001).......................................................................88

Grace v. Corn Exchange Bank Trust,
287 N.Y. 94 (1941) ...........................................................................115-116

Greenspun v. Lindley,
36 N.Y.2d 473, 369 N.Y.S.2d 123 (1975) ...................................................67

Gross v. British Broadcasting Corp.,
386 F.3d 224 (2d Cir. 2004).......................................................................26

In re Gucci,
309 B.R. 679 (S.D.N.Y. 2004)....................................................................85

Guidi v. Inter-Continental Hotels Corp.,
224 F.3d 142 (2d Cir. 2000)...................................................................12-13

Gulf Oil Corp. v. Gilbert,
330 U.S. 501 (1947)............................................................................11, 28

Gunter v. Ridgewood Energy Corp.,
32 F. Supp. 2d 166 (D.N.J. 1998).............................................................96

Haggiag v. Brown,
728 F .Supp. 286 (S.D.N.Y. 1990) .............................................................95

Hallinan v. Republic Bank & Trust Co.,
519 F. Supp. 2d 340 (S.D.N.Y. 2007)......................................................113

Hanil Bank v. PT Bank Negara Indonesia (Persero),
148 F.3d 127 (2d Cir. 1998).................................................................79, 81

Henderson v. Metropolitan Bank & Trust Co.,
494 F. Supp. 2d 294 (S.D.N.Y. 2006),
reconsideration granted, 502 F. Supp. 2d 502 (S.D.N.Y. 2007)..................33

Herbstein v. Bruetman,
768 F. Supp. 79 (S.D.N.Y. 1991) .........................................................38, 39

Hilton v. Guyot,
159 U.S. 113 (1895)................................................................................85

H.J. Inc. v. Northwestern Bell Tel. Co.,
492 U.S. 229 (1989)..............................................................97, 101, 102, 103

Holmes v. Securities Investor Protection Corp.,
503 U.S. 258 (1992)................................................................................96

Hudson v. Hermann Pfauter GmbH & Co.,
117 F.R.D. 33 (N.D.N.Y. 1987).................................................................29

Hughes v. BCI Int'l Holdings, Inc.,
452 F. Supp. 2d 290 (S.D.N.Y. 2006).........................................................48

Ideal Steel Supply Corp. v. Anza,
373 F.3d 251 (2d Cir. 2004).....................................................................93

Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,
157 F.3d 933 (2d Cir. 1998).....................................................................92

Information Resources, Inc. v. Dun & Bradstreet Corp.,
260 F. Supp. 2d 659 (S.D.N.Y. 2003).........................................................96

In re Initial Public Offering Secs. Litig.,
241 F. Supp. 2d 281 (S.D.N.Y. 2003).......................................................106

International Customs Assocs., Inc. v. Ford Motor Co.,
893 F. Supp. 1251 (S.D.N.Y. 1995).........................................................115

International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC,
470 F. Supp. 2d 345 (S.D.N.Y. 2007).........................................................39

International Shoe Co. v. Washington,
326 U.S. 310 (1945).......................................................................40-41, 61

Ionescu v. E.F. Hutton & Co. (France) S.A.,
465 F. Supp. 139 (S.D.N.Y. 1979).............................................................34

Iragorri v. United Technologies Corp.,
274 F.3d 65 (2d Cir. 2001)................................................................. passim

IUE AFL-CIO Pension Fund v. Hermann,
9 F.3d 1049 (2d Cir. 1993).......................................................................39

Jordan (Bermuda) Investment Co., Ltd. v. Hunter Green Investments, Ltd.,
154 F. Supp. 2d 682 (S.D.N.Y. 2001)................................................ 103-104

Joseph v. Office of the Consulate General of Nigeria,
830 F.2d 1018 (9th Cir. 1987) .................................................................84

Jota v. Texaco Inc.,
157 F.3d 153 (2d Cir. 1998)....................................................................85

Jurban v. Musikahn,
673 F. Supp. 108 (E.D.N.Y.1987) .........................................................105

J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,
37 N.Y.2d 220, 371 N.Y.S.2d 892 (1975) ...............................................31

Kelly v. MD Buyline, Inc.,
2 F. Supp. 2d 420 (S.D.N.Y. 1998) ...................................................42, 62

Kingdom 5-KR-41, Ltd v. Star Cruises PLC,
No. 01 Civ. 2946, 2002 WL 432390 (S.D.N.Y. Mar. 20, 2002) ..............117

Klaxon Co. v. Stentor Elec. Mfg. Corp.,
313 U.S. 487 (1941).................................................................................67

Koster v. Lumbermens Mutual Cas. Co.,
330 U.S. 518 (1947).................................................................................14

Kreutter v. McFadden Oil Corp.,
71 N.Y.2d 460, 527 N.Y.S.2d 195 (1988) ..........................................43, 52

L-3 Communications Corp. v. SafeNet, Inc.,
45 A.D.3d 1, 841 N.Y.S.2d 82 (1st Dep't 2007) ....................................50

L & R Exploration Venture v. Grynberg,
22 A.D.3d 221, 804 N.Y.S.2d 286 (1st Dep't 2005) ...........................47-48

In re LaBranche Sec. Litig.,
405 F. Supp. 2d 333 (S.D.N.Y. 2005)....................................................108

Lafarge Canada, Inc. v. Bank of China,
No. 00 Civ. 0261 (LMM), 2000 WL 1457012 (S.D.N.Y. Sept. 29, 2000)...................84

Laker Airways, Ltd. v. Sabena, Belgian World Airlines,
731 F.3d 909 (D.C. Cir. 1984)................................................................85

LaMarca v. Pak-Mor Manufacturing Co.,
95 N.Y.2d 210, 713 N.Y.S.2d 304 (2000) .....................................45, 46, 62

Lasala v. Lloyds TSB Bank PLC,
514 F. Supp. 2d 447 (S.D.N.Y. 2007)...............................................33-34

Laufer v. Ostrow,
55 N.Y.2d 305, 449 N.Y.S.2d 456 (1982) ............................................................62

Lazard Freres & Co. v. Protective Life Ins. Co.,
108 F.3d 1531 (2d Cir. 1997)................................................................................92

LC Capital Partners v. Frontier Ins. Group,
318 F.3d 148 (2d Cir. 1993)........................................................................ 110-111

Leasco Data Processing Equip. Corp. v. Maxwell,
468 F.2d 1326 (2d Cir. 1972)................................................................................38

Leonhard v. United States,
633 F.2d 599 (2d Cir. 1980)..................................................................................89

Lerner v. Fleet Bank, N.A.,
318 F.3d 113 (2d Cir. 2003)...............................................................36, 93, 109

Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah,
184 F. Supp. 2d 277 (S.D.N.Y. 2001) ....................................................... 78, 82-83

Liberty Mutual Ins. Comp. v. Blesinger,
No. 06 CV 391, 2007 WL 951905 (E.D.N.Y. Mar. 27, 2007) ...................................108

Lippe v. Bairnco Corp.
230 B.R. 906 (S.D.N.Y. 1999)..............................................................................114

Local 875 I.B.T. Pension Fund v. Pollack,
992 F. Supp. 545 (E.D.N.Y. 1998) .......................................................................101

Louros v. Cyr,
175 F. Supp. 2d 497 (S.D.N.Y. 2001).....................................................................40

Lovely H. v. Eggleston,
No. 05 CIV 6920, 2006 WL 3333084 (S.D.N.Y. Nov 16, 2006) ............................119

Madanes v. Madanes,
981 F. Supp. 241 (S.D.N.Y. 1997) .........................................................................39

Maiz v. Virani,
253 F.3d 641 (11th Cir. 2001) ...............................................................................95

Manu International, S.A. v. Avon Products, Inc.,
641 F.2d 62 (2d Cir. 1981)....................................................................................32

Marlowe v. Argentine Naval Commission,
604 F. Supp. 703 (D. D.C. 1985)...........................................................................84

Marx v. Akers,
88 N.Y.2d 189, 644 N.Y.S.2d 121 (1996) ...................................................................71

Massaquoi v. Virgin Atlantic Airways,
945 F. Supp. 58 (S.D.N.Y. 1996) ........................................................................29, 32

Mauro v. Southern New England Telecommunications, Inc.,
208 F.3d 384 (2d Cir. 2000)....................................................................................36

Mayatextil, S.A. v. Liztex U.S.A., Inc.,
No. 92 Civ. 4528, 1995 WL 131774 (S.D.N.Y. Mar. 23, 1995) .........................38, 117

McGee v. Int'l Life Ins. Co.,
355 U.S. 220 (1957)....................................................................................................54

Michael v. Clark Equipment Company,
380 F.2d 351 (2d Cir.1967)......................................................................................105

Miller v. Calotychos,
303 F. Supp. 2d 420 (S.D.N.Y. 2004)........................................................................29

Miltland Raleigh-Durham v. Myers,
807 F. Supp. 1025 (S.D.N.Y. 1992)...................................................................99-100

Ministry of Supply, Cairo v. Universe Tankships, Inc.,
708 F.2d 80 (2d Cir. 1983).........................................................................................78

Moneygram Payment Systems, Inc. v. Consorcio Oriental, S.A.,
No. 05 Civ 10773, 2007 WL 1489806 (S.D.N.Y. May 21, 2007)................................53

Moses v. Martin,
360 F. Supp. 2d 533 (S.D.N.Y. 2004).......................................................................99

Muspole v. South African Airways (Pty.) Limited,
172 F. Supp. 2d 443 (S.D.N.Y. 2001).......................................................................85

Nasso v. Seagal,
263 F. Supp. 2d 596 (E.D.N.Y. 2003) .......................................................................47

National Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco P.L.C.,
No. 03 Civ. 0200, 2003 WL 21180421 (S.D.N.Y. May 20, 2003)..........................28-29

National Union Fire Ins. Co. of Pittsburgh, PA v. Mason, Perrin & Kanovsky,
689 F. Supp. 303 (S.D.N.Y. 1988) ............................................................................45

Neufeld v. Neufeld,
910 F. Supp. 977 (S.D.N.Y. 1996) ............................................................................89

Niagara Mohawk Power Corp. v. Freed,
265 A.D.2d 938, 696 N.Y.S.2d 600 (4th Dep't 1999) ................................................116

Norlin Corp. v. Rooney, Pace Inc.,
744 F.2d 255 (2d Cir. 1984)..................................................................67, 68, 72

O'Connor & Associates v. Dean Witter Reynolds, Inc.,
529 F. Supp. 1179 (S.D.N.Y. 1981)..............................................................77

Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.,
No. 00 Civ. 8688 (WHP), 2002 WL 362794 (S.D.N.Y. March 6, 2002) ....................................104

Optics Laboratories Corp. v. Savannah Bank of Nigeria, Ltd.,
816 F. Supp. 898 (S.D.N.Y. 1993) ........................................................ 85-86

OSRecovery, Inc. v. One Groupe Int'l., Inc.,
354 F. Supp. 2d 357 (S.D.N.Y. 2005)............................................................120

Palace Exploration Co. v. Petroleum Development Co.,
41 F. Supp. 2d 427 (S.D.N.Y. 1998)..............................................................46

Parke-Bernet Galleries, Inc. v. Franklyn,
26 N.Y.2d 13, 308 N.Y.S.2d 337 (1970) ............................................................54

Parra v. Greenpoint Mort. Co.,
No. 01 Civ. 2010, 2002 WL 32442231 (E.D.N.Y. Mar. 26, 2002) ............................................114

Pension Committee of University of Montreal Pension Plan
v. Banc of America Securities, LLC,
446 F. Supp. 2d 163 (S.D.N.Y. 2006).............................................................68

Piper Aircraft Co. v. Reyno,
454 U.S. 235 (1981)..........................................................................11

In re Polaroid ERISA Litig.,
362 F. Supp. 2d 461 (S.D.N.Y. 2005)...........................................................104

Pravin Banker Associates, Ltd. v. Banco Popular Del Peru,
109 F.3d 850 (2d Cir. 1997).................................................................85, 86

PT United Can Co. Ltd. v. Crown, Cork & Seal Co., Inc.,
138 F.3d 65 (2d Cir. 1998)....................................................................39

Rabin v. MONY Life Ins. Co.,
No. 06 Civ. 775, 2007 WL 737474 (S.D.N.Y. Mar. 8, 2007) ......................................77

Rahl v. Bande,
328 B.R. 407 (S.D.N.Y. 2005)..............................................................30-31

Reeves v. Phillips,
54 A.D.2d 854, 388 N.Y.S.2d 294 (1st Dep't 1976) ........................................................39

Regency Capital, LLC v. Corpfinance Int'l, Inc.,
No. 02 Civ. 5615, 2003 WL 22400200 (S.D.N.Y. Oct. 20, 2003) ........................... 55-56

Reiss v. Societe Centrale Du Groupe Des Assurances Nationales,
235 F.3d 738 (2d Cir. 2000)...........................................................................................79

Republic of Argentina v. Weltover, Inc.,
504 U.S. 607 (1992).................................................................................................79, 82

Retail Software Services, Inc. v. Lashlee,
854 F.2d 18 (2d Cir. 1988)............................................................................................41

Reynolds Corp. v. Nat'l Operator Services, Inc.,
73 F. Supp. 2d 299 (W.D.N.Y. 1999)............................................................................53

R. Maganlal & Co. v. M.G. Chemical Co., Inc.,
942 F.2d 164 (2d Cir. 1991)..........................................................................................11

Robinson v. City of New York,
24 A.D.2d 260, 265 N.Y.S.2d 566 (1st Dep't 1965) .....................................................92

Rosner v. Bank of China,
No. 06 Civ. 13562 (VM), 2007 WL 4468654 (S.D.N.Y. Dec. 19, 2007) ......................79

Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc.,
466 F.3d 88 (2d Cir. 2006)............................................................................................85

Sadat v. Mertes,
615 F.2d 1176 (7th Cir. 1981) .......................................................................................37

Salinas v. United States, 522 U.S. 52 (1997)..................................................................100

SAS Group, Inc. v. Worldwide Inventions, Inc.,
245 F. Supp. 2d 543, (S.D.N.Y. 2003)..........................................................................51

Saminsky v. Occidental Petroleum Corp.,
373 F. Supp. 257 (S.D.N.Y. 1974) ...............................................................................30

Saudi Arabia v. Nelson,
507 U.S. 349 (1993)......................................................................................................83

Schmuck v. United States,
489 U.S. 705 (1989)......................................................................................................99

Schonfeld v. Hilliard,
62 F. Supp. 2d 1062 (S.D.N.Y. 1999),
rev'd on other grounds, 218 F.3d 164 (2d Cir. 2000) ................................................ 68-69

Schur v. Porter,
712 F. Supp. 1140 (S.D.N.Y. 1989)....................................................................44

Schwab v. Philip Morris USA, Inc.,
449 F. Supp. 2d 992 (E.D.N.Y. 2006) .................................................................74

Scotts Co. v. Rhone-Poulenc, S.A.,
347 F. Supp. 2d 543 (S.D. Ohio 2004) ................................................................37

Sears Petroleum & Transport Corp. v. Ice Ban America, Inc.,
No. 99 Civ. 704, 2004 WL 834849 (N.D.N.Y Apr. 15, 2004) ...................................106

Sedima, S.P.R.L. v. Imrex Co.,
473 U.S. 479 (1985)......................................................................................97

Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,
No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005)..........................119

Seybold v. Groenink,
No. 06 Civ. 772, 2007 WL 737502 (S.D.N.Y. Mar. 12, 2007) .....................................67

Simcuski v. Saeli,
44 N.Y.2d 442, 406 N.Y.S.2d 259 (1978) .............................................................92

SKS Constructors, Inc. v. Drinkwine,
458 F. Supp. 2d 68 (E.D.N.Y. 2006) .................................................................104

Spitzer v. Schussel,
7 Misc. 3d 171, 792 N.Y.S.2d 798 (Sup. Ct. N.Y. Cty. 2005) .....................................89

Starkman v. Warner Communications, Inc.,
671 F. Supp. 297 (S.D.N.Y. 1987) ....................................................................77

Steele v. Anderson,
No. 03-CV-1251, 2004 WL 45527 (N.D.N.Y. Jan. 8, 2004)...........................................88

Stephens v. National Distillers & Chem. Corp.,
No. 91 Civ. 2901, No. 91 Civ. 2902, 1996 WL 271789 (S.D.N.Y. May 21, 1996) ...................67

In re Sumitomo Copper Litig.,
120 F. Supp. 2d 328 (S.D.N.Y. 2000)..................................................................40

Sun Forest Corp. v. Shvili,
152 F. Supp. 2d 367 (S.D.N.Y. 2001)..................................................................47

<u>Sussman v. Bank of Israel</u>,
801 F. Supp. 1068 (S.D.N.Y. 1992),
<u>aff'd per curiam</u>, 990 F.2d 71 (2d Cir. 1993)................................................................34

<u>Talarico v. Thomas Crimmins Contracting Co.</u>,
No 94 Civ. 0420 (RPP), 1997 WL 30940 (S.D.N.Y. Jan. 27, 1997)......................................91-92

<u>Tango Music, LLC v. DeadQuick Music, Inc.</u>,
348 F.3d 244 (7th Cir. 2003) ......................................................................36-37

<u>Texas Trading & Milling Corp. v. Federal Republic of Nigeria</u>,
647 F.2d 300 (2d Cir. 1981)......................................................................78

<u>This Is Me, Inc. v. Taylor</u>,
157 F.3d 139 (2d Cir. 1998)......................................................................112

<u>Traver v. Officine Meccaniche Toschi SPA</u>,
233 F. Supp. 2d 404 (N.D.N.Y. 2002)......................................................21, 29

<u>Triangle Underwriters, Inc. v. Honeywell, Inc.</u>,
604 F.2d 737 (2d Cir. 1979)......................................................................91

<u>Union Mutual Life Insurance Company v. Simon</u>,
22 F.R.D. 186, 187 (E.D.Pa.1958)......................................................................105

<u>United Mine Workers v. Gibbs</u>,
383 U.S. 715 (1966)......................................................................35

<u>United States v. Autouori</u>,
212 F.3d 105 (2d Cir. 2000)......................................................................98

<u>United States v. Gleb</u>,
783 F. Supp. 748 (E.D.N.Y.1991)......................................................................105

<u>United States v. Indelicato</u>,
865 F.2d 1370 (2d Cir. 1989)......................................................................101

<u>United States v. Miller</u>,
116 F.3d 641 (2d Cir. 1997)......................................................................98

<u>United States v. Trapillo</u>,
130 F.3d 547 (2d Cir. 1997)......................................................................98

<u>United States Fidelity & Guar. Co. v. Braspetro Oil Services Co.</u>,
199 F.3d 94, 98 (2d Cir. 1999)......................................................................79

<u>United States Fidelity & Guar. Co. v Petroleo Brasileiro S.A.–Petrobras</u>,
No. 98 Civ. 3099 (JGK), 1999 WL 307642 (S.D.N.Y. May 17, 1999)......................................79, 81

.

Walco Investments, Inc. v. Thenen,
947 F. Supp. 491 (S.D. Fla. 1996) ...............................................................96

Waldorf Assoc. v. Neville,
141 Misc.2d 150, 533 N.Y.S.2d 182 (Sup. Ct. N.Y. Co. 1988) .......................44

Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,
712 F. Supp. 383 (S.D.N.Y. 1989) ................................................................29

Wasserstein Perella Emerging Markets Finance, LP v. Province of Formosa,
No. 97 Civ. 793 (BSJ), 2000 WL 573231 (S.D.N.Y. May 11, 2000).............83

Westchester Religious Inst. v. Kamerman,
262 A.D.2d 131, 691 N.Y.S.2d 502 (1st Dep't 1999) ....................................88

Weltover, Inc. v. Republic of Argentina,
753 F. Supp. 1201 (S.D.N.Y. 1991), aff'd, 941 F.2d 145 (2d Cir. 1991),
cert. granted, 502 U.S. 1024 (1992), aff'd, 504 U.S. 607 (1992) ............31-32

Wiwa v. Royal Dutch Petroleum Co.,
226 F.3d 88 (2d Cir. 2000)......................................................................13, 31

World Wide Volkswagen Corp. v. Woodson,
444 U.S. 286 (1979)................................................................................50, 62

Yatter v. William Morris Agency, Inc.,
268 A.D.2d 335, 702 N.Y.S.2d 243 (1st Dep't 2000) ....................................91

Zuckerwise v. Sorceron Inc.,
289 A.D.2d 114, 735 N.Y.S.2d 100 (1st Dep't 2001) ....................................77

## **Statutes and Rules**                                                          **Page**

18 U.S.C. § 1341.....................................................................................98

18 U.S.C. § 1343.....................................................................................98

18 U.S.C. § 1961.....................................................................................98

18 U.S.C. § 1962(c)................................................................................97

18 U.S.C. § 1962(d)..............................................................................100

18 U.S.C. § 1964(c)..........................................................................35, 93

28 U.S.C. § 1331.....................................................................................35

28 U.S.C. § 1332 ................................................................................................36

28 U.S.C. § 1367 ...........................................................................................35, 36

28 U.S.C. § 1603 ................................................................................................82

28 U.S.C. § 1605 ...........................................................................................79, 84

28 U.S.C. § 1658 ..............................................................................................110

28 U.S.C. § 1781 ................................................................................................29

CPLR § 203(g) ...................................................................................................91

CPLR § 213(8) ...................................................................................................91

CPLR § 301 .......................................................................................................43

CPLR § 302 ..................................................................................................42, 43

CPLR § 302(a) ............................................................................................ *passim*

Fed. R. Civ. P. 8 ................................................................................101, 104, 105

Fed. R. Civ. P. 9(b) .................................................................................... *passim*

Fed. R. Civ. P. 12(b) .....................................................................................38, 97

Fed. R. Civ. P. 15(a) .....................................................................................38, 97

Fed. R. Civ. P. 23.1 ...........................................................................................71

N.Y. Bus. Corp. L. § 626 ..................................................................................71

New York Debtor and Creditor Law § 270 ......................................................113

N.Y. Debtor & Creditor Law § 275 ................................................................113

N.Y. Debtor & Creditor Law § 276 ................................................................113

N.Y. Gen. Oblig. L. § 5-1402 .....................................................................50, 72

**Other Sources**                                                                    **Page**

H.R. Report 94-1487, 1976 U.S.C.C.A.N. 6604 (1976)....................................................84

McKinney's Consolidated Laws of New York Annotated,
CPLR § 302, Practice Commentary C302:1 ............................................................41

McKinney's Consolidated Laws of New York Annotated,
CPLR § 302, Practice Commentary C302:4 ................................................... 39-40, 43

Restatement (Second) of Conflict of Laws, § 145 cmt. (i) (1971) ...............................72

Restatement (Second) of Conflict of Laws, § 186 cmt. (c) (1971)...............................72

Restatement (Second) of Conflict of Laws, § 302 cmt. (k) (1971)...............................72

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

STEPHEN M. WILSON, et al.,                    :        07 Civ. 6176 (LTS)(DFE)

                              Plaintiffs,     :        ECF CASE

             -against-                        :

IMAGESAT INTERNATIONAL N.V., et al.,          :

                              Defendants.     :

-------------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

Plaintiffs respectfully submit this memorandum of law in opposition to the motions of all

Defendants to dismiss the Complaint in this action.[1]  For the reasons set forth herein, and in the

accompanying Declarations and exhibits, the motions to dismiss should be denied in all respects.

Plaintiffs request oral argument on these motions.  Plaintiffs are also prepared to proceed to

an evidentiary hearing on the issues of *forum non conveniens*, jurisdiction, foreign law, or other

threshold issues if such a hearing would assist the Court in its determinations.

**PRELIMINARY STATEMENT**

This is an action by 15 minority shareholders and security holders of Defendant ImageSat

International N.V ("ImageSat" or the "Company"), a Netherlands Antilles (Curacao) company that is

---

[1]     All Defendants have moved to dismiss all claims, submitting a total of six memoranda of law totaling 149 pages.
All but one of the Defendants have joined in a joint memorandum of law addressing issues allegedly common to such
defendants, including *forum non conveniens*, subject-matter jurisdiction, and standing.  In addition, separate motions and
memoranda have been filed by (i) Defendant ImageSat, (ii) the "ImageSat D&O Defendants", (iii) Defendants IAI and
Yehoshua Eldar, (iv) the "Elbit Defendants", and (v) Defendant DePalma.  Because many of the facts and legal
arguments relating to the various motions to dismiss overlap substantially, and in the interest of party and judicial
economy, Plaintiffs are submitting this single memorandum and set of accompanying Declarations and exhibits in
response to all Defendants' motions.

now headquartered in Israel but was substantially funded through investments solicited in New York from United States investors. The Plaintiffs include five members of ImageSat's founding management team together with individuals and companies who invested in the Company after being solicited in New York during ImageSat's period of highest risk and greatest capital needs. A majority of the Plaintiffs are either United States residents or are entities that are wholly or majority owned by United States residents. The Defendants include ImageSat; ImageSat's two largest industrial shareholders, Israel Aerospace Industries, Ltd. ("IAI") and Elbit Systems Ltd. ("Elbit"); and 13 of the corporate Defendants' present and former directors and officers. The individual Defendants serve or served as members of the ImageSat Board of Directors and some of them as senior ImageSat officers, almost all by designation of IAI and Elbit, which are and since 1999 have been the Company's majority and controlling shareholders.

ImageSat's principal business is the sale of rights, under Satellite Operating Partner ("SOP") agreements, for customer governments to enjoy the exclusive regional use of ImageSat's two "EROS" high-resolution earth observation satellites. Although IAI and Elbit are the industrial suppliers of the two satellites that are the Company's major assets, as well as the Company's controlling shareholders, it was understood from the outset, and specifically represented to investors including Plaintiffs, that ImageSat would be run for the proportional benefit of all its security holders, including Plaintiffs. It was agreed that ImageSat would operate as an autonomous, apolitical commercial entity, with business interests entirely separate and distinct, and at arm's length from, those of IAI and Elbit. Contractual arrangements were entered into and promises made in New York and elsewhere, to protect the minority shareholders' rights and to guarantee the commitments made to Plaintiffs at the time of their investments.

2

Plaintiffs' Complaint, filed July 2, 2007, is a detailed one and sets forth at length how Defendants have, time after time, broken their promises to Plaintiffs, breached their fiduciary duties, and destroyed the business of ImageSat. Defendants have, among other things, blocked and interfered with ImageSat's ability to enter into various lucrative transactions, either to curry political and economic favor in Israel or with Israel's preferred export partners, and/or because IAI (an Israeli government-owned company) and Elbit sought to usurp ImageSat's business opportunities for themselves.

In one extreme example of fraud and breach of duty that commenced in 2001 and continues to this day, IAI (and its satellite payload subcontractor Elbit) billed ImageSat for, and collected, tens of millions of dollars for work on a satellite referred to in the Complaint as the "2001 EROS B" or "EROS C" satellite,[2] although even a functional satellite design meeting the Company's requirements was never completed. The Complaint alleges that most of the individual Defendants knew at the time the purchase contract was signed that the satellite design was deficient, that the deficiencies were never corrected, and that no such satellite ever advanced to a material stage of construction, nor even to the Preliminary Design Review (PDR) that is the first step in the performance of any satellite manufacturing contract. In 2005, Ernst & Young in New York required its Israeli affiliate and the Company to revalue this asset, reducing its stated value by $30 million in the Company's audited financial statements prior to their submission to the U.S. Securities and Exchange Commission of the Company's F-1 Confidential Registration Statement in September

[2]    Unable to obtain delivery of, or even view the Work in Progress on, the 2001 EROS B, and facing the imminent loss of two of the Company's four SOP customers for failure to launch a higher-performance second-generation satellite, which would constitute a breach of contract by ImageSat, the Company changed the name of the 2001 EROS B to EROS C, and ordered a less sophisticated satellite, referred to in the Complaint as the "2004 EROS B," to fill the gap. The use of the same name for the original 2001 satellite and the new, substantially less capable 2004 satellite was purposely misleading, as the Company's Investor Reports characterized EROS B as "on schedule" (first for a late 2003 or early 2004 launch, and subsequently for a late 2005 delivery or early 2006 launch) without any explanation that these reports referred to two completely different satellites and satellite contracts.

2005.  Although the Company's Board of Directors resolved to write off the entire remaining $34 million in asset value in May 2006 and to perform a contract audit, no such audit was ever performed.  The now renamed "EROS C" contract remains in effect, though no work has been performed on this satellite.  Moreover, the contract was misused as a basis for the wrongful termination by IAI and Elbit of certain "exclusive commercialization" rights in mid-2007, and is an element of yet another satellite procurement negotiation and monetary termination demand by IAI and Elbit of additional tens of millions of dollars, currently underway.  All of the individual Defendants either were active participants in the original wrongdoing or were, at a minimum, knowledgeable of the problem, did nothing to stop it, and participated in the sustained cover-up that continues today.

Defendants have also purposely damaged Plaintiffs by facilitating IAI's and Elbit's intentional breaches of a series of contracts that were intended to and explicitly did establish ImageSat as the "exclusive vehicle" for the commercialization of Israeli military earth observation satellite technology.  Defendants entered into seven such agreements in order to induce Plaintiffs to invest in the commercialization of the then nearly defunct Israeli military space program so as to allow the program to continue.  For example, in an agreement entered into in New York in 2000, in conjunction with a combined $91 million investment closing, IAI agreed to provide ImageSat with exclusivity rights, non-compete rights, and rights of first refusal with respect to the commercialization of present IAI (Israeli military) earth observation satellite technology, and all future derivatives thereof.  IAI has breached this agreement by, among other things, entering into an agreement in 2007 with a United States company, Northrop Grumman Corp., to commercialize its new synthetic aperture radar (SAR) earth observation satellites in a transaction that in its initial phase is anticipated to result in revenues to IAI of up to $1.6 billion. The Defendants, individually and

collectively, did not fulfill their obligations under the Master Agreement between ImageSat and IAI requiring that IAI first propose to ImageSat the commercialization of the new SAR payload and derivative integrated TECSAR satellite prior to proposing such commercialization to others (in this case, both Northrop Grumman and Lockheed Martin) and indeed they ignored the demands of then ImageSat CEO Menashe Broder that they do so and instead fired Mr. Broder. Defendants have done nothing to protect the rights of Plaintiffs as minority shareholders and security holders of ImageSat, with respect to this and the many other matters that are cited in the Complaint and will be thoroughly elaborated through merits discovery.

The effect of Defendants' conduct has been to strip hundreds of millions of dollars of shareholder value from ImageSat. Significantly, however, Defendants' misconduct does not affect all of ImageSat's security holders equally. Defendants, including IAI, Elbit, and ImageSat functionaries whose first loyalty was to their IAI and Elbit sponsors, all have directly benefited themselves by such actions as overbilling ImageSat tens of millions of dollars for satellites and services, in one instance collecting $34 million in cash and 9% compounding securities for a satellite that was never substantially started; by usurping ImageSat's most valuable corporate opportunities; and by refusing to pursue lucrative SOP opportunities for conflicted, self-interested, and in some instances non-commercial reasons rather than in the proportional business interests of ImageSat's security holders. Once the earth-observation satellite technology was flight-proven and adequately financed, IAI and Elbit, instead of allowing ImageSat to thrive for the benefit of *all* its shareholders and security holders, have developed and pursued their own independently competitive commercialization strategies. Since 2000, they have purposely shifted the vast majority of the value of their now-well-established earth-observation satellite technology from ImageSat's creative and financial sponsors to themselves. It is only ImageSat's disenfranchised minority shareholders and

security holders, such as Plaintiffs, who have suffered economic loss as a result and must be regarded as the targeted victims of Defendants' misconduct.

In their motions to dismiss, Defendants take the implausible position that every claim against every Defendant in the entire Complaint is procedurally deficient and must be dismissed. In a joint memorandum of law filed on behalf all but one of the Defendants, Defendants first contend that the action should be dismissed under the doctrine of *forum non conveniens*. Defendants' position is that this Court is not an appropriate forum for the litigation and that any litigation should take place in Israel. To support this argument, Defendants suggest that few Plaintiffs have an affiliation with the forum they have chosen – completely disregarding the fact that a majority of the Plaintiffs are either United States citizens and residents or are companies owned by United States persons. Accordingly, Plaintiffs are entitled to deference to their choice of a United States, and specifically a New York, forum in which their grievances against Defendants should be resolved. In view of the deference due to Plaintiffs' legitimate choice of this forum, the robust connections between this litigation and the United States and State of New York – including, among many other things, that most of the Plaintiffs were induced to invest in ImageSat as a result of meetings and presentations that the company and its New York advisors made in New York; that many of the Defendants repeatedly visited New York for the purpose of inducing Plaintiffs and others to make such investments and thereafter on other ImageSat business; that key ImageSat Board meetings at which acts and omissions at issue in the Complaint took place were held in New York, that the corporate Defendants engage in regular business activity in New York and the individual Defendants regularly travel here; and that the key contracts under which ImageSat is governed to this day contain New York choice-of-law and/or choice-of-forum provisions – provide ample basis for this action to proceed in this Court. The Court should also consider, among the other private interest and public interest factors to

be weighed on a *forum non conveniens* analysis, the convenience of non-party witnesses identified by Plaintiffs, a majority of whom are located in the United States. The claim of *forum non conveniens* should be denied.

Defendants' joint memorandum next contends that the Court lacks subject-matter jurisdiction over this action. This contention fails because Plaintiffs' claims for relief include two claims brought under the federal Racketeering Influenced Corrupt Organizations (RICO) statute. Plaintiffs would stress that their decision to assert RICO claims against Defendants was not made lightly, but only after Plaintiffs concluded, with reluctance, that Defendants' wrongful conduct was so persistent and pervasive as to amount to a pattern of racketeering activity condemned by the statute. The Court enjoys "federal question" jurisdiction over the RICO claims as well as supplemental jurisdiction over the remaining claims, which arise out of the same nucleus of operative fact as the RICO claims.

Also without merit is Defendants' argument that the action should be dismissed because Plaintiffs lack standing to pursue it under the law of the Netherlands Antilles. Most of the Defendants do not even attempt to deny that if judged by ordinary corporate and fiduciary standards, they owe fiduciary duties to ImageSat's minority shareholders, and that the Complaint states a claim for breach of such duties. Instead, they argue that because ImageSat is incorporated in the Netherlands Antilles, Plaintiffs are without remedies. However, as set forth in the accompanying Declarations of Plaintiffs' Netherlands Antilles and Netherlands law experts, Netherlands Antilles law does embody norms of care owed to minority shareholders and that under appropriate circumstances, Netherlands Antilles law authorizes shareholders to pursue direct actions against corporate directors and officers, controlling shareholders, and the corporation itself. Moreover, even assuming *arguendo* that Netherlands Antilles law would bar the courthouse door to Plaintiffs, New York choice-of-law principles do not, as Defendants would have it, inexorably point to the

Netherlands Antilles as the sole source of the governing law in this case. The facts and transactions underlying this matter have far more connection with the United States and with Israel than they do with the Netherlands Antilles, which is the jurisdiction where ImageSat formally reincorporated in 2000 but which has no other meaningful ties of any kind to the parties or the litigation. Under a choice-of-law interest analysis, the claims would be governed by the law of New York or Israel, either of which would grant Plaintiffs the right to pursue litigation against the Defendants.

Defendants' efforts to avoid accountability for their persistent and varied pattern of misconduct continue through a *potpourri* of other procedural arguments presented by the Defendants both jointly and separately. They contend that those of the Plaintiffs who hold only ImageSat stock options or bridge warrants, rather than common stock, lack standing to pursue a claim. Defendants thus effectively suggest that they were entitled to take millions of dollars of the bridge investors' money and then do not even owe these investors a duty to operate the Company with a view toward making a profit. This is not the law, particularly where the bridge warrants were terminated prematurely as the result of a drafting error that ImageSat has inequitably refused to correct. Defendants further contend that Plaintiffs have failed to plead the "pattern of racketeering activity" required to sustain the RICO claims, although Plaintiffs have enumerated a series of schemes and dozens of misuses of the U.S. mails and wires in support of those schemes over a period of at least seven years. Defendant IAI claims that as an Israeli government-owned company, it enjoys sovereign immunity from suit, even though the "commercial activity" exception to the Foreign Sovereign Immunities Act self-evidently denies immunity on claims arising from IAI's participation as a shareholder of and supplier to a for-profit business.

In the Defendants' separate briefs, most Defendants also move to dismiss the action for lack of *in personam* jurisdiction over them. These motions should also be denied based on robust

evidence that the Defendants engaged in purposeful activity in or directed toward New York in connection with the financing and operation of ImageSat, relating directly to the claims asserted in the Complaint.

Many Defendants argue that the Complaint is insufficiently pleaded under Fed. R. Civ. P. 9(b). The Complaint in this action contains 87 pages of *factual* detail in addition to the 22 claims for relief. This is not mere boilerplate recitation of background facts and generalities, as is sometimes found in Complaints that courts criticize as long on rhetoric but short on substance. Rather, this Complaint sets forth in detail the various misdeeds to which Plaintiffs as minority securityholders of ImageSat have been subjected, such as ImageSat's payment to IAI of tens of millions of dollars for the "2001 EROS B1" (later renamed "EROS C") satellite which the Complaint alleges was never built and the diversion in 2007 of a more than one *billion* dollar contract to IAI in breach of contractual commitments to ImageSat on which Plaintiffs relied in agreeing to invest. The detailed allegations are sufficient to satisfy Rule 9(b), as well as Rule 8(a), which certain Defendants, somewhat contradictorily, invoke as well.

For all the reasons set forth in this Memorandum of Law and the accompanying Declarations, Defendants' motions to dismiss the Complaint should be denied in all respects. However, to the extent that the Court were to determine that Plaintiffs' pleading were insufficient as to any claim for relief or as against any Defendant, Plaintiffs request and should be granted leave to replead such allegations.

## FACTUAL BACKGROUND

The complex factual background to this litigation is set forth in the Complaint, to the extent possible in advance of any merits-based discovery. In addition, to respond to Defendants' motions to dismiss on *forum non conveniens*, jurisdictional, and certain other grounds, Plaintiffs submit

herewith a series of Declarations from many of the Plaintiffs and non-party witnesses, as well as documentary evidence.[3]

In view of the number of legal arguments to be responded to herein and to minimize the reading burden on the Court, Plaintiffs respectfully incorporate the recitations of fact set forth in the Complaint and in the accompanying Declarations rather than set them forth here again at length, with citation to the most relevant facts provided in each of the respective legal arguments below.

## ARGUMENT

## POINT I

### THIS COURT REPRESENTS THE APPROPRIATE FORUM FOR THIS LITIGATION AND DISMISSAL UNDER THE DOCTRINE OF *FORUM NON CONVENIENS* IS NOT WARRANTED

All Defendants, with the exception of Defendant James DePalma (a U.S. citizen and resident of Connecticut), have moved to dismiss this action under the doctrine of *forum non conveniens*, claiming that the matter should be litigated in an Israeli court rather than in this Court.[4]  Defendants have failed to carry their heavy burden in seeking dismissal on *forum non conveniens* grounds.

---

[3]      Specifically, submitted herewith are the Declarations of Plaintiffs Stephen Wilson (for himself and Plaintiff BRW Engineering Limited), Natalia Hercot a/k/a Natalia Steiner (Plaintiff WIS Partners, L.P.), Moshe Bar-Lev, Patrick Rosenbaum, Michael Morris, Haim Yifrah, Robert Miller (Plaintiff Top Down Partners, LLC), Dr. Joel Levine, Morris Talansky, Abraham Moshel, and Philip Siller (for Plaintiffs Albert Reichmann, Hexagram & Co., and Polybutes Company), Yoram Ginach (for Intervenor Plaintiff Harbinger International Holdings S.A., and non-parties Menashe Broder, Andrew Plevin, and Steven Wacaster (Pegasus Capital Advisors).  Also submitted are the Declarations of Plaintiffs' foreign law and legal system experts, Professor Frank B.M. Kunneman (Netherlands Antilles), Professor Geert Raaijmakers (Netherlands), and Advocate Joseph Tamir (Israel), as well as the transmittal Declaration of Ira Brad Matetsky, Esq. submitting copies of documentary evidence as well as excerpts from the transcripts of the jurisdictional-discovery depositions of Jacob Weiss, Moshe Keret, and Hagai Goren (Matetsky Decl. Ex. "P", "Q", "R").

[4]      In a footnote, Defendants suggest in passing that Curacao, Netherlands Antilles could also be a more convenient forum in which to litigate this dispute, because it is ImageSat's place of incorporation.  As discussed below, however, other than furnishing the piece of paper reflecting ImageSat's formal situs of incorporation, ImageSat and the parties have no connections of any kind with the Netherlands Antilles and it could not possibly represent a more "convenient" forum for litigation of this case for either the Plaintiffs or the Defendants.  (See *infra* pp. 69-70) Defendants' suggestion, even in passing, that litigation of this case should be relegated to Curacao, reflects their desperation to avoid being held accountable for their misconduct in the United States where a majority of the Plaintiffs are located and where Plaintiffs were solicited to invest and made their investments, together with well over 95% of the initial $100 million of development stage capital was invested, in ImageSat.

A.    **The Applicable Standards**

In analyzing a motion to dismiss for *forum non conveniens*, a federal court begins with a strong presumption in favor of the plaintiffs' choice of forum. <u>See</u> Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981); <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508 (1947). As the Supreme Court has held, "the plaintiff's choice of forum should rarely be disturbed." <u>Gulf Oil</u>, 330 U.S. at 508. Overturning that choice requires a showing that "the balance of convenience tilts *strongly* in favor of trial in the foreign forum." <u>R. Maganlal & Co. v. M.G. Chemical Co., Inc.</u>, 942 F.2d 164, 167 (2d Cir. 1991) (emphasis added; citations omitted). In other words, Defendants must demonstrate that trial in Plaintiffs' "chosen forum would 'establish . . . oppressiveness and vexation to a defendant. . . out of all proportion to plaintiff's convenience.'" <u>American Dredging Co. v. Miller</u>, 510 U.S. 443, 447-48 (1994).

Courts in this Circuit follow a three-step process in deciding whether a plaintiff's chosen forum is convenient. <u>See</u> Iragorri v. United Technologies Corp., 274 F.3d 65 (2d Cir. 2001) (en banc). First, the court must determine the degree of deference to which the plaintiffs' choice of forum is entitled, based on considerations such as plaintiffs' residence and whether they have selected the forum for legitimate reasons of convenience. <u>Id</u>. at 71. Second, the court considers whether an appropriate alternate forum exists in which the case could be litigated. <u>Id</u>. at 73. Third, the court balances relevant "private and public interest factors" to determine if plaintiffs' chosen forum is convenient. <u>Id</u>. at 73-74. Here, the record establishes that Plaintiffs' forum choice is a permissible one and that, even assuming that an Israeli court could provide a minimally adequate

forum for this litigation,[5] this Court is a sufficiently convenient (and indeed a far superior) forum such that the Plaintiffs' forum choice should be respected and the motions to dismiss denied.

**B.     Plaintiffs' Choice of This Court as the Forum**
**Is Entitled to a Full Measure of Deference**

In Iragorri, the Second Circuit recognized that, in general, a plaintiff's choice of forum is entitled to great deference when the plaintiff has sued in its home forum. By contrast, the choice of a United States forum by foreign plaintiffs may be entitled to less deference. Iragorri, 274 F.3d at 71. These considerations, the court said, can be viewed as applications of a broader principle under which the degree of deference to be accorded to a plaintiff's choice of forum is evaluated on a sliding scale depending on the degree of convenience reflected by plaintiffs' choice in a given case. As the *en banc* Second Circuit explained:

> Based on the Supreme Court's guidance, our understanding of how courts should address the degree of deference to be given to a plaintiff's choice of a U.S. forum is essentially as follows: The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice.

Id. at 71-72. Here, Plaintiffs' choice is entitled to full deference.

**1.     This Court Is Plaintiffs' Home Forum**

This Court represents the Plaintiffs' "home forum" for purposes of the *forum non conveniens* analysis. The Second Circuit has held that "in a *forum non conveniens* case involving a foreign court, 'the "home forum" for the plaintiff is *any federal district in the United States*, not the particular district where the plaintiff lives.'" Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142,

---

[5]     Defendants contend that Israel is an "appropriate alternate forum" for Plaintiffs to bring their claims against Defendants. Plaintiffs acknowledge that this and other Courts have recognized that Israel has a functioning court system and have upheld transfers to that jurisdiction. However, while an Israeli court might be considered an "adequate" forum for this litigation, for the reasons discussed elsewhere in this section, Plaintiffs would suffer serious handicaps should they be required to re-file this suit in Israel, such that Israel is not the appropriate forum for the case where this Court is available as an alternative.

146 n.4 (2d Cir. 2000) (emphasis added; citation omitted).  Accord Iragorri, 274 F.3d at 73 ("It is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district."); Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 102 (2d Cir. 2000) ("During the last two decades, our caselaw and that of the Supreme Court has clearly and unambiguously established that courts should offer greater deference to the selection of a U.S. forum by U.S. resident plaintiffs when evaluating a motion to dismiss for *forum non conveniens*.") .

This rule applies even where only some, but not all, of the plaintiffs are residents of the United States.  Thus, in Wiwa, the Second Circuit faulted the District Court for failing to accord sufficient deference to plaintiffs who brought suit in a judicial district where none of them resided, because two of the four plaintiffs were residents of the United States.  In the Second Circuit's words, "[t]he district court weighed against the plaintiffs that none of them were residents of the Southern District of New York but did not count in favor of their choice of a U.S. forum that two of them were residents of the United States.  This was error."  Wiwa, 226 F.3d at 103.

In our case, Plaintiffs' choice of forum is entitled to maximal deference.  Two of the Plaintiffs, Morris Talansky and Abraham Moshel, are citizens of the United States and residents of New York.  (Cplt. ¶¶ 33-34; Talansky Decl. ¶ 2; Moshel Decl. ¶ 2; Wilson Decl. ¶ 7)  Three other Plaintiffs, Stephen Wilson, Michael Morris, and Dr. Joel Levine, are citizens and residents of the United States, though of states other than New York.  (Cplt. ¶¶ 24, 29, 32; Wilson Decl. ¶ 7; Morris Decl. ¶ 3; Levine Decl. ¶ 2)  A sixth Plaintiff, Top Down Partners LLC, is a United States entity solely owned by a U.S. resident.  (Cplt. ¶ 31; Miller Decl. ¶¶ 1-2)  Thus, no fewer than six of the Plaintiffs are U.S. residents whose choice of a U.S. forum is entitled to full deference under Second Circuit law.

13

Moreover, at least two more of the Plaintiffs should also be regarded as United States residents for *forum non conveniens* purposes. Plaintiff WIS Partners L.P. – which has the largest economic stake in this litigation out of any of the Plaintiffs (see Cplt. ¶¶ 26) – is nominally a Bermuda entity. However, WIS Partners is 78% beneficially owned by The Fairchild Corporation, a United States corporation with offices in New York and Virginia that is traded on the New York Stock Exchange. (Hercot Decl. ¶ 3) The convenient forum for this Plaintiff to litigate is the Southern District of New York. (Id. ¶¶ 19-20) Plaintiff BRW Engineering, though incorporated in the Cayman Islands, is wholly owned by Plaintiff Wilson, who as noted is a United States resident. (Cplt. ¶¶ 24-25; Wilson Decl. ¶ 2, 7)

"In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown." Koster v. Lumbermens Mutual Cas. Co., 330 U.S. 518, 524 (1947). Here, as the Southern District of New York is considered a "home" forum for several Plaintiffs, the Court should accord full deference to Plaintiffs' selection of this Court as the location of this litigation.

### 2. Plaintiffs' Choice of Forum was Motivated by Genuine Considerations of Convenience

"[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult if will be for the defendant to gain dismissal for *forum non conveniens*." Iragorri, 274 F.3d at 72. Here, not only is Plaintiffs' forum choice entitled to maximal deference because many of the Plaintiffs are suing in their home country, but the record reflects that Plaintiffs collectively (including both the United States and non-United States resident Plaintiffs) have chosen an entirely convenient and legitimate forum to adjudicate this dispute.

The Second Circuit's <u>Iragorri</u> decision identifies a series of factors for courts to consider as part of their analysis as to the degree of deference to accord a plaintiff's choice of forum, including (1) "the convenience of the plaintiff's residence in relation to the chosen forum;" (2) "the availability of witnesses or evidence to the forum district;" (3) "the defendant's amenability to suit in the forum district;" (4) "the availability of appropriate legal assistance;" and, (5) "other reasons relating to convenience or expense." <u>Iragorri</u>, 274 F.3d at 72. Here, all of these factors weigh in favor of this action's proceeding in the Southern District of New York.

### (a)    The Southern District of New York is the Most Geographically Convenient Forum for the Plaintiffs

Simply based upon geographical considerations, New York is a substantially more convenient forum from Plaintiffs' point of view than is Israel. As discussed above, of the 15 Plaintiffs in this action, two are residents of New York, and four more are residents of the United States although outside New York (one in Puerto Rico, one in Florida/Massachusetts, one in California, and one in Nevada/California). Two more Plaintiffs, though nominally incorporated offshore (in Bermuda and the Cayman Islands) are wholly or majority owned by United States persons and have submitted Declarations explaining with specificity that their business is conducted from within the United States. (<u>See</u> <u>supra</u> p. 13) Plainly, it is more convenient for each of these Plaintiffs to litigate in a United States court than in Israel.

Three more of the Plaintiffs are located in Canada or Bermuda. One is a natural person who is a resident of Toronto, less than two hours by air from New York, who travels to New York periodically. The second is a Canadian corporation headquartered in Toronto whose principals are Canadian, and the third is a Bermuda company whose principals regularly travel to Toronto and New

15

York. (Cplt. ¶¶ 36-38; Siller Decl. ¶¶ 4-6; Wilson Decl. ¶ 8) The convenience of these Plaintiffs, too, is best served by litigating in New York rather than in Israel. (Siller Decl. ¶ 11)

Three of the four remaining Plaintiffs are citizens of Israel, but they travel to the Western Hemisphere frequently, including to New York. One of them currently works for a United States consulting firm and operates out of its New York office frequently. (Rosenbaum Decl. ¶¶ 2, 8) Another has attested that he also spends significant time in the Western Hemisphere. (Bar-Lev Decl. ¶ 8) The third, who has close family members in Toronto, travels worldwide on business and is presently working on a consulting engagement in South America. (Yifrah Decl. ¶¶ 2, 9) Each of these Plaintiffs has attested that from his point of view, it is convenient for them to litigate this matter in this Court, particularly as the other Plaintiffs would be doing so with or without them. (Rosenbaum Decl. ¶ 8; Bar-Lev Decl. ¶ 8; Yifrah Decl. ¶ 9)

Considering the Plaintiffs collectively and individually, it is clear that their choice of the Southern District of New York was motivated by genuine considerations of convenience – in addition to all the other considerations addressed below – and is entitled to respect.

### (b)    Witnesses and Evidence Are Readily Available in this District

Contrary to the assertions of the Defendants, both witnesses and evidence are readily available in this District. With respect to witnesses, the party witnesses would all be available to testify in the United States. For Plaintiffs' part, all the Plaintiffs are either located in the United States, have representatives in the United States who would testify in the United States, or visit the United States frequently. All these witnesses will be available in this District for any and all required proceedings, including trial.

Defendants, too, would have no trouble traveling to New York to provide testimony as needed and to participate in the defense of the litigation. Although many of the Defendants are

residents of or based in Israel, they still are available to participate in this litigation in New York. The fact that some Defendants might have to travel to the place of trial is not a sufficient reason to overcome the deference due Plaintiffs in choosing their home forum for this litigation. See, e.g., Anglo-American Insurance Group v. Calfed, Inc., 940 F. Supp. 554, 564 (S.D.N.Y. 1996) ("The development of worldwide travel . . . means that mere distance alone is not a sufficient basis on which to conclude that a forum is inconvenient.").

Any legitimate dispute that New York is a convenient forum to which Defendants and their witnesses can travel is eliminated when one considers that for years, ImageSat held more meetings of its Board of Directors in New York than in any other location. At his recent deposition on the jurisdictional and *forum non conveniens* issues, Defendant Moshe Keret, who was Chairman of ImageSat from 2000 to 2005 and CEO of IAI from 1985 to 2005, testified as follows:

> [Q.]   Where were ImageSat board meetings held?
> [A.]   In different places.
> Q.     Did the company receive advice at some point that the meetings should not be held in Israel?
> A.     Yes.
> Q.     Were some of the meetings held in New York?
> A.     Some meetings were made in New York.
> Q.     Did you attend meetings in New York?
> A.     Yes.
> Q.     *Do you know why New York was chosen?*
> A.     *It was for convenience.*
> Q.     *New York is a convenient place to travel to?*
> A.     *Yes.*
> Q.     Is it fair to say that some of the company's advisers were located in New York?
> A.     Say again.
> Q.     Some of the company's advisors were located in New York?
> A.     *Convenient for all the parties.*

(Keret Dep. 16-17 (emphasis added) (Matetsky Decl. Ex. "Q")) Hagai Goren, ImageSat's CFO and corporate Secretary since 2004, confirmed that Board meetings have been routinely held in New

17

York and all of ImageSat's directors and others invited to the meetings are able to attend. (Goren Dep. 24-25)

The fact is that undisputedly, the individual Defendants and high-ranking officials of the corporate Defendants travel to New York on a regular basis quite apart from this lawsuit, and have done so for many years. For example, ImageSat and its corporate predecessors have conducted a substantial array of business activities in New York continuously since 1994, when the enterprise that ultimately became ImageSat was formed as a Joint Venture between Core Software Technology ("CST"), a United States company, and IAI. As longtime ImageSat Chairman (and IAI CEO) acknowledged, "that was the purpose of the joint venture, to raise money" for the commercialization of Israeli military space technology. (Keret Dep. 37) And "it is natural" that the Company sought to raise the funds primarily in the United States, and specifically in New York, because the United States "is a natural market for money." (Keret Dep. 42) ImageSat's CFO agreed that the U.S. was "the most suitable" place for ImageSat's attempts to raise capital. (Goren Dep. 37-40)

As discussed at length in the accompanying Declarations (see, e.g., Wilson Decl. ¶¶ 12-47; Hercot Decl. ¶¶ 5-14; Levine Decl. ¶ 5; Miller Decl. ¶ 5; Morris Decl. ¶¶ 4-10; Talansky Decl. ¶¶ 3-8; Moshel Decl. ¶¶ 4-7; Siller Decl. ¶¶ 7-8; Bar-Lev Decl. ¶¶ 4-5; Rosenbaum Decl. ¶¶ 4-5; Yifrah Decl. ¶¶ 7-8; Ginach Decl. ¶¶ 4-10; Plevin Decl. ¶¶ 17-20), between 1995 and 2000 representatives of ImageSat made hundreds of investor presentations in New York, and solicited millions of dollars in investments in ImageSat from dozens of potential investors, including many of the Plaintiffs. In New York, ImageSat engaged legal counsel (including Milbank, Tweed, Hadley & McCloy, which continues to represent the Company today), investment bankers, and other professional advisors in New York. (Wilson Decl. ¶¶ 39-44; Morris Decl. ¶¶ 10-12) During this period, from 1999 to 2001, West Indian Space/ImageSat operated an office in Norwalk, Connecticut (New York metropolitan

area) staffed by the Company's then CEO, Plaintiff Michael Morris. (Wilson Decl. ¶ 39; Morris

Decl. ¶¶ 5-6)

These efforts resulted in investments such as the investment of $4.6 million by Plaintiff WIS

Partners in 1999 and the investment of more than $91 million by investors affilated with New York-

and Connecticut-based Pegasus Capital Advisors ("Pegasus") and others in 2000, in transactions that

closed in New York, New York attended by at least six individual parties to this action. (See, e.g.,

Wilson Decl. ¶¶ 46-47; Hercot Decl. ¶ 15; Weiss Dep. 134-37)  Thereafter, from 2000 to 2007,

ImageSat held more than a dozen of its Board of Directors meetings and Board committee meetings

in New York.  At least ten of these meetings were full Board meetings, attended by all of the

Company's directors, senior managers, and professional advisors located in the United States, Israel,

and elsewhere. (See Matetsky Decl. Ex. "L", "M")[6]  ImageSat also engaged in protracted efforts to

conduct an initial public offering (IPO) in New York, including dozens of meetings attended by the

Company's directors, officers, counsel, and investment bankers. (Cplt ¶¶ 152-174; Broder Decl. ¶¶

6-7)  ImageSat secured advice from New York attorneys, investment bankers, and auditors in

connection with the proposed IPO, which was a focus of the ImageSat senior management team's

efforts for years, intensifying in 2004 and 2005. (Id.)  Among other things, the New York office of

---

[6]        Exhibit "L" is a listing, prepared by counsel for ImageSat, of ImageSat's Board and Committee meetings
including the attendees and where they took place. Exhibit "M" is a set of meeting minutes for the Board and Committee
meetings that have taken place in New York, also produced by ImageSat, which although heavily redacted list the topics
discussed at each meeting as well as the attendees and location of each. Significantly, most of the individual Defendants'
own Declarations acknowledge that they regularly travel to New York for ImageSat Board meetings and other ImageSat
or IAI or Elbit business. (See Eckhaus Decl. ¶ 13 (about 20 visits to the U.S. in the past five years, including eight
ImageSat Board meetings); Arzi Decl. ¶ 14 (three Board meetings in New York since becoming ImageSat's Chairman in
2006; Chelouche Decl. ¶ 13 (two to three visits to New York annually, including three ImageSat Board meetings since
joining the Board in 2006); Piperno-Beer Decl. ¶ 12 (seven visits to New York since 2002, including five in 2006-2007
to attend Board meetings); Keret Am. Decl. ¶ 13 (three to four visits to New York per year, including attendance at five
board meetings); Ackerman Decl. ¶ 4 (one to two trips to New York annually on Elbit business); Federmann Decl. ¶ 4
(two to five trips to New York per year); Gaspar Decl. ¶ 4 (approximately five trips to New York for ImageSat Board
meetings since joining the Board in 2005; the Elbit Defendants' Answers to Interrogatories actually indicate that Gaspar
has attended eight meetings in New York).

Ernst & Young reviewed ImageSat's entire financial statements for the past three years and required several changes to them, including the write-off of the "2001 EROS B1" satellite asset, to prepare the financial statements for submission to the SEC. (See, e.g., Goren Dep. 92-93, 112-14, 120-23) After the IPO was suddenly terminated in November 2005, ImageSat representatives attended meetings in New York in 2006 concerning a restructuring of ImageSat. (Wacaster Decl. ¶ 6) Professional advice on these transactions was obtained in the United States as well.

ImageSat has engaged and continues to be actively engaged in marketing satellite products and services to U.S. customers which in the aggregate represent the vast majority of the global market for such goods and services, and currently to at least two potential customers within the United States, including the largest individual customer for such goods and services in the world, the U.S. National Geospatial Intelligence Agency (NGA). (Goren Dep. 154-60) In the words of ImageSat's CFO, "the company is very keen and wants to get some kind of contracts from the United States entities or customers. And there were all kinds of meetings, either directly or indirectly that were done with officials, entities, or others" in this connection. (Goren Dep. 155) If ImageSat and its directors and officers can and do engage in all this regular activity in the United States, and can seek to avail themselves of the American capital markets time and again, they can defend a litigation here.

IAI and Elbit are also multinational corporations with substantial presence in the United States. For example, IAI, while claiming that the Southern District of New York is not a "convenient" forum for this litigation, has substantial operations in the United States. These include the offices of a wholly owned subsidiary located in Washington, D.C., through which IAI contracts hundreds of millions of dollars of business with the United States Government annually. (Keret Dep. 13-15; Weiss Dep. 27-31; Wilson Decl. ¶ 65; Rosenbaum Decl. ¶ 5; Bar-Lev Decl. ¶ 5; Broder Decl.

¶ 8) Indeed, of IAI's approximately $2 billion in gross revenue in 2005, some $700 million was earned from sales in the United States. (Keret Dep. 15-16) IAI until recently also maintained an office in New York, New York to support its U.S. government-contracting activities and which was the principal place of business of its U.S. subsidiary. (Weiss Dep. 27-31; Keret Dep. 13-15; Wilson Decl. ¶ 65; Rosenbaum Decl. ¶ 5; Bar-Lev Decl. ¶ 5) Additionally, IAI operates a New York-based subsidiary known as Empire Aero Center located in Rome, New York, of which ImageSat's Chairman, Defendant David Arzi, is Chairman of the Board. (Wilson Decl. ¶ 65; Arzi Decl. ¶ 13) IAI's directors and corporate officers frequently travel to the United States and elsewhere around the world. For example, IAI representatives attended meetings New York in 2006 for meetings concerning a restructuring of ImageSat's finances. (Wacaster Decl. ¶ 6) It is absurd to suggest that IAI officials or the former senior officials who are named as individual Defendants in this case would be unreasonably inconvenienced by travel to New York or that IAI would have trouble bringing witnesses to testify in New York.

Defendant Elbit is a publicly traded corporation whose shares are traded in the United States on the NASDAQ stock exchange. According to its most recent Form 20-F filed with the U.S. Securities and Exchange Commission, during the year ended December 31, 2006, Elbit enjoyed revenues of $1.523 billion dollars, of which $609.5 million or 40% was derived from United States sources. (Matetsky Decl. Ex. "N" at 96-97) Elbit also reported that in 2006, it had 1,357 employees in the United States. (Id. at 117) It too, can readily bring its witnesses here. (See also Wilson Decl. ¶ 66) "[T]he fact that Defendant[s] [do] business all over the world weighs against finding that [traveling to New York to litigate] would be an undue burden on Defendant[s]." Traver v. Officine Meccaniche Toschi SPA, 233 F. Supp. 2d 404, 416 (N.D.N.Y. 2002).

As for non-party witnesses, the parties' Rule 26(a) mandatory disclosures exchanged earlier in this litigation included lists of the persons then known or believed by each party to have knowledge of material facts relevant to this action. The lists submitted by Defendants were generally *pro forma* and primarily named a few of each corporate Defendant's own employees. Plaintiffs, on the other hand, assembled a substantive list of persons having knowledge of relevant facts underlying this action. (Matetsky Decl. Ex. "O".) In that list, Plaintiffs identified 74 persons (excluding the parties and their employees) having relevant knowledge, representing a starting point for the universe of people who are likely to become non-party witnesses in this case. Of these 74 individuals, more than half (42) are residents of the United States (and several others reside elsewhere in the Western Hemisphere). Each of them is a potentially important witness to disputed evidentiary facts, as typified by the examples detailed in the Wilson Declaration. (See, e.g., Wilson Decl. ¶¶ 58-59) For each of these witnesses, it would clearly be more convenient if they were called to testify in a United States rather than an Israeli or other foreign forum.

The documentary evidence in this case will be at least as readily available in New York as in Israel. The courts have recognized that in this age of overnight couriers and electronic communications, documents can as easily be produced in one forum as another. See, e.g., Eclaire Advisor Ltd. v. Daewoo Engineering & Construction Co., 375 F. Supp. 2d 257, 265 (S.D.N.Y. 2005) ("In this day and age of rapid transportation and instant communication, the convenience of immediate physical proximity to documents, testimony, and other proof has become of less consequence to a *forum non conveniens* analysis."); Bodner v. Banque Paribas, 114 F. Supp. 2d 117, 133 (E.D.N.Y. 2000) ("The costs involved to defendants in defending this action in New York are significantly mitigated by the time-and money-saving tools including e-mail, fax, scanners, digital photography, and global access to the internet."); Georgiadis v. First Boston Corp., No. 90 Civ.

7672, 1994 WL 392229, at *3 (S.D.N.Y. July 24, 1994) ("documents can. . . .easily be transferred from one forum to another."). Moreover, to the extent that Plaintiffs' documents are in the United States while Defendants' documents are in Israel, "moving the litigation overseas would simply shift to plaintiff[s] the very costs that defendants seek to avoid." <u>Accordia Northeast, Inc. v. Thesseus International Asset Fund, N.V.</u>, 205 F. Supp. 2d 176, 180 (S.D.N.Y. 2002). This would be particularly inequitable as Defendants are far more readily able to absorb such costs than Plaintiffs.[7]

Defendants also contend that many documents relevant to this litigation are in Hebrew and that English is not the primary language of some individual Defendants and therefore this litigation should take place in Israel rather than in New York. In fact, the SOP contract between the Company and the Israeli Ministry of Defense (IMOD) and the IMOD's licensing and policy representations to ImageSat's shareholders of July 2000 are in English, as are all the contracts among the Plaintiffs and Defendants (except for one side agreement between IAI and Elbit's predecessor ElOp), thousands of e-mail messages, and the vast majority of the other relevant documents. All of the Plaintiffs, Defendants, and non-party witnesses named in Plaintiffs' mandatory disclosures speak English, reflecting that English is the international language of the aerospace business. (See Wilson Decl. ¶ 55, and note that all of the individual Defendants signed English-language Declarations) The number of documents that would have to be translated from Hebrew to English if the case is heard in New York is relatively small and is outweighed by the hundreds of thousands of pages that would have to be translated from English to Hebrew if the case were relegated to Israel.[8] Moreover,

---

[7] We also understand that many of ImageSat's files have already been put into electronic format, in English, and are in the possession of ImageSat's counsel in New York in that format.

[8] Litigation in Israeli courts is conducted in Hebrew, and all pleadings, memoranda, and other court filings must be filed in Hebrew. Documentary evidence in English or other languages, as well as the oral testimony of witnesses testifying in English or another language, generally needs to be translated into Hebrew. (Tamir Decl. ¶ 11) Additionally, many Israeli court decisions that counsel might rely on as precedent, such as decisions of the Supreme Court of Israel and the District Courts, are reported in Hebrew, and many the Israeli law reviews and other secondary literature are also in

because most of the Plaintiffs and many of the non-party witnesses do not speak Hebrew (whereas all Plaintiffs, Defendants, and most of the non-party witnesses speak fluent English), any Hebrew-language documents created in connection with legal proceedings in Israel would have to be translated into English to be used with the Plaintiffs or their witnesses in any event.

### (c)    Defendants Are Amenable to Suit in this District

In evaluating Defendants' *forum non conveniens* arguments, the court may also consider whether the Defendants are amenable to suit in this District.   As discussed above, all of the Defendants have participated in ImageSat business in New York and in the United States, sufficient to render them amenable to suit in this Court.   Although many of the Defendants have challenged this Court's *in personam* jurisdiction over them, such challenges are without merit.   (See infra Point III for discussion of Defendants' challenges to personal jurisdiction.)   Moreover, one Defendant in this action, James DePalma, has not disputed this Court's personal jurisdiction over him, but may not be subject to personal jurisdiction in Israel.

### (d)    Legal Assistance Is Available to All Parties in This District

Another significant factor relied upon by courts in evaluating *forum non conveniens* claims is the availability of legal assistance to the parties in the various forums.   Here, Plaintiffs have been represented in this matter for more than one year by New York counsel, who has expended substantial time and effort in becoming familiar with the entire history of ImageSat and the matters addressed in the Complaint.   All this effort on counsel's part would be lost if the case were dismissed in this District and Plaintiffs were compelled to start over again in another country.

---

Hebrew.  Therefore, counsel from the United States or elsewhere, fluent only in English, would be limited in their ability to assist and advice their clients in connection with a litigation in Israel.  By contrast, virtually all business lawyers in Israel are fluent in English.  Thus, if an Israeli defendant sued in the United States wished to have the assistance of counsel in Israel, the Israeli lawyer would be able to participate fully in the defense of the matter.

For the Defendants' part, all of the Defendants have retained major international law firms with offices in New York City to defend their interests in this litigation. In some instances, the law firms chosen by the Defendants have represented their interests with respect to other matters both within the Southern District of New York and elsewhere in the United States. For example, ImageSat and the "ImageSat D&O Defendants" are represented herein by one of New York's leading law firms, Milbank, Tweed, Hadley & McCloy. Peter Nesgos, Esq., a member of that firm, has been ImageSat's counsel in substantially all material matters since 1996, first at Winthrop Stimson and subsequently at Milbank Tweed, and is more familiar with the Company, the history of its business and financing, and the issues in this litigation than any other single individual (Plaintiff, Defendant, or professional) with the possible exceptions of Plaintiff Wilson and Defendant Weiss.

Defendant IAI is represented in this action by not one but *two* of New York's major law firms, Paul, Weiss, Wharton, Rifkind & Garrison LLP and Cohen Tauber Spievack & Wagner LLP (the latter of which has represented IAI for at least seven years, see Weiss Dep. 138). Defendant Elbit, a multinational defense contractor, and four individuals affiliated with it are represented in this action by still another of New York's leading law firms, Greenberg Traurig LLP. Finally, Defendant James DePalma (a resident of Connecticut who does not move for *forum non conveniens* dismissal) is represented by Weil, Gotshal & Manges LLP.

### 3.    Plaintiffs' Choice of Forum Was Not Motivated By Forum-Shopping

As is clear from the above analysis, Plaintiffs' decision to bring this litigation in the Southern District of New York was founded upon legitimate considerations rather than to cause inconvenience or vexation to the Defendants. Contrary to Defendants' conclusory allegation that Plaintiffs have engaged in forum-shopping, factors found to exist in other cases such as "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in

the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum" are not present here. Iragorri, 274 F.3d at 72. Rather, Defendants' motion in this case proves that "defendants as much as plaintiffs may be concerned with litigation tactics or forum shopping rather than convenience, and may move for dismissal under *forum non conveniens* to further those goals." Gross v. British Broadcasting Corp., 386 F.3d 224, 233 (2d Cir. 2004). Accord Iragorri, 274 F.3d, at 75 (courts should "arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum").

Also highly relevant to demonstrate that it is Defendants, rather than Plaintiffs, who are engaged in forum-shopping is the fact that the parties agreed that their relationships would be governed by New York law, and any disputes would be addressed in a New York court, almost from the inception of their relationship. At the first meeting between Plaintiff Stephen Wilson and Defendant Jacob Weiss, representing CST and IAI respectively as the two members of the joint venture that grew into ImageSat, the parties specifically discussed what law would govern the parties' relationship and agreed that it would be New York law. (Wilson Decl. ¶¶ 24-28, 49-53) A series of Joint Venture Agreements and other contracts signed between 1994 and 1998 put the parties' choice of New York law in writing. (See Id.; Matetsky Decl. Ex. "A", "B", "C") In 1999 and 2000, the parties' understandings became even more explicit, as ImageSat, IAI, Elbit, Plaintiff WIS Partners, and intervenor Plaintiff Loyd's/Harbinger entered into a series of contracts providing not only that New York law would govern their construction, but that New York courts would resolve any disputes arising under the contracts and the parties would waive any defense of *forum non conveniens* in any such litigation. (Id.; Matetsky Decl. Ex. "F", "H") For example, a Securityholders Agreement dated July 25, 2000 among ImageSat, IAI, Elbit, Plaintiff WIS Partners,

Loyd's Invest (Aerospace) Ltd. (now intervenor Plaintiff Harbinger International (Holdings), S.A.),

and Pegasus, expressly provides:

> **Section 4.4    Governing Law; Jurisdiction. (a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to principles of conflicts of law.**
>
> **(b)  Each party hereto (other than the Company) hereby irrevocably submits to the exclusive jurisdiction, and the Company hereby submits to the non-exclusive jurisdiction, of the courts of the city of New York, State of New York in any action, suit or proceeding arising in connection with this Agreement, and agrees that any such action, suit or proceeding shall be brought only in such court (and waives any objection based on forum non conveniens or any other objection to venue therein).** Service of process upon any party hereto in any action, suit or proceeding arising in connection with this Agreement may be made anywhere in the world.

(Matetsky Decl. Ex. H (emphasis added))  While not all the parties and claims in this action are

governed by these provisions, some of the claims of Plaintiff WIS Partners (which has the largest

economic stake in this action of all Plaintiffs) as well as Intervenor Plaintiff Harbinger International

Holdings S.A. (the successor to Loyds Invest (Aerospace)) are so governed.  (See Hercot Decl. ¶ 16;

Ginach Decl. ¶¶ 9, 12-14)  Moreover, CST was also a party to the agreement, so those Plaintiffs who

received their shareholdings from shares held in CST's name as of the time that agreement was

signed – Wilson, Bar-Lev, Rosenbaum, Levine, and Top Down Partners – should be entitled to the

benefit of such provision as well.  (See Wilson Decl. ¶ 27 n.3)  Moreover, other parties that

contracted with ImageSat, such as Pegasus, also insisted on including New York choice-of-law and

consent-to jurisdiction provisions in their agreements (see Wacaster Decl. ¶ 4; Matetsky Decl. Ex.

"G', "I", "K"), and ImageSat's counsel in New York (then and now), Milbank Tweed, issued a

formal opinion letter opining that such clauses are valid and enforceable. (Matetsky Decl. "J" at

2)  It can hardly be said that Plaintiffs are engaged in forum-shopping where they have brought suit

in precisely the forum where Defendants contracted time and again that suits should be brought.

**C.     The Balancing of Private and Public Interest Factors**
       <u>**Favors This District as the Appropriate Forum for this Action**</u>

A review of the relevant factors developed in <u>Gilbert</u> and its progeny confirms that the

Southern District of New York is the appropriate forum in which to litigate this action.   As

enumerated in <u>Gulf Oil</u>, relevant "private interest" factors to be weighed by the Court include:  (1)

"the relative ease of access to sources of proof;" (2) the "availability of compulsory process for

attendance of unwilling" witnesses; (3) "the costs of obtaining attendance of willing witnesses"; and

(4) "all other practical problems that make trial of a case easy, expeditious and inexpensive." <u>Gulf</u>

<u>Oil</u>, 330 U.S. at 508.  "Public interest" factors to be weighed include (1) "[a]dministrative difficulties

. . . when litigation is piled up in congested centers instead of being handled at its origin;" (2) the

burden of jury duty being "imposed upon the people of a community which has no relation to the

litigation;" (3) the "local interest in having localized controversies decided at home;" and (4) the

appropriateness "in having the trial of a diversity case in a forum that is at home with the state law

that must govern the case, rather than having a court in some other forum untangle problems in

conflict of laws, and in law foreign to itself." <u>Id</u>. at 508-09.  All these factors weigh in favor of

keeping the case in New York.

**1.     <u>The Private Interest Factors Weigh In Favor of Litigating in New York</u>**

A review of the private interest factors present in this litigation makes clear that New York is

a proper forum for litigating this matter.  Regarding the relative ease of access to sources of proof,

Plaintiffs have shown at length above that witnesses and documents are available in this forum.  (<u>See</u>

<u>supra</u> pp. 15-23)  The mere fact that sources of proof are also available elsewhere in the world (such

as in Israel) does not tilt the balance in favor of having this matter litigated elsewhere. <u>See</u> <u>National</u>

<u>Fire Insurance Co. of Pittsburgh, PA v. BP Amoco P.L.C.</u>, No. 03 Civ. 0200, 2003 WL 21180421, at

*5 (S.D.N.Y. May 20, 2003) ("the fact that sources of proof are located in both forums, as well as other parts of the world, is insufficient to establish that it would be significantly more convenient to submit this evidence to a court in London than one in New York").

Furthermore, with respect to non-party witnesses and the testimony and/or documentary evidence they may provide, the Defendants have failed to identify any particular non-parties that would be unavailable or to define the testimony that would be lost as a result of their unavailability due to the litigation remaining in New York. See Miller v. Calotychos, 303 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) ("Defendants allude to non-parties who live in London, but they present no evidence of who those parties are and what material role they played in this litigation that would make their appearance at trial here essential."); Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos, 712 F. Supp. 383, 393 (S.D.N.Y. 1989) ("Although certain witnesses are allegedly in Bolivia and no longer employed by [defendant], it is not apparent that these will necessarily be 'key' witnesses, that deposition procedures will be unavailable, or that such non-party witnesses will be unwilling or unable to testify."). In deciding whether a forum is convenient, a court "must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." D'Angelo v. Amtrak Railways, No. 03 Civ. 2560, 2004 WL 2049262, *3 (S.D.N.Y. Sept. 13, 2004).[9]

In similar circumstances, courts have given little weight to the location of third-party "disinterested witnesses whose credibility is not apt to be in issue," because the parties "are not likely

---

[9]     Testimony of non-party witnesses who are unwilling to appear voluntarily for deposition or trial can be obtained through Hague Convention or letters rogatory procedures. See, e.g., Massaquoi v. Virgin Atlantic Airways, 945 F. Supp. 58, 62 (S.D.N.Y. 1996); Hudson v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33, 35 (N.D.N.Y. 1987) (citing 28 U.S.C. § 1781). The fact that discovery from some witnesses must be taken in this way is not sufficient inconvenience to warrant dismissal for forum non conveniens. See Traver, 233 F. Supp. 2d at 417; Anglo-American Insurance, 940 F. Supp. at 564. Moreover, as discussed in the text, the same issue of certain witnesses being located outside the forum would exist if this litigation were pending in Israel, and to a substantially greater extent. (See supra pp. 15-23)

to be prejudiced if they must resort to offering the testimony of these witnesses by deposition." Saminsky v. Occidental Petroleum Corp., 373 F. Supp. 257, 260 (S.D.N.Y. 1974). In the present matter, the parties with crucial testimony are all available to testify in New York, while the parties with crucial testimony are *not* all available to testify in Israel. In addition, the cost of procuring Israeli evidence would not be excessive when compared to the amount in controversy where the potential damages may approach $1 billion dollars or more, thus dwarfing any conceivable litigation expenses.

Israeli courts are unlikely to recognize certain important types of relief to which Plaintiffs could be entitled were the case to proceed in this court, such as treble damages under RICO or punitive damages. (See Tamir Decl. ¶ 15) Although not dispositive, this factor also warrants the Court's consideration.

Finally, the Court is also entitled to consider which parties – Plaintiffs or Defendants – could better bear the cost of litigating in their non-chosen forum. In this regard, Plaintiffs must bear the attorneys' fees and litigation expenses of this litigation themselves, while the individual Defendants' costs and expenses are being borne either by directors-and-officers liability insurance and/or by indemnification from their companies. This additional factor weighs in favor of allowing the case to proceed in Plaintiffs' chosen forum, the Southern District of New York.

## 2.    **The Public Interest Factors Weigh In Favor of Litigating in New York**

Balancing the "public interest factors" also favors keeping this case in New York, a forum which has a strong interest in the just and speedy resolution of this litigation.

Defendants assert that this complex, multi-party action would place an undue burden on the Southern District of New York. However, it is "well-accepted that the Southern District of New York has the resources to adjudicate complex litigation." Rahl v. Bande, 328 B.R. 387, 408

(S.D.N.Y. 2005). While we respect the heavy burdens that complex cases and caseload pressures place on the judicial personnel of this District, this case has been legitimately brought in this Court and should be decided here. Moreover, Defendants' argument based on "docket congestion" in this District does not grapple with the fact that if relegated to Israel, this case would have to be brought in the District Court for Tel Aviv, which is the busiest court in Israel, and would take several years to resolve. (See Tamir Decl. ¶¶ 7-9, 13)

The public interest factors of local interest in the litigation and any potential burden on local jurors hearing non-local disputes are not present in this case. "First and foremost, national and local public policy favors providing a forum in which United States citizens may seek to redress an alleged wrong." American Home Assurance Co. v. Insurance Corp. of Ireland Ltd., 603 F. Supp. 636, 642 (S.D.N.Y. 1984); see also Wiwa, 226 F.3d at 107 ("the United States courts have an interest in adjudicating matters affecting [United States] residents."). New York's highest court has articulated a specific governmental interest in entertaining litigation like this case, where Defendants came to New York for the purpose of soliciting investors and obtained significant capital from New York based individuals and entities. J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd., 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898 (1975) ("New York has an overriding and paramount interest in the outcome of this litigation. It is a financial capital of the world, serving as an international clearinghouse and market place for a plethora of international transactions. . . In order to maintain its pre-eminent financial position, it is important that the justified expectations of the parties to the contract be protected."). This interest has been recognized by this Court as well as the state courts. Weltover, Inc. v. Republic of Argentina, 753 F. Supp. 1201, 1207 (S.D.N.Y. 1991), aff'd, 941 F.2d 145 (2d Cir. 1991), cert. granted, 502 U.S. 1024 (1992), aff'd, 504 U.S. 607 (1992) ("The United States has a substantial interest in maintaining New York's status as an international financial center.

31

. .This choice to accept payment in New York therefore 'sufficiently implicates' the United States' interest in protecting people within its territories.").

Defendants' argument that the Court will be burdened by having to apply the law of a foreign nation to some or all of the claims at issue is also wrong. Even assuming *arguendo* that foreign law might apply to all or some of the claims (see infra Point IV), this Court has repeatedly recognized that "courts are often required to apply foreign law and therefore the likelihood of having to do so should not be a reason for dismissal." Massaquoi, 945 F. Supp. at 63; accord Manu International, S.A. v. Avon Products, Inc., 641 F.2d 62, 67-68 (2d Cir. 1981) (applying foreign law to international disputes is "a chore federal courts must often perform"); Eclaire Advisor, 375 F. Supp. 2d at 265 ("the courts of this District are very well experienced in the determination and application of foreign laws, since so much of the commercial activity of this District involves foreign commerce."). In any event, Defendants' foreign-law argument makes little sense insofar as they contend that the case should be heard in *Israel* while being governed by *Netherlands Antilles* law. An Israeli court is no better equipped than this Court to determine and apply the law of the Netherlands Antilles, and in fact Israeli courts have far less experience than this Court in applying unfamiliar principles of foreign jurisprudence. (See Tamir Decl. ¶ 14)

### D.   Any Dismissal for *Forum Non Conveniens* Should Be Conditioned on Appropriate Protections for Plaintiffs

For all the reasons set forth above, Defendants' motion to dismiss this action on grounds of *forum non conveniens* should be denied, because the Southern District of New York is a convenient and appropriate forum for the litigation of this action.

If, however, the Court were to determine in the exercise of its discretion that the case should be dismissed in favor of a forum in Israel – which Plaintiffs submit would be wholly unwarranted –

then the Court should place appropriate conditions on such discretionary dismissal. As Judge Scheindlin has observed, "where a foreign defendant's motion for dismissal on the ground of *forum non conveniens* is granted, it is usually appropriate to grant dismissal only upon certain conditions that ensure that the interests of the plaintiffs are not prejudiced by the court's refusal to exercise its jurisdiction." Henderson v. Metropolitan Bank & Trust Co., 494 F. Supp. 2d 294, 304 (S.D.N.Y. 2006) (initially granting motion to dismiss for *forum non conveniens*), reconsideration granted, 502 F. Supp. 2d 502 (S.D.N.Y. 2007) (reversing dismissal after plaintiffs were unable to afford foreign court's filing fees). Thus, in Henderson, the court conditioned an initial *forum non conveniens* dismissal on defendants' agreement to, *inter alia*, waive any statute of limitations defenses under the foreign forum's law and to waive any other defenses that might have accrued since the filing of the action in the United States. The court also stated that if defendants proved for any reason not to be amenable to suit in the foreign court, the New York action would be reinstated (which is effectively what happened in that case after the foreign court imposed a prohibitively expensive filing fee that effectively precluded plaintiffs from pursuing their claims abroad).

Similarly, in Do Rosario Veiga v. World Meteorological Organization, 486 F. Supp. 2d 297, 308 n.1 (S.D.N.Y. 2007), Judge Marrero conditioned a *forum non conveniens* dismissal on the defendants' consenting to *in personam* jurisdiction and waiving any foreign statute of limitations defense, while noting that imposing such conditions on dismissal is "routine" in this Circuit. Indeed, conditions of this nature have routinely been imposed even in the cases relied upon by Defendants to support dismissal. See, e.g., Lasala v. Lloyds TSB Bank PLC, 514 F. Supp. 2d 447, 482 (S.D.N.Y. 2007) ("dismissal is conditioned upon the defendant Lloyds appearing and defending on the merits, without interposing a statute of limitations, an action asserting claims arising out of these facts, by the plaintiff Trustees in the courts of Switzerland, failing which plaintiffs may apply to restore the

33

case to this Court's calendar"); <u>Sussman v. Bank of Israel</u>, 801 F. Supp. 1068, 1079 (S.D.N.Y. 1992) (conditioning dismissal on, *inter alia*, defendants' agreement to waive statute of limitations defense), <u>aff'd per curiam</u>, 990 F.2d 71 (2d Cir. 1993); <u>Ionescu v. E.F. Hutton & Co. (France) S.A.</u>, 465 F. Supp. 139, 148 (S.D.N.Y. 1979) (complaint dismissed on condition that defendant waive defenses, including statute of limitations, that it did not have at time of filing action in District Court); <u>First Union National Bank v. Paribas</u>, 135 F. Supp. 2d 443, 454 (S.D.N.Y. 2001) (dismissal conditioned upon defendants' consent to exercise of personal jurisdiction in foreign forum, appointing a representative for receipt of service of process, and waiving any statute of limitation defense arising as a result of the change of forum).

Accordingly, if this Court were inclined to grant Defendants' motion to dismiss the action on grounds of *forum non conveniens* – which it is submitted it should not – any such dismissal should be conditioned upon (1) written stipulation of all Defendants to the jurisdiction of the appropriate Israeli tribunal and to service of process to an action to be commenced by Plaintiffs in that tribunal; (2) waiver of any defense to the Israeli proceeding based upon any statute of limitations or otherwise based on the passage of time; (3) written acknowledgement by all Defendants of their obligation to preserve documents and electronically stored information pending Plaintiffs' filing of an Israeli action and for a reasonable time thereafter; and (4) such other terms and conditions as may be appropriate to preserve Plaintiffs' rights.

## POINT II

### THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS ACTION

Defendants contend in Point II of their joint memorandum that the Court must dismiss this action for lack of subject-matter jurisdiction. Defendants are incorrect.

34

The primary basis of this Court's subject-matter jurisdiction is "federal question" jurisdiction under 28 U.S.C. § 1331, based on the civil RICO claims asserted in the Eleventh and Twelfth Claims for Relief. Under 28 U.S.C. § 1331, this Court enjoys original jurisdiction over "all civil actions arising under the . . . laws . . . of the United States." The federal RICO statute creates an express private civil right of action, providing that "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue therefor in any appropriate United States District Court. . . ." 18 U.S.C. § 1964(c).

Defendants do not dispute that if Plaintiffs have stated a claim for substantive violation of RICO in the Eleventh Claim for Relief, and/or for conspiracy to violate RICO in the Twelfth Claim for Relief, then the Court has subject-matter jurisdiction over such claims. Moreover, Defendants do not dispute – nor could they – that if the RICO claims are sustained, then the Court also enjoys subject-matter jurisdiction over all the other claims for relief asserted in the Complaint under the doctrine of supplemental jurisdiction. See 28 U.S.C. § 1367; United Mine Workers v. Gibbs, 383 U.S. 715 (1966). Rather, Defendants' objection to subject-matter jurisdiction assumes that Plaintiffs' RICO claims are insufficient as a matter of law and should be dismissed. As discussed below in Points IX and X, this assumption is incorrect, as the RICO claims are well-pleaded and should be sustained.[10] Accordingly, the Court has subject-matter jurisdiction over all claims.

However, even if Plaintiffs' RICO claims were held to be insufficient – which they should not be – the Court still would have, and should exercise, subject-matter jurisdiction over this action

---

[10]    Moreover, even if some aspect of the RICO claims were held to be insufficiently pleaded, Plaintiffs should be granted an opportunity to replead with respect to such claims. (See infra Point XIII) If the RICO claims were sustained as to some parties to the action but rejected as to others, "pendent party" supplemental jurisdiction would authorize the Court to exercise jurisdiction over the Defendants who remained in the case on the name federal claims. See 28 U.S.C. § 1367(a) (last sentence) ("supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties").

for at least two separate and independent reasons. *First*, even if the RICO claims were dismissed, the Court should still retain jurisdiction over the remaining claims by exercising supplemental jurisdiction under 28 U.S.C. § 1367. Although Defendants contend that a federal court will decline to exercise supplemental jurisdiction where the federal claims are dismissed at the pleading stage, this rule is not invariable. See 28 U.S.C. § 1367(c)(3) (providing that the District Court "*may*" dismiss state-law claims without prejudice when all federal claims have been dismissed) (emphasis added); Lerner v. Fleet Bank, N.A., 318 F.3d 113, 130 (2d Cir. 2003) (cited by Defendants, Joint Mem. 1) ("*In most circumstances,* a district court should decline supplemental jurisdiction if all federal claims have been dismissed at the pleading stage.") (emphasis added); Mauro v. Southern New England Telecommunications, Inc., 208 F.3d 384, 388 (2d Cir. 2000) (upholding District Court's determination to exercise supplemental jurisdiction over pendent state-law claim after dismissing sole federal claim on summary judgment, where interests of judicial efficiency were served and no novel state-law issues were raised).[11]

*Second*, even absent federal question jurisdiction based on the RICO claims, the Court would still enjoy subject-matter jurisdiction under 28 U.S.C. § 1332, which creates what are commonly referred to as the "diversity" and "alienage" sources of jurisdiction. Specifically, jurisdiction would be founded upon 28 U.S.C. § 1332(a)(3), because this is an action between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." See also Tango Music, LLC v. DeadQuick Music, Inc., 348 F.3d 244, 245-46 (7th Cir. 2003) (sustaining subject-

---

[11]    In this case, several considerations militate in favor of this Court's retaining supplemental jurisdiction even if the RICO claims were to be dismissed (which they should not be). For example, a typical rationale for dismissing pendent state-law claims is that a state court may be in a better position to resolve unsettled issues of state law than a federal court sitting in diversity and required by *Erie* principles to apply forum-state law. Here, however, Defendants' position is that most issues in this case are governed by *foreign* law, which this Court is in at least as good a position, if not a better position, to apply than a New York State court. Moreover, this Court is in the best position to evaluate Defendants' federal defenses, such as Defendant IAI's invocation of an alleged immunity from suit under the Foreign Sovereign Immunities Act or the doctrine of international comity.  (See infra Point VI)

matter jurisdiction where there are citizens of different states as plaintiffs and defendants, even where citizens of the same foreign country were also parties); <u>Scotts Co. v. Rhone-Poulenc, S.A.</u>, 347 F. Supp. 2d 543, 545 (S.D. Ohio 2004) (same).[12]  For all these reasons, this Court has subject-matter jurisdiction over the action.

### POINT III

### DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION

Thirteen Defendants assert that they are not subject to *in personam* jurisdiction in this Court with respect to the claims asserted against them.  (Defendants IAI, Jacob Weiss, and James DePalma do not challenge personal jurisdiction.)  Based on the allegations of the Complaint, as supplemented by the very limited jurisdictional discovery that has been provided, all Defendants are subject to jurisdiction.

As noted above, Plaintiffs are prepared to proceed to an evidentiary hearing on the question of personal jurisdiction (or any of the other threshold issues raised by Defendants) if holding a hearing would aid the Court in its determination.

---

[12]  Defendants contend that the presence in the action of Defendant Jacob Weiss defeats diversity/alienage jurisdiction because Mr. Weiss is a citizen of both Israel and the United States but allegedly not a domiciliary or citizen of any particular state within the United States.  While the general rule is that the naming of a United States citizen domiciled abroad will defeat diversity, and that in the case of dual citizens only the United States citizenship of the dual citizen is considered, Defendants have not addressed the potential application of an exception recognized in the seminal case in this area, <u>Sadat v. Mertes</u>, 615 F.2d 1176 (7th Cir. 1981).  This provides that under certain circumstances, the foreign rather than the U.S. citizenship of a party will be considered for purposes of determining federal subject-matter jurisdiction where the individual's "dominant citizenship" is that of the foreign state.  In our case, Mr. Weiss testified at his deposition that he is a United States citizen, in 1952., but moved to Israel and acquired Israeli citizenship, without giving up United States citizenship, in 1980, and since that time has held both citizenships.  (Weiss Dep. 4-5)  His exercise of citizenship rights is primarily as a citizen of Israel; for example, he votes only in Israeli and not in United States elections.  He pays income taxes as a resident of the State of Israel and as a non-resident of the United States; he does not pay state or local income taxes to any jurisdiction within the United States.  (Weiss Dep. 4-5)  He travels internationally most often using an Israeli passport, although he is required to use a United States passport on travel to or from the United States itself.  (Weiss Dep. 13)  Weiss declared unequivocally that "in terms of my emotional ties, one hundred percent Israel."  (<u>Id.</u>)  While the "dominant nationality" exception has been construed very narrowly and has not previously been applied in this Circuit, Plaintiffs submit that they should be allowed an opportunity to establish its applicability here before the Court were to consider dismissing this action for lack of subject-matter jurisdiction.  At a minimum, before granting dismissal, Plaintiffs are entitled to a reasonable opportunity to consider preserving diversity by dropping the allegedly non-diverse party.

37

A.  **Plaintiffs' Limited Burden of Proof**

On a defendant's motion to dismiss a Complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), a plaintiff seeking to establish personal jurisdiction over a defendant need only make a *prima facie* showing by alleging facts that, if true, would support the Court's exercise of jurisdiction.  See Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990); Mayatextil, S.A. v. Liztex U.S.A., Inc., No. 92 Civ. 4528, 1995 WL 131774, at *1 (S.D.N.Y. Mar. 23, 1995).  In this case, only limited jurisdictional discovery has taken place, and no evidentiary hearing has been held or scheduled.  Therefore, "[b]ecause no evidentiary hearing was held here . . . [plaintiff] need make only a *prima facie* showing that jurisdiction exists.  Further, because the court did not hold a hearing or trial on the merits, the court must construe all pleadings and affidavits in the light most favorable to plaintiff and must resolve all doubts in plaintiff's favor."  Farber v. Zenith Laboratories, Inc., 777 F. Supp. 244, 245 (S.D.N.Y. 1991) (citations omitted).

B.  **The Standards for Determining Jurisdiction**

The claims for relief against Defendants include two federal claims arising under the RICO statute, as well as a series of claims arising under non-federal law (either New York or foreign law). The analysis conducted by the Court to determine whether it has personal jurisdiction over each of the Defendants is similar with respect to the RICO claims and the state or foreign law claims.

Insofar as the RICO claims are concerned, jurisdiction may be asserted over a non-resident of the forum state where the defendant (1) is "doing business in the state"; (2) has done "an act in the state"; or (3) has caused "an effect in the state by an act done elsewhere."  Herbstein v. Bruetman, 768 F. Supp. 79, 81 (S.D.N.Y. 1991) (citing Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1340 (2d Cir. 1972)).  These factors closely track the analysis for assessing jurisdiction under the New York state standards codified in N.Y. CPLR § 302(a), discussed below.  See

38

International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC, 470 F. Supp. 2d 345, 358 (S.D.N.Y. 2007).  However, insofar as the RICO claims are concerned, the jurisdictional inquiry may expand from the Defendant's contacts with the forum state, and consider Defendant's contacts with the entire United States.  See, e.g., PT United Can Co. Ltd. v. Crown, Cork & Seal Co., Inc., 138 F.3d 65, 71 (2d Cir. 1998) (RICO authorizes national service of process); see also Madanes v. Madanes, 981 F. Supp. 241, 260 (S.D.N.Y. 1997).  In this regard, the Court could exercise personal jurisdiction over several of the Defendants given the contacts with other locations within the United States.  Moreover, if the Court may exercise jurisdiction over a Defendant with respect to the RICO claims, then the doctrine of pendant personal jurisdiction gives rise to personal jurisdiction over that Defendant with respect to the related state and foreign law claims.  See, e.g., IUE AFL-CIO Pension Fund v. Hermann, 9 F.3d 1049, 1056 (2d Cir. 1993) ("under the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact', the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available"); see also Herbstein, 768 F. Supp. at 81.

In addition to the allegation of substantive RICO violation, the Complaint also charges Defendants with conspiring to violate the statute.  As a consequence, any acts committed by one conspirator which gives rise to jurisdiction are attributable to the other co-conspirators regardless of their individual contacts with the forum.  See McKinney's Consolidated Laws of New York Annotated, CPLR § 302, Practice Commentary C302:4:

> The New York activities of a "co-conspirator" may also be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rationale. See, e.g., *Reeves v. Phillips*, 1976, 54 A.D.2d 854, 388 N.Y.S.2d 294 (1st Dep't).  See also *CutCo Indus., Inc. v. Naughton*, C.A.N.Y. 1986, 806 F.2d 361, 366 ("where there is joint control of a business enterprise – similar to that existing in a partnership or joint

venture – enough control has been shown to establish *prima facie* this particular element of agency to satisfy long-arm jurisdiction").

Id.[13] See also Louros v. Cyr, 175 F. Supp. 2d 497 (S.D.N.Y. 2001), in which personal jurisdiction was asserted by the court under New York's long-arm statute against a Georgia resident for a RICO conspiracy claim with respect to his role in a banking scheme targeting New York residents. The court held that jurisdiction was proper where plaintiffs had pleaded a prima facie showing of a conspiracy, facts inferring that defendant was part of the scheme and that the defendant's co-conspirators had committed tortious acts in New York. Id. at 519-22.

Long-arm jurisdiction based upon participation in a RICO conspiracy targeting New York residents is also available against foreign defendants as well. See In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 339-340 (S.D.N.Y. 2000), in which long-arm jurisdiction was asserted over two United Kingdom citizens residing in Monaco for their role in a RICO conspiracy. In dismissing the individual defendants' motions to dismiss for lack of personal jurisdiction, the Sumitomo court held that plaintiffs had made a prima facie showing of a conspiracy, alleged facts warranting the inference that the individual defendants were members of the conspiracy, and that another member of the conspiracy, corporate defendant Global Minerals and Metal Corp., had entered into fraudulent contract in New York in furtherance of the conspiracy, therefore warranting the exercise of jurisdiction over the foreign co-conspirators. Id.

New York's long-arm jurisdiction statute, CPLR § 302(a), effectuates the "minimum contacts" theory of personal jurisdiction formulated by the Supreme Court in International Shoe Co.

---

[13]     Co-conspirators may also be subject to a court's jurisdiction by operation of the long-arm statute by virtue of their conspiracy with others who have acted within the court's jurisdiction. CPLR 302(a) jurisdiction provides basis for personal jurisdiction over defendants based upon acts of their co-conspirators if plaintiff has sufficiently alleged facts which (i) establish a prima facie case of conspiracy; (ii) warrant the inference that defendants were members of the conspiracy; (iii) demonstrate that the co-conspirator transacted business or committed a tort in New York; and, (iv) justify an agency relationship between co-conspirators and defendant. See, e.g., Daventree Ltd. v. Republic of Azerbaijan, 349

v. Washington, 326 U.S. 310 (1945). See McKinney's Consolidated Laws of New York Annotated,

CPLR § 302, Practice Commentary C302:1. The statute provides:

> **(a) Acts which are the basis of jurisdiction.** As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
>
> 4. owns, uses or possesses any real property located within the state.

In applying the tests for long-arm jurisdiction to the specific facts of individual cases, the court

should weigh New York's interest in providing a convenient forum to Plaintiffs, some of whom are

New Yorkers (and more of whom are United States residents) who were injured as a result of

investments they were solicited to make and made in New York, as a result of conduct in or affecting

New York. See Retail Software Services, Inc. v. Lashlee, 854 F.2d 18, 24 (2d Cir. 1988) (weighing

in favor of finding *in personam* jurisdiction is that New York has an interest in providing a forum for

its citizens who have been injured by the *intentional acts* of nonresidents).

---

F. Supp. 2d 736, 759 (S.D.N.Y. 2004).

Exercises of judicial jurisdiction must also comport with the Due Process Clause of the United States Constitution. As to this requirement, New York courts have held if a Defendant's jurisdictional contacts with the forum are sufficient to satisfy CPLR § 302, they will generally meet the federal due process requirements that are founded upon the same considerations. See, e.g., Kelly v. MD Buyline, Inc., 2 F. Supp. 2d 420, 431 (S.D.N.Y. 1998).

Finally, it is axiomatic that the federal and state courts of New York will exercise jurisdiction over a Defendant that has consented to such jurisdiction in a contractual choice of forum clause. (See supra pp. 26-27; infra pp. 50-51)

## C.     Defendants' Contacts Are Sufficient To Establish Jurisdiction

Applying the caselaw under New York's long-arm statute to the acts of each of the Defendants challenging jurisdiction in this case, it becomes clear that each Defendant is subject to jurisdiction.  In view of the frequency and importance of Defendants' contacts with New York – including investor meetings, contract negotiations, ImageSat board and other committee meetings, e-mails, telephone calls, letters, Investor and other periodic ImageSat reports, IPO meetings and discussions, the retention of professionals, and many others – are more than enough for the Court to find that each Defendant is subject to jurisdiction on Plaintiffs' claims.[14]

Here, to the extent the CPLR controls the Court's exercise of personal jurisdiction, the Court has jurisdiction over the Defendants pursuant to CPLR § 302(a)(1), (a)(2), and (a)(3)(i-ii). Defendants' activities clearly confer long-arm jurisdiction under these provisions in light of their

---

[14]     While a defendant's communications (i.e., electronic mail, telephone calls and letters) with New York alone are generally not sufficient to establish long-arm jurisdiction over the defendant, if they result in the defendant projecting himself into business transactions in New York they will be sufficient.  See, Deutsche Bank Securities, Inc. v. Montana Board of Investments, 21 A.D.3d 90, 94, 797 N.Y.S.2d 439, 443 (1st Dep't 2005) ("While electronic communications, telephone calls or letters, in and of themselves, are generally not enough to establish jurisdiction, they may be sufficient if used by the defendant deliberately to project itself into business transactions occurring within New York state.") (citations omitted).

relation to the claims asserted by Plaintiffs. Indeed, as to at least some Defendants, such as ImageSat and its senior officers, their activates in New York and the United States court arguably could give rise to *general* jurisdiction under CPLR § 301,[15] and therefore they *a fortiori* establish long-arm jurisdiction under CPLR § 302 with respect to claims arising from the conduct that took place or had its effects here.

In assessing Defendant's jurisdictional contacts, it must be borne in mind that the acts that can subject a defendant to long-arm jurisdiction under CPLR § 302(a) may be performed by the defendant or through an agent. A finding of "agency" in this context does not require a formal showing of agency. See McKinney's Consolidated Laws of New York Annotated, CPLR § 302, Practice Commentary C302:4:

> It is sufficient that the representative acted "for the benefit of and with the knowledge and consent of [the] defendant[] and that [he or she] exercised some control over [the agent] in the matter." *Kreutter v. McFadden Oil Corp.*, 1988, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 199, 522 N.E.2d 40, 44 (nondomiciliary held to have transacted business in New York (CPLR 302(a)(1)) through corporation over which, in his position as officer and owner of affiliated company, he exercised "some control").

Id. In the present matter, given the acts of the individuals Defendant directors and officers are attributable to their respective Defendant corporations, thus subjecting ImageSat and Elbit to personal jurisdiction pursuant to CPLR § 302(a)(1) based upon the actions of their agents in transacting business in New York.

The Second Circuit has observed that a personal jurisdiction analysis is fact-intensive and thus many different factors may be considered in each case, and that the "ultimate determination is based upon the totality of the circumstances." Agency Rent A Car Sys., Inc. v. Grand Rent A Car

---

[15]    See Farber v. Zenith Laboratories, Inc., 777 F. Supp. 244, 247 (S.D.N.Y. 1991) in which general personal jurisdiction was found over a New Jersey corporation which had held frequent board meetings in New York over an eleven year period. "Zenith's supervisory activities in New York were sufficiently systematic, continuous, and permanent to qualify it as "doing business" in New York." Id.

Corp., 98 F.3d 25, 29 (2d Cir. 1996). The overriding criterion that guides a "transacts any business" analysis is whether the defendant has "purposely avail[ed] itself of the privilege of conducting activities within the forum State." Cooper, Robertson & Partners, LLP v. Vail, 143 F. Supp. 2d 367, 371 (S.D.N.Y. 2001). Applying that standard to the facts and circumstances of this case establishes that the Defendants have engaged in purposeful New York activities, and are therefore subject to the personal jurisdiction of the Court.

As noted in Schur v. Porter, 712 F. Supp. 1140 (S.D.N.Y. 1989), the scope of CPLR § 302(a)(1) was broadened to authorize the exercise of *in personam* jurisdiction over a non-domiciliary defendant who, although not physically present in New York, nevertheless "may be deemed virtually or constructively to do business in this state." Id. at 1144-45 (quoting Waldorf Assoc. v. Neville, 141 Misc.2d 150, 533 N.Y.S.2d 182, 185 (Sup. Ct. N.Y. Co. 1988)). Reading the papers in the light most favorable to Plaintiffs, as required on a motion to dismiss, the papers set forth that Defendants knowingly and purposefully availed themselves of the forum in connection with their activities giving rise to the claims set forth in the Complaint. Under the totality of the circumstances, Defendants can be deemed to have transacted business within New York even if some of the activities giving rise to the claims against them were conducted while they were physically present elsewhere, and it is reasonable for them to answer for their conduct in a New York court.

Pursuant to CPLR § 302(a)(2), a court may exercise personal jurisdiction over a defendant that commits a tortious act within the state. In the present matter, each of the Defendants committed a number of tortious acts within the state which give rise to the claims asserted against them in the present matter. The tortious acts include soliciting capital contributions from prospective investors, including Plaintiffs, as part of a larger scheme to defraud Plaintiffs and other minority shareholders in ImageSat; conducting activities within New York to further their fraudulent scheme against

44

Plaintiffs, including holding board meetings, finance and other committee meetings in New York at which Defendants committed tortious conduct; conducting and attending other meetings within New York for the purpose of continuing and perpetuating their fraudulent conduct against Plaintiffs; and other acts which are unknown to Plaintiffs at present but which will be revealed during discovery in this action.

The exercise of *in personam* jurisdiction over Defendants is also appropriate pursuant to CPLR § 302(a)(3)(i-ii), because the Defendants committed tortious acts outside New York that caused injury to persons or property within the state while regularly doing or soliciting business and engaging in a persistent course of conduct. Defendants should have thus reasonably expected such conduct to have consequences in the state and also derived substantial revenue from international commerce. It has been held that CPLR § 302(a)(3) "broadly extends the power of [New York's] courts to obtain personal jurisdiction over parties whose out-of-state acts have foreseeable injurious consequences in New York." National Union Fire Ins. Co. of Pittsburgh, PA v. Mason, Perrin & Kanovsky, 689 F. Supp. 303, 309 (S.D.N.Y. 1988).

As the Court of Appeals explained in LaMarca v. Pak-Mor Manufacturing Co., 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304, 307 (2000):

> The conferral of jurisdiction under this provision [CPLR § 302(a)(3)(ii)] rests on five elements: First, that defendant committed a tortious act outside the State; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce.

Id.

In this case, Defendants' conduct satisfies all five of the listed elements. First, as aforesaid, the Defendants have engaged in systematic ongoing tortious conduct against the Plaintiffs both

within and without the state as well as within the United States and elsewhere in the world. Second, the claims asserted against Defendants in this action all arise from or are directly related to the tortious conduct perpetrated by the Defendants. Third, such acts caused monetary injuries to New York residents. Fourth, by coming to New York and availing themselves with the opportunity to conduct business in New York, Defendants should have reasonably expected that their acts would have consequences in New York. Fifth, all of the corporate Defendants derive substantial revenue from international commerce and all of the individual Defendants act or acted as their agents.

The last element, as the Court of Appeals explained in LaMarca, is simply designed to weed out actions against non-domiciliaries whose business operations "are of a local character." Id., 95 N.Y.2d at 215, 713 N.Y.S.2d at 307-308. See also Palace Exploration Co. v. Petroleum Development Co., 41 F. Supp. 2d 427 (S.D.N.Y. 1998) (holding that New York court could exercise personal jurisdiction pursuant to CPLR § 302(a)(3)(ii) where an Oklahoma defendant made a fraudulent statement to one New York plaintiff, which caused the New York plaintiff to enter into a contract and make substantial payments in reliance upon such misrepresentation).

a.    **ImageSat**

i. *Investment Solicitation Activities*

As discussed above in connection with the *forum non conveniens* analysis, between 1996 and 2005, ImageSat and its predecessors engaged in a continuous and ongoing course of fundraising activities in New York, through which they raised approximately $100 million in New York, primarily from American investors, including many of the Plaintiffs. (See supra pp. 17-20)

CPLR § 302(a)(1) establishes jurisdiction over Defendants who transact business with New York, on claims arising from that business. (As noted above, because federal RICO claims are involved here, under RICO's nationwide service of process provision the field of inquiry is expanded

46

from Defendants' contacts with New York to the entire United States).  Here, much of Defendants'
conduct that is the subject of Plaintiffs' claims took place in New York and constituted the
transaction of business in this State.  As described at length in the accompanying Declarations of
Plaintiffs and several non-parties, many of the Plaintiffs were induced to invest in the enterprise that
became ImageSat, initially through CST and later directly into West Indian Space/IamgeSat, through
meetings and investor presentations that took place in New York (and, to a lesser extent, elsewhere
in the United States), resulting in investments that were made in New York.  (See, e.g., Wilson Decl.
¶¶ 12-47; Hercot Decl. ¶¶ 5-14; Levine Decl. ¶ 5; Miller Decl. ¶ 5; Morris Decl. ¶¶ 4-10; Talansky
Decl. ¶¶ 3-8; Moshel Decl. ¶¶ 4-7; Siller Decl. ¶¶ 7-8; Bar-Lev Decl. ¶¶ 4-5; Rosenbaum Decl. ¶¶ 4-
5; Yifrah Decl. ¶¶ 7-8; Ginach Decl. ¶¶ 4-10; Plevin Decl. ¶¶ 17-20)  Subsequently, Defendants held
ImageSat Board and committee meetings in New York, negotiated and entered into key contracts in
New York, and spent several years seeking to launch an initial public offering from New York.  (See,
e.g., Broder Decl. ¶¶ 6-7)  When those efforts failed, ImageSat negotiated a restructuring in New
York.  (See Wacaster Decl. ¶ 5)

A defendant's efforts to solicit investments in New York may give rise to personal
jurisdiction under the long-arm statute.  See Nasso v. Seagal, 263 F. Supp. 2d 596, 613 (E.D.N.Y.
2003) ("even where the loan itself is not made in New York, '[t]he act of borrowing money from a
New York-based entity can, when considered in combination with other contacts, give rise to
jurisdiction under CPLR § 302(a)(1).'") (quoting Sun Forest Corp. v. Shvili, 152 F. Supp. 2d 367,
387 (S.D.N.Y. 2001)); L & R Exploration Venture v. Grynberg, 22 A.D.3d 221, 221, 804 N.Y.S.2d
286, 287 (1st Dep't 2005) ("[t]he record, which shows that respondent solicited significant amounts
from petitioners, New York investors, communicated by telephone and mail with them in New York,
and visited New York on several occasions to discuss the business of the parties' joint venture,

supports a finding that respondent's contacts with New York were sufficient to confer jurisdiction under CPLR 302(a)(1).") (citations omitted).

Similarly, in Hughes v. BCI Int'l Holdings, Inc., 452 F. Supp. 2d 290, 300-01 (S.D.N.Y. 2006), the defendants' actions including: (1) attending business meetings in New York; (2) holding board and shareholder meetings in New York at which solicitation of investments were discussed; (3) participating in conference calls initiated in New York; (4) officers and directors attending such meetings both in person and over the telephone; (5) meeting with New York based plaintiffs to discuss possible investments in defendant corporation; (6) meeting in New York with other potential investors; and (7) meeting in New York with an investment banking firm retained by defendant corporation in connection with the defendants' investment. Id. "These contacts are sufficient to constitute a transaction of business in New York both by [the individual defendant] personally and by the entities that he represented [the corporate defendants]." Id. at 301.

*ii. Board Meetings*

Since 2001 and continuing into 2007, ImageSat has conducted at least a dozen board and other committee meetings in New York[16], more than in any other location (See Matetsky Aff. Ex. "L", "M") at which decisions were made which adversely impacted the Defendants. Many of Plaintiffs' claims in this action arise from decisions taken at these meetings. For example, it was at a Board meeting held in New York on November 22, 2006, attended by (among others) Defendants Arzi, Chelouche, DePalma, Eckhaus, Gaspar, and Piperno-Beer, that ImageSat's Board of Directors decided to turn its back on the Venezuela as a potential SOP contract customer and potential financial investor based on the presentation of willfully false information, whose misleading nature

---

[16]     Board of Director meetings were held at least on May 11,2001, December 1, 2003, November 4, 2004, February 25, 2005, September 2, 2005, February 10, 2006, May 30, 2006, November 22, 2006, May 31, 2007 and August 23, 2007.  In addition, ImageSat finance committee meetings were held in New York on November 3, 2004, February 24,

was or should have been known to each of these Defendants. Defendants' decision in this instance was taken for explicitly political and/or other improper reasons, in violation of the representation made to investors that ImageSat's services would be available on commercial terms to all potential customers other than those specifically excluded. (See Cplt. ¶¶ 146-148) At this meeting, the Board of Directors also voted to approve financial statements of ImageSat, as part of what the Complaint alleges is an ongoing presentation of financial statements that continue to improperly value certain assets. Discussion at this meeting also included discussion by Board members regarding the status of the EROS C (formerly "2001 EROS B1") satellite – the satellite which, the Complaint alleges in detail, was never built or even fully designed by IAI and Elbit to meet ImageSat "Mission Requirements" or performance specifications, but for which ImageSat paid tens of millions of dollars, and as to which the Complaint alleges in detail that a cover-up of the relevant facts by Defendants is ongoing. (See Cplt ¶¶ 93-112)

Indeed, ImageSat Board meetings continue to take place in New York even following the filing of this action, including a meeting held on August 23, 2007, attended by ImageSat Board members and senior officers including Defendants Arzi, Chelouche, DePalma, Eckhaus, Gaspar, and Piperno-Beer. Issues discussed at this meeting included the addition of two independent directors to the ImageSat Board, which the Company has failed to do since 2000 even though it is contractually required to do so by the July 2000 Securityholders Agreement, which is one of the agreements to which Plaintiff WIS Partners, among others, is a party and which provides for jurisdiction in the New York federal and state courts.

In Cybertech Communications Corp. v. Quad Int'l, Inc., 262 A.D.2d 44, 691 N.Y.S.2d 460 (1st Dep't 1999), the court included the fact that defendant Florida corporation's holding of its

_____

2005 and May 30, 2006.

annual board meeting in New York, together with other factors, gave rise to long-arm jurisdiction over the defendant. "The nature and quality of these contacts comprise a sufficient New York nexus to establish that Quad was transacting business here, and there is a connection between the business transacted and the claim asserted. Id., 262 A.D.2d at 45, 691 N.Y.S.2d 461 (citations omitted).

### iii. Negotiating and Entering Into Agreements

Moreover, as discussed above, ImageSat entered into a series of Agreements under which the it, and IAI and Elbit among others, agreed that any disputes would be litigated in the federal and state courts of New York. (See supra pp. 26-27; Matetsky Decl. Ex. "A"-"K") At least some of Plaintiffs' claims in this action are within the scope of these clauses (see supra pp. 26-27; Hercot Decl. ¶¶ 16-18; Ginach Decl. ¶¶ 9, 12-14) and as to such claims, ImageSat is contractually barred from seeking dismissal for lack of jurisdiction. See N.Y. Gen. Oblig. L. § 5-1402; L-3 Communications Corp. v. SafeNet, Inc., 45 A.D.3d 1, 9-10, 841 N.Y.S.2d 82, 89 (1st Dep't 2007); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 481-82 (1985). Moreover, those shareholders who succeeded to shares owned by CST – Plaintiffs Wilson, Bar-Lev, Rosenbaum, Levine, and Top-Down Partners – should also enjoy the benefits of such provision. (See Wilson Decl. ¶ 27 n.3) Even as to other claims and parties, ImageSat's having contractually assented to being sued in New York demonstrates that it "should reasonably anticipate being haled into court,"(World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1979)), on related claims arising under this agreement or under other agreements that can be construed as part of the same transaction. See Ainbinder v. Potter, 282 F. Supp. 2d 180, 185 (S.D.N.Y. 2003); Day's Inn of Am. v. L.A., Inc., No. 97 Civ. 5476, 1998 WL 765182, at *2-3 (S.D.N.Y. Nov. 3, 1998) ("the requirement of establishing personal jurisdiction over the parties may be waived by prior consent").

Contract negotiations that take place in New York have been held to be a sufficient basis for courts to exercise personal jurisdiction over defendants pursuant to New York's long-arm statute. See, e.g., SAS Group, Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 548-49 (S.D.N.Y. 2003), which exercised personal jurisdiction over the defendants based upon contractual negotiations held in New York, stating:

> First, "[a]ny contract negotiations which indicate a purposeful invocation of the laws of New York State are transactions of business for purposes of New York's long arm statute," and a single transaction of business in New York may be sufficient. It does not matter whether the negotiations are preliminary, whether the contract is executed in New York, or whether performance is contemplated for New York.
>
> In addition, "[c]ontract negotiations in New York will satisfy [§ 302(a)(1)] if the discussions 'substantially advanced' or were 'essential to' the formation of the contract or advance the business relationship to a more solid level."

Id. (citations omitted). See also Clarendon Nat'l Ins. Co. v. Lan, 152 F. Supp. 2d 506, 517 (S.D.N.Y. 2001) ("Moreover, 'New York-based contractual negotiations can by themselves constitute the transaction of business in New York . . . if they substantially advanced or were substantively important or essential to the formation of the contract' so long as 'the negotiations . . . relate to the same agreement that his the subject of plaintiff's lawsuit.'").

Additionally, ImageSat has sought and continues to seek customers located in the United States. (Goren Dep. 154-60)  It has secured the advice of numerous professionals here, including attorneys, investment bankers, and accountants.  (See supra pp. 18-19)  The weight of all of ImageSat's contacts with New York and with the United States, individually and cumulatively, and particularly in mind of the choice-of-forum and choice-of-law clauses expressly applicable to at least some of the matters at issue in this action, render it pellucid that ImageSat is subject to *in personam* jurisdiction in the Southern District of New York.

b. **The ImageSat Directors and Officers**

Each of the "ImageSat D&O" Defendants, except Jacob Weiss, also challenge jurisdiction, but their challenges fail. As set forth below, each of these Defendants has personally taken actions in New York, such as soliciting investments, negotiating and executing contracts, and attending ImageSat Board and other meetings, all in New York.

Furthermore, if the Court findings that ImageSat is subject to jurisdiction, then the Court may exercise jurisdiction over the individual Defendants by attributing ImageSat's conduct to each individual who engaged in conduct in New York. In Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195 (1988), the New York Court of Appeals rejected the "fiduciary shield doctrine" that other states had applied to shield corporate officers from liability where their dealings with the forum were solely in a corporate capacity. Id., 71 N.Y.2d at 472, 527 N.Y.S.2d at 202. Further, the Kreutter court held that the actions of the corporation could be imputed to the individuals responsible for the corporation's actions, such as its officers and directors, in order to confer personal jurisdiction over the individuals pursuant to long-arm jurisdiction. Id., 71 N.Y.2d at 467, 527 N.Y.S.2d at 199. Thus, a plaintiff "need not establish a formal agency relationship" among the defendants, but only that a defendant acting in New York "engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of the [out-of-state] defendants and that they exercised some control over [the defendant who was present] in the matter." Id., 71 N.Y.2d at 467, 527 N.Y.S.2d at 199.

Other courts have relied upon this theory in analyzing the question of whether long-arm jurisdiction would be found over officers and directors as a result of the corporation's actions giving rise to jurisdiction over the corporate entity. See Beatie & Osborn LLP v. Patriot Scientific Corp., 431 F. Supp. 2d 367, 389 (S.D.N.Y. 2006) ("[h]owever, under New York law, a corporation can act

as the agent of a corporate officer and thus subject the officer to personal jurisdiction under section

302.""). The <u>Beatie</u> court further stated:

> [F]or a corporation to be considered an agent of an officer for personal jurisdiction
> purposes, a plaintiff must allege: (1) that the corporation engaged in purposeful
> activities in New York in relation to the transaction; (2) that the corporation's
> activities were performed for the benefit of the individual defendant; (3) that the
> corporation's activities were performed with the knowledge and consent of the
> individual defendant; and (4) that the individual defendant exercised some control
> over the corporation.

<u>Id</u>. (citations omitted). <u>See also</u> <u>Moneygram Payment Systems, Inc. v. Consorcio Oriental, S.A.</u>, No.

05 Civ. 10773, 2007 WL 1489806, at *5 (S.D.N.Y. May 21, 2007) (holding that corporation's Board

President and Vice President were subject to long-arm jurisdiction where corporation's acts were

imputed to them). In other words:

> Of course, if the officer engages in activities and conduct in New York that satisfies
> [*sic*] section 302(a)(1), then the officer subjects himself to personal jurisdiction.
> *Kruetter* established another basis for jurisdiction, however, over individual
> corporate officers. Applying traditional agency principles, if the corporation engaged
> in "purposeful activities" in New York in relation to the transaction at issue "for the
> benefit of and with the knowledge and consent of" the individual defendants, and if
> the individual defendants exercised "some control" over the corporation, then
> personal jurisdiction over the individual defendants exists.

<u>Reynolds Corp. v. Nat'l Operator Services, Inc.</u>, 73 F. Supp. 2d 299, 303 (W.D.N.Y. 1999)

(citations omitted).

In <u>Courtroom Television Network v. Focus Media, Inc.</u>, 264 A.D.2d 351, 352-353, 695

N.Y.S.2d 17, 19 (1st Dep't 1999), the court explicitly held that under CPLR § 302(a)(1),

> The requisite contacts may take place by mail or telephone; physical presence in the
> state is not required. The key inquiry is whether defendant purposefully availed itself
> of the benefits of New York's laws. Jurisdiction may be predicated on a transaction
> conducted by means of telephone calls, faxes and the acts of an in-state agent.

<u>Id</u>. The New York Court of Appeals recently reaffirmed this principle in <u>Fischbarg v. Doucet</u>, 9

N.Y.3d 375, 2007 WL 4438979 (Dec. 20, 2007), in which defendants, residents of California, had

retained a New York lawyer to represent them in an Oregon federal court. The Court held that jurisdiction over the defendants was proper pursuant to CPLR § 302(a)(1) notwithstanding the fact that the defendants had never physically entered New York.

> "[w]hen defendants projected themselves into New York via telephone to solicit plaintiff's legal services, they necessarily contemplated establishing a continuing attorney-client relationship with him. Having established such a relationship and repeatedly projecting themselves into New York – via telephone, mail, e-mail and facsimile – to advance their legal position in the Oregon action through communications with plaintiff here, defendants purposefully availed themselves of the benefits and protections of New York's laws governing lawyers. This lawsuit arises out of defendants' contacts here. Requiring them to defend the present suit properly comports with traditional notions of fair play and substantial justice.

Fischbarg, 9 N.Y.2d at 385, 2007 WL 4438979, at *9; see also Agency Rent A Car, 98 F.3d at 29 (finding jurisdiction under CPLR 302 (a)(1) and stating that "we question whether, in an age of e-mail and teleconferencing, the absence of actual personal visits to the forum is any longer of critical consequence."); accord McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957) (observing the expansion of personal jurisdiction due to the "increasing nationalization of commerce" and "modern transportation and communication"); Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 340 (1970) ("It is important to emphasize that one need not be physically present in order to be subject to the jurisdiction of our courts under CPLR 302 for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in the State."). The fact that some of the Defendants' conduct giving rise to Plaintiffs' claims in this matter did not physically occur in New York is irrelevant.

Turning to the jurisdictional arguments of specific Defendants who serve or served as ImageSat directors and officers, Defendant *Moshe Keret* claims that he has not had sufficient contacts with New York or the United States to warrant this Court's exercising jurisdiction over him. Review of Keret's acts demonstrates the contrary. During the 1990's, Keret was a senior executive

54

of Defendant IAI at the time when IAI agreed to enter into a Joint Venture with an American company (CST) for the purpose of raising millions of dollars in American money on Wall Street for purposes of commercializing Israeli earth-observation satellite technology developed at IAI -- the venture that grew into ImageSat. For this purpose, Keret traveled to New York to meet with investment bankers, beginning the fund-raising process that culminated with many of the Plaintiffs agreeing to invest in ImageSat, and had numerous other contacts with New York during the relevant period. (See Wilson Decl. ¶¶ 28, 68) As Keret acknowledged at his jurisdictional deposition, the entire purpose of this enterprise was to raise money from investors, such as Plaintiffs, in the "natural" location of New York. (Keret Dep. 37, 42) In this regard, Keret was IAI's signatory on each of the Joint Venture Agreements in 1995, 1997, and 1998 in which the parties agreed that New York law would govern in connection with the resolution of any disputes that might arise. (Matetsky Dec. Ex. "A", "B", "C")

Thereafter, concurrent with a pre-closing general meeting of the shareholders of West Indian Space in May 2000, Keret was named as a designee of IAI (ImageSat's largest shareholder and, with Elbit, one of the two controlling shareholders) to ImageSat's Board of Directors and was elected Chairman of the ImageSat board. Thereafter, Keret attended a series of at least five ImageSat Board meetings in New York, including meetings at which many of the matters at issue in the Complaint were discussed and Board decisions made, notably including the status of and accounting for the disputed (and Plaintiffs contend non-existent) "2001 EROS B1" satellite as well as the 2001 restructuring of the Company's securities, among other things. (See Matetsky Ex. "M", "N") These acts, individually and cumulatively, satisfy the CPLR requirements and make it more than reasonable for Keret to expect being haled into Court here to answer for his wrongful actions toward ImageSat security holders. See, e.g., Regency Capital, LLC v. Corpfinance Int'l, Inc., No. 02 Civ. 5615, 2003

WL 22400200, at *3 (S.D.N.Y. Oct. 20, 2003) ("cumulative effect" of corporate officer/board member's contacts with jurisdiction in negotiating contract on behalf of corporate defendant subjected individual to personal jurisdiction under long-arm statute).

Defendant *Itzhak Nissan* became General Manager of IAI's MBT (satellite) Division in 1995 or 1996. He traveled to New York on several occasions in connection with the fundraising for West Indian Space/ImageSat and attended certain investor meetings in New York. (He also hosted the New York Merrill Lynch due diligence team in Tel Aviv in preparation for the Merrill-led initiative that resulted in the $91 million Pegasus financing in July 2000.) During the final negotiations leading up to the closing of the financing transactions in New York in July 2000, Nissan was in frequent telephonic contact with Defendants Weiss and Eldar, who were present in New York, with Eldar explicitly present on behalf of Nissan. (Wilson Decl. ¶ 70) Although Nissan knew that Weiss was in a badly conflicted position, having been sent by ImageSat's Board to participate in the final negotiations with (among others) IAI as a representative of ImageSat's shareholders at the same time he was still a high-ranking officer of IAI, Nissan consistently pressed Weiss to pursue IAI's interests in New York at the expense of the interests of ImageSat and its shareholders during the protracted closing negotiations. (Wilson Decl. ¶ 70)

Nissan has also been an active participant in negotiating agreements with third parties through which IAI has violated its exclusivity, non compete and other commitments to ImageSat as contained in a July 2000 Master Agreement and other contractual agreements. He also served as a member of ImageSat's Board of Directors from 2000 to 2002 and attended at least one ImageSat Board meeting in New York, on May 11, 2001, at which topics of discussion included the "2001 EROS B1" satellite contract and the restructuring of ImageSat's securities, both of which are subjects of the claims asserted against Nissan. As the current CEO of IAI, Nissan, like his predecessor Keret

before him, presides over a company that conducts business regularly in New York and elsewhere in the U.S., whose U.S.-based customers account for roughly one-third of its total revenues of approximately $2 billion annually. (Keret Dep. 13-14)

Defendant *Shimon Eckhaus*, ImageSat's current CEO, was a senior executive of IAI throughout the 1990's ascending to the role of Deputy Chief Executive Officer prior to becoming the Chief Executive Officer of ImageSat in July 2005. He served on the board for approximately two years prior to that appointment and as CEO he has attended all ImageSat Board meetings since 2005, including at least eight in New York, at which virtually all of the wrongful acts and omissions with which Eckhaus is charged were discussed and decided. (Eckhaus Decl. ¶ 13) For example, Eckhaus was an attendee at the Board meeting on November 22, 2006 at which the ImageSat Board acquiesced, for impermissible reasons, in abandoning ImageSat's SOP sales effort in Venezuela and the generation of revenue from that potential SOP in excess of $100 million. Eckhaus has also conducted a substantial amount of ImageSat business in New York, including extensive efforts here in connection with ImageSat's proposed IPO in 2005. (Wilson Decl. ¶ 71)

Defendants *Gino Piperno-Beer*, *Yoav Chelouche*, and *David Arzi* are IAI-designated members of the ImageSat Board (Piperno-Beer since 2005 and Chelouche and Arzi since 2006), with Arzi serving as Chairman of the Board. These individual Defendants too have participated in wrongdoing in New York and the United States by their participation in ImageSat Board meetings in New York, New York at which wrongful acts in violation of the rights of ImageSat's minority shareholders were approved, and they have participated in the breaches of fiduciary duty and other acts of misconduct alleged in the Complaint. Based on their participation in the ImageSat Board meetings – and their ongoing involvement in such RICO-violative schemes as the continuing cover-up of the 2001 "EROS B1" satellite fraud – they too should be accountable in this Court in New

York for their acts of wrongdoing that have impacted ImageSat's minority shareholders and securityholders, many of whom are resident in New York or elsewhere in the United States. (See Wilson Decl. ¶ 74)

**c.    Yehoshua Eldar**

Defendant Yehoshua Eldar is a senior officer of IAI who Plaintiffs understand served as a director or alternate director of ImageSat in or around the period 2000-2001.[17]  Curiously, unlike the Declarations of the other individual Defendants seeking dismissal on jurisdictional grounds, which purport to explain the allegedly limited nature of the contacts between each Defendant and the State of New York, Eldar's cursory Declaration contains no discussion of his contacts or lack of contacts with New York beyond the statement that Eldar is not and has not been a New York resident and does not own real estate in New York.  In fact, Eldar attended meetings in New York in connection with, among other things, the final negotiation and execution of the Master Agreement and other documents executed at the July 2000 closing. (Wilson Decl. ¶ 46)  Further, the Complaint alleges, among other things, that Eldar has participated in the cover-up of the flaws in the "2001 EROS B" satellite and that he participated in the RICO conspiracy to, among other things, continue to fail to

---

[17]       The Complaint alleges that Mr. Eldar served as a director of ImageSat during 2000 and 2001, in addition to serving as IAI's Director of Finance under then-General Manager Nissan of the MBT (satellite) Division, and subsequently as Corporate Vice President of IAI under CEO Nissan.  The Complaint further alleges that Eldar participated in the investment closings in New York in July 2000 and July 2001 and was IAI's signatory on the Master Agreement and other contracts. (Cplt. ¶ 55)  In his Declaration on this motion to dismiss, Eldar contends that he was never a director of ImageSat. (Eldar Decl. ¶ 3)  However, at least two Plaintiffs have recollections of Eldar functioning as a director for some period of time in or around 2000 or 2001 – if not as a formally nominated and elected director, then as an alternate or representative of acknowledged ImageSat director and Eldar's superior at IAI, Nissan. This would have been consistent with a frequent practice at ImageSat in which directors were permitted to send alternates or proxies to Board meetings. (See, e.g., Cplt. ¶ 65; Goren Dep. 197-98)  That Eldar acted as a director or alternate director of ImageSat is consistent not only with the independent recollections of at least two Plaintiffs (see, e.g., Wilson Decl. ¶ 46), but also with the deposition testimony of Defendant Moshe Keret, who was Chairman of the Board of both IAI and ImageSat during the period in question.  Specifically, Keret was asked at his deposition "[d]id Mr. Eldar ever work as a director or alternate director of ImageSat" and responded with a straightforward "Yes." (Keret Dep. 64-65; see also Keret Dep. 80-82, at which Keret testified further about this matter after a break and coaching from counsel, but continued to recollect that Eldar may have been an alternate director, and specifically an alternate for Nissan)  The extent to which Eldar acted as a director of ImageSat, and thus as a fiduciary to its shareholders, will be a subject taken up in

disclose the sordid history of that satellite to ImageSat investors such as Plaintiffs. Such failure,

which has helped to destroy the value of all the investments from Plaintiffs that Defendants solicited

in New York, had a plainly foreseeable impact upon Plaintiffs in New York and elsewhere in the

United States. Eldar's suggestion that only his acts that themselves took place within New York may

be considered for purposes of analyzing *in personam* jurisdiction under either RICO or under the

New York CPLR is, as discussed above, incorrect.

### d.     The Elbit Defendants

The motion of the "Elbit Defendants" to dismiss for lack of *in personam* jurisdiction should

also be denied. Elbit is a publicly traded corporation whose shares are traded in the United States on

the NASDAQ stock exchange. In its most recent SEC filing, Elbit reported that in 2006, the Elbit

companies derived $609.5 million or 40% of their annual gross revenue from United States sources

and had 1,357 employees in the United States. Elbit, like ImageSat, is a party to contracts in which it

consented to this Court's jurisdiction in suits by Plaintiff WIS Partners, which is the Plaintiff having

the largest economic stake in this action, arising from those contracts, which form a basis for certain

of the claims in this action. (See supra pp. 26-27. 50) As such, like ImageSat, Elbit is contractually

barred from denying this Court's jurisdiction over it.

Elbit participated in substantial activity in New York in connection with soliciting

investments in West Indian Space/ImageSat from many of the Plaintiffs and others. In 1998, Elbit

entered into a document known as the "side agreement" under which it agreed to co-invest (through

the contribution of exclusive commercialization rights and "in-kind" contributions to capital) with

IAI in ImageSat and assumed all of IAI's rights and obligations in connection with its participation in

ImageSat. Thereafter, Elbit entered into a series of agreements with ImageSat, IAI, Plaintiff WIS

---

merits discovery.

Partners, and CST (the predecessor-in-interest to several of the Plaintiffs) under which, as noted above, it accepted that New York law would govern the agreements, New York courts would have jurisdiction in any dispute arising under the agreements, and any defense that New York was a *forum non conveniens* would be waived.  (See supra p. 50)

Representatives of Elbit's predecessor ElOp, including individual Defendants Ackerman and Toren, attended numerous meetings in New York, as directed by ElOp's then sole owner Federman, in connection with the solicitation and the closing of ImageSat's major financings in both 2000 and 2001.  (Wilson Decl. ¶ 46)  At least one Elbit designee has also attended all of the ImageSat Board meetings held in New York from 2000 to date, including the meetings at which some of the most destructive and value-destroying Board actions have been discussed and taken.  Additionally, as IAI's subcontractor, Elbit has played an integral and pervasive role in concealing the "2001 EROS B1" satellite fraud.

The four individual Defendants affiliated with Elbit also challenge jurisdiction.  Defendants Michael Federmann, Joseph Ackerman, and Joseph Gaspar each is, and Jacob Toren until his death in December 2006 was, a senior officer of Defendant Elbit.  All were involved in ImageSat's New York financing activities over the relevant period, including Ackerman's and later Gaspar's participation as members of the Audit and Finance Committee of the board.  Ackerman attended and participated actively in the closing of the July 2000 financing transactions in New York, to which he was sent by Elbit owner Federman, and where he was present to make representations and sign documents on behalf of Elbit in connection with the closing of the investment and financing transactions.  (Wilson Decl. ¶ 46)  Toren also participated in the negotiation of the various July 2000 documents including the negotiation and execution of the Master Agreement.  (Id.)  According to the Elbit Defendants' Answers to Interrogatories, Gaspar has attended at least eight ImageSat Board and

Finance Committee meetings held in the New York, at which many of Defendants' wrongful acts such as the termination of ImageSat's SOP negotiations with Venezuela as well as perpetuation of the "2001 EROS B1" satellite fraud took place.

Jacob Toren attended a number of presentations to investors and meetings with the investment bankers and others in New York as the Chief Executive Officer of ElOp while West Indian Space/ImageSat was engaged in financing activities during the period from 1998 to 2000 and he was present during the closing of the 2000 transactions in July 2000. Toren reported directly to and coordinated closely all of his actions relevant to ImageSat with Defendant Michael Federmann (then sole owner of ElOp) including the negotiation and execution of the Stock Purchase Agreement of December 1998 through which Toren committed ElOp to a preference for New York law and to a preference for New York as the appropriate venue for dispute resolution. Toren also attended at least one ImageSat Board meeting in New York, at which decisions that damaged ImageSat's security holders such as Plaintiffs were made. Decisions made and disclosures not made at these meetings have been an integral part of the damage done to Plaintiffs, including the United States and New York-based Plaintiffs, over the past years. Each of these Defendants is subject to personal jurisdiction in New York.

**D.    The Court's Exercise of Personal Jurisdiction Comports with Due Process**

Asserting personal jurisdiction over the Defendants for the claims asserted in the Complaint also satisfies the federal due process requirement that long-arm jurisdiction must be based on the defendant's having "minimum contracts" with the forum state, and that asserting jurisdiction comport with "traditional notions of fair play and substantial justice." International Shoe, 326 U.S., at 316. An assertion of jurisdiction that satisfies CPLR § 302 will generally meet federal due process

requirements; see Kelly, 2 F. Supp. 2d at 431; Laufer v. Ostrow, 55 N.Y.2d 305, 310, 449 N.Y.S.2d 456, 458 (1982).

Here, Defendants have availed themselves of the benefits of transacting business in New York, and have committed tortious acts both within and without the state which adversely impacted (among others) New Yorkers and other Americans, it would not be unreasonable to require Defendants to answer for their misconduct before the courts of this State. The due process analysis turns on the foreseeability that, " the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World Wide Volkswagen, 444 U.S. at 297.

As described by the Supreme Court in Burger King, the "minimum contacts" standard introduced in International Shoe is actually a two-part test. In addition to the existence of a claim arising from purposeful forum-directed activity, the maintenance of the suit must not offend "traditional notions of fair play and substantial justice," the latter of which is intended to insure the reasonableness of the particular assertion of jurisdiction. See Burger King, 471 U.S. at 476-78. The Court in Burger King set forth five factors which may lead a court to conclude that the assertion of jurisdiction is unreasonable. Id. See also LaMarca, 95 N.Y.2d at 218:

> A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.

Id. (quoting Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 113 (1987) (citations omitted). That standard is plainly satisfied here and the Court has, and should exercise, jurisdiction over all Defendants.