Ira Brad Matetsky (IM1881)
William A. Jaskola (WJ9839)
GANFER & SHORE, LLP
360 Lexington Avenue
New York, New York 10017
(212) 922-9250
(212) 922-9335 (facsimile)
*Attorneys for Plaintiffs*
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X
                                                        :
STEPHEN M. WILSON, BRW ENGINEERING LTD.,                :
WIS PARTNERS, L.P., MOSHE BAR-LEV, PATRICK              :
ROSENBAUM, MICHAEL MORRIS, HAIM YIFRAH,                 :
TOP DOWN PARTNERS, LLC, JOEL LEVINE,                    :
MORRIS TALANSKY, ABRAHAM MOSHEL,                        :     07 Civ. 6176 (LTS)(DFE)
MAGMA INTERNATIONAL SERVICES, LTD.,                     :
ALBERT REICHMANN, HEXAGRAM                              :
INTERNATIONAL LIMITED, and POLYBUTES                    :     **FIRST AMENDED**
COMPANY,                                                :     **COMPLAINT**
                                                        :
                        Plaintiffs,                     :
                                                        :
                -against-                               :
                                                        :
IMAGESAT INTERNATIONAL N.V.,  ISRAEL                    :
AEROSPACE INDUSTRIES LTD., ELBIT SYSTEMS                :
LTD., ELBIT SYSTEMS ELECTRO-OPTICS ELOP                 :
LTD., MOSHE KERET, IZHAK NISSAN, JACOB                  :
WEISS, SHIMON ECKHAUS, MICHAEL                          :
FEDERMANN, ESTATE OF JACOB TOREN, JOSEPH                :
ACKERMAN, JOSEPH GASPAR, GINO PIPERNO-                  :
BEER, JAMES DEPALMA, DAVID ARZI, YOAV                   :
CHELOUCHE, and YEHOSHUA ELDAR,                          :
                                                        :
                        Defendants.                     :
                                                        :
--------------------------------------------------------X

        Plaintiffs, STEPHEN M. WILSON, BRW ENGINEERING LTD., WIS PARTNERS

L.P., MOSHE BAR-LEV, PATRICK ROSENBAUM, MICHAEL MORRIS, HAIM YIFRAH,

TOP DOWN PARTNERS, LLC, JOEL LEVINE, MORRIS TALANSKY, ABRAHAM

MOSHEL, MAGMA INTERNATIONAL SERVICES LTD., ALBERT REICHMANN, HEXAGRAM INTERNATIONAL LIMITED, and POLYBUTES COMPANY, by their attorneys, GANFER & SHORE, LLP, for their Complaint, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are minority shareholders of, as well as holders of bridge warrants and/or employee stock options to acquire stock in, ImageSat International N.V ("ImageSat" or "Company"). ImageSat is a Netherlands Antilles (Curacao) company that is now headquartered in Israel but has regularly conducted business in New York. ImageSat's principal business is the sale of exclusive regional rights, under Satellite Operating Partner ("SOP") agreements, to the use of its two "EROS" high-resolution earth observation satellites.

2.      Among the Plaintiffs are the members of the founding management of ImageSat and others who received stock in the Company, and/or stock options, as part of their compensation during years of loyal service. Others among the Plaintiffs are individuals and entities that invested millions of dollars in cash in ImageSat during the Company's highest-risk start-up and development stages and at times that the Company was in financial crisis, for which they received common or preferred shares or bridge warrants. Plaintiffs were minority shareholders, option holders, and warrant holders who collectively owned an estimated 10.7% of ImageSat's fully diluted issued and outstanding shares, prior to certain dilutive transactions that took place in or about March 2006. (As used herein, the term "minority shareholders" also includes the option holders and warrant holders where the context so requires.)

3.      Instead of properly recognizing the rights of ImageSat's minority shareholders, Defendants have deprived them of their voice in the operation of the Company and have engaged in a series of actions and transactions characterized by multiple breaches of fiduciary duty, self-

dealing, and other willfully fraudulent, deceptive, and oppressive acts, the net effect of which, individually and cumulatively, has been to strip hundreds of millions of dollars of shareholder value from ImageSat and to further and wrongfully dilute and devalue or destroy each of the Plaintiffs' ownership interests in the Company.

4.    ImageSat's largest shareholders have been and are Defendant Israel Aerospace Industries, Ltd., formerly known as Israel Aircraft Industries, Ltd. ("IAI") and Defendant Elbit Systems Electro-Optics Elop Ltd. ("ESEOEL"), an affiliate of Defendant Elbit Systems Ltd. ("Elbit Systems"), which are successors to Electro Optical Systems ("ElOp") (collectively "Elbit"). IAI is a 100% Israeli-government-owned corporation and is the principal Israeli defense and aerospace company, whose business includes, among other things, developing and manufacturing the "EROS" earth observation satellites. Elbit is the second-largest Israeli defense company, is publicly traded on the NASDAQ stock exchange ("ESLT"), and manufactures, among other things, electro-optical and related components for earth-observation satellites such as the imaging payload implemented in ImageSat's EROS A and B satellites.

5.    IAI and Elbit personnel have always played a substantial role in ImageSat's operations because financing, building and deploying the Company's initial satellites consumed a majority of the Company's human and financial resources. However, it was always understood, and represented to investors including Plaintiffs, that ImageSat would be run as an autonomous, **apolitical** commercial entity and that its business would be entirely separate and distinct from the businesses of IAI and/or Elbit. Because the essence of the Company's SOP concept was to provide an autonomous regional satellite operating capability to governments, principally in support of each individual government customer's national security agenda, ImageSat's commercial and political independence was a fundamental, indeed essential, element

3

of its business plan. ImageSat's competitors were (and still are) backed by the largest United States aerospace companies and the U.S. government. ImageSat's principal competitive advantage against its financially superior and technically more experienced competitors was its profile as an independent and robustly international company able to sell truly independent high-resolution satellite imaging capabilities to governmental customers worldwide, free from the unwanted influence of a politically motivated regulatory and licensing regime, such as that of the United States. It was understood that the Company could not project the required profile as a U.S. company and, due to the perceived closeness between the U.S. and Israel, not as an Israeli company either. Nor could the Company be perceived as dominated by its Israeli industrial partners, including in particular government-owned IAI. The founding management team, with the support of the earliest financial investors, including Plaintiffs, went to great lengths to ensure that the extensive business contemplated among ImageSat, IAI and Elbit would be characterized by arm's-length transactions, free from the inherent and obvious potential conflicts of interest.

6.    Instead, IAI and Elbit have consistently misused their Israeli government connections to enhance their controlling influence over the Company (for example by withholding the bit-stream specifications of the Company's first satellite, "EROS A", from ImageSat to ensure that IAI would control the integration and maintenance of the Company's ground segment) and by wrongfully exercising that control to obtain inequitable concessions (such as wrongfully obtaining, in July 2000, the exclusive right to supply satellites and payloads to ImageSat without competitive bidding). Since 2005, existing export licenses to sell SOP systems and services, explicitly acknowledged by the Israeli Ministry of Defense ("IMOD") in writing to be among the most valuable assets of the Company and its financial investors, have been wrongfully suspended or withdrawn to further the business and political interests of the

Israeli industrial partners and their IMOD sponsors. As further discussed below, the foregoing examples of deception and self-dealing have had disastrous consequences for the Company and its minority shareholders, including Plaintiffs, ever since.

7.    On July 25, 2000, IAI (acting through its MBT division and sometimes known as "IAI/MBT") and ImageSat (then known as "WIS", for West Indian Space) entered into a contract known as the Master Agreement, intended to govern the parties' rights concerning, among other things, exclusivity and first rights to use, commercialize, and otherwise exploit technology that would be created during the parties' relationship. In the Master Agreement, which was expressly to be governed by New York law, the parties agreed, *inter alia*, that ImageSat would be the "exclusive vehicle" through which IAI would pursue commercialization of IAI's EROS class satellites and accordingly, that IAI would not engage in activities competitive with ImageSat's business, explicitly and particularly including the provision of earth observation services to any party whatsoever, including governments. IAI also agreed not enter into other earth observation business ventures under which it would compete with ImageSat by offering or providing services from earth observation satellites to customers; IAI and ImageSat agreed to leverage their respective capabilities to facilitate the expansion of ImageSat's earth observation satellite imaging business. Beyond granting the exclusive right to exploit existing IAI earth observation satellite technology in all but the government-to-government arena, IAI specifically agreed that whenever IAI/MBT was presented with, or independently considered an opportunity for the commercialization of IAI's future earth observation technology, it would propose the exploitation of such opportunity to ImageSat and the parties would make commercially reasonable efforts to negotiate the terms and conditions of such exploitation. Further, IAI agreed that provided ImageSat placed a specified number of satellite orders with

IAI, IAI would not offer or sell earth observation satellites based on either party's technology to any third-party commercial program or other customer (other than to the Israeli government or on a government-to-government basis, and even in a government-to-government sale subject under certain circumstances to payment of royalties to ImageSat).

8.      These and the other terms of the Master Agreement, and of the successive Joint Venture Agreements of 1994, 1995, 1997 and 1998 that preceded it, as well as the Stock Purchase Agreement ("SPA") between ElOp and WIS of 1998 that mirrored precisely IAI's exclusivity and non-compete commitments to the Company, represented key inducements that persuaded many of the Plaintiffs, including but not limited to Wilson, as well as all of the Company's financial investors since the Company's inception, to agree to ImageSat's entry into transactions with IAI and Elbit, or to invest funds into ImageSat.

9.      Although improper and fraudulent financial transactions involving the Company, under the aegis of IAI and Elbit began as long ago as 2000, since June of 2005 a series of events was planned and executed by Defendants that reflect a new and malicious intent to unwind the once highly promising independent business of the Company and to misappropriate its financial, satellite, and launch assets to serve the business purposes of IAI and Elbit, including in particular their independent plans to aggressively pursue the global market for turn-key high-resolution earth-observation satellites and payloads, and the national security and broader geopolitical interests of their most important customer, the IMOD.

10.      Until November 2005, the Company planned to conduct an initial public offering (IPO) of its common stock. The offering was scheduled to commence at the end of November at an estimated total market valuation for the Company of approximately $470 to $500 million, and in turn valuing Plaintiffs' combined interests (including stock, options, and warrants) at

approximately $30–40 million. The IPO ultimately did not take place, for reasons including the announced Israeli governmental investigation of IAI CEO and then ImageSat Chairman and CEO Defendant Keret on charges of bribery and corruption, some of which reported allegations were linked to the sale of earth observation satellites. In addition, Defendants have made or knowingly allowed the Company to make excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere, outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments.

11.    Instead, allegedly motivated by the urgent need, absent an IPO, for alternative financing to launch the Company's second satellite, "EROS B", which had already been delayed by more than two years due entirely to Defendants' fraudulent and deceptive actions, Defendants sought and obtained new senior debt financing from Israeli investors. This purportedly urgent requirement was artificially transformed into a full-blown financial crisis for the explicit purpose of diminishing or eliminating entirely the influence and importance of the minority and financial shareholders and their legitimate business interests and to bring about a fraudulent restructuring of the then non-Israeli senior debt and equity of the Company. Rather than salvaging a troubled Company, Defendants acted deceptively and fraudulently to tighten their control over ImageSat and its by then fully captive minority shareholders and investors and to terminate, rather than to resurrect, the once highly promising and independent business plans of the Company.

12.    Since the IPO process was suspended in November of 2005, those in control of ImageSat have conspired to subordinate the Company's commercial decision-making interests and the financial interests of the minority shareholders, including Plaintiffs, entirely to those of

IAI and Elbit and to the political interests of the IMOD. Even the pretext of maintaining ImageSat as an independent, apolitical and commercial enterprise has since been blatantly abandoned. At least one lucrative SOP contract opportunity was deliberately sabotaged for purely political reasons. Contract obligations to Angola, an existing SOP customer, were knowingly and purposely unfulfilled to conceal Defendants' corrupt business practices and in order to position the Company to serve the preferred Israeli export partner, and historically the principal financial sponsor of Ofeq technology development, South Africa. Additionally, Taiwan, a fully licensed former SOP customer of the Company, was denied previously promised service from EROS B in favor of export partners of greater strategic importance to IAI, Elbit and the IMOD in the region.

13.    Compounding defendants' misconduct and breaches of fiduciary duty, and confirming their intent to effectively give away ImageSat's business without achieving compensation for the shareholders, ImageSat's Board members and senior management (many of whom are in conflicted positions because they were designated by or are otherwise loyal to IAI) have done nothing to protect and enforce the Company's valuable rights under the Master Agreement providing ImageSat with exclusive rights and/or first rights to commercialize and otherwise to exploit IAI's earth observation satellite technology. ImageSat's rights under the Master Agreement represent one of the Company's most valuable assets, which the directors and officers had the duty to preserve and defend. Instead, the defendant directors and officers have not only stood idly by, but affirmatively acquiesced, and in some cases conspired with IAI, as it has wrongfully sought to terminate ImageSat's exclusive rights, breach the non-competition clause, and has ignored ImageSat's first rights under the Master Agreement. They have also

failed to negotiate and collect royalties from IAI and Elbit to which ImageSat is entitled for uses of technology developed by IAI and Elbit in connection with their work for ImageSat.

14.     In April 2007, IAI announced that it was entering into a transaction with Northrop Grumman Corporation ("Northrop") under which IAI reportedly would supply to Northrop up to eight earth observation radar satellites at a cost of up to $1.6 billion in the initial implementation of the deal.  Although these satellites are proposed to use synthetic aperture radar ("SAR") imaging, rather than the electro-optical imaging payload developed and supplied by Elbit, in virtually all other respects, the technology underlying IAI's radar satellites is the same as that underlying the existing EROS satellites produced by IAI for ImageSat.  Much of the technology that differentiates the new SAR satellites from EROS satellites was developed by IAI using ImageSat employees and/or in the course of developing the EROS B and C satellites for ImageSat and is accordingly within the scope of the non-compete obligations contained in the Master Agreement.  Moreover, because this proposed transaction represents a commercialization of an extension of IAI's earth observation satellite business, it is, at a minimum, subject to the first right provision under which IAI agreed to discuss any opportunity for commercialization of its present and future earth observation satellite technology with ImageSat and to negotiate a mutually agreeable joint strategy for pursuing such commercialization, before making any such proposal to any other party.

15.     Instead of abiding by its obligations under the Master Agreement, including but not limited to its obligation to accord ImageSat a first right to negotiate terms for the exploitation of IAI earth observation satellite technology before entering into a transaction with another party, IAI negotiated the Northrop transaction without according ImageSat the opportunity to exercise its first right and indeed, upon information and belief, without any advance notice to or

discussion with ImageSat at all. On its face, the IAI-Northrop transaction breaches ImageSat's non-compete right, exclusivity right, and first right under the Master Agreement and threatens ImageSat with irreparable and immediate injury. Yet, instead of seeking immediate redress for IAI's wrongful conduct by negotiation, litigation, or otherwise, ImageSat's management and board of the directors have accepted IAI's position that the transaction is outside the scope of the Master Agreement and that ImageSat has no remedy. Only the financial and other conflicts of interest of the IAI-designated members of the ImageSat Board and of senior management can explain defendants' condign failure to protect the rights of the Company and the shareholders whom they supposedly serve. Demands by several of the minority shareholders that the Board and management take appropriate action to safeguard the Company's and its shareholders' rights have been ignored. Defendants' apparent lack of interest in preserving and protecting ImageSat's rights, and their acquiescence in accepting IAI's position that the Company no longer has any such rights, is consistent with their overall plan to wrongfully subordinate the interests of ImageSat and its shareholders, particularly including the minority shareholders such as plaintiffs, to those of IAI.

16.     IAI and Elbit have further violated the non-compete provisions of the Master Agreement and the SPA since 2000 by (i) offering and in some cases supplying earth observation satellite and payload systems under commercial tenders without imposing appropriate export control limitations, and (ii) providing and proposing to provide earth observation services to third parties despite the fact that their doing so is explicitly prohibited by prior agreement with the Company. Indeed IAI and Elbit, separately and together with the IMOD, and contrary to the explicit commitments of each of them to ImageSat's investors and shareholders, have openly and vigorously pursued the provision of earth observation services from Ofeq electro optical earth

observation satellites. Such earth observation services are a key element in the joint IAI/IMOD R&D funding and sales strategies for the new SAR earth observation "TechSAR" satellite (which is also the subject of IAI's aforementioned Northrop Grumman deal), in an audacious theft and conversion of ImageSat's proprietary and unique SOP service concept and technology.

17.    IAI's and Elbit's purpose of placing ImageSat's space and launch assets under their full control and in the primary service of the Israeli government, while also commercializing earth imaging satellite technology through partners other than ImageSat, is inconsistent with the Company's original business plans and purpose, or for that matter with any legitimate entrepreneurial or profit-making model. In fact, ever since the successful financing and deployment of the Company's first (EROS A) satellite in 2000, an undertaking explicitly requested by the IMOD after its failed launch of Ofeq 4 in January 1998 (i.e. the deployment by ImageSat of an "A" class rather than ImageSat's preferred EROS "B" class design), ImageSat's formerly dynamic and robustly international corporate profile has been gradually but irreparably diminished to that of a small and captive (though uniquely valuable) Israeli company based entirely in, and primarily serving constituencies in, Israel.

18.    Between 1998 and 2005, IAI was seemingly and inexplicably unable to deliver to the Company its first EROS B class satellite or even a functional design that met the Company's long-standing commercially competitive requirements. Although it had paid tens of millions of dollars to IAI and its subcontractor Elbit and continued to do so though successive EROS B Satellite Supply Contracts of 1998, 2000, and 2001, as of 2004 ImageSat had not even received a functional design that met the Company's long standing commercially competitive requirements. Only as Ofeq 5 (the real technical predecessor to the Company's existing EROS B) approached the end of its anticipated lifespan did IAI and Elbit begin substantive work on an

"EROS B class" satellite for ImageSat. But the "2004 EROS B" was EROS B in name only, as it was based entirely on substantially less stringent IMOD performance requirements rather than on the substantially enhanced design the Company had specified in the aforementioned successive satellite supply contracts of 1998, 2000 and 2001. Although defendants entered into multiple EROS B supply contracts, and exchanged among themselves $100 million of ImageSat, shareholder, and investor resources, they continued to dedicate all available technical and financial resources to the service of their primary client, the IMOD. But the IMOD was not interested in the commercially competitive enhancements embodied in ImageSat's EROS B mission requirements. Instead, it was interested in (i) ensuring the timely deployment of replacements for failed or dying Ofeq satellites and (ii) developing and adding SAR imaging capabilities to its existing Ofeq and EROS electro-optical surveillance satellite constellation. And that is exactly what Defendants deceptively, willfully, and fraudulently brought about.

19.    When the launch of the IMOD's Ofeq 6 satellite (a satellite by then urgently needed by the IMOD to replace the aging Ofeq 5) failed in September 2004 aboard the consistently troubled Israeli Shavit launch vehicle, ImageSat's IMOD-specified 2004 EROS B (and its highly reliable Russian Start launch vehicle) and its still fully functional EROS A, were suddenly recognized as priceless assets by the Israeli defense establishment. As a direct result, ImageSat is no longer in business to provide apolitical earth observation satellite services for the proportional financial benefit of all its shareholders, as it was designed to do and as Plaintiffs were assured would always be the case. Rather, the Company now exists for the principal benefit of the Israeli industrial shareholders, IAI and Elbit, and more specifically to support and advance the regional national security interests and global geopolitical agenda of their "anchor" customer, the IMOD. Plaintiffs, as minority shareholders, bear the burden of Defendants' greed

and corruption, their misdirected management and their deliberate misuse of the Company for purposes other than achieving the best available return for all its shareholders. Its minority and financial investors are the victims of a fraudulent and conspiratorial, uncompensated "eminent domain"-style seizure of their assets.

20.    Accordingly, the Plaintiffs bring this action to hold Defendants responsible for their breaches of fiduciary duty, corporate waste, fraud, racketeering activity and violation of the RICO statute, fraudulent conveyances, breaches of contract, corrupt business practices, and other misconduct directed against the minority shareholders and investors. As set forth below, the wrongful acts were perpetrated by the Company's controlling shareholders and their representatives, including IAI and ElOp (later Elbit). In doing so, these controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole. As set forth below, many of the acts forming an integral part of Defendants' wrongful acts took place in New York, New York, rendering this Court an appropriate forum to redress Defendants' wrongful conduct.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over the subject-matter of this action under 28 U.S.C. § 1331 because Plaintiffs' claims asserted herein include claims arising under the laws of the United States, namely, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

22.     This Court also has jurisdiction over the subject-matter of this action under 28
U.S.C. § 1332(a)(3) in that Plaintiffs and Defendants are citizens of different States of the United
States together with citizens or subjects of foreign states as additional parties.  No Plaintiff is a
citizen of the same State of the United States as any Defendant.  The amount in controversy
exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     Venue is proper in this District.

## PARTIES

### Plaintiffs

24.     Plaintiff Stephen M. Wilson is a citizen of the United States and of the
Commonwealth of Puerto Rico.  Wilson was the founding CEO of ImageSat and served in that
role from the inception of the Company to 2000.  From 2000 to 2006, Wilson has served under a
consulting contract between the Company and BRW Engineering, Ltd.  Wilson holds 20,000
shares of ImageSat common stock, stock options to acquire an additional 132,077 shares, and
bridge warrants permitting him to acquire another 54,000 shares of ImageSat common stock.

25.     Plaintiff BRW Engineering Ltd. ("BRW") is a Cayman Islands corporation with
its principal place of business in the Cayman Islands.  BRW is wholly owned by Plaintiff
Wilson.  BRW holds 7,810 shares of ImageSat common stock.

26.     Plaintiff WIS Partners, L.P. ("WIS Partners") is a Bermuda limited partnership
with its principal place of business in Hamilton, Bermuda and maintaining an office in New
York City.  WIS Partners holds 243,121 shares of ImageSat common stock and bridge warrants
permitting it to acquire another 26,000 shares of ImageSat common stock.

27.     Plaintiff Moshe Bar-Lev is a citizen and resident of Israel.  He is widely
regarded as the "driving force" behind the initiation and realization of the Israeli national space

program and was the Founding Director of IAI's Space Technologies Directorate. Bar-Lev was the founding chief technical officer (CTO) of ImageSat and President of ImageSat's Israeli subsidiaries from inception and was the senior technical executive of the Company until 2004. Bar-Lev holds 20,000 shares of ImageSat common stock, and options to acquire another 110,693 shares of ImageSat common stock.

28.     Plaintiff Patrick Rosenbaum is a citizen of Israel and France, presently residing in China.  He was the founding Deputy Director of IAI's Space Technologies Directorate. Rosenbaum was the founding chief operating officer (COO) of ImageSat and served in that position from inception to 2002.  Rosenbaum holds 20,000 shares of ImageSat common stock and stock options to acquire another 110,693 shares of ImageSat common stock.

29.     Plaintiff Michael Morris is a citizen of the United States and of the State of Florida.  Morris was the founding chief financial officer (CFO) of ImageSat and served in that position until 2000, spending much of his time in New York interfacing with ImageSat's institutional investors.  Morris holds options to acquire 71,537 shares of ImageSat common stock.

30.     Plaintiff Haim Yifrah is a citizen and resident of Israel.  Yifrah is retired Brigadier General of the Israeli Defense Forces and commander of the IDF Intelligence Corps and was responsible for the integration of the Israeli Ofeq surveillance satellite program subsequent to the successful deployment of Ofeq 3 in 1995.  Immediately upon his retirement in 1999, Yifrah joined ImageSat as its founding Vice President for Defense Systems and served in that position until 2006.  Yifrah holds options to acquire 37,500 shares of ImageSat common.

31.     Plaintiff Top Down Partners, LLC ("Top Down") is a Nevada corporation, with its principal place of business in Pasadena, California.  Top Down holds 4,987 shares of ImageSat common stock.

32.     Plaintiff Joel Levine is a citizen of the United States and of the State of California.  Levine holds 4,986 shares of ImageSat common stock.

33.     Plaintiff Morris Talansky is a citizen of the United States and of the State of New York.  Talansky holds bridge warrants entitling him to acquire 25,000 shares of ImageSat common stock.

34.     Plaintiff Abraham Moshel is a citizen of the United States and of the State of New York.  Moshel holds bridge warrants entitling him to acquire 20,000 shares of ImageSat common stock.

35.     Plaintiff Magma International Services, Ltd. ("Magma") is a corporation organized under the laws of Switzerland and having its principal place of business in Switzerland.  Magma holds 13,629 shares of ImageSat preferred series B stock.

36.     Plaintiff Albert Reichmann is a citizen and resident of Canada.  Reichmann holds bridge warrants entitling him to acquire 5,000 shares of ImageSat common stock.

37.     Plaintiff Hexagram International Limited (doing business as Hexagram & Co.) ("Hexagram") is a Canadian company with its principal place of business in Ontario, Canada.  Hexagram holds bridge warrants entitling it to acquire 5,000 shares of ImageSat common stock.

38.     Plaintiff Polybutes Company ("Polybutes") is a company organized under the laws of the British Virgin Islands, and having its principal place of business in Bermuda.  Polybutes holds bridge warrants entitling it to acquire 20,000 shares of ImageSat common stock, which it purchased from Hexagram.

**Defendants**

39.     Defendant ImageSat is a public limited liability company ("*naamloze vennootschap*" or N.V.) organized under the laws of the Netherlands Antilles (Curacao) with its principal place of business located in Israel. Upon information and belief, ImageSat also does business directly in the United States, including in New York. Among other business conducted by ImageSat and the other Defendants in New York, ImageSat's Board of Directors meetings have frequently been held in New York and, upon information and belief, have been held more often in New York, New York, than in any other location. Upon information and belief, each of the individual Defendants herein, many of whom serve as directors and/or officers of ImageSat at the behest of Defendant IAI or Defendant Elbit (successor to ElOp), has attended such meetings in New York in connection with the conduct at issue in this Complaint.

40.     Defendant Israel Aerospace Industries, Ltd., formerly Israel Aircraft Industries, Ltd. (IAI), is an Israeli corporation owned entirely by the government of Israel, which, upon information and belief, regularly does business in New York. IAI operates a U.S. subsidiary known as Israel Aircraft Industries, Ltd. which is a Delaware corporation authorized to do business in New York. IAI's principal place of business located in Israel. IAI owns a substantial block of ImageSat common stock and is ImageSat's largest shareholder.

41.     Defendant Elbit Systems Ltd. is an Israeli corporation with its principal place of business located in Israel. Elbit owns or is affiliated with several U.S. companies and its shares are listed on the NASDAQ stock exchange under the symbol "ESLT". Elbit is a successor to Electrical-Optical Systems ("ElOp"), formerly an Israeli privately held company, which was merged into Elbit in 2000. References in this Complaint to "ElOp" include its successor-in-interest Elbit or their affiliates, including ESEOEL, where the context so requires and vice versa.

41a.    Defendant Elbit Systems Electro-Optics Elop Ltd. (formerly Elop Electro-Optics Industries Ltd.) is an Israeli corporation with its principal place of business located in Israel. Upon information and belief, ESEOEL is a subsidiary and/or affiliate of Elbit Systems which holds title to the former ElOp shares of stock in ImageSat and is a party to at least some of Elbit's or ElOp's rights and obligations relating thereto.

42.    Defendant Moshe Keret is a natural person and a citizen of Israel. He served as Chairman of the Board of Directors of ImageSat from 2000 to 2005. He was the chief executive officer of IAI throughout the entire history of ImageSat's development from inception until November 2005.

43.    Defendant Izhak Nissan is a natural person and a citizen of Israel. He was the General Manager of the MBT division of IAI (including its space directorate) until succeeding Defendant Keret as CEO of IAI in 2005. He served as a member of ImageSat's Board of Directors from 2000 to 2002.

44.    Defendant Jacob Weiss is a natural person and a citizen of Israel and the United States. He served as the corporate Vice President and General Counsel of IAI until becoming CEO of ImageSat from July 2000 until December 2001. Thereafter, Weiss continued as an active consultant to and member of the Board of Directors of ImageSat until 2005.

45.    [Intentionally omitted].

46.    Defendant Shimon Eckhaus is a natural person and a citizen of Israel. He served as the corporate Vice President of International Marketing and Sales, and subsequently as Executive Vice President and Deputy Chief Executive of IAI, until becoming CEO of ImageSat in 2005. He continues to serve in that capacity. Eckhaus also served as a member of ImageSat's Board of Directors from 2003 to 2005.

47.     Defendant Michael Federmann is a natural person and a citizen of Israel. He is the Chairman of the Board of Directors, and largest shareholder, of Defendant Elbit. He was the former owner of ElOp until that company and its stake in ImageSat became wholly owned assets of Elbit in 2000. He served on the Board of Directors of ImageSat in 2001 and 2002.

48.     Defendant Estate of Jacob Toren is the successor-in-interest to Jacob Toren. Until his death in December 2006, Jacob Toren was a natural person and a citizen of Israel. He was the former chief executive officer of ElOp until its acquisition by Elbit Systems. He served as a director of ImageSat from 1998 to 2001, and most recently served as the Director General of the IMOD between September 2005 and July 2006. References herein to Jacob Toren include his estate where the context so requires.

49.     Defendant Joseph Ackerman is a natural person and a citizen of Israel. He is the chief executive officer of Elbit Systems. He served on the Board of Directors of ImageSat from 2002 until 2005 and was a member of ImageSat's Audit Committee.

50.     Defendant Joseph Gaspar is a natural person and a citizen of Israel. He is the chief financial officer of Elbit Systems. He served as an alternate director of ImageSat for Joseph Ackerman and replaced him as a full member of the ImageSat Board of Directors and the Audit Committee in 2005.

51.     Defendant Gino Piperno-Beer is a natural person and a citizen of Israel and Italy. He has been a member of ImageSat's Board of Directors and Audit Committee since late 2005 or early 2006.

52.     Defendant James DePalma is a natural person and a citizen of the United States and of the State of Connecticut. He has been a member of ImageSat's Board of Directors and Audit Committee since 2003.

53.    Defendant David Arzi is a natural person and a citizen of Israel. He has been a member of ImageSat's Board of Directors since 2006 and has served as its Chairman since his appointment. He concurrently serves as Corporate Vice President of IAI.

54.    Defendant Yoav Chelouche is a natural person and a citizen of Israel. He has been a member of ImageSat's Board of Directors since 2006.

55.    Defendant Yehoshua (Shuki) Eldar is a natural person and a citizen of Israel and is Corporate Vice President of IAI, explicitly responsible for IAI's relationships with affiliates and subsidiaries. Upon information and belief, Eldar was an alternate representative to ImageSat's Board of Directors on behalf of Defendant Nissan of IAI at some times between 1998 and 2001. He attended at least one ImageSat board meeting and acted as a director holding a voting proxy on behalf of Nissan. He was the Director of Finance at MBT and participated in the Pegasus investment and related closings of July 2000 and July 2001 and was a signatory to the Master Agreement and other relevant agreements on behalf of IAI/MBT.

## FACTS

### A.    Background

56.    ImageSat was initially organized as a 50%/50% joint venture of IAI and Core Software Technology (CST) in 1994. It was incorporated in the Cayman Islands in 1997 under the name West Indian Space, Ltd. In 2000, concurrent with certain financing transactions described below, the Company's domicile was changed to the Netherlands Antilles, the Company was registered in Curacao as a public limited liability company ("*naamloze vennootschap*" or N.V.), and its name was changed to ImageSat International N.V. The Company's founding management team included Plaintiffs Wilson as chief executive officer,

Bar-Lev as chief technical officer, Rosenbaum as chief operating officer, Morris as chief financial officer, and Yifrah as vice president for defense systems.

57.     From its inception, ImageSat's business operations and purpose involved the sale of earth imaging services from high resolution (surveillance) satellites. Prior to ImageSat's creation, governments could obtain such data only by launching their own satellites or by entering into formal or informal agreements with other governments that had such satellites. During the mid-1990's, the geopolitical environment changed so as to permit the commercial sale of high-resolution imagery and services and the launching and operation by commercial companies of privately owned surveillance satellites. Several U.S. aerospace companies applied for and received licenses from the U.S. Government to do so.

58.     In May of 1994, Wilson proposed to IAI to create a robustly "international company", i.e. one dominated by neither American nor Israeli interests, as the most appropriate vehicle for approaching the new market. IAI and the IMOD were already desperately seeking new sources of financing for the Israeli military space program (i.e., the new non-apartheid government of South Africa had broken off formal ties and terminated all joint defense research with Israel including previously substantial financing for corresponding Ofeq and Greensat programs). One such option then under consideration was the possible commercialization of Israel's not-yet-flight-proven Ofeq military satellite technology. Wilson and the other members of the founding management team – among them, the former and founding Director and Deputy Director of IAI's space group, Bar-Lev and Rosenbaum – developed the SOP concept wherein governmental customers would purchase autonomous local control of the satellite's imaging systems within the geographic "footprint" (communication range) of their own ground control station. Each such customer country would operate the Company's satellites exclusively as

ImageSat's regional Satellite Operating Partner ("SOP") whenever the satellite overflew its respective portion of the globe. SOP's would receive all equipment and training required to independently define each imaging mission (or "pass" over the ground station) and to transmit the mission directly to the satellite (called "tasking") as well as to process, interpret, archive and control the use of the resulting imagery data acquired within its contractually defined geographic region. In addition to developing and implementing the SOP concept and minor variations thereof, which have been responsible for well over 90% of the Company's revenue to date, the members of the founding management team were individually and collectively responsible for every successful SOP contract closing from inception through the April 2006 launch of the Company's second ("EROS B") satellite.

59.     From ImageSat's inception, IAI was among its largest shareholders. However, it was memorialized in the first Memorandum of Understanding between the original joint venturers that IAI, an Israeli government-owned company, could and would never own in excess of 50% of the Company, so as to prevent ImageSat from becoming subject to the Israeli government company regulatory regime. Indeed, it was explicitly contemplated that IAI's stake in the Company would be gradually and substantially diluted as new partners and investors joined the Company. Although IAI and its electro-optical payload supplier, ElOp, received special consideration for the award of satellite manufacturing contracts, they were explicitly not appointed exclusive satellite suppliers to the Company, which assiduously retained the right between 1994 and 2000 to put satellite contracts out for competitive bidding and thereby to obtain the highest quality satellite manufacturing and services at the lowest available cost.

60.     ImageSat's co-founding U.S.-based joint venturer, CST, and all other future U.S. holders combined, could similarly never own more than 50% of the Company, or it would

become subject to the United States remote sensing regulatory regime, which was incompatible with the "independent" and "exclusive" SOP concept. For a number of business and tax reasons, it was essential that the Company's business would be multinational rather than centered in any one country, but explicitly not in the United States or in Israel, by virtue of the fundamental principles of autonomy, confidentiality, and regional exclusivity, upon which its novel and unique SOP service was based.

61.      ElOp, a privately held Israeli company that manufactures the electro-optical imaging payload for Israel's Ofeq military satellites, resisted the commercialization of Ofeq technology throughout the 1990's. However, when it became apparent, immediately after the failed launch of Ofeq 4 in January 1998, that the IMOD intended to meet the necessary regulatory and non-compete requirements that would finally enable ImageSat to enter the market, ElOp insisted on joining the Company. The IMOD, under pressure from Defendants Jacob Toren, then ElOp's CEO, and Michael Federmann, ElOp's financially and politically powerful owner and Chairman, directed IAI to share its 50% initial joint venture ownership position with ElOp, resulting in a 37.5%/12.5% ownership distribution respectively. As consideration for their "founders" shares, ElOp agreed to grant to ImageSat the exclusive rights to commercialize its contributions to the collective "Ofeq satellite technology", and not to compete with ImageSat in the exploitation of its satellite earth observation technology, precisely as IAI had done through the initial joint venture agreements in 1994 and 1995. This "one-way" exclusivity arrangement seems extraordinary in retrospect, in that ImageSat had no corresponding exclusivity commitment to the manufacturers. However, when the joint venture was originally formed, "Ofeq" was not yet flight-proven technology, Israel had not yet successfully deployed a high resolution surveillance satellite, and the prevailing view among the

23

(entirely U.S.-based) companies that possessed flight-proven digital surveillance satellite technology was that Ofeq was too small a satellite to be able to deliver real-time high-resolution imagery. Moreover, the history of Israeli launch failures (four of six during the 1990s) and the cost of such failures repeatedly threatened to cause the cancellation of the entire Israeli space program whose survival through the mid to late 1990's became dependent entirely on outside investor financing through ImageSat.

62.    At roughly the same time that ElOp joined the Company, CST agreed to transfer a portion of its 50% initial joint venture stake to the European investor group WIS Partners, creating a 31.25%/18.75% ownership respectively. As consideration for their "founders" shares, CST and WIS Partners each made proportional cash investments in the Company at a value of $16 per share.

63.    From the outset, it was understood and agreed that ImageSat would be an apolitical, commercial enterprise. Although it was understood that the Company's commercial activities in the Middle East and globally would be subject to certain narrowly defined limitations by the IMOD (in its role as the export control authority for classified Israeli technology used by the Company) ImageSat's business decision-making, including the selection of the customers (countries) with which ImageSat would do business, was to be completely apolitical. The sole limitations on its activities, accepted by the Company as a condition to obtaining the IMOD's approval to commercialize the Ofeq technology, was that the Company was not to enter into SOP contracts or otherwise sell to (i) any country or other customer within a 2500-kilometer radius around Israel's own SOP ground station (entirely consistent with the SOP program parameters for all SOP countries), and (ii) "rogue states," which was defined in a written bilateral policy agreement between Israel and the United States as comprising those

states that were fully embargoed both commercially and militarily by the U.S. government (a very short list that today is comprised of Iran, Cuba, and North Korea).

64.     In 1998, the IMOD issued approximately 60 SOP export licenses (every country requested including Venezuela, Angola, Taiwan, China and India) as an extraordinary gesture to assure the Company's prospective financial investors of the sincerity and veracity of the "hands off" policy that the IMOD intended to take toward the Company's operations. Indeed, during the early years of its implementation, the IMOD backed up its policy commitments to the Company and its investors by refusing a partial U.S. embargo request to suspend marketing activities and/or rescind export licenses for India after that nation's initial nuclear test. Wilson requested and Yifrah obtained written assurances from the IMOD of the validity of the Company's export license for India and its policy of non-interference during the full term of any SOP contract India might sign with the Company. Upon Yifrah's further request, the IMOD agreed to provide similar written assurance to other prospective SOP customers of the Company and did so on a number of occasions contingent only upon the existence or future availability, according to then clearly defined guidelines, of a valid export license. The fundamentals of the policy regime under which the Company was to be operated took more than four years to put in place, eventually requiring the negotiation of a formal bilateral policy agreement between Israel and the United States. This policy formed the foundation for the SOP program concept and as an integral and inextricable feature of the program it was one of the Company's most valuable assets. The IMOD's licensing commitments were so valuable that the Company required and the IMOD agreed to memorialize them in writing in 2000, even explicitly acknowledging the asset value of the licenses and extending ownership rights in them to all of the Company's shareholders.

65.    In July 2000, certain investors brought into ImageSat by Pegasus Capital Advisors, L.P. and its affiliates (collectively, "Pegasus") first invested in the Company through a $500 million venture fund raised by Merrill Lynch on Pegasus's behalf. Prior to the Pegasus investment, defendant Federmann approached Bank Leumi about the possible availability of a $70 million bank credit facility as an alternative to financing the Company in the private equity and/or institutional risk capital investment market. Presented as an alternative by Federmann's representative to the February 21, 2000 special meeting of the Company's Board of Directors, the bank financing concept, previously undisclosed to ImageSat's management or to the minority designees to the ImageSat board, was to involve financial participation by IAI and ElOp through a joint guarantee of a portion of the Bank Leumi credit line. Wilson objected to Federmann's attempt to derail the equity investment, a transaction the Company had been organizing itself to effect for more than a year, and also objected to Federmann's apparent view that it was appropriate for him to seek funding of any kind on the Company's behalf without disclosing or coordinating such efforts with its management and Board of Directors. Despite the arguments of Federmann's attorney, the Board approved a resolution endorsing the term sheet and Pegasus investment.

66.    On July 25, 2000, a Securityholders Agreement was entered into, among others, ImageSat (then known as "West Indian Space"), IAI, ElOp, several Pegasus-related entities, and Plaintiff WIS Partners, governing among other things the composition of the ImageSat Board of Directors, and providing among other things that the Board would include two independent directors who were to be unaffiliated with ImageSat or any of its securityholders. Despite this provision and subsequent demands that it be adhered to by at least two parties to the

Securityholders Agreement, the Company has never appointed the two independent directors as required.

67.     Also on July 25, 2000, contemporaneous with the Pegasus investment, IAI and ImageSat (then known as "WIS", for "West Indian Space") entered into a contract known as the "Master Agreement" to memorialize certain of IAI's industrial rights and its corresponding commitment to other ImageSat shareholders embodied in the original Joint Venture Agreements (which were to be terminated concurrent with the Pegasus closing) and to govern the nature of the relationship between the two companies going forward. The Master Agreement was intended to govern the parties' rights concerning, among other things, exclusivity and first rights to use the technology that would be created by the parties' relationship. (A copy of the Master Agreement is annexed hereto as Exhibit "A".)

68.     The Master Agreement was subsequently amended by Amendment No. 1 to the Master Agreement dated March 10, 2005 for the purpose of extending certain exclusivity provisions therein. (A copy of Amendment No. 1 to the Master Agreement is annexed hereto as Exhibit "B". References herein to the "Master Agreement" include such amendment where the context so requires.)

69.     Section 1(a) of the Master Agreement provides as follows:

**WIS [ImageSat] shall be the exclusive vehicle through which IAI/MBT pursues the commercialization of the existing IAI/MBT light earth observation satellite (i.e., EROS Class Satellite) technology subject to the provisions of this Section 1, and accordingly, IAI/MBT shall not engage in activities competitive with the business of WIS as defined in this Section 1. Furthermore, at any time that IAI/MBT is a substantial shareholder in WIS, IAI/MBT will not enter into any venture or business entity, as a shareholder or otherwise as an owner, alone or with any third party, to compete with WIS by offering or providing services from earth observation satellites to customers (herein "Commercialization of IAI Technology"). In this regard, IAI acknowledges that changing market conditions may result in the expansion of the business activities of WIS in the commercial remote sensing domain, beyond those currently contemplated in the business plan of**

27

WIS and it is the interest of both Parties that WIS and IAI/MBT leverage their existing and newly created capabilities to facilitate that expansion and therefore, at any time that IAI/MBT is presented with, or independently considers, an opportunity for the Commercialization of IAI/MBT Technology relevant to the commercial earth observation market, IAI/MBT shall propose the exploitation of such opportunity to WIS and the Parties shall use commercially reasonable efforts to negotiate the terms and conditions, including compensation and other considerations, applicable to such opportunity.

(Emphasis added).

70.     This Section 1(a) of the Master Agreement embodied the parties' intent that, as an inducement to investors to invest in ImageSat, IAI was making broad commitments to ImageSat including the grant of exclusivity, non-competition, and first rights. The rights conferred upon ImageSat under this section included:

(a)     ImageSat's right to be the exclusive vehicle for the commercialization of existing and derivative IAI satellite technology in the earth observation arena;

(b)     ImageSat's receipt of IAI's promise that it would not engage in competitive activity by either (i) providing satellite earth observation services to any party, or (ii) participating in any venture that would be competitive with ImageSat's business; and

(c)     ImageSat's "first right" (*i.e.*, right of first refusal) with respect to the commercialization of any future technology developed by IAI in the earth observation arena.

Significantly, "IAI/MBT Technology" is defined in Section 14 of the Agreement as including technology owned or controlled by IAI/MBT as of November 18, 1998 (roughly the date of the last predecessor "Joint Venture" Agreement between the parties) or technology developed based on such technology at a later time. While IAI/MBT Technology is defined as including

technology developed by IAI/MBT under contract with ImageSat, it is not limited to such
technology and indeed explicitly includes "Technology developed by IAI/MBT under or in
connection with a procurement contract with a Government" within its scope.

71.    The "first right" provision contained in the last sentence of Section 1(a) was
added to the Master Agreement at the instance of plaintiff Wilson, for the explicit purpose of
addressing IAI's anticipated development of a SAR based earth observation satellite and the
corresponding widely anticipated introduction of high-resolution SAR sensors and imagery by
commercial satellite operators such as ImageSat. IAI had initially taken the position in the
negotiation that a SAR satellite and/or payload should not be covered by the exclusivity
commitments, because although it had long since been designed (to a significant extent by the
same members of ImageSat's founding management and staff that designed and developed Ofeq
and EROS satellites) it had not yet been developed or even fully financed. Moreover, IAI argued
that third parties might also be involved in joint research and development funding of a SAR
satellite and that it was premature to specify the terms of the possible future commercialization
of this technology. Wilson insisted on behalf of ImageSat that SAR technology would definitely
become a highly complementary and eventually essential element in the commercial earth
observation satellite industry. As such, it would unquestionably become an important element of
the Company's future that needed to be addressed in the Master Agreement. This issue became
even more important to Wilson after defendant Weiss agreed, over Wilson's contemporaneous
objections, to add a provision to the Master Agreement under which IAI was designated as
ImageSat's exclusive satellite provider for the next six (6) satellites to be ordered, because
Wilson knew and stated in the presence of Weiss and others that offering SAR technology would
certainly be a competitive necessity well before ImageSat had ordered six additional satellites.

29

The "first right" provision of the Master Agreement was a compromise solution explicitly created and intended by all parties to address the potential expansion of IAI's and ImageSat's earth observation satellite capabilities to include SAR.

72.    Section 12 of the Master Agreement, captioned "Technology", confirmed and added to ImageSat's right to share with IAI in the commercial exploitation of technology that was created or enhanced as a result of projects wholly or partly funded by ImageSat, such as the design and construction of the EROS B and C satellites. Specifically, Section 12 provided:

Section 12.    Technology.

(a)    All improvements to IAI/MBT Technology (whether or not patented) shall belong to IAI/MBT whether or not such improvement was developed under or in performance of a purchase contract with WIS. Notwithstanding the above, in cases where a major development has been funded by WIS of an improvement to an existing technology or product of IAI/MBT, the Parties will negotiate in good faith a royalty fee to be paid to WIS upon the sale of the improved technology or product to a third party.

(b)    It is acknowledged and recognized by IAI/MBT that it will be developing valuable new IAI/MBT Technology that will be partially funded by WIS under the Satellite Supply Contracts. IAI/MBT agrees, therefore, that WIS will be entitled to a royalty on all sales of EROS Class Satellites containing IAI/MBT WIS Technology to any party other than to the GOI or WIS (or any successor in interest to WIS). The parties shall negotiate in good faith a royalty agreement, associated with all specific Technology development funded by WIS and specified in each Satellite Supply Contract or other development contract, providing for the payment of royalties to WIS, in a mutually agreed to amount, by IAI/MBT for all sales by IAI/MBT (including G to G sales) of:

(i) products containing IAI/MBT/WIS Technology or

(ii) the right to use the IAI/MBT/WIS Technology design or manufacturing know how and data (herein a "Know How Sale/License"), except as otherwise provided for herein. . . .

(Emphasis added.)

73.    Section 8(e) of the Master Agreement provides:

Governing Law. The rights and obligations of WIS and IAI/MBT hereunder shall, pursuant to New York General Obligations Law Section 5-1401, be governed by the laws of the State of New York.

74.    Although all material agreements and the terms and conditions thereof were to have been negotiated jointly on behalf of the Company by Wilson and Weiss acting together (Wilson as the outgoing CEO and Weiss as the incoming CEO), both prior to and immediately after the execution of the signature pages of the documents, Weiss (or persons acting at Weiss's direction and on his behalf) caused the Master Agreement and other deal documents to be changed in material respects that were in some cases not coordinated between Wilson and Weiss, as was the intent and explicit directive of the Board, not disclosed at the time to Plaintiffs or, upon information and belief, to the other shareholders (with the exception of ElOp). Specific changes to the terms and conditions of the Master Agreement included certain enhancements to IAI's and ElOp's long standing satellite procurement arrangements (i.e. IAI was suddenly to become the Company's exclusive satellite supplier for its next six satellites), as well as certain attempts to make less clear or otherwise diminish IAI's prior commitments to ImageSat as the "exclusive vehicle" for the commercialization of Ofeq earth observation satellite technology. This very substantial early investment transaction and the various agreements associated with it, symbolized and may have constituted the beginning of an otherwise inexplicable and immediate transition of ImageSat from an independent commercial entity operated for the benefit of all its shareholders to an entity operated for the benefit of IAI, ElOp (succeeded by Elbit), and the IMOD, without regard to the interests of the minority shareholders. Nonetheless, while some of the last-minute changes appear to have been intended to weaken some of ImageSat's protections under the Agreement, the Master Agreement as executed still conferred upon ImageSat clear and

valuable legal rights, which have been subsequently breached by IAI, with the acquiescence of ImageSat's current directors and management, as described below.

75.    The ImageSat Board of Directors as of 2000 consisted of Defendants Keret (chairman of ImageSat and CEO of IAI), Nissan (IAI/MBT Division General Manager), Eldar (Director of Finance for IAI/MBT) and Weiss (outgoing General Counsel of IAI and incoming CEO of ImageSat) and Defendant Toren (ElOp's CEO). Two additional IAI designees, one CST designee, and one WIS Partners designee also served on the board. As noted above, the two directors who were to be independent of the Company and any of its securityholders were never appointed.

76.    The Master Agreement, Pegasus's Note Purchase Agreement ("NPA"), and the related deal documents were all solicited and almost all of the related transactions and documents were negotiated, prepared, signed, and closed in the County, City, and State of New York and provide that New York law is to govern them and/or for the jurisdiction of the New York courts to adjudicate disputes arising therefrom.

**B.    The Misdating and Mispricing of the July 2000 Bridge Warrants and Options**

77.    As part of the July 2000 transactions, bridge warrants providing the right to obtain stock in the Company were issued (and/or amended) on behalf of certain investors including Wilson, WIS Partners, Talansky, Moshel, Reichmann, and Hexagram. Hexagram subsequently sold certain of its bridge warrants to Polybutes.

78.    The July 2000 transactions involved the issuance of various classes of incentive securities including the bridge warrants and stock options to numerous recipients, requiring the calculation of a conversion price. Most of the closing documents were "work in progress" and not completed during the days and weeks preceding the closing. Because a concurrent Preferred

Series B equity investment was to be made in an amount that had not yet been determined, the conversion price continued to change up to, and even after, the closing.    For this reason, thousands of signature pages were separated for execution prior to the closing from the body (and substance) of the corresponding agreements.

79.    The Company was financing its operations, including the essential EROS A launch preparations, through "bridge loans" throughout the protracted negotiations and closing process that started in late 1999 and continued through the NPA closing in late July 2000. Wilson was still soliciting these investments in parallel with the Pegasus negotiations and closing process, and the Company was in turn issuing promissory notes and incentive "Bridge Warrants" explicitly linked to the anticipated closing. He raised the issue of the unintended disparity in the terms memorialized in the bridge warrants that had already been issued, relative to the anticipated actual terms of similar securities to be issued in connection with the closing. All of the parties to the NPA and related closing negotiations readily agreed that all the classes of incentive warrants and options, including explicitly the warrants issued to the bridge investors, would reflect the same terms and conditions as of the closing date. The previously issued bridge warrants that predated the closing were to be amended to reflect full parity with the new incentive securities issued at the closing. After securing the agreement of the parties including the Company, Wilson advised the bridge investors that the warrants issued in connection with their bridge investments would be so amended. Absent such agreement and representations by the Company, it would not have been able to continue to fund ImageSat's operations during this period.

80.    Notwithstanding unanimous, though oral, agreement on the foregoing entirely non-controversial point among all the parties to the negotiation including ImageSat, IAI, and

ElOp (indeed, IAI and ElOp were to be issued a majority of the bridge warrants), the documents signed at the closing provided for the bridge warrants to expire in five (5) years while all the other incentive securities including the employee stock options issued concurrent with the closing were set to expire in 10 years. Signatories to the agreements, including Wilson, did not notice the discrepancies in the documents at that time (as was the case with the wrongful amendment of the aforementioned Master Agreement) because the documents were not completed or even present at the time the signature pages were executed en masse.

81.     Also not in keeping with the agreed-upon terms, the execution price of the bridge warrants and the stock options was set at $24.4573 per share instead of $23.2737, which was the final conversion price of the Pegasus Convertible Notes. The discrepancies in the options and bridge warrants were not negotiated or agreed-upon terms of the transactions; but rather resulted from a mere scrivener's or arithmetic error in preparing the voluminous paperwork memorializing the transactions.

82.     The length of the term of the bridge warrants was a material term of the transactions and none of the Plaintiffs who received such bridge warrants would have participated in the transactions had he or it been duly advised that the terms of the transaction would not reflect the same terms and conditions being offered to others at the same time.

83.     Also during the closing, certain securities previously issued or committed to Wilson were reallocated to others as special recognition by Wilson for their individual contributions to the very difficult start-up phase of the Company's development, including Plaintiffs Bar-Lev, Rosenbaum, Morris, Top Down, and Levine as well as to the former Director General of the Israeli Ministry of Finance, David Brodet. In connection with this redistribution of his own equity securities, Wilson corresponded with Company counsel, Milbank Tweed, as to

any possible implications of redistributing Stock Options as opposed to Bridge Warrants. Wilson was assured by Milbank Tweed that by agreement among all parties to the NPA negotiation, all incentive option and warrant documents would reflect full parity post closing and that therefore, no impact on Wilson's fully diluted equity position would result from the distribution of Stock Options as opposed to Bridge Warrants or vice versa. As a direct result of such assurances, Wilson directed Milbank, for the sake of simplicity, to issue all of the Bridge Warrants he was entitled to receive to himself and to redistribute many tens of thousands of Employee Stock Options that he was also entitled to receive to the aforementioned others, obviously a decision he would not have undertaken had he believed that he was retaining an inferior class of security.

84. Plaintiffs Reichmann and Hexagram notified ImageSat's then-CEO, Menashe Broder, that the term of the bridge warrants had been set in error at five years and requested correction of the error in late 2003. Broder reported that he would have to take the matter up with other investors but stated that since IAI and Elbit also held a substantial number of bridge warrants he anticipated that an accommodation would be reached among the three largest shareholders. He further suggested that IAI and Elbit would probably be inclined to work something out with Reichmann and that Hexagram could "coat-tail" on any such arrangement. In 2004, these Plaintiffs sent a letter directly to the Company requesting the desired correction. ImageSat's CFO, Hagai Goren, contacted Wilson for guidance since at the time of the bridge financing Wilson had been responsible for representing the Company in connection with all its financing activities. However, when Wilson informed the Company that Hexagram's request conformed to representations made by the Company at the time of the Hexagram and other bridge investments and that the requested correction should be made on behalf of all the bridge

warrant holders, ImageSat ultimately refused to correct the term of their warrants. The final decision of the ImageSat Board that the term of the warrants would not be corrected was not taken by the Company or communicated to Wilson or the other bridge warrant holders among the Plaintiffs until after the purported expiration date of the warrants. As a result, the warrants expired in late 2004 and 2005, "out of the money" and the bridge warrant holders were wrongfully deprived of their right to convert the warrants into ImageSat common stock between that time and their rightful expiration in 2009 or 2010.

85.    The Board's decision to negate the Company's prior commitment to the bridge lenders was made for reasons other than those offered by the Company in its eventual explanation. That Defendants IAI and Elbit participated proportionately to their shareholdings in the bridge financing (and therefore held roughly half of all the bridge warrants) was used to support the fairness of the decision to deprive the minority holders of their rights.

86.    The ImageSat Board of Directors as of 2004 consisted of Defendants Keret (chairman), Weiss, and Eckhaus (all IAI designees), Joseph Ackerman (the Elbit designee), and James DePalma (the CST designee), as well as Menashe Broder (then CEO of ImageSat and a former senior executive of IAI), Zeev Nahmoni (former Vice President and General Manager of IAI's Electronics Group), and the WIS Partners designee.

87.    The documentation and issuance of the misdated and/or mispriced bridge warrants and options had numerous contacts with the County, City, and State of New York. In the cases of each of the Wilson, Talansky, Moshel, Reichmann, and Hexagram (including Polybutes) bridge investments were solicited and/or transactions were concluded that resulted in the issuance and/or amendment of the bridge warrant agreements in New York City. All option documents issued in connection with the closing were drafted and signed in New York.

C.    The July 2001 Transactions and the 2001 EROS B Satellite Fraud

88.    Soon after the July 2000 transactions were completed, ImageSat's new management, led by Weiss, was already working to structure a bank credit facility for the purpose of financing new "satellites." ImageSat's CFO, Ori Ben Amotz, in his July 27, 2001 mailing to Shareholders to announce the closing of transactions that month, confirmed that:

> In the last six months, since the Board of Directors meeting in Cyprus on January 22nd, the management team has been working on completing the transaction of purchasing the next two Satellites and securing the funding for this transaction. We brought the company's proposal to the BOD on May 11th in New York, where it was approved in principle, and we brought the finalized deal to the BOD on July 12th, 2001. The transaction the Board approved and that the company signed on July 25 is reflected in the Bank Credit Agreement with Bank Leumi Le-Israel Ltd for $70m, the Note Exchange Agreement with Pegasus and the Purchase Agreement with IAI for the B1 & B2 satellites. As part of the Bank Credit Agreement, the bank had demanded a Shareholder Guarantee of 10% of the loan (i.e. up to $7m) to secure the loan in case of default. IAI and ElOp had agreed to the bank terms and to stand up to that commitment up to that full amount in the event that no other shareholder would accept the terms.

89.    A Second Amended and Restated EROS B Satellites Supply Contract (the "2001 EROS B SSC"), a Note Exchange and Governance ("NEG") Agreement between ImageSat and Pegasus, and a Bank Credit Agreement between ImageSat and Bank Leumi, all closed in late July 2001. Key terms of these transactions were not disclosed to Plaintiffs or, upon information and belief, to many other shareholders at the time or for years afterwards.

90.    In 2000-2001, Wilson wrote a series of memoranda to the attention of ImageSat shareholders related to IAI's failure to resolve the technical problems with its "hardware DAS" (the system IAI had coerced ImageSat into buying to descramble the EROS A bit stream) as well as IAI's continuing and purposeful refusal to deliver the bit stream specifications as it was obliged to do. Weiss improperly threatened Wilson, orally and in writing, informing him that his attempts to communicate with the Company's shareholders were viewed by the Company as

damaging and as a breach of Wilson's fiduciary duties to the Company under his consulting contract. Wilson defended his right as a shareholder to discuss all matters associated with the Company's well-being with other shareholders and asserted that right by continuing to keep other shareholders informed of problems he perceived.

91.    In December 2000, ImageSat successfully launched its first satellite, EROS A. The Company's technical management then turned its attention to the manufacture of a next-generation satellite, known as EROS B, planned and already twice contracted with IAI and ElOp to build as of 2000. The deployment of an enhanced higher resolution satellite was contemplated in all three of the Company's existing SOP agreements and a requirement under the terms of two of them, so that the customers were entitled to terminate their SOP agreements if ImageSat failed to deploy such a satellite.

92.    ImageSat contracted with IAI (and its sub-contractor ElOp) to purchase its second satellite, referred to here as the 2000 EROS B satellite, contemporaneous with the NPA in July 2000. The agreed-to purchase price was $82 million. Of this amount, $11 million was to be financed by the satellite vendors (as is customary in the industry) and evidenced through the issuance by the Company of Series A Preferred Shares, the "Vendor Equity". However, in early 2001, it became apparent to IAI and ElOp that their 2000 EROS B satellite design as defined in the satellite contract was flawed. The design did not and would not meet ImageSat's mission requirements as were also specified in the satellite contract. Weiss eventually agreed with the then IAI/MBT Division General Manager, Defendant Nissan, and ElOp CEO, Defendant Toren (all ImageSat Directors at the time), to redesign and procure a substantially more expensive EROS B satellite than had previously been planned and agreed to.

93.     The renegotiation of a new EROS B design and contract was conducted by these individuals, all of whom had loyalties to IAI and/or ElOp that were in conflict from, and which they allowed to be superior to, their loyalty to ImageSat and its shareholders. Moreover, the requirement that the new 2001 EROS B contract would automatically be awarded to ImageSat's exclusive satellite supplier IAI and its principal sub-contractor ElOp (under the terms of the aforementioned Master Agreement of July 2000) resulted in a contract with considerably less favorable terms and conditions for the Company, including a substantial increase in the cost. The price of the 2001 EROS B satellite increased from $82 million to $101 million (including $21 million of vendor financing in the form of debt, the "Convertible Vendor Notes") bearing interest at 9%, and convertible to Series C Preferred Shares of the Company solely at the discretion of the manufacturers. The down payment was increased from $17 million to $23.5 (of which $15.5 million was paid in cash, and $8 million paid with the 9% convertible vendor notes).

94.     In any event, the new 2001 EROS B contract was a sham designed to allow the Defendants to squeeze more money out of the Company at the expense of the minority shareholders. The original IAI/ElOp 2000 EROS B design flaw would ostensibly delay the delivery of an EROS B class satellite by at least one year due entirely to the faulty design of the manufacturers. Despite the damage to ImageSat, directly attributable to IAI and ElOp, and the corresponding and obvious increase in the value of the Company attributable to the successful launch of the EROS A satellite in December 2000 and the commencement of revenue generating services under the three existing SOP contracts thereafter, the conversion price of the Convertible Vendor Notes issued to IAI and ElOp was unaccountably set by ImageSat's CEO Weiss at the July 2000 Pegasus conversion price of $23.27 per share.

95.     Bank Leumi required that the new 2001 EROS B SSC be executed as a condition precedent to the closing of the Bank Credit Agreement and the corresponding funding of the Convertible Note redemption under the Note Exchange and Governance (NEG) Agreement. However, less than one month before the closing, it was discovered that the new satellite design by IAI and ElOp, like the design of the original 2000 EROS B satellite before it, was also seriously flawed.   Plaintiffs Bar-Lev and Rosenbaum, who were then leading the technical contract negotiations on behalf of the Company, insisted that the manufacturers address the technical problems before proceeding with the satellite procurement negotiations.   However, to ensure that the satellite procurement and the NEG and Bank Credit closing proceeded, Defendant Weiss dismissed them from the negotiating team.

96.     This highly material development was not shared with the minority designees to ImageSat's Board, with other important parties to the closing (including Bank Leumi), and certainly not with the minority shareholders.   Instead, senior executives and directors of ImageSat, IAI, and ElOp, including Defendants Weiss, Nissan, Eldar, Toren, Federmann and Keret, agreed not to disclose the serious design flaws in the new 2001 EROS B satellite and instead agreed to proceed with both the note redemption and the satellite purchase order.

97.     In or about July 2001, ImageSat's CEO Weiss and its CFO, Ori Ben-Amotz, IAI's then-CEO and ImageSat Chairman Keret, IAI/MBT Division General Manager Nissan, and its controller, Shuki Eldar, and ElOp's owner Federmann and its CEO, Jacob Toren, agreed to delete all the technical specifications (Exhibit C "System Specifications") from the 2001 EROS B Satellites Supply Contract ("SSC").   They did so because otherwise IAI faced the Hobson's choice of including specifications reflecting the critical design flaws together with ImageSat's mission requirements that it knew the satellite, as specified, would never meet.   (A copy of the

relevant excerpt of the Second Amended and Restated EROS B Satellites Supply Contract –
including the contract's "Exhibit C", which was supposed to contain the "EROS B System
Specifications" but instead is **"Intentionally Omitted"** (emphasis in original) – is annexed
hereto as Exhibit "C".)

98.     To conceal the design flaws' existence, the explanation was contrived that the
Company had asked for a delay in beginning the manufacturing process so that ImageSat could
consider possible design modifications.  This was a knowing and willful falsehood used to
deceive and defraud Plaintiffs and numerous other persons, including Bank Leumi.

99.     At the Company's Board of Directors meeting held on July 12, 2001, where
Weiss presented the various July 2001 transactions for Board approval (including the Satellites
Supply Contract complete with both IAI/Elbit's "System Specifications" and ImageSat's
"Mission Requirements"), the WIS Partners-designated director objected to the significantly
higher price of the "new" 2001 EROS B SSC and questioned the Company's decision not to seek
competitive proposals.  Weiss explained to WIS Partners and others including observers from
among the minority shareholders, for the first time, that the Company had appointed IAI as its
exclusive satellite supplier for its first six satellites (pursuant to the aforementioned "Master
Agreement") and that it, therefore, did not have the latitude to seek alternative proposals.  Weiss
justified the exclusivity arrangement by explaining that this was due to a newly imposed
requirement that IAI commit to fixed pricing on the future EROS satellites.  In return, IAI and
ElOp had insisted on the new exclusivity provisions reflected in the Master Agreement of July
2000.  In fact, the Company had secured such future pricing caps from IAI prior to the execution
of the Master Agreement and the stated justification was a willful deception.  Moreover, despite
the future pricing caps, Weiss had just negotiated a new EROS B contract 25% more expensive

that the EROS B contract agreed to in July 2000, concurrent with the execution of the Master Agreement. Weiss willfully neglected to point out to the minority designees that the Company's obligation to purchase satellites exclusively from IAI was predicated on IAI's ability to meet the Company mission requirements, which the 2000 EROS B satellite design the Company contracted for was known to be incapable of achieving well before the new contract negotiations commenced.

100.    After pocketing its $15.5 million cash down payment (and beginning to accrue an additional $60,000 per month on the Convertible Vendor Notes), IAI agreed to hold off on beginning to manufacture the satellite while ImageSat purportedly reconsidered its mission requirements and desired specifications. In reality, ImageSat, under IAI's and ElOp's control, was not reconsidering anything. It was IAI and ElOp that were studying whether and how the design flaws could be overcome. Contemporaneously, ImageSat's CEO Weiss, its Chairman Keret, MBT General Manager Nissan, and ElOp's CEO Toren all continued to advance the interests of IAI and Elbit over the interests of the Company by insisting that ImageSat relax the mission requirements and performance expectations for the EROS B satellite and that ImageSat accept specifications developed by the IMOD in connection with the manufacture of Ofeq 5, a design the Company had initially rejected in 1998. Weiss and Toren even tried to extort cooperation from the Company's then senior technical management, Plaintiffs Bar-Lev and Rosenbaum, who declined to cooperate both before and after the closing of the severely flawed, and ultimately financially disastrous, 2001 EROS B SSC. Such refusal is documented, among other places, in a letter from Plaintiff Rosenbaum to Defendant Weiss dated July 23, 2001, just days before the multiple related closings. (A copy of Rosenbaum's July 23, 2001 letter is annexed hereto as Exhibit "D".)

101.    Over the following fifteen months, ImageSat reported repeatedly to its shareholders (through the monthly Investor Reports initiated by Defendant Menashe Broder (a former IAI executive who took over as CEO from Weiss on January 1, 2002) that the 2001 EROS B satellite was on schedule for launch in late 2003.  However, in the October 2002 Investor Report, ImageSat reported to some of its shareholders (Wilson and several other minority shareholders were unaccountably deleted from the distribution list that month and thereafter) that:

> [t]he delay in payment [by Angola] has impacted [ImageSat's] ability to draw on the Bank Credit facility and to pay for the B1 project. Since [the Company] ha[d] not been able to pay, IAI had issued [ImageSat] a formal letter regarding work stoppage on the B1.

It bears emphasis that the SOP contract with Angola was not signed until a year or more after the Bank Credit Agreement was closed and that the Company's ability to use the credit facility would be inhibited by a payment delay on a contract signed one year thereafter is either not credible or is an illustration of the unacceptably restrictive and risky circumstances under which the Company and its Board of Directors undertook to abandon convertible equity financing in favor of bank debt to finance the Company's operations including capital acquisitions that were essential to maintain its sole sources of revenue.  Despite this initial report of a possible work stoppage by MBT, the Company asserted that work on the 2001 EROS B had proceeded in October, according to the Investor Report.  The Company stated that it remained confident – in fact "certain", according to Broder – that the delayed Angola down payment would be received.  In November and December 2002, it was reported that "IAI/MBT has announced a Work Stoppage" but that critical work continued to be performed.   In January 2003 the Investor Reports stated merely that "MBT is under a Work Stoppage".   In February 2003, Broder triumphantly announced that the first payment, under a new payment schedule, was received

from Angola. However, no mention whatsoever is made of the 2001 EROS B project, the MBT work stoppage that was allegedly due to Angola's delayed payments, or the implications of either a continued stoppage or resumption of the EROS B project in the context of ImageSat's contractual commitments to its SOP customers. The disclosure to the minority shareholders including Plaintiffs of the EROS B work stoppage by MBT and its relationship to Angola's late payment was a willful falsehood and a continuation of the deception perpetrated by Defendants through the premature and fraudulent execution of the 2001 EROS B SSC nearly two years before and the willfully false monthly Investor Reports that the satellite was "on schedule" thereafter.

102.    Rumors concerning the satellite's condition and anticipated delivery date were varied during the following year. It is unclear whether the Company generated the by then routine monthly Investor Reports between March 2003 and May 2004. If so, Wilson and other Plaintiffs remained off the distribution list. Despite the foregoing, throughout 2003 the minority shareholders were falsely led to believe that a functional EROS B satellite was being manufactured.

103.    Upon information and belief, however, the 2001 EROS B satellite that was to have been manufactured by IAI and ElOp/Elbit was defective by design to their actual knowledge and that IAI and ElOp never performed any substantial work on the manufacture of such satellite despite collecting or billing over $60 million under the contract. Assertions of manufacturing delays due to nonpayment by Angola, and therefore by ImageSat to IAI and ElOp, were merely a façade and a willful deception to which IAI and ElOp and their managers and surrogates among ImageSat's management were all parties. In May 2004, the Company distributed an Investor Report, through which Broder informed shareholders that the (IAI/Elbit

controlled) Board of Directors of ImageSat had approved the purchase of EROS B and authorized the Finance Committee to oversee contract signature by the Company with IAI. Wilson and other Plaintiffs remained off the distribution list.    No mention was made of the distinction between the 2001 EROS B and what was in fact a new satellite (the "2004 EROS B" satellite), which would turn out to be based on a satellite design that still did not meet ImageSat's mission requirements of 2000 or 2001 and that was, in fact, the same IMOD Ofeq design originally rejected by the Company in 1998.    The minority shareholders were merely informed in the report that the satellite was now scheduled for delivery by IAI in 19 months, and that it would be launched in the first quarter of 2006. This was a willfully misleading characterization, implying that the project referred to was a continuation of the prior 2001 EROS B.  In fact, it is not possible for IAI and Elbit to manufacture an EROS B class satellite in 19 months.  In reality, the 2004 EROS B was not a satellite that was remotely similar in its performance characteristics to any of the "EROS B" satellites specified and ordered by ImageSat in 1998, 2000, or 2001. Indeed, as ImageSat's minority and financial shareholders would learn only many months later, the 2001 EROS B was renamed "EROS C", and EROS B became the IMOD specified Ofeq 5 class satellite that by then the IMOD urgently needed a replacement for.

104.    No mention was made in the May 2004 or subsequent Investor Reports of the possible impact of a 2006 EROS B launch on the Company's SOP contracts.  Instead the Company repeatedly reports only that **"EROS B is on schedule"** (emphasis added), until in the monthly Investor Report distributed to Shareholders on August 27, 2004 Broder concludes the CEO's report, as if it is a minor detail mentioned only in passing, with the following statement.

> In accordance with our SOP Agreements with SOP 2 [Taiwan] and 3 [India], the Company committed to undertake the launch of additional satellites. These satellites were not launched and both customers have, under certain conditions, the right to terminate their SOP Contracts with us. We have been in discussions

with them for the past eight months to avert this possibility. We are making considerable progress with SOP 3 and I hope to travel with Noam Zafrir, our Vice President of Marketing to SOP 3 in order to finalize the Settlement Agreement. As to SOP 2, there has been a recent change in Government and they have launched their own electro-optical satellite known as "ROCSAT". The Government is currently evaluating its future needs for satellite imagery. I anticipate that we will have more information as to their plans in mid-September.

In fact, the Company had received notice in August, before the foregoing report was disseminated, that Taiwan intended to terminate its SOP contract due to ImageSat's failure to launch an EROS B class satellite by September 2004 as specified in the SOPTRC, and Taiwan did so terminate effective September 16, 2004.    The Company announced the contract termination in its September 2004 Investor Report.

105.    Upon information and belief, IAI and Elbit billed, and the Company booked, more than $60 million in the manufacture of the 2001 EROS B satellite (subsequently and deceptively renamed "EROS C") between 2001 and 2004. However, in the Investor Report of March 2005, the Company reported that IAI had agreed to rescind $31.2 million in invoices previously sent to ImageSat in connection with the manufacture of the EROS C satellite. This is reportedly to occur in connection with an Amendment to the EROS C purchase contract and a revaluation of the asset ordered by the Company's auditors that would be booked retroactively to Q3 2004.    ImageSat also appears to have paid a $4 million penalty for suspending the manufacturing of the 2001 EROS B/C satellite.

106.    ImageSat received nothing of value for this major investment, neither credit for payments made nor title to or credit for the value of the "Work in Progress", as ImageSat was entitled to receive under the Master Agreement of 2000. In fact, after appointing two new IAI designees to the Board on May 19, 2006, the IAI/Elbit dominated Board voted at its board meeting in New York on May 30, 2006 to write off the entire revalued and remaining 2001

EROS B (renamed EROS C) investment in excess of $33 million without any recourse to ImageSat.

107.    The pervasive deception surrounding the fraudulent 2001 EROS B satellite procurement extended from the date of contract signature in July 2001 right up to and including the day on which the Company's board voted to write off the entire investment in the 2001 EROS B/C project.. At the finance committee meeting that preceded the meeting of the full Board on May 30, 2006, the Company's controller reported that the decision to declare the asset "impaired" was based on the willfully false premise that a new and beneficial strategic alliance with the IMOD was incompatible with the continued investment and eventual deployment by the Company of the "EROS C" satellite. The not-yet-obvious, but profoundly important, implication of this statement was that the Company planned to launch another satellite instead of EROS C that would be more compatible with the IMOD's requirements (e.g., an Israeli military satellite). It was further reported by the Controller that the Company may be subject to an additional $4 million charge by IAI for termination of the contract, however, Eckhaus reported to the Committee, board members and observers present (including a representative of the Company's auditors Ernst and Young) that IAI had made a "verbal offer" to waive the $4 million cash penalty if the Company would agree not to exercise its audit rights in connection with the 2001 EROS B/C satellite project.

108.    Upon information and belief, the Company and the members of its Board of Directors and senior management have taken absolutely no steps to recoup any or all of the sums spent on the 2001 EROS B/C satellite, through either negotiations or litigation, with any of the entities or persons responsible for the fiasco. Instead, the ultimate result of the satellite fraud

were sustained financial difficulties that, as set forth in detail below, have damaged and at times threatened to destroy altogether the value of the Company and of Plaintiffs' interests in it.

109.    In addition to the money that ImageSat wasted on building an ultimately non-existent satellite, at least equally damaging was ImageSat's resulting inability to obtain delivery of a second satellite.  The deployment of an enhanced EROS B satellite was necessary to fulfill the requirements of the Company's existing customers and to meet the Company's contractual obligations to them.  The SOP contracts were ImageSat's principal source of revenue and the sustained failure of IAI and Elbit to deliver an EROS B class satellite to the Company severely inhibited its ability to secure new SOP contracts, and to remain credible and competitive in the marketplace.  Indeed after the SOP contract sale to Angola (SOP 4) in July 2002, led by Plaintiffs Rosenbaum and Yifrah, the Company never succeeded in closing a single additional SOP contract prior to the eventual launch of the 2004 EROS B satellite on April 25, 2006.

110.    The Company and its customers relied for several years on IAI and ElOp to deliver a higher resolution, more capable "EROS B" class satellite that they knew was essential to ImageSat's business plan and competitiveness.  The willful falsehoods concerning, and failure to disclose the facts surrounding, the 2001 EROS B satellite contract and manufacture, continuously from 2001 to date, have damaged the Company's credibility and corresponding sales performance, its overall valuation, and the interests of the minority and financial shareholders by hundreds of millions of dollars.

111.    Throughout this period, the directors of ImageSat included Defendants Keret, Weiss, Nissan, Eldar, Toren, Federmann, Ackerman, Gaspar, Eckhaus, Piperno-Beer, Chelouche, Arzi and DePalma.  The members of ImageSat's senior management responsible for the willful damage to the minority shareholders' interests in connection with the satellite fraud have

included Defendants Keret (Chairman of the Board 2000-2005), Weiss (CEO 2000-2001), and Eckhaus (CEO 2005-present), all of whom were former senior executives of IAI, as well as Menashe Broder (2002-2005) who was a former senior IAI executive.

112.    Defendants' fraudulent conduct with respect to the 2001 EROS B (subsequently renamed EROS C) satellite design and manufacture and their concealment of their wrongful activities from Plaintiffs and others had numerous contacts with the County, City, and State of New York, including (i) the fundamental transaction that created the closing deadline was the Note Exchange and Governance Agreement that was originated and negotiated in New York by Defendant Weiss, (ii) the Company's Board of Directors and Audit/Finance Committee meetings have been held in New York more often than in any other location, including in particular the meetings relevant to the 2004 revaluation of the asset, and the 2005 and 2006 asset impairment and write off decisions, and (iii) the Company's independent auditor, Ernst & Young, through its New York affiliate prepared the Company's financial information including its financial statements and numerous restatements of information relating to the 2001 EROS B/C satellite procurement and its ultimate impairment and write-off.

## D.    Destruction of ImageSat's International Profile and Spurning of SOP Opportunities

113.    From the outset of the Company's planning and operations, ImageSat's robust international character was central to its business plan, to the regulatory environment created over four years of negotiation with the IMOD, and to its novel and unique SOP Program concept that was its principal source of revenue. The fundamental importance of the Company's multi-national profile to the successful execution of its business plan was emphasized in all solicitations to investors including Plaintiffs. ImageSat's extensive global presence that by 2000 included formal associations with the leading remote sensing entities in Canada, Argentina,

Australia, Singapore, Taiwan, Japan, Korea, Russia, India, South Africa, Italy, and Sweden and the corresponding good will throughout the "commercial" remote sensing community worldwide was one of the Company's most notable early achievements, a major competitive advantage, and among its most valuable assets.

114.    During the brief 18-month tenure of Defendant Weiss, the first of three senior IAI executives to serve consecutively as CEO of ImageSat, IAI and Elbit abandoned their commitment to maintain ImageSat's international profile, or perhaps more accurately, they abandoned the façade of support for it.  Many of the Company's operations outside of Israel were abruptly terminated, as were virtually all non-Israeli personnel, and the Company commenced a substantial unwinding of its affiliated international ground operations and infrastructure.  The Company's European and Connecticut offices were closed during Weiss's tenure.  The Cyprus Headquarters Office and its global electronic imagery sales and non-SOP service business, which was the electronic central nervous system of the Company's affiliated ground receiving stations and regional imagery archives, was closed during Broder's tenure just one year later.

115.    As Defendants knew or should have known, the Company's international character was an essential part of its operating plans from both a marketing and a regulatory perspective.  Defendants knew that the calculated abandonment of this plan would severely damage the Company's ability to achieve its projected business goals, which in fact it did as reflected in the Company's poor SOP sales performance thereafter.  The decision in 2002 by Broder and the Board of ImageSat to close its Cyprus headquarters office and global electronic distributed electronic archive and imagery distribution business served no valid business purpose for ImageSat or its shareholders.  To the contrary, the decision to deemphasize the entire

Acquisition, Archiving and Distribution or "AAD" elements of the Company's combined SOP/AAD business plan was primarily taken for the purpose of concealing IAI's inability to stabilize and deliver the hardware DAS component of the ground reception segment.

116.    CST ultimately resolved this technical problem for the Company by reverse-engineering the EROS A bit-stream (specifications previously committed but denied to the Company by IAI) from data recorded during a maintenance visit to ImageSat's AAD station in Japan. The resolution of the problem (which had cost the Company millions of dollars in wasted payments to IAI/MBT and inestimable losses of wasted satellite time, good will and credibility) was demonstrated in software by CST within 30 days of recording the raw data bit stream in Hiroshima. Although the controlling parties continued to resist the obvious solution for nearly one year thereafter (in one instance by distributing a misleading Request For Proposal ("RFP") containing willfully false and inaccurate specifications), ImageSat eventually did award contracts to CST to provide a Software DAS (renamed "DAPS") to avoid losing its SOP customers, but only after CST proved that the specifications distributed to prospective bidders through the Company's RFP were false.

117.    The inherently global nature of the Company's business, including in particular the location of its headquarters, Cyprus, was also the subject of extensive tax planning. The Company has been notified recently that it is retroactively subject to Israeli VAT taxes, creating financial exposure of as much as $40 million for which an exemption had previously been granted.

118.    ImageSat's international AAD ground receiving station operators and distributors were in most cases the established space and remote sensing programs of the local military or civilian intelligence agencies in those countries. They were established explicitly to

serve as vehicles through which governments dealt with and participated in the pioneering U.S. Landsat and French SPOT "commercial" satellite imaging programs. As such these entities provided a crucial vehicle for direct interaction between ImageSat and its most knowledgeable SOP contract prospects. In fact, each of the Company's first three SOP customers, including the IMOD, operated such quasi "commercial" satellite imaging ground stations in support of the aforementioned low-resolution "commercial" space imaging programs.

119.    The Company breached many of its contractual commitments to its AAD's based on decisions and directives of Weiss and his successor, Broder. Wilson and Rosenbaum emphasized the importance of the AAD program to future SOP sales and Defendants knew the Company's failure to meet its commitments to the AAD's could result in failures to obtain new SOP customers, and that financial losses to the Company of tens of millions of dollars in revenue annually could be anticipated.

120.    For example, the Company had entered into a strategic cross-distribution and AAD relationship with the exclusive licensee of the Russian Space Agency, "Sovinformsputnik," for the distribution of all Russian high-resolution military imagery. Like Taiwan (ImageSat's first AAD and subsequently its first SOP customer outside of Israel), Russia was expected to become one of ImageSat's SOP program participants. Defendants Weiss and Toren independently and intentionally decided that the Company would breach its commitments to Sovinformsputnik because a strategic relationship with Russia was perceived as a competitive threat to the conflicted interests of IAI and ElOp that sought to control all of ImageSat's satellite procurements.

121.    The Company also willfully failed to deliver under the terms of its AAD agreement with the Korea Advanced Institute of Science and Technology (KAIST) in South

Korea, another of its prime SOP prospects. Although KAIST is a private university, the South Korean national space program was largely incubated by KAIST's Professor Choi, who also was formerly South Korea's Minister of Telecommunications. Choi was among the senior planners and implementers of, as well as ImageSat's original intermediary with, the target SOP entity (the Korean Remote Sensing Center or "KRSC") in that country. In direct competition with ImageSat's highly promising SOP sales initiative in Korea, and in breach of their contractual non-compete obligations under the Master Agreement and SPA, both IAI and ElOp deceptively and aggressively pursued turn-key satellite and payload sales in Korea, and ElOp eventually did sell an electro optical payload launched in July 2006 aboard the Arirang II satellite in a transaction that violated its exclusivity commitment to ImageSat.

122. IAI and Elbit, their leaders, and their surrogates at ImageSat have consistently failed to properly and professionally serve the Company's SOP customers and to exploit SOP contract opportunities that were at odds in any way with their individual agendas and, with increasing frequency, also those at odds with the national (including the financial) agenda of the State of Israel and the IMOD in particular.

123. For example, One of ImageSat's major SOP customers was Taiwan (Republic of China). The Taiwan SOP contract represented revenue to the Company of at least $9 million annually. Under the contract, ImageSat was required to launch a second (EROS B class) satellite to provide service to Taiwan by September 15, 2004. When the Company failed to do so, as a direct consequence of the aforementioned fraudulent 2001 EROS B SSC and its subsequent sustained cover-up, Taiwan terminated its SOP contract. As a further consequence of its non-performance, ImageSat was forced to pay millions of dollars in penalties associated with IAI's and Elbit's delivery default and ImageSat's related performance default and resulting Taiwan

contract termination. Even as Taiwan was negotiating the termination of its SOP contract with ImageSat, it indicated an interest in receiving, and the Company committed to provide, SOP services in the event that ImageSat eventually succeeded in launching a higher resolution EROS B satellite.

124.    For the same reason, failure to timely deploy an EROS B class satellite, ImageSat was forced to accept a $250,000 quarterly discount under the payment terms of the Indian SOP contract.

125.    Eventually ImageSat was forced to order a third EROS B satellite from IAI (having placed unfulfilled EROS B orders in 2000 and 2001), despite IAI's preceding failure to deliver from 1998 to 2004 even a viable design that would satisfy the Company's mission requirements. The 2004 EROS B satellite was based on the design of Ofeq 5, a design that Plaintiffs among the founding management of the Company had originally rejected in 1998. The 2004 EROS B was delivered in early 2006 and placed into orbit on April 25, 2006. Once EROS B became operational, Taiwan reiterated its interest in resuming SOP service from the new satellite. The Company has failed thus far to exploit this business opportunity. Instead, Eckhaus reported to the Board of Directors on May 30, 2006 that the resumption of service to Taiwan was facing difficulties within the IMOD. More recently, the Company has been informed that its license to serve Taiwan will not be renewed, citing the national security interests of Israel as the regulatory justification for the illogical and highly improper license revocation. It is obvious that Taiwan poses no threat to the "national security interests" of the State of Israel and therefore, consistent with the IMOD's written commitments and IAI's repeated representations to ImageSat's minority and financial shareholders, there is no legitimate basis for revocation of the license originally granted by the IMOD in 1998. Instead the misappropriation of this valuable

asset is but a reflection of the willful attempt to take over the Company and its assets with minimal or no compensation to the minority and financial shareholders.

126.    Upon information and belief, the failure of the ImageSat board and current management to pursue the Taiwan opportunity is at the instance of IAI, Elbit and the IMOD, is a direct reflection of their inappropriate redirection of the Company's business to serve their own conflicted interests and does not represent either a valid business decision or a valid implementation of the policy commitments made by IAI and the IMOD to ImageSat's minority shareholders including Plaintiffs.

127.    As another example of failure to pursue and exploit SOP opportunities, from the time ImageSat executed an SOP contract with Angola in mid-2002 until the contract was terminated in mid-2006, ImageSat never delivered a single day of autonomous SOP service to Angola and even failed to deliver to the Angolan authorities the permanent tasking and reception antenna. Both "full autonomous tasking" and the permanent antenna are program deliverables that normally require no more than 18 to 24 months to fulfill.

128.    The highly suspect circumstances surrounding the Company's non-performance of its obligations under this contract are yet another indication of the misuse and misdirection of the Company as a captive vehicle of IAI, Elbit, and their government sponsors. In effect Defendants have taken over the assets of ImageSat to serve their own corrupt financial interests and/or the financial and political interests of their IMOD sponsors, deliberately impairing the viability of the Company, and subordinating the legitimate financial interests of the minority shareholders, including Plaintiffs.

129.    Defendants further mismanaged the finances, and endangered the well-being, of the Company by paying or knowingly allowing the Company to make excessive, inappropriate,

and in some cases outright fraudulent "commission" and other payments or bribes to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere. These payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments. Not only were the Company's funds misappropriated to make these unlawful payments, but upon information and belief, such payments further jeopardized the Company's well-being by creating potential exposure for the Company under applicable corrupt practices legislation or otherwise.

130. Throughout this period, the directors of ImageSat have included Defendants Keret, Weiss, Nissan, Eldar, Eckhaus, Toren, Federmann, Ackerman, Gaspar, Piperno-Beer and DePalma. The members of ImageSat's senior management responsible for the willful damage to the minority shareholders' interests have included Weiss, Keret, and Eckhaus.

131. The conduct described above had numerous contacts with the County, City, and State of New York through the Company's continued financing activities and in particular its efforts in 2003, 2004, and 2005 consecutively to effect an Initial Public Offering of its shares on the NASDAQ stock exchange, including the preparation in New York of its F1 registration filing with the Securities and Exchange Commission (SEC), which was in a near-constant state of preparation in New York throughout 2002, 2003, 2004, and 2005 and was eventually filed in October 2005, and to which all the Company's SOP sales activities, particularly those in Taiwan ("SOP 2") and Angola ("SOP 4"), were highly material.

E.   ImageSat's Spurning of the SOP and Investment Opportunities in Venezuela

132. ImageSat's current Board members and management have continued to spurn lucrative SOP opportunities in order to devalue the Company. In furtherance of that scheme,

these Defendants have, among other things, sabotaged and recently flat-out rejected the opportunity to sell satellite imaging services to Venezuela.

133.    During the past several years, one of ImageSat's most promising and attractive sales opportunities, as consistently represented by management through its monthly Investor Reports, has been to enter into an SOP contract with Venezuela, a highly solvent potential customer. The proposed SOP contract with Venezuela would yield annual revenue to the Company of $18 million or more.

134.    On ImageSat's behalf Wilson, Rosenbaum, and Yifrah began exploratory discussions with the government of Venezuela in 1999. They also pursued discussions with Colombia as an appropriate regional alternative. Subsequent to the launch of EROS A in 2000, Wilson and Yifrah expended substantial effort toward obtaining an SOP contract with Venezuela, Yifrah as a continuing member of ImageSat's management, and Wilson pursuant to a consulting agreement with the Company. Wilson relocated to Caracas in late 2001 and spent virtually his full time attempting to exploit the opportunity from early 2001 to November of 2006. Unfortunately, throughout the same period, forces at IAI, and its surrogate senior managers within the Company, have manipulated ImageSat's SOP program, in one case to enhance the attractiveness of IAI's own sales initiatives in Venezuela, in other cases in direct competition with ImageSat's SOP program for limited budget allocations.

135.    The Venezuelan government first budgeted funds for ImageSat's SOP program for 2002. However, ImageSat's effort to close the SOP contract at that time was sabotaged by IAI. IAI's senior international marketing and sales team, then headed by ImageSat's current CEO, Defendant Eckhaus, informed the Venezuelan Air Force that ImageSat's SOP proposal was withdrawn and that instead, the EROS satellite program had been "bundled" with a

comprehensive and more expensive high-tech intelligence program proposed by IAI. Wilson was not informed of this "bundling concept", introduced to ImageSat's customer directly and secretly by IAI, until he returned to Venezuela from an extended holiday break in early 2002. He was even encouraged by IAI's local sales office to delay his 2002 return to Caracas. He was never informed of the 2002 budget assignment to ImageSat's SOP program (despite the existence of a Strategic Joint Marketing Agreement between ImageSat and IAI) until it was confided to him by a Venezuelan Air Force General with whom Wilson worked closely throughout 2003 and 2004 at the Armed Forces headquarters base in Caracas, Fuerte Tiuna.

136.    As a direct result of Eckhaus's and other Defendants' misconduct, Venezuela reallocated the funds that had been budgeted to the SOP program and the Company may have lost the millions in dollars in revenue that could have been obtained from Venezuela every year from 2002 or 2003 to date.

137.    In 2003, ImageSat's efforts to obtain business from Venezuela were again sabotaged by IAI and IAI's senior management. The Venezuelan Air Force again formally requested a $77 million budget to purchase an EROS A SOP program. Without consulting Wilson, who was the Company's principal representative and program manager in Venezuela, IAI personnel again intervened and convinced the Air Force logistics commander to reduce the requested budget allocation for ImageSat from $77 million (the entire projected cost of a seven-year EROS A SOP program at that time) to just $6 million (i.e., the down payment only). Upon information and belief, IAI did so in order to make a greater portion of the Air Force's budget available for allocation to IAI programs (in particular, the anticipated upgrade of the Venezuelan F-16 and Mirage fleets) offered by IAI to the same customer instead of ImageSat's SOP program.

138.    ImageSat's ability to finalize a Venezuelan SOP was further jeopardized by the Company's failure to maintain in good order its contractor registration with the Venezuelan government as required by that government's procurement policies and regulations.

139.    The Venezuelan Army attempted to assign a budget to ImageSat's SOP program in April of 2005 but was unable to budget the funds and thus to commence the contract negotiation and closing process until the Company completed a newly implemented on-line registration process and submitted its audited 2004 financial information (always a requirement that preceded the implementation of the on-line system).    Although the registration was eventually completed in October 2005, as a direct result of ImageSat's inability to provide its 2004 audited financial statements timely, the Company missed the annual budget deadline (September) and lost the Army funding opportunity.

140.    In both 2005 and 2006, submission of at least some of the required documentation to the Venezuelan Registrar was delayed.    Upon information and belief, much of this delay during 2005 was a direct result of the restatement of the Company's incomprehensible and misleading financial information related to the 2001 EROS B/C satellite procurement that was required by ImageSat's auditors in preparation for the SEC Form F-1 filing.

141.    Upon information and belief, the 2006 delay in the preparation and delivery of the required financial information was at least partly deliberate and done with the deliberate intent of ensuring that ImageSat would not be in a position to take advantage of one of the Company's most promising and lucrative SOP opportunities since its founding.    Such deliberate delays were based on the separate financial interests of Defendants and upon impermissible political considerations rather than on the business and financial interests of ImageSat or its minority shareholders.

142.    As a direct result of the 2001 EROS B/C satellite write-off of more than $33 million, and the corresponding loss of capital reflected in the Company's 2005 financial statements, ImageSat once again became technically ineligible for contract award by the Venezuelan government because its 2005 audit reflected a negative net worth.

143.    Despite the fact that Wilson reported the related Venezuelan registration problem to management and the Board immediately upon receiving the 2005 financial statements in June 2006, and despite the existence of a viable plan the Company did nothing to mitigate the problem or the risk of loss. ImageSat's management refused requests by Wilson to consult with him or with the Company's attorneys in Caracas regarding possible remedial measures that might be taken, including a specific recommendation of the Registrar (which Wilson also reported to ImageSat's management and the Board) to file quarterly updates to its financial information throughout 2006. In fact, ImageSat's Board and management ignored Wilson's repeated requests, and Eckhaus eventually explicitly refused, to provide Q2 statements that would have reflected an improved capital position for ImageSat, and/or Q3 statements that would have completely mitigated the insolvency problem and restored the Company's contract eligibility.

144.    Throughout 2006, far from taking every possible step to ensure that the Company was in good standing in Venezuela, so as to maximize the chances of winning an SOP contract award, ImageSat's leadership sought either to delay or to destroy the opportunity altogether. In doing so, ImageSat's Board and its senior management acted for the benefit of persons other than the shareholders of the Company and in a manner that was specifically and purposely detrimental to the Plaintiffs.

145.    On August 9, 2006, representatives of the Government of Venezuela concluded the preparation of a term sheet reflecting the offer of the President of Venezuela to enter into an SOP contract that would pay the Company $18 million per year (and totaling $115 million over the term of the contract) for imaging services from two satellites that were already in earth orbit and as to which the Company's overhead expenses are fixed. In connection with and as a condition precedent to such proposed SOP contract, the Venezuelan government offered to purchase 20% to 30% of the Company through a "to be negotiated" investment of between $100-150 million. He did so explicitly to negate claims made by some of his advisors, and based on information obtained through Venezuela's own international information channels, that ImageSat was no longer an apolitical commercial company but instead had become a front for IAI, the IMOD and their counterparts in the US defense establishment.

146.    After a lengthy internal review and approval process in Venezuela, on November 15, 2006, Wilson reported to ImageSat's CEO, Eckhaus, and the Board that the Term Sheet had been signed and he forwarded electronic copies of the executed document in Spanish, together with the certified English translation prepared in August by ImageSat's Caracas lawyers, both versions signed and sealed by the Ministry of Defense. Between November 15 and November 28, no response whatsoever was forthcoming from ImageSat or its Board. On November 29, Wilson received a message from the Company's technical operations officer regarding the shipment of the Venezuelan demonstration and database system from Caracas to Tel Aviv, a process previously ordered by Eckhaus but stalled in customs since August. In light of the signature of the Term Sheet, Wilson again requested that the Company and the Board reconsider the decision to move the system, and also expressed surprise that no response had been forthcoming from the Company regarding the Venezuelan SOP and investment opportunity as

memorialized in the Term Sheet. Soon thereafter, Eckhaus e-mailed Wilson advising that the Board of Directors had decided at a Board meeting held in New York on November 22, 2006 not to pursue further activities in Venezuela and that Wilson was instructed to proceed with the shipping of the Company's equipment out of Venezuela immediately. (Copy of the e-mails between Wilson and Eckhaus from November 29 and December 4, 2006 are collectively annexed as Exhibit "E".)

147.    Upon information and belief, although a meeting of the ImageSat Board was held in New York, New York on November 22, 2006 – attended by, among others, Defendants Eckhaus, Arzi, Chelouche, Piperno-Beer, Gaspar, and DePalma – there was no substantive discussion of either the SOP opportunity with Venezuela or the investment proposal by the President of Venezuela to the Company at that meeting and certainly no formal resolution or action taken or recommended, and no action has been taken by the Company to inform the government of Venezuela of any such decision. Eckhaus's statement that the Board had made a business decision not to proceed with the Venezuela opportunity at the November 22, 2006 meeting was willfully false, as was his entire characterization to the board and board observers of the Venezuelan opportunity, including the President's investment proposal, and the implications of then recent actions by the US Department of State as they related to the validity of ImageSat's IMOD export license and its related right to sell SOP services to Venezuela. In doing so Eckhaus dutifully performed his principal role as surrogate spokesperson for the Israeli defense establishment.

148.    No legitimate business basis exists for management's or the Board's refusal to pursue the lucrative opportunities available in Venezuela and there were no legitimate policy or licensing barriers under the terms of the bilateral IMOD U.S. government remote sensing policy

agreement of 1998. The conduct of IAI's and Elbit's board designees is a reflection of a decision taken in late 2005 and early 2006 during Defendant Toren's tenure as Director General of the IMOD that the fundamental purpose of ImageSat is now and henceforth to serve the strategic defense and export interests of the IMOD, including the commercial interests of IAI and Elbit (that both now prefer to pursue the emerging turn-key earth-observation satellite and payload market), rather than the interests of all the Company's shareholders including Plaintiffs. Emblematic of this transformation are the recent public statements of IAI and the IMOD, who took full public credit for one of ImageSat's few recent successes, the launch of the 2004 EROS B satellite in April 2006. Supported by former IAI executive vice president and current ImageSat CEO, Defendant Eckhaus, these statements repeatedly characterize EROS B as an Israeli government satellite deployed primarily to spy on Iran, and secondarily to provide the IMOD with enhanced, even global, surveillance capabilities, rather than as a commercial satellite owned and operated by the Netherlands Antilles company ImageSat and available for independent, autonomous, and regionally exclusive use by multiple governmental customers through ImageSat's SOP agreements worldwide.

149.    Upon information and belief, in failing to take advantage of the Venezuelan opportunity, ImageSat and its Board of Directors were motivated by geopolitical and strategic concerns of the IMOD and senior IMOD personnel including specifically its then Director General, Defendant Toren. Rather than the legitimate commercial interests of Plaintiffs and similarly situated minority shareholders, Defendants were motivated by the deteriorating international relationship between the United States and Venezuela and Israel's desire to improve and maintain its historically good relations with the United States. This type of consideration, however, is not a valid basis for decision-making within ImageSat, which is an independent

commercial entity, duly licensed by the IMOD since 1998 to pursue an SOP contract with Venezuela, whose customer selection was explicitly not to have been subject to control by the United States Government, let alone the whim of the current or any other U.S. administration, nor of the IMOD or any other branch of either the U.S. or Israeli (or any other) government, except under explicitly defined conditions that are the subject of prior agreement between the United States and Israel and among the IMOD and ImageSat's shareholders, none of which narrow conditions are applicable in this case.

150.    During the period in which the Company has sabotaged and then flatly rejected the lucrative opportunities available in Venezuela, the members of its Board of Directors have included Defendants Arzi, Chelouche, Piperno-Beer, Gaspar, and DePalma, as well as the recent IAI designee Ilan Biran (former Director General of the IMOD, IAI board member, and briefly Chairman of the Board of ImageSat from May 2006 to August 2006 when he resigned). Defendant Eckhaus as a member of the Company's senior management and Defendant Toren in his most recent role of Director General of the IMOD from September 2005 to July 2006 were directly responsible for the willful unwinding of the real commercial business of ImageSat and the wrongful misappropriation of the Company and its assets by the Israeli defense establishment.

151.    Defendants' conduct as described above had numerous contacts with the County, City, and State of New York, such as the holding in New York of Board meetings (including but not limited to the November 22, 2006 meeting discussed above) and meetings between Wilson and directors and other shareholders of the Company, in addition to Wilson's unsuccessful efforts to meet with Defendant Eckhaus, all to discuss the investment proposal of the President of Venezuela with the Company's shareholders between July 2006 and November 2006.

F.    Image Sat's Failed IPO and the 2006 Transactions

152.    Beginning in 2002, ImageSat was engaged in virtually continuous preparations to conduct an IPO for the purpose of raising additional capital to finance satellite acquisitions, deployments and operations on behalf of its SOP clients.

153.    Delays in the down payment by Angola in late 2002, the situation surrounding the 2001 EROS B satellite procurement and manufacturing process, and the termination of the Taiwan SOP contract in September 2004 resulted in sequential postponements of the IPO by the Company or its investment bankers throughout the period but by early 2005 ImageSat had announced that it was prepared to proceed with the public equity offering.

154.    ImageSat invested substantial time and effort in the IPO in each year between 2002 and 2005 and millions of dollars, eventually resulting in the filing of a Form F-1 registration statement with the Securities and Exchange Commission in October 2005.

155.    The Company conducted preliminary price negotiations with its underwriter who represented the value of the Company to its board of directors at roughly $470 to $500 million in anticipation of an IPO in 2005.

156.    According to Defendant DePalma, the target IPO price per share was set at $56 (which would have valued Plaintiffs' collective interests at more than $38 million).

157.    The Company's investment bankers, knowing the crucial importance to the Company of completing and financing the launch of the 2004 EROS B, urged management and the board in late February 2005 to complete the Company's audit and file the F-1 on a timely basis in order to ensure that ImageSat could take advantage of a then-favorable IPO market.

158.    However, inconsistencies and possible irregularities in the prior reporting of the 2001 EROS B satellite procurement including its relationship to the 2004 EROS B and the then-

stalled EROS C manufacturing process, could not even be answered to the satisfaction of Ernst and Young's New York staff by the chief financial officer, Hagai Goren. Goren once confided to Wilson that he had been denied access to some of the records relating to the 2001 EROS B transaction and that he was warned by Weiss not to pursue the matter further. Defendant Weiss was then a member of ImageSat's Board of Directors, and receiving consulting fees from both ImageSat and IAI.

159.    The financial statements were not completed and approved until the end of August or September 2005, and the required Form F-1 filing with the Securities and Exchange Commission (SEC) was not made until October. Although already quite late in the year, the IPO proceeded through normal review and clearance of the F-1 by the SEC and the scheduling of "road show" presentations to potential buyers that were to begin on November 30, 2005.

160.    In mid-November 2005, however, the impending IPO was suddenly aborted. Until that point, the minority shareholders had been led to believe that the IPO would provide them with an exit opportunity to sell their interests in the Company by creating a public market in which they could, if they chose, sell their shares. The news of the IPO's suspension implied that the Company could not resume the process until it resolved whatever problem had arisen.

161.    A variety of differing explanations were provided as to why the IPO did not proceed. Wilson enquired, relevant to the announcement on or about 15 November 2005 that Moshe Keret, the then-Chairman of the Board of ImageSat (and chief executive officer of IAI) was the subject of a criminal investigation for corruption and bribery, and ImageSat's CEO, Defendant Shimon Eckhaus, acknowledged to Wilson that the IPO would be delayed as a direct result.

162.    Since the beginning of 2006, however, no further mention has been made of the Keret scandal and his subsequent resignation from ImageSat's Board and from IAI. Instead, the reason most often given for termination of the IPO has been that the Angola SOP customer was withholding payment of SOP service fees, apparently past due since August of 2005, and/or threatening to cancel its SOP contract. This explanation provided to the minority shareholders was false and misleading. The evidence that this explanation was false and misleading includes, but is not limited to, the following:

(a)    The Angolan government had in the past frequently delayed making payments under its contract with the Company but had always eventually paid its obligations;

(b)    The Company's chief financial officer, through the monthly Investor Report distributed to Shareholders on August 23, 2005, reported that the Company had received payment from Angola the day before, August 22, in the amount of $13.5 million "...per the Customer's commitment...".

(c)    As of August 2005, Angola had paid more than $50 million to ImageSat under its SOP contract in a period of just over 3 years since the contract was executed in July 2002 – a sum nearly double what any of the Company's other SOP customers had paid during the same initial three-year period;

(d)    Angola had paid full SOP service fees despite ImageSat's failure by August 2005 (or at any point thereafter) to deliver full autonomous SOP service as it was obliged to do under the SOP contract;

(e)    Wilson was told by ImageSat's CFO Goren in December 2005 that the problem with Angola was "solvable, if not already solved," and independent sources acquainted with the Angolan customer/user entity confirmed this analysis;

(f)    Angola's performance under the SOP agreement was secured by collateralized assets and obligations, so that there was no real credit risk;

(g)    Angola's performance under the SOP agreement was covered by business contract insurance so that the Company did not face a material risk of loss;

(h)    The Company received assurances directly from its customer, the real Angolan user agency, up to late February 2006 that any contract issues would be amicably resolved;

(i)    Although Eckhaus had repeatedly been invited by the Angolan Minister of Finance to visit Angola to discuss and "amicably" resolve the matter of the possible late payments or contract modification Eckhaus intentionally delayed meeting with ImageSat's customer in order to heighten the perception of a financial crisis within the Company;

(j)    Eckhaus later explained to ImageSat's Board that he purposely delayed meeting with the Minister of Finance in order to increase the pressure on him, a willfully misleading explanation; in fact, the entire matter of the late payments was resolved and the full $15 million alleged past-due payment balance was received by the Company within one week of Eckhaus' meeting with the Minister, a meeting that Eckhaus admittedly and willfully delayed from November 2005 to May 2006. Not coincidentally, November 2005 to May 2006 was the entire period during which the Company (not its investment bankers as was subsequently and deceptively reported) first cancelled its IPO

initiative to avoid embarrassment to IAI over the Keret corruption investigation and to avoid drawing attention to its own deceptive characterization to the Company's investment banker (UBS) and the SEC of its own corrupt business arrangements in Angola;

(k)    Representatives of the Company falsely informed its investment banker that the Angolan government had insisted on keeping the terms and conditions of its SOP contract with the Company confidential, to the point that the Company's investment bankers had already negatively adjusted the Company's financial performance expectations to reflect the disclosure deficiency, which substantially diminished the value of the Company during prior IPO price negotiations, so that the Angola contract had already been substantially discounted by the financial community for purposes of the IPO. Contrary to the foregoing representations, long-term SOP contracts were primarily designed as a financing vehicle and the Angola SOP contract provided that:

Notwithstanding any termination of this Agreement, each of ImageSat and the Customer agrees to keep confidential and not to disclose to third-parties (except affiliates, meaning entitles controlling, controlled by or under common control with such party, provided such affiliates agree to the same obligation of confidentiality as applies to ImageSat and the Customer), any proprietary information obtained in connection with the performance by ImageSat or the Customer of their obligations under this Agreement, other than (i) as reasonably required in the performance of their obligations or the enforcement of their rights hereunder; or (ii) to ImageSat's and the Customer's legal counsel, accountants and actual or proposed successors in interest (provided such successors agree to the same obligation of confidentiality as applies to ImageSat and the Customer); or (iii) to the lenders providing and to prospective lenders contemplating providing Project Financing; or (iv) as required by law or legal process or in connection with filings made with the U.S. Securities and Exchange Commission and/or other relevant securities regulatory agencies; or (v) as consented in writing by ImageSat or the Customer, as applicable; or (vi) information that at the time of disclosure is in the public domain not as a result of actions by ImageSat or the Customer in violation of this Agreement. Neither Party shall issue any public notice or any news

release concerning this Agreement or the transactions contemplated herein without the prior approval of the other Party, which approval shall include the right to approve the form, content and timing of any such release, and shall not be unreasonably withheld;

(l)     Angola's alleged non-payment occurred in August 2005 and February 2006, an initial request to renegotiate the SOP contract was made in September 2005, and the initial suggestion that the government might want to terminate or settle the SOP contract was received by the Company prior to IPO price negotiations and the scheduling by the underwriter of the IPO "road show";

(m)     Eckhaus reported to Wilson via telephone on November 5th that the target valuation was set and the IPO road show was scheduled for November 30, 2006, during a meeting between Eckhaus and representatives of UBS on November 4, 2005 in London.

(n)     According to Defendant DePalma, one of the Company's directors, the IPO was still on track until at least November 14, 2005, more than ten days after the ImageSat/UBS meeting in London on November 4.  He subsequently reported that the first rumors of a postponement occurred on November 17, per his communication to the CST board of directors; and

(o)     Not only was it always anticipated within the Company that Angola would pay all or substantially all of its obligations under the SOP contract, but ultimately, Angola in fact satisfied its obligations to ImageSat in full, terminating its still unfulfilled SOP contract for convenience and paying, in addition to the $15 million paid in May, the full remaining face value of the contract ($71 million) in two lump-sum cash payments received by the Company prior to the end of August 2006.

163.     The genuine reasons for the Company's aborting of the IPO process included concerns that continuing the IPO process might reveal the Company's excessive, inappropriate,

and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere, which payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments, as well as an announcement that ImageSat's President, Defendant Keret, was under criminal investigation.

164.    Knowing that the IPO might fail as it had in prior years, Hagai Goren, the Company's chief financial officer, prepared a back-up plan to raise sufficient funds to launch and insure the 2004 EROS B through a rated bond offering organized in Israel. When the decision was taken to halt the IPO in mid-November 2005, the Defendants set into motion plans to completely restructure the senior debt and equity of the Company, subordinating the primarily U.S. and E.U.-based senior debt holders to Israeli bondholders and silencing virtually all of the knowledgeable minority opposition by wiping out the fully diluted holdings of the founding and other former management and employees of the Company. The 2006 transactions cemented complete control of the Company by IAI and Elbit and benefited them substantially to the extreme detriment of all other shareholders and positioned the Israeli defense establishment to misappropriate and redirect the space, launch and other assets of ImageSat once and for all.

165.    To effect these transactions, Defendants conspired to create the perception of a financial crisis within the Company that they conveniently attributed to "problems" with the Angolan SOP contract just as they had repeatedly done in the past by manipulating the perception of the Angolan business relationship through an Israeli-based "agency" relationship (LR/Ofek) with the government of Angola. In reality, the "problems" the Company was experiencing, i.e. its persistent undercapitalization and the general inability to adequately

capitalize the business (including ImageSat's third consecutive failure to organize and execute an initial public offering) were a direct reflection of the self-dealing, corruption, and ineptitude of the Defendants. The contrived crisis based on the alleged non-payment by Angola and/or a series of informal communications from the Angolan Minister of Finance were misrepresented to Pegasus to induce Pegasus to deliver a Notice of Default dated January 30, 2006 on its Senior Notes and PIK Notes based on a claim that a "material adverse event" involving ImageSat's SOP contract with Angola had occurred, so that repayment of the approximately $65 million in Senior Notes and accrued interest owed by the Company to Pegasus was immediately due and payable. The ultimate goal was to refinance and subordinate the full principal and interest due to the U.S. and E.U. institutional investors to the new Israeli bonds.

166.    By early 2006, ImageSat was finally ready to launch its second satellite, the 2004 EROS B. The benefits of the new satellite including contract opportunities to sell services from this enhanced, high-resolution satellite should have redounded to the benefit of all shareholders, including the Plaintiff minority shareholders, option holders, and warrant holders. This did not occur and instead, the Company engaged in a series of transactions whose key terms, implications, and rationale were never disclosed by ImageSat or any of the other Defendants to Wilson and the other Plaintiffs, despite repeated demands by Wilson and other minority shareholders for complete information regarding the nature of the proposed financing and related transactions and their impact upon the minority shareholders. The Company's own in-house counsel repeatedly requested and recommended that management respond to shareholder inquiries from Wilson and others to no avail. Instead, Wilson's requests for information were completely ignored until, less than two hours before the meeting in Curacao at which the transactions were to be submitted for approval for the second time, Goren e-mailed

Wilson indicating that he and Defendant Eckhaus would be available, roughly 15 minutes before the meeting was due to commence in Curacao, to discuss any questions Wilson might have. By that time, it was obviously far too late for Wilson to review any disclosure that might have been provided or to discuss matters with other affected shareholders. Additionally, Wilson's requests that shareholders who were unable to travel to Curacao for the various meetings be enabled to participate by telephone were denied.

167.    Just in advance of the series of events and board and shareholder meetings that approved the transactions and related actions, shareholders led by IAI and Elbit purportedly approved a resolution modifying the Company's Articles of Association in order to (i) eliminate preemptive rights for all classes of shares other than Preferred Series B shares, roughly half of which were held by IAI and Elbit; (ii) to purportedly waive any and all claims of conflict of interest involving the directors; and (iii) to appoint (on behalf of IAI) Defendant Gino Piperno-Beer to the Board of Directors.

168.    In proposing the resolution waiving any and all conflicts of interest among the directors, the directors failed to make a full and complete disclosure of the nature and extent of their conflicting interests, as required by applicable law (including Netherlands Antilles law), and such resolution is therefore invalid.

169.    Previously, it had been anticipated that ImageSat's Board of Directors in 2006 would include four IAI-designated directors (Keret as Chairman, Gennaro Clabatistto, Larry Schafran, and Piperno-Beer), one Elbit designee (Gaspar), one CST designee (DePalma), one WIS Partners designee (Heilpern), and at least two independent directors. However, the election of Board members had been quietly dropped from the agenda of the preceding annual ImageSat shareholders meeting on November 25, 2005. The minority shareholders were never informed

that Keret and the other directors had resigned. Rather a new resolution was distributed on February 20, 2006, in the Convocation and Notice of another Extraordinary General Meeting to be held on March 8 so as "[t]o ratify and confirm the appointment of Mr. James A. DePalma, Mr. Joseph Gaspar, Mr. Rahmi Rudolf Heilpern, and Mr. Gino Piperno-Beer as the sole members of the Board of Directors of the Company, and to dismiss each and every other person not listed herein as a member of the [Board], effective immediately."

170.    In connection with the transactions implemented in March 2006, ImageSat obtained a "fairness opinion" that was prepared and presented to the Board of Directors on February 10, 2006 by Morgan Joseph Co., Inc. ("Morgan Joseph"), a third-party investment bank headquartered in the United States, which opined that the transactions were fair to the shareholders of the Company. However, the Morgan Joseph fairness opinion was – as at least three of the four members of the ImageSat Board knew and as IAI and Elbit and their surrogates among ImageSat's management well knew – founded on fundamentally false and flawed disclosures by ImageSat, which unavoidably resulted in flawed assumptions upon which the opinion was predicated.

171.    The fraudulently misleading information that Defendants provided to Morgan Joseph, and which Morgan Joseph relied upon thereby vitiating the value of the fairness opinion, included but was not limited to the following:

(a)    Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that the Company's investment banker UBS had cancelled the IPO and that during December 2005 and January 2006, "[s]ignificant efforts to raise funds (including IPO, bank financing, private equity investment) have been unsuccessful," although after the postponement of the IPO in November 2005 by the Company in consultation with

Defendants IAI and Elbit, ImageSat had made no serious effort to raise funds through attempting to revive the IPO or by seeking bank financing, private equity investment, or through any other vehicle other than the bond financing that Goren had been pursuing as a back-up financing plan prior to suspension of the IPO, including in particular a shareholder rights offering as the Company was obliged to do;

(b)     Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that bank financing would be unavailable to the Company, even though bank financing would have been readily available, particularly given that IAI, an Israeli-government-owned corporation, later demonstrated that it was available to guarantee the debt financing that the Company required;

(c)     Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that the Company would likely lose its SOP contract with India were it to delay the 2004 EROS B launch, but in fact, an EROS B launch had already been delayed for more than two years owing to the fraudulent and willfully negligent acts of the Defendants themselves;

(d)     Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that the Company would likely lose the SOP contract with Israel were it to delay the 2004 EROS B launch, but in fact, having failed to launch its Ofeq 6 surveillance satellite in September 2004, the IMOD had only one satellite (Ofeq 5) in space and that satellite was rapidly reaching the end of its anticipated lifespan (which is shorter than that of EROS satellites due to its retrograde launch trajectory and related higher fuel consumption). The IMOD has successfully launched only two satellites out of seven attempts since 1990. It has depended on EROS A during periods when it had no

capability in space of its own and would most certainly have continued to do so, with or without EROS B.

(e)     Defendants falsely advised Morgan Joseph, and Morgan Joseph falsely assumed, that "EROS B needs to be launched by April 30th" because on that date "the Russian rocket scheduled to launch EROS B into space" would become "stale and therefore very difficult to insure." In addition to the generally spurious and technically unsupportable nature of the foregoing claim, the Company previously reported in the July 2004 Investor Report that the launch window negotiated with the launch service provider was from January 1 to June 30, 2006. It was further suggested that only a narrow temporal window existed for the Company to realize the "substantial new business" opportunities associated with the launch of EROS B. In general, the urgency of the launch and the damage to the Company from a short delay that would result from seeking far more advantageous transaction terms or the now obviously attainable resolution of the Angolan payment and contract issues, which brought $86 million in cash to the Company within the ensuing few months, were grossly overstated.

172.     In connection with the March 2006 transactions, Defendants ignored persistent written inquiries from Wilson regarding other aspects of the financing and the related transactions. For example IAI, Elbit, and ImageSat management agreed not to transfer title of the 2004 EROS B satellite to the Company at the time of its delivery and launch. Another feature of the agreements could trigger IAI's assumption of the operational control of the EROS satellites. Wilson reported to management and the Board that both of these provisions would have a detrimental impact on, if not absolutely prevent, the Company's ability to close the SOP

contract in Venezuela.  Despite these legitimate business concerns, no response from the Company or its board members or senior management was forthcoming.

173.    Immediately after the launch of the 2004 EROS B in late April 2006, Company management arranged to meet with Angola to resolve the SOP contract and related payment matters.  The alleged past-due payments as of February 2006, totaling $15 million, were made in their entirety only days after that May 2006 meeting and it was agreed that a final resolution according to agreement in principle then achieved would be settled by mid July.  In fact the SOP contract was terminated for the convenience of the parties thereto and Angola paid (in addition to the $15 million May payment) $71 million, representing 100% of the remaining face value of the contract, **with no ongoing obligation on the part of ImageSat to deliver the remaining components of the ground system or to render services of any kind.**

174.    Upon information and belief, the transactions undertaken in the spring of 2006 were undertaken at the instance of IAI and Elbit and their designees on their own behalf and on behalf of their IMOD sponsors for the grossly improper purpose of **minimizing** the value of ImageSat and of the minority shareholders' interests in it and facilitating the improper misappropriation of the Company by the Israeli defense establishment.

**G.    IAI's and Elbit's Breaches of Contract and the Failure of the ImageSat Board and Management To Protect the Shareholders' Rights**

175.    Within recent years, changes in the geopolitical, regulatory, and technical environments worldwide have created a more hospitable market for the sale of "turn-key" earth observation satellites (i.e., satellites delivered operational in space).  In mid-year 2005, IAI announced its intentions to pursue this market aggressively and together with Elbit, which was already active and somewhat successful in offering its satellite imaging payloads in the market, unfairly reinterpreted their prior "exclusive commercialization" commitments to the Company on

the basis that industry had made no commitment to ImageSat regarding the commercialization of its next generation (Synthetic Aperture Radar "SAR") military satellite technology. In fact, Defendants planned, together with the IMOD, to offer SOP like SAR satellite services to key international export partners in direct competition with ImageSat based on ImageSat's proprietary business model, while ignoring the prohibition on providing earth observation services embodied in the Master Agreement. With respect to ImageSat's satellite procurement quota, ImageSat had agreed to purchase four separate EROS B satellites from IAI in 1998, 2000, 2001, and 2004, none of which had been delivered to the Company by the time that IAI and Elbit threatened to terminate or blatantly violated their commitments. Two of the relevant non-deliveries were known by Defendants IAI and Elbit to have been based on their own defective designs. The 2004 EROS B that was eventually delivered was based upon the Ofeq 5 satellite design of the IMOD that had first been rejected by the Company in 1998. However, an explicit extension of the aforementioned exclusivity commitments to ImageSat was memorialized in the First Amendment to the Master Agreement in connection with the execution of the 2004 EROS B contract.

176.    As such, the termination or reinterpretation and modification of ImageSat's exclusive commercialization rights was unfair to the minority shareholders, extremely detrimental to their financial interests, and undertaken by IAI and ElOp in bad faith based on their preference to pursue their independent manufacturing interests over the interests of the Company, while using ImageSat, its existing satellite assets, and its proprietary SOP business model as a highly valuable demonstration of capabilities and an interim service option for their future satellite customers. The former CEO of ImageSat, Menashe Broder ("Broder") belatedly confronted Defendant Chairman Keret and the members of the Board of Directors over this issue

in mid-2005. At the June 22, 2005 Finance committee meeting, Broder reported that meetings were planned for the following day at which IAI, without involving ImageSat management, would discuss the Company's SAR satellite plans and the rescheduling of the EROS B payments. He objected that parties including the major shareholders and suppliers of the satellites (IAI and Elbit) were "discussing such a crucial matter without the participation of the Company." For interfering with Defendants' plans, Broder was promptly given a golden parachute in place of the new two-year employment contract the Company had approved and executed with him only a few months before, and replaced by the then-Executive Vice President and Deputy CEO of IAI, Defendant Eckhaus, who immediately proved, and continues to prove, more obedient to the dictates and agenda of IAI than his predecessor. This abrupt change in leadership disrupted the Company's IPO preparations and damaged its credibility, but more importantly from the perspective of the damage done to ImageSat's minority shareholders, it led directly to the Company's radical change in course, with respect to both its future satellite and operational plans, and with respect to its relationship to the industrial partners, IAI and Elbit, and the IMOD. Despite a letter from Wilson to ImageSat's Board of Directors and Shareholders warning of the certain negative impact on the Venezuelan SOP opportunity, as well as on the Company's SOP sales prospects in general, of replacing Broder with a high-profile IAI executive hired directly from IAI, Eckhaus was hired and all internal objections to the radical redirection of the Company and its inappropriate manipulation by IAI and Elbit was suppressed.

177.    In late 2004, Israel's planned launch of its Ofeq 6 surveillance satellite failed. This failed launch, coupled with international relations considerations left Israel desirous of acquiring enhanced satellite intelligence capabilities over which it can exercise more complete control. At the same time, international relations considerations also left Israel desirous of not

displeasing the United States by allowing ImageSat to enter into SOP contracts with potentially controversial customers such as Venezuela.

178.    As set forth above, ImageSat's rights explicitly granted under the Master Agreement, the Elbit SPA, and otherwise, including but not limited to its right to be the exclusive vehicle through which both IAI and Elbit pursue the commercialization of the Israeli Defense Establishment's earth observation satellite technology, the right to have IAI, Elbit and the IMOD not compete with ImageSat's business, the first right to negotiate any opportunity for the commercialization of IAI or Elbit technology relevant to the commercial earth observation market, and the right to receive a royalty on the commercial exploitation of any technology developed by IAI or its subcontractor Elbit while under contract with ImageSat, represent some of ImageSat's most valuable legal and commercial rights.  The protection and enforcement of such rights is of paramount importance to ImageSat's ability to compete in the marketplace and thus its financial performance and viability.  Conversely, IAI and Elbit have long sought to evade their obligations to ImageSat under the Master Agreement, the SPA, and other agreements with the hopes that they would be able to commercialize earth observation satellite technology on terms and with partners and clients of their own choosing.  IAI and Elbit have thus sought to enhance their operating control over and financial benefit from the exploitation of commercial opportunities, at the expense of ImageSat and ImageSat's shareholders, particularly including its minority shareholders such as Plaintiffs and all of its financial investors.

179.    The conflicting interests of the controlling faction of ImageSat's Board of Directors, four of whose members are IAI designees, together with Elbit and of many members of ImageSat's senior management, have substantially aided IAI in carrying out its wrongful intentions.  For example, at an ImageSat Board of Directors meeting on February 22, 2007, IAI

representatives advanced the theory that ImageSat's exclusive rights under the Master Agreement could be terminated by IAI because ImageSat was supposedly in default on its performance of the EROS C contract and that IAI would only agree to extend the term of such contract on condition that ImageSat consent that the exclusivity period defined in the Master Agreement was no longer in effect. The appropriate response to this is that, as set forth above, it is IAI's and Elbit's collective failure to manufacture the 1998, 2000 and 2001 EROS B and EROS C satellites that ImageSat did order on time and according to specifications, and IAI's and Elbit's other fraudulent and wrongful conduct as set forth herein, that made it impossible or impracticable for ImageSat to proceed with the 2001 EROS B/EROS C contract as scheduled, thereby excusing ImageSat's not having done so and estopping IAI or Elbit from relying on such failure as a basis for seeking to avoid their contractual commitments of exclusivity because they, not ImageSat, were the breaching parties. Instead of advancing this, or any, argument in an attempt to protect the interests of ImageSat and its shareholders, a majority of the ImageSat Board and ImageSat's senior management have purportedly agreed to acquiesce in IAI's position, thereby surrendering valuable rights of the Company and its shareholders and receiving literally nothing in return.

180.    At the February 22, 2007 Board meeting, the Board members were not presented with and did not have before them copies of the Master Agreement or other documentation that would enable them to properly evaluate the Company's options thereunder. The Board members did not have before them and were never provided with an opinion or analysis prepared by the Company's legal counsel or any other qualified person concerning the Company's rights under the Master Agreement or the costs and benefits that would be associated with surrendering such rights. The Board members, and the members of ImageSat's senior management who advised

them, breached their fiduciary duties to the Company and its shareholders, particularly the minority shareholders such as Plaintiffs, by surrendering lucrative rights of ImageSat potentially worth hundreds of millions of dollars without taking the most elementary steps to evaluate, protect, preserve, defend, and enforce the Company's rights.

181.    The reason that IAI was pushing so hard to obtain ImageSat's acquiescence in the position that its exclusivity obligations had terminated became clear in April 2007, when IAI announced that it was entering into a transaction with Northrop Grumman Corporation ("Northrop"), which apparently had been under discussion or negotiation between IAI and Northrop wholly unbeknownst to ImageSat for up to two years.  Under this transaction, it is contemplated that IAI will supply to Northrop on commercial terms up to eight (8) earth observation radar imaging satellites at a total cost of up to $1.6 billion.  Upon information and belief, the contemplated satellites will utilize technology virtually identical to the technology that IAI granted the aforementioned exclusive rights to ImageSat to commercialize, which ImageSat enhanced through the technical participation of its staff and management, and which ImageSat funded through its EROS satellite procurements, including in particular virtually all allocations to non-recurring engineering.  Essentially, the only substantive difference between the TechSAR earth observation system is that it will utilize a synthetic aperture radar imaging payload rather than an electro-optical payload (which optical payload was contributed to the Ofeq/EROS satellites entirely by ElOp rather than by IAI). Much of the new SAR payload and related technology were developed by IAI using ImageSat employees and/or in the course of developing the EROS B and C satellites for ImageSat and is accordingly within the scope of IAI's non-compete and exclusivity obligations contained in the Master Agreement.

182.    Moreover, because this proposed transaction represents a commercialization of an extension of IAI's earth observation satellite technology, it is, at a minimum, subject to the first right provision contained in the last sentence of Section 1(a) of the Master Agreement, under which IAI agreed to discuss any opportunity for commercialization of its earth observation satellite technology with ImageSat and to negotiate a mutually agreeable relationship.

183.    Instead of abiding by its obligations under the Master Agreement before entering into a transaction with Northrop, upon information and belief, long before IAI negotiated the Northrop transaction without any advance notice to or discussion with ImageSat at all, it was proposing various strategies for the commercialization of its SAR satellite technology and satellites and the use of its electro-optical and SAR earth observation through the provision of services to governments similar to the proprietary SOP services conceived of and offered by ImageSat.  By doing so, and by denying the existence and/or the applicability of the non-compete, exclusivity, and first right provisions of the Master Agreement, IAI flagrantly breached the Master Agreement and IAI, Elbit, and the IMOD all reneged on these seminal prior commitments to ImageSat in a fashion that threatens to cost the Company's minority shareholders and financial investors hundreds of millions of dollars in lost shareholder value.

184.    Faced with unlawful conduct by its contract partners that threatens ImageSat with irreparable and immediate financial injury from which ImageSat may never recover, ImageSat should have sought immediate redress, whether through negotiation with IAI, litigation, or otherwise.  Instead, the directors and senior officers of ImageSat have done the precise opposite and have affirmatively chosen to accept IAI's insistence that ImageSat's contractual rights under the Master Agreement are no longer in effect.  This proposed relinquishment of ImageSat's extremely valuable contractual rights has never been the subject of

any considered analysis by the Board of Directors based upon a complete review of all of the surrounding facts and documents. Rather, it appears that ImageSat has done nothing to protect its rights or the rights of its shareholders with respect to this matter, whether through researching and, where relevant, protesting IAI's and Elbit's violations of their contractual and fiduciary obligations to ImageSat, vindicating the rights of ImageSat and its shareholders through legal means, or seeking to negotiate an appropriate financial participation.

185.    Defendants' apparent lack of interest in preserving and protecting ImageSat's rights, and their acquiescence in accepting IAI's and Elbit's position that the Company no longer has any exclusive rights or protection from competition by its controlling industrial shareholders, is consistent with their overall plan to wrongfully subordinate the interests of ImageSat and its shareholders, particularly including the minority shareholders such as plaintiffs, to those of IAI, even in the wake of the announced transaction between IAI and Northrop Grumman which illustrates how valuable to the future of ImageSat these rights can and should be.

186.    At a Board of Directors meeting held on May 8, 2007, a majority of the Board of Directors purported to ratify a set of minutes of the Board of Directors meeting held on February 22, 2007 at which it is recited that the Board had unanimously agreed to IAI's demand that ImageSat acknowledge the termination of its exclusivity with IAI, even though this statement was false and misleading in that, among other things, not all Board members had agreed with the proposal made at the February 22 meeting and even though, as set forth above, the action taken at such meeting was based upon incomplete and misleading presentations by Board members and members of senior management with conflicting interests, in the absence of copies of the relevant documentation or of an opinion by the Company's legal counsel or another qualified

person concerning the scope of the Company's rights and the potential costs and benefits of surrendering them.

187.    Demands by several of the minority shareholders, including Plaintiffs, that the Board and management of ImageSat take appropriate action to safeguard the rights of the Company and its shareholders under the Master Agreement were ignored for a period of weeks, and the limited responses provided were inaccurate and evasive.

188.    On June 19, 2007, the Company gave notice of an extraordinary meeting of shareholders to be convened in Curacao on July 5, 2007, whose agenda includes, in substance, the ratification of ImageSat's action in accepting that ImageSat's exclusive rights under the Master Agreement are null and void, thereby purporting to cure the conflicts of interests heretofore ignored by the directors in violation of applicable Curacao law.  Upon information and belief, the controlling shareholders of ImageSat, IAI and Elbit, will use their controlling block of stock to adopt this resolution, thus purportedly extinguishing the Company's rights under the Master Agreement once and for all and costing ImageSat and its shareholders hundreds of millions of dollars.

189.    The Defendant directors and officers have also failed to negotiate and collect royalties to which ImageSat is entitled from IAI and Elbit for uses of technology developed by IAI and Elbit in connection with their work for ImageSat, and IAI and Elbit have failed to pay such royalties.

190.    Throughout this period, in order to avoid scrutiny of their mismanagement and sabotaging of ImageSat and their diversion of the Company's principal assets and contractual rights, Defendants have among other things continued to refuse to designate the at least two independent directors who are supposed to serve on the ImageSat Board of Directors pursuant to

the July 2000 Securityholders Agreement to which Plaintiff WIS Partners is a party and subsequent contractual agreements under which the ImageSat Board is to include independent directors and such independent directors are to include a majority of the Finance Committee of the Board.  Demands by at least two parties to the Securityholders Agreement, WIS Partners and Pegasus, that independent directors to be added to the Board as required have been disregarded.

191.    Defendants' conduct as described above had numerous contacts with the County, City, and State of New York including, among things, that the Master Agreement and other contracts at issue were negotiated and entered into in New York and provide that they are to be governed by New York law and/or enforced by New York courts, as well as the holding in New York of Board meetings and other meetings at which the Master Agreements and other agreements and their continued applicability and the Company's rights under them were discussed.  Additionally, upon information and belief, meetings and communications relating to the transactions by which IAI and Elbit breached their contractual obligations also took place in New York.

192.    As the cumulative result of defendants' misconduct, including but not limited to ImageSat's intentional refusal to take advantage of SOP opportunities, the Company's decision essentially to abandon its business, and the Company's failure to enforce its contractual rights under the Master Agreement, the Elbit SPA, and other agreements, the value of the minority shareholders' stock in the Company, stock options, and warrants has been virtually destroyed. Defendants' conduct in all respects has breached their fiduciary duties to the minority shareholders, has constituted fraud, constituted a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, and has violated the minority shareholders' rights in multiple respects.

193.    In all of these matters, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (Against Defendants ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Keret, Nissan, Eldar, and Toren For Breach of Fiduciary Duty in the 2000 Transactions)

194.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

195.    As directors and/or officers of the Company, Defendants Weiss, Keret, Nissan, Eldar, and Toren owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

196.    As majority and/or controlling shareholders of the Company, IAI and ElOp (now succeeded by Elbit, including Elbit Systems and ESEOEL) owed Plaintiffs, as shareholders of the Company, the highest fiduciary duties of loyalty, due care, candor, and good faith.

197.    ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

198.    In connection with the 2000 transactions, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)     Inappropriately conspiring and agreeing to modify the "Master Agreement" so as to accord IAI and its subcontractor ElOp (now succeeded by Elbit) the status

87

of "Exclusive Vendor" for ImageSat's next six satellite orders, thus eliminating an important control mechanism that the shareholders had previously agreed to so as to minimize the inherent conflicts of interest among the Company's financial and industrial shareholders, and thus disserving the best interests of the Company and its shareholders but serving the interests of the Defendants;

      (b)    Failing to disclose their intent to bring about this material change to Plaintiff Wilson or the directors designated by the minority shareholders prior to privately convincing Pegasus that the change was justified and in the best interests of the Companyt;

      (c)    Despite conflicts of interest, giving IAI the ability to manipulate satellite pricing as well as to control the award and pricing of related ground systems which IAI proceeded to do with impunity and to the extreme detriment of the minority shareholder's interests; and

      (d)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, causing ImageSat to be an entity dominated by IAI, and ElOp/Elbit, and surrogates among the Company's management and Board, operating wholly without regard to the interests of the minority shareholders.

      199.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

200.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

201.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

202.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

## AS AND FOR A SECOND CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Keret, Eldar, Nissan, Toren, Federmann, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma For Breach of Fiduciary Duty Concerning the EROS B Satellite Fraud)**

203.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

204.    As directors and/or officers of the Company, Defendants Weiss, Keret, Eldar, Nissan, Toren, Federmann, Broder, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

205.     As majority and/or controlling shareholders of the Company, IAI and ElOp (now succeeded by Elbit, including Elbit Systems and ESEOEL) owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

206.     ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

207.     In connection with the purchase and manufacture of the 2001 EROS B satellite, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)     Despite conflicts of interest, requiring that the new 2001 EROS B purchase agreement automatically be awarded to ImageSat's exclusive satellite supplier, IAI, and IAI's principal subcontractor, ElOp, under the terms of the Master Agreement of July 2000, resulting in a substantial increase in the cost of the new 2001 EROS B satellite design;

(b)     Agreeing to procure a substantially more expensive EROS B satellite than had previously been planned and agreed to;

(c)     Upon learning that the actual satellite performance characteristics of the 2001 EROS B satellite did not meet the Company's requirements as specified in the satellite contract, failing to take appropriate and reasonable actions to minimize the negative consequences of the errors that had been discovered and failing to advise Plaintiffs and others parties with a right to know of the existence and consequences of the errors that had been found;

(d)    Negotiating the terms of the satellite contract based entirely on their own self-interest and not in the best interests of ImageSat and all its shareholders, including the minority shareholders, with the result that ImageSat ultimately agreed to pay IAI and ElOp an additional $20 million more than the amount that was originally agreed to be paid for the EROS B satellite as memorialized in the 2000 EROS B satellite purchase contract;

(e)    Willfully and fraudulently withholding information concerning the known design flaws in the 2001 EROS B satellite from the minority shareholders' designees to the Board of Directors and from many of the Company's investors including Bank Leumi, who required that the 2001 EROS B SSC be closed as a condition precedent to the closing of the bank line of credit for more than $70 million;

(f)    Agreeing not to disclose the serious design flaws in the new 2001 EROS B satellite, and instead agreeing to proceed with both the Convertible Note redemption and the satellite purchase order;

(g)    Paying a $23.5 million down payment, including $15.5 million in cash to IAI despite the complete lack of technical specifications that would meet ImageSat's Mission Requirement and making subsequent payments under and in relation to the satellite contract, under circumstances rendering each such payment a fraudulent conveyance;

(h)    Agreeing to delete all the technical specifications from the 2001 EROS B Satellites Supply Contract (SSC), thereby willfully concealing the technical flaws and design defects in the satellite while impairing ImageSat's ability to ensure that the

satellite as manufactured and delivered complied with ImageSat's and its customers' requirements;

(i)     Proffering the contrived excuse that the Company had asked for a delay in beginning the manufacturing process so that ImageSat could consider possible design modifications;

(j)     Fraudulently conveying $15.5 million, the cash portion of the down payment for the satellite, to IAI despite the knowledge that the Company would not be receiving reasonably equivalent value for such payment; and

(k)     Insisting that ImageSat relax the specifications and performance expectations for the satellite and trying to extort cooperation from the Company's then senior technical management, Plaintiffs Bar-Lev and Rosenbaum;

(l)     Not causing or allowing ImageSat to pursue, through negotiation or litigation, claims against IAI, ElOp, and others for fraud, negligence, breach of contract, or other claims arising from the series of issues arising from the successive satellite contracts; and

(m)     Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing.

208.     Throughout the history of the 2001 EROS B satellite, Defendants consistently placed their own self-interests ahead of those of ImageSat and its stockholders, including Plaintiffs. As a result of Defendants' misconduct, IAI and ElOp received tens of millions of dollars to build a satellite that was never to be delivered and that never was delivered in any form, even as work in progress.

209.    Even though a functional B class satellite, the 2004 EROS B, was ultimately delivered nearly two years after ImageSat's contractual commitments to its SOP customers stipulated, the 2004 EROS B design was a design that was repeatedly rejected by the Company when it was originally proposed by IAI and ElOp in 1998 and 2000.

210.    At no time did any of the Defendants take the appropriate action of candidly disclosing to all interested parties, including the minority shareholders, that there were serious problems with the satellite or that its construction and delivery would be seriously, perhaps indefinitely, delayed and that, if the satellite were ever built, it would be far more expensive than originally budgeted even under the onerous terms of the 2001 EROS B SSC.

211.    Instead, as time progressed and the 2001 EROS B satellite was not being constructed in accordance with the specifications, Defendants continued to fail to disclose the relevant facts to the minority shareholders or their representatives on the Board of Directors, continued to fail to take reasonable steps to protect the interests of ImageSat and its minority shareholders, and continued to breach their fiduciary duties to the minority shareholders.  In so doing, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)    Conspiring to agree to delay, deceptively, the manufacture of the satellite while ImageSat purportedly reconsidered the satellite's requirements and specifications and/or purportedly because ImageSat failed to make timely payment for invoices submitted;

(b)    Leading the Plaintiff minority shareholders to believe that the Company was manufacturing an EROS B satellite that met the Company's published mission requirements when it was not;

     (c)    Removing certain of the minority shareholders from the distribution list for the Company's investor reports and/or ceasing altogether to issue such investor reports for the purpose of withholding disclosure concerning the problems with the satellite;

     (d)    Issuing a Stop Work order for the 2001 EROS B manufacturing process, purportedly due to non-payment by ImageSat;

     (e)    Falsely informing the minority shareholders including Plaintiffs that IAI/MBT's and Elbit's suspension of the EROS B manufacturing was due to non-payment of the down payment by the new Angolan SOP and ImageSat's associated inability to access the Bank Leumi credit facility;

     (f)    Misleadingly renaming or redesignating the name of the satellite at the time the 2004 EROS B satellite supply contract was entered into for the purpose of further concealing the problems with the satellite;

     (g)    Falsely booking more than $33 million or more invested in the manufacture of the 2001 EROS B satellite between 2001 and 2005 as an asset on the Company's books and records while knowing that ImageSat had received nothing of value for such expenditures;

     (h)    Providing to ImageSat's auditors and board the willfully false pretense that a new and beneficial strategic alliance with the IMOD was incompatible with the continued investment and eventual deployment of the 2001 EROS B (by then renamed "EROS C") satellite by the Company and that the asset was therefore impaired and must be written off;

(i)    Agreeing to write off as of year-end 2005, without reparation or recourse of any kind to ImageSat, the EROS B/C investment in its entirety, and in doing so rendering the Company insolvent, all by resolution of ImageSat's Board of Directors, dominated by a majority of designees of IAI and Elbit;

(j)    Failing to ensure that a conforming EROS B satellite was launched and providing service to Taiwan by September 2004, causing the cancellation of the Taiwan SOP, with a resulting revenue loss to the Company of more than $9 million per year as well as the payment of penalties;

(k)    Failing to ensure that a conforming EROS B satellite was launched on a timely basis, causing the reduction of revenues under the India SOP, with a resulting revenue loss to the Company of $1 million per year;

(l)    Fraudulently and inequitably claiming and causing the Company to incur expenses for the 2001 EROS B contract suspension of $4 million;

(m)    Failing to take adequate steps to recoup all the moneys spent on the 2001 EROS B/C satellite through either negotiations with or litigation against any of the entities or persons responsible for the fiasco;

(n)    Failing to adequately inform the designees of the minority shareholders to the Board, shareholders, investors, and the Company's own auditors of the highly significant link between the Master Agreement as amended and the satellite supply contracts;

(o)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing. and

(p)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, stating willful falsehoods concerning, and failing to disclose the facts surrounding the 2001 EROS B/C satellite that damaged the company's credibility, corresponding sales performance, its overall valuation, and the interests of the minority shareholders by hundreds of millions of dollars.

212.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

213.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

214.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

215.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or

exemplary damages, in an amount to be determined by the Court, but not less than Three
Hundred Million Dollars.

### AS AND FOR A THIRD CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Keret, Nissan,
Eldar, Eckhaus, Toren, Federmann, Ackerman, Gaspar, Piperno-Beer, Chelouche,
Arzi and DePalma For Breach of Fiduciary Duty Concerning the
Destruction of the Company's International Operations)**

216.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth
herein.

217.     As directors and/or officers of the Company, Defendants Weiss, Keret, Nissan,
Eldar, Eckhaus, Toren, Federmann, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and
DePalma owed Plaintiffs, as shareholders of the Company, and the Company the highest
fiduciary duties of loyalty, due care, candor, and good faith.

218.     As majority and/or controlling shareholders of the Company, IAI and ElOp (now
succeeded by Elbit, including Elbit Systems and ESEOEL), owed Plaintiffs, as shareholders of
the Company, and the Company the highest fiduciary duties of loyalty, due care, and good faith.

219.     ImageSat also owed to its own shareholders the highest fiduciary duties of
loyalty, due care, candor, and good faith.

220.     In connection with the Company's international operations, Defendants breached
their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including
but not limited to the following:

     (a)     Causing many of the Company's operations outside of Israel to be
     terminated, as were virtually all non-Israeli personnel, causing the Company to be
     retroactively subject to Israeli VAT taxes for which an exemption had previously been
     granted and thereby creating a financial exposure of as much as $40 million;

(b)     Abandoning the Company's robust international character that was essential to its credibility as an independent and apolitical commercial entity, the loss of which was reflected in the Company's poor SOP sales performance thereafter;

(c)     Causing several of the Company's contractual commitments to its AAD's to intentionally not be met;

(d)     Deciding to act willfully in default of a strategic cross-distribution and AAD relationship with Sovinformsputnik, the exclusive licensee of the Russian Space Agency for the distribution of Russian high-resolution military imagery, one of ImageSat's prime SOP prospects;

(e)     Willfully failing to deliver under the terms of its AAD agreement with "KAIST" in South Korea, another of the Company's prime SOP prospects;

(f)     Manipulating ImageSat's SOP program sales in Korea and elsewhere to enhance the attractiveness of IAI's and Elbit's own turn-key satellite and payload sales initiatives and in doing so putting IAI's, Elbit's, and the other Defendants' own interests ahead of and in direct competition with ImageSat's SOP program;

(g)     Failing to properly and professionally serve the Company's SOP customers to exploit SOP contract opportunities on a purely commercial, nondiscriminatory, and apolitical basis;

(h)     Willfully failing to deliver, over a four-year period between July 2002 and July 2006 (when the Angolan SOP contract was terminated) even a single day of autonomous SOP service to Angola or even to deliver to the Angolan authorities the permanent tasking and reception antenna, both of which were program deliverables that should have required no more than 18 to 24 months to fulfill;

(i)    Mismanaging the finances, and endangering the well-being, of the Company by paying or knowingly allowing the Company to make excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere, which payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments, thus misappropriating the Company's funds and further jeopardizing its well-being by creating potential exposure under applicable corrupt practices legislation or otherwise;

(j)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing; and

(k)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts that damaged the Company's credibility, its corresponding sales performance, its overall valuation, and the interests of the minority shareholders by hundreds of millions of dollars.

221.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

222.    Defendants' acts and omissions in these respects foreseeably had a devastating effect on ImageSat's business and future prospects. Defendants caused and allowed the Company to willfully default on its obligations to ImageSat's largest customers and prospective customers, whose confidence formed the foundation of any future success ImageSat would be able to have. Defendants also damaged the Company by endangering its status as a truly international Company, thus creating numerous grave risks to ImageSat's future arising from geopolitical as well as legal (export licensing and taxation) factors. By doing all of this, Defendants abandoned ImageSat's entirely apolitical and commercial agenda for reasons wholly unrelated to ImageSat's legitimate business and financial objectives and the corresponding legitimate financial objectives of the minority shareholders including Plaintiffs.

223.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

224.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

225.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

### (Against Defendants ImageSat, IAI, Elbit Systems, ESEOEL, Keret, Nissan, Eckhaus, Federmann, Toren, Weiss, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma for Breach of Fiduciary Duty in Connection with the Company's SOP and Investment Opportunity in Venezuela)

226.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

227.    As present, former, and/or acting directors and/or officers of the Company, Defendants Keret, Nissan, Eckhaus, Weiss, Toren, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

228.    As majority and/or controlling shareholders of the Company, IAI and ElOp (now succeeded by Elbit, including Elbit Systems and ESEOEL), and Federmann, owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

229.    ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

230.    In connection with ImageSat's lucrative Satellite Operating Program (SOP) opportunity with, and opportunity to obtain a sizable investment of capital from, the Government of Venezuela, Defendants breached their fiduciary duties of loyalty, due care, and good faith in numerous respects, including but not limited to the following:

    (a)    Manipulating ImageSat's SOP program to enhance the attractiveness of IAI's own sales initiatives in Venezuela, and in doing so putting IAI's and the other Defendants' own interests ahead of and in direct competition with ImageSat's SOP program for limited budget allocations;

(b)     Falsely informing Venezuela in 2001 that ImageSat's independent SOP proposal was withdrawn, and that instead, the satellite program had been "bundled" with a comprehensive and more expensive high-tech intelligence program offered by IAI;

(c)     Losing millions of dollars of revenue for the Company as the direct result of IAI's bait-and-switch tactics, because the Venezuelan Air Force had already allocated funds in its 2002 budget for the entire seven-year SOP program but later reallocated the funds when falsely informed by IAI that the Company's independent proposal was withdrawn;

(d)     Jeopardizing ImageSat's ability to finalize a Venezuelan SOP by the Company's failure to maintain in good order its contractor registration with the Venezuelan government, as required by that government's procurement policies and regulations;

(e)     Failing to complete and submit to the Venezuelan contractor registrar the Company's audited 2004 financial information until October 2005, as a direct result of the continuing cover-up of the 2001 EROS B satellite fraud, causing the Company to miss the September budget deadline and thereby to lose a requested budget allocation from the Venezuelan Army;

(f)     Once a decision had been made among the majority shareholders in early 2006 that the independent international business of ImageSat would be subordinated to the political interests of the IMOD, willfully causing ImageSat to lose its eligibility to be awarded one of the Company's most promising SOP and revenue opportunities since its founding;

(g)      Causing ImageSat to become technically ineligible for a contract award in Venezuela because its 2005 financial results rendered the Company insolvent as a direct result of the 2001 EROS B/C satellite write-off approved by ImageSat's Board of Directors in May 2006;

(h)      Failing to take any action and continuing to fail to act to mitigate the risk of loss, by refusing to consult with Wilson or with the Company's attorneys in Caracas regarding possible remedial measures that might be taken, including measures recommended by the Venezuelan Registrar, despite repeated persistent attempts by Wilson to inform management and the Board commencing immediately upon receipt of the 2005 financial statements in June 2006, as well as the continued failure to do anything to mitigate the problem or the risk of loss;

(i)      Failing to approve and submit 2006 quarterly financial statements for the second and third quarters reflecting the more than $85 million in cash payments by Angola between May and August 2006 that would have mitigated the insolvency from the perspective of the Venezuelan Registrar;

(j)      Failing to respond in any way to a term sheet reflecting the offer of the President of Venezuela to enter into an SOP contract paying the Company $18 million per year for imaging services and, as a condition precedent to such proposed SOP contract, to purchase a large block of stock in the Company (20% to 30%) for an investment of between $100-150 million;

(k)      Failing to even have a substantive discussion, formal resolution, or any action taken or recommended at the November 22, 2006 Company board meeting regarding the above activities in Venezuela and then falsely advising Wilson by e-mail

that the Board of Directors had decided at a Board meeting held in New York on November 22, 2006 not to pursue further activities in Venezuela and that Wilson was instructed to have all of the Company's equipment located in Venezuela for demonstration and marketing purposes shipped out of Venezuela immediately;

(l)      Allowing IAI, Elbit, and the IMOD to have the power to decide that the fundamental purpose of ImageSat is now and henceforth to serve the military and strategic interests of Israel, rather than the interests of all the Company's shareholders including Plaintiffs;

(m)     Making the willfully deceptive and damaging public statements through which IAI and the IMOD took full public credit for the recent launch of the 2004 EROS B satellite in April 2006, falsely creating the impression that EROS B was an Israeli government owned (rather than a commercial) satellite at a time that ImageSat, its management, board of directors, and controlling shareholders including IAI and Elbit knew or should have known that the impression of Israeli government control of ImageSat's satellites was a particularly sensitive, and perhaps "deal breaking" issue in Venezuela;

(n)      Failing to take advantage of the Venezuelan opportunity for reasons unrelated to the best interests of the Company and its shareholders;

(o)      Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing. and

(p)      Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, reducing the Company's value in

anticipation of a potential strategic transaction such as a further re-capitalization or the undervalued acquisition or wrongful appropriation of ImageSat or its principal assets by IAI, Elbit, the IMOD, and/or others.

231.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

232.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

233.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Two Hundred Fifteen Million Dollars.

234.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Two Hundred Fifteen Million Dollars.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

### (Against Defendants ImageSat, IAI, Elbit Systems, ESEOEL, Keret, Eckhaus, Weiss, Federmann, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma for Breach of Fiduciary Duty Concerning ImageSat's Recent Financial Affairs)

235.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

236.    As directors and/or officers of the Company, Defendants Keret, Eckhaus, Weiss, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, the highest fiduciary duties of loyalty, due care, and good faith.

237.    As majority and/or controlling shareholders of the Company, IAI and Elbit (including Elbit Systems and ESEOEL) together with its Chairman, Federmann, owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, and good faith.

238.    In connection with the financial affairs of ImageSat, Defendants breached their fiduciary duties of loyalty, due care, and good faith in numerous respects, including but not limited to the following:

(a)    Failing in 2002, 2003 and 2004 to account properly for prior reporting irregularities related to the fraudulent 2001 EROS B satellite procurement, as well as the perpetually stalled 2001 EROS B/C manufacturing process;

(b)    Inducing the minority shareholders to believe throughout 2002, 2003, 2004 and 2005 that IPO preparations were proceeding according to a defined schedule and that it would provide them with an exit opportunity to sell their interests in the Company;

(c)     Inducing some of the Plaintiffs to believe that the Company would arrange a buyout of certain of the minority interests in exchange for Plaintiffs' cooperation subsequent to the final suspension in November 2005 of the IPO process;

(d)     Falsifying and misrepresenting the circumstances relevant to Angola's payment delay and/or possible contract problems and their relevance to the suspension of the IPO process;

(e)     Intentionally delaying the Company's efforts to resolve the possible payment and/or SOP contract problems with Angola between November 2005 and May 2006;

(f)     Failing to disclose the key terms or reasons for important financial transactions to the minority shareholders, despite repeated demands by Wilson and other minority shareholders for complete information regarding, among other things, the nature of the proposed financing and related transactions and their impact upon the minority shareholders, and in the process, rejecting the Company's own in-house counsel's repeated requests that management respond to shareholder inquiries from Wilson and others;

(g)     Completely restructuring the senior debt and equity of the Company, subordinating the primarily United States and European Union-based senior debt holders to Israeli bondholders and silencing virtually all of the knowledgeable minority opposition by wiping out the fully diluted holdings of the founding and other former management and employees of the Company, thus cementing complete control of the Company by IAI and Elbit and benefiting them substantially to the detriment of the

Company's other shareholders while positioning the Israeli defense establishment to misappropriate ImageSat's space, launch, and other assets;

(h)    Approving a resolution modifying the Company's Articles of Association that purportedly waived any and all claims of conflict of interest involving the directors, a majority of whom were and are affiliated with the Company's controlling shareholders;

(i)    Failing to adhere to the legal and statutory requirements regarding the existence of conflicts of interest among the directors of the Company, failing to make complete disclosure of such conflicts of interest, and thereby violating their legal obligations to the Company under Netherlands Antilles law and other law;

(j)    Intentionally providing false, misleading, and incomplete information and documentation to Morgan Joseph, causing that firm's fairness opinion with respect to the transactions to be founded on fundamentally false and flawed disclosures and then misrepresenting the nature and content of such fairness opinion to Plaintiffs and others;

(k)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing; and

(l)    Through each and every one of their wrongful acts and omissions and through the cumulation and culmination of such acts, breaching their fiduciary duties to the minority shareholders and to ImageSat, acting in some cases for the grossly improper purpose of deliberately seeking to minimize, rather than maximize, the value of the shareholders' investments.

239.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the

Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

240.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

241.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

242.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

## AS AND FOR A SIXTH CLAIM FOR RELIEF

(Against Defendants ImageSat, IAI, Elbit Systems, ESEOEL, Koret, Nissan, Eckhaus, Weiss, Federmann, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma for Breach of Fiduciary Duty Concerning the Failure to Enforce ImageSat's Exclusivity, First Right, and Royalty Rights)

243.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

244.    As directors and/or officers of the Company, Defendants Keret, Nissan, Eckhaus, Weiss, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma owed Plaintiffs, as shareholders of the Company, the highest fiduciary duties of loyalty, due care, candor, and good faith.

245.    As majority and/or controlling shareholders of the Company, IAI and Elbit (including Elbit Systems and ESEOEL) together with its Chairman, Federmann, owed Plaintiffs, as shareholders of the Company, and the Company the highest fiduciary duties of loyalty, due care, candor, and good faith.

246.    ImageSat also owed to its own shareholders the highest fiduciary duties of loyalty, due care, candor, and good faith.

247.    As set forth above, IAI has breached its Master Agreement and other contractual commitments to ImageSat by, among other things:

(a)    Entering into the announced transaction with Northrop under which it is proposed that IAI will supply to Northrop up to eight earth observation satellites in the initial phase of the deal at a cost of up to $1.6 billion;

(b)    Negotiating such transaction with Northrop for up to two years and publicly announcing the transaction before discussing the matter with ImageSat and seeking to negotiate a mutually agreeable joint strategy for pursuing such commercialization before making any such proposal to any other party;

(c)    Falsely claiming that the Northrop transaction is not within the scope of ImageSat's rights under the Master Agreement and that ImageSat's rights under the Master Agreement have expired and misrepresenting the parties' understanding of the agreement;

(d)     Offering and in some cases supplying earth observation satellite and payload systems under commercial tenders without imposing appropriate export control limitations relevant to their further commercialization or use in a manner that could be competitive with the business of ImageSat;

(e)     Providing and proposing to provide earth observation services to third parties despite the explicit prohibition against doing so under the Master Agreement; and

(f)     Causing its representatives and proxies, including its designees to ImageSat's Board of Directors and members of senior management, to support ImageSat's waiver or relinquishment of its contractual rights for reasons motivated by their conflicts of interest and divided loyalties rather than based upon a genuine analysis of ImageSat's legal rights and the best interests of the Company.

248.    Elbit has also breached its contractual obligations to ImageSat under its Stock Purchase Agreement and otherwise by offering and in some cases supplying earth observation satellite and payload systems under commercial tenders without imposing appropriate export control limitations and by providing and proposing to provide earth observation services to third parties in violation of ImageSat's contractual rights.

249.    ImageSat's rights explicitly granted under the Master Agreement and otherwise, including but not limited to its right to be the exclusive vehicle through which both IAI and Elbit pursue the commercialization of the Israeli Defense Establishment's earth observation satellite technology, the right to have IAI, Elbit and the IMOD not compete with ImageSat's business, the first right to negotiate any opportunity for the commercialization of IAI or Elbit technology relevant to the commercial earth observation market, and the right to receive a royalty on the

commercial exploitation of any technology developed by IAI while under contract with ImageSat, represent some of ImageSat's most valuable legal and commercial rights.

250.    In connection with the IAI's and Elbit's breaches of their contractual obligations and related matters, Defendants breached their fiduciary duties of loyalty, due care, candor, and good faith in numerous respects, including but not limited to the following:

(a)    Taking no meaningful action to protect ImageSat's exclusivity rights, non-compete rights, first rights, and royalty rights under the Master Agreement and ImageSat's other contractual rights against the existing and threatened future breaches by IAI and Elbit, including but not limited to the Northrop transaction, including without limitation by protesting IAI's and Elbit's violations of their contractual and fiduciary obligations to ImageSat, vindicating the rights of ImageSat and its shareholders through legal means, or seeking to negotiate an appropriate financial participation for ImageSat;

(b)    Taking and recommending corporate actions for the purpose and with the intent of deliberately surrendering ImageSat's rights under the Master Agreement or otherwise, while obtaining nothing of value for ImageSat in return;

(c)    Taking and recommending corporate actions effectively surrendering ImageSat's rights under the Master Agreement and otherwise without the benefit of an opinion from legal counsel or another qualified person regarding the Company's legal rights and obligations;

(d)    Misrepresenting the circumstances under which the Board of Directors purportedly took action effectively surrendering certain rights under the Master Agreement at its February 22, 2007 meeting;

(e)    Taking the foregoing actions consistent with their overall wrongful plan to subordinate the interests of ImageSat and its shareholders, particularly including the minority shareholders such as plaintiffs, to those of IAI, Elbit, and the IMOD;

(f)    Failing to meaningfully address demands by several of the minority shareholders that ImageSat take appropriate action to safeguard ImageSat's and its shareholders' rights;

(g)    Failing to negotiate and collect royalties to which ImageSat is entitled for uses of technology developed by IAI and Elbit in connection with their work for ImageSat.

(h)    Failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of Defendants' wrongdoing;

(i)    Taking the foregoing actions as the result of their conflicting interests and as an expression of their primary loyalty to parties other than ImageSat, including IAI, Elbit, and the IMOD, rather than out of loyalty to ImageSat and its shareholders, including the minority shareholders such as plaintiffs;

(j)    Failing to adhere to the legal and statutory requirements regarding the existence of conflicts of interest among the directors of the Company, failing to make complete disclosure of such conflicts of interest, and thereby violating their legal obligations to the Company under Netherlands Antilles law and other law; and

(k)    Giving notice of an extraordinary meeting of shareholders to be convened in Curacao on July 5, 2007, whose agenda includes, in substance, the purported ratification of ImageSat's action in accepting that ImageSat's exclusive rights under the

Master Agreement are null and void, at which meeting, upon information and belief, the controlling shareholders of ImageSat, IAI and Elbit, will use their controlling block of stock to adopt this resolution, thus purporting to extinguish the Company's rights under the Master Agreement once and for all and costing ImageSat and its shareholders hundreds of millions of dollars.

251.     In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have owed or breached such Defendants' fiduciary duties to Plaintiffs or the Company, such Defendant is liable for aiding the breaches of fiduciary duty by the other named Defendants. Each such Defendant knew of the fiduciary duties owed by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with the breaches of such duties.

252.     In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

253.     By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

254.     Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or

exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Koret, Nissan, Eldar, Toren, Federmann, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, and DePalma for Corporate Waste in Connection with the 2001 EROS B Satellite Contract)**

255.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

256.     As set forth above, Defendants caused ImageSat to enter into an unreasonably expensive contract for procurement of the 2001 EROS B satellite, failed to take action after learning that IAI and ElOp/Elbit were unable to provide a satellite that met the Company's requirements and later that the construction was not progressing according to any reasonable standard of contract performance throughout its entire duration beginning in July 2001. Defendants failed to take any action to ensure that any functional EROS B satellite under the 2001 design was being constructed at all, or to discover or disclose that no B class satellite of any kind whatsoever was being constructed until 2004 and that the satellite that then was constructed was an "EROS B" in name only, so named for the explicit purpose of deceiving and defrauding plaintiffs.  Defendants took no action to attempt to recoup any of more than $33 million that the Company expended on a satellite contract for which it never received any form of value and which was ultimately written off the Company's balance sheet in its entirety, and for which it failed to pursue any damage claims against IAI and/or ElOp.

257.     ImageSat paid substantial moneys to IAI and ElOp (now succeeded by Elbit, including Elbit Systems and ESEOEL) in connection with the procurement of the 2001 EROS B satellite, including but not limited to a $23.5 million downpayment including $15.5 million in

cash on the manufacturing of the satellite, additional payments to a total in excess of $33 million, and so-called "penalties" of approximately $4 million imposed under the satellite contract for no justifiable reason. Each of these payments was approved by IAI's and Elbit's representatives on the ImageSat Board of Directors despite their obvious conflicts of interest with respect thereto.

258.    The financial and other terms of the 2001 EROS B satellite contract, as originally drafted and especially as applied as the continuing problems with the satellite continued to come to light, and the obligations of ImageSat thereunder were so grossly disproportionate and unfair to ImageSat and its shareholders that no reasonable corporate director or officer would have believed that the contract and the payments made thereunder were fair and in the best interests of the shareholders. Accordingly, the transactions constituted corporate waste to the severe damage of ImageSat's minority shareholders.

259.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

260.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

261.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or

exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF

### (Against Defendants ImageSat, IAI, Elbit Sytems, ESEOEL, Keret, Eckhaus, Federmann, Toren, Weiss, Gaspar, Piperno-Beer, Chelouche, Arzl, and DePalma for Corporate Waste in Connection with the Company's Squandering of SOP Opportunities and Related Matters)

262.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

263.    As set forth above, Defendants have grossly mismanaged the business and affairs of the Company by, among other things, (i) squandering the Company's position as the only viable international, apolitical provider of earth observation satellite services, (ii) failing and refusing to pursue, consummate, provide services under, and/or attempt to avoid the termination of the Company's SOP's, and (iii) failing almost entirely to pursue seriously the business of the Company, and instead, allowing the Company to be managed, dominated, and effectively taken over by representatives of controlling shareholders IAI and Elbit and the IMOD.

264.    Defendants further mismanaged the finances, and endangered the well-being, of the Company by paying or knowingly allowing the Company to make excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere.  These payments were made outside the ordinary course of the legitimate business practices and, upon information and belief, in at least some cases for the purpose of wrongfully influencing the recipients of such payments.    Not only were the Company's funds misappropriated to make these unlawful payments, but upon information and belief, such

payments further jeopardized the Company's well-being by creating exposure for the Company under applicable corrupt practices legislation or otherwise.

265.    Through their conduct as set forth above, Defendants have engaged in or caused ImageSat to engage in transactions whose impact on the Company was so grossly disproportionate and unfair to ImageSat and its shareholders that no reasonable corporate director or officer would have believed that the contract and the payments made thereunder were fair and in the best interests of the shareholders.  In other instances, Defendants have prevented ImageSat from engaging in transactions whose impact on the Company would have been clearly and substantially beneficial, such that no reasonable corporate director or officer, free from conflicts of interest, would have sought to prevent or interfere with such proposed transactions. Accordingly, each of these transactions, or failures to engage in proposed transactions, constituted corporate waste to the severe damage of ImageSat's minority shareholders.

266.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

267.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

268.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or

exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

### AS AND FOR A NINTH CLAIM FOR RELIEF

**(Against Defendants ImageSat, IAI, Elbit Sytems, ESEOEL, Weiss, Keret, Nissan, Toren, Federmann, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma In Connection with the Company's Failure To Enforce Its Exclusivity, First Right, and Royalty Rights)**

269.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

270.     As set forth above, IAI and Elbit have breached their contractual commitments to ImageSat including commitments of exclusivity, non-competition, first rights, and/or royalty rights as set forth in the July 2000 Master Agreement (as to IAI) and the SPA of December 1998 (as to Elbit), including but not limited to IAI's negotiation of and entry into the Northrop transaction.

271.     ImageSat's rights explicitly granted under the Master Agreement and otherwise, including but not limited to its right to be the exclusive vehicle through which both IAI and Elbit pursue the commercialization of the Israeli Defense Establishment's earth observation satellite technology, the right to have IAI, Elbit and the IMOD not compete with ImageSat's business, the first right to negotiate any opportunity for the commercialization of IAI or Elbit technology relevant to the commercial earth observation market, and the right to receive a royalty on the commercial exploitation of any technology developed by IAI while under contract with ImageSat, represent some of ImageSat's most valuable legal and commercial assets.

272.     As set forth above, Defendants have caused or purported to cause ImageSat to waive and relinquish its rights under the Master Agreement and the SPA, without performing any meaningful review of the Company's legal rights under the agreements and motivated in

large measure by their conflicting interest and loyalties to persons, including IAI and Elbit, other than ImageSat and all of its shareholders. Defendants have also failed to negotiate and collect royalties to which ImageSat is entitled for uses of technology developed by IAI and Elbit in connection with their work for ImageSat.

273.    Defendants have effectively given or attempted to give away ImageSat's valuable contractual rights for little or no consideration in a transaction or bargain whose terms were so grossly disproportionate and unfair to ImageSat and its shareholders that no reasonable corporate director or officer would have believed that the relinquishment of such rights was fair and in the best interests of the shareholders. Accordingly, Defendants' conduct constituted corporate waste to the severe damage of ImageSat's minority shareholders.

274.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

275.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

276.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

## AS AND FOR A TENTH CLAIM FOR RELIEF

### (Against All Defendants For Self-Dealing)

277.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

278.    In connection with each of the transactions and acts described above, each of the Defendants wrongfully placed his or its own personal interests ahead of the interests of the Company's shareholders, including Plaintiffs, and the Company. In doing so, Defendants were motivated by personal interests of self-interest and self-dealing, including but not limited to the desires of IAI and Elbit to maximize their contract revenue on satellite manufacturing and construction, to the point of demanding payments far exceeding the reasonable value of the various satellites manufactured; the desires of the individual Defendants affiliated with IAI and Elbit to secure maximum revenue for IAI and Elbit, to which they gave their primary allegiance, and thereby to obtain bonuses, consulting fees, commissions, advancement, or other personal benefits.

279.    Defendants have further engaged in a persistent and varied pattern of misconduct intended to conceal their wrongdoing from Plaintiffs and others, including but not limited to failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of their wrongdoing.

280.    As fiduciaries for ImageSat and its shareholders, each of the Defendants owed ImageSat the highest fiduciary duties of care, loyalty, candor, and good faith. Time and time again over a period of six years, in numerous transactions including but not limited to those described above, Defendants routinely turned their back on the interests of ImageSat's minority shareholders, including Plaintiffs, and took actions and caused ImageSat to enter into

commitments detrimental to the shareholders. In each instance, Defendants engaged in self-dealing in a fashion that disserved the interests of the Company and its minority shareholders, including Plaintiffs, for the personal benefit of themselves or the other entities with which they were affiliated. Defendants' pattern and practice of self-dealing has been to the severe detriment of Plaintiffs.

281.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

282.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

283.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

## AS AND FOR AN ELEVENTH CLAIM FOR RELIEF

### (Against All Defendants for Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))

284.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

285.    Defendants, acting jointly, severally, and in concert together, have engaged in unlawful acts, practices, and courses of conduct constituting violation of the federal mail fraud and wire fraud statutes of the United States, 18 U.S.C. §§ 1341 and 1343.

286.    Defendants have engaged in a "pattern of racketeering activity" as proscribed by the Racketeer Influenced and Corrupt Organizations Action, 18 U.S.C. § 1961 et seq.

287.    Each of the Plaintiffs is a "person" as defined in 18 U.S.C. § 1961(3).

288.    Defendants, acting jointly, severally and in concert together, have engaged in unlawful acts, practices and courses of conduct that constitute violations of 18 U.S.C. §§ 1341 and 1343.

289.    Defendants have engaged in "racketeering activity" as defined in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1) ("RICO").

290.    Each of the Defendants is a "person" as defined in 18 U.S.C. § 1961(3).

291.    At times relevant hereto, each of the Defendants has been associated, as a director and/or officer and/or employee and/or in a contractual relationship, with an "Enterprise," as such term is defined in 18 U.S.C. § 1961(4).

292.    The Enterprise consisted of (i) ImageSat, and/or (ii) the named Defendants each acting in association and concert with one another within the meaning of 18 U.S.C. § 1962.

293.    The Enterprise as alleged herein was engaged in foreign and interstate commerce and its activities affected foreign and interstate commerce.

294.    In furtherance of its acts as described herein, the Enterprise engaged in interstate mail and wire transactions.

295.    In furtherance of the scheme, Defendants, jointly and severally and in concert together conducted the business of the Enterprise through a pattern of racketeering activity.

296.    While committing and engaging in the acts and practices described herein, the Enterprise and the Defendants engaged in acts of mail and wire fraud in violation of the laws of the United States, 18 U.S.C. §§ 1341 and 1343.

297.    Defendants conspired to perpetrate and did in fact perpetrate fraud and fraudulent schemes upon Plaintiffs. In doing so, Defendants caused certain mail matter to be delivered through the United States Postal Service, caused certain communications to be conveyed through foreign or interstate wires in or at least partially within the United States, and caused certain payments to be wire transferred through the United States banking system, all as part of their pattern of fraudulent acts.

298.    The mail communications, wire communications, and wire transfers perpetrated by the Defendants in their conduct of the Enterprise as part of their fraudulent schemes included, but were not limited to, the following:

(a)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, in addition to hundreds of other instances, each of the documents listed in Exhibit "F" annexed hereto which is incorporated as part of this Complaint for all purposes, and each of which was mailed and/or wired by one or more of the Defendants in connection with one or more of the fraudulent schemes described herein;

(b)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents relating to the July 2000 transactions described above, in which transactions numerous material facts were falsely represented to Plaintiffs and material facts necessary to render the disclosures that were made not misleading were not disclosed;

(c)    Wire transferring and/or mailing the funds involved in the 2000 transactions and the legal, professional, and other fees associated with concluding such transactions;

(d)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents calculated to mislead Plaintiffs as to the Company's intention to adjust the errors that had been committed in calculating the conversion price of the options and warrants issued in 2001 and in setting the length of the bridge warrants as five (5) years rather than ten (10) years;

(e)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents relating to the 2001 EROS B satellite, including but not limited to the false and deliberately highly misleading monthly "Investor Reports" issued by the Company and other documents concerning or constituting part of Defendants' scheme to conceal the fact that the functional satellite was not being constructed and that the books and records of the Company in connection therewith were false and misleading;

(f)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous documents relating to the Company's proposed initial public offering, including but not limited to documents in which the Company's books, records, business prospects, and other highly material facts were falsified or presented in a false, misleading, and misleadingly omissive fashion to numerous persons including Plaintiffs, prospective investors, the Company's investment banker and other professionals, and the Securities and Exchange Commission;

(g)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United

States mails and/or by foreign or interstate wires, numerous documents relating to the transactions consummated in March-April 2006, including but not limited to documents in which the Company's books, records, business prospects, and other highly material facts were falsified or presented in a false, misleading, and misleadingly omissive fashion (including but not limited to the Morgan Joseph opinion) to numerous persons including Plaintiffs, prospective investors, and the Company's investment banker and other professionals;

    (h)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous communications in which the Company misrepresented its intentions with regard to the prospective Satellite Operating Program agreement and/or potential equity investment available from the Government of Venezuela, thereby fraudulently misstating its business prospects to numerous persons including Plaintiffs;

    (i)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous communications in which the Company and others made false and misleading statements with regard to ImageSat's contractual rights under the July 2000 Master Agreement with ImageSat and the 1998 SPA with ElOp and the Company's relinquishment or abandonment of such rights in relation to, among other things, the IAI-Northrop transaction, including but not limited to communications between IAI and Northrop in which IAI made false and misleading statements concerning or failed to disclose its obligations to ImageSat;

    (j)    Mailing, faxing, e-mailing, or otherwise transmitting by use of the United States mails and/or by foreign or interstate wires, numerous communications relating to

the Company's making excessive, inappropriate, and in some cases outright fraudulent "commission" and other payments to agents in connection with the negotiation and/or termination of the Company's SOP programs in Angola and possibly elsewhere.

299.    The number of specific mailings and wirings engaged in by Defendants in connection with their schemes extended into the hundreds or thousands.

300.    The acts of mail and wire fraud engaged in by Defendants were not isolated or sporadic, but involved regular and repeated violations of law to accomplish Defendants' desired ends in the course of conducting and participating in the business of the Enterprise. These acts, upon information and belief, occurred over a period of at least seven (7) years, are continuing through the present, and upon information and belief, will continue to take place in the future.

301.    Defendants' acts were related by virtue of common participants and planning in the conduct of the Enterprise. Upon information and belief, Defendants ImageSat, IAI, Elbit Systems (including ElOp), ESEOEL, Weiss, Nissan, and Federmann participated in the conduct of the Enterprise including the pattern of racketeering activity set forth herein from 2000 through the present; Defendant Keret participated from 2000 to 2005; Defendant Eckhaus participated at least from 2003 through the present; Defendant Ackerman participated from 2002 to 2005; Defendants Gaspar and DePalma participated from in or about 2003 through the present; and Defendant Piperno-Beer participated from late 2005 or early 2006 through the present.

302.    Through their violations of 18 U.S.C. § 1962, and as a consequence of the aforesaid predicate acts, Defendants jointly and severally caused Plaintiffs injury in their business and property.

303.    As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962, Plaintiffs have been damaged in an amount to be determined at trial but not less than Three

Hundred Million Dollars, which Plaintiffs are entitled to recover threefold together with their costs and expenses of this action, including attorneys' fees and disbursements, pursuant to 18 U.S.C. § 1964(c).

### AS AND FOR A TWELFTH CLAIM FOR RELIEF

#### (Against All Defendants for Conspiracy To Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d))

304.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

305.    Defendants, acting jointly, severally, and in concert together, all as set forth above, have conspired together to engage in conduct constituting a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act.

306.    Through their violations of 18 U.S.C. § 1962(c), and as a consequence of the aforesaid predicate acts and conspiracy, Defendants jointly and severally caused Plaintiffs injury in their business and property.

307.    As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962(d), Plaintiffs have been damaged in an amount to be determined at trial but not less than Three Hundred Million Dollars, which Plaintiffs are entitled to recover threefold together with their costs and expenses of this action, including attorney=s fees and disbursements, pursuant to 18 U.S.C. § 1964(c).

### AS AND FOR A THIRTEENTH CLAIM FOR RELIEF

#### (Against All Defendants for Common-Law Fraud)

308.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

309.    From at least 2000 to date, ImageSat has been operated in a fashion designed to serve the best interests of its controlling shareholders, including IAI and Elbit, and the IMOD, rather than those of all of its shareholders including the minority shareholders such as Plaintiffs.

310.    From at least 2000 to date, Defendants have made numerous false and misleading statements of material fact to Plaintiffs in connection with the business, operations, legal rights, and future prospects for ImageSat, and have failed to disclose material facts necessary to render facts that were disclosed, not misleading.    The false, misleading, and misleadingly omissive statements made by defendants have included, but not been limited to, the following:

(a)    The false and misleading statements made by IAI, Elbit Systems, ESEOEL, Weiss, Keret, Nissan, Eldar, Eckhaus, Arzi, Toren, and Federmann in connection with the Pegasus investment and the Master Agreement of July 2000 from in or about 2000 to date, including but not limited to each of the statements and omissions described in the Second and Eleventh Claims for Relief above;

(b)    The false and misleading statements made by ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Keret, Nissan, Eldar, Toren, Federmann, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma, from in or about 2001 to date, including but not limited to the statements contained in ImageSat's monthly investor reports, to the effect that the originally contracted EROS B satellite was being constructed, was on schedule and/or was being delayed for reasons other than the true reasons for such delay, and was in conformity with the specifications that had been discussed at the time the satellite was ordered, including but not limited to each of the statements and omissions described in the Second and Eleventh Claims for Relief above;

(c)    The false and misleading statements made by ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Keret, Nissan, Eldar, Toren, Federmann, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma from in or about 2001 to date concerning ImageSat's financial affairs, including but not limited to each of the statements and omissions described in the Third and Eleventh Claims for Relief above;

(d)    The false and misleading statements made by ImageSat, IAI, Elbit Systems, ESEOEL, Toren, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma from in or about 2004 to date concerning ImageSat's SOP and investment opportunity in Venezuela, including but not limited to each of the statements and omissions described in the Fourth and Eleventh Claims for Relief above;

(e)    The false and misleading statements made by ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Keret, Nissan, Toren, Federmann, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma from in or about 2004 to date concerning ImageSat's recent financial affairs, including but not limited to each of the statements and omissions described in the Fifth and Eleventh Claims for Relief above;

(f)    The false and misleading statements made by ImageSat, IAI, Elbit Systems, ESEOEL, Weiss, Keret, Nissan, Toren, Federmann, Eckhaus, Ackerman, Gaspar, Piperno-Beer, Chelouche, and Arzi from in or about 2005 to date concerning ImageSat's rights under the Master Agreement with IAI and SPA with Elbit, including but not limited to each of the statements and omissions described in the Sixth and Eleventh Claims for Relief above.

311.    Each of the Plaintiffs relied upon the false and misleading statements and omissions of the Defendants by, among other things, continuing to invest money, productive

working time, and other efforts into ImageSat and/or by forbearing from bringing litigation against Defendants that would have been commenced at a substantially earlier time had truthful and accurate disclosure of the relevant facts been made to them.

312.    Defendants have further engaged in a persistent and varied pattern of misconduct intended to conceal their wrongdoing from Plaintiffs and others, including but not limited to failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of their wrongdoing.

313.    In the alternative, to the extent that any Defendant named in this Claim for Relief is held not to have himself or itself made materially false or misleading fraudulent statements to Plaintiffs or the Company, such Defendant is liable for aiding the fraud of the other named Defendants. Each such Defendant knew of the fraud being perpetrated by the other Defendants to Plaintiffs and the Company and provided substantial assistance in connection with such fraud.

314.    In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

315.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

316.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

## AS AND FOR A FOURTEENTH CLAIM FOR RELIEF

### (Against IAI, Elbit Systems and ESEOEL for Breach of the Satellite Supply Contracts)

317.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

318.    IAI and ImageSat are parties to a series of Satellite Supply Contracts relating to the EROS B and EROS C satellites and assumed contractual obligations to perform under those agreements. ElOp/Elbit was a subcontractor under the Satellite Supply Contracts and also assumed contractual obligations to perform thereunder.

319.    As set forth above, in connection with the EROS B and EROS C Satellite Supply Contracts and satellites, IAI and Elbit breached their contractual commitments to ImageSat by, among other things:

(a)    Failing to construct an EROS B satellite for ImageSat in accordance with the agreed-upon design specifications required for the satellite to serve ImageSat's customers;

(b)    Failing to disclose to ImageSat and/or to the minority shareholders of ImageSat that they were unable to construct a satellite in accordance with the specifications;

(c)    Failing to disclose to ImageSat and/or to the minority shareholders of ImageSat that work on the EROS B satellite was well behind schedule and that, in fact, no useful work had been accomplished at all;

(d)    Issuing a Stop Work order for the 2001 EROS B manufacturing process, purportedly due to non-payment by ImageSat;

(e)    Falsely informing the minority shareholders including Plaintiffs that IAI/MBT's and Elbit's suspension of the EROS B manufacturing was due to non-payment of the down payment by the new Angolan SOP and ImageSat's associated inability to access the Bank Leumi credit facility;

(f)    Misleadingly renaming or redesignating the name of the satellite at the time the 2004 satellite manufacturing contract was entered into for the purpose of further concealing the problems with the satellite;

(g)    Demanding and receiving tens of millions of dollars in payments under the Satellite Supply Contracts although no moneys were due and owing, while preventing ImageSat from conducting the audit that it was contractually entitled to conduct of ImageSat's and Elbit's performance under the agreements; and

(h)    Through IAI's own wrongful, deceitful, and breaching conduct in violation of the Satellite Supply Contracts, causing ImageSat to fail to order a sufficient number of satellites as was contemplated under the Master Agreement and then misusing the consequences of its own breaches of contract to seek to purportedly terminate ImageSat's exclusive rights, non-compete rights, first rights, and/or royalty rights under the Master Agreement.

320.    IAI's and Elbit's breaches of the various Satellite Supply Contracts and their other contractual obligations to ImageSat have cost the Company hundreds of millions of dollars in both direct and consequential damages including the loss of numerous actual and potential SOP customers and other business opportunities.

321.    In relation to the breaches of contract and other acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including IAI, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

322.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

## AS AND FOR A FIFTEENTH CLAIM FOR RELIEF

### (Against IAI for Breach of the Master Agreement)

323.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

324.    IAI and ImageSat are parties to the Master Agreement dated July 25, 2000.

325.    As set forth above, IAI has breached its Master Agreement and other contractual commitments to ImageSat by, among other things:

(a)    Entering into the announced transaction with Northrop under which it is proposed that IAI will supply to Northrop up to eight earth observation satellites in the initial phase of the deal at a cost of up to $1.6 billion;

(b)    Negotiating such transaction with Northrop for up to two years and publicly announcing the transaction before discussing the matter with ImageSat and seeking to negotiate a mutually agreeable joint strategy for pursuing commercialization of IAI's new SAR earth observation satellite technology before making any such proposal to any other party;

(c)    Falsely claiming that the Northrop transaction is not within the scope of ImageSat's rights under the Master Agreement and that ImageSat's rights under the Master Agreement have expired and misrepresenting the parties' understanding of the agreement;

(d)    Offering and in some cases supplying earth observation satellites under commercial tenders without imposing appropriate export control limitations;

(e)    Providing and proposing to provide earth observation services to third parties despite the explicit prohibition against doing so under the Master Agreement;

(f)    Failing to pay royalties to which ImageSat is entitled for uses of technology developed by IAI in connection with its work for ImageSat; and

(g)    Causing its representatives and proxies, including its designees to ImageSat's Board of Directors and members of senior management, to support ImageSat's waiver or relinquishment of its contractual rights for reasons motivated by their conflicts of interest and divided loyalties rather than based upon a genuine analysis of ImageSat's legal rights and the best interests of the Company.

326.    IAI's past, present, impending, and contemplated breaches of the Master Agreement and its other contractual obligations to ImageSat threaten to cost the Company hundreds of millions of dollars.

327.    IAI's present, impending, and contemplated breaches of the Master Agreement threaten the solvency and viability of ImageSat as a going concern and subject ImageSat and its shareholders, including the plaintiffs as minority shareholders, to substantial, immediate, and irreparable harm.

328.    In relation to the breaches of contract and other acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including IAI, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

329.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than Three Hundred Million Dollars.

330.    Further, by reason of the foregoing, Plaintiffs should also be awarded declaratory and injunctive relief, declaring that the exclusivity and first right and other provisions of the Master Agreement remain in full force and effect, and enjoining IAI and its directors, officers, employees, agents, and all persons working in concert with it, from any act in breach of the Master Agreement, including but not limited to proceeding with the Northrop transaction.

331.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A SIXTEENTH CLAIM FOR RELIEF

### (Against Elbit Systems and ESEOEL for Breach of the Stock Purchase Agreement)

332.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

333.    Elbit (Elbit Systems and/or ESEOEL) and ImageSat are parties to the Stock Purchase Agreement (SPA) dated December 7, 1998.

334.    As set forth above, Elbit has breached such Agreement and other contractual commitments to ImageSat by, among other things, offering and in some cases supplying earth observation payload systems under commercial tenders without imposing appropriate export control limitations.

335.    Elbit's past, present, impending, and contemplated breaches of the SPA and its other contractual obligations to ImageSat threaten to cost the Company hundreds of millions of dollars.

336.    Elbit's present, impending, and contemplated breaches of the SPA threaten the solvency and viability of ImageSat as a going concern and subject ImageSat and its shareholders, including the plaintiffs as minority shareholders, to substantial, immediate, and irreparable harm.

337.    In relation to the breaches of contract and other acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including Elbit, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

338.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

339.    Further, by reason of the foregoing, Plaintiffs should also be awarded declaratory and injunctive relief, declaring that the exclusivity and first right and other provisions

of the SPA remain in full force and effect, and enjoining Elbit and its directors, officers, employees, agents, and all persons working in concert with it, from any act in breach of the SPA, including but not limited to requiring them to notify all clients that have purchased earth observation payload systems from Elbit in violation of Elbit's commitments to ImageSat of the end-user limitations that apply to such payload systems.

340.    Plaintiffs have no adequate remedy at law.

### AS AND FOR A SEVENTEENTH CLAIM FOR RELIEF

#### (Against ImageSat for Reformation of the Bridge Warrants)

341.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

342.    Plaintiffs Wilson, WIS Partners, Talansky, Moshel, Reichmann, and Hexagram were issued bridge warrants in 1999 and 2000, as amended by the transactions of July 2000, which entitled each of them to acquire shares of ImageSat common stock. Plaintiff Polybutes subsequently acquired bridge warrants from Hexagram.

343.    [Intentionally omitted].

344.    The transactions included the issuance of various classes of warrants and stock options to numerous recipients. Most of the closing documents were "work in progress" and not completed during the days and weeks preceding the closing. It was agreed that all the classes of warrants and options issued, including the warrants previously issued to the bridge investors, would have the same terms and conditions as of the anticipated closing. Existing bridge warrants issued in 1999 and 2000, predating the closing, were to be amended to reflect full parity with the new options and warrants issued at the closing. The foregoing was fully understood by all

parties to the transactions and there was no disagreement or dispute on what the term of the warrants and options was supposed to be.

345.    Notwithstanding agreement on the foregoing entirely non-controversial point among all the parties to the negotiation including ImageSat, IAI, and ElOp, the documents signed at the closing provided for the bridge warrants to expire in five (5) years while all the other options and warrants issued concurrent with the closing were set to expire in ten (10) years.

346.    Also not in keeping with the agreed-upon terms, the execution price of the bridge warrants and the stock options was set at $24.4573 per share instead of $23.2737, which was the final conversion price of the Pegasus Convertible Notes.

347.    The foregoing discrepancies were not negotiated or agreed-upon terms of the transactions; but rather resulted from a mere scrivener's or typographical error in preparing the voluminous paperwork memorializing the transactions and as such constituted mistakes in the documentation of an agreement whose terms had been agreed upon between the parties.

348.    The length of the term of the bridge warrants was a material term of the transactions and the Plaintiffs who received such bridge warrants and/or options would not have participated in the transactions had they or it been duly advised that the terms of the transaction would not reflect the same terms and conditions being offered to others at the same time.

349.    As set forth above, the Company entertained discussion with certain of the Plaintiffs regarding correcting the inadvertent errors that had been made in documenting the terms of the bridge warrants and stock options, but ultimately has failed and refused to correct such terms.

350.    By reason of mistake, equity compels reformation of the terms of the bridge warrants held by Plaintiffs such that each of the bridge warrants will be valid for ten (10) years

from the date of issuance as agreed, consistent with the terms of all other classes of warrants and options issued in the transactions.

351.    In the alternative, each of the Plaintiffs holding bridge warrants should be awarded monetary damages against ImageSat in an amount equal to the amount of money such Plaintiff has lost by reason of being wrongfully deprived of the right to exercise his or its bridge warrants at the agreed-upon execution price.

## AS AND FOR AN EIGHTEENTH CLAIM FOR RELIEF

### (Against ImageSat, IAI, and Elbit Systems, and ESEOEL for Fraud Relating to the Bridge Warrants)

352.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

353.    Plaintiffs Wilson, WIS Partners, Talansky, Moshel, Reichmann, and Hexagram are were issued bridge warrants in 1999 and 2000 as amended in July 2000, which entitled each of them to acquire shares of ImageSat common stock.  Plaintiff Polybutes subsequently acquired bridge warrants from Hexagram.

354.    [Intentionally omitted].

355.    As set forth above, it was represented to Plaintiffs that the terms of all the classes of warrants and options issued in the July 2000 transaction would be identical, but in the final documentation of the transaction, there were discrepancies between the terms of Plaintiffs' bridge warrants and the terms of other securities issued.

356.    As set forth above, Plaintiffs' understanding of the reason for the discrepancies is that they were inadvertent and resulted from scrivener's errors in documenting the terms of the 2000 transactions given that the terms were being negotiated and changing until immediately before the transactions closed.

140

357.    In the alternative, however, if the discrepancies in the documentation of the transactions did not result from mistake, then they were the result of fraudulent representations to Plaintiffs concerning the terms of the transactions, made by or on behalf of Defendants including ImageSat, IAI, and ElOp (now succeeded by Elbit, including Elbit Systems and ESEOEL).

358.    If this is the case, then by reason of fraud, equity compels reformation of the terms of the bridge warrants held by Plaintiffs such that each of the bridge warrants will be valid for ten (10) years from the date of issuance as agreed, consistent with the terms of all other classes of warrants and options issued in the transactions.

359.    In the alternative, each of the Plaintiffs holding bridge warrants should be awarded monetary damages against ImageSat, IAI, and Elbit in an amount equal to the amount of money such Plaintiff has lost by reason of being wrongfully deprived of the right to exercise his or its bridge warrants at the agreed-upon execution price.

## AS AND FOR A NINETEENTH CLAIM FOR RELIEF

### (Against IAI, Elbit Systems, and ESEOEL for Fraudulent Conveyance in Connection with the 2001 EROS B Satellite Contract)

360.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

361.    As set forth above, Defendants caused ImageSat to enter into an unreasonably expensive contract for procurement of the 2001 EROS B satellite, failed to take action after learning that the design of the satellite was flawed and IAI and Elbit would be unable to meet the Company's mission requirements, failed to take any action even to ensure that any functional EROS B satellite under the 2001 design was being constructed at all, and took no action to attempt to recoup any of more than $33 million that the Company expended on a satellite

contract for which it never received any form of value and which was ultimately written off the Company's balance sheet in its entirety.

362.    ImageSat paid substantial moneys to IAI and ElOp (now succeeded by Elbit, including Elbit Systems and ESEOEL) in connection with the procurement of the 2001 EROS B satellite, including but not limited to a $23.5 million downpayment, $15.5 million of which was paid in cash concurrent with the execution of the contract, and the procurement of a satellite, both of which were known by Defendants to be defective.   The Company made additional payments to a total in excess of $33 million, and paid so-called "penalties" of approximately $4 million imposed under the satellite contract for no justifiable reason.

363.    The 2001 EROS B satellite contract was entered into and the sums paid by ImageSat to IAI and Elbit under and in connection with such satellite contract were paid with the actual intent to hinder, delay, or defraud the present and future creditors of ImageSat, including Plaintiffs.

364.    ImageSat did not receive reasonably equivalent value for the moneys it paid to IAI and ElOp under and in connection with the 2001 EROS B satellite contract.

365.    ImageSat sustained severe cash-flow impairments and, upon information, became unable to pay certain of its creditors and suppliers as its debts became due as a result of the payments it made under and in connection with the 2001 EROS B satellite contract.

366.    As a result of the ultimate write-off of the moneys invested by the Company in the 2001 EROS B satellite, upon information and belief, ImageSat was rendered insolvent in a balance-sheet sense.

367.     As a result of the 2001 EROS B satellite contract and the payments made thereunder, ImageSat was left with unreasonably small capital relative to the nature and scope of its business and operations.

368.     In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

369.     By reason of each of the foregoing, the payments made by ImageSat under and relating to the 2001 EROS B satellite contract and the 2001 EROS B satellite constituted fraudulent conveyances pursuant to applicable law, including but not limited to New York Debtor & Creditor Law §§ 273, 274, 275, and 276, and should be set aside and vacated and the parties placed in the position they would have enjoyed had such transactions not taken place.

370.     In relation to the acts and omissions described herein, ImageSat and its controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, including IAI, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

371.    Accordingly, the Court should enter an order directing Defendants, to the maximum possible extent, to rescind the effects of the 2001 EROS B satellite contracts and transactions, requiring Defendants to disgorge any funds they received in connection with such transactions, and should also order them to pay all damages, including consequential damages, suffered by Plaintiffs and by the Company by reason of such transactions.

372.    Additionally, to the extent that the Court determines that the EROS B satellite transactions were undertaken with the actual intent to defraud, Plaintiffs are entitled to their attorneys' fees and costs of suit pursuant to Debtor & Creditor Law § 276-a.

## AS AND FOR A TWENTIETH CLAIM FOR RELIEF

### (Against Keret, Nissan, Eldar, Weiss, Eckhaus, Toren, Ackerman, Gaspar, Piperno-Beer, Chelouche, Arzi, and DePalma for Disgorgement of Compensation)

373.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

374.    As set forth above, each of Defendants Keret, Nissan, Eldar, Weiss, Eckhaus, Toren, Ackerman, Gaspar, Piperno-Beer, and Chelouche, Arzi, and DePalma was a director and/or officer and/or employee of ImageSat at times relevant hereto.

375.    Upon information and belief, each of such Defendants was compensated by the Company for the performance of his duties as a director and/or officer and/or employee, including through the payment of salary, bonuses, directors' fees, commissions, stock options, or otherwise.

376.    As set forth above, each of such Defendants breached his fiduciary duties to the shareholders of the Company and to the Company.

377.    As a matter of equity, fiduciaries of a business entity such as directors, officers, and employees will not be permitted to retain compensation and other things of value earned

from a corporation during a period of time in which they were in breach of their fiduciary duties to the shareholders and the company.

378.    In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

379.    Accordingly, Defendants should each be required to disgorge all moneys and other things of value received from ImageSat beginning on the date of each Defendant's first breach of his fiduciary duties to the shareholders of the Company and to the Company.

### AS AND FOR AN TWENTY-FIRST CLAIM FOR RELIEF

**(Against All Defendants For
Conversion and Misappropriation of Corporate Assets)**

380.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

381.    In connection with each of the transactions and acts described above, each of the Defendants wrongfully caused assets, property, funds, and other things of value belonging to ImageSat to be diverted to themselves or their own use.

382.    Defendants have further engaged in a persistent and varied pattern of misconduct intended to conceal their wrongdoing from Plaintiffs and others, including but not limited to failing to add independent members to the ImageSat Board of Directors and its Finance Committee, as contractually required, for the purpose of avoiding scrutiny of their wrongdoing.

383.    In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

384.    By reason of the foregoing, Plaintiffs have been damaged, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

385.    Additionally, because Defendants' conduct was willful and wanton and involved a high degree of moral culpability, Defendants should be ordered to pay to Plaintiffs punitive or exemplary damages, in an amount to be determined by the Court, but not less than One Hundred Million Dollars.

### AS AND FOR A TWENTY-SECOND CLAIM FOR RELIEF

#### (Against All Defendants for
Unjust Enrichment and Restitution)

386.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

387.    By reason of all the acts and omissions set forth above, each of the Defendants has been unjustly enriched at the expense of the Plaintiffs and has received money, ownership interests in the Company, and/or other things of value that should be right belong to Plaintiffs.

388.    In relation to the acts and omissions described herein, the controlling shareholders and their representatives, who included a majority of the members of the Company's Board of Directors, acted for the financial and other benefit of the controlling

shareholders, and acted with the intention and knowledge that their acts would cause specific injury directed against the Company's minority shareholders, including Plaintiffs, which injury would not be shared by the controlling shareholders that Defendants represented or by the shareholder body as a whole.

389.    Accordingly, Defendants should be ordered to turn over to Plaintiffs or otherwise disgorge all moneys and other things of value that they have inequitably received by reason of their misconduct as set forth above.

WHEREFORE, Plaintiffs respectfully demand judgment:

A.    On the First Claim for Relief, against the Defendants named therein, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

B.    On the Second Claim for Relief, against the Defendants named therein, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

C.    On the Third Claim for Relief, against the Defendants named therein, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

D.    On the Fourth Claim for Relief, against the Defendants named therein, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than

$215 million, and punitive damages in an amount to be determined at trial, but not less than $215 million;

E.      On the Fifth Claim for Relief, against the Defendants named therein, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

F.      On the Sixth Claim for Relief, against the Defendants named therein, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

G.      On the Seventh Claim for Relief, against the Defendants named therein, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

H.      On the Eighth Claim for Relief, against the Defendants named therein, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

I.      On the Ninth Claim for Relief, against the Defendants named therein, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

J.      On the Tenth Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

K.    On the Eleventh Claim for Relief, against all Defendants, jointly and severally, for damages to Plaintiffs' business or property in an amount to be determined at trial but not less than $300 million, to be trebled pursuant to 18 U.S.C. § 1964(c);

L.    On the Twelfth Claim for Relief, against all Defendants, jointly and severally, for damages to Plaintiffs' business or property in an amount to be determined at trial but not less than $300 million, to be trebled pursuant to 18 U.S.C. § 1964(c);

M.    On the Thirteenth Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $300 million, and punitive damages in an amount to be determined at trial, but not less than $300 million;

N.    On the Fourteenth Claim for Relief, against IAI, Elbit Systems, and ESEOEL for compensatory damages in an amount to be determined at trial, but not less than $300 million;

O.    On the Fifteenth Claim for Relief, against IAI for compensatory damages in an amount to be determined at trial, but not less than $300 million, and granting declaratory and injunctive relief as set forth therein;

P.    On the Sixteenth Claim for Relief, against Elbit Systems and ESEOEL for compensatory damages in an amount to be determined at trial, but not less than $100 million, and granting declaratory and injunctive relief as set forth therein;

Q.    On the Seventeenth Claim for Relief, against ImageSat, ordering reformation of the terms of Plaintiffs' bridge warrants as described herein, or in the alternative awarding damages in lieu thereof, in an amount to be determined at trial;

R.    On the Eighteenth Claim for Relief, against ImageSat, IAI, Elbit Systems, and ESEOEL, ordering reformation of the terms of Plaintiffs' bridge warrants as described herein, or

in the alternative awarding Plaintiffs compensatory and punitive damages in lieu thereof, in an amount to be determined at trial;

S.　　On the Nineteenth Claim for Relief, ordering all Defendants, to the maximum possible extent, to rescind the effects of the 2001 EROS B satellite contracts and transactions, requiring Defendants to disgorge any funds they received in connection with such transactions, and awarding Plaintiffs compensatory damages, in an amount to be determined at trial, together with Plaintiffs' attorneys' fees and costs of suit pursuant to Debtor & Creditor Law § 276-a;

T.　　On the Twentieth Claim for Relief, against the Defendants named therein, directing that they disgorge and make restitution of compensation and other things of value received from ImageSat during any period during which they are adjudicated to have breached their fiduciary duties to the Company and its shareholders, including Plaintiffs;

U.　　On the Twenty-First Claim for Relief, against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but not less than $100 million, and punitive damages in an amount to be determined at trial, but not less than $100 million;

V.　　On the Twenty-Second Claim for Relief, directing all Defendants to turn over to Plaintiffs or otherwise disgorge all moneys and other things of value that they have inequitably received by reason of their misconduct as set forth above;

W.　　Awarding Plaintiffs prejudgment interest on all amounts awarded to them at the maximum rate permitted by law;

X.　　Awarding Plaintiffs their attorneys' fees, costs and disbursements of this action; and

Y.    Awarding Plaintiffs such other and further relief as the Court may deem just and

proper.

Dated: New York, New York
       March 17, 2008

GANFER & SHORE, LLP

By:_____
       Ira Brad Matetsky (IM1881)
       William A. Jaskola (WJ9839)
    360 Lexington Avenue
    New York, New York  10022
    (212) 922-9250
    (212) 922-9335 (facsimile)
    Attorneys for Plaintiffs