# Exhibit

# A

## MASTER AGREEMENT

THIS MASTER AGREEMENT, dated as of the 25 day of July, 2000 (the "Agreement"), between ISRAEL AIRCRAFT INDUSTRIES LTD., acting through its MBT Division, organized and existing under the laws of the State of Israel, with a place of business in Yehud, Israel ("IAI/MBT") and WEST INDIAN SPACE, LTD., a company organized under the laws of the [Netherlands Antilles, ] with a Corresponding Office in the Textile House, Kaufman Street 2, Tel. Aviv ("WIS") (each of IAI/MBT and WIS a "Party" and, together, the "Parties").

WHEREAS, WIS and IAI/MBT are signatories to the Joint Venture Agreement dated 10 November 1998 (as amended to the date hereof, the "JVA") establishing, among other things, a venture to conduct a business to fund and operate a series of high resolution satellites and the marketing and distribution of imagery obtained thereby (the "EROS Program");

WHEREAS, WIS and IAI/MBT are each party to the First Amended and Restated EROS A1 Satellite Supply Contract, dated as of the date hereof (the "A1 Satellite Supply Contract"), providing for, among other things, the delivery of one EROS A Class Satellite ("EROS A1") to WIS for use in the EROS Program;

WHEREAS, IAI/MBT desires to grant to WIS an option to purchase one additional EROS Class Satellite ("EROS A2") as set forth in this Agreement;

WHEREAS, in addition to the A1 Satellite Supply Contract, WIS and IAI/MBT are each party to the First Amended and Restated EROS B1 Satellite Supply Contract, dated as of the date hereof (the "B1 Satellite Supply Contract", and, together with the A1 Satellite Supply Contract, the "Satellite Supply Contracts"), providing for, among other things, the delivery of one EROS B Class Satellite ("EROS B1") to WIS for use in the EROS Program;

WHEREAS, WIS may purchase additional EROS Class Satellites from IAI/MBT for use in the EROS Program in accordance with all of the applicable provisions hereunder; and

WHEREAS, WIS and IAI/MBT desire to memorialize certain agreements and understandings with respect to the foregoing.

NOW, THEREFORE, WIS and IAI/MBT hereby agree, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, to be bound by the following terms and conditions from and after the date hereof:

Section 1.    Exclusivity; Preferential Sourcing; Financing.

(a)    WIS shall be the exclusive vehicle through which IAI/MBT pursues the commercialization of the existing IAI/MBT light earth observation satellite (i.e., EROS Class Satellite) technology subject to the provisions of this Section 1, and accordingly, IAI/MBT shall not engage in activities competitive with the business of WIS as defined in this Section 1. At any time that IAI/MBT owns 10% or more of the voting share capital, IAI/MBT will not enter into

any venture or business entity, as a shareholder or otherwise as an owner, alone or with any third party, to compete with WIS by offering or providing services from earth observation satellites to customers (herein "Commercialization of IAI/MBT Technology"). In this regard, IAI/MBT acknowledges that changing market conditions may result in the expansion of the business activities of WIS in the commercial Satellite remote sensing domain, beyond those currently contemplated in the business plan of WIS and it is the interest of both Parties that WIS and IAI/MBT leverage their existing and newly created capabilities to facilitate that expansion and therefore, at any time that IAI/MBT is presented with, or independently considers, an opportunity for the Commercialization of IAI/MBT Technology relevant to the commercial earth observation market, IAI/MBT shall propose the exploitation of such opportunity to WIS and the Parties shall use commercially reasonable efforts to negotiate the terms and conditions, including compensation and other considerations to IAI/ MBT, applicable to such opportunity.

(b)    Except as specifically and expressly otherwise provided in Sections 1(a) and (c) hereof, IAI/MBT will at all times be free to offer and sell its products, including without limitation, satellites, related subsystems and services, to other companies or customers.

(c)    Provided that WIS places with IAI/MBT firm funded orders for a third Satellite (in addition to EROS A1 and EROS B1) by 31 December 2002, for a fourth Satellite by 31 December 2003, and for a fifth Satellite by 31 December 2004, IAI/MBT agrees not to offer or to sell earth observation satellites based on the existing IAI/MBT Technology or the IAI/WIS Technology to any third party commercial program or other customer whose intended use is inconsistent with the expressed intent and provisions of this Section 1. Each Satellite order in excess of three during the above period, or one or more additional orders in successive subsequent years, shall entitle WIS to extend the term of exclusivity by one additional year per order, to a maximum extension of the exclusivity period through 1 January 2009. In addition to the foregoing, it is further agreed that the exclusivity provisions of this Section 1(c) and otherwise provided for in this Agreement, shall apply individually to any EROS class satellite, beginning with EROS B1, for which WIS funds all or a substantial portion of required non-recurring expense, for a period of two years subsequent to delivery by IAI/MBT of the first such Satellite based on such specific Satellite design, provided, however, that recognition of such qualification is explicitly acknowledged in the satellite purchase agreement relevant to the affected Satellite design. Notwithstanding the previous sentence, and subject to all other provisions of this Agreement, IAI/MBT will at all times be entitled to sell earth observation Satellites:

(i)    to the Government of Israel (the "GOI"); and

(ii)    in any G to G transaction.

Any such G to G sales as provided for in Section 1(c)(ii) above shall be subject to the payment of royalties to WIS, as mutually agreed to by the Parties, for the use of IAI/MBT/ WIS Technology.

(d)    For a period of five years commencing on the initial successful EROS Class Satellite deployment, WIS shall give IAI/MBT preference as the supplier of (i) WIS's

2

Satellites, (ii) launch services, including the launch vehicle, for launching WIS' satellites, (iii) SOP Tasking Upgrade Kits, with related installation and training services, (iv) as well as for subsequent award of any contract as a manufacturer of other products and services, including hardware components and software, which are in the areas of business in which IAI/MBT is active from time to time. WIS shall purchase such products and services from IAI/MBT if, and only if, IAI/MBT products and services meet the technical requirements of WIS and are substantially competitive in price and conditions for delivery with suppliers of competing, equivalent products and services. For this purpose, IAI/MBT will be deemed substantially competitive so long as the difference between its prices and the applicable competitor's prices does not exceed fifteen percent (15%) of the competitor's price.

(e)     IAI/MBT hereby agrees that if under Section 1(c) above WIS does not maintain exclusivity as defined therein, IAI/MBT will in any event offer to sell EROS Class Satellites to WIS at terms no less favorable than those applying to an IAI/MBT sale of substantially the same Satellite to a third party purchaser (other than the GOI).

(f)     In light of the major investment being made by WIS in the development and procurement of IAI/MBT satellites, E&D and other goods and services, the Parties hereby agree that the continuing compliance by IAI/MBT (or any successor entity) of its obligations to supply Satellites on an exclusive basis under Section 1(c) above and to offer to sell Satellites to WIS as set forth under Section 1(e) above, is an essential element of this Agreement. Accordingly, IAI/MBT will not enter into any agreement or agreements with third parties that would prevent it from fulfilling its obligations under this Agreement. In the event of a sale of assets, required divestiture, or other material change in ownership of IAI/MBT, or any material division thereof responsible for performance of IAI/MBT's obligations hereunder and under the Satellite Supply Contracts, IAI/MBT shall, in a manner reasonably acceptable to WIS, bind any successor or assignee of its rights and responsibilities to perform the obligations of IAI/MBT in accordance with this Section 1, in particular and without limitation Sections 1(a) and (c).

(g)     IAI/MBT hereby agrees to provide equity financing to WIS in an aggregate amount of US $18,500,000 in the form of "in-kind" contribution to the manufacture of the EROS B1 Satellite ( US$ 8,500,000) and EROS B2 Satellite (US$ 10,000,000), as set forth on Annex B hereto, and in addition to any equity financing previously provided by IAI/MBT. Such vendor equity financing by IAI/MBT (as well as the vendor equity of US$ 2,500,000 to be provided by ELOP on the B1 Satellite) shall be at a per share price which is the same as the final per share conversion price of the Notes purchased by the Purchasers pursuant to the Amended and Restated Note Purchase Agreement dated as of July ___, 2000 (the "NPA").

(h)     IAI/MBT hereby agrees to provide vendor financing to WIS in an aggregate amount of US $4,500,000 in the form of deferred progress payments on certain deliverables , as set forth on Annex B hereto. Such deferred payments shall become due and payable by WIS upon the earlier of the completion of the initial in-orbit testing of the A1 Satellite or the date on which WIS defaults the Company under the A1 Satellite Supply Contract, and shall bear interest from the date originally due and payable under the A1 Satellite Supply

Contract until the date paid at the rate determined pursuant to Section 4.1 of Exhibit F to the A1 Satellite Supply Contract. The repayment of each such deferred payment shall be secured by an escrow deposit pursuant to the provisions of Annex D attached hereto.

Section 2.    Additional EROS Class Satellite Purchases

(a)    The Parties agree that the satellite procurement relationship between IAI/MBT and WIS represents a substantial asset of WIS. In addition to the provisions of Section 1 above and notwithstanding the provisions of Section 1(d) above, the Parties agree that:

(i)    subject to the continuing obligation to purchase under (ii) below, IAI/MBT shall sell EROS B Class Satellites, including EROS B1 and the next 5 consecutive EROS B Class Satellites (referred to herein, respectively, as "EROS B2" through "EROS B6"), to WIS at the prices and in conformance with the lead times defined in Annex A hereto;

(ii)    in the event WIS elects to purchase electro-optical earth observation satellites in addition to EROS A1 pursuant to the A1 Satellite Supply Contract, EROS A2 pursuant to this Agreement, if ordered pursuant to the option provided for hereunder, and EROS B1 pursuant to the B1 Satellite Supply Contract, then subject to the provisions of this Section 2, WIS shall order such Satellites exclusively from IAI/MBT until WIS shall have purchased six (6) EROS B Class Satellites from IAI/MBT, provided, however, that (1) the Satellite Supply Contracts for each of EROS B2 through EROS B6 conform to the technical specifications and lead times defined in Annex A hereto and (2) WIS has not terminated any Satellite Supply Contract entered into with IAI/MBT for default, and, as a result of such termination, WIS has reasonably determined that IAI/MBT cannot reliably perform its obligations under this Agreement.

In the event of a change to the technical specification of any of EROS Class Satellite, the Parties will negotiate in good faith a reasonable adjustment to the pricing set forth on Annex A for the Satellite associated with such change. All Satellite Supply Contracts for EROS B1 -6 Satellites shall contain payment terms based on performance milestones. Notwithstanding the foregoing, the Parties agree that WIS may, by written notice to IAI/MBT, delay the commencement of manufacturing on EROS B1 until such time as WIS determines that sufficient financing is available.

(iii)    IAI/MBT hereby agrees that, in the event of a work stoppage for any reason on EROS B1, IAI/MBT shall exercise its best efforts, on behalf of WIS, to sell the work in progress ("WIP"). Any buy-back agreement between IAI/MBT and the GOI, or any other purchase agreement for the WIP, in such event, shall inure to the benefit of WIS up to the full amount invested by WIS up to the date of such work stoppage.

(b)    In the event that, prior to WIS' purchase of six (6) EROS B Class Satellites as set forth in Section 2(a) above, WIS' Board of Directors determines, in good faith, that there is

4

a significant business opportunity for WIS through the commercialization by WIS of the excess capacity of an earth observation satellite owned by a Government or Government agency, then, solely in order to meet the requirements of such business opportunity, WIS shall be entitled to purchase such excess capacity from such Government or otherwise, as the Board of Directors of WIS may in good faith determine, commercialize said excess satellite capacity.

(c)     From and after the effective date of this Agreement (in accordance with Section 15(a)), WIS shall have the option to purchase EROS A2 upon the terms and conditions set forth in, and pursuant to a Satellite Supply Contract substantially in the form of, Annex C hereto, such option to be exercisable by written notice to IAI/MBT not later than sixty (60) days after the effective date of this Master Agreement.   In light of the above, no payments will be made on the EROS A2 Satellite Supply Contract unless and until the exercise of the aforesaid option.

(d)     WIS shall have the right to monitor the activities under any Satellite Supply Contract and may station WIS personnel at the IAI/MBT facility to observe the effort in accordance with the terms of such Satellite Supply Contract, provided, however, that all such WIS personnel shall have obtained all requisite MOD security clearance.

(e)     WIS and IAI/MBT hereby agree that, to the extent WIS procures additional EROS Class Satellites from IAI/MBT, each such acquisition shall be pursuant to the terms of a Satellite Supply Contract in form and substance substantially the same as the B1Satellite Supply Contract (except for such terms as certain technical specifications, pricing and terms of payment, which shall be based on performance milestones, and as otherwise described in Annex A hereto).

Section 3.     EROS Satellite Operation.

(a)     IAI/MBT will be WIS' sole designated ground station operator for commercial data collection in the Middle East (including, but not limited to, WIS' AAD Program), it being understood that, without limiting any other provisions hereunder, such data collection is subject to required MOD approvals.  Other than in connection with IAI/MBT's performance of such commercial data collection services under such WIS AAD Program which shall be on the same terms as all other participating AAD ground stations; WIS and IAI/MBT will negotiate, in good faith, prices and other terms and conditions for such ground operation services to be provided by IAI/MBT.

(b)     It is the intent of the Parties that certain ground control station services for EROS A1 and subsequent EROS Class Satellites of WIS shall be ordered by WIS from IAI/MBT as defined in the Satellite Operation and Associated Services Agreement.  In particular the Parties agree that delivery of all mission plans for EROS A1 shall be communicated to such Satellite via the IAI/MBT ground control station at IAI/MBT, consistent with the terms of the MOD SOPTRC.  Subject to the foregoing, WIS may, at any time the Board of Directors of WIS determines that it is materially advantageous to the business development of WIS, perform ground control station services with its own personnel or order certain ground control station

5

services outside of Israel (as has already been determined by the Board of Directors in the case of the auxiliary Polar Ground Station to be operated in Kiruna, Sweden). The procurement of such ground control station services ordered from outside of Israel shall not derogate from WIS' obligations under the Satellite Operation and Associated Services Agreement. In any such event and if it is deemed desirable to have a third party or WIS perform the ground control station services based in part upon IAI/MBT Technology, WIS and IAI/MBT will negotiate in good faith the licensing of such IAI/MBT technology under terms and a compensation formula to be mutually agreed.

(c)    In furtherance of the agreements set forth in this Section 3, IAI/MBT and WIS will in good faith facilitate the development of procedures on behalf of WIS ensuring convenient access to the IAI/MBT ground station at the IAI/MBT site, and other relevant infrastructure located at such site, by WIS employees, guests and customers, subject to all applicable security procedures.

Section 4.    Effect of Exercise of Special Default Right.

WIS and IAI/MBT agree that pursuant to Section 13.1 of the A1 Satellite Supply Contract which provides that in the event IAI/MBT fails to deliver a functioning EROS Class Satellite in accordance with the schedule therefor set forth therein, and as further provided in Section (B)(4) of Exhibit C (IAI Agreement) to the NPAn IAI/MBT may be required to pay to Purchaser Representative, on behalf of the Purchaser, certain amounts paid to IAI/MBT by or on behalf of WIS with respect to EROS A1. In the event the Purchaser representative elects to exercise such right and such payment is made by IAI/MBT to the Purchaser Representative , whether directly or through WIS, WIS agrees that such amounts shall be deemed to have been paid by IAI/MBT directly to WIS as follows:

(1)    If WIS has terminated the A1 Satellite Supply Contract due to the default of IAI/MBT, then such payment shall be deemed to have been made by IAI/MBT in accordance with the termination and delivery default provisions of the A1 Satellite Supply Contract;

(2)    If WIS has not so terminated the A1 Satellite Supply Contract due to the default of IAI/MBT, then such payment shall be deemed to have been a refund by IAI/MBT of payments made under such contract and such payments will be due from WIS to IAI/MBT under such contract as a condition to delivery of EROS A1 to WIS. In the case of the event described in this Section (2), IAI/MBT shall facilitate WIS' ability to refinance such payment by delivering title to EROS A1 as part of a closing of such refinancing and executing commercially reasonable security agreements related to EROS A1 as may be required by the bank or other source of replacement financing that WIS may designate.

6

Section 5.     Interest Deferral.

IAI/MBT hereby agrees to defer payment of all interest which has accrued to the date hereof (as set forth in the payment Schedule to the Note Purchase Agreement) pursuant to Section 4.1 of Exhibit F to the A1 Satellite Supply Contract, as a result of late payments from WIS to IAI/MBT thereunder, until six months after WIS has successfully deployed its first Satellite and commenced receiving revenues from customers for the use of such Satellite; provided, however, that IAI/MBT may, upon written notice to WIS (stating the amount of such setoff), offset the amount of any such deferred interest payments against any other amounts payable by IAI/MBT to WIS under the A1 Satellite Supply Contract. In the case of a Launch failure of the A1 Satellite, the interest shall become immediately due and owing to IAI/MBT and the provisions of Section 1(i) Escrow Deposit shall apply.

Section 6.     Assignment of Option.

WIS and IAI/MBT hereby reconfirm their agreement that the option that had existed in WIS to repurchase 90,000 WIS Shares from ELOP under the ELOP WIS Share Subscription Agreement has been irrevocably assigned to IAI as follows: WIS shall grant to IAI/MBT an option to purchase 90,000 shares of the common shares held by ELOP. Such option shall be exercisable by IAI/MBT upon payment to ELOP of US$ 4 million. During the term of the option which shall be defined as the earlier of (1) six months subsequent the Initial Public Offering of WIS plus any " lock up" period imposed by WIS's underwriter on its founding shareholders and restricting the right to trade its shares in the public market or (2) five years from the execution of the ELOP Share Subscription Agreement with WIS. IAI/MBT may transfer or exercise all or any portion of the option on a pro – rata basis at any time.

Section 7.     IAI/MBT Software and Documentation.

IAI/MBT hereby grants to WIS a non-exclusive, royalty free software license that facilitates use of existing IAI/MBT software for the reception of the data from the EROS Satellites to be used by SOP customers and AAD ground receiving stations which will participate in the collection, archiving and processing of WIS imagery. Notwithstanding the foregoing, the Parties agree that additional software development is required in order to implement the ground station upgrade plan of WIS. IAI/MBT shall make all relevant engineering documentation available to WIS for its review and shall submit a software proposal.     The Parties further acknowledge that WIS shall fund such additional software development, and that having done so, WIS shall own all rights to the software in object and source code, which software shall be considered WIS Technology, except that WIS shall grant to IAI/MBT a non-exclusive, royalty free license in perpetuity to use such software in its ground receiving station at the MBT facility in Yehud, Israel and as otherwise required for the purpose of providing goods and services to the Government of Israel.

Section 8.     Government Regulations or Licenses.

7

Notwithstanding anything to the contrary in this Agreement, all transfers of technology, know how or hardware from any Party to another Party hereunder or otherwise shall be subject to any applicable requirement of any necessary Government licenses, approvals or consents. The transferring Party shall take all commercially reasonable steps to seek such licenses, approvals, or consents on a timely basis.

Section 9.    <u>Undertaking by WIS not to employ employees, contractors and consultants of IAI/MBT.</u>

Except for the employees or former employees of IAI/MBT currently working for WIS, WIS hereby undertakes not to employ or solicit the services of any employee or former employee or contractor or consultant of IAI/MBT, during the one (1) year period commencing when such employee, contractor or consultant ceases to work for or on behalf of IAI/MBT.

Section 10.    <u>IAI/MBT Ownership of WIS.</u>

Notwithstanding any provision to the contrary in any agreement to which IAI/MBT or WIS is a party, at no time shall IAI/MBT take ownership of more than fifty percent (50%) of the total voting equity shares of WIS (whether as preferred shares, common shares or both), and to the extent that IAI/MBT would be entitled to take ownership of any equity shares of WIS but for the provisions of this Section 11, IAI/MBT shall have an option to purchase such shares for US $0.01 (subject to satisfaction by IAI/MBT of any conditions to the purchase of such shares in the agreement pursuant to which IAI/MBT became entitled to purchase such shares) at any time in the future that such purchase would not result in IAI/MBT ownership of more than fifty percent (50%) of the total voting equity shares of WIS, which option may be exercised from time to time and in whole or in part by IAI/MBT. This Section shall no longer apply if at any time under Israeli law IAI/MBT's acquisition of the deferred shares would not be subject to the provisions of the Government Companies Act of the State of Israel.

Section 11.    <u>Technology.</u>

(a)    All improvements to IAI/MBT Technology (whether or not patented) shall belong to IAI/MBT whether or not such improvement was developed under or in performance of a purchase contract with WIS. Notwithstanding the above, in cases where a major development has been funded by WIS of an improvement to an existing technology or product of IAI/MBT, the Parties will negotiate in good faith a royalty fee to be paid to WIS upon the sale of the improved technology or product to a third party.

(b)    It is acknowledged and recognized by IAI/MBT that it will be developing valuable new IAI/MBT Technology that will be partially funded by WIS under the Satellite Supply Contracts. IAI/MBT agrees, therefore, that WIS will be entitled to a royalty on all sales of EROS Class Satellites containing IAI/MBT/WIS Technology to any party other than to the GOI or WIS (or any successor in interest to WIS). The parties shall negotiate in good faith a royalty agreement, associated with all specific Technology development funded by WIS and specified in each Satellite Supply Contract or other development contract, providing for the

8

payment of royalties to WIS, in a mutually agreed to amount, by IAI/MBT for all sales by IAI/MBT (including G to G sales) of:

      (i)      products containing IAI/MBT/WIS Technology or

      (ii)     the right to use the IAI/MBT/WIS Technology design or manufacturing know how and data (herein a "Know How Sale/License"), except as otherwise provided for herein. All such royalty obligations of IAI/MBT shall be memorialized in writing concurrent with the execution of any Satellite Supply Contract, or other development contract entered into between WIS and IAI/MBT, and such royalty obligations as well as the IAI/MBT/WIS Technology associated therewith shall be specifically defined therein. In no event shall IAI/MBT enter into a Know How Sale/License transaction for use by a commercial program competing with WIS without the express written consent of WIS. The foregoing sentence is independent of the expiration of the exclusivity provisions of this Agreement. IAI/MBT further grants to WIS audit rights with respect to all such third party transactions involving the sale of turn-key satellites or related "know how" based in part on the IAI/MBT/WIS Technology, if any. Such audit shall be carried out by an Israeli CPA with the necessary security clearance from the Government of Israel.

Section 12.    Rights of Third Parties.

     All rights of third parties under existing agreements or instruments with a Party, that could reasonably be expected to materially affect the other Party hereto or the business of WIS, shall be disclosed by such first Party prior to the effective date hereof, and any similar right granted after the effective date hereof shall be so disclosed prior to such grant. The Parties acknowledge that all or a substantial portion of the IAI/MBT Technology existing at the time of this Agreement has been funded by the Government of Israel which retains rights in such Technology.

Section 13.    Escrow Agreement

     The repayment to IAI/MBT of of the amounts under Section 1(h) and Section 5 shall be secured by the Company for the benefit of IAI/MBT in the event of a launch failure of the EROS A1 Satellite in accordance with the terms of Annex D hereto.

Section 14.    Definitions.

     For the purposes of this Agreement:

     "A1 Satellite Supply Contract" has the meaning ascribed thereto in the preamble hereto.

     "B1 Satellite Supply Contract" has the meaning ascribed thereto in the preamble hereto.

9

"E&D" means the activities required to meet the engineering, development and design objectives producing commercially feasible remotely sensed data.

"ELOP" shall mean Electro Optics Industries, Ltd., a company organized under the laws of the State of Israel.

"ELOP WIS Share Subscription Agreement" shall mean the Stock Purchase Agreement dated December 7, 1998 between WIS and ELOP, as amended by an amendment dated August 10, 1999, providing for the distribution of a portion of the common stock of WIS to ELOP.

"EROS" and "EROS Program" means the commercial Earth Remote Observation Satellite program created by IAI/MBT, jointly pursued by IAI/MBT and Core Software Technology since 1994, and subsequently by WIS.

"EROS A1" shall mean the electro-optical earth observation satellite to be supplied by IAI/MBT to WIS under the A1 Satellite Supply Contract, as specified in said A1 Satellite Supply Contract.

"EROS A2" shall mean the electro-optical earth observation satellite that WIS has the option to purchase from IAI/MBT as set forth in Section 2(c) of this Agreement.

"EROS B1" shall mean the electro-optical earth observation satellite which will be developed by IAI/MBT based in substantial part upon EROS A1, as well as additional Technology developed by IAI/MBT under programs unrelated to the EROS Program, and to be supplied by IAI/MBT to WIS under the B1 Satellite Supply Contract, as specified in such B1 Satellite Supply Contract.

"EROS B Class Satellite" shall mean a Satellite which is the same as or a derivative of the EROS B1 Satellite, as well as additional Technology developed by IAI/MBT under programs unrelated to the EROS Program. For clarity, EROS B Class Satellites are electro-optical earth observation satellites with greater imaging capacity, higher image quality including resolution and greater pointing accuracy relative to EROS A1.

"EROS Class Satellite" shall mean EROS A1, and EROS B Class electro-optical earth observation satellites to be supplied under the Satellite Supply Contracts, and any electro-optical earth observation satellites developed by IAI/MBT under the EROS Program that are derivatives of EROS A1 or EROS B Class satellites.

"G to G" transactions shall mean any sale of a Satellite or transfer of a production file enabling the independent production of a Satellite (hereinafter "production file") by IAI/MBT to a Government (other than the Government of Israel) or to an entity designated by such Government for that purpose where the purchase of such Satellite or production file is for the end use of such Government only, which end use shall not be competitive with the business of WIS, and such Government undertakes not to transfer the Satellite or production file or the

NYK 647966-1.056463.0019

right to use the Satellite or production file to any other party who proposes to use or uses the Satellite or production file in a manner competitive with WIS, provided, however, that any such sale is either in response to an open solicitation by a Government or is undertaken at the direction of an agency of the Government of Israel. For the purposes of this Agreement, the end use shall not be deemed competitive with WIS, so long as such end use does not include the right to offer for sale to parties other than such Government (i) tasking rights to such Satellite sold or produced with the production file or (ii) data retrieved from such Satellite sold or produced with the production file.

"Government" shall mean any government or agency or administrative body thereof having jurisdiction over the matter which is the subject of the reference to Government.

"IAI/MBT" has the meaning ascribed thereto in the preamble hereto.

"IAI/MBT Technology" shall mean Technology owned or under the legal control of IAI/MBT as of November 18, 1998, as well as Technology developed by IAI/MBT or WIS based on IAI/MBT Technology after November 18, 1998, including Technology developed by IAI/MBT under contract to WIS based on IAI/MBT Technology. For clarity's sake, for all purposes of this Agreement, Technology developed by IAI/MBT under or in connection with a procurement contract with a Government shall be deemed IAI/MBT Technology.

"IAI/MBT/WIS Technology" shall mean certain IAI/MBT Technology when developed by IAI/MBT after November 18, 1998 specifically for and under contract to WIS or Technology based on IAI/MBT Technology or IAI/MBT /WIS Technology developed by employees of WIS.

"JVA" has the meaning ascribed thereto in the preamble hereto.

"MOD" shall mean the Ministry of Defense of the Government of Israel.

"MOD SOPTRC" shall mean the SOP Tasking Rights Contract, dated as of January 1999, between WIS and the MOD.

"Satellite" shall mean an electro-optical EROS Class Satellite and its future derivatives.

"Satellite Operation and Associated Services Agreement" shall mean the Satellite Operation and Associated Services Agreement, dated as of this Agreement, between IAI/MBT and WIS.

"Satellite Supply Contract/s" shall mean the A1 Satellite Supply Contract and/or the A2 Satellite Supply Contract, if ordered by WIS, and/or the B1 Satellite Supply Contract, and/or any other satellite supply contract entered into between WIS and IAI/MBT associated with the procurement of the EROS B Class Satellites described herein as applicable.

NYK 647966-1.056463.0019

"Technology" shall mean any trade secrets, know how or proprietary information, whether or not reduced to writing, including but not limited to, inventions whether or not patentable, patent applications, licenses, software, programs, prototypes, designs, analysis codes, source codes, discoveries, techniques, methods, ideas, concepts, data, engineering and manufacturing information, procedures, specifications, diagrams, drawings, schematics, blueprints, and parts lists. A grant of a non-exclusive license under Technology hereunder shall not include the right to grant sub-licenses unless expressly provided otherwise in this Agreement. A grant of an exclusive license under Technology hereunder shall include the right to grant sub-licenses unless expressly provided otherwise in this Agreement. A grant of any license under any Technology hereunder includes the right to have products embodying Technology made by a third party subcontractor.

"WIS" has the meaning ascribed thereto in the preamble hereto.

"WIS Technology" shall mean Technology owned or under the legal control of WIS as of November 18, 1998, as well as Technology developed by WIS or IAI/MBT based on WIS Technology after November 18, 1998, including Technology developed by WIS under contract to IAI/MBT based on WIS Technology.

Section 15.    Miscellaneous Provisions.

(a)    Effectiveness of this Agreement. This Agreement shall become effective on the date of the last to occur of the following, and shall continue in force and effect unless terminated in writing by the Parties:

(i)    Signature of this Agreement by IAI/MBT;

(ii)    Signature of this Agreement by WIS;

(iii)    Closing of the transaction with contemplated by the NPA , including funding of the initial draw-down thereunder.

(b)    No Assignment. Neither Party to this Agreement may assign, transfer or otherwise convey any or all of its rights or obligations hereunder without the prior written consent of the other Party. Notwithstanding the above, either Party may assign all of its rights together with all of its obligations hereunder to a wholly owned subsidiary of such Party or to a company that purchases all or substantially all of the assets of such Party.

(c)    Entire Agreement; Amendment. This Agreement sets forth the entire understanding between the Parties relating to the subject matter contained herein and merges all prior discussions, understandings and agreements of any kind or nature between them on such subject matter. No amendment to this Agreement shall be effective unless it is in writing and executed by both of the Parties.

12

(d)    Severability.  If any one or more of the provisions contained in this Agreement or in any document executed in connection herewith shall be invalid, illegal or unenforceable in any respect under applicable law, the validity, legality and enforceability of the remaining provisions contained herein shall not in anyway be affected or impaired; provided, however, that in such case the Parties shall use their best efforts to achieve the purpose of the invalid provision.

(e)    Governing Law.  The rights and obligations of WIS and IAI/MBT hereunder shall, pursuant to New York General Obligations Law Section 5-1401, be governed by the laws of the State of New York.

(f)    Notices.  All notices, certificates, requests, demands and other communications hereunder shall be in writing and may be personally served or sent by facsimile, or certified or registered mail.  All such notices, certificates, requests, demands and other communications shall be delivered to the party to receive same at the address indicated below (or at such other address as a party specifies in a written notice):

13

If to WIS:                                              If to IAI/MBT:
Attn:  Jacob Weiss, Chief Executive Officer            General Counsel
       Kaufman 2, 17th Floor                           Ben Gurion International Airport
       Tel Aviv  61500                                 Israel
       Israel

    (g)    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same agreement.

    (h)    <u>Waiver of Subrogation and Salvage Value Remedies</u>.  Each Party to this Agreement shall obtain a waiver of subrogation and release of any right of recovery against each other Party to this Agreement and its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of the EROS A1 Satellite Supply Contract or the EROS B1 Satellite Supply Contract, from any insurer providing coverage for risk of loss or non-compliant performance of or damage to any Satellite to be delivered thereunder.

    IN WITNESS WHEREOF, this MASTER AGREEMENT has been executed this 25th day of July 2000 by the duly authorized representatives for the parties.

WEST INDIAN SPACE, LTD.                                 ISRAEL AIRCRAFT INDUSTRIES, LTD.

By: _____                          By: _____
    Name:                                                  Name:  ABRAHAM KNOBEL
    Title:                                                 Title:  VICE PRESIDENT FINANCE

By: _____                          By: _____
    Name:                                                  Name:  YEHOSHUA ELDAR
    Title:                                                 Title:  DIRECTOR OF FINANCE

14

## <u>ANNEX A</u>

### CONTRACT PRICES AND DELIVERY LEAD TIMES
### FOR EROS B CLASS SATELLITES

(A)   <u>Prices</u>

| <u>SATELLITE TYPE COST</u> | <u>ONE TIME NON-RECURRING COST</u> | <u>RECURRING COST</u> |
|---|---|---|
| B2 Class-Pan/Multispectral | $25,000,0000 | $55,000,000 |
| B1 Class-Panchromatic | $31,000,000 | $51,000,000 |

All prices are determined as of November 1998 and subject to escalation pursuant to the escalation formula set forth in the EROS A2 Satellite Agreement.

(B)   <u>Delivery Lead Times</u>

    1.  B1 Class-Panchromatic

- first including NRE Time      34 Months
- second and subsequent B1      27 Months
- second and subsequent B1s and if LLI are pre-ordered and received      20 Months

    2.  B2 Pan/Multispectral

- first including NRE and assuming B1 NRE not completed      40 Months
- first assuming ordered after completion of first B1      32 Months
- second and subsequent B2s after first B2      27 Months
- second and subsequent B2s and if LLI are pre-ordered and received      20 Months

15

<u>ANNEX B</u>

<u>IAI/MBT FINANCING SCHEDULE</u>

1. US$ 8.5 Million on the EROS B1 Satellite Supply Contract, per the terms of such Contract.

2. US$ 10 Million on the EROS B2 Satellite Supply Contract to be negotiated as part of that Contract.

16

ANNEX C

[ATTACH FORM OF A2 SATELLITE SUPPLY CONTRACT]

17

## ANNEX D TO MASTER AGREEMENT

(a)    Immediately prior to the launch of the EROS A1 satellite, the Company shall deposit (the date of such deposit, the "Escrow Establishment Date") with Chase Bank (or, if Chase Bank is unwilling to serve, with another escrow agent mutually agreeable to the Purchaser Representative, IAI/MBT and WIS) (the "Escrow Agent") an amount equal to (x) the $4.5 million Deferred Amount (as hereinafter defined) and (y) the Deferred Interest Amount (as hereinafter defined) minus (z) the aggregate amount of penalty payments owing from IAI to WIS pursuant to the A1 Satellite Supply Contract through the Escrow Establishment Date (such resulting difference, the "Net Amount");  provided, however, that if on the Escrow Establishment Date, the aggregate of (w) the Pegasus Investment Amount, (x) the Series B Investment Amount (each as hereinafter defined), (y) the $4.5 million Deferred Amount and (z) the Deferred Interest Amount (as hereinafter defined) (collectively, the "Total Amount") is less than $100 million, no escrow shall be established hereunder; and provided further that if the Total Amount exceeds $100 million, but is less than the sum of (x) $100 million, (y) the $4.5 million Deferred Amount and (z) the Deferred Interest Amount, the amount to be deposited into escrow hereunder shall be the difference between the Total Amount and $100 million.

(1)    If the Purchaser Representative provides a written demand (the "Demand Notice") to the Escrow Agent to the effect that (i) there has been a Total Loss of the EROS A1 satellite; (ii) the Purchaser Representative has exercised its right to have the Purchasers' entire investment in WIS (plus accrued interest thereon through the date of the Demand Notice) (the "Pegasus Investment Amount") repaid to it from the launch and in-orbit insurance proceeds (the "Insurance Proceeds"), (iii) the proceeds received by the Purchaser Representative from such Insurance Proceeds were insufficient to repay the Pegasus Investment Amount, and (iv) the amount set forth in the Demand Notice (the "Demand Amount") represents the difference between the amount due to the Purchaser Representative and the amount actually received by it (up to the entire amount of the Net Amount), then the Escrow Agent shall immediately pay the Demand Amount to the Purchaser Representative, and shall pay the balance, if any, of the Net Amount to IAI/MBT; provided, however, that this does not derogate from IAI/MBT's right to be paid the balance due to it from the Company.

(2)    If (i) a Total Loss does not occur, or (ii) a Total Loss occurs but (x) the Purchaser Representative is paid in full the Pegasus Investment Amount from the Insurance Proceeds, or (y) the Purchaser Representative does not exercise its right to be repaid the Pegasus Investment Amount in connection with such Total Loss, the Purchaser Representative will promptly so notify the Escrow Agent in writing, in which event  the Net Amount shall promptly be paid to IAI/MBT.

(b)    For purposes of this Section:

(1)    "$4.5 million Deferred Amount" shall mean $4.5 million dollars, plus interest thereon at a rate determined pursuant to Section 4.1 of Exhibit F to the A1 Satellite Supply Contract calculated from the date hereof through the Escrow Establishment Date.

18

(2)    "Deferred Interest Amount" shall mean $1.65 million, plus interest thereon at a rate determined pursuant to Section 4.1 of Exhibit F to the A1 Satellite Supply Contract calculated from the date hereof through the Escrow Establishment Date.

(c)    WIS agrees to manage its operations prior to the launch of the EROS A1 satellite to enable it to have sufficient funds at launch to establish the escrow referred to in paragraph (i) above.

(d)    Both IAI/MBT and WIS agree to cooperate with the Purchaser Representative in the establishment and release of the escrow, and each party acknowledges that the Escrow Agent will be instructed that it shall take directions solely from the Purchaser Representative pursuant to the escrow agreement.

19

# Exhibit

# B

### Amendment No. 1 to the Master Agreement

THIS AMENDMENT NO. 1 to the MASTER AGREEMENT DATED July 25, 2000 is entered into by and between **ISRAEL AIRCRAFT INDUSTRIES LTD.**, acting through its **MBT SPACE DIVISION** ("IAI" or " Seller") and **IMAGESAT INTERNATIONAL N.V.** ("ImageSat" or "Buyer"), as of June 1, 2004.

**WHEREAS**, Seller and ImageSat have entered into the Master Agreement dated July 25, 2000 ("Master Agreement");

**WHEREAS** the Parties amended the Master Agreement in the Principles of Settlement Agreement, dated March 7, 2002; and

**WHEREAS** the Parties desire to further amend the Master Agreement.

**NOW THEREFORE** the Parties agree as follows:

A. The Preamble to this Amendment forms an integral part hereof.

B. The Parties hereby declare that Section F of the Principles of Settlement Agreement, dated March 7, 2002, is hereby deleted.

C. The Parties declare that Exhibit I of the EROS B Satellite Supply Contract dated June 1, 2004, signed by the Parties prior to the signature of this Amendment No. 1, is deleted.

D. The Parties hereby agree that the exclusivity provision set forth in Section 1(c) of the Master Agreement shall be modified as follows:

    1.    Seller will extend the exclusivity rights of Buyer to purchase EROS Class Satellites (as defined in the Master Agreement) for a period of fifty (50) months from the Launch date of the EROS B Satellite.

    2.    If either of the EROS B or EROS C Satellite Supply Contracts are terminated, then this amendment to the Master Agreement shall also be annulled and the parties' rights shall revert to what they were under the Master Agreement before this amendment was made and before the signature of the EROS Satellite Supply Contract dated June 4, 2004.

E. The other provisions of the Master Agreement shall not be affected by this Amendment.



**IN WITNESS WHEREOF** this Amendment No. 1 to the Master Agreement has been executed this 10th day of March 2005 by the duly authorized representatives for the parties.

**IMAGESAT INTERNATIONAL N.V.**

BY: _____

NAME: Menashe Broder
TITLE: CEO

BY: _____

NAME: Hagai Goren
TITLE: CFO

**ISRAEL AIRCRAFT INDUSTRIES LTD., SYSTEMS MISSILES AND SPACE GROUP, MBT SPACE DIVISION**

BY: _____

NAME: Dr. Abraham Knobel
TITLE: Vice-President Finance

BY: _____

NAME: Yaacov Galazan
TITLE: Vice-President and General Counsel

# Exhibit

# C

7/25/2001          COMPANY CONFIDENTIAL

## SECOND AMENDED AND RESTATED EROS B SATELLITES SUPPLY CONTRACT

THIS SECOND AMENDED AND RESTATED EROS B SATELLITES SUPPLY CONTRACT is duly signed on the 25th day of July,2001  between ISRAEL AIRCRAFT INDUSTRIES LTD., acting through its MBT Division, organized and existing under the laws of the State of Israel, with a place of business in Yehud, Israel (hereinafter referred to as "SELLER"); and IMAGESAT INTERNATIONAL N.V., a company organized under the laws of the Netherland Antilles (hereinafter referred to as the "BUYER" or as the "Company" ).

WHEREAS, BUYER desires to procure an EROS B Satellite, together with certain services, consisting of certain launch services and other services, and ground receiving equipment, and to have an option to procure an additional EROS B Satellite at a price and other conditions as set forth in Exhibit H of this Contract, together with the above mentioned equipment and services at prices to be agreed upon in good faith between the Parties at the time of exercising the option, all subject to the terms and conditions hereof;

WHEREAS, SELLER desires to supply such EROS B Satellite, together with certain services, consisting of certain launch services and other services, and ground receiving equipment, and to provide BUYER with an option to procure an additional EROS B Satellite at a price and other conditions as set forth in Exhibit H of this Contract, together with related equipment and services at prices to be agreed upon in good faith between the Parties at the time of exercising the option, all in accordance with the terms and conditions hereof;

WHEREAS, BUYER and SELLER are parties to the First Amended and Restated EROS B Satellite Supply Contract (the "B1 Satellite Supply Contract"), and the Master Contract (footer number NYK 647966-1.056463.0019) (the "Master Contract"), each dated 25 July 2000;

WHEREAS, BUYER and SELLER desire to amend and restate the B1 Satellite Supply Contract;

NOW THEREFORE, BUYER and SELLER hereby agree, for good and valuable consideration, the receipt and sufficing of which is hereby acknowledged, to amend and restate the Existing Satellite Supply Contract in its entirety as follows, comprising the following parts and exhibits:

(I)     The Terms and Conditions;

(II)    The Exhibits to this Contract as follows:

        Exhibit "A"  Deliverables;
        Exhibit "B"  EROS B  Mission Requirements;
        Exhibit "C"  EROS B  System Specifications;
        Exhibit "D"  Statement of Work (SOW);
        Exhibit "E"  Program Schedule;
        Exhibit "F"  Pricing and Payment Terms;
        Exhibit "G"  EROS B  In-Orbit Test; and
        Exhibit "H"  EROS B2 Option

Eros B_Supply_BD257clean.doc          - 1 -                              25 July 2001

COMPANY CONFIDENTIAL

IN WITNESS WHEREOF this CONTRACT has been executed this 25 day of July, 2001 by the duly authorized representatives for the parties.

IMAGESAT N.V.

BY:
NAME:            Jacob Weiss
TITLE:              CEO

ISRAEL AIRCRAFT INDUSTRIES LTD.

BY:
NAME:
TITLE:              Yehoshua Eldar
                   Director of Finance
                   IAI/ MBT Division

**EXHIBIT C**

**Intentionally omitted**

# Exhibit

# D

Monday, July 23, 2001

To:    Jacob Weiss, CEO
       Moshe Bar-Lev, President

Dear Jacob,

I need to make it clear that I strongly object and oppose to any change to the Mission Requirements with respect to the satellite minimum imaging time per orbit.

Indeed, the original requirement on the Eros B satellites was that such a satellite would be enable to image up to 37 minutes per orbit. I have agreed with Moshe, based on real life experience acquired with the launch of Eros A, that it is possible to relax the original requirement on the maximum satellite imaging time per orbit to 27 minutes, as is reflected in the present Exhibit B of the Purchase contract.

I was caught by surprise, yesterday when Moshe told me about a possible change in the Mission requirements that would enable the building of a satellite that would be required to image ONLY A MAXIMUM OF 17 MINUTES PER ORBIT. As I told you over the phone, yesterday, such a change is unacceptable to ImageSat due to the negative impact such a feature would have on our business, especially when everyone anticipates that within the lifetime of Eros B the civilian demand will overpass the military demand and the satellite is to be conceived as a factory whose throughput needs to be maximize and not limited.

At the light of the above, I want you to note that I oppose the possibility for ImageSat to be maneuvered into a situation where ImageSat would buy a cripple satellite at the price of a very sophisticated one. i recommend that you view any such change in the satellite performances (and price) as a material change with respect to what Moshe Bar-Lev presented to the BOD in last May.

Regards,

Patrick Rosenbaum

Rserves imaging time                                    23/07/2001

# Exhibit

# E

RE: Envio de computadora a Tel Aviv

**From:** Shimon Eckhaus [seckhaus@imagesatintl.com]
**Sent:** Wednesday, November 29, 2006 3:22 PM
**To:** Steve Wilson; Roberto Monaco; Vola Levin
**Cc:** Hagai Goren; jberger@pegasusinvestors.com; Rudi Heilpern; gspr@elbit.co.il; yoav@avivvc.com; Efrat Klein; Elisabeth Hebert; nesgos@milbank.com; darzi@iai.co.il; James DePalma
**Subject:** RE: Envio de computadora a Tel Aviv

Steve,

The Board did not accept your recommendation.

Please finalize all required arrangements and ship the equipment to us.

Shimon

---

**From:** Steve Wilson [mailto:steve@brweng.com]
**Sent:** Wed 11/29/2006 7:49 PM
**To:** 'Roberto Monaco'; Vola Levin
**Cc:** Hagai Goren; Shimon Eckhaus; jberger@pegasusinvestors.com; 'Rudi Heilpern'; gspr@elbit.co.il; yoav@avivvc.com; Efrat Klein; 'Elisabeth Hebert'; nesgos@milbank.com; darzi@iai.co.il; 'James DePalma'
**Subject:** RE: Envio de computadora a Tel Aviv

All:

I want to reiterate my request that this initiative be put on hold BY THE COMPANY until there is a decision as to whether the Company wishes to pursue the combined (and interdependent) investment/SOP proposal of President Chavez. Although I have received no feedback whatsoever, I assume that a response will be forthcoming immediately. Assuming that the Company doesn't wish to BURN permanently the bridge to this highly attractive opportunity, I also reiterate my request that Q2 and Q3 financial statements be provided immediately for the purpose of (1) restoring the Company's contract eligibility; and (2) ensuring that ImageSat's registration account is not closed permanently.

Steve Wilson

-----Original Message-----
From: Roberto Monaco [mailto:monaco_ra@yahoo.com]
Sent: Wednesday, November 29, 2006 12:14 PM
To: Vola Levin
Cc: Hagai Goren; Shimon Eckhaus; Steve Wilson
Subject: Re: Envio de computadora a Tel Aviv

Vola,

I've just asked Tomas, who told me that MoD is not responsive due to the coming elections (next Sunday) - apparently constantly in meetings and delaying all paperwork. They have requested him to contact them again after the 6th on this matter.

Roberto

----- Original Message -----
From: "Vola Levin" <vola@imagesatintl.com>
To: "Roberto Monaco" <monaco_ra@yahoo.com>
Cc: "Hagai Goren" <hagaig@imagesatintl.com>; "Shimon Eckhaus" <seckhaus@imagesatintl.com>; "Steve Wilson" <steve@brweng.com>
Sent: Wednesday, November 29, 2006 9:49 AM
Subject: RE: Envio de computadora a Tel Aviv

RE: Envio de computadora a Tel Aviv                                    Page 2 of 5

Roberto,

2 weeks passed. Something new about letter, Tomas, entity, mission, etc?
They say in Russian: we can make here livelihood all our life (:)

Vola

-----Original Message-----
From: Roberto Monaco [mailto:monaco_ra@yahoo.com]
Sent: Wednesday, November 15, 2006 8:08 AM
To: Vola Levin
Cc: Hagai Goren; Shimon Eckhaus; Steve Wilson
Subject: Re: Envio de computadora a Tel Aviv

Vola,

Tomas mentioned he's going to the MoD for the letter tomorrow, and thinks it
should be ready. The head of the Intelligence Division, entity that was
requested to issue the authorization and place where we were operating, was
on mission. I'll keep you updated.

Roberto

----- Original Message -----
From: "Vola Levin" <vola@imagesatintl.com>
To: "Roberto Monaco" <monaco_ra@yahoo.com>
Cc: "Hagai Goren" <hagaig@imagesatintl.com>; "Shimon Eckhaus"
<seckhaus@imagesatintl.com>; "Steve Wilson" <steve@brweng.com>
Sent: Tuesday, November 14, 2006 12:20 PM
Subject: RE: Envio de computadora a Tel Aviv

Roberto,

It's about 3 weeks since your last report on this issue. What's the last
thing you heard on it?

About the invoices, you'll better speak to Hagai.

Vola

-----Original Message-----
From: Roberto Monaco [mailto:monaco_ra@yahoo.com]
Sent: Tuesday, November 14, 2006 5:37 PM
To: Vola Levin
Cc: Hagai Goren; Shimon Eckhaus; Steve Wilson
Subject: Re: Envio de computadora a Tel Aviv

Vola,

Tomas is not reachable right now, I'll update you as soon as I can talk with
him.

I suppose we accept the difference in the invoice #2 and I paid for it here,
but I would appreciate confirm.

Regards,
Roberto

----- Original Message -----
From: "Vola Levin" <vola@imagesatintl.com>
To: "Roberto Monaco" <monaco_ra@yahoo.com>
Cc: "Hagai Goren" <hagaig@imagesatintl.com>; "Shimon Eckhaus"

RE: Envio de computadora a Tel Aviv

<seckhaus@imagesatintl.com>; "Steve Wilson" <steve@brweng.com>
Sent: Tuesday, November 14, 2006 11:20 AM
Subject: RE: Envio de computadora a Tel Aviv

Roberto,

Please, update on nay news (hopefully) in this issue.

Vola,

P.S. I heard from Hagai today, that all your invoices were paid.

-----Original Message-----
From: Roberto Monaco [mailto:monaco_ra@yahoo.com]
Sent: Tuesday, October 24, 2006 1:55 PM
To: Vola Levin
Cc: Hagai Goren; Shimon Eckhaus; Steve Wilson
Subject: Re: Envio de computadora a Tel Aviv

The message below returned with error for all the imagestaintl addressees

----- Original Message -----
From: "Roberto Monaco" <monaco_ra@yahoo.com>
To: "Roberto Monaco" <monaco_ra@yahoo.com>; "Vola Levin"
<vola@imagesatintl.com>
Cc: "Hagai Goren" <hagaig@imagesatintl.com>; "Shimon Eckhaus"
<seckhaus@imagesatintl.com>; "Steve Wilson" <steve@brweng.com>
Sent: Monday, October 23, 2006 5:51 PM
Subject: Re: Envio de computadora a Tel Aviv

> Vola
>
> The letters have been requested - I asked Tomas to follow this since he is
> the one who is better connected to both Ministry of Defense and Ministry
> of Foreign Affairs. I could not get a hold of him today and hence I don't
> have any other news.
>
> Robertro
>
>
> ----- Original Message -----
> From: "Roberto Monaco" <monaco_ra@yahoo.com>
> To: "Vola Levin" <vola@imagesatintl.com>
> Cc: "Hagai Goren" <hagaig@imagesatintl.com>; "Shimon Eckhaus"
> <seckhaus@imagesatintl.com>; "Steve Wilson" <steve@brweng.com>
> Sent: Thursday, October 19, 2006 6:10 AM
> Subject: Re: Envio de computadora a Tel Aviv
>
>
>> Vola,
>>
>> I will check on the status of the letters requested and let you know.
>>
>> Roberto
>>
>>
>> ----- Original Message -----
>> From: "Vola Levin" <vola@imagesatintl.com>
>> To: "Roberto Monaco" <monaco_ra@yahoo.com>
>> Cc: "Hagai Goren" <hagaig@imagesatintl.com>; "Shimon Eckhaus"

RE: Envio de computadora a Tel Aviv

>> <seckhaus@imagesatintl.com>; "Steve Wilson" <steve@brweng.com>
>> Sent: Thursday, October 19, 2006 2:42 AM
>> Subject: RE: Envio de computadora a Tel Aviv
>>
>>
>> Roberto,
>>
>> What's new in this "project"?
>>
>> Vola
>>
>> -----Original Message-----
>> From: Roberto Monaco [mailto:monaco_ra@yahoo.com]
>> Sent: Monday, October 09, 2006 9:37 PM
>> To: Steve Wilson
>> Cc: Hagai Goren; Vola Levin; Shimon Eckhaus
>> Subject: Fw: Envio de computadora a Tel Aviv
>>
>> Customs office in Maiquetia is asks for the following :
>> - a letter from MoD to Customs authorizing the export of the system
>> - to compile the inventory list in the attached form, and get it stamped
>> by
>> both MoD and Ministry of Foreign Affairs
>> - a letter from Ministry of Foreign Affairs authorizing the shipment of
>> the
>> goods
>>
>>
>> ----- Original Message -----
>> From: "Edith Correa" <edith@vipca.com>
>> To: <rmonaco@imagesatintl.com>; <vola@imagesatintl.com>
>> Cc: "Bibi Jabar" <bibi@vipca.com>; "Cesar Quintero (Ventas)"
>> <cesarvip@cantv.net>
>> Sent: Monday, October 09, 2006 7:37 AM
>> Subject: Envio de computadora a Tel Aviv
>>
>>
>>> Buenos dias Sr. Monaco,
>>>
>>> El presente es para informarle que nuestro agente aduanal reviso los
>>> documentos entregados por usted a nuestra oficina y nos informo lo
>>> siguiente:
>>>
>>> -       Se nos debe entregar una Carta dirigida a la Aduana aérea de
>>> Maiquetía emitida por el Ministerio de la Defensa, en la cual otorga el
>>> permiso a exportar dicho computador con sus partes a Tel Aviv.
>>> -       La Lista de empaque debe estar sellada por el Ministerio de
>>> Defensa y por el Ministerio de Relaciones Exteriores (ver lista de
>>> empaque
>>> anexa).
>>> -       Debemos recibir un oficio de parte del Ministerio de
>>> Relaciones
>>> Exteriores en el cual autoriza el envío de este embarque a Tel Aviv
>>> informando la finalidad del mismo.
>>>
>>> Esperando su pronta respuesta, se despide cordialmente
>>>
>>> Edith Correa
>>> Departamento de Exportaciones
>>> Venezuelan International Packers, c.a.
>>> *** eSafe scanned this email for malicious content ***
>>> *** IMPORTANT: Do not open attachments from unrecognized senders  ***
>>>
>>
>> *** eSafe scanned this email for malicious content ***

file://C:\D...        A:\%20...;\%20Settings\filestaff0\Local%20Settings\Temporary%20Internet%20F...     7/2/2007

RE: Envio de computadora a Tel Aviv

```
>> *** IMPORTANT: Do not open attachments from unrecognized senders ***
>>
>>
>>
>
>
>
```

RE: Envio de computadora a Tel Aviv

**From:** Shimon Eckhaus [seckhaus@imagesatintl.com]
**Sent:** Monday, December 04, 2006 11:50 AM
**To:** Steve Wilson
**Cc:** Bak, Sander; Nesgos, Peter; Efrat Klein; Hagai Goren; Eyal Lerman; Noam Zafrir;
eric.devries@hbnlaw.com
**Subject:** Further Communication

Dear Steve,

  After internal discussions and taking into account many considerations, the Company's Board has reached the business decision not to pursue further matters in Venezuela at this time. It is therefore not productive for us to continue exchanging emails on this topic. I note as well that the Company received a lawyer's letter on November 21, 2006 sent on your behalf to the Company and several shareholders that, among other things, threatens litigation against the Company. It is unfortunate that you have chosen to take this route. In light of that letter and your claims, I do not believe it is productive for either side to further debate these issues by email. Your attorney will be receiving a response to the November 21 letter from our outside counsel at the Milbank Tweed law firm in New York. If there are further discussions you or your counsel wish to pursue on these issues, you should direct them only to Sander Bak at Milbank, who will act as the point person to respond on behalf of the Company."

**Sincerely yours**

**Shimon Eckhaus**

# Exhibit

# F

**EXHIBIT F**

1. E-mail message from Jacob Weiss to Stephen Wilson dated June 18, 2000, transmitting a draft of the Master Agreement between ImageSat (then known as West Indian Space) and Israel Aircraft International, Ltd. (IAI).

2. E-mail message from Jacob Weiss to Stephen Wilson dated June 19, 2000, transmitting a memorandum captioned "Your Mark-Up of the Master Agreement."

3. E-mail message from Jacob Weiss to Stephen Wilson dated June 20, 2000, transmitting a memorandum with his comments on the final draft of the Master Agreement iterated between Weiss and Wilson.

4. E-mail message from Jacob Weiss to Stephen Wilson dated November 28, 2000 regarding exclusivity commitments.

5. E-mail message from Jacob Weiss to Stephen Wilson dated December 6, 2000 regarding Pegasus investment and EROS A satellite launch.

6. E-mail message from Jacob Weiss to Stephen Wilson dated February 9, 2001 regarding ImageSat operations.

7. E-mail message from ImageSat to its directors and others transmitting the minutes of ImageSat's Board of Directors meeting in New York on May 11, 2007, including "Annex I" containing a presentation regarding EROS B1 satellite negotiations and specifications relative to the provisions of the Master Agreement.

8. E-mail message from Jacob Weiss to Stephen Wilson dated June 30, 2001 containing threats against Wilson.

9. E-mail message from ImageSat to its directors, investors' observers and others dated July 6, 2001 transmitting a memorandum identifying the agenda of the meeting scheduled for July 12, 2001, and the Board materials, including minutes of the May 11 meeting referenced above and related correspondence.

10. E-mail message from ImageSat to its directors and others transmitting minutes of the Board of Directors meeting held on July 12, 2001, including discussion of the EROS B satellite supply contract, that it was not put out to competitive bidding, and the relationship of the Master Agreement to the Company's decision not to compete the satellite supply contract.

11. E-mail message from Ori Ben-Amotz to Directors of ImageSat dated July 27, 2001, with a post-closing shareholder rights offering to participate in the 10% guarantee associated with the Bank Leumi Bank Credit Agreement.

12.    E-mail message from Jacob Weiss to Stephen Wilson dated August 23, 2001 regarding satellite contract and corporate agreements.

13.    E-mail message from ImageSat CFO Ori Ben-Amotz to ImageSat shareholders dated September 9, 2001, advising that a shareholder meeting would be held on September 24, 2001.

14.    E-mail message from Ori Ben-Amotz to Stephen Wilson *et al.* regarding prior e-mail messages.

15.    E-mail message from ImageSat Communications VP Anisfeld to ImageSat shareholders dated February 28, 2002 transmitting article from *Aviation Week's AviationNow Shownews* including and based upon false statements by Menashe Broder regarding the planned launch of EROS B.

16.    E-mail message from Anisfeld to ImageSat shareholders dated February 28, 2002 transmitting article from *Spacenews* including statements based on interviews with Menashe Broder, including that IAI received an estimated $110 million contract from ImageSat to build the EROS B1 satellite and that the satellite was proceeding on schedule and is "planned for launch by the end of 2003."

17.    E-mail message from Anisfeld to ImageSat shareholders dated March 4, 2002, transmitting a press release stating that the EROS B-1 satellite was "due to be launched in 2003."

18.    E-mail message from Anisfeld to ImageSat shareholders and investors dated May 28, 2002 transmitting ImageSat's May 2002 Investors Report, which stated that the structure and On Board Recorder of the EROS B1 satellite was scheduled for May 29-30, 2002.

19.    E-mail message from Anisfeld to ImageSat shareholders and investors dated June 27, 2002, transmitting ImageSat's June 2002 Investors Report, which stated that the EROS B1 satellite program was proceeding and was "on schedule."

20.    E-mail message from Anisfeld to ImageSat shareholders and investors dated July 10, 2002, including an article published in the on-line edition of *Aviation Week & Space Technology* stating, based on false statements by Menashe Broder, that the EROS B-1 satellite would be launched in early 2004, which was a "few months later than first planned and recently reported."

21.    E-mail message from ImageSat to ImageSat shareholders dated August 26, 2002 transmitting a memorandum on guidelines on publicity regarding the registration of a public offering in the United States.

22.    E-mail message from ImageSat to ImageSat shareholders dated September 5, 2002 transmitting (i) a company information document falsely stating that the EROS B1 satellite was "due to be operational in 2004", and (ii) a press release announcing executive promotions for Ori Ben-Amotz and Dave Krueger.

2

23. E-mail messages between Menashe Broder and Stephen Wilson dated from September 24 to 26, 2002 concerning closing of ImageSat's headquarters and termination of aspects of its business plan.

24. E-mail message from ImageSat to ImageSat shareholders and investors dated October 1, 2002, transmitting ImageSat's September 2002 Investors Report. The report falsely and misleadingly stated that (i) ImageSat had approved the System Requirement Review for the EROS B satellite, and (ii) attempts were being made to secure a "Long March" satellite launcher as a second option for launching the satellite.

25. Upon information and belief, e-mail message from ImageSat to ImageSat shareholders and investors in late October or early November 2002, transmitting ImageSat's October 2002 Investors Report. The report falsely and misleadingly (i) stated that ImageSat's IPO would occur in the first quarter of 2003, (ii) stated for the first time that MBT had provided notice to ImageSat of a Work Stoppage on the EROS B satellite but that critical time sensitive work was proceeding, and (iii) stated that the reason for the stoppage was payment delays by Angola.

26. Upon information and belief, e-mail message from ImageSat to ImageSat shareholders and investors in late November or early December 2002, transmitting ImageSat's November 2002 Investors Report. The report falsely and misleadingly stated that since the Angola payment delays continued, a "stop work" order for the 2001 EROS B1 was still in effect, but that critical work was still being performed.

27. Upon information and belief, e-mail message from ImageSat to ImageSat shareholders and investors in late December 2002 or early January 2003, transmitting ImageSat's December 2002 Investors Report. The report repeated the false and misleading statements in the prior Investor Report.

28. Upon information and belief, e-mail message from ImageSat to ImageSat shareholders and investors in late January or early February 2003, transmitting ImageSat's January 2003 Investors Report. The report falsely and misleadingly stated that (i) Angola had not yet made payment but that Menashe Broder claimed the problem was now solved, (ii) that a bank credit agreement guaranteed future payments by April 2003, and (iii) EROS B was under Work Stoppage by IAI/MBT.

29. Upon information and belief, e-mail message from ImageSat to ImageSat shareholders and investors in late February or early March 2003, transmitting ImageSat's February 2003 Investors Report. The report announced that the initial payment by the Angolan SOP had been received but made no mention of EROS B, the Company's plans or arrangements to mitigate the effects of MBT's Work Stoppage, or the possible implications on ImageSat's ability to meet is SOP contract obligations. The report also disclosed a sub-system failure on the EROS A satellite.

3

30.    Upon information and belief, e-mail message from Menashe Broder to Stephen Wilson *et al.* in or about February 2003 concerning activities in Venezuela.

31.    E-mail message from Anisfeld to ImageSat shareholders and investors dated February 23, 2003 with attachments containing two press releases concerning contracts between ImageSat and the European Union. The EROS B program is not mentioned in either press release, the first such omission in nearly two years.

32.    E-mail message from Anisfeld sent to ImageSat investors and shareholders, dated May 27, 2004, which included ImageSat's May 2004 Investors Report. The report falsely and misleadingly, among other things, (i) announced ImageSat's contract negotiations for EROS B, but made no direct connection to the previously reported EROS B satellite Work Stoppage, and (ii) stated that ImageSat was just now preparing to install a temporary antenna for its SOP customer in Angola, nearly two years after the initial contract signature in July 2002.

33.    E-mail message from Hagai Goren to Stephen Wilson, dated May 28, 2004, stating that Goren was "just finishing terms and conditions on EROS B contract", some 19 months, only 19 months before the Company reported in its Investor Report the satellite would be launched, deceptively implying that the EROS B the Company was reporting on, was the same EROS B contracted for and reportedly started in 2001..

34.    E-mail message from Anisfeld to ImageSat investors and shareholders dated August 1, 2004, which included the July 4, 2004 Investors' Report. The report stated, among other things, that the EROS B launch contract had been finalized and that the launch window for EROS B would occur sometime between January 2006 and June 2006.

35.    E-mail message from Anisfeld to ImageSat investors and shareholders dated August 25, 2004, which included the August 2004 Investors Report. The report stated, among other things, that (i) Angola had made its $17.5 million payment on August 14, 2004 per the new payment schedule; (ii) ImageSat was to pay IAI for EROS B; (iii) that ImageSat's SOP customers had the right to terminate their SOP contracts because ImageSat was not going to be able to launch an EROS B satellite before September 15th 2004, (iv) that Broder was negotiating with India and was optimistic an accommodation would be achieved, and (v) that Broder did not know what Taiwan would do with regard to the possible termination of SOP satellite service from ImageSat (notwithstanding that ImageSat had received notice in August of Taiwan's intent to terminate its contract on September 16, 2004).

36.    E-mail messages between Hagai Goren and Stephen Wilson between September 30, 2004 and October 3, 2004 concerning the September 2004 Investors Report. Through the September report, Broder disclosed Taiwan's notice and contract cancellation for failure to launch EROS B by the deadline.

4

37.    E-mail message from ImageSat to ImageSat investors and shareholders, dated October 3, 2004, transmitting ImageSat's October 2004 Investors' Report. The Report (i) stated that Taiwan cancelled its SOP contract due to ImageSat's breach of contract to provide services from a EROS B by September 15, 2004, (ii) acknowledged the purchase of the EROS B satellite was "critical to the success of the Company", and (iii) Angola's payment of $17.5 million to ImageSat in August 2004 increased the cash balance of the Company and helps to finance the EROS B satellite.

38.    E-mail message from ImageSat to ImageSat investors and shareholders, dated October 21, 2004, which included the October 2004 Investors' Report. The report stated, among other things, that (i) "we are continuing to make progress in Venezuela" and (ii) the mirror on the telescope of the EROS B satellite had been damaged by IAI's subcontractor.

39. .    E-mail message from Anisfeld to ImageSat investors and shareholders dated November 25, 2004, which included the November 2004 Investors Report. The report falsely and misleadingly stated, among other things, that (i) delays in the EROS B Program "will probably be less than two months," (ii) all components for the EROS B satellite are "on time and in accordance with the work plan," and also reported that (iii) "we are still confident that we will conclude the Venezuela contract in 2005."

40.    E-mail message from Anisfeld to ImageSat investors and shareholders dated December 5, 2004, which included ImageSat's November 2004 Investors' Report as well as financial statements for the third quarter of 2004. The report falsely and misleadingly, among other things, referred to financial statements that listed the value of the 2001 EROS B/C Work-In-Progress as valued at 10's of millions of dollars.

41.    E-mail message from Anisfeld to ImageSat investors and shareholders dated December 23, 2004, which included ImageSat's December 2004 Investors' Report. The report misleadingly stated, among other things, that "EROS B" was on schedule for delivery on December 31, 2005.

42.    E-mail message from Anisfeld to ImageSat investors and shareholders dated January 24, 2005, which included ImageSat's January 2005 Investors' Report. The report misleadingly stated, among other things, that "EROS B" was on schedule.

43.    E-mail message from Anisfeld to ImageSat investors and shareholders dated March 1, 2005, which included ImageSat's February 2005 Investors' Report. The report falsely and misleadingly stated, among other things, that the EROS C program would be revalued, resulting in a delay in the release of the 2004 financial statements, and that "[d]ue to several recent developments, the Company in consultation with its Auditors...decided to adjust the financial statements for [the third quarter of 2004]."

5

44. E-mail message from Anisfeld to ImageSat investors and shareholders dated March 24, 2005, which included ImageSat's March 2005 Investors' Report. The report falsely and misleadingly stated, among other things, the signing of Amendment 1 to the EROS C Satellite Supply Contract and stated that the price of the EROS contract stood at $101 million, and could increase due to obsolescence of some of the satellite components. Furthermore, IAI agreed to cancel past unpaid invoices sent to ImageSat for a total of $31.2 million. Finally, negotiations for a Synthetic Aperture Radar (SAR) commenced, with delivery of the SAR to occur by mid 2008.

45. E-mail message from Anisfeld to ImageSat investors and shareholders dated May 4, 2005, which included ImageSat's April 2005 Investors' Report. The report misleadingly stated, among other things, that the "EROS B" program was advanced and on schedule.

46. E-mail message from Anisfeld to ImageSat investors and shareholders, dated May 31, 2005, which included the May 2005 Investors' Report. The report misleadingly stated, among other things, that the "EROS B" program was advanced and on schedule.

47. E-mail message from Anisfeld to ImageSat investors and shareholders, dated June 30, 2005, which included the June 2005 Investors' Report. The report stated, among other things, that ImageSat continued to work on the EROS C adjustment for the third quarter of 2004.

48. E-mail message from Anisfeld to ImageSat investors and shareholders, dated July 20, 2005, which included the July 2005 Investors' Report. The Report, among other things, referred to an agreement between IAI and Pegasus regarding payment for the EROS B satellite and stated that ImageSat continued to work on the EROS C adjustment for the third quarter of 2004.

49. E-mail message from Anisfeld to ImageSat investors and shareholders, dated August 23, 2005, which included the August 2005 Investors' Report. The Report announced a payment of $13.6 million from SOP4, allegedly received by ImageSat on August 22, 2005. The Report also mentioned the need for the completion of ImageSat's 2004 financial statements in preparation for the Company's potential IPO.

50. E-mail message from Anisfeld to ImageSat shareholders dated August 30, 2005, concerning appointment of Gaspar to the ImageSat Board of Directors.

51. E-mail message from Anisfeld to ImageSat investors and shareholders dated September 14, 2005, attaching a copy of ImageSat's signed 2004 Financial Statements. Upon information and belief, these financial statements misrepresent the value of ImageSat's 2001 EROS B/C satellite investment and the data therein are presented in a misleading and deceptive fashion.

6

52.    E-mail message from Anisfeld to ImageSat directors and shareholders stating that ImageSat had decided to "cease to issue written Investors' Reports" to its investors and shareholders because of the SEC's acceptance of the Company's confidential Form F-1 filing.

53.    E-mail message from Shimon Eckhaus to Stephen Wilson dated November 4, 2005 regarding negotiation of a target price for the IPO of ImageSat and scheduling of IPO "road shows", inconsistent with subsequent representations.

54.    E-mail message from Shimon Eckhaus to Stephen Wilson dated November 5, 2005, advising Wilson that, among other things, there was a "0% chance of radar license for ImageSat in Venezuela."

55.    E-mail message from Shimon Eckhaus to Stephen Wilson dated November 20, 2005, falsely representing reasons for a delay in the ImageSat IPO as well as developments concerning the Company's SOP contract in Angola.

56.    E-mail messages between Eckhaus, Efrat Klein, and Stephen Wilson between November 22 and 24, 2005, in which a shareholder request to participate in the 2005 Annual Shareholder meeting of ImageSat by conference call was denied.

57.    E-mail message from Shimon Eckhaus to Stephen Wilson dated November 25, 2005, stating that Eckhaus would not provide Wilson with a written explanation of the reasons for the IPO cancellation, allegedly on the advice of counsel.

58.    E-mail message from Shimon Eckhaus to Stephen Wilson dated November 30, 2005 regarding coverage by CNN of the news that Spain and Russia were selling military equipment to Venezuela.

59.    E-mail message from Eckhaus to Wilson dated December 2, 2005, reporting on Eckhaus's meeting with Jacob Toren, then Director General of the IMOD, including discussion by Eckhaus of, among other things, how ImageSat's fate relevant to Venezuelan sales initiative is based entirely on Israeli political considerations.

60.    E-mail message from Eckhaus to Wilson dated December 4, 2005, seeking evidence regarding competitive sales or sales initiatives to Venezuela and misleadingly suggesting that ImageSat would require U.S. and/or additional Israeli governmental permission to sell to Venezuela.

61.    E-mail message from Hagai Goren to ImageSat shareholders dated January 18, 2006, transmitting a Convocation and Notification of the Extraordinary General Meeting ("BGM") of Shareholders of ImageSat scheduled for February 3, 2006 at which resolutions were to be adopted in further pursuance of defendants' fraudulent conduct and breaches of fiduciary duty.

62.    E-mail message from Hagai Goren to ImageSat shareholders dated January 26, 2006, requesting again that shareholders provide proxies for the Extraordinary

General Meeting. in advance of the February 10, 2006 board meeting to approve the restructuring transactions.

63.   E-mail message from James DePalma to Stephen Wilson dated February 7, 2006, falsely and misleadingly explaining that the purpose of the proposed restructuring transactions was to get EROS B launched, because ImageSat could not pay its bills and its only other alternative was to declare bankruptcy.

64.   E-mail message from James DePalma to Stephen Wilson and Robert LaPenta dated February 15, 2006, falsely and misleadingly explaining that an 80% dilution in the equity holdings of ImageSat's minority shareholders was necessary in order that IAI and Pegasus provide additional money and extend loan due dates and in view of problems with SOP 4.

65.   E-mail message from James DePalma to Stephen Wilson dated February 20, 2006, representing that the restructuring of the ImageSat minority shareholders was unavoidable because (i) ImageSat had no money, (ii) can only borrow from IAI or Pegasus, (iii) the shareholders have the right to the same terms and conditions as Pegasus and IAI through a rights offering and (iv) ImageSat received a fairness opinion.

66.   E-mail messages and registered mail communications from Curacao counsel for ImageSat to ImageSat shareholders dated March 14, 2006 transmitting a Notice and Convocation of an Extraordinary General Meeting of ImageSat shareholders scheduled for March 29, 2006.  This communication transmitted, among other things, a fairness opinion provided by Morgan Joseph & Co. and unaudited financial statements for 2005 through the third quarter. opinion and financials up to the third-quarter of 2005, which documents were false and misleading and include false, misleading, and deceptive capitalization tables as well as false and misleading assumptions used as the basis for inducing the shareholders to approve the transaction.

67.   E-mail message from Shimon Eckhaus to Wilson dated March 17, 2006 regarding the proposed agreement between ImageSat and Venezuela, in which Eckhaus falsely and misleadingly states that *"…USA will say NO – it will be NO"* (emphasis added) in violation of prior written commitments and representations concerning IMOD licensing policy related to the sale of ImageSat's SOP Program.

68.   Upon information and belief, e-mail messages dated on or about May 31, 2006, transmitting minutes Audit Committee and Board of Directors meetings in which ImageSat fraudulently represents that write off of 2001 EROS B/C is due to a change in the Company's strategy that is no longer compatible with deploying the EROS B/C satellite.

69.   Registered mail communications from ImageSat's Curacao counsel in Curacao to ImageSat shareholders dated August 11, 2006, requesting shareholder approval of ImageSat's 2005 financial statements, which included the write-off of the entire

8

$33 million remaining on the 2001 EROS B/C investment and thereby culminating the fraud surrounding this satellite.

70. E-mail message from Hagai Goren to investor representatives, James DePalma, *et al.* dated September 13, 2006 regarding Audit Committee meetings and attaching minutes of the July 18, 2006 meeting.

71. E-mail message and registered mail communication from Curacao counsel to ImageSat (de Vries) to ImageSat shareholders dated October 26, 2006, transmitting a Notice and Convocation of an Extraordinary General Meeting of ImageSat shareholders to be held November 15, 2006.

72. E-mail messages between Shimon Eckhaus, Stephen Wilson, and counsel for ImageSat between November 29 and December 4, 2006, in which Eckhaus and ImageSat falsely and misleadingly state that the ImageSat Board had decided not to pursue matters in Venezuela without a response to the President of Venezuela's investment and SOP contract proposal.

73. E-mail messages and other communications concerning IAI's announced transaction with Northrop-Grumman, more specific information as to which is not within Plaintiffs' possession at this time.

74. E-mail message from ImageSat's corporate counsel in Curacao to ImageSat's shareholders, dated June 19, 2007, transmitting Notice and Convocation of the Annual General Meeting of Shareholders to be held on July 5, 2007, with all exhibits thereto including:
    a. ImageSat International NV signed 2006 annual financial statements
    b. Exhibit 1A (Second Amended and Restated EROS B Contract)
    c. Exhibit 1B (Amendment 1 to EROS C Contract)
    d. Exhibit 1C (Amendment No.2 to EROS C)
    e. Exhibit 2A (Master Agreement)
    f. Exhibit 2B (Amendment No. 1 to the Master Agreement)
    g. Exhibit 3 (email of May 6, 2007 from Rudi Heilpern)
    h. Exhibit 4 (letter May 7, 2007 from Imaging to ISI)
    i. Exhibit 5 (letter May 7, 2007 Imaging to IAI)
    j. Exhibit 6 (letter May 17 2007 IAI to ISI)
    k. Exhibit 7 (letter may 27, 2007 IAI to Imaging)
    l. Exhibit 8 (letter May 23, 2007 Imaging to ISI)
    m. Exhibit 9 (letter May 15, 2007 from counsel for Plaintiffs to ISI)
    n. Exhibit 10 (letter June 14, 2007 IAI to ISI)
    o. Exhibit 11 (letter June 20, 2006 ISI to IAI)
    p. Exhibit 12 (letter September 10, 2006 IAI to ISI)
    q. Exhibit 13 (letter November 20, 2006 IAI to ISI)
    r. Exhibit 14 (letter January 4, 2007 IAI to ISI)