**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- X
                                               :

STEPHEN M. WILSON, *et al.*                 :

                                         :      **Filed Electronically**

                       Plaintiffs,          :

                                           :

            -against-                  :

                                                   07 Civ. 6176 (LTS) (DFE)

IMAGESAT INTERNATIONAL N.V., *et al.*     :

                       Defendants.        :

                                               :

------------------------------------------------------------- X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF IMAGESAT**
**INTERNATIONAL N.V., ISRAEL AEROSPACE INDUSTRIES LTD., ELBIT SYSTEMS**
**LTD., MOSHE KERET, IZHAK NISSAN, JACOB WEISS, SHIMON ECKHAUS, GINO**
**PIPERNO-BEER, DAVID ARZI, YOAV CHELOUCHE, MICHAEL FEDERMANN,**
**ESTATE OF JACOB TOREN, JOSEPH ACKERMAN, JOSEPH GASPAR AND**
**YEHOSHUA ELDAR'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

TABLE OF AUTHORITIES ................................................................................. iv

I.   THE COMPLAINT SHOULD BE DISMISSED ON GROUNDS OF *FORUM NON CONVENIENS* .............................................................................. 1

    A.   Plaintiffs' Choice of This Forum is Not Entitled to Significant Deference ............ 2

        1.   As the Israeli Ministry of Defense Has Stated, the Government of Israel Has a Strong Interest in Having This Case Litigated in Israeli Courts ................................................................................ 2

        2.   Plaintiffs Invested in a Company Based in Israel ....................................... 3

        3.   The Contracts Relevant to this Lawsuit Contain Israeli Choice of Law and Forum Provisions .......................................................... 3

    B.   Plaintiffs Do Not Dispute that Israel is an Adequate Forum ................................. 4

    C.   The Balance of Factors Favors Litigation in Israel ................................................ 7

        1.   The Private Interest Factors Favor Litigation in Israel ............................... 7

        2.   The Public Interest Factors Favor Litigation in Israel ................................ 9

    D.   Defendants Do Not Object to a Dismissal With Conditions ................................. 10

II.   THE COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION ................... 11

III.   PLAINTIFFS DO NOT HAVE STANDING ON THE MAJORITY OF THEIR CLAIMS .................................................................................... 12

    A.   Plaintiffs' Declarations Confirm that Shareholders in an Antilles Corporation Cannot Assert Claims for Injury to the Company ........................... 12

    B.   Netherlands Antilles Law Governs Plaintiffs' Standing ....................................... 14

IV.   THE WARRANT/OPTION HOLDERS LACK STANDING ........................................ 16

V.   PLAINTIFFS' CAUSES OF ACTION FOR CONVERSION, UNJUST ENRICHMENT AND DISGORGEMENT MUST ALL BE DISMISSED ..................... 17

    A.   Plaintiffs Have No Standing to Bring These Claims ............................................ 17

    B.   Plaintiffs' Claim for Conversion Must Also be Dismissed Because it Identifies No Specific Property Alleged to Have Been Converted ....................... 18

- ii -

C.    Plaintiffs' Claim for Unjust Enrichment is Duplicative of Their Claims for Breach of Contract and Breach of Fiduciary Duty ................................................ 19

VI.    PLAINTIFFS LACK RICO STANDING AND HAVE NOT ADEQUATELY ALLEGED A PATTERN OF RACKETEERING ........................................................... 19

A.    Plaintiffs Have Not Pleaded That Their Injuries Are Anything Other Than Derivative of Injuries to ImageSat ......................................................................... 19

B.    The Complaint Does Not Allege a Pattern of Racketeering ................................ 21

VII.    PLAINTIFFS' FIRST CLAIM (BREACH OF FIDUCIARY DUTY IN THE 2000 TRANSACTION) IS TIME-BARRED ............................................................................ 22

VIII.    THE REFORMATION AND FRAUD CLAIMS (17 AND 18) FAIL ........................... 23

A.    The Reformation and Fraud Claims Are Time-Barred ......................................... 23

B.    The Fraud Claim (Claim 18) Fails ...................................................................... 24

IX.    PLAINTIFFS LACK STANDING ON THE CLAIM FOR DISGORGEMENT OF COMPENSATION (CLAIM 20) .................................................................................... 25

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adena, Inc. v. Cohn,*
   162 F. Supp. 2d 351 (E.D. Pa. 2001) ...................................................................... 21

*Albany Plattsburgh United Corp. v. Bell,*
   763 N.Y.S.2d 119 (App. Div. 2003) ................................................................. 13, 18

*Alfadda v. Fenn,*
   159 F.3d 41 (2d Cir. 1998) ...................................................................................... 5

*Bankers Trust Co. v. Rhoades,*
   859 F.2d 1096 (2d Cir. 1988) ................................................................................. 21

*Beck v. Prupis,*
   162 F.3d 1090 (11th Cir. 1998) ........................................................................ 20, 21

*Bohn v. Bartels,*
   No. 06 Civ. 1390 (PKL), 2007 WL 4334667 (S.D.N.Y. Dec. 13, 2007) .................... 2

*BRS Assocs., L.P. v. Dansker,*
   246 B.R. 755 (Bankr. S.D.N.Y. 2000) ................................................................... 21

*Carnegie-Mellon Univ. v. Cohill,*
   484 U.S. 343 (1988) ................................................................................................ 12

*Carr v. Equistar Offshore, Ltd.,*
   No. 94 Civ. 5567 (DLC), 1995 WL 562178 (S.D.N.Y. Sept. 21, 1995) .................. 21

*Cedar Swamp Holdings, Inc. v. Zaman,*
   487 F. Supp. 2d 444 (S.D.N.Y. 2007) .................................................................... 22

*Conwill v. Arthur Andersen LLP,*
   No. 602023/05, 2006 WL 1703621 (N.Y. Sup. Ct. Jul. 21, 2006) .......................... 17

*Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.,*
   113 F.3d 308 (2d Cir. 1997) ................................................................................... 22

*Cresswell v. Sullivan & Cromwell,*
   922 F.2d 60 (2d Cir. 1990) ..................................................................................... 11

*Crosstown Songs UK, Ltd. v. Spirit Music Group, Inc.,*
   513 F. Supp. 2d 13 (S.D.N.Y. 2007) ........................................................................ 9

*Cyberlease, LLC v. JP Morgan Chase Bank,*
   No. 04 Civ. 1221 (NRB), 2005 WL 2030317 (S.D.N.Y. Aug. 22, 2005) ............... 18

*DeFalco v. Bernas,*
   244 F.3d 286 (2d Cir. 2001) ................................................................................... 22

*Dewan v. Blue Man Group L.P.,*
   73 F. Supp. 2d 382 (S.D.N.Y. 1999) ...................................................................... 24

NY2:#4781942

*Diversified Grp., Inc. v. Daugerdas*,
  139 F. Supp. 2d 445 (S.D.N.Y. 2001) .................................................................... 19

*Dombroski v. Samaritan Hosp.*,
  864 N.Y.S. 2d 430 (Sup. Ct. 2007) ........................................................................ 24

*Drenis v. Haligiannis*,
  452 F. Supp. 2d 418 (S.D.N.Y. 2006) .................................................................... 15

*Dujardin v. Liberty Media Corp.*,
  359 F. Supp. 2d 337 (S.D.N.Y. 2005) .................................................................... 26

*EBC I, Inc. v. Goldman Sachs & Co.*,
  832 N.E. 2d 26 (N.Y. 2005) .................................................................................... 17

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ................................................................................................ 15

*Entel v. Guilden*,
  223 F. Supp. 129 (S.D.N.Y. 1963) ......................................................................... 16

*Evercrete Corp. v. H-Cap Ltd.*,
  429 F. Supp. 2d 612 (S.D.N.Y. 2006) .................................................................... 21

*F.D.I.C. v. Five Star Mgmt.*,
  692 N.Y.S.2d 69 (App. Div. 1999) ......................................................................... 23

*GICC Capital Corp. v. Tech. Fin. Group, Inc.*,
  67 F.3d 463 (2d Cir. 1995) ..................................................................................... 22

*Greenwald v. ORB Commc'ns & Mktg., Inc.*,
  192 F. Supp. 2d 212 (S.D.N.Y. 2002) .................................................................... 12

*Gunter v. Ridgewood Energy Corp.*,
  32 F. Supp. 2d 166 (D.N.J. 1998) .......................................................................... 21

*Haggiag v. Brown*,
  728 F. Supp. 286 (S.D.N.Y. 1990) ......................................................................... 21

*Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*,
  No. 04 Civ. 3318 (LAP), 2005 WL 736217 (S.D.N.Y. Mar. 30, 2005) .................. 26

*Hausman v. Buckley*,
  299 F.2d 696 (2d Cir. 1962) ................................................................................... 16

*Henneberry v. Sumitomo Corp. of America*,
  No. 04 Civ. 2128 (PKL), 2007 WL 2068346 (S.D.N.Y. July 12, 2007) ................. 16

*Herrick Co., Inc. v. SCS Commc'ns, Inc.*,
  251 F.3d 315 (2d Cir. 2001) ................................................................................... 11

*Highland Capital Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................................................... 12

*Hoatson v. New York Archdiocese*,
  No. 05-CV-10467 (PAC), 2007 WL 431098 (S.D.N.Y. Feb. 8, 2007) ................... 19

- v -

*In re Bailo*,
   16 Misc.3d 1106(A) (N.Y. Sup. June 29, 2007) ........................................................ 24

*In re BMW of N. Am., LLC v. Gesmundo*,
   824 N.Y.S.2d 760 (Sup. Ct. 2006) ............................................................................. 24

*In re Gucci*,
   126 F.3d 380 (2d Cir. 1997) ....................................................................................... 12

*Kaszirer v. Kaszirer*,
   730 N.Y.S.2d 87 (App. Div. 2001) ............................................................................ 22

*Kirch v. Liberty Media Corp.*,
   No. 4 Civ. 667 (NRB), 2006 WL 3247363 (S.D.N.Y. Nov. 8, 2006) ........................ 2

*Kostolany v. Davis*,
   Civ. A. No. 13299, 1995 WL 662683 (Del. Ch. Nov. 7, 1995) ................................. 14

*LaSala v. Bank of Cyprus Public Co.*,
   510 F. Supp. 2d 246 (S.D.N.Y. 2007) ......................................................................... 9

*Lehman Gov't Sec. v. Pickholz*,
   No. 95 Civ. 7744 (LMM), 1996 WL 447995 (S.D.N.Y. Aug. 8, 1996) .................... 11

*Leonard F. v. Israel Discount Bank of N.Y.*,
   199 F.3d 99 (2d Cir. 1999) ......................................................................................... 20

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003) ....................................................................................... 12

*Local 875 I.B.T. Pension Fund v. Pollack*,
   992 F. Supp. 545 (E.D.N.Y. 1998) ............................................................................ 22

*Locals 302 & 612 of the Int'l Union of Operating Eng'rs v. Blanchard*,
   No. 04 Civ. 5954 (LAP), 2005 WL 2063852 (S.D.N.Y. Aug. 25, 2005) .................. 15

*Maiz v. Virani*,
   253 F.3d 641 (11th Cir. 2001) .................................................................................... 21

*Manson v. Stacescu*,
   11 F.3d 1127 (2d Cir. 1992) ....................................................................................... 20

*Meadowlands Invs., LLC v. CIBC World Mkts. Corp.*,
   No. 04 Civ. 7328 (DAB), 2005 WL 2347856 (S.D.N.Y. Sept. 22, 2005) ................. 26

*Montefiore Med. Ctr. v. Am. Protection Ins. Co.*,
   No. 00 Civ. 3235 (LTS) (MHD), 2003 WL 21108261 (S.D.N.Y. May 14, 2003) ....... 26

*Nagel v. AIG Life Ins. Co.*,
   No. 94 Civ. 1035 (RPP), 1994 WL 406045 (S.D.N.Y. July 29, 1994) ...................... 26

*NatTel, LLC v. SAC Capital Advisors*,
   No. 3-04 CV1061, 2005 U.S. Dist. LEXIS 20179 (D. Conn. Sept. 16, 2005) ......... 15

*New York City Econ. Dev. Corp. v. T. C. Foods Imp. & Exp.*,
   No. 5856/00, 2006 WL 1132350 (N.Y. Sup. Ct. Apr. 17, 2006) .............................. 18

NY2:#4781942

*O'Neill v. Warburg, Pincus & Co.*,
    833 N.Y.S.2d 461 (App. Div. 2007) ............................................................... 13

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998) ........................................................................... 24

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ........................................................... 15

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ....................................................................................... 5

*Priestley v. Comrie*,
    No. 07 CV 1361 (HB), 2007 WL 4208592 (S.D.N.Y. Nov. 27, 2007) .................. 14

*PT United Can Co. v. Crown Cork & Seal Co.*,
    138 F.3d 65 (2d Cir. 1998) ............................................................................. 5

*Rabin v. Mony Life Ins. Co.*,
    No. 06 Civ. 775 (LTS) (KNF), 2007 WL 737474 (S.D.N.Y. Mar. 8, 2007) ........... 17

*Ray Larsen Assoc., Inc. v. Nikko Am., Inc.*,
    No. 89 Civ. 2809 (BSJ), 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) .................... 22

*Ruffolo v. Oppenheimer & Co.*,
    987 F.2d 129 (2d Cir. 1993) ......................................................................... 26

*Sabbatini v. Galati*,
    842 N.Y.S.2d 539 (App. Div. 2007) ............................................................... 24

*Sadat v. Mertes*,
    615 F.2d 1176 (7th Cir. 1980) ...................................................................... 11

*Seybold v. Groenink*,
    No. 06 Civ. 772 (DLC), 2007 WL 737502 (S.D.N.Y. Mar. 12, 2007) ............. 14, 16

*SKS Constructors, Inc. v. Drinkwine*,
    458 F. Supp. 2d 68 (E.D.N.Y. 2006) ............................................................. 22

*Spanierman Gallery, PSP v. Love*,
    No. 03 Civ. 3188 (VM), 2003 WL 22480055 (S.D.N.Y. Oct. 31, 2003) ............... 19

*Stephens v. National Distillers & Chem Corp.*,
    No. 91 Civ. 2902 (JSM), 1996 WL 271789 (S.D.N.Y. May 21, 1996) ................... 15

*Strategic Value Master Fund v. Cargill Fin. Serv., Corp.*,
    421 F. Supp. 2d 741 (S.D.N.Y. 2006) ............................................................. 3

*The Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments Ltd.*,
    154 F. Supp. 2d 682 (S.D.N.Y. 2001) ............................................................ 22

*Walco Invs., Inc. v. Thenen*,
    947 F. Supp. 491 (S.D. Fla. 1996) ................................................................. 21

*Whitman Realty Grp., Inc. v. Galano*,
    838 N.Y.S.2d 585 (App. Div. 2007) ............................................................... 18

- vii -

*Winn v. Schafer*,
    499 F. Supp. 2d 390 (S.D.N.Y. 2007) ................................................................. 14

*Zumpano v. Quinn*,
    816 N.Y.S.2d 703 (2006).......................................................................................... 24

## STATUTES

18 U.S.C. § 1962(c) ................................................................................................... 22

28 U.S.C. § 1332(a) ................................................................................................... 11

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ............................................................................................. 18, 19

Fed. R. Civ. P. 12(b)(6).............................................................................................. 12

## RULES

Restatement (Second) of Conflict of Laws §§ 304, 306................................................ 15

Restatement (Second) of the Foreign Relations Law of the United States § 171(c)(ii)
    (1965).................................................................................................................. 11

NY2:#4781942

I.    **THE COMPLAINT SHOULD BE DISMISSED ON GROUNDS OF** *FORUM NON CONVENIENS*[1]

We showed in our moving brief that this case centers on Israel and involves almost no meaningful contact with New York.  Plaintiffs' response to this showing -- largely based on fundraising meetings in New York held nearly a decade ago and choice of law clauses in contracts on which Plaintiffs' claims are not based -- is patently insufficient.

The case for dismissal is further strengthened by a recent letter to IAI from the Israeli Ministry of Defense ("IMOD"), expressing IMOD's "strong interest that this case not be litigated before any foreign tribunal and that, if it will be litigated, it should proceed before an Israeli tribunal."  (Letter dated 12 March 2008 from Pinchas Buchris, Director General, IMOD to Itzhak Nissan, President and CEO of IAI ("IMOD Letter"), at 2 attached to the Decl. of Eric S. Goldstein, Esq. ("Goldstein Decl.") as Ex. A.)  As the IMOD Letter notes, the Complaint implicates the sensitive security interests of Israel, as well as the policies, regulatory activities, and decision-making of IMOD itself.  The IMOD Letter further notes that discovery may well call for information relating to Israeli national security and other sensitive governmental information.  As the letter states (and as confirmed by the accompanying Declaration of Yair Sherman ("Sherman Decl.") and by the Supplemental Declaration of Dror Vigdor ("Vigdor Supp. Decl.")), Israeli courts have established procedures for handling such classified or sensitive information.

The probability that discovery will touch on classified or sensitive information justifies dismissal in favor of Israel for additional reasons.  As set forth in the Sherman Decl. and in the accompanying Declaration of Arie Halsband ("Halsband Decl."), this circumstance will require extraordinary efforts in discovery to avoid revealing such information.  It will also severely handicap Defendants' ability to present relevant evidence in their defense and to communicate with their counsel.

---

[1]    Defendants' Motion to Dismiss and Joint Memorandum of Law in Support of the Motion to Dismiss, filed on October 15, 2007, were directed at the original complaint in this action.  On March 17, 2008, Plaintiffs filed the First Amended Complaint ("Compl.").  Each ground for dismissal and argument raised in the Joint Memorandum applies equally to the allegations in the First Amended Complaint.

A.     **Plaintiffs' Choice of This Forum is Not Entitled to Significant Deference**

       1.     **As the Israeli Ministry of Defense Has Stated, the Government of Israel Has a Strong Interest in Having This Case Litigated in Israeli Courts**

The Israel-centered nature of this lawsuit warrants dismissal in favor of an Israeli forum.[2] (*See* Jt. Br. at 6-9.)[3]  Plaintiffs allege that two Israel-based corporations (one owned by the Israeli government) and their representatives (all but one of whom are located in Israel) breached their fiduciary duties to ImageSat, a company based in Tel Aviv.  Defendants did so, Plaintiffs allege, to further the national interests of the State of Israel (and IMOD in particular), and to serve the "geopolitical and strategic concerns of the IMOD and senior IMOD personnel" (Compl. ¶ 149; *see also id.* ¶¶ 122, 125, 128, 177).

Based upon these and similar allegations, the IMOD has expressed the strong view that this action is more appropriately litigated in Israel.  In the IMOD Letter, the IMOD, after reviewing the Complaint, stated:

> [I]t appears from the allegations in the Complaint that one of the major areas of focus in this litigation would be the policies, regulatory activities and decision-making of the GOI-MOD [*i.e.*, Government of Israel-Ministry of Defense] in the area of export control and sensitive technology and with particular reference to sophisticated imaging technology.  Any  judicial review of such allegations would appear to entail consideration of the internal policy deliberations and foreign policy activities of the GOI-MOD in fundamental areas affecting the sovereignty, national security and foreign relations interests of the State of Israel.

---

[2]     Plaintiffs' focus on the location of investment meetings in the mid and late 1990s misses the point (Opp. at 18-20).  Those meetings are not mentioned in the Complaint, and if this lawsuit were based on them it would be time-barred.  These decade-old meetings are irrelevant to this lawsuit and do not change the fact that ImageSat conducts no business and has no customers in the U.S.  (*See* Decl. of Hagai Goren in Supp. of ImageSat International N.V.'s Mot. to Dismiss ("Goren Decl.") at ¶¶ 7-18.)  Indeed, in contrast to the picture painted in Plaintiffs' opposition brief, the First Amended Complaint describes ImageSat as a "small and captive (though uniquely valuable) Israeli company based entirely in, and primarily serving constituencies, in Israel" (Compl. ¶ 17).

[3]     *See also Kirch v. Liberty Media Corp.*, No. 4 Civ. 667 (NRB), 2006 WL 3247363, at *4 (S.D.N.Y. Nov. 8, 2006) ("[P]laintiffs' choice of this forum is not to be afforded great deference, in light of the inherently German nature of this dispute."); *Bohn v. Bartels*, No. 06 Civ. 1390 (PKL), 2007 WL 4334667, at *10 (S.D.N.Y. Dec. 13, 2007) ("[A]lthough the parties are United States citizens, this case is at heart a Portuguese one.  Consideration of the public interest factors reflects this and therefore weighs heavily in favor of dismissal.").

To the extent that any judicial review of such deliberations and activities of the GOI-MOD would take place, *we strongly believe that such judicial review should not take place in a foreign tribunal, but, rather, before an Israeli tribunal*, which has in place well-established mechanisms for presenting, reviewing and protecting classified or otherwise sensitive Israeli governmental information.  (IMOD Letter at 1 (emphasis added).)

### 2.    Plaintiffs Invested in a Company Based in Israel

Plaintiffs discourse at length about which of them live in or close to the U.S. or "travel to the Western Hemisphere frequently," (Opp. at 16)[4] but they do not address the numerous cases (Jt. Br. at 2, 5) holding that when investors in a foreign company bring a lawsuit against the company their choice of U.S. forum is entitled to minimal deference.  When, as here, plaintiffs choose to sue Israeli corporations and their Israel-based representatives, based on an investment in an Israel-based company, it is "reasonable to expect that a dispute resulting from the transaction will be adjudicated in the forum in which the adversary resides."  *Strategic Value Master Fund v. Cargill Fin. Serv., Corp.*, 421 F. Supp. 2d 741, 773 (S.D.N.Y. 2006).

Plaintiffs' claim that "[t]his Court represents the Plaintiffs' 'home forum' for purposes of the *forum non conveniens* analysis" (Opp. at 12) is inaccurate.  As Plaintiffs concede, nine of the 15 Plaintiffs are based outside the U.S.  (*Id.* at 13.)  Of the six U.S.-based plaintiffs, only two are based in New York, and these two plaintiffs should not factor significantly in the deference analysis because they hold only expired warrants.  (Jt. Br. at 5.)  Plaintiffs have not cited, and Defendants are not aware of, any case holding that a U.S. forum is considered the home forum for the plaintiffs when the majority of them are located outside the U.S.

### 3.    The Contracts Relevant to this Lawsuit Contain Israeli Choice of Law and Forum Provisions

Plaintiffs rely on years-old, irrelevant agreements -- to which, in virtually all cases, they are not parties -- that contain New York choice of law and/or choice of forum provisions.

---

[4]    For example, Plaintiffs submit several declarations trying to prove that WIS Partners, which "has the largest economic stake in this litigation out of any of the Plaintiffs" (Opp. at 14) has significant U.S. connections.  In the First Amended Complaint, however, Plaintiffs refer to "the European investor group WIS Partners".  (Compl. ¶ 62.)

Plaintiffs argue that "some of the claims" of certain plaintiffs are governed by these agreements (Opp. at 27), but they never specify which claims they are referring to, and, in fact, the agreements with New York choice of law or choice of forum provisions are not at issue. Hence, those provisions do not factor into the choice of law analysis.[5]

In contrast, numerous ImageSat agreements directly relevant to this lawsuit contain *Israeli* choice of law and choice of forum clauses. For example, the satellite supply contracts for the principal satellites at issue contain Israeli choice of law clauses and provide that disputes regarding the agreements are to be arbitrated exclusively in Israel. (*See, e.g.,* Decl. of Sander Bak, Esq. ("Bak Decl.") Exs. 1-4.) One of those agreements, the Second Amended and Restated EROS B Satellites Supply Contract ("EROS B SSC"), is the subject of an entire section of the First Amended Complaint (¶¶ 88-112), and is the basis for Plaintiffs' Fourteenth Claim for Relief (*id.* ¶¶ 317-332).[6] Plaintiffs annexed portions of the EROS B SSC to the Complaint -- but not the Israeli choice of law and arbitration provisions. Likewise, the Bank Credit Agreement between ImageSat and Bank Leumi and related agreements from the July 2001 financing, which are also subjects of Plaintiffs' claims (*id.* ¶¶ 89, 101), contain Israeli choice of law and choice of forum provisions. (*See* Credit Agreement dated July 25, 2001 between ImageSat International N.V. and Bank Leumi Le-Israel at 69-70, attached as Ex. 5 to the Bak Decl.)

### B.     Plaintiffs Do Not Dispute that Israel is an Adequate Forum

It is undisputed that Israel is an adequate forum. (Jt. Br. at 9-10; Opp. at 12 n.5.) Plaintiffs argue only that Israel is not an "appropriate" forum because they "would suffer serious

---

[5]     The joint venture agreements (cited in Opp. at 26) are mentioned briefly in the Complaint but they are not invoked in any of Plaintiffs' causes of action. The Securityholders Agreement dated July 25, 2000 (cited in Opp. at 27) is signed by only one plaintiff (WIS Partners) and is relevant only to Plaintiffs' claim (Compl. ¶¶ 66-67) that the board should consist of two additional independent directors, which also is not invoked in any of Plaintiffs' causes of action.

[6]     Although Plaintiffs are not signatories to the EROS B SSC, they argue that they may sue derivatively on ImageSat's behalf for an alleged breach of this agreement or that they are intended third-party beneficiaries of this agreement. (Opp. at 111-112.) Defendants dispute Plaintiffs' standing to sue for breach of this agreement, but if Plaintiffs' claim may proceed then they must be bound by all terms of the agreement, including its choice of law and forum provisions. If it is determined that Plaintiffs may allege a breach of this agreement, Defendants reserve the right to move to compel arbitration in Israel.

handicaps should they be required to re-file this suit in Israel" (Opp. at 12 n.5), but they identify no such handicaps. It is irrelevant to *forum non conveniens* that an Israeli court would not recognize RICO claims,[7] and while it may be that Plaintiffs' U.S. lawyer has spent significant time on this case, that is undoubtedly true in any *forum non conveniens* dismissal. It is even less relevant here where Plaintiffs have also retained Israeli counsel. (*See* Weiss Tr. at 2, attached as Ex. P to the Decl. of Ira Brad Matetsky, Esq. (reflecting that "Plaintiffs' Israeli counsel, Mr. Joseph Tamir" participated in the jurisdictional depositions).)

The IMOD Letter makes clear that Israeli courts are a preferable forum for addressing the issues raised in the Complaint. As the IMOD Letter notes:

> Because of the nature of the assertions made in the Complaint, discovery may be sought with respect to sensitive Israeli governmental information, whether in the possession of agencies of the Government of Israel, potential witnesses, or any of the defendants in this case. … [I]f this case were to be heard before an Israeli court, with its mechanisms for accommodating such situations, issues relating to such information are likely to be handled more efficiently, potentially allowing for the release of more information. (IMOD Letter, at 2.)

Likewise, Messrs. Sherman and Halsband explain that, because the Complaint implicates information that is subject to Israeli official secrets laws, discovery in a U.S. court will impose significant delays on all parties, and significant impediments on the ability of defendants to marshal relevant evidence in their defense. (Halsband Decl. ¶¶ 6-7; Sherman Decl. ¶¶ 9-12) As Mr. Halsband explains, "[t]he Complaint contains allegations that implicate classified information that [Defendants] are not permitted to discuss even with [their] own lawyers. This creates a significant obstacle for [Defendants] because information necessary to defend against these allegations is classified." (Halsband Decl. ¶ 6.) Disclosure of this information, absent government approval, is a violation of Israel's Official Secrets Act and is punishable by

---

[7]    *See PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998) (affirming *forum non* dismissal and noting that Indonesia was an adequate forum even though it has no RICO statute); *see also Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir. 1998) ("That the law of the foreign forum differs from American law 'should ordinarily not be given conclusive or even substantial weight' in assessing the adequacy of the forum." (*quoting Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247 (1981)).

imprisonment.  (Sherman Decl. ¶ 6; *see also* Vigdor Supp. Decl. ¶¶ 13-16 (describing security

procedures applied by Israeli courts to protect matters of national security or foreign affairs).)

Citing precisely these reasons, plaintiff Moshe Bar-Lev repeatedly refused at his recent

jurisdictional deposition to answer questions about matters central to this case.  (Bar-Lev Tr. 26:

13-23 attached to Bak Decl. as Ex. 9.)  Mr. Bar-Lev, a key witness in this case (Compl. ¶ 27),

testified:

> Q.    Why did Israel initiate a space program in the early 1980s?
> A.    I am not sure that I am at liberty okay to disclose all the facts for that.
>
> Q.    Because of sensitive information?
> A.    Because of sensitive information, yes.
>
> Q.    Affecting the national security interests of Israel?
> A.    That is correct.  Or may have.  (Bar-Lev Tr. at 26.)
>
>       . . .
>
> Q.    Why was it that Israel decided to pursue its own development [of an earth observation satellite] rather than purchase one from another country?
> A.    I don't think I will answer that.
>
> Q.    Would you say that again?
> A.    I will not answer that question.  I consider it to be sensitive.
>
> Q.    With respect to the national security interests of Israel?
> A.    Right. (*Id.* at 28-29.)
>
>       . . .
>
> Q.    They were all launched from the Shavit launcher in Israel, correct?
> A.    They were launched by an Israeli launcher from Israel in Shavit.  I am not – I am familiar with the name.  It is not the right name.
>
> Q.    What is the right name, sir?
> A.    I am not at liberty to say that.
>
> Q.    Because it affects the national security of Israel?
> A.    Yes. (*Id.* at 29.)
>
>       . . .
>
> Q.    Do you know who financed the technology for Israel to obtain space technology?
> A.    Yes.
>
> Q.    Who was that?

A.      I am not at liberty to disclose that.

Q.      Because it affects the national security interests of Israel?
A.      Yes.  (*Id.* at 31.)

        . . .

A.      Let me make a statement at this point.

. . .    You have to realize that I am in a very sensitive position.  Okay? Because I have
        to defend the security of Israel and also the interest of IAI which is interwoven,
        okay, with the security of Israel in one way or the other.  The last thing I want to
        do is to expose, okay, the possibility whether individuals, organizations or
        processes, okay.  This is why I am avoiding, okay, those questions.  With your
        permission.  Okay.  (*Id.* at 41.)

Although U.S. courts have mechanisms for adjudicating cases that involve confidential

material, the significant amount of evidence that will involve material confidential to a foreign

government and sensitive to its national security interests make this case inappropriate to be

litigated in this forum.  Israeli courts have well-established procedures for "protecting the

security and integrity of the information while, at the same time, permitting both parties access to

necessary information."  (Sherman Decl. ¶ 13; *see also* Vigdor Decl. ¶¶ 13, 16; IMOD Letter at

1-2.)

     **C.      The Balance of Factors Favors Litigation in Israel**

          **1.      The Private Interest Factors Favor Litigation in Israel**

Contrary to Plaintiffs' unsupported assertion that "the parties with crucial testimony are

not all available to testify in Israel"[8] (Opp. at 30), the individuals with the most crucial testimony

are the parties, the overwhelming majority of whom are in Israel.  The three Israeli Plaintiffs --

Bar-Lev, Rosenbaum, and Yifrah -- are among the most critical witnesses.  (Compl. ¶¶ 27, 28 &

---

[8]      Plaintiffs identify no such individual but may be referring Mr. Wilson's statement that Omar Jaffrey, an
investment banker who worked with ImageSat on a potential IPO, "declined all invitations to visit Israel" (Wilson
Decl. ¶ 37).  In fact, Mr. Jaffrey traveled to Israel on several occasions in connection with his work for ImageSat.

30.)[9]  All but one of the individual defendants are Israeli citizens, and all three corporate defendants are based in Israel (including their representatives who will have to testify).[10]

Israel is also a more convenient forum for crucial non-party witnesses.[11]  (Jt. Br. at 10-12.)  As the IMOD Letter notes, there are "frequent references in the Complaint to alleged activities of various parties in connection with the GOI-MOD, including alleged activities or decisions of the GOI-MOD itself."  (IMOD Letter at 1.)  Among other things, resolution of this lawsuit will require testimony from Israeli government officials regarding:

- IMOD's decision to place limitations on ImageSat's activities as a condition to commercialization of Ofeq Technology (Compl. ¶ 63) and to begin granting Satellite Operating Partner ("SOP") export licenses.  (Id. ¶ 64.)

- The nature of the IMOD Ofeq design allegedly rejected by ImageSat.  (Id. ¶ 103.)

- The political interests of the IMOD that allegedly caused Defendants to withdraw the Taiwan and Angola export licenses.  (Id. ¶¶ 6,12, 26,127-28.)

- The national agenda of the IMOD such that it affected ImageSat's actions with respect to customers generally (id. ¶ 122) and the nature of the relationship between IMOD and ImageSat.  (Id. ¶¶ 230(l), 250(i), 263.)

- IMOD's interests in not permitting satellite services with Taiwan.  (Id. ¶ 125.)

- The IMOD's need to replace the Ofeq 5 satellite in 2004.  (Id. ¶ 103.)

- The compatibility of EROS C with the IMOD requirements.  (Id. ¶¶ 107, 211(h).)

---

[9]      By contrast, the only two plaintiffs who live in New York -- Messrs. Moshel and Talansky -- were never affiliated with, or held shares of, ImageSat.  (Id. ¶¶ 33, 34.)

[10]      Plaintiffs' reliance on a passing statement by defendant Moshe Keret that New York is a convenient place to travel (Opp. at 17) is misplaced.  Mr. Keret is in his seventies and has lived in Israel his entire life.  (Keret Decl. ¶ 5.)  He has never lived in, or owned property in, the United States.  (Id. ¶¶ 9-11.)  The fact that on occasion he traveled to New York for ImageSat Board meetings scarcely demonstrates that it would be more convenient for this retired native Israeli to litigate a lawsuit in a forum six thousand miles from his home rather than in Israel.

[11]      Plaintiffs point out that their initial disclosures listed 74 individuals and 42 of them reside in New York (Opp. at 22), but they did not include on that list the parties to this lawsuit or their employees -- the overwhelming majority of whom are based in Israel.  Furthermore, the fact that Plaintiffs came up with 42 names of U.S.-based individuals has little significance where they did so for the transparent purpose of countering an anticipated *forum non conveniens* motion.

- The reasons why IMOD caused ImageSat to reject the Venezuelan proposals. (*Id*. ¶¶ 145, 147, 145, 148.).

- The nature of the terms of the bilateral IMOD U.S. government remote sensing policy agreement of 1998.  (*Id*. ¶ 148.)

Israeli government officials are highly unlikely to be available to testify about these matters in the U.S.  By contrast, as the IMOD Letter states, litigation in an Israeli court will be subject to existing procedures for the handling of sensitive information, "potentially allowing for the release of more information."  (IMOD Letter at 2; *see also* Vigdor Supp. Decl. ¶¶ 13-16.)

Finally, the overwhelming number of documents that will have to be produced during discovery are documents maintained in Israel by the three corporate defendants and the three crucial Israeli plaintiffs.  (*See* Jt. Br. 10.)[12]  Additionally, for IAI, "before any document can be released in this case -- even to IAI's retained counsel in New York -- it must be reviewed by IAI personnel who have the appropriate security clearance."  (Sherman Decl. ¶ 11; *see also* Halsband Decl. ¶ 7.)[13]  Production of those documents would be facilitated if this case were in an Israeli court.  (Sherman Decl. ¶ 13; Halsband Decl. ¶ 7.)

### 2.    The Public Interest Factors Favor Litigation in Israel

Israel, of course, has a substantial interest in regulating companies operating within its borders.  *See LaSala v. Bank of Cyprus Public Co.*, 510 F. Supp. 2d 246, 262 (S.D.N.Y. 2007) (dismissing in favor of Cyprus, which had a strong interest in regulating its national banks).  And, to protect the sovereign interests of Israel (including the protection of "classified or otherwise sensitive Israeli governmental information"), the Government of Israel "has a strong

---

[12]    While it is certainly true that documents can be transported from one forum to another (Opp. at 22-23), recent decisions in this district hold that the location of documents remains a key factor in the *forum non conveniens* analysis.  *See, e.g.*, *Crosstown Songs UK, Ltd. v. Spirit Music Group, Inc.*, 513 F. Supp. 2d 13, 17 (S.D.N.Y. 2007).

[13]    Plaintiffs claim that the majority of relevant documents in this litigation are in English (Opp. at 23), but, in fact, IAI conducts most of its internal communications in Hebrew.  (Halsband Decl. ¶ 8.)  Plaintiffs' assertion that an Israeli court would require English documents to be translated to Hebrew is incorrect.  (*See* Vigdor Supp. Decl. ¶ 7.)

NY2:#4781942

interest that this case not be litigated before any foreign tribunal and that, if it will be litigated, it should proceed before an Israeli tribunal."  (IMOD Letter at 1, 2.)

Plaintiffs do not respond to the showing (Jt. Br. at 14) that this forum does not have a strong interest in this lawsuit in light of the attenuated connection between the underlying facts and this district.  And while this Court has the resources to adjudicate complex litigation (Opp. at 30), courts in this district nonetheless frequently dismiss litigations in favor of another forum.

Finally, Plaintiffs are wrong when they claim that this lawsuit would be heard in one of the busiest courts in Israel.  (Opp. at 31.)  In May 2007, a new district court was established in Israel for the specific purpose of easing the caseload from the district court for Tel-Aviv. (Vigdor Supp. Decl. ¶ 4.)  This lawsuit could be heard in the new court and it is expected that court proceedings in that court will be faster than in the district court for Tel-Aviv -- and almost certainly faster than in this district.  This factor further supports dismissal.[14]

### D.    Defendants Do Not Object to a Dismissal With Conditions

If this lawsuit is dismissed pursuant to *forum non conveniens* and re-filed in an Israeli court, Defendants will stipulate to the three conditions for dismissal that Plaintiffs seek (Opp. at 34).  Specifically, Defendants will agree to the jurisdiction of an Israeli court and to service of process, without waiver of their right to seek arbitration of this dispute pursuant to the governing contracts.[15]  (*See* pp. 3-4, above.)  Defendants also will agree that whether the claims in the Israeli action are timely should be analyzed as if the lawsuit were filed in Israel on July 2, 2007 -- the date that this action was commenced.  Finally, Defendants will acknowledge their obligations to continue to preserve all potentially relevant paper and electronic documents.

---

[14]    Defendants never argued, as Plaintiffs wrongly state, that all of the claims in this lawsuit will be governed by Netherlands Antilles law.  (Opp. at 32.)  Some of the claims will be governed by Antilles law -- and Israeli courts are well-equipped to determine and apply foreign law.  (*See* Vigdor Decl. ¶ 23.)  But many of the claims will be governed by Israeli law, as demonstrated by the fact that many of the relevant contracts provide for application of Israeli law.  And Plaintiffs' claims for conversion, misappropriation, unjust enrichment and restitution likely will be governed by Israeli law because that is where the relevant events occurred.

[15]    Although one defendant, James DePalma, is not a resident of Israel, Israeli courts may exercise jurisdiction over him and allow for service of process abroad if he is deemed to be a "necessary or proper party to the action". (Vigdor Supp. Decl. ¶¶ 8-9; *see also* Vigdor Decl. ¶ 22.)

- 10 -

## II.    THE COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION

As we showed in our opening brief, the presence of Jacob Weiss as a defendant defeats

diversity jurisdiction, because "United States citizens domiciled abroad are neither citizens of

any state of the United States nor citizens or subjects of a foreign state," and 28 U.S.C. § 1332(a)

does not provide courts with jurisdiction over suits to which such persons are parties.  *Herrick*

*Co., Inc. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001) (internal citations omitted).

(*See* Jt. Br. at 15-16.)

Plaintiffs nevertheless urge the Court to recognize diversity jurisdiction under the narrow

"dominant nationality" exception to this rule adopted by the Seventh Circuit in *Sadat v. Mertes*,

615 F.2d 1176 (7th Cir. 1980).  That exception, however, has never been recognized by the

Second Circuit (as Plaintiffs acknowledge, Opp. at 37 n.12), and has been explicitly rejected by

the only district court in this Circuit that has considered it.  *See Lehman Gov't Sec. v. Pickholz*,

No. 95 Civ. 7744 (LMM), 1996 WL 447995, at *2 (S.D.N.Y. Aug. 8, 1996) ("This Court,

however, does not read the fact that, in *Action*, the court cited *Sadat*, as meaning that the Second

Circuit adopted the effective or dominant nationality concept.  Had it meant to do so, it would, in

this Court's view, have given some indication of that.").  Moreover, even under the Seventh

Circuit rule, the exception applies only where the dual national in question has taken "'all

reasonably practicable steps to avoid or terminate his status as a national'" of the United States.

*See Sadat*, 615 F.2d at 1187 (citing Restatement (Second) of the Foreign Relations Law of the

United States § 171(c)(ii) (1965)).  Plaintiffs conducted a deposition of Mr. Weiss on

jurisdictional issues, yet they offer no evidence that he meets this standard.[16]

Plaintiffs argue that the Court should nevertheless retain supplemental jurisdiction over

their purely state-law claims if their RICO claims are dismissed.  (Opp. at 35-36.)  But the

---

[16]    Plaintiffs' request for an opportunity to establish the applicability of the "dominant nationality" exception before the case is dismissed for lack of subject-matter jurisdiction (Opp. at 37 n.12) should be denied.  Plaintiffs have already taken Mr. Weiss' deposition in which he testified that he holds and travels on a valid United States passport.  This clearly indicates that he has not taken all reasonably practicable steps to avoid or terminate his status as a U.S. national.  (Weiss Tr. 12:9-13:7, attached to Matetsky Decl. as Ex. P.)  Plaintiffs offer no reason why they should be entitled to more discovery on this issue.

Supreme Court and the Second Circuit have repeatedly stated that when all federal claims are dismissed on a Rule 12(b)(6) motion, the court should decline supplemental jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 130 (2d Cir. 2003). Plaintiffs offer no reason to depart from that rule here.

## III.    PLAINTIFFS DO NOT HAVE STANDING ON THE MAJORITY OF THEIR CLAIMS[17]

### A.    Plaintiffs' Declarations Confirm that Shareholders in an Antilles Corporation Cannot Assert Claims for Injury to the Company

Professor Peter van Schilfgaarde drafted the section of the Netherlands Antilles Civil Code that supplies the rules for corporate governance and directors' liability. (Decl. of Peter van Schilfgaarde, dated Oct. 15, 2007 ("van Schilfgaarde Decl.") ¶ 3.) Plaintiffs' declarations on Antilles law do not dispute his key conclusions that shareholders of an Antilles company lack standing to sue the company or its directors if the alleged misconduct involved an act that damaged the company as a whole (*id.* ¶¶ 26, 37) and that actions against other shareholders are subject to similar restrictions (*id.* ¶ 39). Professor Kunneman's declaration submitted with Plaintiffs' opposition acknowledges that the Supreme Court of Netherlands ruled in a "landmark decision" that before a shareholder may bring an action against directors "it must be shown by the shareholder that the alleged misconduct by the director violated a specific norm of care as applicable in its own relations toward the complaining shareholder." (Kunneman Decl. ¶ 25.)[18] Professor Kunneman further explains that a violation of a specific norm of care arises when "the unlawful act (or breach of contract) against the company is committed with the preconceived (*vooropgesteld*) aim of impacting the shareholder(s) in his private capacity". (*Id.* ¶ 27.)[19] These

---

[17]    Whether a plaintiff has standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *In re Gucci*, 126 F.3d 380, 387-88 (2d Cir. 1997) (internal citations omitted).

[18]    Professor Kunneman later explains that this is the same criteria used to determine whether a shareholder may assert a claim against the company. (*Id.* ¶ 42.)

[19]    In addition to opining on Antilles law, Professor Kunneman provides his legal conclusion, based upon a review of the Complaint, that a court applying Antilles law "can allow" Plaintiffs to assert their claims. (Kunneman Decl. ¶ 36.) This is improper expert testimony. Applying the legal principles to the facts of the case is exclusively the role of the Court. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005)

- 12 -

statements confirm that Plaintiffs do not have standing because the underlying claim in this lawsuit is that Defendants acted "to subordinate the Company's commercial decision-making interests and the financial interests of the minority shareholders, including Plaintiffs, entirely to those of IAI and Elbit and to the political interests of the IMOD". (Compl. ¶ 12.) In other words, Plaintiffs allege that Defendants took actions to benefit IAI and Elbit. There is no allegation that any defendant acted with the specific intent to harm Plaintiffs.

Even in their opposition memo where Plaintiffs attempt to marshal allegations to meet the "violation of a specific norm of care" standard, they summarize those allegations as acts "designed to enrich ImageSat's controlling shareholders while wholly disregarding the interests of minority shareholders such as Plaintiffs". (Opp at 65.) Alleging that Defendants took actions to benefit themselves and in the process disregarded the interests of other shareholders falls far short of the standard articulated by Professor Kunneman of alleging "preconceived" acts "impacting the shareholder(s) in his private capacity."[20]

The declaration that Plaintiffs submit from Professor Raaijmakers also confirms the principle that under Netherlands Antilles law shareholders cannot sue for acts alleged to have damaged the company as a whole. (*See* Raaijmakers Decl. ¶ 10 ("Damage consisting solely of a decrease in value of the shares in a corporation as a result of damage to the corporation itself is characterized as a derivative loss. In that situation, the shareholder's damage would typically disappear if the corporation were to be reimbursed.").) Professor Raaijmakers queries "whether

---

(refusing to admit an expert report that applies legal principles to the facts of the case to conclude that a securities violation was committed). Furthermore, Professor Kunneman's conclusion that the allegations of the Complaint "rise to the level of disproportionally impacting Plaintiffs and Minority Shareholders and security holders of the company," (¶ 35) does not even meet the standard, as articulated by him, that requires acts to be committed with the "preconceived aim of impacting the shareholder in his private capacity". (*Id.* ¶ 27.)

[20]    Plaintiffs appear to be suggesting that because IAI and Elbit are allegedly majority shareholders (an inaccurate allegation), while Plaintiffs are minority shareholders, the actions of IAI and Elbit must be viewed automatically as specifically directed to harm the Plaintiffs. But Plaintiffs allege that their holdings represent only approximately 10% of the shares of ImageSat (Compl. ¶ 2) and there are numerous shareholders who are not parties to this action. Furthermore, if Plaintiffs were correct, then lawsuits brought by minority shareholders against majority shareholders would be treated as direct actions. In fact, however, minority shareholder versus majority shareholder lawsuits are viewed by New York courts as classic derivative actions. *See O'Neill v. Warburg, Pincus & Co.*, 833 N.Y.S.2d 461, 462 (App. Div. 2007) (minority shareholder suit against majority shareholders must be brought in derivative capacity).

the Complaint contains specific additional circumstances to justify a claim for compensation of derivative loss" but, tellingly, he does not answer that question. (*Id.* ¶ 16.) Instead, he concludes only that "the Court should evaluate" (*id.* ¶ 19) whether the allegations taken as a whole constitute a breach of a specific norm of care.[21]

Plaintiffs' experts acknowledge that Antilles law and Dutch law are virtually identical on issues of corporate law. (*Id.* ¶ 8; Kunneman Decl. ¶ 14.) Indeed, the leading court cases cited in the declarations are decisions from the Supreme Court of the Netherlands. Nevertheless, Plaintiffs fail to address the decisions (Jt. Br. at 21-22) that dismiss shareholders' lawsuits because Dutch law does not recognize derivative suits. *See Seybold v. Groenink*, No. 06 Civ. 772 (DLC), 2007 WL 737502, at *7 (S.D.N.Y. Mar. 12, 2007); *Kostolany v. Davis*, Civ. A. No. 13299, 1995 WL 662683, at *4 (Del. Ch. Nov. 7, 1995).

## B.    Netherlands Antilles Law Governs Plaintiffs' Standing

Plaintiffs argue that ImageSat does not have significant contacts with the Netherlands Antilles, its place of incorporation, and the Court should therefore override the internal affairs doctrine. (Opp. at 66.)[22] But courts consistently apply the internal affairs doctrine, even where companies have little connection to the place of incorporation.[23]

---

[21]    Notably, although Professor Raaijmakers declines to reach a conclusion as to whether Plaintiffs have standing on the corporate governance claims (claims 1-10 and 13), he readily concludes that Plaintiffs have standing to bring claims relating to the options and warrants (claims 17 and 18). (Raaijmakers Decl. ¶ 19.)

[22]    In the Complaint, however, Plaintiffs indicate that Antilles law should govern issues regarding ImageSat's corporate governance. (Compl. ¶ 168.) Plaintiffs also fail to inform the Court that ImageSat has been represented by a Netherlands Antilles law firm and has engaged the services of an accounting firm in that jurisdiction since it was incorporated there; ImageSat's Netherlands Antilles counsel participates in most of the Board meetings to advise on Antilles law regarding issues of corporate governance; ImageSat's shareholders meetings are conducted in the Netherlands Antilles (although many shareholders choose to vote by proxy); the corporate minutes are maintained in Netherlands Antilles; and several corporate documents, including the stock option agreements referenced in the Complaint, are expressly governed by Antilles law. (*See* Decl. of Eric de Vries ¶¶ 4-9. *See also* Compl. Exs. 13 (P1031) (showing shareholder meetings held in Curacao, N.A.), 74 (P1439) (same).)

[23]    *See Winn v. Schafer*, 499 F. Supp. 2d 390, 396 (S.D.N.Y. 2007) (applying Cayman Islands law and dismissing the suit even though defendant did not have a place of business in the Cayman Islands); *Priestley v. Comrie*, No. 07 CV 1361 (HB), 2007 WL 4208592, at *1, 5 (S.D.N.Y. Nov. 27, 2007) (derivative claims governed by Delaware law because it was the defendant's place of incorporation even though the defendant and almost every other party to the suit had their place of business in New York); *Carr v. Equistar Offshore, Ltd.*, No. 94 Civ. 5567 (DLC) 1995 WL 562178, at *2, 5 (S.D.N.Y. Sep. 21, 1995) (holding that "[c]laims of breach of fiduciary duty brought by a shareholder against an officer of a corporation are governed by the law of the state of incorporation,

The decisions where a New York court declined to apply the internal affairs doctrine (Opp. at 67-68) are inapposite because they did so only after determining that *all* the relevant contacts of the parties and the allegations were in New York.[24]  Here, Plaintiffs acknowledge that "at least two other jurisdictions" have significant connections to this lawsuit.  (Opp. at 70.)  The rationale for the internal affairs doctrine is to promote consistency and predictability in the application of laws governing a corporation's affairs "because otherwise a corporation could be faced with conflicting demands".  *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).[25]  In the case of ImageSat -- a company based in Israel, incorporated in the Netherlands Antilles, with shareholders in Israel, New York and throughout the world (Compl. ¶¶ 24-41) -- the internal affairs doctrine is critical so that the directors and shareholders of the company know that there is one body of law that will govern matters relating to their corporate relationship.

Plaintiffs argue that applying Netherlands Antilles law here violates public policy (Opp. at 72-75), but they do not even address the required standard.  Application of the public policy exception requires a showing that the foreign law "is immoral or fundamentally unjust" or "outrages the public policy of New York."  *Hausman v. Buckley*, 299 F.2d 696, 700 (2d Cir.

---

which for Equistar is the British Virgin Islands," even though Equistar operated out of New York, a substantial portion of the relevant conduct occurred in New York, and there was none of the relevant events were alleged to have occurred in the British Virgin Islands).

[24]    *See Stephens v. National Distillers & Chem Corp.*, No. 91 Civ. 2902 (JSM), 1996 WL 271789, at *45 (S.D.N.Y. May 21, 1996) ("most of the events at issue in this motion [ ] took place in New York" and "public policy concerns of New York State as embodied in the New York Insurance Law mandate a departure from the 'internal affairs' doctrine"); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, 446 F. Supp. 2d 163, 194 (S.D.N.Y. 2006) ("New York has a strong interest in applying its law with respect to defendants who aid and abet torts masterminded and executed by hedge fund managers from within the state"); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) ( "[t]he alleged torts largely occurred in New York; all plaintiffs and the vast majority of the false profit defendants are domiciled in New York").

[25]    *See also Locals 302 & 612 of the Int'l Union of Operating Eng'rs v. Blanchard*, No. 04 Civ. 5954 (LAP), 2005 WL 2063852, at *3 n.2 (S.D.N.Y. Aug. 25, 2005) ("[S]tockholders impliedly consent to be governed by the law of a corporation's state of incorporation when they purchase stock in the company."); *NatTel, LLC v. SAC Capital Advisors*, No. 3-04 CV1061, 2005 U.S. Dist. LEXIS 20179, at *27 (D. Conn. Sept. 16, 2005) ("the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation because '[a]pplication of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation.").  *See also* Restatement (Second) of Conflict of Laws, which dictates that the local law of the state of incorporation shall apply "to determine the right of a shareholder to participate in the administration of the affairs of the corporation," § 304, and to determine "[t]he obligations owed by a majority shareholder to the corporation and to the minority shareholders," § 306.

- 15 -

1962); *see also Seybold*, 2007 WL 737502, at *6 ("a court should be wary of substituting its own notions of public policy") (internal citations omitted).  In *Seybold*, the court applied Dutch law under the internal affairs doctrine and dismissed the shareholder's claim for lack of standing. The plaintiff had argued that Dutch law violated public policy, but the court reviewed the remedies available to shareholders of a Netherlands corporation -- which are virtually identical to the remedies available under Netherlands Antilles law -- and concluded that "Dutch law provides a variety of means for checking malfeasance by members of the Managing and Supervisory Boards of companies incorporated in the Netherlands." *Id.* at *7.

Netherlands Antilles law provides four remedies to shareholders such as Plaintiffs and, in certain respects, they are even more favorable to shareholders than the remedies available in the Netherlands.  (Supplemental Decl. of Peter van Schilfgaarde dated Mar. 17, 2008 ¶ 22.) [26] There is no basis to suggest that the remedies available to Plaintiffs under Netherlands Antilles law are immoral, fundamentally unjust, or would outrage the public policy of New York.[27]

## IV.     THE WARRANT/OPTION HOLDERS LACK STANDING

Plaintiffs make no effort to address the extensive caselaw (Jt. Br. at 28) establishing that neither option nor warrant holders are owed a fiduciary duty by a corporation's officers or insiders under New York law.[28]  The case on which Plaintiffs primarily rely does not address fiduciary duty; *Entel v. Guilden*, 223 F. Supp. 129, 133 (S.D.N.Y. 1963) states only that warrant

---

[26]     One of the remedies available to shareholders under Netherlands Antilles law is to bring a suit to void a particular board resolution.  (van Schilfgaarde Decl. ¶ 44.)  Plaintiffs reject this remedy on the grounds that "[r]elatively few of the acts and omissions challenged by Defendants [ ] resulted from a particular Board resolution adopted at a particular Board meeting".  (Opp. at 74.)  Yet earlier in their memorandum (*id.* at 48-50), Plaintiffs argue that one of the grounds for jurisdiction over ImageSat in New York is that "[m]any of Plaintiffs' claims in this action arise from decisions taken at these [board] meetings."  Plaintiffs cannot have it both ways.

[27]     Even if New York law were to apply here to determine Plaintiffs' standing, the claims would have to be dismissed because they are not pleaded in a derivative capacity.  *See Henneberry v. Sumitomo Corp. of Am.*, No. 04 Civ. 2128 (PKL), 2007 WL 2068346, at *7 (S.D.N.Y. July 12, 2007) ("Generally an individual shareholder lacks standing to bring a claim where 'the duty owed to the shareholder[ ] is ... indistinguishable from the duty owed to the corporation.'  Absent an independent duty, the shareholder's perceived injury is deemed to be considered the same injury as that to the corporation and, consequently, the shareholder maintains no separate right of action separate and apart from the corporation's.").  Israel law is to the same effect.  (Vigdor Decl. ¶¶ 25-26.)

[28]     Under Netherlands Antilles law, as well, option or warrant holders do not have standing to bring a claim for a breach of fiduciary duty .  Even shareholders have no such standing under Netherlands Antilles law.  *See* § III.

holders have a private right of action under the Investment Company Act.  Plaintiffs then cite two cases holding respectively that underwriters may be fiduciaries in their capacity as expert advisors, and that one who exercises investment discretion for another may be a fiduciary.  *EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E. 2d 26, 36-37 (N.Y. 2005); *Rabin v. Mony Life Ins. Co.*, No. 06 Civ. 775 (LTS) (KNF), 2007 WL 737474, *3 (S.D.N.Y. Mar. 8, 2007).  Neither case addresses whether a warrant holder is owed a fiduciary duty.[29]

Finally, Plaintiffs suggest that if the Court dismisses the option holders' claims for breach of fiduciary duty, they should be allowed to replead it as a claim for the breach of duty of good faith and fair dealing inherent in any contract, ignoring the fact that such a claim would itself not constitute a valid cause of action under New York law.  The cases they cite (Opp. at 77) stand merely for the proposition that contractual duties will be interpreted in the light of the implied duty of good faith and fair dealing.  Far more similar to the facts here is *Conwill v. Arthur Andersen LLP*, which held that a bank had no contractual or statutory duty to make the desired disclosures relating to digital currency options because "the implied covenant of good faith and fair dealing . . . [did] not operate to create new contractual rights".  No. 602023/05, 2006 WL 1703621, at *13 (N.Y. Sup. Ct. July 21, 2006).  Similarly, the option and warrant agreements pursuant to which Plaintiffs received their options and warrants do not give Plaintiffs rights relating to the management of ImageSat generally.

## V.     PLAINTIFFS' CAUSES OF ACTION FOR CONVERSION, UNJUST ENRICHMENT AND DISGORGEMENT MUST ALL BE DISMISSED

### A.     Plaintiffs Have No Standing to Bring These Claims

As fully set forth in Defendants' moving brief, Plaintiffs' causes of action for conversion, unjust enrichment, and disgorgement must be dismissed because Plaintiffs themselves were not

---

[29]     Plaintiff Haim Yifrah's claim that he attempted to exercise one of his options but was prevented from doing so (Opp. at 75 n.21) is not an argument that warrant or option holders are owed fiduciary duties, but an allegation of a breach of a contractual agreement, and has no relevance to the question of the rights of option and warrant holders generally.  Furthermore, Mr. Yifrah's statement (Yifrah Decl. ¶ 10) that he sought to exercise his option "for the express purpose of making myself a stockholder and to enjoy the rights of a stockholder" appears to be a concession that option holders do not enjoy the same rights as shareholders.

directly damaged by any of the conduct they allege.  Plaintiffs allege that ImageSat's property was converted, that Defendants were unjustly enriched at ImageSat's expense, and that compensation paid by ImageSat to Defendants should be disgorged.  (Opp. at 114-17.)  Each of these claims is a claim for damages to ImageSat that is alleged to have affected Plaintiffs only through their ownership interests in ImageSat.  Plaintiffs have no standing to bring these claims on their own behalf, as their injuries are solely derivative of the injuries they allege to ImageSat. *See New York City Econ. Dev. Corp. v. T. C. Foods Imp. & Exp.*, No. 5856/00, 2006 WL 1132350, at *3 (N.Y. Sup. Ct. Apr. 17, 2006) (holding that disgorgement is not an available remedy unless the plaintiff can show that defendant was unjustly enriched at plaintiff's expense); *Albany-Plattsburg United Corp. v. Bell*, 763 N.Y.S. 2d 119 (App. Div. 2003) (holding that a shareholder did not have standing to bring a claim for conversion of corporate property).

### B.    Plaintiffs' Claim for Conversion Must Also be Dismissed Because it Identifies No Specific Property Alleged to Have Been Converted

Plaintiffs note that Rule 9(b) does not apply to conversion claims (Opp. at 114), but that is irrelevant to Defendants' argument that a necessary element of conversion is "violation of the plaintiff's dominion, rights, or possession in *specific, identifiable money* or tangible personal property."  *Cyberlease, LLC v. JP Morgan Chase Bank*, No. 04 Civ. 1221 (NRB), 2005 WL 2030317, *8 (S.D.N.Y. Aug. 22, 2005) (emphasis added) (conversion action cannot be maintained where damages are merely sought for breach of a contract); *Whitman Realty Group, Inc. v. Galano*, 838 N.Y.S.2d 585, 587 (App. Div. 2007) (dismissing conversion claim where "plaintiff failed to come forward with evidentiary facts showing that it had legal ownership or an immediate right of possession to specifically identifiable funds" and "showed only a contractual right to payment where it never had ownership, possession, or control of the disputed monies").

Plaintiffs do not allege that they had legal ownership or an immediate right of possession to any specifically identifiable sum of money or other tangible property with respect to which Defendants violated their rights.  Rather, Plaintiffs' conversion claim is stated in general terms, as a claim that Defendants violated their contractual and other legal rights and that as a result

- 18 -

Plaintiffs are owed monetary damages.  In the absence of an allegation that some specifically identified property was converted, Plaintiffs' claim for conversion must be dismissed.

### C.    Plaintiffs' Claim for Unjust Enrichment is Duplicative of Their Claims for Breach of Contract and Breach of Fiduciary Duty

Plaintiffs' argument that "fiduciary duty" need not exist before an unjust enrichment claim can be sustained (Opp. at 116) is true as a matter of law, but blind to the nature of the claims actually pleaded.  Plaintiffs have not alleged that Defendants were unjustly enriched other than through alleged breaches of contract or violations of a fiduciary duty alleged to be owed to Plaintiffs by virtue of their ownership interests in ImageSat; no money or assets are alleged to have been transferred from Plaintiffs to Defendants as a result of Defendants' alleged wrongdoing.  Given the claims Plaintiffs have actually pled, their claim for unjust enrichment is duplicative of their claims for breach of contract and breach of fiduciary duty.  *See Spanierman Gallery, PSP v. Love*, No. 03 Civ. 3188 (VM), 2003 WL 22480055, at *4 (S.D.N.Y. Oct. 31, 2003) (dismissing unjust enrichment claim where plaintiffs "failed to allege any distinct harm or actions giving rise to any separate claim of unjust enrichment or constructive trust"); *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 460-61 (S.D.N.Y. 2001) (dismissing claim for unjust enrichment as duplicative of claims for breach of contract and breach of fiduciary duty).

## VI.    PLAINTIFFS LACK RICO STANDING AND HAVE NOT ADEQUATELY ALLEGED A PATTERN OF RACKETEERING

### A.    Plaintiffs Have Not Pleaded That Their Injuries Are Anything Other Than Derivative of Injuries to ImageSat

Plaintiffs, as ImageSat shareholders, lack standing to sue under RICO because the only harm they allege is that ImageSat was damaged and the value of their ImageSat shares was thereby diminished.  (*See* Jt. Br. at 34-38.)[30]  Plaintiffs concede that "the general rule [is] … that

---

[30]    As discussed further in the individual defendants' separate memoranda and reply memoranda, Plaintiffs have also failed to plead RICO as to each Defendant, including the predicate acts of mail and wire fraud, with 9(b) particularity.  *See Hoatson v. New York Archdiocese*, No. 05-CV-10467 (PAC), 2007 WL 431098, at *3 (S.D.N.Y. Feb. 8, 2007) (dismissing RICO claim where there was "not even a minimal attempt to allege which predicate acts were performed by which Defendants.").

a corporate shareholder may not bring a direct RICO action for injuries suffered by the corporation rather than the shareholder himself or herself" (Opp. at 94), but they argue that they fall within an alleged "exception" to this rule because "their injuries are not the same as those to the corporation as a whole." (*Id.*) But Plaintiffs point to no facts in the Complaint showing that their alleged harm is any different from the harm they allege to ImageSat.[31] And, contrary to Plaintiffs' suggestion (*id.*), it is insufficient for Plaintiffs to allege that IAI and Elbit, as ImageSat's majority shareholders, benefited from the alleged wrongdoing in some other capacity. *See Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1992) (plaintiff shareholder did not have RICO standing even though defendant, also a shareholder, was "alleged to have participated in some of the wrongdoing" because both the plaintiff and the defendant "sustained the same injury with respect to the value of their shares"). (*See also* Jt. Br. at 36.)

Plaintiffs do not even attempt to distinguish the numerous cases cited in our moving brief (Jt. Br. at 36-38) holding that derivative claims such as those they assert do not support standing under RICO, and none of the cases Plaintiffs cite (Opp. at 94-96) reach a contrary conclusion. In *Beck v. Prupis*, 162 F.3d 1090, 1094, 1096 n.10 (11th Cir. 1998), the court held that the plaintiff had RICO standing where he alleged that he incurred harm distinct from harm suffered by the corporation, including being wrongfully terminated and fraudulently induced to provide a personal guarantee on a corporate loan. The court made clear that it was only those personal injuries that supported RICO standing. By contrast, the court emphasized (in a passage that plaintiffs ignore), to the extent the plaintiff's claim arose from allegations "that defendants' illegal activities led to [the corporation's] demise, which in turn caused [plaintiff's] losses (the reduction in value of his investments and the accountability for the loan he guaranteed)," the claim was "clearly barred" because "[t]his is the type of derivative claim that the district court

---

[31]   Plaintiffs assert that they are "prepared to amplify" in their Complaint "through repleading" that their alleged damages differ from those allegedly incurred by ImageSat. (Opp. at 95 n. 26, 98 n. 27.) But they identify no new facts, and, in any event, the Court need not address on this motion unasserted allegations. *See Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'").

correctly held does not confer standing under RICO." *Id.* at 1097 n.12; *see also id.* at 1096-97 (affirming summary judgment for defendants on plaintiff's RICO claims on other grounds).[32]

### B.    The Complaint Does Not Allege a Pattern of Racketeering

As we showed in our moving brief, plaintiffs' RICO claim -- involving alleged wrongs aimed at a single discrete class of victims (ImageSat's minority shareholders); a single scheme (a purported effort to control ImageSat for the benefit of IAI and Elbit); and two different types of predicate acts (mail and wire fraud) allegedly committed by a discrete group of defendants, all allegedly acting for the benefit of IAI and/or Elbit -- does not constitute a "pattern of racketeering" required to state a claim under the statute. (*See* Jt. Br. at 39-41 (collecting cases).) In cases such as this, "[c]ourts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity." *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624-25 (S.D.N.Y. 2006) (quotation omitted).

Plaintiffs cite no case where the court upheld a RICO claim involving allegations similar to those here. Indeed, the cases on which Plaintiffs themselves rely recognize that RICO claims similar to those asserted here do not satisfy the requirement of alleging a pattern of racketeering.

---

[32]    The other cases on which Plaintiffs rely likewise involved claims arising from damages incurred by the plaintiffs directly, and not, as here, damages allegedly incurred by a corporation in which plaintiffs hold shares. In *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001), the court held that the plaintiffs had standing under RICO because, "the majority of the alleged wrongdoing -- including the primary wrong . . . -- occurred, and the lion's share of the sought-after damages were incurred, well in advance of the chartering of the corporations" and there was "no indication that Defendants' focus changed after formation of the corporations, or that the existence of corporations in any way affected the injury ultimately suffered by the individual Plaintiffs." *Id.* at 655-56. And in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), the plaintiff likewise alleged harm separate and apart from any harm to the company in which the plaintiff held stock. *Id.* at 1098-99. No such facts have been our could be alleged here. The other cases cited by Plaintiffs are likewise distinguishable in that they permit standing in case where, unlike here, the allegations concerned conduct by the defendant that specifically targeted the individual plaintiffs, and not the corporation or partnership. *See Adena, Inc. v. Cohn*, 162 F. Supp. 2d 351, 358 (E.D. Pa. 2001) (standing where allegations were that defendants had "induced" plaintiffs to buy shares); *Carr v. Equistar Offshore, Ltd.*, No. 94 Civ. 5567 (DLC), 1995 WL 562178, at *10 (S.D.N.Y. Sept. 21, 1995) (same); *Walco Invs., Inc. v. Thenen*, 947 F. Supp. 491 (S.D. Fla. 1996) (standing where allegations that plaintiff had been induced to buy into a Ponzi scheme); *see also BRS Assocs., L.P. v. Dansker*, 246 B.R. 755, 769 (Bankr. S.D.N.Y. 2000) (standing on RICO claim for inducement, but no standing on RICO claim for "overall diminution in value of" limited partnership); *Haggiag v. Brown*, 728 F. Supp. 286, 295 (S.D.N.Y. 1990) (same); *see also Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 166, 175 (D.N.J. 1998) (finding plaintiffs had standing because "plaintiffs suffered more than mere diminution in the value of their investments").

- 21 -

*See, e.g.*, *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 468 (2d Cir. 1995) (holding that alleged scheme to loot company was "inherently terminable" and that it is "simply not the case" that "similar activities extending over a similar period of time form a pattern"); *The Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Inv. Ltd.*, 154 F. Supp. 2d 682, 691, 694 (S.D.N.Y. 2001) (holding that "although plead as four different schemes, the acts alleged in fact constitute only a single fraudulent scheme against the plaintiffs" and finding no continuity where "alleged scheme existed with a single purpose directed at a single victim").[33]

Where as here, Plaintiffs' "putative civil RICO claims . . . 'are nothing more than sheep masquerading in wolves' clothing,' or ordinary fraud cases 'clothed in the Emperor's trendy garb' [they] should be 'flush[ed] out' at early stages of the litigation." *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 449, 452 (S.D.N.Y. 2007) (citations omitted).[34]

## VII.    PLAINTIFFS' FIRST CLAIM (BREACH OF FIDUCIARY DUTY IN THE 2000 TRANSACTION) IS TIME-BARRED

Plaintiffs argue incorrectly (Opp. at 88) that the clear repudiation doctrine applies to the First Claim for Relief ("Claim One"). The doctrine applies only to claims for an accounting or other equitable relief. *See Kaszirer v. Kaszirer*, 730 N.Y.S.2d 87, 88 (App. Div. 2001) ("requirement of a clear repudiation applies only to claims seeking an accounting or other equitable relief"). Claim One seeks monetary damages. (Compl. ¶ 201.) Even if the clear repudiation doctrine could apply here, the limitations period for Claim One began to run in July 2000 when, according to the Complaint, defendant Weiss allegedly repudiated his fiduciary

---

[33]    The other cases on which plaintiffs rely (Opp. at 100-04) are likewise distinguishable. *See DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) (upholding jury verdict because a reasonable jury could have concluded that numerous public officials, private individuals, and corporations engaged in multiple different types of predicate acts implied a threat of continued criminal activity); *Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.*, 113 F.3d 308 (2d Cir. 1997) (denying summary judgment where scheme was interminable); *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) (finding continuity where there were numerous victims and separate incidents); *Local 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545 (E.D.N.Y. 1998) (finding continuity where six different groups of defendants engaged in "numerous predicate acts of fraud").

[34]    Even if the Court does find that plaintiffs have adequately alleged a violation of 18 U.S.C. § 1962(c), Plaintiffs' RICO conspiracy claim fails because they have "failed to allege any factual basis for a finding of conscious agreement among [the defendants] to commit predicate acts." *See Ray Larsen Assoc., Inc. v. Nikko Am., Inc.*, No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (holding that plaintiff's broad and vague statement that the defendants "agreed and conspired" was insufficient to state a 1962(d) claim).

obligation to ImageSat by agreeing to the exclusivity provision of the Master Agreement "over [plaintiff] Wilson's contemporaneous objections". (Compl. ¶ 71.)[35]

As Defendants demonstrated in their opening brief (Jt. Br. at 42-43), Claim One is based on the Master Agreement, which was signed in July 2000, and related events that took place and concluded in 2000. (Compl. ¶¶ 194-202.) It does not help Plaintiffs to argue that other claims in the lawsuit relate to events post-2000 or to recite the conclusory phrase "continuing pattern of breaches". (Opp. at 89.) Plaintiffs styled Claim One as a separate claim, yet they do not (either in the Complaint or in the Opposition) cite any event in connection with that claim that post-dates July 2000. Claim One is therefore time-barred.

## VIII.    THE REFORMATION AND FRAUD CLAIMS (17 AND 18) FAIL[36]

### A.    The Reformation and Fraud Claims Are Time-Barred

The two year discovery rule does not apply because Plaintiffs had the documents with the alleged mistake (the bridge warrants) throughout the limitations period. *See F.D.I.C. v. Five Star Mgmt.*, 692 N.Y.S.2d 69, 72-73 (App. Div. 1999) (declining to apply discovery rule because "the requisite diligence necessary to thus toll the limitations period is not present here, when the lender possessed the very document containing the mistake"). (*See also* Jt. Br. at 44 n.54.)

Furthermore, the discovery rule cannot save Plaintiffs' claims because the Complaint alleges (Compl. ¶ 84) that certain plaintiffs communicated with ImageSat about the purported error in 2003 and early 2004[37] -- more than two years before the lawsuit was filed. Plaintiffs offer no explanation why their failure to discover the alleged mistake was reasonable even when

---

[35]    The open repudiation doctrine does not state that the limitations period for breach of fiduciary duty claims commences only when the fiduciary relationship ends. (Opp. at 88.) The doctrine states that the limitations period for breach of fiduciary duty claims also commences when the fiduciary openly repudiates his obligation.

[36]    Plaintiffs have withdrawn with prejudice the portions of claims 17 and 18 that relate to the exercise price of the options and warrants because, contrary to the allegations in the original Complaint, shortly after July 2000 ImageSat amended the exercise price of the options and warrants to reflect the updated exercise price. (*See* Docket No. 98: May 14, 2008 Stipulation and Order Concerning Dismissal with Prejudice of Portions of Claims 17 and 18.)

[37]    (*See* Letter dated Apr. 28, 2004 from Phillip Siller, Solicitor and President of Hexagram & Co., on behalf of Hexagram & Co., Albert Reichmann and Shaw Street Investments to Broder and Keret, referenced in the Compl. at ¶ 84 and attached to Bak Decl. as Ex. 6.)

other warrant holders discovered the purported error years earlier. Each warrant holder plaintiff either knew or reasonably should have known of the purported error more than two years before commencing this action.[38] *See Sabbatini v. Galati*, 842 N.Y.S.2d 539, 543 (App. Div. 2007) (denying claims as time-barred where complaint revealed that plaintiff should have discovered objective facts more than two years before commencing the fraud action).

Plaintiffs also cannot rely on the equitable estoppel doctrine, which requires plaintiffs to "establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit."[39] Plaintiffs claim they were "lulled into believing that ImageSat was going to fix the mistake" (Opp. at 91), but the Complaint alleges only that Mr. Broder stated that he "anticipated" that an accommodation regarding the warrants would be reached. (Compl. ¶ 84.) Plaintiffs plead no action or actual representation that could form the basis of an estoppel claim. *See, e.g.*, *Dombroski v. Samaritan Hosp.*, 864 N.Y.S. 2d 430, 433 (Sup. Ct. 2007) (no equitable estoppel when plaintiffs fail to allege facts that could demonstrate the requisite reasonable reliance and due diligence); *Dewan v. Blue Man Group L.P.*, 73 F. Supp. 2d 382, 387 (S.D.N.Y. 1999) (passive reliance on defendant's assurances defeats a claim for equitable estoppel).

### B.    The Fraud Claim (Claim 18) Fails

Plaintiffs' fraud claim fails for lack of reasonable reliance because the alleged oral representations are contradicted on the face of subsequently signed warrant agreements. (Jt. Br. at 46-49.) Plaintiffs allege that they did not know what they were signing because "in a mammoth multi-day closing the signature pages were separated from the body of the documents"

---

[38]    The letters referenced in ¶ 84 of the Complaint not only undermine Plaintiffs' reliance on the discovery rule they also belie the claim of mistake. Plaintiffs Hexagram, Reichmann and Shaw Street's letter, attached as Ex. 6 to the Bak Decl., requested a two year extension on the five year expiration dates of the warrants because of ImageSat's alleged failure to meet its targets. There is no mention of a "scrivener's error" and no request that the expiration date be extended to ten years. These letters are properly before this Court on a motion to dismiss because they are referenced in the Complaint. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

[39]    *See In re BMW of N.. Am., LLC v. Gesmundo*, 824 N.Y.S.2d 760 (Sup. Ct. 2006) ("plaintiff asserting equitable estoppel must establish the Defendant's specific actions that kept Plaintiff from timely commencing the action") (citing *Zumpano v. Quinn*, 816 N.Y.S.2d 703 (2006)); *In re Bailo*, 16 Misc.3d 1106(A) (N.Y. Sup. June 29, 2007) (dismissing action where plaintiff failed to show that it "was induced by the fraud, deception or misrepresentation [of defendant] from commencing an action within the statute of limitations period").

(Opp. at 92) but they cite no case supporting such an exception.  In any event, Plaintiffs

acknowledge (*See* Stipulation and Order Concerning Dismissal with Prejudice of Portions of

Claims 17 and 18, entered March 17, 2008, and as reflected in the Amended Complaint filed

March 17, 2008) that the warrants were amended in October 2000, so their excuse about signing

in a multi-day closing in July 2000 cannot save their claim.

Plaintiffs claim that whether their reliance was reasonable is a question of fact and that

the "single case relied upon by Defendants in this regard was resolved in the context of a motion

for summary judgment".  (Opp. at 92.)  They are wrong.  Defendants cited six cases where at the

pleadings stage courts dismissed fraud claims for lack of reasonable reliance because the

misrepresentation was contradicted by the language of the contract.  (Jt. Br. at 47-49.)

## IX.    PLAINTIFFS LACK STANDING ON THE CLAIM FOR DISGORGEMENT OF COMPENSATION (CLAIM 20)

A plaintiff lacks standing to bring a claim for disgorgement where the underlying alleged

unjust enrichment did not flow from the plaintiffs.  (Jt. Br. at 49-50.)  Plaintiffs cite no contrary

authority.  Their argument that they are entitled to assert a disgorgement claim because the

director and officer defendants will not assert it against themselves (Opp. at 114) does not

address the fact that they have failed to plead a basic element of the claim.  Plaintiffs also fail to

account for the fact that there is another entity that could bring the claim for disgorgement, *i.e.*,

the Company itself.  The fact that ImageSat has not filed this claim does not give a small group

of minority shareholders the right to file a direct claim in their own name where only a derivative

claim lies.

## CONCLUSION

For the foregoing reasons, as well as those discussed in the opening memorandum, and

the individual defendants' opening and reply memoranda of law, the Complaint should be

dismissed with prejudice.  Any amendment of the claims would not change the fact that this

Court is not the appropriate forum for the litigation, Plaintiffs do not have standing to assert their

claims, and many of the causes of action fail to state a claim.[40]  Furthermore, Plaintiffs identify

no facts they could allege on repleading that would cure any of the pleading deficiencies of the

Complaint.  For these reasons, Plaintiffs should not be given leave to amend the Complaint.  *See*

*Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (granting leave to amend is not

required if it is "unlikely to be productive").

Dated: March 25, 2008          MILBANK, TWEED, HADLEY & MᶜCLOY LLP
      New York, New York

By: _____/s/ Sander Bak_____

    Sander Bak, Esq. (SB 2263)
    Deborah Elman, Esq. (DE 2310)
    1 Chase Manhattan Plaza
    New York, NY 10005
    sbak@milbank.com
    (212) 530-5000

*Counsel for Defendants ImageSat International N.V.,*
*Moshe Keret, Izhak Nissan, Jacob Weiss, Shimon*
*Eckhaus, Gino Piperno-Beer, David Arzi, and Yoav*
*Chelouche*

COHEN TAUBER SPIEVACK & WAGNER PC

By: _____/s/ Stephen Wagner_____

    Stephen Wagner, Esq. (SW 2500)
    Sari E. Kolatch, Esq. (SK 3026)
    420 Lexington Avenue, Suite 2400
    New York, NY  10170
    swagner@ctswlaw.com
    (212) 586-5800

---

[40]  Courts routinely deny leave to replead where, as here, the complaint fails to state a claim as a matter of law, and the defect cannot be cured by repleading.  *See, e.g., Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 352 n.6 (S.D.N.Y. 2005) (Swain, J.) (denying leave to replead time-barred claims); *Meadowlands Invs., LLC v. CIBC World Mkts. Corp.*, No. 04 Civ. 7328 (DAB), 2005 WL 2347856, at *8 (S.D.N.Y. Sept. 22, 2005) (denying leave to replead breach of contract and fraud actions); *Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04 Civ. 3318 (LAP), 2005 WL 736217, at *5-6 (S.D.N.Y. Mar. 30, 2005) (denying motion to replead fraud claim); *Montefiore Med. Ctr. v. Am. Protection Ins. Co.*, No. 00 Civ. 3235 (LTS) (MHD), 2003 WL 21108261, at *1-2 (S.D.N.Y. May 14, 2003) (Swain, J.) (denying leave to amend where "proposed cause of action fails to state a claim"); *Nagel v. AIG Life Ins. Co.*, No. 94 Civ. 1035 (RPP), 1994 WL 406045, at *2 (S.D.N.Y. July 29, 1994) (denying leave where court determined it lacked subject matter jurisdiction).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON
LLP

By: _____/s/ Eric Goldstein_____

    Eric S. Goldstein, Esq. (ESG 1034)
    Jonathan H. Hurwitz, Esq. (JHH 8037)
    1285 Avenue of the Americas
    New York, NY  10019-6064
    egoldstein@paulweiss.com
    (212) 373-3000
*Counsel for Defendants Israel Aerospace Industries Ltd.
and Yehoshua Eldar*

GREENBERG TRAURIG LLP

By: ____/s/ Simon Miller_____

    Simon Miller, Esq. (SM 6278)
    200 Park Avenue
    New York, NY  10166
    MillerSj@gtlaw.com
    (212) 801-9200

*Counsel for Defendants Elbit Systems Ltd., Michael
Federmann, Estate of Jacob Toren, Joseph Ackerman,
and Joseph Gaspar*

NY2:#4781942