# Exhibit 2

TAB 2 (a)

EXECUTION COPY

**COMPANY CONFIDENTIAL**

FIRST AMENDED AND RESTATED EROS B1 SATELLITE SUPPLY CONTRACT

THIS FIRST AMENDED AND RESTATED EROS B1 SATELLITE SUPPLY CONTRACT is duly signed on the 25th day of July, 2000, between ISRAEL AIRCRAFT INDUSTRIES LTD., acting through its MBT Division, organized and existing under the laws of the State of Israel, with a place of business in Yehud, Israel (hereinafter referred to as "SELLER"); and WEST INDIAN SPACE, LTD., a company organized under the laws of the Netherlands Antilles with a Corresponding Office in the Textile House, Kaufman Street, 2, Tel-Aviv (hereinafter referred to as the "BUYER").

WHEREAS, BUYER desires to procure one EROS B1 Satellite, together with certain related launch services, subject to the terms and conditions hereof;

WHEREAS, SELLER desires to supply such EROS B1 Satellite, together with certain related launch services in accordance with the terms and conditions hereof;

WHEREAS, BUYER and SELLER are party to the Satellite Supply Contract dated November 1998 (as amended or modified as of the date hereof, the "Existing Satellite Supply Contract"); and

WHEREAS, BUYER and SELLER desire to amend and restate the Existing Satellite Supply Contact to, among other things, no longer govern the provision of certain deliverables and services with respect to the upgrade and operation of certain receiving stations for the reception of data from such EROS B1 class commercial satellite;

NOW THEREFORE, BUYER and SELLER hereby agree, for good and valuable consideration, the receipt and sufficing of which is hereby acknowledged, to amend and restate the Existing Satellite Supply Contract in its entirety as follows, comprising the following parts and exhibits:

(I)     The Terms and Conditions;

(II)    The Exhibits to this Contract as follows:

|          |                                   |
|----------|-----------------------------------|
| Exhibit "A" | Deliverables;                  |
| Exhibit "B" | EROS B1 Mission Requirements;  |
| Exhibit "C" | EROS B1 System Specifications; |
| Exhibit "D" | Statement of Work (SOW);       |
| Exhibit "E" | Program Schedule;              |
| Exhibit "F" | Pricing and Payment Terms; and |
| Exhibit "G" | EROS B1 In-Orbit Test.         |

SEP-08-2000  12:30                                                              P.04

**COMPANY CONFIDENTIAL**

IN WITNESS WHEREOF this CONTRACT has been executed as of the date first referenced above by the duly authorized representatives for the parties.

WEST INDIAN SPACE N.V.                    ISRAEL AIRCRAFT INDUSTRIES LTD.

BY: _____            BY: _____
    NAME:                                     NAME:
    TITLE:                                    TITLE:


BY: _____
    NAME:
    TITLE:
3262037

**COMPANY CONFIDENTIAL**

PART I

TERMS AND CONDITIONS

COMPANY CONFIDENTIAL

ARTICLE 1      DEFINITIONS

1.1    For purposes of this Contract, the following terms shall have the meaning stated hereunder:

"Acquisition, Archiving and Dissemination" or "AAD" means a customer which is able to collect, upon request, any imaging plan to be performed by the Satellite when passing within the customer's ground receiving station coverage area.

"Contract" means this written agreement, including the Exhibits annexed hereto and made a part hereof.

"Contract Price" means the total amount to be paid to SELLER by BUYER for the Deliverables and Services to be provided under the terms of this Contract.

"Default Notice" has the meaning set forth in Paragraph 13.1.

"Deliverables" means the items of hardware (with their respective embedded software) and services to be delivered by SELLER under this Contract and which are listed in Exhibit A hereto.

"Delivery" shall have the meaning set forth in (a) with respect to the EROS B1 Satellite, Paragraph 6.1 and (b) with respect to any other Deliverables, Paragraph 6.2.

"Documentation" means documentation to be delivered under this Contract as set forth in the SOW.

"Effective Date of Contract" means the date that the last condition of Article 18 is completed.

"EROS A1" shall mean the electro-optical earth observation satellite to be supplied by IAI/MBT to WIS under the A1 Satellite Supply Contract, as specified in said A1 Satellite Supply Contract.

"EROS A Class Satellite" shall mean the electro-optical earth observation satellite which will be developed by IAI/MBT based on existing IAI/MBT space related Technology (derived programs unrelated to EROS Program), as specified in A1 Satellite Supply Contract and A2 Satellite Supply Contract.

"EROS B1" shall mean the electro-optical earth observation satellite to be supplied by IAI/MBT to WIS under the A1 Satellite Supply Contract, as specified in said B1 Satellite Supply Contract.

"EROS B Class Satellite" shall mean the electro-optical earth observation satellite with the same or greater imaging capacity and image quality and image resolution comparing to EROS B1 Satellite and which will be developed by IAI/MBT basing on existing IAI/MBT space related Technology (derived from programs unrelated to EROS Program), as well as additional Technology developed by IAI/MBT under EROS Program, as specified in B1 Satellite Supply Contract.

COMPANY CONFIDENTIAL

"EROS Class Satellite" shall mean EROS A Class Satellite, EROS B Class Satellite and any other electro-optical earth observation satellite developed by IAI/MBT under the EROS Program.

"EROS/GCS" or "EROS Ground Control System" means the combination of the EROS/SCC, to be located in Israel at BUYER's designated location, together with one EROS/TCC which includes the SELLER's existing EROS/TTC-MBT and one EROS/TCC which includes EROS/TTC-ESRANGE..

"EROS/GCS ATP" or "EROS/GCS Acceptance Test Plans" means the EROS/GCS test plan which shall be submitted to BUYER in accordance with the SOW.

"EROS/SCC" or "EROS Satellite Control Center" means the collection of hardware and software required for the planning and preparation of all necessary commands needed for the operation of the EROS Class Satellites, up to and including the bit-stream level (satellite imaging planning for AAD and PAS customers, satellite preparation for SOP, AAD and PAS customers, satellite housekeeping, orbit corrections and management).

"EROS/TCC" or "EROS Tracking and Communication Center" means a combination of EROS/TTC and a dedicated EROS/TCC Control Computer, while such EROS/TCC Control Computer is located either at EROS/SCC site or at the EROS/TTC site.

"EROS/TCC Control Computer" means a computer being designated to manage the communication with the Satellite and to be an intermediary between the EROS/SCC and the Satellite.

"EROS/TTC" or "EROS Tracking Telemetry and Command" means an appropriate antenna and appropriate communication equipment enabling (1) the tracking of the EROS B1 Satellite, (2) the receiving of the telemetry from the EROS B1 Satellite and (3) the transmission of commands to the EROS B1 Satellite.

"EROS/TTC-ESRANGE" means the EROS/TTC located at Kiruna/Sweden premises.

"EROS/TTC-MBT" means the SELLER's existing EROS/TTC located at SELLER's premises.

"Launch" means ignition of the launch gas generator in Transport-and-Launch Canister, as defined in "START-1 Launch Vehicle User's Handbook", if such ignition is followed by successful separation of all electrical connections (provided that the launching of EROS B1 Satellite will be performed by START-1 Launch Vehicle).

"Launch Campaign and IOT" means the services as defined in the related paragraph in Exhibit D under the Contract.

"Launch Company" means the company selected by BUYER in consultation with SELLER to provide the launch vehicle and launch services to launch the Satellite into orbit.

COMPANY CONFIDENTIAL

"Launch Site" means the site where the Launch Company has designated as the Launch Site.

"Launch Vehicle" means the launch vehicle selected by BUYER, in consultation with SELLER, to launch the Satellite.

"Management Services" means the services as defined in the related paragraph in Exhibit D under the Contract.

"Priority Acquisition Services" or "PAS" means a customer which is entitled to request an imaging plan to be performed by the Satellite and to collect images gathered by the Satellite in accordance with such imaging plan within 72 hours from such request.

"Program Schedule" means the Schedule for Program Performance attached hereto as Exhibit E.

"Satellite" means the EROS B1 class satellite that meets the EROS B1 Mission Requirements of Exhibit B, being sold by SELLER to BUYER hereunder in accordance with the specifications attached hereto as Annex II to Exhibit C.

"Satellite Acceptance Review" means the final review to be conducted at the SELLER's facility and which will consist of presenting and reviewing the final satellite test results in accordance with the Acceptance Test Procedures established in accordance with the SOW.

"Satellite Acceptance Test Plan" or "Satellite ATP" means the Satellite test plan which shall be submitted to BUYER in accordance with the SOW.

"Satellite In-Orbit-Test" or "IOT" means the set of In-Orbit-Tests to be performed using EROS/TTC-MBT, EROS/TTC-ESRANGE, and BUYER's EROS/SCC, as defined in Exhibit G to demonstrate satellite performance compliance with the EROS B1 Mission Requirements (Exhibit B).

"Satellite Operating Partner" or "SOP" means a customer which is able to (a) independently generate an imaging plan to be performed by the Satellite when passing within its imaging area, (b) access directly the Satellite from an appropriate ground control station located in SOP country, in order to load the imaging plan to the Satellite, and (c) receive the images gathered during the execution of such imaging plan.

"Services" means the Launch Campaign, IOT services, Management Services and other specific services to be performed by SELLER as set forth in Exhibit A,

paragraph 2.

"Statement of Work" or "SOW" means each of the Statements of Work set forth in Exhibit D hereto.

COMPANY CONFIDENTIAL

1.2    The Article and Paragraph headings are for convenience of reference only and shall not be considered in interpreting this Contract.

ARTICLE 2      SCOPE OF CONTRACT

2.1    SELLER hereby agrees to sell to BUYER and BUYER hereby agrees to buy from SELLER, on and subject to the terms and conditions contained in this Contract, the EROS B1 Satellite and other Deliverables and Services listed in Exhibit A hereto.

2.2    SELLER shall perform its obligations under this Contract pursuant to the terms and provisions of documents forming a part of this Contract (i.e., this Contract and all of its Exhibits).

2.3    SELLER shall perform its obligations substantially as set forth in the Program Schedule attached hereto as Exhibit E.

2.4    The prices to be paid by BUYER to SELLER, as well as the terms of payment and related provisions, shall be as set forth under Exhibit F hereto.

2.5    With regard to the EROS B1 Satellite, the SELLER shall, among other things, be responsible to (i) Deliver the Satellite in accordance with the specification for same (Annex II to Exhibit C hereto), (ii) after Delivery of the Satellite, to correct any deficiencies discovered in the Satellite during the Warranty period and subject to the provisions of the Warranty, all as set forth under Article 10 below, and (iii) carry-out the Launch Campaign, IOT and Management Services all as set forth under Article 9 below. Upon the Delivery of the Satellite by SELLER to BUYER, BUYER shall have the risk of loss of the Satellite and shall be responsible to purchase insurance for any loss or damage to the Satellite thereafter.

ARTICLE 3      QUALITY CONTROL

3.1    The EROS B1 Satellite and all other Deliverables shall be manufactured by the SELLER in accordance with the applicable specifications and standards prevailing at the SELLER's premises at the time of manufacture for the supply of same or similar items, in particular in accordance with the standards and procedures identified in the SOW. SELLER will provide Hebrew copies of its Quality Assurance (QA) and Product Assurance (PA) specifications and procedures to BUYER within thirty (30) days of BUYER's request for same.

3.2    The SELLER shall perform Quality Control and Inspection while manufacturing and/or inspecting the Satellite and other Deliverables, as well as when performing any Services hereunder, in accordance with the standards of the aerospace industry and the practices and procedures utilized by the SELLER in the performance of the same or similar activity generally.

3.3    BUYER shall have the right, on a non-interference basis, to have its representatives inspect the work in progress at SELLER's facility, subject to reasonable notice and compliance with applicable security requirements of the SELLER. The said

COMPANY CONFIDENTIAL

representatives shall bring to the attention of the SELLER's Program Manager any non-conformities or defects discovered during said inspection/observance, and SELLER shall take the necessary corrective action. To the extent that BUYER receives any data or learns any information by inspection, BUYER will maintain all such data and information in strict confidence and will not use or disclose same to third parties without the express written approval of SELLER.

3.4    SELLER shall make available to BUYER office space and office services at SELLER's facility.

ARTICLE 4    INSPECTION AND ACCEPTANCE

4.1    BUYER shall have the right, on a non-interference basis (i.e., so as not to interrupt the work in progress at SELLER), to have its representatives observe the final tests performed on the EROS B1 Satellite and on the EROS/GCS, subject to compliance with applicable security requirements of the SELLER. Such visits shall be coordinated between the parties upon the request of BUYER from time to time. The said representatives shall bring to the attention of the SELLER's Program Manager any non-conformities or defects discovered during said observance, and SELLER shall take the necessary corrective action.

4.2    Upon completion of the EROS B1 Satellite Acceptance Test (as defined in the SOW) to be performed by SELLER at its facility on the fully integrated Satellite and prior to the shipment of the integrated and tested Satellite, the SELLER shall conduct at its facility the Satellite Acceptance Review which will be attended by SELLER and BUYER. SELLER shall provide the BUYER fifteen (15) days notice of the Satellite Acceptance Review together with all relevant documentation. In the event BUYER's duly authorized representative fail to be present at the Satellite Acceptance Review at the stipulated date, an extension of additional five (5) days, which will be considered as an excusable delay for the SELLER, upon BUYER's request shall be provided to BUYER. At the end of the Satellite Acceptance Review, the BUYER and SELLER shall sign a Certificate of Successful Completion of the Satellite Acceptance Review, noting outstanding action items, if any. Should the BUYER's duly authorized representative fail to be present at the Satellite Acceptance Review or unreasonably fail to sign the Certificate of Successful Completion thereof, then SELLER shall be entitled to have its own representative sign on behalf of the BUYER the said Certificate of Successful Completion, whereupon SELLER will be free to deliver the Satellite to the BUYER. The Satellite Acceptance Review shall be deemed successfully completed notwithstanding the existence of specification deviations which SELLER demonstrates to BUYER's reasonable satisfaction have no material adverse effect upon the capability of the Satellite to perform its in-orbit mission.

4.3    SELLER shall conduct, in accordance with the Acceptance Test Plans, an inspection and checkout of the Satellite upon its arrival at the Launch Site to assure that there was no material impact to the Satellite during shipping and handling. The SELLER shall provide the BUYER five (5) days notice of the beginning of the inspection/checkout. The BUYER shall have the right to witness the inspection/checkout. SELLER shall, as part of its Warranty obligations under Article 10 below, promptly correct any discrepancies

**COMPANY CONFIDENTIAL**

found in the checkout so as to minimize the impact on the Launch schedule. Upon the successful completion of the Satellite Acceptance Review and Delivery of same (as defined below), and without derogating from SELLER's responsibility to perform the Services, SELLER's remaining obligation and responsibility for the Satellite shall be the Warranty obligations under Article 10 below.

4.4     After the successful Launch of the Satellite into its designated orbit, the SELLER shall conduct for the BUYER an In Orbit Test of the Satellite (IOT), in accordance with the Acceptance Test Plans. At the end of this activity, the SELLER shall also conduct a Commissioning Review in accordance with the SOW. In the event of any failure in the Satellite discovered in the IOT, SELLER shall provide to the BUYER all reasonable assistance in documenting the nature and cause of the failure and provide technical assistance to the BUYER in preparing, submitting, and prosecuting any insurance claim the BUYER may have with respect to such failure.

ARTICLE 5     PERMITS AND LICENSES: GOVERNMENT APPROVALS

5.1     The SELLER represents that it has obtained and is in possession of a written authorization from the authorities of its government for the sale of the Satellite and Services hereunder. Upon the finalization of the selection of the Launch Company, SELLER shall use its best efforts to obtain any required licenses required (1) for the export of the Satellite and other Deliverables and Services to the country of such Launch Company, (2) as well as for the import of the Satellite and SELLER personnel to the Launch Site. A failure to obtain any required license for the export of the Satellite and other Deliverables to a mutually acceptable Launch Site within three months of the time requested by SELLER shall entitle either Party to terminate this Contract for Convenience and the provisions of Article 11 below shall apply, provided that if SELLER exercises the right of termination hereunder it shall not be entitled to the profit allocated under a Termination for Convenience. BUYER hereby undertakes to comply with any restrictions or conditions imposed under the export license, including without limitation, on the sale of the Satellite or any services or goods related thereto to non-approved customers. It is agreed and understood that, without derogating from the significance of any other provision of this Contract, a violation by BUYER of the conditions or restrictions of an export license shall constitute a fundamental breach of this Contract and SELLER, if so directed by a government representative, will, inter alia, be entitled to immediately cease the operation of or access to any Satellite involved and BUYER shall not prevent the SELLER from doing so.

5.2     The SELLER shall manufacture or perform (as applicable) the Deliverables and Services in accordance with all applicable laws, government rules, regulations and ordinances and the conditions of all applicable permits and licenses.

5.3     SELLER shall assist BUYER from time to time with respect to any applications to international telecommunication organizations for licenses or permits required by BUYER to provide its Customers with services from the Satellite.

ARTICLE 6     TITLE AND RISK OF LOSS

COMPANY CONFIDENTIAL

6.1    Title and Risk of Loss, damage, or failure of the Satellite to be delivered under this Contract shall pass from SELLER to BUYER FOB at the SELLER's facility after successful completion of the Final Satellite Acceptance Test by SELLER at SELLER's facility after packing of same by SELLER in the appropriate packing container for same ("Delivery" of the Satellite), subject to the continuing obligations of SELLER under Article 10 Warranty. SELLER shall, prior to the Delivery of the Satellite, include the Satellite and its corresponding work-in-progress under SELLER's standard insurance policies.

6.2    Title and Risk of Loss or damage to any other item of Deliverables shall be FOB SELLER's premises, after completion of its respective Acceptance Test or inspection, as the case may be ("Delivery" of other Deliverables).

ARTICLE 7    FORCE MAJEURE

7.1    In case of a delay due to Force Majeure or unforeseen circumstances beyond the SELLER's control and without the fault or negligence of the SELLER (including but not restricted to acts of God and/or acts of governments in their sovereign or contractual capacity, and/or of nature, war, mobilization, export embargoes, fires, floods, epidemics, quarantines, force majeures of subcontractors, strikes, lockouts, freight embargoes and unusually severe weather), the period of performance or delivery shall be extended by a time equal to the duration of such delay and the time needed to remedy the consequences of the delay. In the event of a force majeure which prevents the performance by SELLER for more than ninety (90) days, BUYER shall be entitled to terminate this Contract for convenience in accordance with the provisions of Article 11 hereto.

7.2    SELLER shall notify BUYER as soon as SELLER becomes aware that a Force Majeure event will affect the performance of this Contract. In all cases the SELLER shall use reasonable efforts to avoid or minimize such delay.

ARTICLE 8    PENALTIES FOR DELIVERY DELAYS

8.1    In the event that SELLER fails to complete the Delivery of the Satellite pursuant to the Program Schedule (as same may be extended pursuant to the provisions of Sub-Article 7.1, "Force Majeure" above or is otherwise excused under the terms of this Contract), SELLER shall pay to BUYER, a penalty of a percentage of the escalated Net Contract Priceof the Satellite (as defined in Exhibit F hereto) for each month of delay or pro rata portion thereof, as follows:

| End of Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Penalty % | 0% | 1% | 1.5% | 1% | 1% | 1.5% | 2% |
| Total Penalty | 0% | 1% | 2.5% | 3.5% | 4.5% | 6% | 8% |

8.2    The penalty specified in Paragraph 8.1 above, shall be the BUYER's sole remedy for the SELLER's late delivery under this Contract and shall be in lieu of all damages, or the right to Terminate for Default for delay until the delay has resulted in the maximum

COMPANY CONFIDENTIAL

amount stated in Paragraph 8.1. At any time after a period of forty-five (45) days of delay and upon the written request of BUYER the parties will meet to determine a reasonable course of action to mitigate the consequences of such delay and continue the program. If after the delay is in excess of the period resulting in the imposition of the maximum amount under Paragraph 8.1, BUYER may exercise its right to terminate this Contract for SELLER's default pursuant to Article 13 below. Pending the successful completion of the Satellite Acceptance Review, BUYER shall have no other rights or remedies for late delivery of any other Deliverable.

8.3     Except to the extent otherwise expressly stated in Sub-Article 13.2 below, in no event shall SELLER be liable for any special, incidental or consequential damages of any kind (including without limitation loss of revenues and loss of profits) caused by SELLER's delay.

8.4     In the event there is a delay in the Launch, SELLER shall, upon BUYER's request, submit a proposal for storage and maintenance of the Satellite at SELLER's facility pending the availability of the Launch. In such event, the Delivery will be deemed achieved upon notice by SELLER to BUYER of the readiness for shipment of the Satellite.

ARTICLE 9     LAUNCH CAMPAIGN, IOT AND MANAGEMENT SERVICES

9.1     (A) SELLER shall perform the Launch Campaign, as defined in SOW, in support of the BUYER's Launch at the Launch Site. The Parties will coordinate the scheduling of such activity.

(B) If the launching EROS B1 Satellite will be made with Launch Vehicle different from Launch Vehicle for EROS A1 Satellite and EROS A2 Satellite, then SELLER shall provide a list of required equipment to be provided by the BUYER at the Launch Site and the BUYER shall be responsible to supply or cause the Launch Company to supply all such equipment in a timely manner. The equipment will be the general equipment which is typically available at a western launch site (which does not include SELLER's special test or installation equipment). In addition, BUYER and SELLER shall coordinate the terms and conditions of the Launch Services Agreement with the Launch Company with respect to any required facilities and/or services and/or technical cooperation and/or information which SELLER will need in its performance of the Launch Campaign and IOT.

(C) Prior to the time that SELLER enters the Launch Site, the BUYER shall arrange for security arrangements reasonably satisfactory to SELLER.

(D) If the launching EROS B1 Satellite will be made with Launch Vehicle different from Launch Vehicle for EROS A1 Satellite and EROS A2 Satellite, then parties agree that SELLER shall actively participate in the selection of the Launch Company and the definition of the provisions under the purchase contract with the Launch Company defining the technical activity and interface between the Launch Company and the SELLER. Furthermore, the parties agree that the said purchase contract will

COMPANY CONFIDENTIAL

designate the SELLER as the technical designee of the BUYER vis-a-vis the Launch Company, with the SELLER performing the activities generally described in the SOW under Management Services. These services will be carried out by SELLER in coordination with BUYER.

9.2    (A)    SELLER shall make the EROS/TTC-MBT available for IOT and SELLER shall train the necessary people to enable operation of the EROS/GCS during the performance of IOT. The parties will coordinate the scheduling of such activity

       (B)    Prior to the time of the IOT SELLER shall arrange for security arrangements reasonably satisfactory to BUYER

ARTICLE 10    WARRANTY

10.1    SELLER warrants that at the time of Delivery the Satellite and other Deliverables delivered under this Contract shall comply with specifications as defined in Exhibit C, and shall be free from material defects in material or workmanship. The SELLER's obligation in respect of such a defect is limited to the repair or replacement, at SELLER's option, of the defective part or item thereof of the Satellite/Deliverable in which BUYER discovers such defect, provided that BUYER notifies SELLER immediately upon becoming aware of such defect, and in no event after the Warranty Period (as defined below). The balance of the warranty period shall apply to the repaired or replaced item. Upon BUYER's written request, SELLER shall submit a proposal for the extension of the aforesaid Warranty period for an additional two (2) year period on the basis and condition that the Satellite will be stored by BUYER in accordance with SELLER's then applicable specification for storage of same.

10.2    The "Warranty Period" for the Satellite (or any other Deliverables to be placed on the Launch Vehicle) shall be the earlier of (a) twelve (12) months from delivery and (b) the Launch of the Launch Vehicle on which the Satellite is installed. The "Warranty Period" for any other Deliverable hardware, shall be twelve (12) months after Delivery of same.

10.3    Unless otherwise determined by SELLER, on a case-by-case basis, all warranty repairs shall be performed at SELLER's premises. BUYER shall be responsible to transport the goods to SELLER and SELLER shall be responsible to transport the repaired/replaced goods back to BUYER. Any removed parts of goods shall become the property of SELLER.

10.4    The warranty set forth in Paragraph 10.1 above shall apply only to the extent that the warranted Deliverable is stored, handled and maintained in accordance with the relevant manuals and other written instructions of SELLER and its subcontractors in respect of the warranted item.

       10.5    SELLER shall redo any Service which is found to be defective or incomplete to the extent such re-performance is necessary for the purpose of Launch and/or operating the Satellite.

COMPANY CONFIDENTIAL

10.6 THE WARRANTY PROVIDED IN THE FOREGOING PROVISIONS OF THIS ARTICLE AND THE OBLIGATIONS AND LIABILITIES OF SELLER THEREUNDER ARE EXCLUSIVE AND IN LIEU OF AND BUYER HEREBY WAIVES ALL OTHER RIGHTS, REMEDIES, WARRANTIES, GUARANTEES OR LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW, CONTRACT, NEGLIGENCE OF ANY DEGREE, STRICT LIABILITY OR OTHERWISE, IN RESPECT OF THE DELIVERABLES, SERVICES, OR DOCUMENTATION TO BE DELIVERED/PERFORMED UNDER OR IN CONNECTION WITH THIS CONTRACT (INCLUDING WITHOUT LIMITATION, IT IS IN LIEU OF ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). THIS WARRANTY SHALL NOT BE EXTENDED, ALTERED OR VARIED EXCEPT BY EXPRESS WRITTEN AGREEMENT OF SELLER AND BUYER. IN NO EVENT SHALL SELLER OR SELLER's SUBCONTRACTORS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION, LOSS OF REVENUES, LOSS OF PROFITS, ADDITIONAL OR INCREASED COSTS OR ANY OTHER DAMAGES).

ARTICLE 11     TERMINATION FOR CONVENIENCE

11.1 The BUYER may, upon written notice to the SELLER, at any time terminate all, but not part of, this entire Contract in accordance with the terms set forth below, and the SELLER shall immediately cease work in the manner and to the extent specified.

11.2 Upon receipt of a notice of termination, as provided in Paragraph 11.1 above, the SELLER shall take the following actions:

(A) stop work under this Contract on the date specified in the notice of termination;

(B) place no further orders, subcontracts for materials, services, or facilities, except as may be necessary for minimizing the overall costs of such termination;

(C) terminate orders and subcontracts, except as may be necessary for minimizing the overall costs of such termination;

(D) settle all outstanding liabilities and all claims arising out of such termination or orders, or subcontracts for material, services or facilities; and

(E) take such action as may be reasonably necessary for the protection and preservation of the property related to this Contract which is in possession of the SELLER or any subcontractor and in which the BUYER has or may acquire an interest.

11.3 Within six (6) months after determination of the cost of the termination (including related costs incurred as a result of the termination), SELLER shall submit to the BUYER its termination claim consisting of the costs of all work done up to the date of termination, including any payments made to subcontractors which are non-refundable to SELLER, and including the settlement with vendors or subcontractors and other costs connected with the termination. The term "costs" as used herein includes direct costs, indirect costs

COMPANY CONFIDENTIAL

and general and administrative expense, that are posted to SELLER's books of account in connection with this Contract in accordance with his standard accounting practice for commercial contracts, consistently applied. In addition to these incurred costs, such termination claim shall include, and the BUYER shall be obligated to pay, a profit of ten percent (10%) on such costs. In no event shall a termination settlement exceed the Contract Price.

11.4    The termination claim shall be accompanied by a certificate signed by the Chief Financial Officer of the SELLER stating that the claim properly includes the costs incurred by SELLER in connection with the termination. In the event BUYER desires independent verification of the claim, it may request SELLER's independent Certified Public Accountant (CPA) to audit the costs incurred by SELLER and report to the parties, subject to such qualifications as SELLER's independent CPA may make in its report, the total amount due under that portion of the claim. Such a report shall constitute a final determination of actual costs notwithstanding the provisions of Article 15, Law and Arbitration, of this Contract save that if the costs determined by such report exceed the amount of SELLER's termination claim, BUYER shall only be obliged to pay the amount of SELLER's termination claim. Costs of the audit and report billed by SELLER's independent CPA shall be borne by BUYER.

11.5    BUYER shall within thirty (30) days pay to SELLER for any termination for convenience hereunder the amount claimed by SELLER unless BUYER requests verification by SELLER's independent CPA. In the event verification is requested, BUYER shall place the amount claimed by SELLER into an interest-bearing escrow account within thirty (30) days after receipt of invoice. Within thirty (30) days after receipt of aforementioned report, BUYER shall pay all amounts set forth in said report.

11.6    Notwithstanding the payment by BUYER of the amounts set forth in this Article, SELLER shall retain title to and possession of all items of Deliverables produced or procured by SELLER in connection with this Contract. SELLER shall make reasonable efforts to use such items in contracts for other customers, and to the extent of such use, SELLER will refund to the BUYER any amounts received by SELLER from such other customer for such items up to the amounts received by SELLER from the BUYER for same. If so requested by BUYER at the time of giving SELLER the notice of Termination hereunder, SELLER shall (i) have the identification of such items separately certified by an independent Israeli CPA and (ii) at the time of SELLER's resale of such items, have an independent Israeli CPA confirm the price of the sale of such items or the portion of the price of the completed product incorporating such item properly allocable to such items. In the event that SELLER is considering selling all or an item of the Deliverables for an amount that would not be sufficient to reimburse BUYER for the monies paid by BUYER with respect to that item/s, SELLER shall first obtain BUYER's agreement for the sale at such lower price.

11.7    SELLER shall use reasonable efforts to place subcontracts on terms that will enable SELLER to terminate in a manner consistent with this Article.

ARTICLE 12    RIGHTS FOR INFRINGEMENT OF PATENT RIGHTS

COMPANY CONFIDENTIAL

12.1   SELLER hereby agrees to indemnify and hold harmless BUYER from and against any claim by any third party that the Deliverables or any part thereof violates any valid claim under the Patent laws of the State of Israel and Russia by virtue of the production, operation, use or sale of the Deliverables or imagery products retrieved from the Satellite;

**PROVIDED** that the BUYER shall notify the SELLER as soon as possible of the receipt by the BUYER of any claims referred to in this Clause and give the SELLER complete control over the defense or settlement of such claims and the SELLER may, at its own expense:

    (a)   conduct any litigation or negotiate any settlement arising therefrom in such a way that the BUYER is able to continue using the Satellite without infringing or interference;

    (b)  procure for the BUYER the right to continue using the Satellite are as contemplated under this Contract;

    (c)  modify or amend the Satellite so that the same becomes non-infringing without affecting the capability or performance of the Satellite;

    (d)  replace the part of the Satellite so infringing with other equipment or part thereof of identical capability and performance; or

    (e)  defend such claims.

**PROVIDED** further that the BUYER shall also provide necessary information and assistance to SELLER in the defense of any such claim subject to coordination of BUYER and SELLER on any applicable security restrictions.

## ARTICLE 13    TERMINATION FOR SELLER'S DEFAULT

13.1   BUYER may issue a written notice of default (the "Default Notice") to SELLER if the Delivery of the Satellite is not achieved by the time the maximum amount is accrued as liquidated damages under Article 8 above, as such date may be adjusted by Article 7, Force Majeure, or as otherwise mutually agreed by the parties.

13.2   In the event BUYER terminates this Contract as provided in Article 13.1, the BUYER shall be entitled to a refund of all payments previously made to the SELLER under this Contract, together with interest at the rate of LIBOR (six (6) month LIBOR published by Bank Leumi Ltd. applicable at the day payment was due) plus two percent (2%) together with (i) the amount of late penalties fees paid to the Launch Company and (ii) the amount paid by BUYER to the Launch Company under the purchase contract with the Launch Company for the specific non-recurring costs to implement changes to the Launch vehicle to interface with the Satellite that are not refundable to BUYER, and all Deliverables then in existence shall be the sole property of SELLER.

COMPANY CONFIDENTIAL

13.3    All amounts received by BUYER pursuant to Article 8, Penalties for Delivery Delays, hereof shall be offset by SELLER against any refunds or other payments payable to BUYER pursuant to Article 13.2.

13.4    If, after termination of this Contract under the provisions of this Article 13, it is determined by arbitration or admitted in writing by BUYER that SELLER was not in default under the provisions of this Article, or that the default was excusable under the provision of Article 7, Force Majeure, such termination shall be considered a termination for convenience of BUYER and the provisions of Article 11 shall apply and BUYER shall in addition (notwithstanding Article 15, Law and Arbitration) reimburse SELLER's cost of the arbitration (including legal counsel).

13.5    The rights and remedies provided to BUYER in this Article 13, in Article 8, Penalty for Delivery Delays and Article 10, Warranty, shall be exclusive and in lieu of any other rights and remedies provided by law or in equity in the event SELLER fails to meet its obligations to perform under this Contract.

13.6    Notwithstanding the above, SELLER's entire liability for breach under this ARTICLE shall not exceed the Contract Price plus applicable interest pursuant to Sub-Article 13.2. In no event shall SELLER be liable for any indirect, incidental, special or consequential damages (including but not limited to lost revenues or profits). This Paragraph shall survive the expiration or termination of the Contract for whatever cause.

ARTICLE 14    TRANSFER OF INFORMATION; CONFIDENTIALITY

14.1    SELLER and BUYER may transfer or exchange information during the performance of the work, in oral or written form, which may include specifications, drawings, sketches, models, samples, computer programs, reports, data, techniques, designs, codes, documentation, and financial, statistical or other technical information essential to the objectives of this Contract. All disclosures of such information will be treated as proprietary if marked as "Proprietary" by the party making the disclosure at the time of disclosure.

14.2    Subject to the provisions of Paragraph 14.3 below, the party receiving the proprietary information of the other party shall maintain such information in confidence and shall not use such information except as expressly authorized by this Contract. Each party agrees to use the same care and discretion to avoid unauthorized disclosure, publication or dissemination of the other's proprietary information and the unauthorized use thereof as the receiving party uses with respect to similar information of its own, but in no event, less than reasonable care. Should it become legally necessary for either party to disclose certain of the other's proprietary information to a third party, it shall be disclosed only to the extent required by law and after a five (5) day prior written notification to the other party of the requirement for disclosure.

14.3    The obligations of confidentiality and restrictions on use specified in this Article shall not apply to any information that:

COMPANY CONFIDENTIAL

    (A)   is already in the possession of the receiving party without obligation of confidentiality at the time of disclosure;

    (B)   is independently developed by the receiving party or any of its Affiliates or subcontractors prior to disclosure as evidenced by appropriate documents;

    (C)   is or becomes publicly available without breach of this Contract and without the fault of the receiving party;

    (D)   is released for public disclosure by the disclosing party.

14.4    SELLER and BUYER shall take reasonable efforts necessary, including the appropriate contractual provisions in subcontracts, to ensure the confidentiality of all proprietary information of the BUYER which may be disclosed to subcontractors.

14.5    The receiving party agrees that: (i) any proprietary information disclosed hereunder shall be used by the receiving party solely for the purpose of performing its functions in connection with the parties' relationship with respect to the purposes of this Contract; (ii) it will not use the proprietary information disclosed hereunder for any other purpose; and (iii) it will not distribute, disclose or disseminate to anyone such proprietary information of the disclosing party, except that either party may disclose to its own employees or subcontractors on a need-to-know basis, and either party may disclose with the consent of the disclosing party which consent will not be given unless such third party executes a proprietary data protection Contract with terms consistent with the requirements herein prior to receiving such information. For the sake of clarity, BUYER is entitled to use the deliverable Documentation hereunder for purposes of analyzing the performance by SELLER hereunder, for purposes of participating in inspections and/or acceptance tests at SELLER's premises and at the Launch Site, and for the retrieval of data from the Satellite once in orbit.

14.6    The Parties shall designate in writing (from time to time) specific individuals as the point for receiving proprietary information exchanged between the parties pursuant to this Contract.

14.7    The confidentiality obligations in this Article shall survive expiration or termination of this Contract for whatever cause.

14.8    Nothing herein shall require a party to transfer proprietary information to the other party.

ARTICLE 15    LAW AND ARBITRATION

15.1    Any disputes or disagreement arising between the parties in connection with this Contract or in relation to the interpretation or execution thereof, will be given time for settlement within three (3) months from the date of notification of a dispute from one party to the other party. In case there is no solution, the dispute shall be settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with said Rules. Arbitration proceedings shall take place in Tel Aviv, Israel. The arbitration award shall be final and binding upon the Parties.

COMPANY CONFIDENTIAL

15.2   This Contract shall be governed and interpreted under and in accordance with the laws of the State of Israel.

## ARTICLE 16    INDEMNITY

16.1   BUYER and SELLER shall each be individually responsible for and have no claims of any nature whatsoever against any of the other parties for any loss of or damage to its own property arising out of or in connection with the Satellite and/or Services supplied/performed hereunder, regardless of how such loss and/or damage was caused, including negligence of the other Party or its subcontractors, their respective servants or agents. Each Party shall have the right, in its sole discretion and at its own expense, to insure its own property.

16.2   BUYER and SELLER shall each be individually responsible for the bodily injuries or death suffered by its own servants or agents arising out of or in connection with the Satellite and/or Services supplied/performed under this Contract, regardless of how such injury, or death was caused, including negligence of any other party, its servants or agents. In the event of a claim by a servant or agent of any party against any one of the other party/parties, the employer party will defend and pay on behalf of such party/parties any amounts which said other party/parties is legally obliged to pay. Each party has the right, in its sole discretion and at its own expense, to insure its liabilities herein.

## ARTICLE 17    MISCELLANEOUS

17.1   <u>Amendments</u>

The Contract may not be modified except by written amendment signed by duly authorized representatives of both parties.

17.2   <u>Changes</u>

BUYER shall have the right to request a change(s) to the Contract and SELLER shall response to such request. Such response shall include the price, schedule, system performances, interfaces and all other impacts of the change. BUYER shall have the option, after receiving this response, to decide whether to implement the change and then to direct SELLER to proceed with the change. In case of the implementation of the change by SELLER, BUYER shall be responsible for all impacts of the change as presented by the SELLER.

17.3   <u>Publicity</u>

Except for internal publications/releases not intended for the public at large, each party shall obtain the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed, concerning the content and timing of news releases, articles, brochures, advertisements, prepared speeches and other information releases concerning this Contract or any part hereof, within a reasonable time prior to the release of such information.

COMPANY CONFIDENTIAL

17.4 <u>Notices</u>

Any notices or requests or receipts required or desired to be given or made hereunder shall be in writing and shall be effective if delivered by hand to an officer of the recipient party or sent by registered mail or by facsimile transmission or telex and received by the recipient party, at the address indicated below:

In respect of BUYER, to:

West Indian Space
Diagoras House .
7, Agias Phylaxeos Street
Limassol - Cyprus
Attention: CEO
Fax: 357-5-535 0495

In respect of SELLER, to:

Israel Aircraft Industries Ltd., MBT Division
Yehud Industrial Zone
Yehud, Israel        56000
Attention: EROS Program Manager
Fax: 972 3 531 4560

Any notice or request shall be deemed to have been served if delivered by hand, when delivered, if sent by registered airmail, upon receipt, and if sent by facsimile transmission, upon receipt.

17.5 <u>Language</u>

All communications required under this Contract shall be in the English language. All deliverable Documentation shall be in English or Hebrew as mutually agreed by the parties based upon the use of such Documentation or as specifically set forth in this Contract. All EROS specific Documentation generated under this Contract shall be delivered in English.

17.6 <u>Assignment</u>

Neither party hereto shall assign, or transfer, either in whole or in part, this Contract or any of its rights, duties or obligations thereunder to any person or entity, without prior express written approval of the other party, except that either party may assign or transfer any of its rights, duties or obligations under this Contract, either in whole or in part, to a parent company at any tier or wholly-owned subsidiary thereof provided always that the party making the assignment or transfer shall remain fully and primarily liable with respect to performance of all duties and obligations set forth in this Contract, including compliance with all applicable laws and regulations.

17.7 <u>Severability</u>

COMPANY CONFIDENTIAL

In the event any one or more of the provisions of this Contract shall, for any reason, be held to be invalid or unenforceable, the remaining provisions of this Contract shall be unimpaired, and the invalid or unenforceable provision shall be replaced by a mutually acceptable provision which, being valid and enforceable, comes closest to the intention of the parties underlying the invalid or unenforceable provision.

17.8   Integration

THIS CONTRACT, TOGETHER WITH THE EXHIBITS, CONTAINS THE ENTIRE CONTRACT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF. ALL PRIOR UNDERSTANDINGS, REPRESENTATIONS AND WARRANTIES (INCLUDING THOSE CONTAINED IN SALES, PROMOTIONAL AND/OR MARKETING MATERIALS) BY AND BETWEEN THE PARTIES, WRITTEN OR ORAL, THAT MAY BE RELATED TO THE SUBJECT MATTER HEREOF IN ANY WAY, INCLUDING, WITHOUT LIMITATION, THE EXISTING SATELLITE SUPPLY CONTRACT, ARE SUPERSEDED BY THIS CONTRACT.

17.9   Inter-Party Waiver of Liability

BUYER hereby agrees to be bound by a no-fault, no-subrogation inter-party waiver of liability and related indemnity provisions provided for in the Launch Services Agreement and to cause its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract and any other person having an interest in the Satellite (including customers of BUYER), to accede to such waiver. BUYER also shall obtain from its insurers, and shall cause its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract and any other person having an interest in the Satellite (including customers of BUYER) to obtain from their insurers, an express waiver of such insurers' rights of subrogation with respect to any and all claims that have been waived pursuant to this Article 17.9.

17.10   Waiver of Subrogation

Each party to this Contract shall obtain a waiver of subrogation and release of any right of recovery against the other party to this Contract and its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract, from any insurer providing coverage for risk of loss or non-compliant performance of or damage to the EROS B1 Satellite.

ARTICLE 18     EFFECTIVE DATE OF CONTRACT

The Effective Date of Contract (EDC) is conditioned upon the completion of all of the following:

1.   Signature of this Contract by both parties; and

2.   Upon receipt by SELLER of is first payment hereunder.

**COMPANY CONFIDENTIAL**

ARTICLE 19    ORDER OF PRECEDENCE

In the event of any inconsistency among or between the parts of this Contract, such inconsistency shall be resolved by giving precedence in the order of the parts as set forth below:

A.  These Contract Terms and Conditions.

B.  The Exhibits hereto in the following order of precedence:

Exhibit "D"     Statement of Work (SOW);
Exhibit "F"     Pricing and Payment Terms;
Exhibit "B"     EROS B1 Mission Requirements;
Exhibit "C"     EROS B1 System Specifications; and
All other Exhibits