# Exhibit 3

7 /25/2001          COMPANY CONFIDENTIAL

# SECOND AMENDED AND RESTATED EROS B SATELLITES SUPPLY CONTRACT

THIS SECOND AMENDED AND RESTATED EROS B SATELLITES SUPPLY CONTRACT is duly signed on the 25th day of July,2001  between ISRAEL AIRCRAFT INDUSTRIES LTD., acting through its MBT Division, organized and existing under the laws of the State of Israel, with a place of business in Yehud, Israel (hereinafter referred to as "SELLER"); and IMAGESAT INTERNATIONAL N.V., a company organized under the laws of the Netherland Antilles (hereinafter referred to as the "BUYER" or as the "Company" ).

WHEREAS, BUYER desires to procure an EROS B Satellite, together with certain services, consisting of certain launch services and other services, and ground receiving equipment, and to have an option to procure an additional EROS B Satellite at a price and other conditions as set forth in Exhibit H of this Contract, together with the above mentioned equipment and services at prices to be agreed upon in good faith between the Parties at the time of exercising the option, all subject to the terms and conditions hereof;

WHEREAS, SELLER desires to supply such EROS B Satellite, together with certain services, consisting of certain launch services and other services, and ground receiving equipment, and to provide BUYER with an option to procure an additional EROS B Satellite at a price and other conditions as set forth in Exhibit H of this Contract, together with related equipment and services at prices to be agreed upon in good faith between the Parties at the time of exercising the option, all in accordance with the terms and conditions hereof;

WHEREAS, BUYER and SELLER are parties to the First Amended and Restated EROS B Satellite Supply Contract (the "B1 Satellite Supply Contract"), and the Master Contract (footer number NYK 647966-1.056463.0019) (the "Master Contract"), each dated 25 July 2000;

WHEREAS, BUYER and SELLER desire to amend and restate the  B1 Satellite Supply Contract;

NOW THEREFORE, BUYER and SELLER hereby agree, for good and valuable consideration, the receipt and sufficing of which is hereby acknowledged, to amend and restate the Existing Satellite Supply Contract in its entirety as follows, comprising the following parts and exhibits:

(I)      The Terms and Conditions;

(II)     The Exhibits to this Contract as follows:

Exhibit "A"   Deliverables;
Exhibit "B"   EROS B  Mission Requirements;
Exhibit "C"   EROS B  System Specifications;
Exhibit "D"   Statement of Work (SOW);
Exhibit "E"   Program Schedule;
Exhibit "F"   Pricing and Payment Terms;
Exhibit "G"   EROS B  In-Orbit Test; and
Exhibit "H"   EROS B2 Option

OB

25 July 2001

**COMPANY CONFIDENTIAL**

IN WITNESS WHEREOF this CONTRACT has been executed this 25 day of July, 2001 by the duly authorized representatives for the parties.

IMAGESAT N.V.                          ISRAEL AIRCRAFT INDUSTRIES LTD.

BY:                                     BY:
NAME:         Jacob Weiss               NAME:         Yehoshua Eldar
TITLE:        CEO                       TITLE:        Director of Finance
                                                      IAI/ MBT Division

COMPANY CONFIDENTIAL

# PART I

# TERMS AND CONDITIONS

COMPANY CONFIDENTIAL

ARTICLE 1          DEFINITIONS

1.1     For purposes of this Contract, the following terms shall have the meaning stated hereunder:

(a)     "Acquisition, Archiving and Dissemination" or "AAD" means a customer which is able to collect, upon request, any imaging plan to be performed by the Satellite when passing within the customer's ground receiving station coverage area.

(a')    "ARO" means the effective date on which the Program Schedule commences and shall be the date set forth in Paragraph 2.2 of Exhibit F.

(b)     "Contract" means this written agreement, including the Exhibits annexed hereto and made a part hereof.

(c)     "Default Notice" has the meaning set forth in Paragraph 14.1.

(d)     "Deliverables" means the items of hardware (with their respective embedded software) to be delivered by SELLER under this Contract and which are listed in Exhibit A hereto.

(e)     "Delivery" shall have the meaning set forth in (a) with respect to the EROS B Satellites, Paragraph 6.1 and (b) with respect to any other Deliverables, Paragraph 6.2.

(f)     "Documentation" means documentation to be delivered under this Contract as set forth in the SOW.

(g)     "Effective Date of Contract" means the date that the last condition of Article 19 is completed.

(h)     "EROS A Satellite" or "EROS A" shall mean the electro-optical earth observation satellite supplied by SELLER to BUYER under FIRST AMENDED AND RESTATED EROS A1 SATELLITE SUPPLY CONTRACT.

(i)     "EROS B" shall mean the electro-optical earth observation satellite to be supplied by SELLER to BUYER under this Contract.

(j)     "EROS B1" shall mean the first of the two EROS B Satellites which is being ordered under this Contract.

(k)     "EROS B2" shall mean the EROS B satellite which Buyer has been granted an option to purchase under this Contract.

(l)     "EROS B1 Contract Price" means the total amount to be paid to SELLER by BUYER for the Satellite to be provided under the terms of this Contract.

Eros B_Supply_BD257clean.doc

COMPANY CONFIDENTIAL

(m)   "EROS B2 Contract Price" means the total amount to be paid to SELLER by BUYER for the EROS B2to be provided under the terms of this Contract.

(n)   "EROS/GCS" or "EROS Ground Control System" means the combination of EROS/SCC, to be located in Israel at BUYER's designated location, together with EROS/TCC-Network.

(o)   "EROS/GCS ATP" or "EROS/GCS Acceptance Test Plans" means the EROS/GCS test plan which shall be submitted to BUYER in accordance with the SOW.

(p)   "EROS/SCC" or "EROS/SCC-B" or "EROS Satellite Control Center" means the collection of hardware and software required for the planning and preparation of all necessary commands needed for the operation of the EROS B Satellites, up to and including the bit-stream level (satellite imaging planning for AAD and PAS customers, satellite preparation for SOP, AAD and PAS customers, satellite housekeeping, orbit corrections and satellite resources management).

(q)   "EROS B / ICD" means the ICD as defined in the SOW hereto.

(r)   "EROS/TCC" or "EROS Tracking and Communication Center" means a combination of EROS/TTC and a dedicated EROS/TCC Control Computer, while such EROS/TCC Control Computer is located at EROS/SCC site.

(s)   "EROS/TCC Control Computer" or "EROS/TCCOM" means a computer being designated to manage the communication with the EROS A and EROS B Satellites and to be an intermediary between the EROS/SCC-A (EROS/SCC for EROS A Satellite) and EROS/SCC-B and the EROS/TTC.

(t)   "EROS/TTC" or "EROS Tracking Telemetry and Command" means an appropriate antenna and appropriate communication equipment enabling (1) the tracking of the EROS A and EROS B Satellites, (2) the receiving of the telemetry from the EROS A and EROS B Satellites and (3) the transmission of commands to the EROS A and EROS B Satellites.

(u)   "EROS/GRS" or "EROS Ground Receiving Station" means the hardware and software, which will enable (1) tracking of the EROS B Satellite, (2) receiving of the imagery from the EROS B Satellite and (3) processing, archiving and dissemination of the imagery.

(v)   "EROS/TTC-MBT" means the SELLER's existing EROS/TTC located at SELLER's premises.

(w)   "EROS/TCC-NETWORK" means a combination of all installed EROS/TCC's, while each EROS/TTC is located at different site worldwide selected by BUYER, including but not limited by, EROS/TCC-MBT and EROS/TCC-POLAR.

(x)   "EROS/ TCC-POLAR" or "EROS/TCC-RELAY-STATIONS" means the EROS/TTC located at Kiruna/Sweden premises or such other EROS/TTC site at which it may be moved or installed by BUYER at any other location in accordance with BUYER decision.

COMPANY CONFIDENTIAL

(y)  "Launch" means the ignition of the launch gas generator in the Transport-and-Launch Canister, as defined in the "START-1 Launch Vehicle User's Handbook", if such ignition is followed by successful separation of all electrical connections (provided that the launching of the EROS B Satellite will be performed on a START-1 Launch Vehicle).

(z)  "Launch Campaign and IOT" means the services as defined in the related paragraph in Exhibit D under the Contract.

(aa) "Launch Company" means the company selected by BUYER in consultation with SELLER to provide the launch vehicle and launch services to launch the Satellite into orbit.

(bb) "Launch Site" means the site where the Launch Company has designated as the Launch Site.

(cc) "Launch Vehicle" means the launch vehicle selected by BUYER, in consultation with SELLER, to launch the Satellite.

(dd) "Management Services" means the services as defined in the related paragraph in Exhibit D under the Contract.

(ee) "Priority Acquisition Services" or "PAS" means a customer which is entitled to request an imaging plan to be performed by the Satellite and to collect images gathered by the Satellite in accordance with such imaging plan within 72 hours from such request.

(ff) "Program Schedule" means the schedule for performance attached hereto as Exhibit E.

(gg) "Satellite" means the EROS B1 satellite that meets the EROS B Mission Requirements of Exhibit B, being sold by SELLER to BUYER hereunder in accordance with the EROS B Satellite Specifications of Exhibit C.

(hh) "Satellite Acceptance Review" means the final review to be conducted at the SELLER's facility and which will consist of presenting and reviewing the final satellite test results in accordance with the Acceptance Test Procedures established in accordance with the SOW.

(ii) "Satellite Acceptance Test Plan" or "Satellite ATP" means the Satellite test plan which shall be submitted to BUYER in accordance with the SOW.

(jj) "Satellite In-Orbit-Test" or "IOT" means the set of In-Orbit-Tests to be performed using EROS/TTC-MBT, EROS/TTC-RELAY-STATION, and BUYER's EROS/SCC, as defined in Exhibit G to demonstrate satellite performance compliance with the EROS B Mission Requirements (Exhibit B).

(kk) "Satellite Operating Partner" or "SOP" means a customer which is able to (a) independently generate an imaging plan to be performed by the Satellite when passing within its imaging area, (b) access directly the Satellite from an appropriate ground control station located in the SOP country, in order to load the imaging plan

COMPANY CONFIDENTIAL

to the Satellite, and (c) receive the images gathered during the execution of such imaging plan.

(ll) "Services" means the Launch Campaign, IOT services, Management Services and all other specific services to be performed by SELLER as set forth in Exhibit A, paragraph 2.

(mm) "SOP Ground Command Station" or "SOP/GCS" means the combination of SOP/GRS and SOP/SCC connected to one SOP/TCC.

(nn) "SOP Ground Receiving Station" or "SOP/GRS" means a ground station which includes necessary infrastructure, suitable antenna and a dedicated hardware and software, which enable (1) tracking of the EROS B Satellite, (2) receiving of the imagery from the EROS B Satellite and (3) processing, archiving and dissemination of the imagery.

(oo) "SOP Satellite Command Center" or "SOP/SCC" or "SOP/SCC-B" means the collection of hardware and software required for the planning and preparation of the imaging mission in SOP imaging area for EROS B Satellite.

(pp) "SOP Tracking and Communication Center" or "SOP/TCC" means a combination of (a) an appropriate antenna enabling the tracking of the EROS A and EROS B Satellites, (b) an appropriate communication equipment enabling the receiving of the telemetry from the EROS A and EROS B Satellites and the transmission of commands to the EROS A and EROS B Satellites, and (c) a dedicated EROS/TCC Control Computer, while such SOP/TCC Control Computer is located at the SOP/TCC site.

(qq) "SOP/TCC Control Computer" or "SOP/TCCOM" means a computer being designated to manage the communication with the EROS A and EROS B Satellites and to be an intermediary between the SOP/SCC-A (SOP/SCC for EROS A Satellite) and SOP/SCC-B and the EROS A and EROS B Satellites.

(rr) "Statement of Work" or "SOW" means each of the Statements of Work set forth in Exhibit D hereto.

(ss) 'Warranty Period Event" means the ignition of the launch gas generator in the Transport-and-Launch Canister, as defined in the "START-1 Launch Vehicle User's Handbook" (if the EROS B Satellite will be performed on an alternative Launch Vehicle to the START-1 Launch Vehicle, then comparable provisions shall apply).

(tt) "Total Contract Price" means the total amount to be paid to SELLER by BUYER hereunder for the Satellite, Deliverables and Services.

1.2 Other terms in this Contract are defined in the context in which they are used and shall have the meanings there indicated.

1.3 The Article and Paragraph headings are for convenience of reference only and shall not be considered in interpreting this Contract.

COMPANY CONFIDENTIAL

## ARTICLE 2    SCOPE OF CONTRACT

2.1    SELLER hereby agrees to sell to BUYER and BUYER hereby agrees to buy from SELLER, on and subject to the terms and conditions contained in this Contract,  one EROS B1 satellite and other Deliverables and Services listed in Exhibit A hereto.

2.2    SELLER hereby grants BUYER an option ("the Option") to buy, subject to the terms and conditions contained in this Contract, an EROS B2 satellite and other Deliverables and Services  and as set forth in Exhibit "H" hereto. The BUYER shall have the right to exercise the Option up to 24  months after the Effective Date of the Contract, subject to paragraph 1 of Exhibit H.

2.3    SELLER shall perform its obligations under this Contract pursuant to the terms and provisions of documents forming a part of this Contract (i.e., this Contract and all of its Exhibits).

2.4    SELLER shall perform its obligations substantially as set forth in the Program Schedule attached hereto as Exhibit E.

2.5    The prices to be paid by BUYER to SELLER, as well as the terms of payment and related provisions, shall be as set forth under Exhibit F hereto.

2.6     With regard to each  EROS B Satellite purchased hereunder, the SELLER shall, be responsible to (i) Deliver the Satellite in compliance with the specification as defined in Exhibit C, (ii) after Delivery of the Satellite, to correct any deficiencies discovered in the Satellite during the Warranty Period and subject to the provisions of the Warranty, all as set forth under Article 10 below, and (iii) carry-out the Launch Campaign, IOT and Management Services all as set forth under Article 9 below. Upon the Delivery of a Satellite by SELLER to BUYER, BUYER shall have the risk of loss of the Satellite, all as set forth under Article 6 below, and shall be responsible to purchase insurance for any loss or damage to the Satellite thereafter.

2.7    With regard to all other Deliverables under this Contract, excluding the Satellites,  and as listed under Exhibit "A" hereto, the SELLER shall,  be responsible to (i) Deliver same in compliance with the respective specifications for same and  (ii) after Delivery of same, to correct any deficiencies covered by the Warranty and discovered in same during the Warranty Period and subject to the provisions of the Warranty, all as set forth under Article 10 below.

2.8    In order to enable SELLER to perform its obligations under this Contract, and as a condition precedent thereto, BUYER undertakes to perform it's responsibilities as set forth in this Contract in a timely manner and to furnish to SELLER all the items, equipment and services designated in the SOW as "Buyer-Responsibilities", in conformance with the applicable specifications and in a timely manner  as set forth in the SOW.

2.9    Within sixty (60) days of the date hereof SELLER shall designate a program manager and key executives.  SELLER shall notify BUYER of the names, titles and contact information with respect to such team and manager.  SELLER shall consult with BUYER prior to any replacements of such manager or executives.

COMPANY CONFIDENTIAL

ARTICLE 3          QUALITY CONTROL

3.1    The EROS B Satellites and all other Deliverables shall be manufactured by the SELLER in accordance with the applicable specifications and standards prevailing at the SELLER's premises at the time of manufacture for the supply of same or similar items, in particular in accordance with the standards and procedures identified in the SOW. SELLER will provide Hebrew copies of its Quality Assurance (QA) and Product Assurance (PA) specifications and procedures to BUYER within sixty (60) days of BUYER's request for same.

3.2    The SELLER shall have and will follow a quality control and inspection plan while manufacturing and/or inspecting the Satellite and other Deliverables, as well as when performing any Services hereunder, in accordance with the standards of the aerospace industry and the practices and procedures utilized by the SELLER in the performance of the same or similar activity generally. The Quality Control and Inspection reports for each Satellite shall be kept by Seller for a period of not less than the service life of the respected Satellite.

3.3    BUYER shall have the right, on a non-interference basis, to have its representatives inspect the work in progress at SELLER's facility, subject to reasonable notice and compliance with applicable security requirements of the SELLER. The said representatives shall bring to the attention of the SELLER's Program Manager any non-conformities or defects discovered during said inspection/observance, and SELLER shall take the necessary corrective action. If an acceptance test shall occur at a facility of one of SELLER's major subcontractors, SELLER shall obtain, if such acceptance test is of the camera to be delivered hereunder, and shall use reasonable efforts to obtain, with respect to all such other acceptance tests, for BUYER the right, on a non-interference basis, to have its representatives witness such acceptance tests, subject to reasonable notice and compliance with applicable security requirements of the SELLER and subcontractor. BUYER agrees and represents that such representatives shall be accompanied by a representative of SELLER and that BUYER's representatives shall not communicate and/or give instructions directly or indirectly with such subcontractors.

3.4    SELLER shall make available to BUYER office space and office services at SELLER's facility for BUYER's inspection representative's activities.

ARTICLE 4    INSPECTION AND ACCEPTANCE

4.1    BUYER shall have the right, on a non-interference basis (i.e., so as not to interrupt the work in progress at SELLER), to have its representatives observe the final tests performed on each EROS B Satellite and on any other related equipment and Deliverables, subject to compliance with applicable security requirements of the SELLER. Such visits shall be coordinated between the parties upon the request of BUYER from time to time. The said representatives shall bring to the attention of the SELLER's Program Manager any non-conformities or defects discovered during said observance, and SELLER shall take the necessary corrective action.

4.2    Upon completion of EROS B Satellite Acceptance Test (as defined in the SOW) to be performed by SELLER at its facility on the fully integrated Satellite and prior to the shipment of the integrated and tested Satellite, the SELLER shall conduct at its facility the Satellite Acceptance Review which will be attended by SELLER and BUYER. SELLER shall provide the BUYER fifteen (15) days notice of the Satellite Acceptance Review

COMPANY CONFIDENTIAL

together with all relevant documentation. In the event BUYER's duly authorized representative fail to be present at the Satellite Acceptance Review at the stipulated date, an extension of additional five (5) days, which will be considered as an excusable delay for the SELLER, upon BUYER's request shall be provided to BUYER. At the end of the successful completion of the Satellite Acceptance Review, the BUYER and SELLER shall sign a Certificate of Successful Completion of the Satellite Acceptance Review, noting outstanding action items, if any. Should the BUYER's duly authorized representative fail to be present at the Satellite Acceptance Review or unreasonably fail to sign the Certificate of Successful Completion thereof, then SELLER shall be entitled to have its own representative sign on behalf of the BUYER the said Certificate of Successful Completion, whereupon SELLER will be free to deliver the Satellite to the BUYER. The Satellite Acceptance Review shall be deemed successfully completed notwithstanding the existence of specification deviations which SELLER demonstrates to BUYER's reasonable satisfaction have no material adverse effect upon the capability of the Satellite to perform its in-orbit mission as set forth in Exhibit B.

4.3    SELLER shall conduct an inspection and checkout of the Satellite upon its arrival at the Launch Site to assure that there was no material impact to the Satellite during shipping and handling. The SELLER shall provide the BUYER five (5) days notice of the beginning of the inspection/checkout. The BUYER shall have the right to witness the inspection/checkout. SELLER shall, in accordance with its Warranty obligations under Article 10 below, promptly correct any discrepancies found in the checkout so as to minimize the impact on the Launch schedule. Upon the successful completion of the Satellite Acceptance Review and Delivery of same (as defined below), and without derogating from SELLER's responsibility to perform the Services, SELLER's remaining obligation and responsibility for the Satellite shall be the Warranty obligations under Article 10 below.

4.4    After the successful Launch of the Satellite into its designated orbit, the SELLER shall conduct for the BUYER an In Orbit Test of the Satellite (IOT), in accordance with the Acceptance Test Plans. At the end of this activity, the SELLER shall also conduct a Commissioning Review in accordance with the SOW. In the event of any failure in the Satellite discovered in the IOT, SELLER shall provide to the BUYER all reasonable assistance in documenting the nature and cause of the failure and provide technical assistance to the BUYER in preparing, submitting, and prosecuting any insurance claim the BUYER may have with respect to such failure.

ARTICLE 5    PERMITS AND LICENSES; GOVERNMENT APPROVALS

5.1    The SELLER represents that it has obtained and is in possession of a written authorization from the authorities of its government for the sale of the Satellite and Services hereunder. Upon the finalization of the selection of the Launch Company, SELLER shall use its best efforts to obtain any license required for the export of the Satellite and other Deliverables and Services to the country of such Launch Company. The BUYER shall obtain all the permits and licenses required for the import of the Satellite and its ground support equipment to the Launch Site, including those related to the activity of SELLER personnel in the Launch Site. Seller shall assist the Buyer in obtaining the above permits and licenses. If SELLER cannot obtain any license required to be obtained for the export of the Satellite and other Deliverables to a mutually acceptable Launch Site within three months of the time of SELLER's request of same, it shall be considered a Force Majeure. BUYER hereby undertakes to comply with any restrictions or conditions imposed under the export license,

COMPANY CONFIDENTIAL

including without limitation, on the sale of the Satellite or any services or goods related thereto to non-approved customers. It is agreed and understood that, without derogating from the significance of any other provision of this Contract, a violation by BUYER of the conditions or restrictions of an export license shall constitute a fundamental breach of this Contract and SELLER, if so directed by a government representative, will, inter alia, be entitled to immediately cease the operation of or access to any Satellite involved and BUYER shall not prevent the SELLER from doing so.

5.2    The SELLER shall manufacture or perform (as applicable) the Deliverables and Services in Israel in accordance with all applicable laws, government rules, regulations and ordinances and the conditions of all applicable permits and licenses of the state of Israel. BUYER will be responsible for the fulfillment of all the applicable laws, regulations, licenses and permits etc. required out of Israel.

5.3    SELLER shall assist BUYER from time to time with respect to any applications to international telecommunication organizations for licenses or permits required by BUYER to provide its Customers with services from the Satellite.

ARTICLE 6    TITLE AND RISK OF LOSS

6.1    Title and risk of loss of or damage to the Satellite shall pass from SELLER to BUYER Ex Works (Incoterms 2000) at the SELLER's facility after successful completion of the Final Satellite Acceptance Test by SELLER at SELLER's facility and after packing of same by SELLER in the appropriate packing container for same ("Delivery" of the Satellite), subject to the continuing obligations of SELLER under Article 10 Warranty. Subject to the following sentence, BUYER shall be entitled to register a secured lien on all work-in-progress (WIP) (and on any insurance proceeds related thereto) created by SELLER and paid for in cash by BUYER under this Contract in the amount of Net Payments (as defined under Exhibit F) made to SELLER under this Contract, for the benefit of BUYER. SELLER shall cooperate with BUYER in the perfection of such lien including without limitation (a) signing necessary documentation, declarations and forms and filing same with the necessary government officials and (b) using its best efforts to obtain the consent of SELLER's lenders to such secured lien.    In the event that SELLER is unable to obtain such consent within sixty (60) days of the date hereof, BUYER shall have title to an interest in the WIP, the value of which interest shall be equal to the amount of the total Net Payments made to SELLER.   BUYER agrees that SELLER shall retain possession of such WIP, and that the sale of such WIP shall be in accordance with paragraph 11.6.

6.2    Title and risk of loss of or damage to any other item of Deliverables shall be Ex Works (Incoterms 2000) SELLER's premises, after completion of its respective Acceptance Test or inspection, as the case may be ("Delivery" of other Deliverables).

6.3    SELLER shall at all times after the date of ARO until and including the date of Delivery of the Satellite include the WIP under SELLER's standard insurance policies. Within 30 (thirty) days after the date hereof, SELLER shall name BUYER as an additional insured under such policies and (ii) deliver irrevocable instructions to the insurers of such policies (in form and substance reasonably satisfactory to BUYER) to pay, after the date of ARO as notified by SELLER to such insurers, any insurance proceeds under such policies in which BUYER has an interest to the Insurance Escrow Account as defined in the Credit Agreement between BUYER and Bank Leumi Le-Israel B.M. of

COMPANY CONFIDENTIAL

even date herewith (the "Credit Agreement"). In addition, SELLER shall notify such insurers each time BUYER makes a cash Net Payment to SELLER hereunder of the corresponding increase of the interest of BUYER in such policies.

6.4    Upon the occurrence of any event that will result in a payment of any proceeds under such policies in an amount less than fifteen million dollars (US$15,000,000), SELLER shall, within 30 days submit to BUYER a plan for the full replacement or repair of the asset in respect of which such proceeds will be paid, including the anticipated cost of such replacement or repair, together with a certification of the chief financial officer of SELLER as to whether, in the best judgment of SELLER, the execution of such plan will cause the Program Schedule to be extended by more than 180 days. Subject to agreement on such plan, BUYER shall pay SELLER such proceeds for application in accordance therewith in an amount not exceeding fifteen million dollars (US$15,000,000) in respect of any such insured events.

## ARTICLE 7    FORCE MAJEURE

7.1    In case of a delay due to Force Majeure or unforeseen circumstances beyond the SELLER's control and without the fault or negligence of the SELLER (including but not restricted to acts of God and/or acts of governments, and/or of nature, war, mobilization, export embargoes, fires, floods, epidemics, quarantines, force majeures of subcontractors, strikes, lockouts, freight embargoes and unusually severe weather), the period of performance or delivery shall be extended by a time equal to the duration of such delay and the time needed to remedy the consequences of the delay. In the event of a force majeure which prevents the performance by SELLER for more than ninety (90) days, BUYER shall be entitled to terminate this Contract for convenience in accordance with the provisions of Article 11 hereto.

7.2    SELLER shall notify BUYER as soon as SELLER becomes aware that a Force Majeure event will affect the performance of this Contract. In all cases the SELLER shall use reasonable efforts to avoid or minimize such delay.

## ARTICLE 8   LIQUIDATED DAMAGES FOR DELIVERY DELAYS

8.1    In the event that SELLER fails to complete the Delivery of the EROS B1 Satellite pursuant to the Program Schedule (as same may be extended pursuant to the provisions of Sub-Article 7.1 , "Force Majeure" above or is otherwise excused under the terms of this Contract), SELLER shall pay to BUYER liquidated damages for each month of delay or pro rata portion thereof, as follows (amounts in thousands of US dollars):

| End of Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Penalty | 0 | 960 | 960 | 960 | 960 | 960 | 800 |
| Total Penalty | 0 | 960 | 1,920 | 2,880 | 3,840 | 4,800 | 5,600 |

| End of Month | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|

COMPANY CONFIDENTIAL

| Penalty | 800 | 800 | 800 | 800 | 800 |
|---|---|---|---|---|---|
| Total Penalty | 6,400 | 7,200 | 8,000 | 8,800 | 9,600 |

8.2  The penalty specified in Paragraph 8.1 above, shall be the BUYER's sole remedy for the SELLER's late delivery under this Contract and shall be in lieu of all damages, or the right to Terminate for Default for delay during such penalty period. After such period but prior to the completion of the Delivery by SELLER of the EROS B1 Satellite, BUYER may exercise its right to terminate this Contract in accordance with Article 14.

8.3  Except to the extent otherwise expressly stated in Sub-Article 14.2 below, in no event shall SELLER be liable for any special, incidental or consequential damages of any kind (including without limitation loss of revenues and loss of profits) caused by SELLER's delay.

8.4  In the event there is a delay in the Launch, SELLER shall, upon BUYER's request, submit a proposal for storage and maintenance of the Satellite at SELLER's facility pending the availability of the Launch. In such event, the Delivery will be deemed achieved upon notice by SELLER to BUYER of the readiness for shipment of the Satellite.

8.5  Notwithstanding Article 8.1, in the event there is a delay in the Launch which is not caused by SELLER and SELLER completes Delivery by the end of such Launch delay, then no penalties shall accrue during the period of such Launch delay.

ARTICLE 9        LAUNCH CAMPAIGN, IOT AND MANAGEMENT SERVICES

9.1  (A)  SELLER shall perform the Launch Campaign, as defined in the SOW, in support of the BUYER's Launch at the Launch Site. The Parties will coordinate the scheduling of such activity.

(B)  If the launch of the EROS B Satellite will be carried out on a Start-1 launcher, the SELLER represents that the Launch Site used for the launch the EROS A Satellite, including all facilities and equipment installed therein, was (at the time the EROS A Satellite was launched) suitable for launching the EROS B Satellite. If the launch of the EROS B Satellite will be carried out using a Launch Vehicle other than the Start-1 launcher, SELLER shall provide a list of required facilities and equipment to be provided by the BUYER at the Launch Site and the BUYER shall be responsible to supply or cause the Launch Company to supply all such facilities and equipment in a timely manner. The equipment will be the general equipment which is typically available at a western launch site (which does not include SELLER's special test or installation equipment). In addition, BUYER and SELLER shall coordinate the terms and conditions of the Launch Services Agreement with the Launch Company with respect to any required facilities and/or services and/or technical cooperation and/or information which SELLER will need in its performance of the Launch Campaign and IOT.

COMPANY CONFIDENTIAL

(C) Prior to the transportation of the Satellite and ground support equipment and prior to the time that SELLER enters the Launch Site, the BUYER shall arrange for security arrangements, reasonably satisfactory to the SELLER, including but not limited to the security of SELLER's personnel and all transported equipment.

(D) If the launching of the EROS B Satellite will be made with the Start-1 launcher, then the parties agree that SELLER shall jointly participate in meetings and discussions involving technical activity and interface between the Launch Company and the SELLER regarding deviations from those used for EROS A1 Launch. Furthermore, the parties agree that the said purchase contract will designate the SELLER as the technical designee of the BUYER vis-a-vis the Launch Company, with the SELLER performing the activities generally described in the SOW under Management Services. These services will be carried out by SELLER in coordination with BUYER.

(E) If the launching of the EROS B Satellite will be made with a Launch Vehicle other than the Start-1 launcher, then the parties agree that SELLER shall jointly participate in the selection of the Launch Company and the negotiation and definition of the provisions under the purchase contract with the Launch Company defining the technical activity and interface between the Launch Company and the SELLER. Furthermore, the parties agree that the said purchase contract will designate the SELLER as the technical designee of the BUYER vis-a-vis the Launch Company, with the SELLER performing the activities generally described in the SOW under Management Services. These services will be carried out by SELLER in coordination with BUYER. In the event that BUYER decides to request modifications to the Satellite to enable the proper interface with the Launcher, the Parties will negotiate a price adjustment to compensate for the additional effort required of SELLER.

9.2 (A)   SELLER shall make the EROS/TTC-MBT available for the IOT and SELLER shall train the BUYER's operating team that is qualified to operate the EROS A Satellite to enable the operation of the EROS B Satellite using the EROS/GCS during the performance of the IOT and as well as for the operation of the Satellite during the period of the MOD SOP Contract term. BUYER will make the Satellite available for the IOT in accordance with the Program Schedule.   The parties will coordinate the scheduling of this activity.

(B) BUYER shall be entitled to be present and observe in the IOT effort and SELLER shall make all the necessary security arrangements for BUYER.

(C) SELLER commits to maintain all the required personnel for the completion of the IOT and not to assign them to other projects and / or activities until the completion of the IOT as defined in the SOW.

ARTICLE 10      WARRANTY

10.1   SELLER warrants that at the time of Delivery of each Satellite and other Deliverables delivered under this Contract each such Satellite and Deliverables shall comply with specifications as defined in Exhibit C, and shall be free from defects in material and workmanship. The SELLER's obligation in respect of such a defect is limited to the repair

COMPANY CONFIDENTIAL

or replacement, at SELLER's option, of the defective part or item thereof of the Satellite/Deliverable in which BUYER discovers such defect, provided that BUYER notifies SELLER immediately upon becoming aware of such defect, and in no event after the Warranty Period (as defined below). The balance of the warranty period shall apply to the repaired or replaced item. Upon BUYER's written request, SELLER shall submit a proposal for the extension of the aforesaid Warranty period for an additional two (2) year period on the basis and condition that the Satellite/s will be stored by BUYER in accordance with SELLER's then applicable specification for storage of same.

10.2    The "Warranty Period" for the Satellite (or any other Deliverables to be placed on the Launch Vehicle) shall be the earlier of (a) twelve (12) months from Delivery or (b) the Warranty Period Event of the Launch Vehicle on which the Satellite is installed. The "Warranty Period" for any other Deliverable hardware shall be twelve (12) months after Delivery of same.

10.3    Unless otherwise determined by SELLER, on a case-by-case basis, all warranty repairs shall be performed at SELLER's premises. BUYER shall be responsible to transport the goods to SELLER and SELLER shall be responsible to transport the repaired/replaced goods back to BUYER, including all shipping and insurance costs involved. Any removed parts of goods shall become the property of SELLER.

10.4    The warranty set forth in Paragraph 10.1 above shall apply only to the extent that the warranted Deliverable is stored, handled and maintained in accordance with the relevant manuals and other written instructions of SELLER and its subcontractors in respect of the warranted item.

10.5    SELLER shall redo any Service which is found to be defective or incomplete to the extent such re-performance is necessary for the purpose of Launch and/or operating the Satellite.

10.6    After the successful Launch of the Satellite, SELLER undertakes to carry-out any corrections to the performance of the Satellite which can be implemented by a communication uplink to the Satellite so as to enable the Satellite to perform in accordance with the Specifications and Mission Requirement definitions hereunder. Notwithstanding the above, after carrying out 5,000 man-hours of work scope under this 10.6, subsequent efforts to implement this clause 10.6 at the request of BUYER shall be chargeable to BUYER at SELLER's then current most favored customer rates. For the avoidance of any doubt, the 5,000 man-hours mentioned above shall be performed only for defects identified during the twelve months after Launch for corrections of defects covered under Clause 10.1 above and subject to Clause 10.4 above.

10.7    THE WARRANTY PROVIDED IN THE FOREGOING PROVISIONS OF THIS ARTICLE AND THE OBLIGATIONS AND LIABILITIES OF SELLER THEREUNDER ARE EXCLUSIVE AND IN LIEU OF AND BUYER HEREBY WAIVES ALL OTHER RIGHTS, REMEDIES, WARRANTIES, GUARANTEES OR LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW, CONTRACT, NEGLIGENCE OF ANY DEGREE, STRICT LIABILITY OR OTHERWISE, IN RESPECT OF THE DELIVERABLES, SERVICES, OR DOCUMENTATION TO BE DELIVERED/PERFORMED UNDER OR IN CONNECTION WITH THIS CONTRACT (INCLUDING WITHOUT LIMITATION, IT IS IN LIEU OF ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). THIS WARRANTY SHALL NOT BE EXTENDED, ALTERED OR VARIED EXCEPT BY EXPRESS WRITTEN AGREEMENT OF SELLER AND BUYER. IN NO EVENT SHALL SELLER OR SELLER's SUBCONTRACTORS

COMPANY CONFIDENTIAL

BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION, LOSS OF REVENUES, LOSS OF PROFITS, ADDITIONAL OR INCREASED COSTS OR ANY OTHER DAMAGES).

ARTICLE 11          TERMINATION FOR CONVENIENCE

11.1    The BUYER may, upon written notice to the SELLER, at any time terminate this Contract with regard to the Satellite and related Deliverables and Services in accordance with the terms set forth below, and the SELLER shall immediately cease work in the manner and to the extent specified.

11.2    Upon receipt of a notice of termination, as provided in Paragraph 11.1 above, the SELLER shall take the following actions:

(A)    stop the terminated work under this Contract on the date specified in the notice of termination;

(B)    place no further orders, subcontracts for materials, services, or facilities regarding the terminated work , except as may be necessary for minimizing the overall costs of such termination;

(C)    terminate orders and subcontracts, except as may be necessary for minimizing the overall costs of such termination;

(D)    settle all outstanding liabilities and all claims arising out of such termination or orders, or subcontracts for material, services or facilities; and

(E)    notwithstanding the provisions of (A) – (D) above, take such action as may be reasonably necessary for the protection and preservation of the property related to this Contract which is in possession of the SELLER or any subcontractor and in which the BUYER has title  or partial ownership or may acquire an interest.

11.3    Within six (6) months after determination of the cost of the termination (including related costs incurred as a result of the termination), SELLER shall submit to the BUYER its termination claim consisting of the costs of all work done up to the date of termination and work done in accordance with Clause 11.2 above, including any payments made to subcontractors (including subcontractors in IAI ) which are non-refundable to SELLER, and including the settlement with vendors or subcontractors and other costs connected with the termination. The term "costs" as used herein includes direct costs, indirect costs and general and administrative expense, that are posted to SELLER's books of account in connection with this Contract in accordance with his standard accounting practice for commercial contracts, consistently applied. In addition to these incurred costs, such termination claim shall include, and the BUYER shall be obligated to pay, a profit of ten percent (10%) on such costs. Notwithstanding anything to the contrary herein stated, the total amount of the claim together with all other payments made to SELLER under this Contract shall not exceed the Total Contract Price.

11.4    The termination claim shall be accompanied by a certificate signed by the Chief Financial Officer of the SELLER stating that the claim properly includes the costs incurred by SELLER in connection with the termination. In the event BUYER desires independent verification of the claim, it may request SELLER's independent Certified Public

**COMPANY CONFIDENTIAL**

Accountant (CPA) to audit the costs incurred by SELLER and report to the parties, subject to such qualifications as SELLER's independent CPA may make in its report, the total amount due under that portion of the claim. Such a report shall constitute a final determination of actual costs notwithstanding the provisions of Article 15, Law and Arbitration, of this Contract save that if the costs determined by such report exceed the amount of SELLER's termination claim, BUYER shall only be obliged to pay the amount of SELLER's termination claim. Costs of the audit and report billed by SELLER's independent CPA shall be borne by BUYER.

11.5    BUYER shall within thirty (30) days pay to SELLER for any termination for convenience hereunder the amount claimed by SELLER unless BUYER requests verification by SELLER's independent CPA. In the event verification of any amount claimed is requested, BUYER shall pay the undisputed amount to SELLER and place the amount claimed by SELLER that is being verified into an interest-bearing escrow account within thirty (30) days after receipt of invoice. Within thirty (30) days after receipt of aforementioned report, BUYER shall pay all amounts set forth in said report plus applicable accrued interest.

11.6    SELLER shall provide BUYER with full documentation and invoices incurred for the WIP and termination charges. Following the payment by BUYER of the amounts set forth in this Article, SELLER shall make all reasonable commercial efforts to use such items in contracts for other customers, and to the extent of such use, SELLER will refund to the BUYER any amounts received by SELLER from such other customer for such items up to the amount of Net Payments received by SELLER from the BUYER for same. If so requested by BUYER at the time of giving SELLER the notice of Termination hereunder, SELLER shall (i) have the identification of such items separately certified by an independent Israeli CPA and (ii) at the time of SELLER's resale of such items, have an independent Israeli CPA confirm the price of the sale of such items or the portion of the price of the completed product incorporating such item properly allocable to such items. In the event that SELLER is considering selling all or an item of the WIP for an amount that would not be sufficient to reimburse BUYER for the monies paid by BUYER with respect to that item/s, SELLER shall first obtain BUYER's agreement for the sale at such lower price.

11.7    The proceeds of the sale of the WIP or parts thereof under 11.6 above shall be remitted to BUYER forthwith, except that with respect to the amount of such proceeds which are in excess of BUYER's secured interest or ownership interest, as the case may be, in the WIP, SELLER shall be entitled to retain same and shall offset any amounts of its termination claim (including convertible vendor financing provided by SELLER hereunder) still outstanding.

11.8    SELLER shall use all reasonable commercial efforts to place subcontracts with major vendors on terms that will enable SELLER to terminate in a manner consistent with this Article.

ARTICLE 12    RIGHTS FOR INFRINGEMENT OF PATENT RIGHTS

12.1    SELLER hereby agrees to indemnify and hold harmless BUYER from and against any claim by any third party that the Deliverables or any part thereof violates any valid claim under the Patent laws of the State of Israel and Russia by virtue of the production, operation, use or sale of the Deliverables or imagery products retrieved from the Satellite.

COMPANY CONFIDENTIAL

**PROVIDED** that the BUYER shall notify the SELLER as soon as possible of the receipt by the BUYER of any claims referred to in this Clause and give the SELLER complete control over the defense or settlement of such claims and the SELLER may, at its own expense:

(a) conduct any litigation or negotiate any settlement arising therefrom in such a way that the BUYER is able to continue using the Satellite without infringing or interference;

(b) procure for the BUYER the right to continue using the Satellite as contemplated under this Contract;

(c) modify or amend the Satellite so that the same becomes non-infringing without affecting the capability or performance of the Satellite;

(d) replace the part of the Satellite so infringing with other equipment or part thereof of identical capability and performance; or

(e) defend such claims.

**PROVIDED** further that the BUYER shall also provide necessary information and assistance to SELLER in the defense of any such claim subject to coordination of BUYER and SELLER on any applicable security restrictions.

SELLER represents to BUYER that to the actual knowledge of SELLER, there are no claims against SELLER that the Deliverables or any part thereof violates any valid claim under the Patent laws anywhere in the world by virtue of the production, operation, use or sale of the Deliverables or imagery products retrieved from the Satellite

## ARTICLE 13    STRETCH OUT OPTION

13.1    SELLER is aware that BUYER has raised bank financing with a Bank (the "Financing Bank"), a portion of which financing is being applied to fund this Contract, and that under the arrangement with the Financing Bank the funding can be suspended at two different milestones under certain conditions each time for up to 6 months. Accordingly, if the Financing Bank suspends the funding as aforesaid, BUYER may, after giving fifteen (15) days written notice to SELLER, suspend this Contract for a period of up to six (6) months ("Suspension Period") on either or both of the occasions that the Financing Bank so suspends its funding for this Contract.

13.2    During said suspension the BUYER shall pay, in addition to any other payment due under this Contract, the following payments: (1) at the end of the first month of suspension Buyer shall pay the value of the direct working hours of SELLER's employees working on this Project, as accumulated for the month prior to the date of Suspension (as verified by SELLER's CPA) for work on this Contract, (hereinafter Base Monthly Labor Compensation (BMLC)), together with SELLER's additional costs and/or payments to sub-contractors working on this Contract required during the suspension period or incurred with respect to their suspension of their relevant sub-contracts; (2) at the end of the second month of suspension BUYER shall, in addition to the above-mentioned payments, pay 80% of the BMLC, together with SELLER's additional costs and/or payments to sub-contractors working on this Contract required during the suspension period or incurred with respect to their suspension of their relevant sub-contracts; (3) at the end of the third month of suspension BUYER shall, in addition to the abovementioned payments, pay 60% of the BMLC, together with SELLER's additional costs and/or payments to sub-contractors working on this Contract required during the suspension period or incurred with respect to

COMPANY CONFIDENTIAL

their  suspension of their relevant sub-contracts; (4) at the end of the fourth month of suspension BUYER shall, in addition to the abovementioned payments, pay the actual hourly rates of employees to SELLER on this Project not otherwise employed by SELLER during this period, but in no event more than 50% of the BMLC, together with SELLER's additional costs and/or payments to sub-contractors working on this Contract required during the suspension period or incurred with respect to their suspension of their relevant sub-contracts; (5) at the end of the fifth month of suspension BUYER shall, in addition to the abovementioned payments, pay the actual hourly rates of employees to SELLER on this Project not otherwise employed by SELLER during this period, but in no event more than 50% of the BMLC, together with SELLER's additional costs and/or payments to sub-contractors working on this Contract required during the suspension period or incurred with respect to their  suspension of their relevant sub-contracts; and (6) at the end of the sixth month of suspension BUYER shall, in addition to the abovementioned payments, pay the actual hourly rates of employees to SELLER on this Project not otherwise employed by SELLER during this period, but in no event more than 50% of the BMLC, together with SELLER's additional costs and/or payments to sub-contractors working on this Contract required during the suspension period or incurred with respect to their suspension of their relevant sub-contracts. SELLER shall coordinate with BUYER the use of the working hours funded by BUYER hereunder during the Suspension Period to facilitate, to the extent reasonably practicable, the resumption of performance of this Contract following expiration of the Suspension Period with minimal impact on the Program Schedule.

13.3    If the BUYER has delivered to SELLER a copy of the written notice delivered by the Financing Bank to BUYER, confirming that funding is available to BUYER (a "Resumption Notice"), then at the end of the Suspension Period and after payment of amounts due under Sub-Article 13.2 above the performance of the Contract shall be resumed subject to a Program Schedule adjustment to be negotiated by the Parties for the impact of such suspension and all other provisions of this Contract shall remain unchanged except that all payments due under Sub Article 13.2 above shall be added to the Contract Price. With regard to SELLER's claim for payments due to SELLER's subcontractors, the addition to the Contract Price shall be only for the additional payment resulted due to the suspension period. Notwithstanding any of the foregoing, no payment under this Article 13 shall be due and payable by BUYER to SELLER until ten (10) days after delivery of the Resumption Notice to BUYER.

13.4    In the event that at the end of either six (6) month Suspension Period the BUYER has not delivered a Resumption Notice to SELLER, and if SELLER notifies BUYER that SELLER has determined, in its sole discretion, that BUYER does not have the funding to continue its payment obligations hereunder, then this Contract shall automatically be terminated for Convenience.

ARTICLE 14        TERMINATION FOR SELLER'S DEFAULT

14.1    BUYER may issue a thirty day written notice of default (the "Default Notice") to SELLER if the Delivery of the Satellite is not achieved by the time the maximum amount is accrued as liquidated damages under Article 8 above, as such date may be adjusted by Article 7, Force Majeure, or as otherwise mutually agreed by the parties.

COMPANY CONFIDENTIAL

14.2   In the event BUYER terminates this Contract as provided in Article 14.1, the BUYER shall be entitled to a refund of all payments previously made to the SELLER under this Contract, together with (i) the amount of late penalties fees paid to the Launch Company and (ii) the amount paid by BUYER to the Launch Company under the purchase contract with the Launch Company for the specific non-recurring costs to implement changes to the Launch vehicle to interface with the Satellite that are not refundable to BUYER, and (iii) interest on all of the above at the rate of LIBOR (six (6) month LIBOR published by Bank Leumi Ltd.) applicable at the day payment was due) plus two percent (2%), and all Deliverables then in existence shall be the sole property of SELLER.

14.3   All amounts received by BUYER pursuant to Article 8, Penalties for Delivery Delays, hereof shall be offset by SELLER against any refunds or other payments payable to BUYER pursuant to Article 14.2.

14.4   If, after termination of this Contract under the provisions of this Article 14, it is determined by arbitration or admitted in writing by BUYER that SELLER was not in default under the provisions of this Article, or that the default was excusable under the provision of Article 7, Force Majeure, such termination shall be considered a termination for convenience of BUYER and the provisions of Article 11 shall apply and BUYER shall in addition (notwithstanding Article 16, Law and Arbitration) reimburse SELLER's cost of the arbitration (including legal counsel).

14.5   Notwithstanding the above, SELLER's entire liability for breach under this ARTICLE shall not exceed the amounts payable under clauses 14.2 and 14.3 above . IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOST REVENUES OR PROFITS). This Paragraph shall survive the expiration or termination of the Contract for whatever cause.

ARTICLE 15          TRANSFER OF INFORMATION; CONFIDENTIALITY

15.1   SELLER and BUYER may transfer or exchange information during the performance of the work, in oral or written form, which may include specifications, drawings, sketches, models, samples, computer programs, reports, data, techniques, designs, codes, documentation, and financial, statistical or other technical information essential to the objectives of this Contract. All disclosures of such information will be treated as proprietary if marked as "Proprietary" by the party making the disclosure at the time of disclosure.

15.2   Subject to the provisions of Paragraph 15.3 below, the party receiving the proprietary information of the other party shall maintain such information in confidence and shall not use such information except as expressly authorized by this Contract. Each party agrees to use the same care and discretion to avoid unauthorized disclosure, publication or dissemination of the other's proprietary information and the unauthorized use thereof as the receiving party uses with respect to similar information of its own, but in no event, less than reasonable care. Should it become legally necessary for either party to disclose certain of the other's proprietary information to a third party, it shall be disclosed only to the extent required by law and after a five (5) day prior written notification to the other party of the requirement for disclosure.

15.3   The obligations of confidentiality and restrictions on use specified in this Article shall not apply to any information that:

COMPANY CONFIDENTIAL

(A)   is already in the possession of the receiving party without obligation of confidentiality at the time of disclosure;

(B)   is independently developed by the receiving party or any of its Affiliates or subcontractors prior to disclosure as evidenced by appropriate documents;

(C)   is or becomes publicly available without breach of this Contract and without the fault of the receiving party;

(D)   is released for public disclosure by the disclosing party.

15.4   SELLER and BUYER shall take reasonable efforts necessary, including the appropriate contractual provisions in subcontracts, to ensure the confidentiality of all proprietary information of the BUYER which may be disclosed to subcontractors.

15.5   The receiving party agrees that: (i) any proprietary information disclosed hereunder shall be used by the receiving party solely for the purpose of performing its functions in connection with the parties' relationship with respect to the purposes of this Contract; (ii) it will not use the proprietary information disclosed hereunder for any other purpose; and (iii) it will not distribute, disclose or disseminate to anyone such proprietary information of the disclosing party, except that either party may disclose to its own employees or subcontractors on a need-to-know basis, and either party may disclose with the consent of the disclosing party which consent will not be given unless such third party executes a proprietary data protection Contract with terms consistent with the requirements herein prior to receiving such information. For the sake of clarity, BUYER is entitled to use the deliverable Documentation hereunder for purposes of analyzing the performance by SELLER hereunder, for purposes of participating in inspections and/or acceptance tests at SELLER's premises and at the Launch Site, and for the retrieval of data from the Satellite once in orbit.

15.6   The Parties shall designate in writing (from time to time) specific individuals as the point for receiving proprietary information exchanged between the parties pursuant to this Contract.

15.7   The confidentiality obligations in this Article shall survive expiration or termination of this Contract for whatever cause.

15.8   Nothing herein shall require a party to transfer proprietary information to the other party.

ARTICLE 16        LAW AND ARBITRATION

16.1   Any disputes or disagreement arising between the parties in connection with this Contract or in relation to the interpretation or execution thereof, will be given time for settlement within three (3) months from the date of notification of a dispute from one party to the other party. In case there is no solution, the dispute shall be settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with said Rules. Arbitration proceedings shall take place in Tel Aviv, Israel. The arbitration award shall be final and binding upon the Parties.

16.2   This Contract shall be governed and interpreted under and in accordance with the laws of the State of Israel.

COMPANY CONFIDENTIAL

ARTICLE 17        INDEMNITY

17.1   BUYER and SELLER shall each be individually responsible for and have no claims of any
       nature whatsoever against any of the other parties for any loss of or damage to its own
       property arising out of or in connection with the Satellite and/or Services
       supplied/performed hereunder, regardless of how such loss and/or damage was caused,
       including negligence of the other Party or its subcontractors, their respective servants or
       agents. Each Party shall have the right, in its sole discretion and at its own expense, to insure
       its own property.

17.2   BUYER and SELLER shall each be individually responsible for the bodily injuries or death
       suffered by its own servants or agents arising out of or in connection with the Satellite and/or
       Services supplied/performed under this Contract, regardless of how such injury, or death was
       caused, including negligence of any other party, its servants or agents. In the event of a claim
       by a servant or agent of any party against any one of the other party/parties, the employer
       party will defend and pay on behalf of such party/parties any amounts which said other
       party/parties is legally obliged to pay. Each party has the right, in its sole discretion and at its
       own expense, to insure its liabilities herein.

17.3   With respect to any and all claims by third parties against BUYER and/or SELLER arising
       from damage to or loss of property and/or death or personal injury, from Launch of the
       Satellite and until immediately after the completion of the IOT, BUYER shall include
       SELLER as additional insured under BUYER's launch insurance which shall include
       insurance against such third parties claims. Thenafter, if BUYER by its sole discretion
       maintains such insurance against third parties claims, the BUYER shall include SELLER as
       additional insured under BUYER's insurance for same.

ARTICLE 18        MISCELLANEOUS

18.1   Amendments

       The Contract may not be modified except by written amendment signed by duly authorized
       representatives of both parties.

18.2   Changes

       BUYER shall have the right to request a change(s) to the Contract and SELLER shall
       response to such request. Such response shall include the price, schedule, system
       performances, interfaces and all other impacts of the change. BUYER shall have the option,
       after receiving this response, to decide whether to implement the change and then to direct
       SELLER to proceed with the change. In case of the implementation of the change by
       SELLER, BUYER shall be responsible for all impacts of the change as presented by the
       SELLER.

18.3   Publicity

       Except for internal publications/releases not intended for the public at large, each party shall
       obtain the prior written approval of the other party, which approval shall not be

COMPANY CONFIDENTIAL

unreasonably withheld or delayed, concerning the content and timing of news releases, articles, brochures, advertisements, prepared speeches and other information releases concerning this Contract or any part hereof, within a reasonable time prior to the release of such information.

18.4    Notices

Any notices or requests or receipts required or desired to be given or made hereunder shall be in writing and shall be effective if delivered by hand to an officer of the recipient party or sent by registered mail or by facsimile transmission or telex and received by the recipient party, at the address indicated below:

In respect of BUYER, to:
ImageSat N.V.Diagoras House .7,
Agias Phylaxeos Street
Limassol – Cyprus
Attention: CEO
Fax: 357-5-535 0495
With a copy to: ISI Israel LTD. (Fax No. 972-3-5163430)

In respect of SELLER, to:
Israel Aircraft Industries Ltd., MBT Division
Yehud Industrial Zone
Yehud, Israel 56000

Attention: EROS Program Manager
Fax: 972 3 531 4230

With a copy to: Yehoshua Eldar
972 3 531 4230

Any notice or request shall be deemed to have been served if delivered by hand, when delivered, if sent by registered airmail, upon receipt, and if sent by facsimile transmission, upon receipt.

18.5    Language

All communications required under this Contract shall be in the English language. All deliverable Documentation shall be in English or Hebrew as mutually agreed by the parties based upon the use of such Documentation or as specifically set forth in this Contract. All EROS specific Documentation generated under this Contract shall be delivered in English.

18.6    Assignment

Neither party hereto shall assign, or transfer, either in whole or in part, this Contract or any of its rights, duties or obligations thereunder to any person or entity, without prior express written approval of the other party, except that either party may assign or transfer any of its rights, duties or obligations under this Contract, either in whole or in part, to a parent company at any tier or wholly-owned subsidiary thereof provided always that the party

COMPANY CONFIDENTIAL

making the assignment or transfer shall remain fully and primarily liable with respect to performance of all duties and obligations set forth in this Contract, including compliance with all applicable laws and regulations.

18.7    <u>Severability</u>

In the event any one or more of the provisions of this Contract shall, for any reason, be held to be invalid or unenforceable, the remaining provisions of this Contract shall be unimpaired, and the invalid or unenforceable provision shall be replaced by a mutually acceptable provision which, being valid and enforceable, comes closest to the intention of the parties underlying the invalid or unenforceable provision.

18.8    <u>Integration</u>

THIS CONTRACT, TOGETHER WITH THE EXHIBITS AND THE MASTER CONTRACT, CONTAINS THE ENTIRE CONTRACT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF. ALL PRIOR UNDERSTANDINGS, REPRESENTATIONS AND WARRANTIES (INCLUDING THOSE CONTAINED IN SALES, PROMOTIONAL AND/OR MARKETING MATERIALS) BY AND BETWEEN THE PARTIES, WRITTEN OR ORAL, THAT MAY BE RELATED TO THE SUBJECT MATTER HEREOF IN ANY WAY, INCLUDING, WITHOUT LIMITATION, THE EXISTING SATELLITE SUPPLY CONTRACT, ARE SUPERSEDED BY THIS CONTRACT, EXCEPT THAT ALL THE TERMS AND CONDITIONS OF THE MASTER CONTRACT NOT RELATING TO CONFIGURATION OF THE EROS B SATELLITES AND FINANCING/PAYMENT TERMS SHALL REMAIN IN EFFECT.

18.9    <u>Inter-Party Waiver of Liability</u>

BUYER hereby agrees to be bound by a no-fault, no-subrogation inter-party waiver of liability and related indemnity provisions provided for in the Launch Services Agreement and to cause its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract and any other person having an interest in the Satellite (including customers of BUYER), to accede to such waiver. BUYER also shall obtain from its insurers, and shall cause its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract and any other person having an interest in the Satellite (including customers of BUYER) to obtain from their insurers, an express waiver of such insurers' rights of subrogation with respect to any and all claims that have been waived pursuant to this Article 19.9.

18.10    <u>Waiver of Subrogation</u>

Each party to this Contract shall obtain a waiver of subrogation and release of any right of recovery against the other party to this Contract and its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract, from any insurer providing coverage for risk of loss or non-compliant performance of or damage to the EROS B Satellite.

ARTICLE 19    EFFECTIVE DATE OF CONTRACT



COMPANY CONFIDENTIAL

The Effective Date of Contract (EDC) is conditioned upon the completion of all of the following:

1.    Signature of this Contract by both parties; and
2.    Upon receipt by SELLER of the entire down payment hereunder.

ARTICLE 20  ORDER OF PRECEDENCE

In the event of any inconsistency among or between the parts of this Contract, such inconsistency shall be resolved by giving precedence in the order of the parts as set forth below:

A.    These Contract Terms and Conditions.
B.    The Exhibits hereto in the following order of precedence:

    Exhibit "D"    Statement of Work (SOW);
    Exhibit "F"    Pricing and Payment Terms;
    Exhibit "B"    EROS B Mission Requirements;
    Exhibit "C"    EROS B System Specifications; and
    All other Exhibits