# Exhibit 4

COMPANY CONFIDENTIAL

## EROS B SATELLITE SUPPLY CONTRACT

THIS **EROS B SATELLITE SUPPLY CONTRACT** is duly signed on the ___ day of June 2004 by and between **ISRAEL AIRCRAFT INDUSTRIES LTD.**, acting through its MBT Space Division, a company organized and existing under the laws of the State of Israel, with a place of business in Yehud, Israel (hereinafter referred to as "SELLER" or "IAI/MBT"), and **IMAGESAT INTERNATIONAL N.V.**, a company organized and existing under the laws of the Netherland Antilles (hereinafter referred to as the "BUYER" or "ISI").

**WHEREAS,** IAI/MBT and ISI are parties to a series of agreements that extensively define their relationship, including inter alia (i) a Master Agreement, dated July 25, 2000 (the "Master Agreement"), (ii) a certain Second Amended and Restated EROS B Satellites Supply Contract, dated 25 July 2001, for the sale and supply of an EROS B satellite together with certain related equipment and services, as detailed therein, and (iii) Principles of Settlement dated March 7, 2002, as amended,

**WHEREAS,** the Parties wish to enter into a new supply contract for the purchase of a satellite (designated as the "EROS B Satellite") and certain related equipment and services (launch and other services and certain ground systems) as further detailed in this Contract,

**WHEREAS,** for avoidance of confusion, the Parties have decided to rename the former EROS B satellite (which is the subject of the Second Amended and Restated EROS B Satellites Supply Contract, dated 25 July 2001) as the "EROS C Satellite" (and it shall be referred to as such hereafter),

**NOW THEREFORE,** BUYER and SELLER hereby agree, for good and valuable consideration, the receipt and sufficing of which is hereby acknowledged, to enter into this Contract, which consists of the following parts and exhibits:

(I)     The Terms and Conditions;

(II)    The Exhibits to this Contract as follows:

Exhibit "A"     Deliverables and Services;

Exhibit "B"     EROS B Mission Requirements;

Exhibit "C"     EROS B System Specifications;

Exhibit "D"     Statement of Work (SOW);

Exhibit "E"     Program Schedule;

Exhibit "F"     Pricing and Payment Terms;

**COMPANY CONFIDENTIAL**

Exhibit "G"    EROS B In-Orbit Test.

Exhibit "H"    Program Management Team

Exhibit "I"    Amendment to the Master Agreement

Exhibit "J"    SOP Ground Station Items

Exhibit "K"    EROS C

**COMPANY CONFIDENTIAL**

**IN WITNESS WHEREOF** this Contract has been executed this 4th day of June 2004 by the duly authorized representatives for the parties.

**IMAGESAT INTERNATIONAL N.V.**

BY: _____

NAME: Menashe Broder
TITLE: CEO

BY: _____

NAME: Moshe Bar Lev
TITLE: President

BY: _____

NAME: Hagai Goren
TITLE: CFO

**ISRAEL AIRCRAFT INDUSTRIES LTD.**
**SYSTEMS MISSILES AND SPACE GROUP**
**MBT SPACE DIVISION**

BY: _____

NAME: Dr. Abraham Knobel
TITLE: Vice-President Finance

BY: _____

NAME: Yaacov Galazan
TITLE: Vice-President and General Counsel

BY: _____

NAME: Itzhak Nissan
TITLE: Vice-President and General Manager IAI Space Missiles and Systems Group

COMPANY CONFIDENTIAL

**PART I**

**TERMS AND CONDITIONS**

COMPANY CONFIDENTIAL

## ARTICLE 1        DEFINITIONS

1.1    For purposes of this Contract, the following terms shall have the meaning stated hereunder:

    (a)    "Acquisition, Archiving and Dissemination" or "AAD" means a customer that is able to collect, upon request, any imaging plan to be performed by the Satellite when passing within the customer's ground receiving station coverage area.

    (b)    "ARO" means months after the Effective Date.

    (c)    "Contract" means this written agreement, including the Exhibits annexed hereto and made a part hereof.

    (d)    "Dedicated Services" means the services as defined in Paragraph 7 of Exhibit D under the Contract.

    (e)    Default Notice" has the meaning set forth in Paragraph 13.1.

    (f)    "Deliverables" means the items of hardware (with their respective integrated embedded software), to be sold and delivered by SELLER under this Contract.

    (g)    "Delivery" shall have the meaning set forth in (a) Paragraph 6.1, with respect to the EROS B Satellite; and (b) Paragraph 6.2, with respect to any other Deliverables.

    (h)    "Documentation" means documentation to be delivered under this Contract as set forth in the Exhibits A and D (SOW).

    (i)    "Effective Date of Contract" means the date that the last condition of Article 18 is completed.

    (j)    "End of the IOT" shall have the meaning set forth in Paragraph 4.6.

    (k)    "EROS A1 Satellite" or "EROS A1" shall mean the electro-optical earth observation satellite supplied by SELLER to BUYER under the FIRST AMENDED AND RESTATED EROS A1 SATELLITE SUPPLY CONTRACT, dated 25 July 2000.

    (l)    "EROS B Satellite" or "Satellite" shall mean the electro-optical earth observation satellite to be supplied under this Contract by SELLER to BUYER which meets the requirements according to the Specifications and Mission Requirements, all as set forth in Exhibits B and C hereto



COMPANY CONFIDENTIAL

(m)     "EROS B Satellite Contract Price" means the total amount to be paid to SELLER by BUYER for the EROS B Satellite to be provided under the terms of this Contract.

(n)     "EROS-B System" shall mean the system that includes the (i) EROS-B Satellite, (ii) the EROS/GCS, (iii) EROS/GRS, (iv) the network of SOP/GCSs, SOP/GRSs and AAD/GRSs, and (v) the associated special hardware and software (other than generic hardware and software) which enable the operation of the satellite and the provision of SOP, PAS and AAD imaging services.

(o)     "EROS Class Satellite" shall have the same meaning as set forth in the Master Agreement.

(p)     "EROS C Borrowed Parts" shall have the meaning set forth in Articles 2.7 and 6.3 below.

(q)     "EROS/GCS" or "EROS Ground Control System" means the combination of the EROS/SCC, to be located in Israel at BUYER's designated location, together with the EROS/TCC-Network.

(r)     "EROS/GCS ATP" or "EROS/GCS Acceptance Test Plans" means the EROS/GCS test plan which shall be submitted to and approved by BUYER in accordance with the SOW.

(s)     "EROS/SCC" or "EROS/SCC-B" or "EROS Satellite Control Center" means a subsystem of EROS/GCS comprised of hardware and embedded software required for the planning and preparation of all necessary commands needed for the operation of the EROS B Satellite, up to and including the bit-stream level (satellite imaging planning for AAD and PAS customers, satellite preparation for SOP, AAD and PAS customers, satellite housekeeping, orbit corrections and satellite resources management).

(t)     "EROS B ICD" means the interface control documents as defined in the SOW hereto.

(u)     "EROS/TCC" or "EROS Tracking and Communication Center" means a subsystem of EROS/GCS comprised of the EROS/TTC and a dedicated EROS/TCC Control Computer.

(v)     "EROS/TCC Control Computer" or "EROS/TCCOM" means a computer that manages the communication with the EROS A and EROS B Satellites and to be an intermediary between the Satellites and the EROS/SCC-A (EROS/SCC for EROS A Satellite) and EROS/SCC-B and the EROS/TTC.



COMPANY CONFIDENTIAL

(w)     "EROS/TTC" or "EROS Tracking Telemetry and Command" means the antenna and the communication equipment enabling (1) the tracking of the EROS A and EROS B Satellites, (2) the receiving of the telemetry from the EROS A and EROS B Satellites and (3) the transmission of commands to the EROS A and EROS B Satellites, all these for one satellite at a time.

(x)     "EROS/GRS" or "EROS Ground Receiving Station" means a subsystem of the EROS-B System comprised of the hardware and embedded software, which will enable (1) tracking of the EROS B Satellite, (2) receiving of the imagery from the EROS B Satellite and (3) processing, archiving and dissemination of the imagery.

(y)     "EROS/TTC-MBT" means the SELLER's existing EROS/TTC located at SELLER's premises.

(z)     "EROS/TCC-NETWORK" means a subsystem of the EROS/GCS comprised of the installed EROS/TCC's, while each EROS/TTC is located at different site worldwide selected and established by BUYER, including but not limited to, EROS/TCC-MBT and EROS/TCC-POLAR.

(aa)    "EROS/TCC-POLAR" or "EROS/TCC-RELAY-STATIONS" means the EROS/TTC located at the Kiruna/Sweden premises or such other EROS/TTC site to which it may be moved by BUYER as well as any additional locations to be established by BUYER

(ab)    "IOT" means the in orbit test to be carried out by BUYER after the launch of the EROS B Satellite to test the Satellite and ground segment compliance with the Mission Requirements (Exhibit B) and Specifications (Exhibit C).

(ac)    "Launch" means the ignition of the launch gas generator in the Transport-and-Launch Canister, as defined in the "START-1 Launch Vehicle User's Handbook", if such ignition is followed by successful separation of all electrical connections (provided that the launching of the EROS B Satellite will be performed on a START-1 Launch Vehicle).

(ad)    "Launch Campaign and IOT" means the services as defined in Paragraphs 7.2 and 7.3 of the SOW (Exhibit D) of the Contract.

(ae)    "Launch Company" means Puskuvoy Uslugie.

(af)    "Launch Services Agreement" means the agreement signed between BUYER and the Launch Company.

COMPANY CONFIDENTIAL

(ag)   "Launch Site" means the site that the Launch Company has designated as the Launch Site.

(ah)   "Launch Vehicle" means a Russian START-1 launcher.

(ai)   "Priority Acquisition Services" or "PAS" means a customer that is entitled to request an imaging plan to be performed by the Satellite and to collect images gathered by the Satellite.

(aj)   "Program Schedule" means the schedule for performance attached hereto as Exhibit E.

(ak)   "Satellite Acceptance Review" means the final review to be conducted at the SELLER's facility and which will consist of presenting and reviewing the final satellite test results submitted to and approved by BUYER in accordance with the Acceptance Test Procedures established in accordance with the SOW (Exhibit D).

(al)   "Satellite Acceptance Test Plan" or "Satellite ATP" means the Satellite test plan, which shall be submitted to BUYER in accordance with the SOW.

(am)   "Satellite Operating Partner" or "SOP" means a customer that is able to (a) independently generate an imaging plan to be performed by the Satellite when passing within its imaging area, (b) access directly the Satellite from an appropriate ground control station located in the SOP country, in order to load the imaging plan to the Satellite, and (c) receive the images gathered during the execution of such imaging plan.

(an)   "SOP Ground Station" or "SOP/GS" means a system comprised of SOP/GCS and SOP/GRS.

(ao)   "SOP Ground Command Station" or "SOP/GCS" means the subsystem of the SOP/GS that is comprised of SOP/SCC and SOP/TCC.

(ap)   "SOP Ground Receiving Station" or "SOP/GRS" means the subsystem of SOP/GS that includes the necessary infrastructure, suitable antenna and dedicated hardware and software, which enable (1) tracking of the EROS A and EROS B Satellites, (2) receiving of the imagery from the EROS A and EROS B Satellites and (3) processing, archiving and dissemination of the imagery.

(aq)   "SOP Satellite Command Center" or "SOP/SCC" or "SOP/SCC-B" means the subsystem of SOP/GCS comprised of the hardware and software required for the planning and preparation

COMPANY CONFIDENTIAL

of the imaging mission in SOP imaging area for EROS B Satellite.

(ar) "SOP Tracking and Communication Center" or "SOP/TCC" means the subsystem of SOP/GCS comprised of (a) an antenna enabling the tracking of the EROS A and EROS B Satellites, (b) a communication equipment enabling the receiving of the telemetry from the EROS B Satellite and the transmission of commands to the EROS B Satellite, and (c) a dedicated SOP/TCC Control Computer, while such SOP/TCC Control Computer is located at the SOP/SCC site.

(as) "SOP/TCC Control Computer" or "SOP/TCCOM" means a computer that manages the communication with the EROS B Satellite and is an intermediary between the SOP/SCC-A (SOP/SCC for EROS A Satellite) and SOP/SCC-B and the EROS A and EROS B Satellites.

(at) "Statement of Work" or "SOW" means the statement of work set forth in Exhibit D hereto.

(au) "System Commissioning" shall have the meaning set forth in the SOW.

(av) "Total Contract Price" means the total amount to be paid to SELLER by BUYER hereunder for the Deliverables, Documentation and Dedicated Services and the performance of SELLER of its obligations under this Contract.

1.2    Other terms in this Contract are defined in the context in which they are used and shall have the meanings there indicated.

1.3    The Article and Paragraph headings are for convenience of reference only and shall not be considered in interpreting this Contract.

## ARTICLE 2        SCOPE OF CONTRACT

2.1    SELLER hereby agrees to sell to BUYER and BUYER hereby agrees to buy from SELLER, on and subject to the terms and conditions contained in this Contract, the Deliverables, Documentation, and Dedicated Services.

2.2    SELLER shall perform its obligations under this Contract pursuant to the terms and provisions of documents forming a part of this Contract (i.e., this Contract and all of its Exhibits).

COMPANY CONFIDENTIAL

2.3    SELLER shall perform its obligations as set forth in the Program Schedule attached hereto as Exhibit E.

2.4    The prices to be paid by BUYER to SELLER, as well as the terms of payment and related provisions, shall be as set forth under Exhibit F hereto.

2.5    With regard to the EROS B Satellite purchased hereunder, the SELLER undertakes: (i) to deliver the Satellite in compliance with the Mission Requirements as defined in Exhibit B and the System Specifications as defined in Exhibit C, (ii) after Delivery of the Satellite, to correct defects discovered in the Satellite during the Warranty Period pursuant to the terms of the Warranty under Article 10 below, and (iii) to carry-out the Launch Campaign, IOT and Dedicated Services all as set forth in Article 9 below, and (iv) to carry-out the corrective activities agreed by the parties as set forth in the EIOT Report, signed by the SELLER and the BUYER, pursuant to the terms of Article 10 below.  Upon the delivery of the Satellite by SELLER to BUYER Ex Works MBT's facilities (Incoterms 2000), BUYER shall assume the risk of loss of the Satellite, and shall be responsible to purchase insurance for loss or damage to the Satellite thereafter.

2.6    With regard to all other Deliverables under this Contract, excluding the Satellite, the SELLER shall, be responsible to (i) deliver same in compliance with the respective Specifications for same and (ii) after Delivery of same, to replace or repair any defects covered under the Warranty set forth in under Article 10 below.

2.7    In order to enable SELLER to perform its obligations under this Contract, BUYER undertakes to perform its responsibilities, at its expense, as set forth in this Contract in a timely manner and to furnish to SELLER all the items, equipment and services defined in the Contract , in conformance with the applicable specifications. Failure by BUYER to perform its responsibilities in a proper and timely manner will constitute an excusable delay for SELLER's performance of its obligations to the extent such BUYER failure impacted the schedule of the SELLER's performance.  SELLER shall not be responsible for any technical non-compliances, or delays in the Deliverables and Services that are caused by problems (defects, failures, etc.) in any equipment, software or services supplied/provided by BUYER under the Contract. For clarity sake, the provisions of this paragraph 2.7 does not apply to the EROS C Borrowed Parts and SELLER will have sole responsibility, both for the serviceability and timely delivery, of the EROS C Borrowed Parts.

2.8    SELLER will designate Dr. Shevach Katzir as its dedicated Program Manager for the program hereunder. Furthermore, Exhibit H includes the Project organization and Project Key personnel who will be dedicated full time to the EROS B program.  SELLER represents that it

COMPANY CONFIDENTIAL

has or will have sufficient personnel and facilities to carry out this program in parallel with any other satellite programs it may have during the course of the performance of this Contract.

2.9    BUYER has an option to purchase the SOP ground station items listed in Exhibit J. BUYER is entitled to purchase such items directly from SELLER or to direct the Ground Station prime contractor selected by BUYER in a particular case to buy such items from SELLER at the prices and other terms as set forth in Exhibit J. SELLER will cooperate with BUYER to facilitate the transaction by BUYER.

2.10    BUYER agrees, subject to Paragraph 2.10(C) below, to provide to SELLER the following security exercisable by SELLER in the event of a termination (whether for default or convenience) of this Contract, within 30 days after the Effective Date:

(A)    Insofar as the first US $ 10 Million of SELLER's termination claim, the following security shall be provided:

(1)    BUYER has purchased a three-year Contract Repudiation Insurance Policy for an existing SOP customer (the "Contract Repudiation Insurance Policy"). With respect to such policy:

(i)    BUYER shall establish an escrow account wherein the proceeds of the Contract Repudiation Insurance Policy will be deposited in an account in a bank in Israel, with irrevocable instructions to the escrow agent to allocate the first US$10 million to pay SELLER's termination claim (to the extent of such claim owed by BUYER). BUYER shall provide written irrevocable instructions to the insurer of the Contract Repudiation Insurance Policy to pay the first $10 million of the proceeds of the policy to the above mentioned escrow account, and BUYER shall provide copies of the above mentioned irrevocable instructions to the SELLER.

(ii)    In addition, BUYER shall not change the terms of the policy in any manner that affects SELLER's interest or cancel it without SELLER's prior written approval.

(iii)    BUYER has provided SELLER's General Counsel with a copy of such Contract Repudiation Insurance Policy to be retained by the General Counsel in confidence. The SELLER undertakes that it shall not disclose the existence of the Contract Repudiation Insurance Policy or its

COMPANY CONFIDENTIAL

contents to any third party, except as required by SELLER's auditors and under law, without the express prior written consent of the BUYER.

(iv)    BUYER shall grant, a first priority lien on the escrow account mentioned above and on BUYER's right to receive the proceeds of the Contract Repudiation Insurance Policy in favor of SELLER in the amount of US$10 million.

(2)    BUYER shall grant SELLER (and shall take the necessary actions required to obtain the agreement and acquiescence of Pegasus) a first priority to receive BUYER's "free cash flow" up to an aggregate of US$10 million for the duration of this Contract as a source of payment of the first US$ 10 Million of the termination claim. BUYER's "free cash flow" shall be defined to mean BUYER's revenues less BUYER's authorized expenses according to BUYER's authorized budget plus up to 15% over such amount incurred in the ordinary course of business.

(3)    For clarity sake, the rights of SELLER under (1) and (2) above shall expire at such time as SELLER has received in the aggregate from any source, including paragraphs (1) and/or (2) above, payment of US$ 10 Million of SELLER's termination claim. For purposes of this clause, the term "SELLER's termination claim" used in the prior sentence means the IAI Termination Claim (as defined in Article 11 below) less payments received from BUYER. At such time, SELLER shall release any liens and priority rights it may have as a result of the provisions of this Paragraph (A).

(B)    To secure the amount of a SELLER termination claim which is in excess of said US$ 10 Million, BUYER shall grant a third priority lien on all of its assets in favor of SELLER to secure the balance of BUYER's payment obligations to SELLER included in SELLER's termination claim under the Contract. SELLER shall enter into a subrogation agreement with Pegasus and Bank Leumi in which, inter alia, SELLER undertakes a complete standstill in the exercise of its lien without the prior written consent of Pegasus and Bank Leumi. BUYER shall not grant additional liens (beyond the existing liens of Pegasus and Bank Leumi) that have a higher priority than SELLER's lien.

(C)    Notwithstanding Paragraphs (A)(2) and (B) above, should BUYER decide to obtain a loan from a bank or other financial institution, SELLER agrees to allow the lender to obtain a lien on



COMPANY CONFIDENTIAL

all or any particular BUYER assets (other than the escrow account under Paragraph A(1) above) with a priority ahead of SELLER provided that the aggregate amount of such loan does not exceed US$ 4 million. BUYER will be entitled to use the proceeds of such loan with no limitation from SELLER. SELLER shall sign any necessary documents to implement the above prior bank lien/s.

(D)    Notwithstanding Paragraphs (A) and (B) above, should BUYER decide to obtain a loan from a bank or other financial institution in addition to the loan referred to in (C) above, SELLER agrees to allow the lender to obtain a lien on all or any particular BUYER assets with a priority ahead of SELLER (other than the escrow account under Paragraph A(1) above) provided that the proceeds of the loan are applied as follows:

(i)    the first amount shall be paid to SELLER to the extent needed to bring SELLER's payments to the level they would have been under Exhibit F, Table F-4, Column B at such time.

(ii)    fifty percent (50%) of the balance of the loan proceeds will be set aside by BUYER in a separate bank account in Israel, secured by a lien in favor of SELLER, at BUYER's sole expense, as a reserve to be used to increase subsequent payments to SELLER under this Contract to the level of said Exhibit F, Table F-4, Column B at such time.

(iii)    fifty percent 50% of the balance of the loan proceeds may be used by BUYER for its general business operations.

SELLER shall sign any necessary documents to implement the above prior bank lien/s.

(E)    In the event of termination of this Contract and if SELLER makes the decision to complete the Satellite (as set forth in Paragraphs 11.6 and 13.3 below) then, upon SELLER's written request, BUYER shall make best efforts to assign its contracts with the Launch company and the insurance company for the Launch of the EROS B Satellite, or BUYER shall implement such contracts for the benefit and at the expense of SELLER, as a trustee for SELLER.   Is it agreed that SELLER shall comply with all of the conditions of such contracts.

**ARTICLE 3**        QUALITY CONTROL

**COMPANY CONFIDENTIAL**

3.1    The EROS B Satellite and all other Deliverables shall be
manufactured by the SELLER in accordance with the applicable
specifications and standards prevailing at the SELLER's premises at
the time of manufacture for the supply of same or similar items, in
particular in accordance with the standards and procedures identified
in the SOW.

3.2    The SELLER shall have and will follow a (i) quality control and
inspection plan and (ii) a configuration management plan, while
manufacturing and/or inspecting the Satellite and other Deliverables,
as well as when performing any Services hereunder, in accordance
with the standards of the aerospace industry and the practices and
procedures utilized by the SELLER in the performance of the same or
similar activity generally. The quality control and inspection
reports/configuration management plan for the Satellite shall be kept
and updated (as to software) by Seller for a period of not less than
the service life of the Satellite. SELLER will maintain configuration
control and management on all the Deliverable items supplied by the
SELLER under this Contract so that future purchases of such items
will be maintained in an identical configuration (subject to
obsolescence and availability) and any changes agreed by the
parties.

3.3    SELLER agrees that any consent or approval of the BUYER to
drawings, designs, reports or reviews and the like of the SELLER
shall in no way diminish the full and complete responsibility of the
SELLER to meet all of its obligations under this Contract, unless
expressly agreed by the BUYER in writing otherwise. Any required
approvals (or disapproval) by BUYER will be issued within seven (7)
working days of SELLER's request for same. The authorized
representative of BUYER for this purpose is the BUYER's CEO or a
person designated by him in writing.

**ARTICLE 4**        INSPECTIONS AND ACCEPTANCE

4.1    BUYER shall have the right, on a non-interference basis, to have its
representatives inspect the work in progress at SELLER's facility,
subject to reasonable notice and compliance with applicable security
requirements of the SELLER. The said representatives may bring to the
attention of the SELLER's Program Manager any non-conformities or
defects discovered during said inspection/observance, and SELLER
shall take the necessary corrective action.  If an acceptance test shall
occur at a facility of one of SELLER's major subcontractors, SELLER
shall obtain, if such acceptance test is of the camera to be delivered
hereunder, and shall use reasonable efforts to obtain, with respect to all
such other acceptance tests, for BUYER the right, on a non-interference
basis, to have its representatives witness such acceptance tests,
subject to reasonable notice and compliance with applicable security

**COMPANY CONFIDENTIAL**

requirements of the SELLER and subcontractor. BUYER agrees and represents that such representatives shall be accompanied by a representative of SELLER and that BUYER's representatives shall not communicate with, and/or give instructions directly or indirectly to, such subcontractors.

4.2    BUYER shall have the right, on a non-interference basis (i.e., so as not to interrupt the work in progress), to have its representatives observe the final tests performed on the EROS B Satellite and on any other related equipment and Deliverables, subject to compliance with applicable security requirements of the SELLER. Such visits shall be coordinated between the parties upon the request of BUYER from time to time. The said representatives may bring to the attention of the SELLER's Program Manager any non-conformities or defects discovered during said observance, and SELLER shall take the necessary corrective action.

4.3    Upon completion of the EROS B Satellite Acceptance Test (as defined in the SOW) to be performed by SELLER at its facility on the fully integrated Satellite and prior to the shipment of the integrated and tested Satellite, the SELLER shall conduct at its facility the Satellite Acceptance Review which will be attended by SELLER and BUYER. SELLER shall provide the BUYER fifteen (15) days notice of the Satellite Acceptance Review together with all relevant documentation. In the event BUYER's duly authorized representative fails to be present at the Satellite Acceptance Review at the stipulated date, an extension of additional five (5) days, which will be considered as an excusable delay for the SELLER, shall be provided to BUYER upon BUYER's request. At the end of the successful completion of the Satellite Acceptance Review and correction of any non-compliances, the BUYER and SELLER shall sign a Certificate of Successful Completion of the Satellite Acceptance Review. The SELLER shall not be obligated to Deliver the Satellite unless the Certificate of Completion of the Satellite Acceptance Review has been signed. Should the BUYER's duly authorized representative fail to be present at the Satellite Acceptance Review, then SELLER shall be entitled to have its own representative sign on behalf of the BUYER the said Certificate of Completion, whereupon SELLER will be free to Deliver the Satellite to the BUYER.

4.4    SELLER shall conduct an inspection and checkout of the Satellite upon its arrival at the Launch Site to assure that there was no material impact to the Satellite during shipping and handling. The SELLER shall provide the BUYER five (5) days notice of the beginning of the inspection/checkout. The BUYER shall have the right to witness the inspection/checkout. SELLER shall, in accordance with its Warranty obligations under Article 10 below, promptly correct any discrepancies found in the checkout so as to minimize the impact on the Launch schedule.

COMPANY CONFIDENTIAL

4.5    After the successful Launch of the Satellite into its designated orbit, the SELLER shall conduct for the BUYER an In Orbit Test (IOT) of the Satellite, in accordance with the provisions of Exhibit G.

4.6    The SELLER shall provide BUYER a report of the IOT test results at the end of IOT, for BUYER's approval. The report will include a list of defects or failures, if any, that caused deviations from the EROS B Mission Requirements and/or from EROS B System Specifications. Subject to security regulations, the SELLER shall present for review to the BUYER existing documentation in SELLER's possession,    as needed by the BUYER in order to evaluate the report. The Buyer will provide to the SELLER its comments on the report within seven (7) days of the presentation of the report. The said report, as amended by the mutual agreement of the parties, shall be signed by the parties ("EIOT Report"). The signature by the parties of the EIOT Report shall constitute the "End of the IOT" and entitle the SELLER for any payment due in respect thereof.  The provisions of Paragraph 10.5 shall apply to the corrections of the items listed in the EIOT Report.

4.7    After the End of the IOT and completion of the corrections listed in the EIOT Report, the SELLER shall conduct a Commissioning Review in accordance with the SOW. Upon successful completion of the Commissioning Review both Parties will sign the Certificate of Commissioning.

4.8    In addition, for a period of twelve (12) months after Launch of the Satellite, SELLER will provide BUYER, at no cost, with all reasonable assistance in documenting the nature and cause of any failure/s and provide technical assistance to the BUYER in preparing, submitting, and prosecuting any insurance claim the BUYER may have with respect to such failure.

**ARTICLE 5**  PERMITS AND LICENSES: GOVERNMENT APPROVALS

5.1    The SELLER represents that it has obtained and is in possession of a written authorization from the Government of Israel a copy of which has been delivered in confidence (subject to security regulations) to the BUYER, for (i) the sale of the Satellite, other Deliverables and Services hereunder to BUYER, (ii) the sale by BUYER of certain services and ground equipment (i.e. those presently being sold with respect to the EROS A satellite) to the countries that BUYER is presently permitted to sell EROS A services to, and (iii) to enable the export of the Satellite and ground equipment and the performances of other applicable Deliverables and Services to/in Russia (the "Vatmach/Authorization"). The BUYER shall obtain all the permits and licenses required for the import of the Satellite and its ground support equipment to the Launch Site, including those related to the activity of SELLER personnel at the Launch Site. BUYER and SELLER shall assist each other in obtaining

COMPANY CONFIDENTIAL

the above permits and licenses. BUYER hereby undertakes to comply with any restrictions or conditions imposed under the Vatmach/Authorization, including without limitation, on the sale of the Satellite or any services or goods related thereto to non-approved customers. It is agreed and understood that, without derogating from the significance of any other provision of this Contract, a violation by BUYER of the conditions or restrictions of Vatmach/Authorization shall constitute a fundamental breach of this Contract and SELLER, if so ordered in writing by an authorized government representative, will be entitled to immediately cease the operation of or access to any Satellite involved. Immediately upon receipt of the aforesaid order, the SELLER shall provide to the BUYER a copy thereof authenticated by SELLER's General Counsel.

5.2    The SELLER declares that, at the time of signature of the Contract, there are no subsystems or components in the Satellite, Deliverables and Services that require an "end user" declaration to be signed by the BUYER to any government, other than the Government of Israel. It is agreed that a breach by the SELLER of the aforesaid declaration shall not constitute or be deemed a force majeure event.

5.3    The parties shall comply with all applicable laws and regulations including the requirements of any governmental permits or licenses. The SELLER shall manufacture or perform (as applicable) the Deliverables and Services in Israel in accordance with all applicable laws, government rules, regulations and ordinances and the conditions of all applicable permits and licenses of the State of Israel. BUYER will be responsible for the fulfillment of all the applicable laws, regulations, licenses and permits etc. required outside of Israel.

5.4    SELLER shall assist BUYER from time to time with respect to any applications to international telecommunication organizations for licenses or permits required by BUYER to provide its customers with services from the Satellite.

5.5    If at any time the applicable Israel governmental agency revokes or suspends the Vatmach/Authorization, due to an act of SELLER in applying for or maintaining the Vatmach/Authorization , then SELLER shall be responsible for the consequences of such revocation or suspension. If the revocation or suspension of the Vatmach/Authorization is not attributable to an act of the SELLER, then the matter shall be considered a Force Majeure.

**ARTICLE 6    TITLE AND RISK OF LOSS**

6.1    Title and risk of loss to the Satellite shall pass from SELLER to BUYER Ex Works MBT facility (Incoterms 2000), after successful completion of the Satellite Acceptance Test by SELLER at SELLER's facility and after

COMPANY CONFIDENTIAL

packing of same by SELLER in the appropriate packing container for same and presentation by SELLER for shipping to the freight forwarder at MBT facility. ("Delivery" of the Satellite). Title to the Satellite shall pass upon payment of the EROS B Satellite Contract Price, as set forth in Exhibit F.

6.2    Title and risk of loss of or damage to Deliverables (other than the Satellite) shall pass from SELLER to BUYER Ex Works, MBT facility (Incoterms 2000) for items that are to be shipped, after completion of its respective Acceptance Test or inspection, after packing of same by SELLER in the appropriate packing container for same and presentation by SELLER for shipping to the freight forwarder at MBT facility. ("Delivery" of other Deliverables) and full payment of their respective Contract prices. Title and risk of loss of or damage to Deliverables that are to remain in BUYER's facilities in MBT shall pass from SELLER to BUYER upon the handing over of possession to the BUYERs, after completion of its respective Acceptance Test or inspection and full payment of their respective Contract prices.

6.3    BUYER hereby authorizes SELLER to use certain parts, components, subsystems and/or work in process ordered for the EROS C satellite and required for the EROS B Satellite (the "EROS C Borrowed Parts"). SELLER will be required at its expense and without impact on the EROS C Satellite schedule and price to replace (by providing substitute parts, components and subsystems) all such parts, components, or subsystems so used.  To the extent that any of the aforesaid parts, components, subsystems or work in process is subject to a lien granted by BUYER to Bank Leumi or any other third party, BUYER shall indemnify SELLER for any claims made by the lien holder against SELLER. In the event of such a claim, SELLER shall give BUYER immediate written notice of same and follow BUYER's written instructions with regard to the disposition of such claim. By no later than fourteen (14) months after the Effective Date of this Contract SELLER will provide BUYER, for information purposes only, information regarding the total cost of the parts, components and/or subsystems so used. In the event the EROS C satellite program is terminated for convenience, BUYER will be credited for the cost of said parts, components and/or subsystems.

## ARTICLE 7        FORCE MAJEURE

7.1    In case of a delay due to Force Majeure or unforeseen circumstances beyond the SELLER's control and without the fault or negligence of the SELLER (including but not restricted to acts of God and/or acts of governments, and/or of nature, war, mobilization, export embargoes, fires, floods, epidemics, quarantines,  strikes, lockouts, freight embargoes and unusually severe weather), the period of performance or delivery shall be extended by a time equal to the duration of such

COMPANY CONFIDENTIAL

delay and the time needed to remedy the consequences of the delay. In the event of a force majeure which prevents the performance by SELLER for more than ninety (90) days, BUYER shall be entitled to terminate this Contract for convenience in accordance with the provisions of Article 11 hereto. A delay by SELLER's subcontractors will not constitute an excusable delay unless the subcontractor's or the subcontractor's lower tier subcontractor delay is caused by a force majeure event within the meaning of this clause.

7.2    SELLER shall notify BUYER as soon as SELLER becomes aware that a Force Majeure event has occurred or may affect the performance of this Contract. In all cases the SELLER shall use reasonable efforts to avoid or minimize such delay. SELLER will provide BUYER a bi-weekly written report on the status of the force majeure claimed and the efforts to minimize the effect of same.

7.3    It is agreed by the parties that with respect to the bonus incentive to be paid to the Seller by the Buyer and set forth in Exhibit F, a force majeure event as defined in this Article and/or in law shall not extend the Satellite delivery date of December 31, 2005. For the sake of clarity, the non delivery of the Satellite to the BUYER by December 31, 2005, for any reason whatever, shall not entitle the SELLER to the said incentive bonus.

**ARTICLE 8    LIQUIDATED DAMAGES AND SPECIAL TERMINATION RIGHT**

8.1    (A)    In the event that SELLER fails to Deliver the EROS B Satellite pursuant to the Program Schedule (as same may be extended pursuant to the provisions of Paragraph 7.1 above (Force Majeure) or is otherwise expressly excused under the terms of this Contract) and after the end of a grace period of one month, SELLER shall pay to BUYER liquidated damages for each month of delay or pro rata portion thereof, as follows (amounts in thousands of US dollars):

| End of Month after grace period | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Penalty | 500 | 500 | 500 | 500 | 500 |
| Total Penalty | 500 | 1000 | 1500 | 2000 | 2500 |

Payment of liquidated damages shall be made at time of termination for SELLER's default of the Contract by BUYER.



COMPANY CONFIDENTIAL

(B)    In the event that Deliverables (listed in Exhibit A) relating to the ground segment fail to pass their applicable acceptance tests by the Launch date (and such failure or delay is not due to Force Majeure or is otherwise expressly provided for under the terms of this Contract), a penalty at the rate of US$1,500.00 per working day shall apply until the End of the IOT, and thereafter the penalty shall be at the rate of US$2,000.00 per working day for the next thirty (30) days, and thereafter the rate of penalty shall increase by US$500.00 for each succeeding 30-day period until such Deliverables pass said acceptance test. In any case SELLER's maximum aggregate liability for such penalties shall not exceed US$350,000. SELLER will continue to attempt to correct any defects until the tests are passed, notwithstanding reaching said cap. For clarification, nothing above is intended to derogate from SELLER's obligation to pass the Satellite Acceptance Test.

8.2    Except for the BUYER's special right of termination set forth in Article 8.4 below, the penalties specified in Articles 8.1(A) and (B) above, shall unless otherwise specified therein, be the BUYER's sole remedy for the SELLER's late delivery under this Contract and shall be in lieu of all damages and remedies for such delay, including the termination for default, during such penalty period. After such period has ended but prior to the completion of the Delivery by SELLER of the EROS B Satellite, BUYER may exercise its right to terminate this Contract for default in accordance with Article 13.

8.3    Except to the extent otherwise expressly stated in Paragraph 13.2 below, in no event shall SELLER be liable for any special, incidental or consequential damages of any kind (including without limitation loss of revenues and loss of profits) caused by SELLER's delay.

8.4    Notwithstanding any provision of this Contract to the contrary, in the event that either or both of the existing SOP customers numbers 2 and 3 of the BUYER, at any time after three months of penalty accumulation for delay in delivery of the Satellite, terminate their SOP contracts with the BUYER with respect to the EROS B and such delay is attributable to SELLER's failure to deliver the Satellite for reasons other than force majeure or BUYER's default, BUYER may, by written notice to SELLER, terminate this Contract in accordance with Article 13 below. BUYER shall immediately notify SELLER when it receives a notice of termination from its existing SOP 2 and 3 customers and provide copies of such notice/s to SELLER. BUYER shall notify SELLER, in writing, of its intention to terminate this Contract within thirty days of the termination of such SOP contracts or the termination of same with respect to the EROS B Satellite. Notwithstanding anything to the contrary, in the event BUYER takes Delivery of the Satellite, it shall reimburse penalties received from SELLER.

COMPANY CONFIDENTIAL

8.5    In the event there is a delay in the Launch, SELLER shall, upon BUYER's request, submit a proposal for storage and maintenance of the Satellite at SELLER's facility pending the availability of the Launch. In such event, the Delivery will be deemed achieved upon notice by SELLER to BUYER of the readiness for shipment of the Satellite.

8.6    Notwithstanding Paragraph 8.1, in the event there is a delay in the Launch, which is not caused by SELLER, and SELLER completes Delivery by the end of such Launch delay, then no penalties shall accrue during the period of such Launch delay.


**ARTICLE 9    LAUNCH CAMPAIGN, IOT AND DEDICATED SERVICES**

9.1    (A)    SELLER shall perform the Services (including Launch Campaign, IOT and Dedicated Services) as defined in the SOW, in support of the BUYER's Launch of the Satellite at the Launch Site. The Parties will coordinate the scheduling of such activity.

       (B)    The Launch of the EROS B Satellite shall be carried out on a START-1 Launch Vehicle. The SELLER represents that the Launch Site used for the launch of the EROS A1 Satellite, including all facilities and equipment installed therein, was (at the time the EROS A1 Satellite was launched) suitable for the Launch of the EROS B Satellite.

       (C)    Prior to the transportation of the Satellite and ground support equipment and prior to the time that SELLER enters the Launch Site, the BUYER shall arrange for security arrangements, reasonably satisfactory to the SELLER, including but not limited to the security of SELLER's personnel and all transported equipment.

       (D)    The Parties agree that SELLER shall jointly participate in meetings and discussions involving technical activity and interface between the Launch Company and the SELLER regarding deviations from those used for EROS A1 Launch. Furthermore, the Parties agree that the purchase contract between the BUYER and the Launch Company will designate the SELLER as the technical designee of the BUYER vis-a-vis the Launch Company, with the SELLER performing the activities generally described in the SOW under Dedicated Services. These services will be carried out by SELLER in coordination with BUYER.

9.2    (A)    BUYER shall be entitled to be present at and observe the IOT effort and SELLER shall make all the necessary security arrangements for BUYER.

COMPANY CONFIDENTIAL

(B)     SELLER commits to maintain all the required personnel for the completion of the IOT and not to assign them to other projects and/or activities until the End of the IOT as defined in Exhibit G.

## ARTICLE 10     WARRANTY

10.1    SELLER warrants that at the time of Delivery of the Satellite and other Deliverables, the Satellite and Deliverables shall comply with the Mission Requirements set forth in Exhibit B, the System Specifications set forth in Exhibit C and shall be free from defects in materials and workmanship. The SELLER's obligation in respect of any such defect in the Satellite and the Deliverables prior to Launch is limited to the repair or replacement, at SELLER's option, of the defective part or item thereof of the Satellite/Deliverable in which BUYER discovers such defect, provided that BUYER notifies SELLER immediately upon becoming aware of such defect, and in no event after the end of the Warranty Period (as defined below).   The balance of the Warranty Period shall apply to the repaired or replaced item.

10.2    The Warranty Period for the Satellite and Deliverables that are placed on or incorporated in the Satellite or the Launch Vehicle shall commence upon Delivery of such items and shall end at the earlier of (a) twelve (12) months after Delivery, or (b) the End of IOT. The Warranty Period for any other Deliverables shall end twelve (12) months after Delivery of same.

10.3    SELLER shall determine, on a case-by-case basis and at its sole discretion, where all warranty repairs shall be performed (whether at SELLER's facilities or otherwise).    In the event the repairs are performed at SELLER's facilities, SELLER shall be responsible for round-trip transportation of the items to and from SELLER's facility including all shipping and insurance costs involved.  Any parts removed from the items shall become the property of SELLER.

10.4    During the Warranty Period, SELLER shall redo any Service which is found to be defective or incomplete to the extent such re-performance is necessary for the purpose of Launch and/or operation of the Satellite.

10.5    EIOT Report Repairs

SELLER, at its sole expense, shall diligently and without delay, correct, to the extent possible, the defects listed in the EIOT Report which can be implemented by a communication uplink to the Satellite or repair /software modification of the ground segment (at SELLER's discretion) so as to enable the Satellite to perform in accordance with the Mission Requirements (Exhibit B) and the System Specifications (Exhibit C).

10.6    Post-Warranty Repairs



COMPANY CONFIDENTIAL

Defects or failures or deviations from the Mission Requirements and/or the System Specifications of the Satellite that are discovered after the End of the IOT and which are not included in the EIOT Report shall be corrected, as follows:

(1)    All corrections/fixes (which can be implemented by a communication uplink to the Satellite or repair/software modification of the ground segment, (at SELLER's discretion) shall be made as soon as possible by SELLER through software fixes and/or fixes in the ground segment, with the cost (without profit) of said effort being shared as follows:

| Discovered during period from End of the IOT | IAI/MBT share of the cost (in %) | ISI share of the cost (in %) |
|---|---|---|
| 0-6 months | 80 | 20 |
| 7-12 months | 75 | 25 |
| 12-18 months | 50 | 50 |
| Beyond 18 months | 0 | 100 |

(2)    Upon the request of BUYER, the CFO of IAI Systems Missiles and Space Group shall certify the costs being charged to the BUYER under this provision.

10.7    The warranty and repair obligations set forth in Article 10 shall apply only to the extent that the Deliverable items are stored, handled, used and maintained in accordance with the relevant manuals and other written instructions of SELLER and its subcontractors in respect of such items. SELLER shall have no responsibility for defects in items (hardware and software) furnished by BUYER. In addition, to the extent that a defect or other fault is caused by an event that is covered by insurance then the proceeds of such insurance will be used to pay SELLER for the repair or replacement.

10.8    THE WARRANTY AND OTHER OBLIGATIONS PROVIDED IN THE FOREGOING PROVISIONS OF THIS ARTICLE AND THE OBLIGATIONS AND LIABILITIES OF SELLER THEREUNDER ARE EXCLUSIVE AND IN LIEU OF, AND BUYER HEREBY WAIVES, ALL OTHER RIGHTS, REMEDIES, WARRANTIES, GUARANTEES OR LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW, CONTRACT, NEGLIGENCE OF ANY DEGREE, STRICT LIABILITY OR OTHERWISE, IN RESPECT OF THE DELIVERABLES, SERVICES, OR DOCUMENTATION TO BE DELIVERED/PERFORMED UNDER OR IN CONNECTION WITH THIS CONTRACT (INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). THE OBLIGATIONS SET FORTH HEREIN SHALL NOT

COMPANY CONFIDENTIAL

BE EXTENDED, ALTERED OR VARIED EXCEPT BY EXPRESS WRITTEN AGREEMENT OF SELLER AND BUYER. IN NO EVENT SHALL SELLER OR SELLER'S SUBCONTRACTORS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION, LOSS OF REVENUES, LOSS OF PROFITS, ADDITIONAL OR INCREASED COSTS OR ANY OTHER DAMAGES).

**ARTICLE 11        TERMINATION FOR CONVENIENCE**

11.1    The BUYER may by written notice to the SELLER, at any time, terminate this Contract with regard to the Satellite and related Deliverables and Services in accordance with the terms set forth below, and the SELLER shall immediately cease work in the manner and to the extent specified. Notwithstanding the above, prior to exercising its right to terminate hereunder BUYER must have issued and secured for SELLER's benefit the liens described in Articles 2.10 (A)(1) and (B) above.

11.2    (A)    Upon receipt of a notice of termination, as provided in Article 11.1 above, the SELLER shall stop the terminated work under this Contract.

       (B)    Unless SELLER elects to continue working on the Satellite pursuant to Paragraph 11.6, SELLER shall take the following actions:

              (1)    stop the terminated work under this Contract on the date specified in the notice of termination;

              (2)    place no further orders, subcontracts for materials, services, or facilities regarding the terminated work , except as may be necessary for minimizing the overall costs of such termination;

              (3)    terminate orders and subcontracts, except as may be necessary for minimizing the overall costs of such termination;

              (4)    settle all outstanding liabilities and all claims arising out of such termination or orders, or subcontracts for material, services or facilities; and

              (5)    notwithstanding the provisions of (1) – (4) above, take such action as may be reasonably necessary for .the protection and preservation of the property related to this Contract which is in possession of the SELLER or any

COMPANY CONFIDENTIAL

subcontractor and in which the BUYER has title or partial ownership or may acquire an interest.

(C)    For the avoidance of doubt, in the event of termination for convenience of this Contract by BUYER, SELLER shall retain all title to and possession of all items of Deliverables (including materials, components and work in process) produced or procured by SELLER in connection with this Contract.

11.3    Within six (6) months after determination of the cost of the termination (including related costs incurred as a result of the termination), SELLER shall submit to the BUYER its termination claim consisting of the costs of all work done up to the date of termination and work done in accordance with Paragraph 11.2(B) above, including any payments made to subcontractors which are non-refundable to SELLER, and including the settlement with vendors or subcontractors and other costs connected with the termination (collectively the "IAI Termination Claim"). The term "costs" as used herein includes direct costs, indirect costs and general and administrative expenses, that are posted to SELLER's books of account in connection with this Contract in accordance with his standard accounting practice for commercial contracts, consistently applied plus a profit of ten percent (10%). Notwithstanding anything to the contrary herein stated, the total amount of the claim together with all other payments made to SELLER under this Contract shall not exceed the Total Contract Price.

11.4    IAI's Termination Claim shall be accompanied by a certificate signed by the Chief Financial Officer of the SELLER stating that the claim properly includes the costs incurred by SELLER in connection with the termination. In the event BUYER desires independent verification of the claim, it may request an independent Certified Public Accountant (CPA) agreed by the Parties and subject to necessary security clearances to audit (the "Joint Audit Report") the costs incurred by SELLER and report to the Parties. The Joint Audit Report shall constitute a final determination of actual costs notwithstanding the provisions of Article 15, Law and Arbitration, of this Contract save that if the costs determined by such report exceed the amount of SELLER's termination claim, BUYER shall only be obliged to pay the amount of SELLER's termination claim. Costs of the audit and report billed by the independent CPA shall be borne equally by the SELLER and the BUYER.

11.5    (A)    BUYER shall, within thirty (30) days of presentation of SELLER's invoice/claim, pay to SELLER for any termination for convenience hereunder the amount undisputed by BUYER.. Within thirty (30) days after receipt of aforementioned Joint Audit Report, BUYER shall pay all amounts set forth in said report plus applicable accrued interest. Notwithstanding any other provision to the contrary, BUYER shall pay interest to SELLER at the rate

COMPANY CONFIDENTIAL

of 6-month LIBOR plus 3% for any delay in payment of the undisputed portion of IAI's Termination Claim.

(B)     SELLER's election to continue working on the Satellite (or not) shall not affect BUYER's obligation to make payment as set forth in Article 11.5(A) above.

11.6    In the event of a termination for convenience, notwithstanding anything to the contrary, SELLER may elect to complete construction of the Satellite as follows:

(A)     If SELLER elects to continue working and completes the Satellite, then in addition to the foregoing and subject to SELLER's request, BUYER shall take the steps set forth in Article 2.10(E) in relation to the Launch and Launch insurance contracts. In the event of the sale or launch of the Satellite by SELLER, the net sale proceeds (after deduction of legal, travel and external marketing expenses, and regulatory and license fees [other than to the Israeli government] and storage and preservation costs, if applicable, from the sale price) will be distributed according to the following priority (to the extent such proceeds are sufficient):

(1)     To repay SELLER for all payments made by SELLER to the Launch company and the Launch insurance company;

(2)     To pay SELLER's audited costs of completion, calculated in accordance with the principles set forth in Paragraph 11.3.

(3)     To pay SELLER any unpaid amounts of its Termination Claim.

(4)     To pay BUYER a sum equal to all moneys paid by BUYER to SELLER, plus the amounts paid by BUYER to the Launch insurance and Launch companies which was not refunded to BUYER (plus interest thereon at 6-month LIBOR applied from the date such payment was made to SELLER until the date of repayment to BUYER).

(B)     SELLER may sell the Satellite at a price and on terms determined in its sole discretion provided such price is a fair market value under the circumstances existing at the time of the sale. In case BUYER does not receive the full payment under Paragraph 11.6(A)(4) above, SELLER will disclose signed sale documents to BUYER (subject to security clearances) so that BUYER can audit the reasonableness of the price.

COMPANY CONFIDENTIAL

(C)    BUYER shall perform all acts and execute all documents that may be required to support or implement SELLER's decision to continue working on the Satellite. BUYER shall also make its best efforts to perform all required actions to release and/or remove any liens, levies or charges that may have been placed on Deliverables and work in process by BUYER and/or third parties.

11.7  (A)    SELLER also has the option not to complete the Satellite and to use the work in process (including components and sub-systems) in contracts for other customers and in such case will credit to the BUYER any amounts received by SELLER from such other customer for such items up to the amounts received by SELLER from BUYER for same. In this case, if SELLER is considering selling all or an item of the work in process for an amount that would not be sufficient to reimburse BUYER for the monies paid by BUYER with respect to that item/s, SELLER shall first obtain BUYER's agreement for the sale at such lower price.

(B)    If BUYER has paid SELLER the amounts due SELLER as set forth in Paragraph 11.5(A) above, SELLER will make all reasonable commercial efforts to make use of the work in process (including components and sub-systems) in contracts for other customers and if so requested by BUYER at the time of giving SELLER the Notice of Termination hereunder, SELLER shall (i) have the identification of such items separately certified by an independent Israeli CPA and (ii) at the time of SELLER's resale of such items, have an independent Israeli CPA confirm the price of the sale of such items or the portion of the price of the completed product incorporating such item properly allocable to such items.  In this case, if SELLER is considering selling all or an item of the work in process for an amount that would not be sufficient to reimburse BUYER for the monies paid by BUYER with respect to that item/s, SELLER shall first obtain BUYER's agreement for the sale at such lower price.

11.8  SELLER shall use all reasonable commercial efforts to place subcontracts with major vendors on terms that will enable SELLER to terminate in a manner consistent with this Article.

11.9  The parties hereby acknowledge that in the event that the BUYER is unable to make payments numbers 2 and 3 as set forth under Exhibit F (Table F-2) by September 7, 2004, either party shall be entitled to terminate this Contract for convenience in accordance with this Article 11, upon forwarding a written notice to the other party. In the event of such a termination, SELLER's maximum claim shall not exceed US$20 million.  The actual claim will be subject to audit and verification as set forth in Paragraph 11.4 above.  If SELLER terminates this Contract,

COMPANY CONFIDENTIAL

BUYER shall not have any of the rights set forth in Paragraphs 11.4, 11.5, 11.6, 11.7 above, until after it has performed all its obligations set forth in Article 2.10(A)(1) and (B) above.

**ARTICLE 12**        RIGHTS FOR INFRINGEMENT OF PATENT RIGHTS

12.1    SELLER hereby agrees to indemnify and hold harmless BUYER from and against any claim by any third party that the Deliverables or any part thereof violates any valid claim under the patent laws of the State of Israel and of Russia by virtue of the production, operation, use or sale of the Deliverables or imagery products retrieved from the Satellite, **PROVIDED** that, the BUYER shall notify the SELLER as soon as possible of the receipt by the BUYER of any claims referred to in this Paragraph 12.1, and give the SELLER complete control over the defense or settlement of such claims and the SELLER may, at its own expense:

(a)    conduct any litigation or negotiate any settlement arising therefrom in such a way that the BUYER is able to continue using the Satellite without infringing or interference;

(b)    procure for the BUYER the right to continue using the Satellite as contemplated under this Contract;

(c)    modify or amend the Satellite so that the same becomes non-infringing without affecting the capability or performance of the Satellite;

(d)    replace the part of the Satellite so infringing with other equipment or part thereof of identical capability and performance; or

(e)    defend such claims.

**PROVIDED** further that the BUYER shall also provide necessary information and assistance to SELLER in the defense of any such claim subject to coordination of BUYER and SELLER on any applicable security restrictions.

12.2    SELLER represents to BUYER that to the actual knowledge of SELLER, there are no claims against SELLER that the Deliverables or any part thereof violates any valid claim under the patent laws anywhere in the world by virtue of the production, operation, use or sale of the Deliverables or imagery products retrieved from the Satellite.

**ARTICLE 13**        TERMINATION FOR SELLER'S DEFAULT

**COMPANY CONFIDENTIAL**

13.1    BUYER may issue a thirty (30) day written notice of default (the "Default Notice") to SELLER if the Delivery of the Satellite is not achieved by the time the maximum amount of liquidated damages has accrued under Article 8 above, as such date may be adjusted by Article 7, Force Majeure, or as otherwise mutually agreed by the parties in writing. The termination date shall be the date that is thirty (30) days after the date of the Default Notice.

13.2    In the event BUYER terminates this Contract as provided in Paragraph 13.1, the BUYER shall be entitled to a refund of all payments previously made to the SELLER under this Contract, together with (i) the amount of late penalties fees paid to the Launch Company and (ii) the amount paid by BUYER to the Launch Company under the purchase contract with the Launch Company for the specific non-recurring costs to implement changes to the Launch Vehicle to interface with the Satellite that are not refundable to BUYER, and (iii) interest on all of the above at the rate of LIBOR (six (6) month LIBOR published by Bank Leumi Ltd.) applicable from the date of the default notice) plus three percent (3%) (collectively the "Termination Payment"), and all Deliverables and work in progress then in existence shall be the sole property of SELLER. BUYER shall substantiate any amounts claimed from SELLER for termination of the Contract under (i) and (ii) above.

13.3    In the event of termination for SELLER's default, SELLER may elect to continue work on the EROS B Satellite and to either sell or launch the Satellite on its own. In such event, BUYER shall take the steps set forth in Article 2.10(E) in relation to the Launch and Launch insurance contracts. BUYER shall make its best efforts to perform all acts and execute all documents that may be required to support or implement SELLER's decision to continue working on the Satellite. BUYER shall make best efforts to release and/or remove any liens, levies or charges that may have been placed on Deliverables and work in progress by BUYER and/or third parties. SELLER will not offer or sell such Satellite to BUYER's then existing SOP customers. For avoidance of doubt, nothing contained herein shall limit SELLER's ability to sell or offer to sell the Satellite to the Government of Israel. SELLER will keep BUYER informed on matters concerning the sale of the satellite and disclose signed sale documents (subject to security clearances).

13.4    SELLER will pay BUYER's Termination Claim upon the earlier of (i) 24 months after the termination date, or (ii) receipt of the sale proceeds for the Satellite. For clarity sake, any partial payments on the sale of the Satellite will be paid to BUYER on account of the BUYER Termination Claim. In the event that the net sale proceeds for the Satellite exceed Buyer's Termination Claim, then the balance shall be paid as follows: (a) SELLER shall receive a sum equal to the EROS B Contract Price (less penalties accrued under the Contract), and (b) any

COMPANY CONFIDENTIAL

additional excess after that will be divided equally between BUYER and SELLER.

13.5   In the event of default by the BUYER under this Contract, the procedures of Article 11 shall apply as if the Contract had been terminated for convenience, with the necessary changes to reflect that SELLER is initiating the termination. For clarity sake, in the event that the situation described in Paragraph 11.9 occurs, then its provisions will apply. In addition, BUYER shall not have any of the rights set forth in Paragraphs 11.4, 11.5, 11.6, 11.7 and 11.9, until after it has performed all its obligations set forth in Article 2.10(A)(1) and (B) above.

13.6   In the event of delay of more than thirty (30) days in payments due by BUYER after successful completion by SELLER of a payment milestone and receipt of invoice and supporting documentation (if required), BUYER shall be deemed to be in default under the Contract. SELLER, at its sole discretion, may elect not to exercise its right to terminate the Contract for BUYER's default, and, in such a case, BUYER shall be required to pay interest to SELLER at the rate of 6-month LIBOR plus 3% on the unpaid amount from the date payment is due until the date payment is made. For the avoidance of doubt, SELLER has the right (but is not obligated) to require BUYER to pay interest, and such payment of interest shall not derogate from SELLER's right to terminate the Contract. To the extent SELLER elects not to exercise its right to terminate and has accepted the full payment due plus interest on such payment calculated as set forth above, SELLER shall no longer have the right to terminate the Contract for such specific payment. In addition, upon SELLER's written request the Parties will agree on a program schedule adjustment.

13.7   If, after termination of this Contract under the provisions of Paragraph 13.1, it is determined by arbitration or admitted in writing by BUYER that SELLER was not in default under the provisions of this Article, or that the default was excusable under the provision of Article 7 or expressly otherwise under the Contract, such termination shall be considered a termination for convenience of BUYER and the provisions of Article 11 shall apply and BUYER shall in addition (notwithstanding Article 15, Law and Arbitration) reimburse SELLER's cost of the arbitration (including legal counsel).

13.8   Notwithstanding the above, SELLER's entire liability for breach under this ARTICLE shall not exceed the amounts payable under Paragraphs 13.2 and 13.3 above. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOST REVENUES OR PROFITS). This Paragraph shall survive the expiration or termination of the Contract for whatever cause.



COMPANY CONFIDENTIAL

**ARTICLE 14        TRANSFER OF INFORMATION; CONFIDENTIALITY**

14.1    SELLER and BUYER may transfer or exchange information during the performance of the work, in oral or written form, which may include specifications, drawings, sketches, models, samples, computer programs, reports, data, techniques, designs, codes, documentation, and financial, statistical or other technical information essential to the objectives of this Contract. All disclosures of such information will be treated as proprietary if marked as "Proprietary" by the party making the disclosure at the time of disclosure.

14.2    Subject to the provisions of Paragraph 14.3 below, the party receiving the proprietary information of the other party shall maintain such information in confidence and shall not use such information except as expressly authorized by this Contract. Each party agrees to use the same care and discretion to avoid unauthorized disclosure, use, publication or dissemination of the other's proprietary information and the unauthorized use thereof as the receiving party uses with respect to similar information of its own, but in no event, less than reasonable care. Should it become legally necessary for either party to disclose certain of the other's proprietary information to a third party, it shall be disclosed only to the extent required by law and after a five (5) day prior written notification to the other party of the requirement for disclosure.

14.3    The obligations of confidentiality and restrictions on use specified in this Article shall not apply to any information that the receiving party can show:

(A)    is already in the possession of the receiving party without obligation of confidentiality at the time of disclosure;

(B)    is independently developed (without use of or resort to any of the disclosing party's proprietary information) by the receiving party or any of its Affiliates or subcontractors prior to disclosure as evidenced by appropriate documents;

(C)    is or becomes publicly available without breach of this Contract and without the fault of the receiving party;

(D)    is released for public disclosure by the disclosing party.

14.4    SELLER and BUYER shall take reasonable efforts necessary, including the appropriate contractual provisions in subcontracts, to ensure the confidentiality of all proprietary information of the BUYER and SELLER which may be disclosed to subcontractors.

14.5    The receiving party agrees that: (i) any proprietary information disclosed hereunder shall be used by the receiving party solely for the purpose of

**COMPANY CONFIDENTIAL**

performing its functions in connection with the parties' relationship with respect to the purposes of this Contract; (ii) it will not use the proprietary information disclosed hereunder for any other purpose; and (iii) it will not distribute, disclose or disseminate to anyone such proprietary information of the disclosing party, except that either party may disclose to its own employees or subcontractors on a need-to-know basis, and either party may disclose with the consent of the disclosing party which consent will not be given unless such third party executes a proprietary data protection agreement with terms consistent with the requirements herein prior to receiving such information.   For the sake of clarity, BUYER is entitled to use the deliverable Documentation hereunder for purposes of analyzing the performance by SELLER hereunder, for purposes of participating in inspections and/or acceptance tests at SELLER's premises and at the Launch Site, and for the retrieval of data from the Satellite once in orbit.

14.6   The Parties shall designate in writing (from time to time) specific individuals as the points of contact for receiving proprietary information exchanged between the parties pursuant to this Contract.

14.7   The confidentiality obligations in this Article shall survive expiration or termination of this Contract for whatever cause.

14.8   Nothing herein shall require a party to transfer proprietary information to the other party.


**ARTICLE 15        LAW AND ARBITRATION**

15.1   Any disputes or disagreement arising between the parties in connection with this Contract or in relation to the interpretation or execution thereof, will be given time for settlement within three (3) months from the date of notification of a dispute from one party to the other party.  In case there is no solution, the dispute shall be settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with said Rules. Arbitration proceedings shall take place in Tel Aviv, Israel. The arbitrator shall set forth his decision in writing fully explaining the basis and justification for such decision.  The arbitration award shall be final and binding upon the Parties.

15.2   This Contract shall be governed and interpreted under and in accordance with the laws of the State of Israel.


**ARTICLE 16        INDEMNITY AND INSURANCE**

16.1   BUYER and SELLER shall each be individually responsible for and have no claims of any nature whatsoever against any of the other

COMPANY CONFIDENTIAL

parties for any loss of or damage to its own property arising out of or in connection with the Satellite and/or Services supplied/performed hereunder, regardless of how such loss and/or damage was caused, including negligence of the other Party or its subcontractors, their respective servants or agents. Each Party shall have the right, in its sole discretion and at its own expense, to insure its own property.

16.2    BUYER and SELLER shall each be individually responsible for the bodily injuries or death suffered by its own servants or agents arising out of or in connection with the Satellite and/or Services supplied/performed under this Contract, regardless of how such injury, or death was caused, including negligence of any other party, its servants or agents. In the event of a claim by a servant or agent of any party against any one of the other party/parties, the employer party will defend and pay on behalf of such party/parties any amounts which said other party/parties is legally obliged to pay. Each party has the right, in its sole discretion and at its own expense, to insure its liabilities herein.

16.3    With respect to any and all claims by third parties against BUYER and/or SELLER arising from damage to or loss of property and/or death or personal injury, from Launch of the Satellite and until immediately after the completion of the IOT, BUYER shall include SELLER as additional insured under BUYER's launch insurance which shall include insurance against such third parties claims. Thereafter, if BUYER at its sole discretion maintains such insurance against third party claims, the BUYER shall include SELLER as additional insured under BUYER's insurance for same.

16.4    To the extent that BUYER owes money to SELLER at the time of Delivery of the Satellite, and notwithstanding the provisions of Paragraph 6.1, then BUYER shall name SELLER as an additional insured and loss payee under BUYER's shipping and/or Launch insurance policies.


## ARTICLE 17    MISCELLANEOUS

17.1    <u>Amendments</u>

The Contract may not be modified except by written amendment signed by duly authorized representatives of both parties.

17.2    <u>Changes</u>

BUYER shall have the right to request a change(s) to the Contract and SELLER shall respond to such request. Such response shall include the price, schedule, system performances, interfaces and all other impacts of the proposed change. BUYER shall have the option, after receiving this response, to decide whether to implement the proposed



COMPANY CONFIDENTIAL

change and then to direct SELLER to proceed with the proposed change.   In case of the implementation of the proposed change by SELLER, BUYER shall be responsible for all impacts of the change as presented by the SELLER.

17.3    Publicity and Disclosure

SELLER shall not publicize or disclose, including without limitation the progress of the program, the existence of this Contract, the content of this Contract or the transactions contemplated hereby without the prior written express approval of the BUYER.   SELLER is authorized to disclose/publicize information that has been officially released to the public by the BUYER.  Notwithstanding the foregoing SELLER shall be entitled to disclose this Contract to (i) the Israeli MOD for purposes of obtaining the licenses required for the program or as required by law, and (ii) subcontractors/vendors or other parties, as needed to perform the Contract; it being understood that the parties listed above (other than the IMOD) to whom it is disclosed will undertake to respect the confidentiality set forth in the preceding sentence.  SELLER will use its best efforts to seek the IMOD's agreement to this provision.


17.4    Notices

Any notices or requests or receipts required or desired to be given or made hereunder shall be in writing and shall be effective if delivered by hand to an officer of the recipient party or sent by registered mail or by facsimile transmission or telex and received by the recipient party, at the address indicated below:

In respect of BUYER, to:

ImageSat International N.V.
45 Ayias Paraskevis, Yermasoyia, CY-4044
Limassol – Cyprus
Attention: EROS B Program Manager
Copy: Chief Executive Officer

With a copy to: ImageSat International N.V. Correspondance Office
2 Kaufman Street, 17th Floor, Tel Aviv,
(Fax No. 972-3-5163430)

In respect of SELLER, to:

Israel Aircraft Industries Ltd.
MBT Satellite Division
Yehud Industrial Zone
Yehud, Israel 56000

COMPANY CONFIDENTIAL

Attention: EROS Program Manager
Fax: 972 3 531 4230

With a copy to: Yehoshua Eldar
972 3 531 4230

Any notice or request shall be deemed to have been served if delivered by hand, when delivered, if sent by registered airmail, upon receipt, and if sent by facsimile transmission, upon receipt.

17.5    Language

All communications required under this Contract shall be in the English language. All deliverable Documentation shall be in English. All EROS specific Documentation generated under this Contract shall be delivered in English.

17.6    Assignment

Neither party hereto shall assign, or transfer, either in whole or in part, this Contract or any of its rights, duties or obligations hereunder to any person or entity, without prior express written approval of the other party, except that either party may assign or transfer any of its rights, duties or obligations under this Contract, either in whole or in part, to a parent company at any tier or wholly-owned subsidiary thereof provided always that the party making the assignment or transfer shall remain fully and primarily liable with respect to performance of all duties and obligations set forth in this Contract, including compliance with all applicable laws and regulations.

17.7    Severability

In the event any one or more of the provisions of this Contract shall, for any reason, be held to be invalid or unenforceable, the remaining provisions of this Contract shall be unimpaired, and the invalid or unenforceable provision shall be replaced by a mutually acceptable provision which, being valid and enforceable, comes closest to the intention of the parties underlying the invalid or unenforceable provision.

17.8    Integration

This Contract, together with the Exhibits, contains the entire contract between the parties relating to the subject matter hereof. All prior understandings, representations and warranties (including those contained in sales, promotional and/or marketing materials) by and between the parties, written or oral, that may be related to the subject matter hereof in any way are superseded by this Contract. No modification or amendment to this Contract (including without limitation to any Exhibit hereto) shall be effective unless signed by the Parties (in

COMPANY CONFIDENTIAL

the case of Buyer by Buyer's CEO and CFO, and in the case of Seller by the Manager and Finance Director of The Systems Missiles And Space Group).

17.9    <u>Inter-Party Waiver of Liability</u>

BUYER hereby agrees to be bound by a no-fault, no-subrogation inter-party waiver of liability and related indemnity provisions provided for in the Launch Services Agreement and to cause its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract and any other person having an interest in the Satellite (including customers of BUYER), to accede to such waiver. BUYER also shall obtain from its insurers, and shall cause its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract and any other person having an interest in the Satellite (including customers of BUYER) to obtain from their insurers, an express waiver of such insurers' rights of subrogation with respect to any and all claims that have been waived pursuant to this Paragraph 17.9.

17.10    <u>Waiver of Subrogation</u>

Each party to this Contract shall obtain a waiver of subrogation and release of any right of recovery against the other party to this Contract and its contractors and subcontractors at any tier (including suppliers of any kind) that are involved in the performance of this Contract, from any insurer providing coverage for risk of loss or non-compliant performance of or damage to the EROS B Satellite.

17.11    <u>EROS C ISSUES</u>

The continuation of the EROS C Satellite purchase contract is dealt with in Exhibit K. For claims, which may have arisen prior to this Contract, both parties reserve their rights.

17.12    <u>MASTER AGREEMENT AMENDMENT</u>

Attached hereto as Exhibit I is the amendment to the Master Agreement signed in conjunction with this Agreement.

**ARTICLE 18        EFFECTIVE DATE OF CONTRACT**

18.1    The Effective Date of Contract (EDC) is conditioned upon the completion of all of the following:

A.    Signature of this Contract by both parties; and
B.    Upon receipt by SELLER of the down payment hereunder; and
C.    Receipt by BUYER of requisite corporate approvals; and

**COMPANY CONFIDENTIAL**

D.    Receipt by SELLER of requisite corporate approvals.

**ARTICLE 19**        ORDER OF PRECEDENCE

19.1    In the event of any inconsistency among or between the parts of this Contract, such inconsistency shall be resolved by giving precedence in the order of the parts as set forth below:

A.    These Contract Terms and Conditions.

B.    The Exhibits hereto in the following order of precedence:

1. -Exhibit "B"        EROS B Mission Requirements;
2. -Exhibit "C"        EROS B System Specifications
3. -Exhibit "E"        Program Schedule
4. -Exhibit "D"        Statement of Work (SOW);
5. -Exhibit "F"        Pricing and Payment Terms;
6. - and all other Exhibits.

COMPANY CONFIDENTIAL

# Exhibits

| ANNEX | | STATUS |
|---|---|---|
| A | Deliverables and Services | |
| B | EROS B Mission Requirements | |
| C | EROS B System Specifications | |
| D | Statement of Work (SOW) | |
| E | Program Schedule | |
| F | Pricing and Payment Terms | |
| G | EROS B In-Orbit Test | |
| H | Program Management team | |
| I | Amendment to the Master Agreement | |
| J | SOP Ground Station Items | |
| K | EROS C | |