# Exhibit 9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STEPHEN M. WILSON, et al.,

              Plaintiffs,

        against      07 Civ. 6176(LTS)

IMAGESAT INTERNATIONAL N.V.,

et al.,

              Defendants.
------------------------------x


           MOSHE BAR-LEV

        New York, New York

      Tuesday, February 26, 2008


Reported by:  Steven Neil Cohen, RPR

Page 18

Bar-Lev

1
2     want me to start?  Kindergarten?
3     Q.   You can start with college.
4     A.   I got my engineering degree from
5     the Technion, my B.Sc., Bachelor of Science.
6          I got my Ph.D. from USC in Los
7     Angeles.
8     Q.   When did you get your B.Sc. in
9     aeronautical engineering from Technion?
10    A.   1966.
11    Q.   When did you get your Ph.D.
12    from --
13    A.   1975.
14    Q.   Had you done your military service
15    before or after or both?
16    A.   Military service in Israel
17    includes also, you know, how do you say,
18    reserve duties.  Do you refer to that?
19    Q.   No, other than reserve duties.
20    A.   Before.  Just a minute.  Before
21    the B.Sc., before I went to the Technion I
22    was in the paratroopers.
23         After I finished the Technion I
24    was in the Air Force.
25    Q.   After you finished the Technion in

Page 19

Bar-Lev

1
2     1966 you went into what part of the Israeli
3     defense forces?
4     A.   Into the Air Force.
5     Q.   What was your specific role in the
6     Air Force?
7     A.   I was an officer in the Air Force.
8     Q.   Were -- did you have a specific
9     area of involvement in the Air Force as an
10    officer?
11    A.   I don't think I would like to
12    disclose that.
13    Q.   I am not meaning to probe what is
14    inappropriate to be probed but let me just
15    ask this question.
16    A.   I will tell you, make it easier.
17    I was in the flight school and then I was in
18    the headquarter of the Air Force.
19    Q.   When you were in the headquarter
20    of the Air Force what projects were you
21    involved with?
22    A.   I cannot tell you.
23    Q.   You cannot tell me because?
24    A.   Because I regard that as a
25    sensitive issue for Israel.  Maybe it is not

Page 20

Bar-Lev

1
2     but I would rather not get into it.
3     Q.   What years were you an officer in
4     the Air Force?
5     A.   From 1967 up to 1970.
6     Q.   Did you have a security clearance
7     during the period that you served in the Air
8     Force from 1967 to 1970?
9     A.   Every officer had one, yes.
10    Q.   Are there various classifications
11    of clearance that the military gives to
12    officers?
13    A.   It was too long ago.  I don't
14    remember what kind of classifications but
15    there are.
16    Q.   Do you recall what classification
17    you had?
18    A.   No.  Well, to tell you which kind
19    of grade it was?
20    Q.   Yes.
21    A.   No, I don't remember.
22    Q.   Do you recall whether you were --
23    you had the clearance to receive secret
24    information?
25    A.   I would phrase, yes.  Depend --

Page 21

Bar-Lev

1
2     the secrecy, of course, has grades by
3     itself.
4     Q.   What are the grades of secrecy
5     that exist?
6     A.   I don't remember.  Remember it was
7     '67.
8     Q.   Are these grades of secrecy -- are
9     there grades of secrecy today in Israel?
10    A.   I don't know.
11    Q.   Do you recall who it is that gives
12    the securities clearance for you to serve in
13    the Air Force with a security clearance?
14    A.   You mean by name?
15    Q.   No.  What unit?
16    A.   Do you want me to answer?
17         MR. MATETSKY:  Do you want him to
18    do it that way?  I assume you don't.
19         MR. GOLDSTEIN:  I would prefer --
20    BY MR. GOLDSTEIN:
21    Q.   The question is if you know the
22    word in English, that is great.  If not --
23    A.   No, I don't know how to translate
24    it.
25    Q.   Can you roughly describe what the

Page 22

Bar-Lev
1
2  group -- is it within the military?
3      A.   It was in the military.  It has to
4  do with security.
5      Q.   They would assign --
6      A.   They will check you out and then
7  they will assign you according to your
8  position in the Air Force.
9      Q.   Do you recall once you had a
10  securities clearance in the military whether
11  it needed to be renewed?
12      A.   No, I don't.  I don't remember.  I
13  assume it is done automatically.
14          MR. MATETSKY:  Don't assume
15  things.  Answer from what you know.
16  BY MR. GOLDSTEIN:
17      Q.   You said that after completing
18  your military service in the Air Force you
19  then went to get your Ph.D.?
20      A.   Yes.
21      Q.   In California?
22      A.   Yes.
23      Q.   You received your Ph.D. in 1975?
24      A.   1975, yes.
25      Q.   Then?

Page 23

Bar-Lev
1
2      A.   M.Sc. and Ph.D., yes.
3      Q.   Then what did you do at that
4  point, sir?
5      A.   After 1975?
6      Q.   Yes.
7      A.   I went back home.
8      Q.   Went back --
9      A.   Home.  Home is Israel.
10      Q.   Home is Israel?
11      A.   Yes.
12      Q.   What did you do back home in
13  Israel.
14      A.   I joined IAI.
15      Q.   Just for purposes of the record,
16  when you say "IAI" and when I refer to IAI
17  we are referring to Israel Aircraft, Israel
18  Aerospace Industries as it is currently
19  named?
20      A.   Yes. You know why I am smiling.
21      Q.   Do you want to share with us why
22  you are smiling?
23      A.   It was because of us now it
24  changed its name to Aerospace.
25      Q.   When you first joined the IAI what

Page 24

Bar-Lev
1
2  group did you first work in, Dr. Bar-Lev?
3      A.   It was the control group dealing
4  with aircrafts and aircraft flight dynamics
5  and flight controls and then I moved into
6  missile and I became the head of the future
7  next generation sea to sea missiles.
8          Then we started the space program
9  of Israel.  We initiated it really.
10      Q.   When you say that you initiated
11  the space program of Israel, when was that,
12  sir?
13      A.   The beginning of the '80s.
14      Q.   Was it a specific division of IAI
15  in which you initiated the space program of
16  Israel?
17      A.   It was MBT.
18      Q.   MBT is a division of IAI?
19      A.   It is a plant.  It used to be a
20  plant in IAI.
21      Q.   Within MBT was there a group that
22  was focused on space?
23      A.   No, not at this point.
24          It was part of the missile group,
25  you call it, something else and then it

Page 25

Bar-Lev
1
2  developed into an entity by itself.
3      Q.   Your title in this original group
4  was what?
5      A.   The head of the directorate.
6      Q.   In the beginning of the 1980s when
7  you assumed this position was there yet a
8  space technology directorate?
9      A.   No.
10      Q.   So that followed after?
11      A.   Yes.
12      Q.   What was the impetus -- you say
13  that in the beginning 1980s Israel, you
14  began -- you initiated the space program in
15  Israel?
16      A.   We.
17      Q.   We.
18          Who do you include within the
19  "we"?
20      A.   At some point Dr. Rosenbaum and
21  the rest of the group that was with me on
22  the sea-to-sea missile, engineers and
23  technicians that we used in order to check
24  this possibility.
25      Q.   Do you have any greater

7 (Pages 22 to 25)

1                    Bar-Lev
2    recollection of what year this began other
3    than the beginning of 1980s?
4           A.   I am very bad at dates, okay.
5    Please recall that.  It was the beginning of
6    the 1980s.
7           Q.   What was the precipitating fact?
8               Why did Israel initiate a space
9    program in the early 1980s?
10              MR. MATETSKY:  Objection to the
11      form.
12              You can answer.
13              THE WITNESS:  I am not sure that I
14      am at liberty, okay, to disclose all the
15      facts for that.
16   BY MR. GOLDSTEIN:
17         Q.   Because of sensitive information?
18         A.   Because of sensitive information,
19   yes.
20         Q.   Affecting the national security
21   interests of Israel?
22         A.   That is correct, or may have,
23   okay.
24         Q.   Now was the space program
25   developed by MBT alone or was it in

1                    Bar-Lev
2    conjunction with the Israeli military?
3           A.   It was done with the Israeli
4    military.  I am not sure it is sensitive
5    information or not but it was done with the
6    Israeli military.
7           Q.   What was the intended purpose of
8    the Israeli space program?
9           A.   To develop space technology in
10   Israel.
11          Q.   For the purpose of putting a man
12   on the moon or for some other purpose?
13              MR. MATETSKY:  Objection to the
14      form.
15   BY MR. GOLDSTEIN:
16          Q.   You can answer.
17          A.   It was not to put man on the moon.
18          Q.   What was its purpose, Dr. Bar-Lev?
19          A.   As I said, to develop technologies
20   that may lead to any other derivatives.
21          Q.   What kind of derivatives?
22          A.   Anything that a missile can do, a
23   satellite can do, as you know, okay,
24   probably, okay, that by now Israel has
25   developed, okay.

1                    Bar-Lev
2               Observation satellites, both
3    select or optical, radar or static aperture
4    satellites and also communication satellites
5    all of which we were part of.
6           Q.   By the time Israel began
7    building -- developing a earth observation
8    satellite were there other countries that
9    had already developed such technology?
10          A.   Yes.
11          Q.   Why was it that Israel decided to
12   pursue its own development rather than
13   purchase one from another country?
14              MR. MATETSKY:  Objection to the
15      form.
16              THE WITNESS:  I don't think I will
17      answer that.
18              MR. MILLER:  Would you say that
19      again?
20              THE WITNESS:  I will not answer
21      that question.  I consider it to be
22      sensitive.
23   BY MR. GOLDSTEIN:
24          Q.   With respect to the national
25   security interests of Israel?

1                    Bar-Lev
2           A.   Right.
3           Q.   During your tenure at MBT there
4    were three Ofeq satellites that were
5    successfully launched; is that correct?
6           A.   Yes.
7           Q.   They were all launched from the
8    Shavit launcher in Israel, correct?
9           A.   They were launched by an Israeli
10   launcher from Israel.
11          Q.   In Shavit?
12          A.   I am not -- I am familiar with the
13   name.  It is not the right name.
14          Q.   What is the right name, sir?
15          A.   I am not at liberty to say that.
16          Q.   Because it affects the national
17   security of Israel?
18          A.   Yes.
19          Q.   At the time you were at MBT
20   working on the space program did you have
21   military clearance of some sort?
22          A.   Yes, definitely.
23          Q.   Do you recall the clearance that
24   you had?
25          A.   No, but it was a top clearance.

Global Deposition Services
212-867-7766

Page 30

Bar-Lev

1
2    Q.    Now, how long did it take from the
3    time that Israel began developing satellite
4    technology until the first launch of the
5    Ofeq?
6    A.    Basically, four years.
7    Q.    And in total -- and then there
8    were launches through 1995?
9    A.    Then it continued.
10    Q.    Of Ofeq 3?
11    A.    Yes.
12    Q.    Can you estimate how much it cost
13    to design and develop the Ofeq technology
14    through the launch of Ofeq 3 in 1995?
15    A.    I am not at liberty to disclose
16    that information.
17    Q.    Do you have a sense of the
18    magnitude of the cost?
19    A.    I may have but, again, I would
20    refer you to IAI to get this information
21    since you represent them anyway.
22    Q.    You are not at liberty to disclose
23    that information?
24    A.    No, because I think, again, okay,
25    that it may be sensitive information.

Page 31

Bar-Lev

1
2    Q.    And affect the national security
3    interests of Israel?
4    A.    Probably, and IAI, okay, which is
5    part of Israel.
6    Q.    You said probably, I believe, in
7    answer to my question?
8    A.    Excuse me.
9    Q.    Do you know who financed the
10    technology for Israel to obtain space
11    technology?
12    A.    Yes.
13    Q.    Who was that?
14    A.    I am not at liberty to disclose
15    that.
16    Q.    Because it affects the national
17    security interests of Israel?
18    A.    Yes.
19    MR. MATETSKY:    Let's take a short
20    break.
21    MR. GOLDSTEIN:    No, no.
22    MR. MATETSKY:    We can take a break
23    at any time.
24    MR. GOLDSTEIN:    We just started.
25    Let's wait a little bit.

Page 32

Bar-Lev

1
2    MR. MATETSKY:    No.  Let's take a
3    short break here.  Thank you.
4    Off the record.
5    MR. GOLDSTEIN:    I want to finish
6    the topic.  I want to finish the topic.
7    MR. MATETSKY:    I have never at a
8    deposition had counsel refuse to
9    accommodate a break.  I won't physically
10    walk out of the room if you are going to
11    ask questions but I object.
12    MR. GOLDSTEIN:    My sense is this
13    is a purely tactical break.
14    Dr. Bar-Lev has not asked for a
15    break.  We started a short time ago.
16    This is a break designed for no
17    other reason than to speak with your
18    witness about the substance of his
19    testimony and that is absolutely and
20    entirely inappropriate.
21    MR. MATETSKY:    No.  I think the
22    purpose of the break was to see if the
23    witness could provide more information
24    in response to your questions which I
25    would have assumed is something you

Page 33

Bar-Lev

1
2    would like to have had happen.
3    MR. GOLDSTEIN:    My sense is the
4    witness is in the best position to
5    answer these questions.
6    MR. MATETSKY:    If you won't
7    accommodate a break we won't take a
8    break.
9    I have never had that happen in 20
10    years.
11    MR. GOLDSTEIN:    We will finish the
12    subject.
13    MR. MATETSKY:    In 20 years no one
14    has ever refused to accommodate a
15    request for a break.  Go ahead.
16    MR. GOLDSTEIN:    There is always a
17    first time.
18    BY MR. GOLDSTEIN:
19    Q.    Dr. Bar-Lev, were there any
20    foreign countries involved in financing any
21    of the Ofeq satellite program?
22    MR. MATETSKY:    Objection.  This
23    goes beyond the scope of jurisdictional
24    discovery.
25    MR. GOLDSTEIN:    It absolutely does

9 (Pages 30 to 33)

Bar-Lev

1
2    not go beyond the scope of our motion
3    which relates to foreign sovereign
4    immunity, international comity and forum
5    non conveniens.
6  BY MR. GOLDSTEIN:
7    Q.   I repeat the question,
8  Dr. Bar-Lev.
9         Were any foreign countries
10  involved in financing any of the Ofeq
11  satellite project?
12    A.   I am not at liberty to disclose
13  that.
14    Q.    Because it would affect the
15  national security interests of Israel?
16       MR. MATETSKY:  Objection.
17       THE WITNESS:  I am not at liberty
18  to disclose it.
19  BY MR. GOLDSTEIN:
20    Q.   What role did you specifically
21  play in the design and development of the
22  Ofeq satellite technology?
23    A.   I was highly involved in that.
24    Q.   I understand that is a very large
25  question and it spans a large amount of

Bar-Lev

1
2  time.
3    A.   In every aspect.
4    Q.   Can you generally describe,
5  Dr. Bar-Lev, what your role was in terms of
6  the design and development of the Ofeq
7  satellite technology?
8    A.   It is a long answer, okay.  Are
9  you ready for that?
10    Q.   Sure.
11    A.   Okay.
12       You have to understand that in
13  order to design something, I am not speaking
14  about managing, okay, you have, first of
15  all, to understand what the requirements
16  are, to translate it into mission
17  requirements, to find some, I would say,
18  options for system design, to find what the
19  best system configuration is, in all
20  aspects, engineering, price-wise,
21  availability, design and things like that.
22       Then go through a preliminary
23  design to make sure that what you are doing
24  is right.
25       Make reviews, okay, to do that.

Bar-Lev

1
2  Go through a specific design, now, after you
3  finished the PDR.
4       Then check out, okay, whatever
5  system you are developing and in this case
6  then of course prepare the launch, okay.
7       That includes everything that goes
8  around.  It is not only the satellite, it is
9  the ground stations, the operation of the
10  satellite and so on.
11       I was involved highly in all
12  aspects, especially in the technical parts.
13    Q.   Were you, in terms of this design
14  and development process that you have just
15  described, in frequent contact with the
16  Israeli military about the program?
17    A.   I wouldn't say frequent but I was.
18    Q.   Who owned the Ofeq satellite
19  technology that was being built by MBT?
20    A.   I believe that basically IAI but
21  you have to remember that IAI is a
22  state-owned company.
23       You probably know that already.
24    Q.   What types of issues would you
25  interact with people in the Israeli military

Bar-Lev

1
2  or the ministry of defense relating to the
3  design and development of the Ofeq satellite
4  technology.
5    A.   You are relating to some kind of
6  an answer that I gave you before that I
7  didn't want to answer.
8       So the nature of our relationship
9  I cannot disclose.
10    Q.   Because it affects national
11  security interests?
12    A.   Because I believe it has some
13  impacts.
14    Q.   Who paid for the Ofeq satellite
15  technology?
16       MR. MATETSKY:  Asked and answered,
17  or asked and responded to.
18  BY MR. GOLDSTEIN:
19    Q.   Is the person who pays for the
20  technology the owner?
21       MR. MATETSKY:  Objection.
22       Objection to form on multiple grounds.
23  BY MR. GOLDSTEIN:
24    Q.   You can answer.
25    A.   It is too complicated for me to

Global Deposition Services
212-867-7766

Page 38

Bar-Lev

1  answer.
2      Q.   At some point there developed the
3  idea of potentially commercializing the Ofeq
4  satellite; is that correct?
5      A.   We did.
6      Q.   When you say "we did --"
7      A.   I mean my directorate did.
8          Basically it was Dr. Rosenbaum and
9  me.
10     Q.   It was your idea to --
11     A.   Our idea, yes.
12     Q.   Let me finish the question.
13         It was your idea to commercialize
14  the Ofeq satellite for commercial purposes?
15     A.   Yes.
16     Q.   And this was an idea you had while
17  you were first still at IAI?
18     A.   Yes.
19     Q.   Do you recall when you and Dr.
20  Rosenbaum approximately first had this idea?
21     A.   Well, I told you before I am very
22  bad in dates, okay.  Dr. Rosenbaum is much
23  better than I am, probably can correct me
24  later, but it was somewhere around 1993,

Page 39

Bar-Lev

1  1994.
2      Q.   Was approval necessary from the
3  Israeli Ministry of Defense or other
4  governmental entities before the Ofeq
5  satellite technology could be
6  commercialized?
7      A.   Yes.
8      Q.   Who at MBT was the point person in
9  trying to obtain approval from the Israeli
10  Ministry of Defense to commercialize the
11  Ofeq satellite technology?
12     A.   It is not a specific person.  It
13  is the complete administration including us
14  and other people who were in the division.
15     Q.   I didn't mean to interrupt.
16         Had you completed --
17     A.   I am finished.
18     Q.   Were you one of the people who was
19  involved in discussing with the Ministry of
20  Defense its approval to commercialize the
21  Ofeq satellite technology?
22     A.   Again, it is -- you have to
23  realize that even the minister of defense is
24  not one person, okay.  It is a lot of

Page 40

Bar-Lev

1  persons.
2          I was involved in one way or the
3  other obviously because -- yes.
4      Q.   With whom would you meet on these
5  subjects?
6      A.   I cannot answer that.
7      Q.   You cannot tell me?
8      A.   No.
9      Q.   Because it --
10     A.   First, I don't remember.  There is
11  a lot of people and I don't want to disclose
12  the organization of the MOD, Ministry of
13  Defense.
14     Q.   Because it could affect our --
15     A.   It may have implications.  I don't
16  know about security.
17     Q.   Do you know over what period of
18  time you were involved in discussing with
19  the Ministry of Defense the possibility of
20  its approving the commercialization of the
21  Ofeq satellite technology?
22     A.   As I told you at that time.
23     Q.   Do you know what period of time?
24     A.   No.

Page 41

Bar-Lev

1      Q.   Is this a month-long period,
2  many-year-long period, how long a period was
3  it?
4      A.   It stretched all the time since
5  then.
6          At that time I was at IAI and it
7  continued after I had left IAI and also Dr.
8  Rosenbaum left IAI.
9          We had one year another business
10  and then we joined together with Steve to
11  start WIS and then the whole process started
12  again.
13     Q.   Is it fair to say that the process
14  of obtaining approval from the IMOD to
15  commercialize the Ofeq satellite was a
16  difficult one?
17     A.   This was a relative term, okay.
18     Q.   On any relative measure was it a
19  difficult process to get approval from the
20  Israeli Ministry of Defense to commercialize
21  the Ofeq satellite technology?
22     A.   I can't answer that.  I have seen
23  harder things and I saw projects that didn't
24  materialize.

11 (Pages 38 to 41)

Page 42

Bar-Lev

1
2    Q.   What were the issues that the
3  Ministry of Defense were concerned about in
4  terms of the commercialization of the Ofeq
5  satellite technology?
6         MR. MATETSKY:  I object to the
7     form of that question because it is
8     asking him to read another person's
9     mind.
10        THE WITNESS:  I cannot answer.
11        MR. GOLDSTEIN:  You and I can
12    debate that at some point but if you can
13    answer the question.
14        THE WITNESS:  I will not answer
15    that because whatever you say, it may
16    affect, okay.
17  BY MR. GOLDSTEIN:
18    Q.   It may affect the national
19  security interests of Israel?
20    A.   Yes, definitely.
21    Q.   Is it correct that it took more
22  than four years for a policy to be put in
23  place which would allow a company like
24  ImageSat to operate?
25        MR. MATETSKY:  Objection to form.

Page 43

Bar-Lev

1
2         THE WITNESS:  I am not aware of
3     any specific policy that was formed.
4  BY MR. GOLDSTEIN:
5     Q.   Are you aware that in order for a
6  company like ImageSat to operate a formal
7  bilateral agreement was needed between
8  Israel and the United States?
9     A.   No, I don't recollect such a
10  thing.
11    Q.   Let me ask you to look at the
12  complaint that was filed in this action.
13     Dr. Bar-Lev, I would like to ask
14  you to look at paragraph 64 on page 25 of
15  the complaint.
16    A.   What do you want me to look at?
17    Q.   Is it actually page 25.
18    A.   What section?
19    Q.   I will direct you.  This may be
20  easier to read.
21    A.   I can read it.
22        MR. GOLDSTEIN:  I don't think
23    there is any reason to mark the
24    complaint.
25        MR. MATETSKY:  I think we all know

Page 44

Bar-Lev

1
2  what the complaint is.
3         MR. GOLDSTEIN:  I generally don't
4     mark complaints.
5         MR. MILLER:  Fine.
6         THE WITNESS:  Just tell me what to
7     look at.
8  BY MR. GOLDSTEIN:
9     Q.   If you look at paragraph -- page
10  25, you have seen the complaint before?
11    A.   Yes.  I have glanced through it.
12    Q.   When you say you glanced on it --
13    A.   I read it.
14    Q.   You agreed?
15    A.   Can you tell me --
16    Q.   -- with the statements contained
17  in it?
18    A.   Yes, I did.
19        Can you tell me where to look at?
20    Q.   Sure.
21        If you look at -- in the middle of
22  the page there is a sentence beginning, "The
23  fundamental of the policy" -- it says, "The
24  fundamentals of the policy regime under
25  which the company was to be operated took

Page 45

Bar-Lev

1
2  more than four years to put in place
3  eventually requiring negotiation of a
4  formal, bilateral policy agreement between
5  Israel and the United States."
6         Do you see that, sir?
7     A.   Yes, I see that, yes.
8     Q.   Is that a correct statement?
9     A.   Regarding the four years, I told
10  you how long it took from the time that we
11  initiated it and the times that we left IAI
12  started WIS and got finally, okay, the
13  permission.  That --
14    Q.   Let me stop you there,
15  Dr. Bar-Lev, not meaning to interrupt.
16        Does the four year time frame
17  sound about right to you?
18    A.   Yes, because 1994 plus four is
19  1998 which sounds right, yes.
20    Q.   Focusing on the second part of the
21  sentence, "Eventually requiring the
22  negotiation of a formal bilateral policy
23  agreement between Israel and the United
24  States," is that correct?
25    A.   Probably.  Okay.  I am not aware

12 (Pages 42 to 45)

Global Deposition Services
212-867-7766

```
                                          Page 46
 1              Bar-Lev
 2    of this agreement.
 3       Q.   You are not aware of this
 4    agreement?
 5       A.   I am not aware of the specific
 6    agreement.  I would assume that it would
 7    have.
 8       Q.   Had you heard that there was such
 9    a formal bilateral policy agreement that was
10    entered into between Israel and the United
11    States?
12       A.   I don't remember.  Not to the best
13    of my recollection.
14       Q.   I take it you couldn't answer who
15    negotiated such a policy agreement?
16       A.   And if I did I wouldn't tell you.
17    Sorry about that.
18       Q.   You wouldn't tell me because?
19       A.   That is exposing --
20          MR. MATETSKY:  Objection.
21          MR. GOLDSTEIN:  You can't stop in
22    the middle of his answer, Mr. Matetsky.
23          Mr. Matetsky, you are now -- if
24    you have -- there are four words to say;
25    objection as to form.
```

```
                                          Page 47
 1              Bar-Lev
 2       Do not speak in terms --
 3          MR. MATETSKY:  Control your voice.
 4          MR. GOLDSTEIN:  Mr. Matetsky, I
 5    will do what I want to do.
 6          MR. MATETSKY:  I object to the
 7    form of the question as being
 8    hypothetical.
 9    BY MR. GOLDSTEIN:
10       Q.   Dr. Bar-Lev --
11       A.   Let me make a statement at this
12    point.
13       Q.   Go ahead.
14       A.   You have to realize that I am in a
15    very sensitive position, okay, because I
16    have to defend the security of Israel and
17    also the interest of IAI which is
18    interwoven, okay, with the security of
19    Israel in one way or the other.
20          The last thing I want to do is to
21    expose, okay, the possibility, whether
22    individuals, organizations or processes,
23    okay.  This is why I am avoiding, okay,
24    those questions, with your permission.
25    Okay.
```

```
                                          Page 48
 1              Bar-Lev
 2       Q.   Do you know whether the policy
 3    agreement that is referenced here would be
 4    publicly available?
 5       A.   I don't know.
 6       Q.   Do you know how I would go about
 7    obtaining a copy of it?
 8       A.   No.  I am a simple engineer.  You
 9    have to understand that.
10       Q.   Dr. Bar-Lev, you testified
11    previously that it was your idea with others
12    to commercialize the Ofeq technology.
13       A.   It was our idea, yes.
14       Q.   Just for ease of the reporter you
15    have to let me finish so he can get my
16    questions.
17       A.   Sorry.
18       Q.   And then your answer.
19          MR. MATETSKY:  Then you have to
20    pause for a minute so I can make my
21    objection and not get yelled at.
22    BY MR. GOLDSTEIN:
23       Q.   What was your role in the
24    commercialization of the Ofeq technology?
25       A.   Well, I will give you a broader
```

```
                                          Page 49
 1              Bar-Lev
 2    answer if you would like to, okay.
 3          We at the directorate at some
 4    point, because of some events, okay, decided
 5    to strengthen, okay, our directorate and to
 6    go into commercialization of the
 7    technologies that we have developed.
 8          One of the projects or the
 9    programs that we started, and you will
10    probably know about, is the communication
11    satellite and that started even before we
12    started thinking about commercialization of
13    Ofeq satellite and then being exposed to the
14    commercial world in some sense, this is
15    where we started thinking maybe to do the
16    impossible and take the sensitive technology
17    and commercialize it.
18          It made sense, okay, for IAI to do
19    that.
20       Q.   You made reference to the
21    directorate.
22          You are referring to the space
23    technology directorate?
24       A.   Space technology directorate which
25    I head, yes, me, and Dr. Rosenbaum was my
```

```
 1              Bar-Lev
 2   deputy.
 3       Q.  Once the process began to make the
 4   impossible possible what role did you play
 5   at IAI in the design and development of what
 6   would be the EROS satellite?
 7       A.  I was the one who started it.  We
 8   were the ones who started it.
 9           We wrote the business plan and we
10   went around trying to persuade everyone
11   including the management of IAI of the
12   viability and the possibility of this
13   program.
14       Q.  Do you know how much it cost to
15   commercialize the Ofeq satellite technology
16   and create the EROS program?
17       A.  I would not answer that.
18       Q.  You would not?
19       A.  I will not answer that.  Again,
20   okay.
21       Q.  Because it affects the national
22   security interests of Israel?
23       A.  And it may expose things, okay,
24   including your client, okay.
25       Q.  Do you know who financed the
```

```
 1              Bar-Lev
 2   commercialization of the Ofeq satellite
 3   technology?
 4       A.  It was done in WIS at the end.
 5       Q.  My question was who specifically
 6   was financing -- was there an entity who was
 7   financing the project?
 8       A.  No.  At that time at IAI you mean?
 9       Q.  Yes.
10       A.  No.  The answer was no entity.
11           It was our job, okay, to do it.
12   We wrote -- it was a business plan.  We went
13   around and tried to persuade all the
14   entities that are involved, okay, to do
15   that.
16       Q.  Were there any --
17       A.  There was no budget for that.
18       Q.  When you say there was no
19   budget --
20       A.  There was no budget allocated
21   outside my directorate for that.
22           I used my R&D.
23       Q.  Do you know whether any other
24   governmental entities were involved in IAI's
25   effort to commercialize the Ofeq satellite
```

```
 1              Bar-Lev
 2   technology?
 3       A.  No, no, I don't know.
 4       Q.  Dr. Bar-Lev you said in describing
 5   the reason for having the idea to
 6   commercialize the Ofeq technology, you said
 7   that we at the directorate at some point
 8   because of some events decided to strengthen
 9   our directorate and to go into the
10   commercialization of the technologies that
11   we have developed.
12           What events were you referring to?
13       A.  Basically, if you want to hear it
14   was the LAVI collapse.
15       Q.  What was the LAVI collapse?
16       A.  The LAVI was a military aircraft
17   that was designed by IAI and was canceled.
18       Q.  Why was it canceled?
19       A.  Because the Government of Israel
20   decided to cancel it.
21       Q.  Why did the Government of Israel
22   decide to cancel it?
23       A.  That is not up to me to tell you
24   that.
25       Q.  Do you know why?
```

```
 1              Bar-Lev
 2       A.  No.  It was their decision, okay.
 3       Q.  It was a military decision?
 4       A.  The Government of Israel includes
 5   other aspects, okay.
 6       Q.  What was the connection -- sorry.
 7   You think it was --
 8       A.  I think it was political also.
 9       Q.  What was the connection between
10   the collapse of the LAVI program and your
11   decision to commercialize Ofeq, what is the
12   linkage?
13       A.  We were looking for other clients,
14   okay, outside of the Government of Israel
15   that may support such endeavors in order to
16   make sure that whatever we have built and
17   the people that we have trained and the
18   technologies that we have developed in IAI
19   will survive, okay, a similar collapse,
20   would it happen.
21       Q.  While you were at --
22       A.  It was not IAI policy.  It was the
23   directorate policy to do that.
24       Q.  Now, you are familiar with the
25   technology called SAR, S-A-R?
```

Global Deposition Services
212-867-7766

Page 74

Bar-Lev

1
2  station, ground stations you need a license
3  but I was not involved in getting a license.
4       Q.   Just to be clear, it would be a
5  license from the Israeli government?
6       A.   Anything in Israel whatever,
7  require, like anything else, would require a
8  license from the places they are operating,
9  when they are transmitting into the area you
10  need some kind of license so as to not to
11  interfere.  That is obvious.
12       Q.   Do you recall that the Ministry of
13  Defense placed certain conditions on IAI's
14  sale to ImageSat of the EROS A and EROS B
15  Satellites?
16       A.   Can you ask it again?
17       Q.   Do you recall that the Ministry of
18  Defense placed certain conditions on IAI's
19  sale to ImageSat of their EROS A and EROS B
20  satellites?
21       A.   Okay.  I understand what you are
22  saying.
23            Yes, definitely.
24            For example, there was a list of
25  countries, okay.  Some of them which were

Page 75

Bar-Lev

1
2  prohibited, which are rogue, how you call it
3  rogue, countries, obviously rogue countries.
4            Other countries should have gotten
5  the license or the agreement of the MOD but
6  most of them got it.  It is an extensive
7  list of countries.
8       Q.   Are you aware that the licenses
9  granted to IAI by the IMOD in connection
10  with the operation of the ImageSat
11  satellites are subject to annual renewal?
12       A.   No.  I don't remember that.
13       Q.   Do you recall that one of the
14  conditions of the IMOD to granting the
15  license to IAI to do business with ImageSat
16  was to have the satellite operated through
17  mabat?
18       A.   I do recall something like that at
19  the beginning, yes.
20       Q.   Would you agree that the
21  Government of Israel could revoke at any
22  time for reasons of national security the
23  approval it had given to IAI and ImageSat to
24  do business with any of the countries on the
25  approved list?

Page 76

Bar-Lev

1
2       MR. MATETSKY:  Objection to form.
3  You can answer.
4       THE WITNESS:  I can answer?
5       MR. MATETSKY:  Yes.
6       THE WITNESS:  Okay.  Yes.
7  Definitely.  Okay.  But I would like to
8  explain that.  Okay?
9  BY MR. GOLDSTEIN:
10       Q.   Sure.
11       A.   Obviously, to the best of my
12  recollection it had to do with the problem
13  of taking images over Israel or near Israel
14  that may have something to do with the
15  security of Israel which is obvious, the
16  same way that other countries are protecting
17  themselves to my opinion.
18       Q.   Would you agree, Dr. Bar-Lev, that
19  Israel, the Government of Israel, could
20  revoke, modify any of the licenses even if
21  it did not relate to taking images over
22  Israel if the government determined that it
23  was in the national security of interests of
24  Israel to do so?
25       MR. MATETSKY:  Objection to form.

Page 77

Bar-Lev

1
2       THE WITNESS:  Can I answer?
3       MR. MATETSKY:  Yes, you can answer
4  the question anyway unless I tell you
5  not to.
6       THE WITNESS:  Okay.
7       I would assume, yes, but it has to
8  be presented and persuasive arguments
9  that it does have something to do with
10  the security of Israel.
11  BY MR. GOLDSTEIN:
12       Q.   You would agree that in connection
13  with ImageSat's business the Government of
14  Israel never agreed to do anything to limit
15  its sovereign authority?
16       MR. MATETSKY:  Objection to form.
17       THE WITNESS:  It is a legal
18  question.  Okay.  I am not qualified to
19  answer that.
20       MR. GOLDSTEIN:  I would like to
21  mark as Bar-Lev Exhibit 1 a document
22  that we have put Bates stamps on of IAI
23  00598 through 600.
24       (Document with Bates Numbers 00598
25  through 600 was marked Bar-Lev Exhibit 1 for

20  (Pages 74 to 77)

Page 90

Bar-Lev

1
2    me in a corner, okay.  I don't know.
3    Okay.
4    BY MR. GOLDSTEIN:
5        Q.   I am asking.  I am not looking to
6    put you in a corner.
7        A.   But you are.  You don't intend to
8    but you are.  Okay.
9        Q.   What did you understand, what --
10       A.   You are.
11       Q.   Let me ask the question.
12           What do you understand paragraph 5
13   to mean as you sit here today?
14           MR. MATETSKY:  Objection to form.
15           THE WITNESS:  Okay.  I think I
16   referred to it before.
17           I said that the sovereignty of a
18   state was contended to some point, okay,
19   what it means, okay, in one of the
20   earlier questions.
21           I am really not in a liberty,
22   okay, to interpret or not to interpret,
23   whatever, okay.
24           If you really need an answer from
25   me I will have to go to a legal adviser

Page 91

Bar-Lev

1
2    and get a clear answer to you, okay,
3    because I believe, just to finish the
4    sentence, because I believe the
5    sovereignty of a state is not
6    overwhelming totally.  It is not a total
7    one.
8           This is my own, okay, belief.
9    BY MR. GOLDSTEIN:
10       Q.   What do you understand to be the
11   limits on sovereign authority?
12       A.   I am not -- I am sure this is a
13   legal.  It depends on the country, depends
14   on its laws and so on.
15       Q.   What do you understand to be the
16   limits, if any, on the sovereign authority
17   of Israel?
18           MR. MATETSKY:  Objection to form.
19           THE WITNESS:  Again, okay.  I am
20   not a lawyer.  I cannot answer that.
21   BY MR. GOLDSTEIN:
22       Q.   What do you think, Dr. Bar-Lev,
23   would happen if you found that the arguments
24   presented by the Ministry of Defense for
25   revoking a license were not persuasive?

Page 92

Bar-Lev

1
2        A.   What I would do in what position?
3        Q.   What did you think would happen
4    based on your reading of Bar-Lev Exhibit 1?
5        A.   I believe that the investors,
6    okay, those who invested money in that,
7    okay, would consider the case, okay, and
8    then agree to whatever needs to be done
9    because it has some implications under
10   marketing capabilities and the income of the
11   company.
12       Q.   So?
13       A.   You said it is probably in a case
14   that it doesn't make sense, okay, to them at
15   least, okay.
16           If it makes sense then obviously
17   it would have been accepted.
18       Q.   When you say if it made sense it
19   obviously would have been accepted, in other
20   words, if the Israeli government had a
21   legitimate national security interest
22   obviously there would have been no ability
23   to question that judgment by Israel?
24           MR. MATETSKY:  Objection to form.
25           THE WITNESS:  I believe so, yes.

Page 93

Bar-Lev

1
2    BY MR. GOLDSTEIN:
3        Q.   Are you aware, Dr. Bar-Lev, that
4    at some point while you were at ImageSat the
5    Israeli Ministry of Defense had negotiations
6    about certain potential opportunities that
7    you believed to be contrary to what the
8    Ministry of Defense would be allowed to do
9    on its own without using ImageSat?
10       A.   You mean to offer services similar
11   to ImageSat?
12       Q.   Yes.
13       A.   I remember some instances.  I
14   don't remember to what extent, okay, it
15   ended up those discussions but I remember
16   discussions regarding services to specific
17   countries in which may, okay, be in
18   contradiction to the agreements that we had.
19           Yes, I remember something like
20   that.
21       Q.   Do you remember having
22   communications with people in the Ministry
23   of Defense on that subject?
24       A.   No.  It wouldn't have been me.  I
25   would not have been involved, the other

24 (Pages 90 to 93)

Page 106

Bar-Lev

1          Bar-Lev
2    disclosed to all of the partners and all of
3    the clients of ImageSat.
4        A.   Yes.
5        Q.   That would not be true of the SAR
6    technology, correct?
7        A.   I am not involved anymore in the
8    SAR technology so I don't know.  I really am
9    not in a position to answer that, but as I
10   told you before, okay, a lot of information
11   was disclosed in all kind of meetings to my,
12   some amazement, to some extent.
13       MR. MATETSKY:  There is still a
14   representation that all of this is
15   germane to the issues we are here today
16   on?
17       MR. GOLDSTEIN:  Absolutely.
18   Absolutely.
19       THE WITNESS:  I rather you
20   concentrate on the technical parts.
21       MR. MATETSKY:  I am waiting
22   patiently for the connection up.
23       THE WITNESS:  As I said, yes, I
24   would like you to concentrate on the
25   technical part which I am more familiar

Page 107

Bar-Lev

1          Bar-Lev
2    with and more able to answer your
3    questions.
4    BY MR. GOLDSTEIN:
5        Q.   Are you familiar that in -- let
6    me -- withdrawn for a moment.
7        A.   Yes.
8        Q.   When did you leave ImageSat?
9        A.   I think it was 2005 if I am not
10   mistaken.
11       Q.   Are you aware that in July 2001
12   there was a credit agreement entered into
13   between ImageSat and Bank Leumi to obtain a
14   $70 million in financing?
15       A.   In general, yes, but I was
16   prohibited from getting the information of
17   that and/or participating in that by the
18   CEO.
19       Q.   By the CEO?
20       A.   By Mr. Weiss, yes, but definitely
21   I know there was an agreement like that that
22   was negotiated.
23       Q.   And at that time what was your
24   title at ImageSat?
25       A.   Well, basically you have to

Page 108

Bar-Lev

1          Bar-Lev
2    understand the president is kind of an
3    honorary position but I was dealing with the
4    technical part of the -- and the management
5    of the company basically, because the CEO
6    was a lawyer and lawyers usually, okay, are
7    not capable of managing technical companies.
8        MR. GOLDSTEIN:  I would like to
9    show you what we will mark as Bar-Lev
10   Exhibit 2 which bears Bates numbers IAI
11   643 through 795.
12       (Project Finance Facility was
13   marked Bar-Lev Exhibit 2 for identification)
14   BY MR. GOLDSTEIN:
15       Q.   Dr. Bar-Lev, have you ever seen
16   Bar-Lev Exhibit 2 before?
17       A.   I may have.  I don't remember.
18       Q.   I would like you to look at the --
19       A.   Can I refer to the circumstances
20   of that?  Okay?
21       Q.   I will ask questions --
22       A.   So you will understand, okay?
23       Q.   If I could ask you to look at page
24   794?
25       A.   What do you mean by 794?

Page 109

Bar-Lev

1          Bar-Lev
2        MR. MATETSKY:  In the lower
3    right-hand corner there is a set of
4    numbers.
5        THE WITNESS:  Yes.
6    BY MR. GOLDSTEIN:
7        Q.   There are -- that is a signature
8    page?
9        A.   794?
10       Q.   Yes.
11       A.   No, it is not 94.  Sorry.
12       MR. MATETSKY:  Two pages from the
13   end.
14       THE WITNESS:  Yes.
15   BY MR. GOLDSTEIN:
16       Q.   It is signed -- there appear to be
17   two signatures for ImageSat.
18       One is clearly Jacob Weiss.
19       Is that your signature?
20       A.   No.
21       Q.   Do you know whose it is?
22       A.   No.  It is not a good copy either
23   but it is not mine.  Definitely not.
24       Q.   Do you know what the money that
25   was provided by Bank Leumi was to be used

Page 110

```
1              Bar-Lev
2  for?
3      A.  No.  I don't have recollection of
4  that, but, again, if you want to hear the
5  circumstances I can share it with you.
6          Maybe later if you want.
7      Q.  Dr. Bar-Lev, you are saying that
8  you don't know why Bank Leumi was providing
9  the $70 million, what the use of the
10 proceeds would be?
11     A.  I didn't say that.  I said that
12 ImageSat needed all the money it could,
13 okay, in order to buy satellites, in order
14 to buy launchers, in order to pay for
15 insurance for the satellites and so on.
16         This is a source of money to make
17 the company operate obviously.
18     Q.  If I could refer you to page 717,
19 IAI 717 of --
20     A.  717?
21     Q.  Of Bar-Lev Exhibit 2.
22     A.  Yes.
23         Which one?
24     Q.  The very top it says Jurisdiction.
25     A.  In what paragraph?
```

Page 111

```
1              Bar-Lev
2          MR. MATETSKY:  The very top of
3      that page.
4          THE WITNESS:  Let me to open it.
5  BY MR. GOLDSTEIN:
6      Q.  The very top of that page.
7      A.  Yes.
8      Q.  It says that the jurisdiction of
9  any disputes in connection with any of these
10 documents, anyone who is involved with
11 submit to the jurisdiction of the District
12 Court of Tel Aviv, Jaffa; do you see that?
13         MR. MATETSKY:  Objection to the
14     phrase "any of these documents."
15 BY MR. GOLDSTEIN:
16     Q.  Referring specifically to the word
17 "In connection with any" "Finance," capital
18 F, "document," close quote D?
19         MR. MATETSKY:  Objection
20     withdrawn.
21 BY MR. GOLDSTEIN:
22     Q.  Do you see the reference to
23 jurisdiction of Tel Aviv in Israel?
24     A.  Yes.
25     Q.  This provision means if there is
```

Page 112

```
1              Bar-Lev
2  any dispute about this bank agreement --
3      A.  Yes.
4      Q.  The parties agree to submit to the
5  jurisdiction of Israel?
6          MR. MATETSKY:  Objection to form.
7          THE WITNESS:  Well, you are asking
8      me a legal question.
9          If this is the only paragraph
10     related to this then obviously, yes.
11 BY MR. GOLDSTEIN:
12     Q.  Further it -- the borrower here is
13 ImageSat; is that true?
14     A.  It would seem so, yes.
15     Q.  If you look at the middle of the
16 page --
17     A.  I will have to look and see what
18 is the -- it is someplace.
19         MR. MATETSKY:  I can stipulate to
20     that.
21         THE WITNESS:  Okay.  Fine.
22 BY MR. GOLDSTEIN:
23     Q.  If you look at the middle of the
24 page it says, "The borrower waives objection
25 to the Israeli courts on grounds of
```

Page 113

```
1              Bar-Lev
2  inconvenient forum or otherwise as regards
3  proceedings in connection with the finance
4  document."
5          Do you see that?
6      A.  Are you checking my understanding
7  of English?
8      Q.  No.  I am asking if you see the
9  document, sir.
10     A.  My eyesight or what?
11     Q.  No.
12         In order for me to ask a
13 question --
14     A.  I would like to understand that.
15     Q.  In order for me to ask a question
16 I have to read the question to you so you
17 have something to answer.
18     A.  You are asking me if I can see it.
19     I can see it, yes.
20     Q.  Do you understand that provision,
21 Dr. Bar-Lev, to --
22     A.  I understand English.  That is
23 all.
24     Q.  You understand that that provision
25 means that ImageSat agrees to waive any
```

Global Deposition Services
212-867-7766

Page 114

Bar-Lev

1
2      objection to the Israeli courts on grounds
3      of inconvenient forum or otherwise?
4          A.   If you want I can read it to you,
5      okay.  This is what it means, okay.
6          Q.   Then, finally, if you look to the
7      next page of the document it says, under
8      Governing Law, you see that?
9          A.   Where?
10         Q.   Number 33.
11         A.   Okay.
12         Q.   On the page we marked IAI 718, it
13     says, "This agreement is governed by Israeli
14     law."
15             I am asking you -- Dr. Bar-Lev, I
16     am not trying to question your ability to
17     read, please.  I am just asking for purposes
18     of creating --
19         A.   But you can understand that I am
20     puzzled why you are wasting my time on
21     something that is obviously, okay, written,
22     okay.
23             Yes.  I can read it.  I can see
24     it.
25         Q.   You would agree that ImageSat was

Page 115

Bar-Lev

1
2      agreeing to be governed by Israel law with
3      respect to this bank finance?
4          A.   For this specific document, again,
5      okay.
6              Under Restrictions there are no
7      other articles regarding that, assuming
8      that.
9              Are we finished with that?
10         Q.   For the moment, yes.
11         A.   Okay.  Just a minute.
12             MR. GOLDSTEIN:  We will take a
13     break.
14             THE VIDEOGRAPHER:  The time is
15     11:45.
16             We are off the record.
17             (Discussion off the record)
18             THE VIDEOGRAPHER:  The time is
19     11:57.
20             We are on the record.
21     BY MR. GOLDSTEIN:
22         Q.   During the time that you were at
23     ImageSat were you involved in looking at
24     satellite supply contracts between ImageSat
25     and IAI?

Page 116

Bar-Lev

1
2          A.   At least on the technical part,
3      yes, definitely.
4          Q.   What was your responsibility in
5      that regard?
6          A.   To make sure that I approved them
7      or not approved them.
8              MR. GOLDSTEIN:  Let me show you
9      what we will mark as Bar-Lev Exhibit 3
10     which has Bates numbers IAI 101 through
11     200.
12             (EROS B1 Satellite Supply Contract
13     was marked Bar-Lev Exhibit 3 for
14     identification)
15     BY MR. GOLDSTEIN:
16         Q.   Obviously I don't expect you to
17     read all of Exhibit 3 but it is entitled
18     EROS B1 Satellite Supply Contract.
19             It is from November 1998 and it is
20     dated.
21         A.   Yes.
22         Q.   Do you recall seeing this contract
23     before?
24         A.   Probably, yes.
25         Q.   At the time you were still the

Page 117

Bar-Lev

1
2      chief technology officer at ImageSat?
3          A.   Oh, yes, yes.
4          Q.   If you would look at page 103?
5          A.   Yes.
6          Q.   IAI 103?
7          A.   Yes.
8          Q.   There are initials?
9          A.   Yes.
10         Q.   On the bottom right-hand.
11             One of them looks to be MB.  Is
12     that you?
13         A.   Probably is because usually I have
14     an L also but MB, yes, it is the way I write
15     B.
16             Yes, it is mine.
17         Q.   So then obviously you would have
18     looked at this contract.
19             Specifically, I would like to ask
20     you to look at page IAI 117.
21         A.   Yes.  You mean the terms and
22     conditions?
23         Q.   Your initials --
24         A.   On each page.
25         Q.   -- are on each page including the

Page 118

Bar-Lev

1
2  bottom of this page IAI 117?
3      A.   Yes.
4      Q.   If you could look at article 15?
5      A.   Yes.
6      Q.   It is entitled Law and
7  Arbitration.
8      A.   Yes.
9      Q.   And it says that, "Any dispute or
10 disagreement arising between the parties in
11 connection with this contract will be
12 arbitrated in a proceeding in Tel Aviv which
13 will be final and binding on the parties."
14         Do you see that, sir?
15     A.   Yes.
16     Q.   Do you remember discussions at
17 ImageSat about the fact that the EROS B1
18 satellite supply contract from November 1998
19 would be subject to arbitration in Tel Aviv?
20     A.   No. I don't remember but it is
21 clearly stated here.
22         It was changed later, you know,
23 once we got the investors in, yes.
24     Q.   Do you recall whether the -- it is
25 your testimony, Dr. Bar-Lev, that there are

Page 119

Bar-Lev

1
2  satellite supply contracts that provide for
3  other than arbitration in Tel Aviv under
4  Israeli law?
5      A.   Maybe. I don't know.
6          I am just stating the fact, okay,
7  that the issue of the jurisdiction, okay,
8  was raised after we got some investing
9  money, okay, outside of Israel.
10     Q.   Let me ask you this question, sir.
11         Do you recall any discussion at
12 the time this contract was signed and
13 initialed by you in 1998 about the fact that
14 any disputes with respect to this satellite
15 supply contract would be governed by the
16 laws of Israel and arbitrated in Israel?
17     A.   No. I don't remember that.
18         I probably didn't even participate
19 in the negotiation but I went through it
20 together with Mr. Wilson and got full
21 explanation.
22         I was responsible for the
23 technical part of it which I negotiated with
24 IAI, but, yes, this is my signature and I
25 went through it.

Page 120

Bar-Lev

1
2      Q.   Let me also ask you to look at
3  what we will mark as Bar-Lev Exhibit 4 which
4  is a satellite supply contract also from
5  1998 bearing Bates numbers IAI 1 through 100
6  and ask you to take a look at that.
7      A.   Yes.
8          (Satellite Supply Contract was
9  marked Bar-Lev Exhibit 4 for identification)
10         THE WITNESS: What page.
11 BY MR. GOLDSTEIN:
12     Q.   My first question to you is, if
13 you look at -- have you seen Bar-Lev Exhibit
14 4 before?
15     A.   Oh, definitely.
16     Q.   If you look at IAI, page 3 --
17     A.   Yes.
18     Q.   Again, it is a little blurrier --
19     A.   No, no. It is my signature.
20     Q.   It is your initials on each page
21 of the agreement, correct?
22     A.   Yes, sure.
23     Q.   If you look at page 15 of the
24 document which is IAI 17 do you see a law
25 and arbitration provision?

Page 121

Bar-Lev

1
2      A.   What page please; 15 or 17?
3      Q.   The Bates number is IAI 17.
4      A.   Oh, 17.
5          MR. MATETSKY: Would it help if I
6  stipulated it is the same?
7          MR. GOLDSTEIN: Sure. I am not
8  looking to -- let me make sure that we
9  have the correct stipulation which is
10 that the November --
11         THE WITNESS: Yes, it is the same.
12 BY MR. GOLDSTEIN:
13     Q.   1998 EROS A satellite supply
14 contract provided for arbitration in Israel
15 with respect to any disputes relating to the
16 interpretation or execution of this contract
17 which would be governed by the law of
18 Israel?
19         MR. MATETSKY: That's right. That
20 is what it says.
21         THE WITNESS: Yes. 1998, yes.
22 Makes sense.
23         MR. GOLDSTEIN: If we can then
24 mark as Bar-Lev Exhibit 5?
25         (Amended and Restated EROS B1

Page 122

Bar-Lev

1
2  Satellite Supply Contract from July 25, 2000
3  was marked Bar-Lev Exhibit 5 for
4  identification)
5      THE WITNESS:  What am I going do
6  with all of that?  Give it to you?
7      MR. MATETSKY:  It is going to sit
8  in my office and eventually go to an
9  expensive storage place for large sums
10  of money that will be debited to you
11  personally.
12      THE WITNESS:  I will regret I
13  signed all of those documents.
14      What date is that?
15  BY MR. GOLDSTEIN:
16      Q.   First, I am going ask you whether
17  you have seen -- this is an amended and
18  restated EROS B1 satellite supply contract
19  from July 25, 2000.
20      A.   Can I have a minute to look at it?
21      Q.   Sure.
22      MR. MATETSKY:  I think this copy
23  is missing the exhibits as well as the
24  signature page.
25      MR. GOLDSTEIN:  It has a signature

Page 123

Bar-Lev

1
2  page on the second page, 797.
3      MR. MATETSKY:  Okay.
4      THE WITNESS:  I am familiar with
5  this satellite, yes.
6  BY MR. GOLDSTEIN:
7      Q.   Let me focus you, Dr. Bar-Lev, on
8  the timing of this.
9      This amended and restated
10  satellite supply contract is dated July 25,
11  2000.
12      Am I correct, Dr. Bar-Lev, that
13  that was the same date that Pegasus first
14  made its investment?
15      A.   Yes.
16      Q.   In ImageSat?
17      A.   Yes.
18      Q.   And so this contract was signed
19  between ImageSat and Israel -- Israel
20  Aircraft at a time when the company had
21  fully negotiated the Pegasus agreement;
22  correct?
23      A.   Yes, yes.
24      Q.   I would like you to look at page
25  IAI 812.

Page 124

Bar-Lev

1
2      A.   Yes.  I can see that.
3      Q.   Specifically the article 15, law
4  and arbitration section.
5      A.   Yes.
6      Q.   And give you an opportunity to
7  read it.
8      A.   I read it.
9      Q.   And then there is actually on the
10  following page, IAI 813, there is a
11  provision, 15.2, that says, "This contract
12  shall be governed and interpreted under and
13  in accordance with the State of Israel."
14      Do you see that?
15      A.   Yes.
16      Q.   Is it fair to say then,
17  Dr. Bar-Lev, that as of July 25, 2000 at the
18  very same time that the deal with Pegasus
19  was signed ImageSat and Israel Aircraft
20  entered into an amended satellite supply
21  contract for the EROS B1 satellite that
22  provided that any disputes regarding that
23  contract would be resolved by arbitration in
24  Israel and subject to the laws of Israel?
25      A.   What I understand this is is a

Page 125

Bar-Lev

1
2  supply contract, selling satellite by IAI to
3  ImageSat.
4      The answer is under that, yes.
5      MR. GOLDSTEIN:  Let me ask you
6  what we will mark as Bar-Lev Exhibit 6.
7  It is a document entitled Second Amended
8  and Restated EROS B Satellite Supply
9  Contract bearing Bates numbers IAI 201
10  through 285.
11      (Second Amended and Restated EROS
12  B Satellite Supply Contract bearing Bates
13  numbers IAI 201 through 285 was marked
14  Bar-Lev Exhibit 6 for identification)
15      THE WITNESS:  Are we disputing
16  satellite supplies?
17      MR. MATETSKY:  Just answer the
18  questions.
19      THE WITNESS:  Okay.  Let me see.
20  Again, I am not signed on that.
21      Is it always the signature?
22  BY MR. GOLDSTEIN:
23      Q.   Let me ask you, this agreement
24  is -- says on it, July 25, 2001.
25      Do you see that, sir?

Global Deposition Services
212-867-7766

Page 126

```
              Bar-Lev
 1
 2      A.   Yes.
 3      Q.   And it is entitled Second Amended
 4  and Restated EROS B Satellite Supply
 5  Contract, correct?
 6      A.   Yes.
 7      Q.   And you saw this contract before
 8  it was signed as well?
 9      A.   I probably did.  Probably did.
10      Q.   In fact, if you look at some of
11  the -- if you go to IAI 227 you signed each
12  page of the Exhibit B, Mission Requirements;
13  is that correct?
14      A.   You can see now the L, right?
15      Q.   Yes.
16      A.   All right.
17      Q.   You also signed --
18      A.   This is the technical part, right?
19      Q.   And you also signed each page of
20  Exhibit D which is the statement of work for
21  EROS B?
22      A.   If it is technical, I did.
23      Q.   If it is technical you signed it?
24      A.   Yes.
25      Q.   Dr. Bar-Lev, you similarly signed
```

Page 127

```
              Bar-Lev
 1
 2  Exhibit E which is the EROS B1 Program
 3  Schedule?
 4      A.   Yes.
 5      Q.   Beginning on IAI 268?
 6      A.   I don't even look at it.
 7           If my signature is there,
 8  obviously, I did.  Yes.
 9           I am just trying to see what kind
10  of satellite it is.
11           Yes, okay.
12      Q.   Finally, you signed Exhibit G
13  which is the EROS B1 in orbit test?
14      A.   Yes.
15      Q.   Beginning on IAI 278; is that
16  correct?
17           MR. MATETSKY:  Look and make sure.
18  There were some you didn't sign.
19           THE WITNESS:  What page?
20  BY MR. GOLDSTEIN:
21      Q.   278.
22      A.   My signature is on 278, yes.
23      Q.   If you go to page 285, the last
24  document, the last document -- the last page
25  of the document?
```

Page 128

```
              Bar-Lev
 1
 2      A.   Yes.
 3      Q.   Under Mr. Weiss's signature there
 4  is another signature.
 5      A.   It is Ori, O-R-I; Ben, B-E-N; Amoz
 6  AMOZ, the CEO.
 7      Q.   It is correct, Dr. Bar-Lev, that
 8  there are numerous claims that you and the
 9  other plaintiffs bring in this litigation
10  that are based on Bar-Lev Exhibit 6, this
11  amended and restated EROS B Satellites
12  supply contract?
13           MR. MATETSKY:  If you can't think
14      of six objections to that question you
15      are not trying.
16           I object to the form.
17  BY MR. GOLDSTEIN:
18      Q.   You can answer.
19      A.   Should I?
20           MR. MATETSKY:  If you can
21  understand it, you can answer it.
22           THE WITNESS:  I don't understand.
23           MR. GOLDSTEIN:  Shocking how that
24  works, isn't it?
25           MR. MATETSKY:  Why don't you read
```

Page 129

```
              Bar-Lev
 1
 2  it back?
 3           MR. GOLDSTEIN:  I will start
 4  again.
 5           THE WITNESS:  I will answer your
 6  question.
 7           Regarding EROS B?
 8  BY MR. GOLDSTEIN:
 9      Q.   Right.
10      A.   You have to remember there was a
11  history, okay, starting with EROS B in one
12  configuration and then it went into a
13  configuration which was a much better
14  configuration.
15           Finally, it ended up with
16  satellite, not in this date, I think two
17  years later, which was a much inferior
18  satellite, okay, to any of the other
19  configurations, okay, and whatever you are
20  going to bring up, that probably would be
21  the case.
22      Q.   I take it from your answer,
23  Dr. Bar-Lev, that this contract is one of
24  the principal claims that you assert in this
25  litigation against the defendants, correct?
```

33 (Pages 126 to 129)

```
1              Bar-Lev
2         MR. MATETSKY:  Objection to form.
3    I think you misspoke.  I don't think --
4    BY MR. GOLDSTEIN:
5         Q.   You can answer.
6         A.   No, I don't.  I don't understand
7    really so I would rather not.
8         Q.   Is it correct to say that one of
9    your central claims in the litigation you
10   brought against the defendants is that this
11   satellite that was ultimately provided to
12   ImageSat was inferior to the satellite that
13   was contracted for to be provided as
14   reflected in Bar-Lev Exhibit 6?
15        A.   This one?
16        Q.   Yes.
17        A.   Let me just make sure, okay?
18        I think the answer is, yes, but
19   let me make sure.  That is why I looked.
20        MR. MATETSKY:  While he is doing
21   that I will object to the form.
22        THE WITNESS:  I looked at it.
23        Yes, it was.
24   BY MR. GOLDSTEIN:
25        Q.   Now, I would like you to look at
```

```
1              Bar-Lev
2    IAI 221 in Bar-Lev Exhibit 6.
3         IAI 221 in the document you have,
4    yes.
5         A.   This one?
6         Q.   Yes.
7         A.   Where?
8         Q.   IAI 221 is the Bates number.
9         A.   Okay.  Yes.
10        Q.   Dr. Bar-Lev, as with the other
11   satellite supply contracts we have seen this
12   contract also contains a provision that any
13   disputes or disagreements arising in
14   connection with this contract or in relation
15   to its interpretation will be resolved in an
16   arbitration in Tel Aviv subject to the laws
17   of Israel?
18        A.   That is what it says, yes.
19        Q.   And this contract is between
20   Israel Aircraft and ImageSat, correct?
21        A.   I believe so.  Let me just see.
22        Between the buyer, ImageSat, and
23   Israel Aircraft, yes.
24        Q.   And is this agreement long after
25   Pegasus made its investment in ImageSat?
```

```
1              Bar-Lev
2         A.   This is the supply contract,
3    right?
4         Yes, yes.
5         Q.   And a supply contract that is a
6    significant claim -- that is the source of a
7    significant claim in your litigation,
8    correct?
9         MR. MATETSKY:  Objection to form.
10        THE WITNESS:  I don't know.
11   BY MR. GOLDSTEIN:
12        Q.   You can answer that question.
13        A.   No, I don't.
14        Q.   I --
15        A.   He objected and I didn't answer.
16        MR. MATETSKY:  You can answer the
17   question.
18        Repeat the question please.
19   BY MR. GOLDSTEIN:
20        Q.   And is it correct that this supply
21   contract and its terms is a source of a
22   significant claim that plaintiffs bring
23   against the defendants in this litigation?
24        A.   Yes, but you have to look at the
25   context, okay, under which the claim is.
```

```
1              Bar-Lev
2         And the claim is that the
3    satellite that was supplied, okay, is
4    inferior to the satellite, okay, that we
5    have intended to and basically we objected
6    to that.
7         You may ask how did I agree to
8    serve the company after that and I can
9    answer this question, if you will answer me,
10   but you have to remember that this is the
11   context, okay.  This is part of the problem,
12   okay?
13        Q.   I take it, though, Dr. Bar-Lev,
14   that you allege that this contract was
15   breached by Israel Aircraft, correct?
16        A.   No.
17        Q.   No, you don't claim that there was
18   any breach of contract by Israel Aircraft of
19   this agreement, Bar-Lev Exhibit 6?
20        MR. MATETSKY:  Objection to form.
21        THE WITNESS:  What do you mean by
22   "breached."
23   BY MR. GOLDSTEIN:
24        Q.   That Israel Aircraft did not
25   comply with the terms of the contract as
```

Page 134

```
                    Bar-Lev
1
2    reflected in Bar-Lev Exhibit 6?
3        A.   Let me explain to you.
4        Q.   You have to, for the benefit of
5    the court reporter, you have to let me
6    finish and then you can respond.
7        A.   You didn't finish?  Okay.  Sorry.
8    He asked me a question.
9        MR. MATETSKY:  Are you going to
10   repeat the question?
11       THE WITNESS:  You asked me a
12   question.
13       MR. MATETSKY:  You were giving an
14   answer.  Go ahead.  He was going to
15   explain and he started to explain and
16   the reporter had to cut him off.  Now he
17   is going to give the explanation.
18   BY MR. GOLDSTEIN:
19       Q.   There is not a pending question.
20       MR. MATETSKY:  There is a pending
21   question.
22       If you don't let him answer I will
23   move to strike the entire line.
24       MR. GOLDSTEIN:  You can move to
25   strike whatever, Mr. Matetsky, you would
```

Page 135

```
                    Bar-Lev
1
2    like to move to strike.
3        There is no pending question.
4        MR. MATETSKY:  I don't think that
5    is an accurate statement of the record.
6        MR. GOLDSTEIN:  Okay.
7        THE WITNESS:  Are you not
8    interested in my answer?
9        MR. MATETSKY:  Apparently not.
10   BY MR. GOLDSTEIN:
11       Q.   Well, the question, Dr. Bar-Lev,
12   that I think you answered but I will ask
13   again, is, you contend as one of the
14   plaintiffs in the litigation that Israel
15   Aircraft did not meet its obligations --
16       A.   Yes.
17       Q.   -- in connection with what we have
18   marked as Bar-Lev Exhibit 6, this 2001 July
19   EROS B supply contract?
20       A.   That needs explanation.  That is
21   what I was going to tell you.  It is not a
22   yes or no.
23       Q.   Sure.  Go ahead.
24       A.   Probably you would like to be
25   aware of the facts at least the way we
```

Page 136

```
                    Bar-Lev
1
2    understand them.
3        EROS B, when we started, okay, was
4    based on some design, okay, that already
5    existed.
6        Later on it was improved, okay, to
7    include a multispectral and a bigger camera
8    and that was the satellite that was started
9    to be designed, okay, and was acceptable for
10   marketing, competition and so on, okay.
11       And that was based on our
12   assessment, strategy assessment, of
13   competition in the international world.
14       At some point, okay, there was a
15   work stoppage, I don't remember when, I
16   think it was 2001, okay, 17 July or
17   something like that, I think, something like
18   that.
19       Q.   What year?
20       A.   2001, I think.  I think 2001.
21   Okay.
22       And after that, okay, ImageSat was
23   trying to revive the program.
24       The end result was that it was
25   suggested to take an existing design based
```

Page 137

```
                    Bar-Lev
1
2    on Ofeq 5, okay, which we, okay, I mean Dr.
3    Rosenbaum and me, objected to that because
4    it was a much inferior satellite.
5        There is a confusion because B1
6    became C and there is a lot of confusion
7    there.
8        That was the satellite that
9    finally, okay, was launched, okay, including
10   some modification in some subsystems that I
11   already had, okay, and I asked in order to
12   ask the management of ImageSat declared
13   would be the right thing in order to be in
14   the right schedule or time frame regarding
15   penalties of SOPs and things like that.
16       We objected to that, okay.  We
17   said, this is the wrong satellite.  It is
18   not the right satellite to do that, and this
19   is what I am trying to tell you, okay, that
20   I cannot tell you this specific agreement
21   does not represent the final satellite that
22   was launched, okay, to my best of my
23   recollection.  I will look at it later.  I
24   don't have the time to go into detail.
25       Q.   In fact, Dr. Bar-Lev, if I
```

Global Deposition Services
212-867-7766

Page 138

Bar-Lev
1
2  understand the background you just provided,
3  that the fact that this wasn't the satellite
4  that was ultimately launched is a basis of
5  one of your claims in this litigation
6  against --
7      A.   No, I am not sure this is what I
8  said.
9          I said a better satellite was
10  starting to be developed and as I looked it
11  is not this supply contract.
12          It is not -- you want me to look
13  at it again and tell you definitely this is
14  not the one?
15          I will do that gladly.
16      Q.   Go right ahead.
17      A.   Yes.
18          It is not.  Of course, it is not.
19          Would you like to know why?
20          Very simply.  You have a
21  multispectral here.  I am not even looking.
22      Q.   Just what page are you referring
23  to, Dr. Bar-Lev?
24      A.   233.
25      Q.   You handwrote notes over -- you

Page 139

Bar-Lev
1
2  put a little mark --
3      A.   Yes, just to show you I am not
4  looking at the whole thing.
5          It is enough for me to see the
6  spectral bands, full multispectral, it is
7  not black and white, it is in color.
8          That was the satellite that was
9  going to be launched, should have been
10  launched, in our opinion, and was not
11  launched.
12          MR. MATETSKY:  Eric, I think you
13  need to do a tape change.
14          THE VIDEOGRAPHER:  The time is
15  12:28.
16          We are off the record.
17          (Discussion off the record)
18          MR. GOLDSTEIN:  Number 7.
19          (EROS B Satellite Supply Contract
20  dated June 4, 2004 was marked Bar-Lev
21  Exhibit 7 for identification)
22          THE VIDEOGRAPHER:  The time is
23  12:29.
24          We are on the record.
25

Page 140

Bar-Lev
1
2  BY MR. GOLDSTEIN:
3      Q.   Dr. Bar-Lev, I have just marked as
4  Bar-Lev Exhibit 7 a document entitled EROS B
5  Satellite Supply Contract dated June 4, 2004
6  and bearing Bates numbers IAI 286 through
7  323.
8      A.   Yes.
9      Q.   My question to you is:  Have you
10  seen this document before?
11      A.   Yes.
12      Q.   So far as you know this was the
13  last satellite supply contract that was
14  entered into between IAI and ImageSat?
15      A.   Yes.  The last one when I was
16  there, yes.
17      Q.   Yes.
18          And if you would again please look
19  at the third page of the document, the
20  signature page, which is IAI 288, your
21  signature is on the document?
22      A.   Yes.
23      Q.   And --
24      A.   And I explained the circumstances,
25  part of it.

Page 141

Bar-Lev
1
2      Q.   Let me ask the question.
3      A.   Okay.
4      Q.   Once again this is jurisdictional
5  and not merits and it goes to the issues
6  that you want to dismiss?
7      A.   Yes.
8      Q.   Looking to page IAI 317 which is
9  entitled Article 15, Law and Arbitration, do
10  you see that, sir?
11      A.   Yes.
12      Q.   Would you please look at that?
13      A.   Yes.  I looked at it.
14      Q.   Article 15.1 and 15.2?
15      A.   Yes.
16      Q.   Would you agree, sir, that once
17  again this 2004 supply satellite contract
18  also provides that any disputes relating to
19  or arising under this contract are going to
20  be arbitrated in Tel Aviv under the laws of
21  Israel?
22      A.   Yes.
23      Q.   And is it fair to say,
24  Dr. Bar-Lev, that every supply contract of
25  which you are aware, not only at the

36 (Pages 138 to 141)

Page 142

Bar-Lev
1
2  beginning but through the entire time that
3  you were involved with ImageSat, had a
4  provision saying that any disagreements
5  relating to those contracts would be subject
6  to arbitration in Tel Aviv and governed by
7  the laws of Israel?
8        MR. MATETSKY:  Objection to the
9  form.
10       THE WITNESS:  Every one I saw is,
11  yes; the answer is, yes.
12  BY MR. GOLDSTEIN:
13    Q.   Are you aware of any that I have
14  not shown you?
15    A.   Not at this moment.
16    Q.   Let me finish the question.
17       Are you aware of any that I have
18  not shown you that, and I take it -- let me
19  withdraw that.
20       You are aware?
21    A.   The answer is, yes, anyway,
22  whatever form.
23    Q.   Let me take you on the road,
24  Dr. Bar-Lev, and I take it that you are not
25  aware of any contract between Israel

Page 143

Bar-Lev
1
2  Aircraft and ImageSat relating to a supply
3  contract that does not contain an
4  arbitration clause for Tel Aviv governed by
5  the law of Israel?
6    A.   Not at this moment, no.
7       MR. GOLDSTEIN:  Off the record.
8       THE VIDEOGRAPHER:  The time is
9  12:33.
10       We are off the record.
11       (Discussion off the record)
12       THE VIDEOGRAPHER:  The time is
13  12:35.
14       We are on the record.
15       MR. GOLDSTEIN:  I would like to
16  mark as Bar-Lev Exhibit 8 a document
17  entitled Intercreditor Agreement dated
18  July 25, 2001 between ImageSat, Bank
19  Leumi, Noteholders and Subordinated
20  Creditors.
21       (Intercreditor Agreement dated
22  July 25, 2001 between ImageSat, Bank Leumi,
23  Noteholders and Subordinated Creditors was
24  marked Bar-Lev Exhibit 8 for identification)
25

Page 144

Bar-Lev
1
2  BY MR. GOLDSTEIN:
3    Q.   Dr. Bar-Lev, you understand what
4  Bar-Lev Exhibit 8 is?
5    A.   No.
6    Q.   Let me represent to you, sir, that
7  it reflects an agreement among ImageSat,
8  Bank Leumi, Israel Aircraft and various
9  investors in ImageSat including the Pegasus
10  entities?
11    A.   I can see that.
12    Q.   You can see that, sir?
13    A.   Yes, I can see that, yes.
14    Q.   And this document was dated
15  July 25, 2001, correct?
16    A.   Uh-huh.
17    Q.   You have to say, yes, Dr. Bar-Lev.
18       MR. MATETSKY:  Or no or I don't
19  know.
20       Those are all good answers but not
21  uh-huh.
22       THE WITNESS:  Yes.
23  BY MR. GOLDSTEIN:
24    Q.   I would like to refer you to page
25  IAI 630.

Page 145

Bar-Lev
1
2       By the way, let me say for the
3  record that Bar-Lev Exhibit 8 bears Bates
4  numbers IAI 601 through 642 and I am asking
5  you to look at IAI 630.
6    A.   Yes.  I see, yes.
7       I have never seen this before.
8  Just for the record, I didn't see.  I am not
9  aware of it.
10    Q.   If you could look, sir, at, as I
11  said, IAI 630, and specifically paragraph
12  27, governing law and jurisdiction?
13    A.   Yes, I saw that.
14    Q.   You have read it now?
15    A.   Yes.
16    Q.   Would you agree that it provides
17  that all the parties to this agreement agree
18  that any disputes arising out of this
19  intercreditor agreement are to be governed
20  by the law of Israel with each party
21  agreeing to submit the exclusive
22  jurisdiction of the courts of Israel?
23    A.   Yes.
24    Q.   As I think you said, parties to
25  this agreement include ImageSat's investors,

Global Deposition Services
212-867-7766

Page 146

Bar-Lev
1
2    correct?
3         MR. MATETSKY:  Objection to the
4    form.
5    BY MR. GOLDSTEIN:
6         Q.   You can answer.
7         A.   It is a statement.  It is right.
8         You are asking me if the
9    observation is right.
10         Yes, the observation is right.
11         MR. MATETSKY:  Hang on.
12         Do you mean all of ImageSat's
13    investors?
14         MR. GOLDSTEIN:  Mr. Matetsky, when
15    I want you to testify I will have you
16    testify.
17         MR. MATETSKY:  You are blatantly
18    misrepresenting the document on the
19    record.
20         MR. GOLDSTEIN:  Mr. Matetsky, I
21    ask you to be quiet.
22         You know what is an appropriate
23    thing to say or not say.
24         That is entirely inappropriate.
25    The witness -- let's not clutter the

Page 147

Bar-Lev
1
2    record.
3         MR. MATETSKY:  You stop, I will
4    stop.
5         THE WITNESS:  I answer, I agreed
6    whatever is written here is right.  That
7    is all.
8    BY MR. GOLDSTEIN:
9         Q.   When you were at ImageSat,
10    Dr. Bar-Lev, you had security clearance,
11    correct?
12         A.   From whom?
13         Q.   From the Israeli military.
14         A.   At what time, what year?
15         Q.   Let's -- let me ask it more
16    broadly.
17         At any time when you were an
18    executive of ImageSat did you have security
19    clearance?
20         A.   I really can't answer that.  I
21    will tell you why, okay, because I don't
22    remember when I finished my reserve duties
23    and I don't know if after the reserve duties
24    your security clearance is annulled or not.
25         I really don't know.  I may still

Page 148

Bar-Lev
1
2    have a security clearance.
3         Q.   Do you know, Dr. Bar-Lev, whether
4    in connection with the work you did at
5    ImageSat you were given a security
6    clearance?
7         A.   No.  I don't know.
8         Q.   You don't know?
9         A.   I don't know.
10         I don't think so, by the way.  If
11    it was, it was due to my reserve duties and
12    my former work at IAI which might have
13    applied.
14         Q.   Let me mark as -- actually, I
15    don't think we need to mark it.
16         I would like to show you a
17    document that your counsel has filed in this
18    litigation.
19         MR. MATETSKY:  We didn't
20    technically file it but we exchanged it
21    with the other side.
22    BY MR. GOLDSTEIN:
23         Q.   By the way, Dr. Bar-Lev, before
24    you look at that document, while you were at
25    ImageSat were you provided with any access

Page 149

Bar-Lev
1
2    at any point to classified information?
3         A.   At ImageSat in the role of my
4    position at ImageSat?
5         Q.   My question to you, Dr. Bar-Lev,
6    is whether at any point --
7         A.   No, I don't think so.
8         Q.   At any point during the time you
9    were employed by ImageSat were you
10    provided -- whether you were provided with
11    any classified information?
12         A.   By whom?  You have to specify
13    that.
14         Q.   By anyone who was providing you
15    with classified information.
16         A.   Commercial.
17         Q.   Classified by the Israeli
18    government?
19         A.   I must say that I don't remember
20    anything like that but I have to look at it
21    back, okay, because you are not specifying
22    military ones.  You are specifying by the
23    Government of Israel.
24         Q.   Including.  I wasn't seeking to
25    limit the question.

38  (Pages 146 to 149)

Page 234

Bar-Lev

1
2     investor, as a shareholder, okay, as a
3     shareholder I thought it is the right
4     thing to do it in New York according to
5     the other investors that would have been
6     damaged, okay, according to the
7     plaintiff's complaint.
8   BY MR. MILLER:
9        Q.   You are talking about the other
10  investors that are parties to other
11  agreements that are not part of this
12  lawsuit, right?
13           MR. MATETSKY:  Objection to form.
14           THE WITNESS:  I don't understand.
15           There are a lot of plaintiffs here
16      which are shareholders, okay, which are
17      Americans as well.
18  BY MR. MILLER:
19       Q.   Okay.
20       A.   Some of them, so it just made
21  sense that it should be in New York.
22       Q.   For you personally?
23       A.   It doesn't matter.
24       Q.   It doesn't matter, right?
25           MR. MATETSKY:  Objection to form.

Page 235

Bar-Lev

1
2           THE WITNESS:  Well, don't take it
3      out of context.
4   BY MR. MILLER:
5        Q.   Sir, I am asking you the question.
6   Excuse me.  Let me ask the question.
7           With respect to you personally the
8   fact that it is in New York does not help
9   you, does it?
10           MR. MATETSKY:  Objection to form.
11           THE WITNESS:  Okay.  I think -- I
12      will tell you, okay, what I can say, yes
13      or no.
14           I think New York is the right
15      place to do it, okay.
16           If it would have been decided to
17      do it someplace else I probably would
18      have considered it.
19  BY MR. MILLER:
20       Q.   Other than --
21       A.   But I didn't.
22       Q.   Okay.
23           Other than the fact that other
24  plaintiffs reside in New York and there are
25  other potential lawsuits which haven't been

Page 236

Bar-Lev

1
2     brought yet which may have to be brought in
3     New York are there any other reasons that
4     you believe the lawsuit should take place in
5     New York?
6        A.   I think it is a business issue,
7     okay, that should have been resolved in the
8     right environment without putting any other
9     issues on the board, okay, so I thought
10    that, as I said before, that New York is the
11    right place because of what I thought and
12    because of the other contracts that we had.
13       Q.   What is the business issues that
14    you are referring to?
15       A.   Business issues is the point of
16    the shareholders being cramped down, one of
17    the issues being of the companies that could
18    have been a much better company would have
19    some decisions been made or would have
20    other, I would say, influences would have
21    not been exercised, okay.
22           This is business issues.  Okay.
23    It has nothing do with technical issues.
24       Q.   Okay.
25           So basically what you are saying,

Page 237

Bar-Lev

1
2     if I may paraphrase, tell me if I am wrong,
3     is that the reason you think this lawsuit
4     should be in New York is because certain of
5     the other plaintiffs are in the United
6     States and because there were certain other
7     agreements that other investors, not you,
8     but other investors, had that provided for
9     litigation in New York, is that a fair
10    summary of the reasons you think this should
11    be tried here?
12           MR. MATETSKY:  Objection to form.
13           THE WITNESS:  No.  It is not a
14      fair assessment.
15  BY MR. MILLER:
16       Q.   What did I leave out?  What else?
17       A.   I said to the best of my
18  assessment this is the right place to do it.
19  Okay.
20       Q.   For what reason?
21       A.   I said because most of the
22  contracts that had to do with business
23  issues was under the jurisdiction of New
24  York and this is a business issue.
25       Q.   Anything else?

Page 238

Bar-Lev
1
2       A.   It is not a supply.  Supply, I
3  understand, or I may understand.
4          It is an issue between IAI,
5  ImageSat being governed by the MOD, I could
6  understand why it should be in the Israeli
7  law.
8          I would hate to come and defend
9  some kind of technical issues and history of
10  the space and probably I wouldn't have done
11  it in New York but on the business issue,
12  definitely, yes.
13      Q.   Anything else?
14      A.   I am too tired to think.
15      Q.   Give me one second.
16          That is fine.
17          MR. MILLER:  I have no further
18  questions.
19          THE WITNESS:  Thank you.
20          THE VIDEOGRAPHER:  The time is
21  3:02.
22          We are off the record.
23          (Discussion off the record)
24          MR. MATETSKY:  I have no
25  questions.

Page 239

1          Bar-Lev
2       (Time noted:  3:02 p.m.)
3
4

_____
5  MOSHE BAR-LEV
6
       Subscribed and sworn to
7  before me this    day
   of      2008.
8
9  _____
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 240

1          Bar-Lev
2          CERTIFICATE
3  STATE OF NEW YORK )
           : Ss
4  COUNTY OF NEW YORK)
5       I, Steven Neil Cohen, a Registered
6  Professional Reporter and Notary Public
7  within and for the State of New York, do
8  hereby certify:  That MOSHE BAR-LEV, the
9  witness whose deposition is herein before
10  set forth, was duly sworn by me and that
11  such deposition is a true record of the
12  testimony given by such witness.
13       I further certify that I am not
14  related to any of the parties to this action
15  by blood or marriage and that I am in no way
16  interested in the outcome of this matter.
17       I further certify that neither the
18  deponent nor a party requested a review of
19  the transcript pursuant to Federal Rule of
20  Civil Procedure 30(e) before the deposition
21  was completed.
22       In witness whereof, I have
23  hereunto set my hand this 27th day of
24  February 2008.
25       ------------------------

Page 241

1          Bar-Lev
2       INDEX OF EXAMINATION
3  WITNESS              PAGE
4  MOSHE BAR-LEV          9
5  By Mr. Goldstein      13
6  By Mr. Bak           175
7  By Mr. Miller        200
8
9          EXHIBITS
10  BAR-LEV
11  EXHIBIT NO.          MARKED
12  1   Document with Bates    77
13      Numbers 00598 through
14      600
15
16  2  Project Finance      108
17     Facility
18
19  3  EROS B1 Satellite    116
20     Supply Contract
21
22  4  Satellite Supply     120
23     Contract
24
25  5  Amended and Restated   121

Global Deposition Services
212-867-7766