# EXHIBIT 1

| | |
|---|---|
| Issue: | JOR 2007/12 |
| Location: | JOR 2007/302 |
| Classification: | Corporate law |
| Court: | The Supreme Court of the Netherlands |
| Date: | November 2, 2007 |
| | |
| Docket no.: | R06/032HR, LJN BB3671 |
| Tribunal: | Fleers LL.M. |
| | Van Buchem-Spapens |
| | Kop LL.M. |
| | Van Oven LL.M. |
| | Streefkerk LL.M. |
| Conclusion: | Advocate General, Timmerman |
| Editor's notes: | Dr. B.F. Assink LL.M. |
| | |
| Parties: | 1. M.W. Kessock, |
| | 2. S.C. Kessock-Leenders, |
| | both from Curacao, |
| | cassation appellants, |
| | attorney: R.S. Meijer LL.M., |
| | *versus* |
| | SFT Bank NV in Curacao, |
| | cassation appellee, |
| | attorney: D. Rijpma LL.M. |
| | |
| Subject matter: | Incidental damages |
| | Blocking of lines of credit of corporations by the bank, resulting in reduced selling prices of their shares |
| | Unlawful act or breach of contract by the bank against shareholders of the corporations |
| | Reference HR December 2, 1994, NJ 1995, 288, HR February 16, 2007 (Poot/ABP), <<JOR>> 2007/112, with commentary from Van Veen and Van Wechem (Gebr. Tuin Beheer/Houthoff Buruma) and HR June 15, 2001, <<JOR>> 2001/172, with commentary from Kroeze |
| | (Chipshol/Coopers & Lybrand) |
| | |
| Articles: | Netherlands Civil Code, Art. 162 |

**Summary**

The assertions by Kessock et al. are, in principle, capable of supporting a claim on the grounds of a specific unlawful act or a breach of contract, committed against them. What is important in this respect, is that the Court has decided on the one hand that SFT has acted unlawfully against Kessock et al., by freezing their lines of credit in the manner in which they did, a judgment against which SFT's grounds for appeal II are directed, and on the other hand, the assertion by Kessock et al., which rejected the statement that SFT had promised both corporations to make available open lines of credit of ANG. 1.2 million, a judgment that grounds for appeal VII from Kessock et al. is directed against. However, the Court of Appeals did not deal with either of those grounds for appeal, leaving open on appeal the possibility that SFT acted unlawfully or in breach of contract on both counts.
Section 2 of the appeal asserts that the Court of Appeals has erred in its opinion that the granting of the claim by Kessock et al. is prevented by the fact that it relates to 'incidental damages,' and further argues that the fact that the 'definite' character of the loss has also been caused by the now irreversible acceptance by the corporations of the dismissal of the legal claim, does not automatically prevent the granting of the claim by Kessock et al. either.
The section is based on an incorrect reading of the relevant considerations of the Court of Appeals and therefore misses the factual basis. The Court of Appeals did not deny that Kessock et al., as shareholders of the corporations, are able to claim damages from SFT for the reduction in value of their shares in the corporation ('incidental damages'), if they suffered such a loss as a consequence of SFT's breaching a specific duty of care towards them (cf. HR December 2, 1994, NJ 1995, 288 and HR February 16, 2007, <<JOR>> 2007/112, with commentary from Van Veen and Van Wechem). Nor has the Court of Appeals denied that the payment of compensation for such losses is not prevented by the losses for the corporations becoming 'definite' based on a claim from the corporations for the payment of damages that has been rejected by a court, and that the corporations have accepted this. The Court of Appeals has,

in this respect, only decided that the 'incidental damage' becoming definite, because the corporations are now unable, or have rendered themselves unable, to claim compensation, does not in itself have the effect that SFT's conduct with regard to Kessock et al. must be deemed unlawful. This opinion is correct (cf. HR June 15, 2001, <<JOR>> 2001/172, with commentary from Kroeze)

**Judgment**

**Rejoinder Advocate-General**
(Timmerman LL.M.)
Cassation appellant—the shareholders of Caribbean Bistros N.V. and Beach Bistros N.V. blame SFT Bank for having acted unlawfully towards them by blocking lines of credit for Caribbean Bistros N.V. and Beach Bistros N.V., with the result that the restaurants operated by the corporations had to be closed and that the shares of the corporations had to be sold at a reduced price. At issue, is the question of whether the Joint Court of Justice of the Netherlands and the Netherlands Antilles (hereinafter referred to as the Court of Appeals) was justified in dismissing the appellant's claim on the grounds that insufficient facts were presented for accepting that the SFT Bank breached a specific standard of care regarding Kessock et al.

**1. The facts (1)**
1.1. Caribbean Bistros N.V. has operated a restaurant in Mahaai on Curacao, since around 1987. M.W. Kessock (cassation appellant under 1, hereinafter referred to as Kessock) and his wife, S.C. Kessock-Leenders (cassation appellant under 2, hereinafter referred to as Kessock-Leenders; and together with Kessock, as Kessock et al.), were managing directors of this restaurant. In 1999, Kessock and Kessock-Leenders, because of the success of the restaurant in Mahaai, decided to open a branch-establishment. This business was operated by Beach Bistros N.V. This corporation was incorporated in 1997. The branch-establishment was located at Cornelis Bay. Both corporations will hereinafter be referred to collectively, as the bistros.
1.2. At the time that the action was instituted, the Court of the First Instance determined that Kessock was the sole shareholder of the corporation, Beach Bistros N.V. (2) Kessock-Leenders is one of the shareholders of the corporation Caribbean Bistros N.V. (3)
1.3. In 1999, Kessock-Leenders became seriously ill. Since that time, she has not been able to adequately meet her management responsibilities. Kessock did not have enough time to manage both restaurants in a responsible way either. The result was mismanagement and mounting losses. Since that time, Kessock has attempted to sell both restaurants. The bank for both corporations, SFT Bank (hereinafter referred to as SFT Bank), was aware of this.
1.4. Around December 2000, the debit balances on the accounts kept at the SFT Bank by Beach Bistros N.V. collectively amounted to approximately ANG 1.5 million, even though the 'overdraft facility' had a limit of ANG 50,000. No security had been provided for this debt.
1.5. In a letter, dated December 4, 2000 (4), Kessock advised Club Caribbean N.V., the owner of the premises in which Beach Bistros N.V. operated its restaurant, of the following, among other things:
"(...) my office called to inform me that SFT Bank had refused to honor checks from the Cactus Club restaurants. (...) The bank is requesting additional conditions, which we are unable to meet. (...) We are, as you know, trying to sell the restaurants. (...) Considering the local economy, I also believe that it is doubtful that Beach Bistros can ever make a profit; in fact, our losses are growing each month. Accordingly, I regret to inform you that it is most unlikely that we will be able to continue our lease with Club Caribbean. Please consider this letter to be our notice as per article 2.E. of our lease agreement."
This last statement meant that Kessock was terminating the lease on the premises.
1.6. On December 27, 2000, Kessock deposited ANG 100,000 in the accounts, so that the salaries of the staff could be paid.
1.7. On or around January 26, 2001, SFT Bank promised Kessock that they would forgive ANG 300,000 of the debit balances of both accounts (also referred to as 'write off' in the documents), after Kessock repaid an amount of ANG 580,000 (according to Kessock) or ANG 600,000 (according to SFT Bank).
1.8. In a fax, dated February 1, 2001, SFT advised Kessock of the following among other things:
We herewith acknowledge your various meetings, recently held with our Messrs. L. Rigaud and R. Irasusquin, and (...) During above mentioned conversations we discussed (...) the present situation of the overdraft facilities, extended to Caribbean Bistros N.V. and Beach Bistros N.V. We agreed upon that you will grant your personal guarantee for all amounts that exceed the cumulative balances on both accounts of ANG 1,200,000.00 we have to inform you that the total debit balance on both accounts amounts to ANG. 1,357,438.70 (...) being respectively ANG 865,633.28 debit on current account number 0011-276030-002 and ANG 491,805.45 on current account number 0011-276020-002."
1.9. On March 5, 2001, Kessock deposited ANG 320,000 and on March 13, 2001, ANG 260,000 in the Caribbean Bistros N.V. account, number 011-276030-002, in accordance with the abovementioned agreement.
1.10. In a fax, dated March 15, 2001, SFT advised Kessock that:
"due to the fact that parties still have no solution to the various disputes the (...) accounts will be managed in the following manner from now on: (...) Caribbean Bistros N.V. current outstanding balance on number 011-276030 amounts to ANG 303,047.18 (...) Beach Bistros N.V. outstanding balance on account number 011-276020 sums up to ANG 448,254.47" (by combining both account numbers). The

debit balance on this account will be limited to the aforementioned amount until further notice. As of date these payments will be alternated with deposits."

1.11. Since March 15, 2001, Beach Bistros N.V. and Caribbean Bistros N.V. have only deposited part of their daily takings in their bank accounts.

1.12. In a fax, dated March 29, 2001, SFT Bank advised Kessock:

"Caribbean Bistros N.V. account number 0011-276030-002. We hereby reiterate our offer to write off ANG 300,000 on this account subject to your acceptance of this proposal. If and when this takes place, no debit balances will be allowed on this account in the future. Beach Bistros N.V. account number 011-276020-002. We are willing to grant a maximum credit balance of ANG 450,000 on this account for a period of 6 months subject to you granting us the fiduciary transfer of ownership on the assets of Beach Bistros N.V. and Caribbean Bistros N.V."

1.13. In his reply to the fax, dated March 29, 2001, Kessock, in a letter to SFT Bank, dated March 30, 2001, wrote the following:

"1. SFT's offer of ANG 300,000 made to myself (...) contained only one condition; that I would transfer an amount of ANG. 580,000. This was done. Having received the monies (...), you have now placed conditions on that offer, which are almost impossible to meet. Accordingly, I must again insist that the money be transferred as promised by Ron, prior to continuing any further negotiations (...) Obviously, SFT's part of the bargain should be honored as promised.

2. The suggested debit balance for Caribbean and Beach Bistros are inadequate to allow us to continue to do business for the coming six months. The pledge of assets would be acceptable should SFT be willing to grant some leeway in these accounts."

1.14. On April 9, 2001, SFT Bank obtained a prejudgment attachment of all goods and moneys of Beach Bistros N.V. On April 20, 2001, both restaurants closed their doors. On April 27, 2001, SFT Bank wrote off the promised amount of ANG 300,000 from the Caribbean Bistros N.V. account. In a letter, received by Beach Bistros N.V. and Caribbean Bistros N.V. on May 2, 2001, the bank ended its relationship with both corporations.

1.15. From the end of 2000, various offers were made for the purchase of both bistros. These offers did not lead to an agreement until after the end of the relationship between the parties, albeit for a sum much below that originally offered.

## 2. The course of the proceedings

2.1. Kessock et al., together with the *Stichting Administratiekantoor Caribbean Bistros* [association of Caribbean bistros], in their petition with exhibits lodged on June 30, 2003 with the registry of the Court of the First Instance of the Netherlands Antilles in Curacao (hereinafter referred to as the Court of the first Instance), have petitioned the Court to order SFT Bank—in summary—to pay ANG 1,1,140,000 [sic], or at any rate, an amount as determined by the court in the proper administration of justice. SFT Bank has contested this petition, providing reasons.

2.2. In its judgment, dated March 22, 2004, the Court of the First Instance ordered Kessock et al. to substantiate the details of shareholdings put.

2.3. In its decision, dated August 31, 2004, the Joint Court of Justice of the Netherlands and the Netherlands Antilles (hereinafter referred to as the Court of Appeals) refused to grant a separate appeal against the interim judgment, dated March 22, 2004.

2.4. In its judgment, dated January 17, 2005, the Court of the First Instance dismissed the claim and in doing so, took the following—grounds for the decision 10.1— into consideration among other things:

"10.1. SFT Bank certainly acted carelessly with regard to Kessock et al. However, their actions have not led to losses on the part of Kessock et al. that they can be held responsible for in a court of law. These losses were the direct consequence of negligence on the part of both corporations and/or Kessock et al. to provide collateral, or to arrange alternative finance for the corporations. Kessock et al. have negotiated too hard. However, this would not have caused them any harm, if they had been able to sell the restaurants in time. They were not successful in doing so, but this cannot be blamed on SFT Bank."

2.5. Kessock et al. appealed the final judgment, providing seven grounds for appeal. SFT Bank has also lodged an appeal, providing two grounds for appeal. Both parties, in their appellee's briefs, have disputed the claims of the opposing parties, providing reasons for doing so. The viewpoints have been explained in greater detail during oral pleadings on November 1, 2005, and the submission of memoranda of oral pleadings, after which the parties asked the court to hand down a decision.

2.6. In its judgment, dated December 13, 2005, the Court of Appeals upheld the judgment.

2.7. Kessock et al. lodged an application in cassation within the prescribed timeframe. (5) A statement of defense was filed on behalf of the respondents. Both parties have provided written explanations.

## 3. Introduction to the discussion of the grounds for appeal in cassation

3.1. In the Poot-ABP decision handed down, your tribunal considered that if a third party causes damages to a corporation, only the legal person—in its independent legal capacity—is capable of claiming compensation for the losses they may have suffered. (6) A shareholder does not have an independent claim to payment for damages he or she may suffer as a consequence of a fall in the value of their shares. Your tribunal has recently considered the following in regard to this rule: In its decision on December 2, 1994, no. 15511, NJ 1995, 288, the Supreme Court stated first of all that, if a public or a private company has suffered a financial loss caused by a third party not properly meeting its contractual obligations to the corporation, or because of acts that are unlawful with regard to the corporation, only the corporation will have the right

to claim compensation from the third party for the damage suffered in this respect. The financial losses to the corporation will/may, for as long as they have not been reimbursed, lead to a fall in the value of the shares of the corporation. However, in principle, the shareholders cannot make a valid claim for compensation against the third parties referred to themselves based on the losses they have incurred.  The Supreme Court further decided that the shareholders are only entitled to the payment of compensation for the loss they may have suffered in this capacity, if the loss was the consequence of a breach of a specific duty of care to them. In HR November 29, 1996, no. 16136, NJ 1997, 178, the losses suffered by the shareholders as a consequence of a decrease in the value of their shares in the corporation, are referred to as incidental damages." (7)

3.2. The rule formulated in Poot/ABP, that shareholders are not entitled to compensation for what is referred to as incidental damages, is being strictly applied. Your tribunal has allowed no exceptions (i) in the event that there is a one director/sole shareholder situation (8) (ii) in the event that the corporation can no longer sustain a claim because of bankruptcy of the corporation, (9) (iii) if the corporation is unable, or has rendered itself unable to claim compensation from the third party responsible (e.g. by entering into an agreement), so that the shareholders have definitely suffered the loss themselves, (10) (iv) in the event that a general manager (not being a director under the articles of association), has caused losses for the corporation through mismanagement. (11) In all these cases, proceedings seeking the payment of compensation for damages failed because of the central idea, that no standard of care could be identified that the third party had breached vis-à-vis the shareholder(s)/members, apart from unlawful conduct against/breach of contract relating to the legal person by the third party being sued.

3.3. HR May 2, 1997, NJ 1997, 662 (Kip/Rabobank), did involve a breach of a standard of due care relating to shareholders. The Rabobank was considered to have acted unlawfully vis-à-vis the shareholders (Kip & Sloetjes), because (i) the Rabobank's careless lending policies had put their corporation in an unfavorable financial position, (ii) the Rabobank had subsequently put pressure on Kip & Sloetjes to sell their shares at an unfavorable point in time, which shifted the financial loss directly to Kip and Sloetjes.

3.4. Finally, it is important that in the Tuin Beheer judgment—under grounds for the decision 3.9—the tribunal emphasizes, that only the value reduction of the shares can be deemed incidental damages:

"(…) It already follows from the formulation of the judgment quoted in 3.3 under (c), dated December 2, 1994, that the standard referred to there is not (also) applicable if the shareholder claims payment of compensation for losses that he/she suffers other than through a reduction in the value of his/her shares in the corporation. After all, the undisputed claim by Tuin Beheer in its current account, which, because of Tuin Recreation's bankruptcy has remained unsatisfied, and which, at the request of Tuin Recreatie was given the character of a subordinated loan just before the bankruptcy, is not incidental damage for Tuin Beheer. That is to say, that it did not consist of a reduction in the value of the shares that Tuin Beheer had in Tuin Recreatie, but of a reduction in the value of the claim that Tuin Beheer had against Tuin Recreatie.

3.5. Against this background, I now move on to a discussion of the complaints.

4. **Discussion of grounds for appeal in cassation**

4.1. The grounds for appeal in cassation can be split into two sections. The first part splits into three sub-sections.

4.2. Section 1 argues that the opinion of the Court of Appeals—that Kessock et al. have not satisfactorily put the case for an (also) specific breach of contract or unlawful act committed against them by the SFT Bank—is incorrect and/or has not been substantiated adequately.

4.3. Section 1.1 elaborates this complaint by asserting that the Court of Appeals has ignored that Kessock et al. relied on arrangements made with SFT Bank (regarding additional pay-ins, write-offs and the provision of personal guarantees) and that they were able to draw confidence from this that SFT Bank, during the period of six months that it was attempting to sell the corporations, the corporations would be granted lines of credit totalling ANG 1.2 million. Section 1.2 adds to this that the conduct of SFT Bank breached these arrangements (or the confidence that was generated). As a result, SFT Bank therefore was in breach of contract and acted unlawfully vis-à-vis Kessock et al. in particular.  Section 1.3 indicates why the matters that the Court of Appeals has considered anyway, cannot resolve the foregoing. The sections are suitable for being considered together.

4.4. In the grounds for the decisions 4.3 and 4.4, the Court of Appeals has considered the following:

"4.3. In this case, Kessock et al. specifically blames SFT Bank for not immediately (but on April 27, 2001 instead) writing off (forgiving) ANG 300,000 (the debit balance of the account, other than a minor sum), after Michael William Kessock deposited ANG 580,000 into the account of Caribbean Bistros N.V., that SFT Bank did not make available lines of credit totaling ANG 1.2 million to the two bistros, that SFT Bank froze the accounts (in the sense that credit was limited to the balances outstanding as at March 15, 2001) without giving the bistros a reasonable period of time to find another financial institution willing to provide credit facilities, that (related to the latter) SFT Bank, contrary to arrangements, set new conditions relating to the provision of credit facilities, that after the credit facility agreements were terminated, the SFT Bank issued and later executed a warrant of attachment, and the SFT Bank has prevented the sale of the bistros as 'going concerns.'

4.4. These facts and circumstances contain a potential breach of contract or carelessness towards the corporations, but not (also) specifically against the shareholders. Kessock et al. have not provided sufficient facts and circumstances for that to be the case. The fact that one of the shareholders (Michael William

Kessock) has deposited ANG 580,000 in the account of Caribbean Bistros N.V. and has presumably created a claim against Caribbean Bistros N.V. as a result, is not enough in itself. Large shareholders who are also directors, will often make financial injections into corporations (cf. the payment for shares in HR July 14, 2000, NJ 2001, 685, Van de Mosselaar, grounds for decision 3.6.3) The SFT Bank required the corporation to reduce the overdraft on the account. The deposit of ANG 580,000 was matched by a write-off of the company's debt of ANG 300,000, which was a benefit to the equity situation of the corporation and indirectly for that of the shareholders (since a financial collapse was not yet expected at that point in time)."

4.5. The section focuses on the opinion of the Court of Appeals that the facts asserted by Kessock et al. do not suggest a breach of contract or unlawful act against the petitioners.

4.6. The facts established by the Court of Appeals, reveal the following course of events relating to the cancellation of credit facilities by SFT Bank:

i. In his letter, dated December 4, 2000, Kessock indicated that the future of the restaurants was in jeopardy because of serious financial problems. (12)

ii. Kessock and SFT Bank have been negotiating from the beginning of December, about the (temporary) continuation of credit facilities for Caribbean Bistros N.V. and Beach Bistros N.V., so that Kessock would be able to sell the restaurants operated by these legal persons. (13)

iii. SFT Bank wanted to ensure payment of the outstanding debts, which at around December 2000 amounted to ANG 1.5 million, and that they would be covered by collateral security. (14)

iv. At the end of January, Kessock and SFT Bank agreed that SFT would write off ANG 300,000 of the debit balances of both accounts, after Kessock paid an amount of ANG 580,000 (ANG 600,000 according to SFT).

v. In a fax, dated February 1, 2001, SFT Bank advised Kessock of the following, among other things: "(...) We agreed that you will grant your personal guarantee for all amounts that exceed the cumulative balances on both accounts of ANG 1,2000,000.00 [sic] (...)"

vi. It has not been shown that Kessock did provide a personal guarantee in the end. (15)

vii. Kessock deposited ANG 320,000 on March 5, 2001 and a further ANG 260,000 on March 13, 2001 in compliance with the aforementioned arrangements. (16)

viii. In their letter, dated March 15, 2001, two days after the latter deposit, SFT Bank informed Kessock that their credit limit was frozen at the existing balance. (17)

4.7. Kessock et al. have argued that the SFT Bank acted unlawfully towards them by suddenly canceling the credit facilities. I will first discuss the situation that SFT Bank was supposed to have acted unlawfully towards Kessock. The Court of the First Instance examined this assertion on the part of Kessock et al. and came to the conclusion that SFT Bank had indeed acted carelessly vis-à-vis Kessock et al:

"6.1. Kessock et al. argued that the limit on outstanding balances at the time of both credit facilities, imposed by SFT Bank on March 15, 2001, was an unlawful act against them. To support this, they have mainly argued that they were thus denied a reasonable period of time to find another financial institution, and as a result were forced to close their restaurants. As a consequence of the latter, they were not able to sell the businesses as going concerns and therefore suffered a substantial loss on the sale.

6.2. When assessing this allegation, significant weight must be given to the circumstance that Kessock et al. had known for some time, certainly since November 2000, that the continuation of the relationship between SFT Bank and both bistros depended on Kessock providing SFT Bank with collateral security. However, Kessock et al. have consistently taken the view from March 29, 2001, that they were not able to provide such collateral security. This circumstance, after (at least) two-and-a-half months of negotiations, gave SFT Bank the perfect right to set the limits of the credit facilities for both restaurants. However, this did not mean that SFT, when determining the size of the limits of the credit facilities, had the right to leave out of the equation the voluntary payment of ANG 580,000 and their promised write-off of ANG 300,000 against the account of Caribbean Bistros N.V. To this extent, the setting of the limits was not justified and therefore unlawful [italics LT] This opinion would not have been different if SFT had in fact credited the amount of ANG 300,000 and had subsequently set the credit limit at the then outstanding balance. Taking into account the deposit of ANG 580,000 made by Kessock, he was entitled to expect that the credit facilities would immediately be frozen at (too) low a balance and that he would not be granted further credit [italics LT]. If SFT Bank already had in mind the course of action they took when they were discussing arrangements, and had they informed Kessock of this, he would have undoubtedly refrained from depositing the ANG 580,000.

Nonetheless, this could not have led to a granting of the claim, because, among other things, Kessock et al. had negotiated 'too hard' (see reasons for decision 10.1 of the judgment of the Court of the First Instance, dated January 17, 2005) and the losses that Kessock et al. had suffered as a result of the unlawful actions of the SFT Bank did not entitle them to payment of compensation because of 'circumstances which can be imputed to the injured party' (reasons for the decision 10.2). The (explanations accompanying) Grounds for Appeal VI by Kessock, contains a denial that Kessock et al. would 'be at fault' themselves. SFT Bank, in its Ground for Appeal to the Supreme Court, challenges the opinion that SFT Bank had acted carelessly in respect of Kessock et al.

4.8. The Court of Appeals in its judgment, dated December 13, 2005, only deals with Grounds for Appeal I of the SFT Bank. Grounds for Appeal I argues that the court failed to recognize that Kessock et al. were claiming incidental damages. I cannot find a challenge in these Grounds for Appeal to the opinion of the Court of the First Instance, that Kessock et al. were entitled to expect that the available credit facilities would not be frozen suddenly. The Court of Appeals next considered in 4.4 of their grounds for the decision: "These facts and circumstances contain a potential breach of contract or carelessness towards the corporations, but not (also) specifically against the shareholders." In Reasons for the Decision 4.7, the Court of Appeals further looks at: "In addition to the foregoing, Kessock only claims 'incidental damages' suffered by the corporations (…)." I do not understand the first sentence in Reasons for the Decision 4.4, in light of what

the Court of the First Instance has considered in Reasons for the Decision 6.2 of its decision.

4.9. The established facts show that Kessock, during negotiations with SFT Bank, did not act as a director of the corporations, but as a private person as well. I refer to the declaration of 'joint and sever liability' requested and the agreement of the settlement of the debit balances using Kessock's private means. As far as SFT Bank betraying any confidence they had given Kessock, by freezing the credit facilities shortly after Kessock deposited ANG 580,000, it is not immediately obvious why tenet of the losses suffered would prevent Kessock from making a claim based on an unlawful act. The tenet of incidental damage is that only the corporation can claim payment for damages that have been sustained by the corporation. In my view, this leaves intact the fact that if someone causes another person to suffer a loss in his or her capacity as a shareholder of a corporation by disregarding his or her justified expectations and interests, this person/shareholder can claim compensation. Such a situation could arise in the event that a bank entices a shareholder into an injection of capital, in the knowledge that that the intended objective, i.e. to keep the business running for some time, cannot be achieved. In my view, there is a breach of a standard of care within the meaning of Art. 6:162 of the Civil Code, in respect of the private shareholder in such a case.

4.10. In my view, the Court of Appeals erred in not dealing with the question of whether SFT Bank committed a breach of contract by not making available credit facilities of ANG 1.2 million to both bistros. The Court of the First Instance decided this question as follows in its Reasons for the Decision 5.2: "Even prior to December 2000, SFT Bank had asked Kessock et al. to provide collateral security for the outstanding debts of Beach Bistros N.V. and Carribean Bistros N.V. These debts amounted to at least ANG 1.4 million, see point 4.9 together with 4.5. The fax, dated February 1, 2001, only mentions that Kessock has personally guaranteed debit balances that exceed ANG 1.2 million. This undertaking on the part of Kessock does not automatically imply that SFT Bank has also expressed a willingness, without the provision of collateral security, to provide open credit facilities for both bistros, up to an amount of ANG 1.2 million. This is even less obvious, because SFT Bank had committed themselves to write off ANG 300,000 of the debts, after Kessock had made a payment towards them of ANG 580,000, to use Kessock et al.'s reading of the situation. Following Kessock et al. in their assertions, this would mean that the entire operation of reducing the debts could in fact be undone by both bistros, whilst SFT Bank still hadn't received any security to cover the money owing, and yet, by writing off ANG 300,000, had given up this part of the amount owing. It is so unlikely that SFT Bank would have agreed to such an arrangement, that Kessock et al. should have provided further facts and/or details of circumstances for their reading of the situation to find acceptance. However, they have failed to do so." Kessock et al. have disputed this consideration in the Grounds for Appeal VII.

4.11. In summary, the following applies in my view. In contrast with the Court of Appeals, I believe that in light of what Kessock et al. have argued in their Supreme Court appeal, it cannot be dismissed out of hand that SFT Bank has committed a breach of contract or an unlawful act against Kessock et al. In my view therefore, the Court of Appeals has erred in declaring SFT Bank's Grounds for Appeal I as valid. The Court of Appeals should have investigated the extent to which SFT Bank could have been accused of:

i. having ignored the justified expectations on the part of Kessock (and those of Kessock-Leenders) by freezing the credit facilities of the corporations shortly after Kessock privately deposited funds for the corporations (Ground for Appeal II of SFT Bank opposes the decision of the Court of the First Instance that SFT Bank can be accused of acting without due care on this point), and/or

ii. by freezing the accounts, breached any arrangements made between the parties (as submitted in Grounds for Appeal VII by Kessock et al).

4.12. In view of what Kessock et al. submitted in the appeal to the Supreme Court, the matters considered by the Court of Appeals in Reasons for Decisions 4.5 and 4.6, are not sufficient to exclude the possibility that SFT Bank betrayed the justified expectations on the part of Kessock, or that they acted contrary to the arrangement made between them. This brings me to the conclusion that the first sentence in Reasons for the Decision 4.4, is puzzling, i.e. that this section of the appeal should succeed.

4.13. To the extent that the Court of Appeals allowed its considerations to be supported by what your tribunal considered in HR July 14, 2000, NJ 2001, 685 (Van de Mosselaar), Reasons for the Decision 3.6.3, referred to in Reasons for the Decision 4.4, this is in error. In that case, the curator, in selling the assets of the estate to Lagero Europe B.V., failed to advise them that a long-term contract had been cancelled, as a result of which they were to have paid too much. Lagero Europe B.V. and Van de Mosselaar as a shareholder of Lagero Europe B.V. demanded compensation from the curator on the basis of an unlawful act and/or a breach of contract. After the bankruptcy of Lagero Europe B.V., and the refusal of the receiver in that bankruptcy to continue with the legal action against the curator, Van de Mosselaar continued with the action himself. Van de Mosselaar thereby took the view, among other things, that an unlawful act had also been committed against him as a shareholder, since he would not have injected fl. 1 million in capital, had he known that the contract had been cancelled. The Court of Appeals did not consider the single fact that Van de Mosselaar injected capital, a circumstance that justified an exception to the rule that any unlawful conduct on the part of the curator vis-à-vis Lagero Europe is not in principle an unlawful act against Van de Mosselaar as a shareholder. Your tribunal did not challenge this opinion . The difference in this case, in my opinion, is that in the Van de Mosselaar case, Van de Mosselaar did not assert that the curator had raised certain expectations on his part. In this case, the question in the dispute is whether an agreement was entered into between SFT Bank and Kessock et al. privately, regarding the provision of credit facilities and/or whether SFT Bank had specifically raised Kessock's expectations regarding the ongoing provision of credit facilities, so that the freezing thereof can be deemed unlawful vis-à-vis Kessock.

4.14. In conclusion, a note about the decision of the Court of Appeals that Kessock et al. claimed only 'incidental damages.'

Should it be proven that SFT Bank had acted unlawfully vis-à-vis Kessock et al., or that there was a breach of contract, then the extent of the loss needs to be determined. When determining the extent of the losses, the causal relationship, among other things, between the unlawful act and the losses that were occurring, must be investigated. The fact that Kessock has asserted that the extent of the losses equals the reduction in value of the shares of the corporations, is only a submission on the size of the losses he has suffered. The fact that Kessock links the size of his losses with the value reduction of the shares in the corporations, does not mean that Kessock is claiming incidental damages. Kessock could have asserted that the extent of his loss was equal to the ANG 580,000 that he deposited.

4.15. The well-grounded finding of the first section, means that the second section of the grounds for appeal does not require any further discussion. Although no doubt superfluous, I nevertheless wish to touch on it briefly.

4.16. Section 2 asserts that—if it can be assumed that SFT Bank has committed a breach of contract or an unlawful act vis-à-vis Kessock et al.—the fact that this involves incidental damages, does not necessarily prevent the claim from being granted.

4.17. The section assumes that the losses—as claimed by Kessock et al.—are related to incidental damages. This is the reason why it fails. Incidental damages relate to losses suffered by the corporation. Payment of compensation for these losses can, in principle, only be claimed by the corporation. This has recently been confirmed by your tribunal, in the Tuin Beheer judgment referred to above. The foregoing does not alter the fact that Kessock et all—insofar as SFT Bank was to have breached a standard in the duty of care vis-à-vis Kessock et al.—could try to claim the payment of compensation for the drop in value of the shares, as a 'personal loss.' (18) The question as to what extent the drop in value of the shares can be deemed to have been caused by circumstances which can be imputed to the Kessock et al., will depend on the circumstances of the case. Should it get that far, then in answering that question, the requirement of a causal link will also have to be examined.

**5. Conclusion**

The conclusion is to the effect that the judgment should be quashed and referred back.

**The Supreme Court of the Netherlands**


**(...; Ed.)**


**3. Assessment of the grounds for appeal**

3.1. In cassation, the following may be taken as fact.

i. Caribbean Bistros N.V. has operated a restaurant in Mahaai on Curacao, since approximately 1987. Kessock et al. were the managing directors of this restaurant. In 1999, they opened a branch restaurant in Cornelis Bay on Curacao, operated by Beach Bistros N.V.  Kessock was the sole shareholder of Caribbean Bistros N.V. and Kessock-Leenders was one of the shareholders of Beach Bistros N.V.

ii. Since 1999, there have been increasing losses in both businesses. Kessock had attempted to sell both restaurants, and SFT knew this. Around December 2000, the debit balances of the bank accounts of both restaurants, held by SFT, collectively amounted to approximately ANG 1.5 million, whilst an overdraft of only ANG 50,000 had been approved. No security had been provided for this debt.

iii. On, or around, January 26, 2001, SFT promised Kessock that they would write off an amount of ANG 300,000 against both accounts after Kessock paid an amount of ANG 580,000 (according to Kessock) or ANG 600,000 (According to SFT).

iv. In a fax, dated February 1, 2001, SFT Bank advised Kessock:

"(...) we discussed (...) the present situation of the overdraft facilities, extended to Caribbean Bistros N.V. and Beach Bistros N.V. We agreed upon that you will grant your personal guarantee for all amounts that exceed the cumulative balances on both accounts of ANG 1,200,000. For the sake of completeness we have to inform you that the total debit balance of both accounts amounts to ANG 1,357,438.70 (...), being respectively ANG 865,633.28 (...) and ANG 491,805.45 (...)."

v. In implementing the arrangements set under (iii), Kessock paid a total amount of ANG 580,000 into the account of Caribbean Bistros N.V. on March 5 and 13, 2001.

vi. In a fax, dated March 15, 2001, SFT Bank advised Kessock:

"(…) Due to the fact that parties still have no solution to the various disputes the aforementioned accounts will be managed in the following manner from now on:

1. Caribbean Bistros N.V.

The current outstanding balance (...) amounts to ANG 303,047.18.

The debit balance on this account will be limited to the aforementioned amount until further notice. As of date payments will be alternated with deposits.

2. Beach Bistros N.V.

The outstanding balance (...) adds up to ANG 448,254.47.

The debit balance on this account will be limited to the aforementioned amount until further notice. As of this date, payments will be alternated with deposits. (...)"

vii. Since March 15, 2001, Beach Bistros N.V. and Caribbean Bistros N.V. (hereinafter also collectively referred to as the corporations) have only paid part of their daily takings into their accounts.

viii. In a fax, dated March 29, 2001, SFT Bank advised Kessock:
"Caribbean Bistros NV
(...) We hereby reiterate our offer to write off ANG 300,000 on this account subject to your acceptance of this proposal. If and when this takes place, no debit balances will be allowed on this account in the future.
Beach Bistros N.V.
(...) We are willing to grant a maximum credit balance of ANG 450,000 on this account for a period of 6 months subject to you granting us the fiduciary transfer of ownership on the assets of Beach Bistros N.V. and Caribbean Bistros N.V. (...)"
ix. On March 30, 2001, Kessock answered SFT as follows:
"1. SFT's offer of ANG 300,000 made to myself (...) contained only one condition; that I would transfer an amount of ANG 580,000. This was done. Having received the monies (...) you have now placed conditions on that offer, which are almost impossible to meet. Accordingly, I must again insist that the money be transferred as promised (...), prior to continuing any further negotiations. (...) Obviously, SFT's part of the bargain should be honored as promised.
2. The suggested debit balance for Caribbean and Beach Bistros are inadequate to allow us to continue to do business for the coming six months. The pledge of assets would be acceptable should SFT be willing to grant some leeway in these accounts. (...)"
x. On April 9, 2001, SFT obtained a prejudgment attachment of all the goods and moneys of Beach Bistros N.V. On April 20, 2001 both restaurants closed their doors. On April 27, 2001, SFT credited the account of Caribbean Bistros N.V. with the promised write-off of ANG 300,000. Shortly thereafter, SFT ended their relationship with both corporations.
xi. From the end of 2000, various offers were made for the purchase of the corporations. These offers did not result in an agreement until after the end of the relationship between the parties, albeit for a much lower amount than offered initially.
3.2. Kessock et al., in these proceedings claim the payment of compensation from SFT for an unlawful act and/or a breach of contract. The court dismissed the claims. The Court of Appeals confirmed this judgment. In doing so, the Court of Appeals, after referring in its Grounds for the Decision 4.2, to the judgments HR December 2, 1994, no. 15511, NJ 1995, 288 (Poot/ABP) and HR June 15, 2001, no. C99/301, NJ 2001, 573 (Chipshol), considered the following, among other things:
"4.3. In this case, Kessock et al. specifically blames SFT Bank for not immediately (but on April 27, 2001 instead) writing off (forgiving) ANG 300,000 (the debit balance of the account, other than a minor sum), after Michael William Kessock deposited ANG 580,000 into the account of Caribbean Bistros N.V., that SFT Bank did not make available lines of credit totaling ANG 1.2 million to the two bistros, that SFT Bank froze the accounts (in the sense that credit was limited to the balances outstanding as at March 15, 2001) without giving the bistros a reasonable period of time to find another financial institution willing to provide credit facilities, that (related to the latter), SFT Bank, contrary to arrangements, set new conditions relating to the provision of credit facilities, that after the credit facility agreements were terminated, the SFT Bank issued and later executed a warrant of attachment, and the SFT Bank has prevented the sale of the bistros as going concerns.
4.4. These facts and circumstances contain a potential breach of contract or carelessness towards the "corporations, but not (also) specifically against the shareholders. Kessock et al. have not provided sufficient, particular facts and circumstances for that to be the case. That one of the shareholders (Michael William Kessock) deposited ANG 580,000 in the account of Caribbean Bistros N.V. and has presumably created a claim against Caribbean Bistros N.V. as a result, is not enough in itself. Large shareholders, who are also directors, will often make financial injections into corporations (cf. the payment for shares in HR July 14, 2000, NJ 2001, 685, Van de Mosselaar, grounds for decision 3.6.3). The SFT Bank required the corporation to reduce the overdraft on the account. The deposit of ANG 580,000 was matched by a write-off of the company's debt of ANG 300,000, which was a benefit to the equity situation of the corporation and indirectly for that of the shareholders (since a financial collapse was not yet expected at that point in time)."
3.3. Section 1 of the appeal, complains about the opinion of the Court of Appeals that Kessock et al. did not convincingly argue that SFT had committed an unlawful act or a breach of contract against them. This complaint is justified. Kessock et al. submitted the following, among other things, during the examination of the facts:

- That SFT had made arrangements with Kessock in his private capacity, including the settlement of the debit balance by Kessock in the amount of ANG 580,000 and a declaration of joint and several liabilities by Kessock for the debit balances of the corporations, above the amount of ANG 1.2 million.

- That SFT, based on these arrangements, would forgive the corporations the amount of ANG 300,000 and would approve credit facilities to a maximum of ANG 1.2 million;

- That Kessock et al., based on these arrangements could be confident that they would have approximately six months to sell both restaurants as 'going concerns';

- That SFT has acted contrary to these arrangements and as a result has betrayed the confidence created on the part of Kessock by freezing the outstanding balances after Kessock had deposited ANG 580,000, and by not proceeding with the writing off of the ANG 300,000 immediately after the deposit of ANG 580,000, but instead doing so after the restaurants had to close their doors, and by subsequently ending the financial relationships between the corporations;

- That Kessock et al., as a consequence of these acts on the part of SFT, sold their shares in the corporations for a significantly lower amount than would have been the case otherwise, a loss for which they hold SFT responsible.

These assertions can, in principle, support a claim on the grounds of a specific, unlawful act or a breach of contract, committed against Kessock et al. specifically. What is important in this respect, is that the Court has decided on the one hand that SFT has acted unlawfully against Kessock et al., by freezing their lines of credit in the manner in which they did (Grounds for Appeal 6.2), a judgment against which SFT's grounds for appeal II are directed, and on the other hand, has rejected the assertion by Kessock et al., that SFT had promised both corporations to make available open lines of credit of ANG 1.2 million (Grounds for Decision 5.2), a judgment against which grounds for appeal VII from Kessock et al. is directed. However, the Court of Appeals did not deal with either of those grounds for appeal, leaving open the possibility on appeal to the Supreme Court, that SFT acted unlawfully or in breach of contract on both counts. In this light, there is either an error in law or the opinion of the Court of Appeals in Reasons for Decision 4.4, that Kessock et al. have not made their case, is difficult to understand. The matters subsequently considered by the Court of Appeals in the Reason for Decision 4.4-4.6, does not change this, since the matters considered there, having regard to what Kessock et al. submitted in the appeal to the Supreme Court, does not exclude the possibility that SFT has acted contrary to the arrangements made or the expectations created.

3.4. Section 2 of the appeal is directed against the Reasons for Decision 4.7–4.10, in which the Court of Appeals considered that 'in addition to the foregoing,' Kessock et al. only claim 'incidental damages' and no 'direct loss,' that the 'incidental damages' became definite because the claim against SFT by the corporations, for the payment of compensation for these damages had been dismissed by the court (in earlier proceedings), a decision that the corporations had accepted, and that the 'incidental damages' becoming definite does not in itself deem the actions on the part of SFT vis-à-vis Kessock et al., unlawful. The section complains that the Court of Appeals has thus erred in its opinion that the granting of the claim by Kessock et al. is prevented by the fact that it relates to 'incidental damages,' and further argues that the fact that the 'definite' character of the loss has also been caused by the now irreversible acceptance by the corporations of the dismissal of the legal claim, does not automatically prevent the granting of the claim by Kessock et al. either.

The section is based on an incorrect reading of the relevant considerations of the Court of Appeals and therefore misses the factual basis. The Court of Appeals did not deny that Kessock et al., as shareholders of the corporations, are able to claim damages from SFT for the reduction in value of their shares in the corporation ('incidental damages'), if they suffered such a loss as a consequence of SFT's breaching a specific duty of care towards them (cf. HR December 2, 1994, NJ 1995, 288 and HR February 16, 2007, no. C05/173, NJ 2007, 256 (Reasons for Decision 3.3 under (c)). Nor has the Court of Appeals denied that the payment of compensation for such losses is not prevented by the losses for the corporations becoming 'definite' based on a claim from the corporations for the payment of damages that has been rejected by a court and that the corporations have accepted this. In this respect, the Court of Appeals has only decided (Reasons for Decision 4.9) that the 'incidental damage' becoming definite, because the corporations are now unable, or have rendered themselves unable, to claim compensation, does not in itself have the effect that SFT's conduct with regard to Kessock et al. must be deemed unlawful. This decision is correct (refer Reasons for Decision 3.4.4 of HR June 15, 2001, no. C99/301, NJ 2001, 573). Therefore, this section fails.


**4. Decision:**
The Supreme Court of the Netherlands:
overturns the judgment of the Joint Court of Justice of the Netherlands Antilles and Aruba, dated December 13, 2005;
refers the proceedings to the Court of Appeals for further hearing and decision;
SFT is ordered to pay the cost of these proceedings in cassation (…; Ed.)


**Note:**
1. What makes the decision of the Supreme Court in this Antillean issue so interesting, is the attention that is given to the tenet of incidental damages. What is important for the Supreme Court's case law on this tenet, is the judgment HR December 2, 1994, NJ 1995, 288 (Poot/ABP), after which this difficult material has been given further form in various judgments. For an accurate analysis of this development, see: M.J. Kroeze, incidental damages and derived proceedings (diss.), Deventer: Kluwer 2004; L. Timmerman, Hartkamp and incidental damages, in: Hartkampvariaties, Deventer: Kluwer 2006; and J.M.M. Maeijer in his note with HR February 16, 2007, NJ 2007, 256 (Gebroeders Tuin Beheer/Houthoff Buruma). In numbers 2–6, I am taking a run-up for the jump to the judgment in question here, which I will explain in numbers 7–10 below.
2. When a corporation suffers a financial loss because of the actions of a third party (which may include the general manager of the corporation, see HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma), Reason for Decision 3.3 sub-section d), the loss, as long as no compensation has been paid, will usually result in a reduction of the value of the shares in the corporation. In HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma), Reason for Decision 3.3 sub-section c, the Supreme Court mentions "(may) result." For this nuancing in a critical sense, see M.J. Kroeze in his notation sub-section 1 with the judgment in Corporate Law 2007, 220. These 'loss of value' damages, which are suffered by the shareholder (and which are a flow-on from the financial loss that the corporation itself suffers), is sometimes referred to by the Supreme Court as 'incidental damages.' See HR November 29, 1996, <<JOR>> 1997/26 (Dohmen/Amersfoortse Algemene Verzekeringsmaatschappij), Grounds for Decision 3.3

and HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma), Reason for Decision 3.3 sub-section c; cf. HR October 13, 2000, NJ 2000, 699 (S./Sobi), Reason for Decision 3.5 in the case of a corporation. If the financial loss of the corporation has been compensated, then logic suggests that there will be no loss to the shareholder as a consequence. If it relates to damages that the shareholder has not suffered through his or her connection with—the assets of—the corporation, but suffers directly, than it is not a matter of incidental damages.

3. Since its standard judgment in 1994, which may safely be regarded as a foundation for today's Corporate Law in the Netherlands, the supreme Court has repeatedly made it clear that the shareholder who suffers incidental damage cannot, in principle, succeed in making a claim for compensation of his or her own against the third party that caused the damage to the corporation. Such a claim requires additional circumstances. The shareholder can only have a claim against such a third party if the loss is the consequence of a breach of a specific duty of care against them, according to these previous decisions. It also generates an image that a breach of such a specific duty of care (as well), is not often the case. To illustrate the point, I refer to HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma), Reason for Decision 3.3 c-d, 3.5, which says the following: The only circumstance, that a foreseeable consequence of the actions of the third party, i.e. that the shareholder would be disadvantaged, does not mean that the third party breached a specific duty of care towards the shareholder in that capacity; the latter also applies if the third party unnecessarily and unwittingly caused the bankruptcy of the corporation for his own gain; if the third party acts in this manner, it will lead to a reduction in value of the shares in the corporation, or even a total loss of their value, and therefore to an incidental loss for the shareholder(s) of that corporation; if no additional circumstances have been put forward, such as an intent to disadvantage this shareholder in this way, it cannot be argued that the director thus also breached a specific duty of care towards the shareholder. Cf. about intent to disadvantage, as early as Advocate General Hartkamp in 12 sub-section c for HR December 2, 1994 (Poot/ABP). For details of provisional intent, see Maeijer in, for example his notation, sub-section 3 with HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma) and others.

4. In their notation with HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma) in <<JOR>> 2007/112, W.J.M. van Veen and T.H.M. van Wechem ask themselves whether the Supreme Court, in referring to intent to disadvantage, means that the obligation to pay compensation for incidental damages exists in the case of intent, but that it may also exist in other cases, or, that it expresses the principle need for 'intent,' for the payment of compensation of incidental damages, and that it is also possible in very unusual situations where intent is absent. The have made it known that they are inclined towards the latter. It escapes me, on what they base this. The Supreme Court does not say more than what is written down, namely that if no additional circumstances have been put forward, such as an intent to disadvantage this shareholder in this manner, it cannot be argued that the third party has also breached a specific standard of care towards the shareholder. In the case of actual intent to disadvantage, it will generally involve a breach of a specific standard of care, but I cannot imagine any other angles. Furthermore, in the case of an actual breach of a specific standard of care, is there really a duty of care relating to incidental losses, such as Van Veen and Van Wechem suggest in both possibilities? The Supreme Court is not entirely clear about his in their annotated judgment. See Kroeze (2007), 220 and Timmerman (2006), 134–136 and others who are taken by this supplementary opinion. In B.F. Assink, a judicial review of the conduct of directors—Within Corporate Law in the Netherlands and Delaware (diss.), Deventer: Kluwer 2007, 113, I deliberately left open the possibility of this—supported by Kroeze and Timmerman—nuanced approach, in which all circumstances of the case are taken into consideration, making a tailor-made solution possible. See number 8-9 below.

5. I regard the term 'incidental damages' in this context, as being a loss consisting of a the reduction in value of the shares in the corporation (and therefore a loss that passes through the equity of the corporation), which the shareholder him or herself suffers, since this is a reduction in the value of his or her wealth. The incidental damage is a personal loss to the shareholder, the reverse does not apply: if the shareholder suffers a direct loss, this loss does not run through—the equity of—the corporation, then the loss is also a personal loss, but not an incidental loss. An example of a personal and not an incidental loss, is a loss that the shareholder suffers because of a misleading prospectus, as a result of which he or she buys shares in a corporation at too high a price. Cf. prospectus liability HR November 7, 1997, NJ 1998, 268 (Philips Electronics/VEB) and others. Cf. the dichotomy of incidental and direct damages HR May 2, 1997, NJ 1997, 662 (Kip/Rabobank) and the view of Kroeze (2004), 79-80 of same. It follows from the foregoing that a financial loss of the corporation will—also—result in an incidental loss for the shareholder, but is a direct loss for the corporation. The question of whether a shareholder is independently entitled to claim payment of damages for incidental losses, in principle receives a negative answer, on the grounds of particularly pragmatic/practical considerations. See in detail Kroeze (2004), 37 et seq. For this independent entitlement to exist, requires that a third party—at least—commits a breach of a specific standard of care towards the shareholder in that capacity: the shareholder cannot simply run this along the line of, for example, an unlawful act committed against the corporation. Of course, whether a specific standard of care has been breached, cannot be determined with a magic formula, although intent to disadvantage the shareholder, once established, will usually lead to that conclusion (see number 4 above). This, I think is the crux of incidental damages from the Supreme Court's precedents.

6. If I am right, then recently A.J.P. Schild conceptualized it somewhat differently in his notation with HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma) in Bb 2007, 193, 198-199. He is of the opinion that incidental damages are losses suffered by the corporation, and that the shareholder can never make a claim for payment of incidental damages. If a third party acts unlawfully against a shareholder in particular,

then the shareholder *can* make a claim for the payment of compensation, but, in that case, it involves "direct losses, which in some circumstances may correspond with a drop in value of the shares." The approach by van Schild, which I consider less pure, is not an easy fit with the approach that the Supreme court appears to be taking. The Supreme Court does not, in my view, assume that the shareholder does not suffer a loss him or herself (consisting of a reduction in the value of the shares as a consequence of a financial loss caused to the corporation) until an unlawful act is committed against him or herself specifically, but that if the shareholder suffers a consequential loss (i.e. as a consequence of a reduction in value of the shares because of a financial loss that the corporation has suffered), he or she is not entitled to a claim for compensation (even if there is a personal loss), unless there exist special circumstances. Be that as it may, the nature of the loss must be separated from the entitlement to make a claim for compensation. See, for example, the matters set out under 3 above, regarding the judgment annotated by Schild (in which the Supreme Court, in Reasons for the Decision 3.3 sub-section c, emphasizes that in "HR November 29, 1996, no.16136, NJ 1997, 178, the loss suffered by the shareholder as a consequence of a reduction in the value of his/her shares in the corporation, is called an 'incidental loss.' Cf. on incidental and direct losses, Kroeze (2004), 10-11, 17-18, 23-25. See numbers 9-10 below.

7. Next, the Supreme Court's judgment in question here, which I am viewing against the background of the foregoing. For the sake of brevity, I refer to Grounds for Decision 3.1-3.2 for the facts.

8. Section 1 of the Ground for Appeal successfully argued that the Court of Appeals has erred in its judgment that Kessock et al. has not plausibly argued that SFT Bank had committed an 'unlawful act or breach of contract' specifically against them, as asserted by the petitioners (see Ground for the Decision 3.3). Because the Court of Appeals did not deal with two of the grounds for appeal, it left open the possibility of an appeal to the Supreme Court that SFT Bank committed an unlawful act or a breach of contract on both points, so that the assertions made by the petitioners in the first instance, could, in principle, support a claim on the grounds of an unlawful act or breach of contract, according to the Supreme Court (following on from the Advocate General). These assertions are, in essence, that the bank acted contrary to the expectations created/arrangements made. The strong factual character of this reasoning, does not alter the fact that the Supreme Court does not touch on intent to disadvantage, much less that it is a more or less a required condition for accepting that a specific standard of care towards the petitioners has been breached. In this case, this breach of a standard can be hidden in both an unlawful act and in a breach of contract. It has been my experience, that in practice with the tenet of incidental damages - to which the Supreme Court in its Grounds for the Decision 3.3 does not refer by the way, and I emphasize this—usually the first possibility gets a run.

9. Section 2 of the grounds for appeal in cassation argues without success, because it is based on an incorrect reading of the judgment handed down by the Court of Appeals, a) that the Court of Appeals' view, incorrectly states that the granting of the claim by the petitioners is being prevented by the fact that it relates to incidental losses and b) that the definite character of the losses—caused in part because the dismissal of the claim by the two corporations is final—does not automatically prevent the granting of the claims by the petitioners (see Grounds for Decision 3.4). I will split this into a) and b).

a. The parts of the considerations of the Supreme Court in sub-section a) worth mentioning is that they again narrowly describe the incidental loss as a decrease in the value of the shares in the corporations, for which the petitioners, as shareholders, can claim compensation from the bank. In doing so, the Supreme Court limits the tenet of incidental damages. Cf. for example HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma), Grounds for Decision 3.3 sub-section c in conjunction with. 3.9, in which, taking one thing and another, the Supreme Court considers that the reasoning contained in HR December 2, 1994 (Poot/ABP) does not—also—apply if the shareholder claims payment of compensation for a loss suffered other than through the reduction in the value of his or her shares in the corporation (we are justified in asking whether this is not the case here, see number 10 below). The Supreme Court, of course, mentions that the loss does have to be the consequence of a breach by the bank of a specific duty of care owed to the petitioner. I am not clear from this either, whether the Supreme Court, in the case of such a breach, will leave unimpaired the entitlement to claim compensation, or whether it should be followed by an assessment of 'all circumstances of the case,' via—in essence—the link with reasonableness (correction) (see number 4 above). I certainly do not get the impression from the judgment in HR February 16, 2007 (Gebroeders Tuin Beheer/Houthoff Buruma), Ground for Decision 3.3 sub-section c, that the Supreme Court attaches a lot of importance to such a supplementary assessment. However, I note, that where it was considered earlier this year, that the shareholder is only entitled to compensation for the loss he or she has suffered in that capacity, if the loss is the consequence of a breach of a duty of care owed to him or her, it in this case considered that the petitioners as shareholders were able to claim compensation for the abovementioned incidental loss, if they suffered this loss as a consequence of a breach of a specific standard of care owed to them. This, to me, seems like a summary qualification. I would welcome a real and substantial clarification in the future.

b. In sub-section b), the Supreme Court refers to the fact that the loss for the corporations became definite (because the corporations had accepted the court's dismissal of their claim for compensation), and was of the opinion that the Appellate Court did not repudiate that this fact 'did not prevent' the payment of compensation for incidental damages. It seems to me that this fact is a pre-eminent example of a factor that ought to be considered in a supplementary multi-factor assessment such as touched on in sub-section a) and number 4 above, if the Supreme Court accepts it. See Timmerman (2006), 134-136 and others. The only thing that the Court of Appeals has assessed correctly in this respect, according to the Supreme Court, is that the abovementioned fact in itself does not mean that the conduct of the bank vis-à-vis the petitioners has to be deemed unlawful. The final conclusion is no surprise: after all, the alternative is as different as chalk and cheese. See also HR June 15, 2001, <<JOR>> 2001/172 (Chipshol/Coopers & Lybrand), Grounds for Decision 3.4.4, to which the Supreme Court also refers (see also the Advocate General in 3.2 for the judgment).

10. According to the Advocate General, this case does not relate to any loss on the part of the petitioners running through—the equity of—the corporation, but a direct (and therefore: not an incidental) loss on the part of the petitioners (see the Advocate General in 4.14 and 4.17 for the judgment) cannot deduce from Grounds for Decision 3.3-3.4 that this opinion is conveyed herein. The Supreme Court, who, in parrying the second section of the grounds for appeal, placed Grounds for Decision 3.4 expressly in the 'incidental damages' slot, appear to be avoiding this point. However, I did read in Grounds for Decision 3.4, that the Supreme Court regards incidental damages as defined by them, as personal damage to the shareholder, even if there has not been a breach of a standard of care specifically against them (see numbers 5-6 above).

11. Finally. The foregoing deals with incidental damages, not a derivative suit. A derivative suit is not recognized under current Dutch corporate law, although its introduction is being advocated. See Kroeze (2004) for example. I refer to the letter from the Minister for Justice to the Lower House, dated November 12, 2007, Lower House, parliamentary year 2007-2008, 29 752, no. 5, 3 (titled 'Modernizing corporate law'), which suggests that this subject has not been taken from the agenda (and which also refers to the 'business judgment rule' and its possible introduction), even though it is not set out very clearly. I will confine myself to the remark that the more the regulation of corporate governance (for example where it involves conflict of interest issues) tends towards personal liability towards the corporation, the more important the introduction of derivative suits in Dutch corporate law becomes. It then makes sense to equip Dutch corporate law with this facility and to offer shareholders of companies—subject to conditions—the opportunity to put corporate governance before the courts for assessment, in the interest of the corporations. 2:9 Civil Code proceedings See Assink (2007), 621-622.

Bastiaan F. Assink, Barrister with NautaDutilh NV in Amsterdam

**Footnotes**

[1] The facts have been taken from the Grounds for Decision 3.1 to 4.16 of the decision of the Court of the First Instance of the Netherlands Antilles, sitting in Curacao, dated January 17, 2005 (AR 785/2003). The facts under 4.1 to 4.16, have been adopted by the Court of Appeals (see under 3) in the disputed judgment. The facts as established by the Court of the First Instance, under 3.1 and 3.2 (shareholder status of the petitioners) were not disputed in the Supreme Court Appeal (source: the court).

[2] See the judgment of the Court of the First Instance, dated January 17, 2005, under 3.1, last line (source: the court)

[3] See the judgment of the Court of the First Instance, dated January 17, 2005, under 3.2, last line (source: the court)

[4] Exhibit 3, with statement of defense (source: the court)

[5] The disputed judgment was handed down on December 13, 2005. Art. 4 of the statutory provisions extending the Supreme Court's competence of cassation for the Netherlands Antilles determine that the period for a cassation appeal in this case is three months. The request for cassation was received by fax at the registry of the Supreme Court on March 13, 2006 (source: the court)

6 HR December 2, 1994, NJ 1995, 288 m.nt. Ma (Poot/ABP), rov. 3.4.1 *(source: the court)*

7 HR February 16, 2007, LJN: AZ0419 (Tuin Beheer), rov. 3.3, NJ 2007, 256 m. nt. Ma *(source: the court)*

8 HR December 2, 1994, NJ 1995, 288 m.nt. Ma (Poot/ABP), rov. 3.4.1 *(source: the court)*

9 HR July 14, 2000, NJ 2001, 685 m.nt. Kortmann (Mosselaar/Lagero), rov. 3.6.4 *(source: the court)*

10 HR June 15, 2001, NJ 2001, 573 m.nt. Ma (Chishol), rov. 3.4.4 *(source: the court)*

11 HR October 13, 2000, NJ 2000, 699 m.nt. Ma (Heino Krause), rov. 3.3 *(source: the court)*

12 See under 1.5 of this rejoinder *(source: the court)*

13 See under 1.3 of this rejoinder *(source: the court)*

14 See under 1.4 of this rejoinder *(source: the court)*

15 See rov. 4.6 of the disputed judgment *(source: the court)*

16 See under 1.9 of this rejoinder *(source: the court)*

17 See under 1.10 of this rejoinder *(source: the court)*

18 Cf. HR May 2, 1997, NJ 1997, 662 (Kip/Rabobank) *(source: the court)*