EXHIBIT 6

RVDW 1997/118 c

*HOGE RAAD (DER NEDERLANDEN)*
**(NETHERLANDS SUPREME COURT) (HR)**
2 May 1997, no. 16249
(counsels Snijders, Korthals Altes, Neleman, Heemskerk, Jansen).
NJ 1997, 662

*Rv.* (Civil Procedure) **art. 67; BW** (Burgerlijk Wetboek) (Dutch Civil Code) **art. 6:162**

[In Essence] **Tort by bank towards former shareholders of company recipient of financing. Compensation for material and non-material damage. No final judgement.**
The basis for the claim is of an entirely different nature than in HR 2 Dec. 1994, NJ 1995, 288 (Poot/ABP).
The Court of Appeal has based itself on an erroneous interpretation of the law by deciding not to examine in conjunction all events of tortious acts towards appellants, but rather to split up their respective assertions into acts on the part of the bank that - primarily – affected the Group and acts on the part of the bank directly towards appellants, and to subsequently rule that due to the aforementioned Judgement appellants cannot invoke first-intended acts. Further, the Court of Appeal's ruling as to appellants being bound to the decision of the Court in Amsterdam is erroneous, as this does not concern an action between the same parties as defined in art. 67 *Rv.*
[Text] 1. Lambertus Kip, and
2. Berendina Geertruida Sloetjes, spouses, both in Winterswijk, appellants in cassation, counsel mr. E. Grabandt,
against
De Coöperatieve Raiffeissen-Boerenleenbank Winterswijk BA, in Winterswijk, respondent in cassation, counsel mr. J.L.W. Sillevis Smitt.
**Court of Appeal:**
*Ruling on the dispute in appeal*
*in the appeal on merits and in the appeal on procedural matters.*
1. As a result of the reciprocally asserted grievances, the dispute is submitted to the Court of Appeal in full scope. The Court of Appeal will therefore subject the matter to review.
2. Kip claims compensation on the grounds of alleged tortious acts on the part of the bank. According to Kip, this damage consists of devaluation of his shares in the Elka Group, which shares he was compelled to sell at a depressed value, and of non-material damage with regard to all the psychological injury caused to him by the bank.
3. Kip asserts that the bank has committed tortious acts towards him by:
   a) applying highly imprudent methods to furnish financing to the Elka Group;
   b) deciding on the credit restriction on 1 May 1980;
   c) cancelling the credit on 25 August 1980;
   d) exerting pressure on Kip to agree to a suspension of payment;
   e) exerting pressure on Kip to sell the Elka Group as on a "going concern" basis and agree to the sale of his shares in the Elka Group to Albada Jelgersma.
4. First and foremost, the bank argues the defence that as a shareholder of the Elka Group Kip cannot bring a valid claim for damage caused (according to Kip, but contested by the bank) by the bank to the Elka Group. In this context the bank refers to the recent Judgement of the *Hoge Raad* of 2 December 1994, NJ 1995, 288.
5. From this Judgement follows that tortious acts (if any) of the bank towards the Elka Group are in principle not also tortious towards Kip as shareholder, not either if it was foreseeable that the shares would decrease in value as a result thereof.
6. The acts alleged above sub 3. a) towards c) of the bank manifestly concern the relationship between the bank and the Elka Group and not the relationship between the bank and Kip in private capacity. As to the act defined sub 3. d), Kip may accuse the bank of exerting pressure on him to file for suspension of payment, however this concerns the suspension of payment of the Elka Group and therefore not the suspension of payment of Kip in his private capacity. This too concerns an act of the bank in the context of its relationship with the Elka Group.
   For aforementioned acts therefore the premise must be the ruling in aforementioned *Hoge Raad* Judgement.
   Such does not apply to the act stated sub 3. e), so that this one will be separately viewed below sub 10.
7. Kip pleads that the facts in abovementioned *Hoge Raad* Judgement are incomparable to the facts and circumstances in the present action. Kip arguing that his claim for compensation concerns his own damage, incurred by him as a result of dealing by the bank, and that therefore he does not claim the same damage as might be claimed by the Elka Group. Further, he points out that for his income and wealth creation he fully relied on the Elka Group and that in order to receive financing for the Group he pledged, also in private capacity, virtually all securities (surety agreement, assignments, mortgage as natural person). Cancelling the credit was directed also against him, as evidenced by the cancellation letter of 25 August 1980.

8.  The Court of Appeal rejects this plea. The asserted devaluation of the shares is, as evidenced by the underlying calculation, the difference between the value of the Elka Group in August 1980 shortly before the credit cancellation by the bank and the value of the shares late October 1989 at the sale of the Elka Group on a "going concern" basis. The value of the shares therefore cannot be regarded separately from the value of the Group. This means that, in the event of full compensation by the bank of the damage that it allegedly caused the Group, the value of the shares would not have decreased. In other words, the damage claimed by Kip as shareholder with regard to devaluation of his shares is materially to be equated with the claim that the Elka Group would have been able to institute. That Kip for his income and wealth creation relied entirely on the Elka Group is not a circumstance that entails that, for this reason alone, tort on the part of the bank towards the Elka Group is tortious towards him.

    As to Kip in private capacity having pledged securities for the credit granted to the Elka Group, it is conceivable that the bank has a specific duty of care towards Kip, but this fact has ceased, according to the Court of Appeal, to play a role now that the bank on the occasion of the shares sale discharged Kip from said securities and has not sued him in this regard.

    The Court of Appeal rejects the assertion of Kip that from the fact that he pledges securities in private capacity that there is a mixing of the capitals of the Elka Group and of him personally. This assertion is not supported at law. Not tenable either is the assertion of Kip that it follows from the fact that the bank demanded securities in private capacity that the bank allegedly regarded the Elka Group as a sole proprietorship. Nor does this follow from the fact that the letter by which the credit was cancelled was addressed not only to the Elka Group but also to Kip. This undoubtedly related to the fact that Kip in private capacity had pledged securities for the cancelled credit, but does not mean that bank did not distinguish between the capitals of on the one hand the Group and on the other hand Kip.

9.  The conclusion can only be that the asserted tortious acts on the part of the bank towards the Elka Group do not also produce a violation of the duty of care towards Kip, so that Kip as shareholder cannot bring a claim for devaluation of the shares.

10. Now will be reviewed the assertion (contested by the bank) of Kip that the bank committed tort towards him by pressuring him into selling the Elka Group on a "going concern" basis such by means of transferring the shares in the Elka Group to Albada Jelgersma.

11. Kip claims – as considered above – damage due to devaluation of his shares in the Elka Group. This devaluation equates according to Kip the difference between on the one hand the value of the shares in the Elka Group in August 1989 shortly before the sit-down strike organized by the FNV (Dutch Trade Union Federation) and the credit cancellation by the bank, such estimated by the experts in the action Kip against FNV, and on the other hand the monetary amount he received at the sale of the shares as at late October 1980. From this difference must be deducted the amount of NLG 40,000 paid by the FNV under the order pronounced by the Court of Appeal in Amsterdam by Judgement of 21 December 1989.

12. On this same damage, resulting from devaluation of the shares, the Court in Amsterdam, in afore-intended action Kip against FNV, ruled in aforementioned Judgement. Taking into account the purchase price that Kip had received from Albada Jelgersma, the Court in Amsterdam irrevocably determined this damage at NLG 400,000.

    As Kip holds both the FNV and the Bank liable for the damage resulting from the devaluation of his shares, these are both severally liable. Therefore, as a result of the compliance by the FNV, the bank is discharged towards Kip. Cf. articles 6::102 and 6:7 BW, comprising also the statute law applicable to this matter before 1 January 1992.

    This means that Kip in this action against the bank cannot claim compensation of the same damage again, as this has already occurred through the payment of the amount of NLG 400,000 by the FNV.

13. The above does not detract from the fact that Kip in Statement of Defence asserts that his damage is considerably higher than NLG 2,800,000 which is the sum the damage was appraised at by the experts. For, he based his damage claim against the bank on this report and on the value of those shares as at 25 August 1980. However, in such an event it must be considered that with respect to the value of those shares on stated date, the Court in Amsterdam chose to depart from the calculation of the experts and make its determination, which is binding on Kip.

14. The Court of Appeal rejects the assertion of Kip that the Court in Amsterdam determined not the full damage but only the portion of the damage that is for account of the FNV. Having ordered Kip, in provisional judgement of 23 March 1984, to bring proof that the shares sale to Albada Jelgersma on 28 October 1980 can reasonably be attributed to the FNV, the Court in Amsterdam subsequently ruled, in Judgement of 9 April 1987, that Kip succeeded in bringing this proof and that this share transfer is not – also – the legal consequence of acts by the bank. Thus, solely the FNV is deemed liable for the *full* damage resulting from shares sale to Albada Jelgersma.

15. Equally erroneous is the assertion of Kip that the Court in Amsterdam has determined the damage at a considerably lower amount than the actual damage. Though according to Kip the actual damage is an amount of NLG 2,800,000 as calculated by the three experts appointed by the Court in Amsterdam, he ignores the fact that the Court in Amsterdam, on the basis of a number of circumstances described in the Judgement, perceived cause to depart from the calculation of the experts and subsequently arrived at its own determination of the value of the shares as at August 1980. So, it cannot be argued that the Court failed to determine the entire damage.

16. The afore going concerns the value of the shares as at August 1980. In the present action however, in view of the considerations sub 9 and 10, only the asserted tortious act on the part of the bank towards Kip as at late October 1980 can be included in the review. In that event, relevant is the value of the shares as at late October 1980. Only if that value would be higher than the value as at August 1980, there might be cause to order the bank to pay compensation. But this circumstance does not apply. Kip himself has repeatedly asserted that the value of the shares then, as at late October 1980, had dropped dramatically as a result of the suspension of payment.

17. The conclusion can only be that the damage regarding the devaluation of the shares in the Elka Group has already been compensated, so that Kip can no longer bring a claim for that same damage.

18. The claim for non-material compensation has been substantiated by Kip as follows. He asserts that as a result of the tortious acts on the part of the bank he has suffered great (psychological) damage, having been compelled to sell (his shares in) the Elka group. This business was his life's work which he had built from scratch and in which he found fulfilment. The business was his source of income and in his private ownership. As a result of the tortious acts on the part of the bank, Kip incurred psychological damage preventing him from building a new business. As a result of the traumatic experiences, he was compelled to submit to psychiatric treatment.

19. It follows from above considerations that a tortious act on the part of the bank towards Kip can apply only in so far it concerns pressuring Kip to enter into the transaction with Albada Jelgersma. This specifically concerns the proceedings at the offices of the bank on 27 and 28 October 1980. Under the old statute law, valid prior to 1 January 1992, applicable to this matter there is a plausible case to answer, subject to circumstances, for compensation of non-material damage in the event of (grave) personal injury. In so far as there is anything in the assertions of Kip from which to deduce that he has suffered grave personal injury, this injury is not specifically attributable to the acts of the bank on 27 and 28 October 1980, but rather to the whole complex of factors that lead to a situation whereby he lost control of and his financial stake in the Elka Group. Admittedly, the way can be criticized in which the bank treated Kip at the time, but the resultant suffering cannot be regarded as such a personal injury that it requires cash compensation.

*Conclusion*

The claim of Kip must be denied. The judgement being appealed must be quashed, and Kip as the party ruled against must be ordered for costs in both instances.

(etc.)

**Ground for Appeal in Cassation**

Violation of statute law and/or failure, on penalty of being declared void, to observe prescribed forms, as the Court of Appeal considered and ruled as worded in the Judgement being contested in this action, such wrongfully for one or several of the following reasons, to be interpreted as appropriate in conjunction:

1. The decision of the Court of Appeal worded in r.o. (*rechtsoverweging* = legal ground) 5 through 9 is erroneous in law, at least not duly reasoned as required by law. The Court of Appeal erroneously ignores that there are, at least can be, tortious acts on the part of the bank towards Kip and associates, considering the involvement of Kip and associates in private capacity in the Elka Group, more specifically in the financing of that Group, and considering the integration of the financial position of Kip and associates with the financial position of the Elka Group. Such as reiterated in the proceedings by Kip and associates, pleading various arguments (*cvr* = conclusie van repliek *in prima* (Statement of Reply in Counterclaim in First Instance), sub 5 and 6, and sub 22; motion 25 February 1993, sub 16, *mva* (memorie van antwoord) *in hoger beroep* (memorandum of reply in appeal pp. 7/8; defence motion in appeal on merits 18 April 1995, p. 2). In the decision of the Court of Appeal, specifically in r.o. 8, certain aspects are ignored; in particular the aspect of the circumstance that the integration, asserted by Kip and associates, of the capital position of the Elka Group and that of Kip and associates can entail that, even if the asserted damage incurred is based on a devaluation of the shares, the situation involves tortious acts on the part of the bank towards Kip and associates.

   Kip and associates have argued that they relied for their income and wealth creation on the Elka Group; in private capacity securities had been pledged to finance the Elka Group including surety agreement, assignments and mortgage in private capacity. Such aspects, combined with the fact that the bank furnished the financing for Kip and associated also in private capacity, makes for a situation whereby there was such a degree of integration of Kip an associates and the Elka Group (cf. *mva in hoger beroep* p. 7/8) that it cannot be ruled out (on the basis of the grounds applied by the Court of Appeal) that the acts of the bank produce tortious acts also towards Kip and associates in private capacity.

2. Erroneous, at least incomprehensible and not duly reasoned as required in law, is furthermore the statement in r.o. 6. second sentence; the bare circumstance that "it concerns the suspension of payment of the Elka Group and therefore not the suspension of payment of Kip in private capacity" does not detract from the fact that pressurizing Kip and associates to agree to filing for suspension of payment can produce tortious acts on the part of the bank towards Kip and associates; the circumstance that this concerned the suspension of payment of the Elka Group and that this too involved (in the view of the Court of Appeal) an act of the bank in the relationship with the Elka Group (see also r.o. 6) does not detract from the abovementioned.

3.  In r.o. 8 the Court of Appeal considers among other things:
    "In so far as Kip in private capacity has pledged securities for the credit granted to the Elka Group, it is conceivable that the bank has a specific duty of care towards Kip, but this fact in the view of the Court of Appeal has ceased to play a role since on occasion of the shares sale the Bank discharged Kip from that securities and has not sued him in this regard."
    Such is incomprehensible in the light of the pleas argued by Kip and associates purporting that they stood surety in private capacity, that they had mortgaged properties in private capacity to secure the debts of the business, that the acts of the Rabobank has had direct impact on the capital and income of Kip and associates, and that this was manifested most clearly by the pledging by Kip and associates on 18 August 1980 of mortgage security on four private properties with a foreclosure value of NLG 1,000,000, such without this furnishing of extra security resulted in increased credit, whereupon one week later, on 25 August 1980, the credit was cancelled by the Rabobank (stating that the value of the securities had dropped) whereupon this additionally furnished securities were foreclosed by the Rabobank (compare preliminary summons, p. 3; *cvr in prima* p. 15; exhibit 15c and exhibit 47 to *cvr in prima*; see also *cvr in prima* pp. 9 and 10; motion *in prima* 25 February 1993, p. 8, and *mva in hoger beroep*. p. 8). In the light of such, the Court of Appeal's ruling that the fact in question (Kip pledged securities in private capacity for the credit granted to the Elka Group) has ceased to play a role since on the occasion of the shares sale the bank has discharged Kip from this securities and has not sued him in this regard, is incomprehensible.

4.  In so far as in r.o. 6, first sentence, is to be read the decision that intended aspects (in part) prevent awarding the claim of Kip and associates, such is, without further argumentation, not readily comprehensible. In part considering the pleas by Kip and associates concerning their involvement in private capacity in (the financing of) the Elka Group, the circumstance that the allegations intended in r.o. 3 sub a. through c. regard the relationship between the bank and the Elka Group does not, at least not without due argumentation which is absent in the Court of Appeal Judgement, provide sufficient reasons for the conclusion by the Court of Appeal, considering the plea by Kip and associates that the imprudent method of financing, plus the credit restriction of 1 May 1980, as well as the cancelling of the credit on 25 August 1980, negatively impacted on the financial situation of Kip and associates in private capacity (Kip and associates stood surety in private capacity for the debts of the Elka Group, and had pledged in private capacity the requisite securities). The bare circumstance that the intended alleged acts concern the relationship between the bank and the Elka Group does not automatically imply that in the circumstances of this case, in view of the involvement of Kip and associates in private capacity, that such aspects prevent awarding the claim of Kip and associates, at least that the situation does not involve tortious acts on the part of bank towards Kip and associates in private capacity.

5.  In so far as in r.o. 12 through 17 of the Judgement *a quo* is to be read that the Court of Appeal in the present action adjudges the ruling referred to in intended r.o. in the action of Kip and associates against the FNV to be final and conclusive, such is erroneous in law, since the situation does not involve "another action between the same party" in the meaning of article 67 *Rv*. In so far as the Court of Appeal might hold on any other legal ground that the decision in the action of Kip and associates against the FNV is binding in any form, is such erroneous in law because this is not supported at law. This action is about the question which damage Kip and associates have incurred due to imputable acts on the part of the bank; that this damage is set at a lower value because Kip and associates received under different title, i.e. from the FNV pursuant to aforementioned action, any sum in payment does not alter this. The aforementioned renders invalid all the considerations in r.o. 12 through 15.

6.  In so far as the Court of Appeal in r.o. 14, last sentence, arrives at the concision that in the earlier action between Kip and associates and the FNV it was ruled by the Court in Amsterdam that "solely the FNV (was) deemed liable for the *full* damage resulting from the shares sale to Albada Jelgersma", such is incomprehensible, since such is not to be read in that Judgement, or in any other Judgement of the Court of Appeal in Amsterdam (the judgements have been submitted as Exhibits to *cvr in prima*).

7.  The decision in r.o. 16 is erroneous, at least incomprehensible and insufficiently substantiated, on the basis of the assertions above sub 1 through 4.

8.  The decision in r.o. 18 and 19 is erroneous in law, at least insufficiently substantiated in the light of the assertions of Kip and associates. First and foremost, erroneous in law is that which the Court of Appeal in r.o. 19, closing, decides; it is not clear that the suffering incurred by Kip and associates due to the method by which the bank treated Kip is not to be regarded as such a (grave) personal injury that compensation of the non-material damage incurred is possible and required (also under the law applicable in this matter). Further it is not clear that, even if other circumstances not due to the acts of the bank had co-contributed to the non-material damage incurred, there is no legal standing for a compensation of non-material damage to be ordered against the bank, since the (grave) personal injury in question is due in part to the acts of the bank.

9.   Erroneous in law is further the decision of the Court of Appeal in r.o. 19, first sentence. First and foremost, the consideration there is rendered invalid by the pleadings in earlier elements of this ground for appeal in cassation, in respect of which the Court of Appeal for that matter considered negatively. Moreover, it is not clear that there can be no tortious acts on the part of the bank towards Kip regarding the method by which the bank treated Kip (which lead to the consequences described in r.o. 18; cf. also *mva in hoger beroep* pp. 58 and 59), even if the earlier considerations of the Court concerning the allegations intended in r.o. 3 sub a thru d are accurate. The fact that the acts intended there in the view of the Court of Appeal concern the relationship between the bank and the Elka Group leaves intact that the treatment of Kip and associates in private capacity in the context of aforementioned aspects might be such that the situation involves a (grave) personal injury that may be cause for compensation of non-material damage incurred.

**Hoge Raad:**

*1. The action in fact-finding instances*

Appellants in cassation – hereinafter: Kip and Sloetjes; also to be referred to collectively as: Kip – did by writ of 10 April 1984 summon defendant in cassation – hereinafter to be referred to as: the Bank – before the Court in Zutphen, claiming that the Bank be ordered to pay compensation to Kip and Sloetjes of damage to be assessed by the Court and to be increased by the legal interest. By Statement of Reply Kip and Sloetjes amended their claim claiming the Bank be ordered to pay to Kip and Sloetjes a sum in the amount of NLG 3,400,000 with the legal interests as from 10 April 1984.

The Bank did not oppose the amendment of claim and contested the claim.

The Court by preliminary judgement of 15 July 1993, deferring any further decision, delivered the documents to parties for further documents to be introduced into the proceedings and affording parties the opportunity to debate the contents thereof.

The Bank appealed this preliminary judgement before the Court in Arnhem. Kip and Sloetjes appealed on procedural matters.

By judgement of 21 November 1995, the Court of Appeal quashed the contested judgement on contents and procedural matters and, re-administering justice, denied the claim.

(…)

*3. Review of the remedies*

3.1. In cassation the following can be presumed:

(i)     Kip and Sloetjes, married to one another in community of property, are, were, respectively, the incorporators, sole shareholders and sole directors of Elka Beheer BV. This company in turn was holder of all shares in two other companies, being Elka Onroerend Goed BV and Elka BV, of which last-mentioned company it was moreover director. Elka BV was the operating company, its business being wholesale and retail commerce, and the production, export and import of food and non-food items, specifically items customarily sold in department stores / supermarkets, while Elka Onroerend Goed BV provided the use of the buildings in which the activities were being performed.

(ii)    Since late 1975, the Bank alone furnished financing for Elka BV. At that time it furnished two loans of NLG 1,600,000 and NLG 550,000 with consistently an interest of 8.5% per annum variable, and furthermore a credit in current account of NLG 850,000 with an interest of 9.25% per annum variable. These were backed apart from security rights to goods owned by Elka BV proper (immoveable property, stock, machines, receivables, etc.), also security rights to immoveable property and to receivables in name of Kip in private capacity, and a surety agreement granted by Kip in private capacity.

(iii)   In 1977, Elka Bv acquired a former dairy plant in Aalten. Its plan was to refurbish this plant into among other things a department store, central warehouse and restaurant, and to establish in it its "head quarters". The Bank was aware of this acquisition and these plans and partly due to this furnished to Elka BV a refinancing in November 1977. This was effected among other things in the form of a loan granted to Kip in private capacity, as per statement of the bank in the amount of NLG 1,000,000, and comprised a total amount of NLG 6,500,000. Of this total sum, NLG 2,000,000 was earmarked for refurbishing the dairy plant in Aalten and NLG 885,000 for the (associated) expansion of inventory and stock. Such was secured in favour of the bank by first mortgage registrations on eight properties owned by Elka BV and on six properties owned by Kip and Sloetjes in private capacity, which registrations combined generated a cover of NLG 7,500,000 and furthermore by a surety agreement of Kip in private capacity up to NLG 3,000,000 and by additional securities as listed above.

(iv)    Whereas the refinancing originally had been furnished up to a limit of NLG 2,500,000 as current account credit, in 1978 the bank permitted Elka BV informally to exceed this limit by an identical sum (NLG 2,500,000). The facility thus furnished to Elka BV, which allowed the option of running up its current account debt with the bank up to NLG 5,000,000, was then renewed for 1979. In that same year, Elka Onroerend Goed BV and Elka Beheer Bv pledged surety towards the bank up to a sum of NLG 2,500,000 for the debts of Elka BV.

(v)     Elka BV sales rose year on year with every year profits being reported. In 1978 and 1979 this changed however. Because, even though in these years sales ex VAT were NLG 61,000,000, at least NLG 71,000,000, respectively, for 1978 for the first a slight loss was reported whereby the preliminary figures for 1979, being presented to the bank in April 1980, revealed a loss of NLG 800,000, a figure subsequently adjusted to NLG 657,519.

(vi)    It should be noted in respect of this loss that the percentage of debit interest due on the current account debt had risen considerably in 1979 and varied in 1980 between about 15% and about 18% per annum. Where the interest charges in 1978 owed by Elka BV to the bank was a total of as yet NLG 693,000, these interest charges in 1979, though the current account debt showed a descending trend, had risen by close to NLG 300,000 to NLG 991,000.

(vii)    Early 1980, according to statement by Kip, the mortgage debt of Elka BV to the Bank (under long-term loans) was NLG 2,775,000 with an annual 8.5% interest payable, in addition to which Kip (still) had a debt in private capacity to the bank of NLG 1,000,000. Whereas early April 1980, according to statement by the bank, the highest level of the – as mentioned above carrying a considerably higher interest charge – current account debt was NLG 6,209,147.22 and the lowest level NLG 5,000,775.21. However, requests by Elka BV to the Bank to permit transfer of the financing of the refurbishing costs in Aalten to the long-term loans carrying a lower interest rate were not accommodated.

(viii)   By letter of 1 May 1980, in connection with the aspects stated sub (v), the loss of NLG 800,000 (subsequently adjusted to NLG 657,519) reported to it in April 1980, the bank informed the management board of Elka BV that it regrettably had been informed that business in 1979 had been "lamentable" so that it was "now" compelled to presume that the created expectations had or, as the case might be, would "not be realized" and that therefore it entertained "grave doubts" as to "the continuity of your enterprise". There was according to the Bank "self-evident" that as a result of the losses incurred the ratio equity capital to borrowed capital had become "unacceptable". This was the reason that it, awaiting the final annual statements on 1979 and further meetings to discuss same, was "now" compelled to communicate to Elka BV that the credit over-extension had to be "gradually" phased out. This implied according to the Bank that the credit over-extension had to be phased out "by NLG 1,000,000 in May and by NLG 500,000 in the months of June up to an including September", so that "as at end September" it would have been completely cancelled.

(ix)     To meet the Bank's demands, Elka BV started reducing stock resulting in a situation whereby it could no longer purchase the same stock it did before. This caused a stand-still in its supplies and rumours that Elka BV was in difficulties. Plus, employees started to feel uneasy.

(x)      In the context of last-mentioned aspect, early June 1980 the FNV communicated its concerns to Kip about the economic position of Elka BV and furthermore by letter of 21 August 1980 issued a vote of no confidence in Elka BV (read: Kip), demanding that the management board would retire with immediate effect and sell the business in the shortest possible term. In this context, in case its demand were not met, it announced strike actions which would be accompanied by extensive publicity.

(xi)     After on 18 August 1980 by Kip four unencumbered properties had been mortgaged to the bank and Elka BV for this reason had received postponement until 31 August 1980 of the demanded credit reduction, the Bank did not await this and communicated by letter of 25 August 1980 to all three Elka companies "and/or" to Kip in private capacity, referring to "recent articles in the media", that in its opinion the securities in question had dropped in value and that for this reason it was compelled "to terminate effective today" the financing, including the credit and the over-extension, formally demanding "to clear aforementioned credit/over-extension" and furthermore claiming recovery of all securities.

(xii)    On 26 August 1980 followed in the branch of Elka BV in Aalten a sit-down strike organized by the FNV  The next day, 27 August 1980, by request of the bank Kip visited a regional office in Velp where the bank informed him that the best thing for him was to sell the Elka Group. If not, the Bank would have no other option than to foreclose the securities. Some days later, i.e. on 1 September 1980, the sit-down strike was ended after Kip had committed to transferring management powers with respect to Elka BV to another party.

(xiii)   Subsequently, the management powers with respect to Elka BV were indeed transferred to another party, being Custom Management BV, such in principle for a period of 14 days. Shortly after this, on 3 September 1980, by request of the new manager suspension of payment was granted to Elka BV and an administrator appointed, whereupon on 5 September 1980 the Bank granted a short-term preferential loan to a bankrupt estate in the amount of NLG 1,500,000, such to run to no later than 15 October 1980 and subsequently renewed until 24 October 1980. With the help of this short-term preferential loan the stock could be replenished.

(xiv)    As to the grounds on which the Bank decided at the time to grant this short-term preferential loan, the following. During a meeting on 2 September 1980, attended beside by Kip also by FNV people, it was communicated by the bank that the furnished securities "(were) greater than the creditors" and that for this reason a short-term preferential loan to a bankrupt estate would present "no problems". In a letter of 18 September 1980, from Ten Have's Groothandel Doetinchem BV and addressed to the administrator, it is furthermore stated that the relevant encumbered properties, which were appraised by real-estate broker Enning as at 17 September 1980 at a combined foreclosure value of NLG 8,960,000, had a "considerable surplus value" and that therefore their market value was even much higher.

(xv)     In the first half of October 1980, Kip on several occasions urgently requested the bank in writing not to compel him to sell the Elka Group. Minutes of an internal preliminary meeting of the Bank of 14 October 1980 however reveal among other things that in principle Kip would not be allowed any time to detail other plans.

(xvi)   Under a contract of 28 October 1980, Kip and Sloetjes sold their shares in Elka BV for a purchase price of NLG 400,000 to the private limited liability company Albada Jelgersma Holding BV, hereinafter to be referred to as Albada Jegersma, with additionally an annuity being assigned to Kip in the amount of NLG 8,012 per annum.

(xvii)  On 20 November 1980, Elka BV – undergoing the so-called "*sterfhuisconstructie*" (split-up of a company into viable and non-viable units) – was declared bankrupt. Thus fully redeeming the receivables of the bank with securities remaining. These remaining securities were released.

(xviii) Kip and Sloetjes did in connection with the above sue (two Unions of) the FNV for damages. They claimed compensation for the damage they had incurred because the acts of the FNV had forced them in such a precarious position that they were compelled to sell their shares in Elka Beheer BV at an excessively depressed price. After experts had assessed this damage at NLG 2,800,000, the Court in Amsterdam awarded an amount of NLG 400,000 plus interest, upon which an appeal in cassation by the FNV against this award was denied by the Hoge Raad (such by Judgement HR 19 April 1991, NJ 1991,690 .

3.2.    The claim above sub 1 serves to obtain payment by the Bank to Kip and Sloetjes of damages in the amount of the difference between the sums stated above sub 3.1. (xviii) for material damage (NLG 2,400,000) and further a sum for non-material damage (NLG 1,000,000), for which claim Kip and Sloetjes submitted, in succinct terms, as grounds that the acts of the Bank not only towards the Elka Group but also towards themselves were highly imprudent and have lead to a situation whereby they were compelled to sell their shares in Elka Beheer BV at an excessively depressed price to Albada Jelgersma, as a result of which they incurred in addition to material damage also personal injury, last-mentioned aspect due to traumas suffered. We deem liable for this damage beside the FNV also the bank.

3.3.    The Court deemed the Kip and Sloetjes claim awardable in principle. It judged, in succinct terms: that the skewed ratio between the long-term loans and the short-term current account credit, which credit was for the Bank "significantly profitable", had to be imputed in part to the Bank (*rov.* (rechtsoverweging = legal ground) 5.4); that also in connection with the credit restriction mentioned above in 3.1 sub (viii) also the bank was at fault (*rov.* 5.5); that the credit cancellation mentioned there sub (xi), in part considering the fact that the pledged securities were amply adequate to enable recovery of the total debt to the Bank, was tortious both towards the Elka Group and towards Kip and Sloetjes (*rov.* 5.6 and 5.7); that however the suspension of payment pronounced subsequently had ceased to be a damage increasing factor (rov. 5.8); that in the course of the sale of shares in Elka BV to Albada Jelgersma mentioned above in 31. sub *xvi) inappropriate pressure had been exerted by the bank on Kip and Sloetjes, and that, in so far as this "overzealous interference by the Bank" resulted in a situation whereby said shares were sold at an excessively low price, this had a direct relation with the tortious credit cancellation (*rov.* 5.9); that, however, Kip and Sloetjes were also to be blamed for the damage they incurred (*rov.* 5.10); that further examination was required as to the scope of the non material damage and the reciprocal indebtedness 9rov 5.11); and that the claimed non material damages could not be deemed awardable (*rov.* 5.12). restored the case to the case list to allow introduction into the proceedings of the complete expert testimony including all associated documents and to allow parties to resume the debate on this basis.

3.4.    The Court of Appeal, having ruled that the grievances in the dispute shall be addressed in their full scope, following appeal on merits by the Bank and appeal on procedure by Kip and Sloetjes, quashed the judgement of the Court and denied the claim of Kip and Sloetjes. The underlying grounds, in succinct terms and in so far as pertinent at this juncture, came down to the following:

    (a)   From the Judgement of HR 2 December 1994, NJ 1995, 288, follows that (any) tortious acts on the part of the Bank towards the Elka Group is in principle not also tortious towards Kip and Sloetjes as shareholders, not either if it could have been foreseen that as a result their shares would decrease in value. The allegations of Kip and Sloetjes, in so far as they relate to the role of the Bank with respect to the financing of the Elka Group, regarding the credit restriction and credit cancellation it was notified of and regarding the acts of the Bank with respect to the suspension of payment, all fail for the following reason: they after all mainly concern the relation between the bank and the Elka Group, the suspension of payment imposed on this Group, and therefore bear no relation to the position of Kip and Sloetjes in private capacity. In so far as Kip and Sloetjes plead otherwise, this plea must be rejected because their claim for damages on the grounds of devaluation of said shares must be deemed materially equivalent to the claim that the Elka Group could have instituted against the bank, and because the fact that Kip and Sloetjes fully relied for their income and wealth creation on the Elka Group is not a circumstance that produces tortious acts on the part of the bank towards the Elka Group that for this reason alone would be tortious towards them as well. From the fact that Kip and Sloetjes in private capacity pledged various securities and in this context were being equated by the bank with the Elka Group does not follow either that the rule of abovementioned Judgment would not apply, whereby it is moreover relevant that Kip and Sloetjes on the occasion of the shares sale to Albada Jelgersma were discharged by the Bank from said securities and were not sued by the bank in this regard.

    (b)    In so far as Kip and Sloetjes allege that the Bank exerted pressure on them to consent to the shares sale to Albada Jelgersma, their claim fails because of the fact that the damage ensuing from this shares sale has been irrevocably established by the Court in Amsterdam at no more than NLG 400,000 and that Kip and Sloetjes have already received this sum from the FNV. For, Kip and Sloetjes are bound by the ruling of the Court in Amsterdam and cannot, since they hold the FNV and the Bank "severally" liable for this damage, claim all over again the NLG 400,000 that the FNV has already paid them. Therefore, Kip and Sloetjes have incurred no more damage than the damage established by the Court in Amsterdam

    (c)    And finally, the claim for non material damage is not awardable because under the law valid before 1 January 1992, which applies here, there is only non material damage in the event of (grave) personal injury and because, in so far as the assertions of Kip and Sloetjes contend grave personal injury, this injury cannot be specifically imputed to the sole act that is relevant, as evidenced by the statements sub a and b, i.e. the act of the Bank regarding the shares sale to Albada Jelgersma, but to the whole complex of factors that lead to a situation whereby Kip and Sloetjes lost their control and the financial stake in the Elka Group. Against this background it must be assumed that, though one might be critical of the way in which Kip and Sloetjes have been treated by the bank, the resultant suffering cannot be regarded as such a personal injury that this requires compensation in cash.

3.5.    This is what the remedy opposes. The elements 1 through 4, and 7 dispute the conclusions drawn by the Court of Appeal for this case from the Judgement of HR 2 December 1994, NJ 1995,288 (cf. 3.4 sub a). The elements 5 and 6 dispute furthermore the ruling of the Court of Appeal that Kip and Sloetjes are bound by the decision of the Court in Amsterdam (cf. 3.4 sub b). The elements 8 and 9 finally dispute the ruling of the Court of Appeal that the claim for compensation of non material damage is not awardable (cf. 3.4 sub c).

3.6.    Aforementioned Judgement of HR 2 December 1994, NJ 1995, 288, related to a case where the plaintiff as director / sole shareholder of a group had asserted facts and circumstances that would produce a tort towards that group but had asserted nothing from which might follow that his other party in addition had acted also contrary the due care required towards himself in private capacity. The damage in connection with the devaluation of the shares of appellant – of which he was still owner – fully matches the damage that the group had incurred as a result of allegedly committed tort in his competence.
The grounds for the claim of Kip and Sloetjes is however of a completely different nature. Their assertions come down to this, that the Bank has committed tortious acts towards them personally and that the damage they incurred is the result of a coherent complex of tortious acts on the part of the Bank, which lead not only to a serious devaluation of their shares due to imprudent credit policy by the Bank and by the latter compelling them to afford cooperation to the suspension of payment procedure, but also resulted in a situation whereby they subsequently had to sell said shares – being pressurized by the bank – at a highly unfavourable moment, so that the damage due to the devaluation conclusively impaired their capital and cannot any longer be undone by a possible compensation paid by the bank to the companies of the Group, while moreover at the time of the acts being imputed to the bank their interests were highly integrated with those of the Group, in part due to the securities they had pledged in private capacity and their reliance, in terms of their income and wealth creation, on the business they performed in the Group they had built.
The Court of Appeal assumed an erroneous interpretation of the law by not examining this complex of tortious acts allegedly committed by the Bank towards Kip and Sloetjes in mutual interrelation, but rather splitting up their pertinent assertions into acts by the Bank that – primarily- affected the Group, and acts by the Bank directly towards Kip and Sloetjes, and by then ruling that Kip and Sloetjes in connection with the aforementioned Judgement cannot invoke first mentioned acts. In so far as the Court of Appeal has interpreted the assertions of Kip and Sloetjes otherwise than discussed above, it has substantiated its Judgement, in the absence of providing any further grounds in this regard, insufficiently.
The elements 1 through 4, and 7 contain grievances directed against the afore-going, which therefore succeed.

3.7.    The ruling of the Court of Appeal that Kip and Sloetjes are bound by the decision of the Court in Amsterdam is also erroneous. In a case like this one, which is not an action between the same [arties in the meaning of art. 67 *Rv*., a decision in the first action is not binding on the second action. Reliance by the Bank on rules valid before 1 January 1992 as to severalty also fails because those rules do not produce something else if in the case at issue by the law valid at the time severalty did not apply but rather coincidentally concurrent contractual obligations. Therefore in this case the reciprocal assertions about the scope of the claimed damages will need to be re-examined and the documentary proof submitted for in this regard be reviewed.
It follows from the afore-going that the elements 5 and 6 succeed.

3.8.    The argumentation of the Court of Appeal that the claim for non material damage is not awardable cannot in the light of the above be upheld either. This argumentation – mentioned above in 3.4 sub c – assumes, in view of all of the abovementioned, erroneously that for the question whether Kip and Sloetjes incurred non material damage only the imputation regarding the shares sale to Albada Jelgersma is relevant. The assertions that Kip and Sloetjes have submitted as grounds for their claim for compensation of no material damage and that the Court of Appeal summarized in its *rov*. 18 can, if they are accepted as established fact, serve in principle as basis for awarding such a claim. Thus also the elements 8 and 9 succeed.

3.9.    From the above follows that the remedy succeeds on al three points mentioned above in 3.4 sub a, b, and c. Further discussion is not needed.

*4.    Decision*

The Hoge Raad:

quashes the Judgement of the Court in Arnhem of 21 November 1995;

refers the action to the Court in 's-Hertogenbosch for further review and ruling;

orders the Bank for costs of the action in cassation, set until this pronouncement on the side of Kip and Sloetjes at NLG 8,534.86 in disbursements and NLG 3,500 in attorney fees.