# EXHIBIT 7

District Court of The Hague
24 May 2007, acc. no. 06.1170, LJN BA6044
(Meesters Wien, De Valk and Van Dorp)

Provisional examination of witnesses. Derivative loss.
Rejection of request by duped minority shareholders of KPNQwest for the holding of a provisional examination of witnesses. Applicants have not established sufficiently specifically what specific standard of care is alleged to have (possibly) been violated vis-à-vis them by the policymakers and majority shareholders. Reference to HR 2 December 1994, NJ 1995/288, with note Ma (Poot/ABP) and HR 16 February 2007, "JOR" 2007/112 with note Van Veen and Van Wechem (Tuin Beheer/Houthoff Bruma c.s.).

[BW art. 6:162; Rv art. 186 ff]

*Verhoeff and the Foundation request the district court to order a provisional examination of witnesses. In the opinion of the district court KPN's defence, the essence of which is that the applicants do not as yet have a (sufficient) interest respected in law in permitting the provisional examinations of witnesses, is successful. This being because in the light of the Poot/ABP jurisprudence their legal position as minority shareholders given the content of the application and the written pleading of the applicants to the district court as yet appears so weak that the intended compensation claim against third parties for the time being appears to have no or hardly any chance of success.*
*In the view of the district court the Supreme Court recently (16 February 2007, "JOR" 2007/112 with note Van Veen and Van Wechem (Tuin Beheer)) gave further substantiation to the Poot/ABP judgement.*

*The district court concludes from the judgement that the Poot/ABP rule, which is severe and unfavourable for the shareholders, also applies in cases in which an executive director of a company has failed in his obligations towards the company. The sole circumstance that a foreseeable result was that as a result of the unlawful manner of action of that executive director the shareholder was disadvantaged does not, according to the Supreme Court, mean that said executive director has violated the required specific standard of care vis-à-vis that shareholder. The latter applies even if the executive director of the company has unnecessarily and consciously caused the bankruptcy of the company for his own gain, according to the Supreme Court. Only if additional circumstances are alleged, such as the intention to disadvantage the shareholder in this way, can – in the understanding of the district court – according to the Supreme Court the required specific standard of care vis-à-vis that shareholder or those shareholders also have been violated.*
*Given that it has not been established with some degree of specificity what specific misleading of the investing public is presumed to have taken place or what specific standard of care could have been violated by the policymakers and majority shareholders for purposes of limitation of the legally relevant topics of the provisional examination of witnesses, the application has the character of a "fishing expedition" which is virtually unlimited, is highly burdensome for virtually all those involved and by current standards is to be regarded as inadmissible.*
*The district court rejects the application.*

1. O. Verhoeff, Amsterdam
2. Stichting VEB-Actie KPNQwest (*VEB KPNQwest campaign foundation*) The Hague, applicants,
barrister: A. Haan,
against
1. KPNQwest NV, Hoofddorp,
2. KPN Telecom BV, now known as KPN BV, The Hague
barrister: A.R.J. Croiset van Uchelen,
3. Qwest BV, Amsterdam,
barrister: M. Das
defendants.

(…; ed.)

*2. The application*
2.1. Verhoeff and the Foundation assert the following. The Foundation's aims include obtaining information about the policy and the course of events at KPNQwest and obtaining financial

compensation for the loss suffered by investors in securities of the listed company KPNQwest. The participants in the Foundation have transferred their claims for reimbursement of loss irrevocably to the Foundation. Verhoeff is one of the duped shareholders of KPNQwest.

2.2 Investors in KPNQwest suffered a loss as a result of the enormous fall that occurred in the value of the shares of KPNQwest. With the totally unexpected bankruptcy of KPNQwest on 31 May 2002 a stock exchange value of more than 3 billion euros evaporated. This loss is the result of the unlawful actions of KPNQwest, its managing director, supervisory directors and de facto managers and of the two majority shareholders, namely KPN and Qwest.

The unlawful actions of KPNQwest relate among other things to:

a. the provision of incorrect and misleading information to investors;
b. the generation of the appearance of creditworthiness;
c. entering into transactions the purpose of which was to present a more favourable picture of KPNQwest's financial development;
d. the execution of an acquisition that was only in the interests of (one of) the majority shareholders.

2.3 The two majority shareholders had a dominant influence on the company and its management. They bore a special duty of care towards the creditors and other shareholders of KPNQwest. They violated this duty of care thus acting unlawfully vis-à-vis Verhoeff and the Foundation. For purposes of a possible future civil procedure it is necessary to obtain clarity on the actual course of events and details surrounding the downfall of KPNQwest and the role of its executive directors, de facto managers and supervisory directors, as well as the role of KPN, Qwest and their executive directors, de facto managers and supervisory directors.

2.4 Verhoeff and the Foundation question in particular the following activities and transactions of KPNQwest.

a. KPNQwest paid a total of 645 million euros for the acquisition of certain activities from GTS (Global Tele-Systems Group). This acquisition offered only very limited added value. In addition, during the presentation of its annual figures for 2000, KPNQwest had indicated that new acquisitions would no longer be considered. It was also made known at the time of the announcement of the GTS transaction that KPN sold 20 million shares to Qwest and Qwest's majority shareholder Anschutz. It later emerged that Anschutz also had interests in GTS. The control structure between KPN and Qwest was changed to such an extent by this share transaction that Qwest and Anschutz acquired a deciding voice on the purchase of the GTS activities. In this transaction attention was only paid to the interests of KPN and Qwest and the action taken was contrary to the duty of care that KPN and Qwest should have observed vis-à-vis the creditors and other shareholders.

b. The method of processing of so-called swap and IRU transactions used by KPNQwest is contrary to reporting rules. Payments were booked immediately as turnover, even in the case of contracts extending over several years. However, unlike the turnover, the costs associated with the transactions were spread out over the term of the contracts. The purpose of this method of operation was none other than to polish up KPNQwest's turnover figures.

c. KPN and Qwest, as majority shareholders, did not abide by the turnover guarantees issued by them to KPNQwest. They provide no clarity concerning the nature, size and conditions of those guarantees. Greater clarity has to be obtained in this regard.

d. Together with a syndicate of banks KPNQwest in 2002 took up loans, in respect of which the majority shareholders knew or were in a position to know that the resulting liabilities could not be met. Clarity should also be obtained on the course of events relating to the taking up of those loans.

e. On the date of the application for judicial postponement of payment of debts the Supervisory Board of KPNQwest resigned, without providing for its succession or for replacement of another kind. As a result of this the banks froze the credit facilities. More clarity is required on the events surrounding the resignation.

2.5 With the requested provisional examination of witnesses, Verhoeff and the Foundation wish in particular to gather evidence for their assertions that the Management Board, or KPN and Qwest:

- had an insight into and control of the policy of KPNQwest;
- had knowledge of the disadvantaging of creditors and other KPNQwest shareholders;
- violated their duty of care towards creditors and other shareholders of KPNQwest;
- as shareholders of KPNQwest (in any case) acted in the context of the GTS transaction contrary to the duty of care to be observed as shareholders vis-à-vis KPNQwest, the other shareholders and the creditors of KPNQwest, or at any rate acted unlawfully in that context and are therefore liable to these parties, including Verhoeff and the Foundation;
- also as employer of the supervisory directors are liable for the activities of those supervisory directors in the context of the GTS transaction;

- were aware of and/or involved in the so-called IRU and swap transactions and that they also acted unlawfully in this connection;
- also acted unlawfully in other respects in that they did not fulfil their guarantee and other obligations to KPNQwest;
- knew or were in a position to know that KPNQwest was entering into obligations, including in respect of a syndicate of banks, which it could not fulfil or could not fulfil within a reasonable period and that it also had no assets from which to compensate the loss to be suffered by the counterparty as a result of that default;
- caused or at least allowed their various interests to conflict in an improper manner.

2.6 With regard to the Supervisory Board Verhoeff and the Foundation wish to collect evidence for their assertions that the supervisory directors:
- had no or insufficient regard for the interests of KPNQwest, among other things in the context of the GTS transaction;
- also for the rest did not adopt an independent position or adopted an insufficiently independent position with regard to the majority shareholders;
- were aware of the unlawful IRU and swap transactions;
- were aware or could have been aware that KPNQwest was entering into obligations, including those in respect of the syndicate of banks, that it would not be able to fulfil or would not be able to fulfil within a reasonable time and that KPNQwest also did not have assets with which to compensate the loss incurred by the counterparties as a result of that default;
- did not ensure or did not adequately ensure that the majority shareholders fulfilled their obligations and undertakings to KPNQwest;
- evidently failed to fulfil their tasks properly by all resigning on 23 May 2002 and in addition not providing for succession or other replacement;
- also for the rest failed to fulfil their tasks properly and that it is plausible that the improper task fulfilment was an important cause of the bankruptcy.

2.7 To start, Verhoeff and the Foundation wish to have 32 witnesses examined in respect of all of the above, to whom the former chairman of the management board of KPN NV, Ad Scheepbouwer, was added as 33rd witness at the sitting pursuant to the so-called "Scheepbouwer fax" of 26 September 2001.

*3. The defences*

3.1 Qwest asserts as defence in particular that Verhoeff and the Foundation are abusing their right to request a provisional examination of witnesses as the Enterprise Section of the Amsterdam Court of Appeal has also been requested to order an examination/investigation into the policy of and course of events at KPNQwest. That request was based on virtually the same circumstances as are currently advanced in the application. In a ruling dated 28 December 2006 the Enterprise Section has since ordered an examination/investigation. All the topics put forward by Verhoeff and the Foundation will be dealt with in this extensive examination/investigation ordered by the Enterprise Section. In addition, Qwest points to the fact that the required financial resources for the examination/investigation ordered have not yet been made available, so that there are obvious misgivings as to whether Verhoeff and the Foundation are able and willing to finance a provisional examination of witnesses.

3.2 With regard to the activities and transactions raised by Verhoeff and the Foundation for discussion Qwest makes the following observations.
a. In its ruling the Enterprise Section decided that entry into the GTS transaction does not result in valid reasons for doubts regarding correct policy on the part of KPNQwest.
b. The Enterprise Section has already initiated an investigation with regard to the so-called IRU and swap transactions and the alleged inadequate reporting thereon.
c. The Enterprise Section has determined that there is no reason for doubting that KPN and Qwest met their turnover guarantees.
d. The banks that were involved in the loans entered into in 2002 have in the meantime themselves brought a case before the district court in Amsterdam against KPN, Qwest and other parties. It will be possible to obtain clarity regarding events surrounding the contracting of those loans from the said instituted procedure.
e. The Enterprise Section has also ordered an examination with regard to the resignation of the supervisory directors.

3.3 If the application should nevertheless be granted, Qwest believes that the requirements of judicial efficiency mean that (for each evidence topic) a limited number of witnesses should first be heard.

3.4 In a written pleading at the hearing, supplementary to Qwest's defence, KPN asserts among other things the following. Even if it could be judged that unlawful action had occurred in the context of the

activities and transactions indicated by Verhoeff and the Foundation, this is for the account of the policymakers within KPNQwest and certainly not for the account of the majority shareholder KPN. By requesting a provisional examination of witnesses almost five years after the bankruptcy of KPNQwest, without having notified a claim to the official receiver for verification, Verhoeff and the Foundation are abusing their right to request such an examination.

3.5 If the claimed unlawful action had in fact occurred, and this action could be blamed on the majority shareholders, it is solely up to the official receivers of KPNQwest and not the duped minority shareholders to institute a compensation action against KPN. KPN points to the Poot/ABP judgement (NJ 1995 no. 288), in which the Supreme Court judged that if financial loss has been caused to a company by a third party, in principle only that company, and not also the shareholders, has the right to claim from that third party reimbursement of the loss caused to it. The official receivers also undertook this, initiating proceedings in the United States against the parent company of Qwest and against a number of former company officers of KPNQwest. A claim could only exist against KPN and Qwest if they can be blamed independently with regard to misleading of investors as a result of which loss was incurred on purchase of securities. However, according to KPN nothing relevant has been asserted in this regard.

*4. The judgement*

4.1 In view of the nature and scope of this case and the substantial financial interests behind it the district court resolved to decide this matter with a panel of three judges. The district court states first and foremost that it will check the request and the defences against the most recent criteria as set out in the ruling of the Supreme Court dated 11 February 2005, NJ 2005, no. 442.

4.2 As discussed at the court hearing, the requested large-scale and exhaustive provisional examination of witnesses, if granted, constitutes a substantial to enormous burden for the initially 33 witnesses, counterparties, barristers and district court involved. For the sake of brevity the district court also refers to the conclusion of A-G Wesseling-van Gent and to the note by Asser to the aforementioned standard ruling of the Supreme Court. Both write about recent cautious judicial policy in the area of requested provisional examinations of witnesses such as that under consideration. In this context the district court also paid heed to the Final Report 2006 of the Commission on Fundamental Review of Dutch civil procedural law by professors Asser, Groen and Vranken, pages 69 to 71.

4.3 On the other hand the district court sees and understands the wish and the actual interest on the part of the duped investing public represented by the applicants finally by this means to have as much clarity, information and "finally the truth revealed". The more so since according to the documents in summary the initiator VEB has apparently already been unable for five years to obtain any relevant information from the official receivers or from the two majority shareholders about any executive directors' liability and/or liability of majority shareholders and/or of other relevant policymakers. In addition, the examination of witnesses agreed to by the Enterprise Section is much more limited in scope than the provisional examination of witnesses requested, while substantial costs are also involved in such an examination of witnesses. The fact that the applicants wish to ascertain facts and circumstances in order to be better able to estimate in advance their chances in the intended action on the substance of the case (*bodemprocedure*) to obtain compensation from the relevant policymakers of KPNQwest and in order to be able to provide further substantiation of those claims, is an interest which traditionally and in principle can pre-eminently be served by the holding of a provisional examination of witnesses.

4.4 The district court rejects the defence advanced in particular by Qwest that the applicants now have no interest in or are making improper use of the requested substantial provisional examination of witnesses, such because according to Qwest the Enterprise Section of the Amsterdam Court of Appeal has already granted to (in brief) the VEB an investigation (examination of witnesses) with regard to the policy and course of events within KPNQwest. The reasons for this are as follows.

4.5 In this context in the opinion of the district court Qwest and also KPN not only overlook the fact that the examination of witnesses agreed to by the Enterprise Section is, in terms of the permitted period and topics, of more limited scope than the provisional examination of witnesses requested, but also that in practical terms it can no longer be expected that said examination of witnesses will still proceed given that no-one appears willing or able to advance the costs of €500,000 estimated by the Enterprise Section. Moreover the respondents fail to appreciate that the possible results of an examination of witnesses ex art. 2:345 of the Netherlands Civil Code have only limited evidential significance for the action on substance intended by the applicants on the basis of art. 6:162 of the Netherlands Civil Code in conjunction with article 2:9 of the Netherlands Civil Code (cf. Supreme Court, NJ 2003 no. 538 and NJ 2006 no. 443).

4.6 In the judgement of the district court, however, KPN's defence, which essentially signifies that for the time being the applicants have no or insufficient legally justifiable interest (Netherlands Civil Code art. 3:303) in allowing the requested provisional examinations of witnesses. This being because, in light of the Poot/ABP jurisprudence (Supreme Court, NJ 1995 no. 288) given the content of the application and the applicants' written pleading, their legal position as minority shareholders for the time being appears to the district court to be so weak that the intended compensation claim against third parties appears for the time being to have hardly if any chance of success. This is based on the following reasons.

4.7 It follows from the Poot/ABP casebook judgement that "in the normal type of case" in the case of an unlawful deed committed by a third party vis-à-vis the company, shareholders cannot in principle make their own claim for compensation against that third party if (as is the case here with the public investors in KPNQwest shares duped by the sudden bankruptcy) that loss consists of reduction in value or complete loss of value of those shares. Such an action against the third party is in principle reserved for the company itself or after bankruptcy for its official receivers. The Supreme Court does not make an exception in the case of stock exchange listed public limited companies such as the bankrupt KPNQwest. Only if the claimant states which specific standard of care has been violated against him as private shareholder, is it possible for the duped shareholder to conduct his own action for compensation against the third party in this type of case. According to the Supreme Court, in such a case it is not sufficient for the claimant simply to allege (in general terms) careless action on the part of that third party.

4.8 In the Poot/ABP judgement A-G Hartkamp and annotator Maeijer (see also Asser-Maeijer 2000, no. 180a) indicate as a possible example of an exception to the above fixed rule for the shareholders, that the third party intended or had the preconceived intention to hit not so much the company but primarily the shareholder(s) in his or their private capacity, i.e. where the company is as it were used to strike the shareholder(s) "behind the scenes". According to Hartkamp strict requirements must be set for the success of an action by a shareholder in a private capacity on the basis of an unlawful act on account of reduction in the value of that shareholder's shares.

4.9 According to Hartkamp this can be justified by the fact that a shareholder is not an ordinary creditor of a company but solely a so-called subsidiary unsecured creditor (*post-concurrente crediteur*) with a special position of an individual nature vis-à-vis the company. Incidentally: apparently for this reason the applicants have also not submitted any (a priori prospectless) claim for verification to the official receivers in the bankruptcy of KPNQwest, and nor do the applicants find or see any legal access to the bankruptcy RC of the Haarlem district court for the holding of bankruptcy hearings into possible liability of the executive directors, policymakers and majority shareholders of KPNQwest.

4.10 In the opinion of the district court the Supreme Court (RvdW 2007 no. 203 ("JOR" 2007/112 with note Van Veen and Van Wechem; ed.) Tuin Beheer) recently provided further substance to the Poot/ABP judgement. The district court concludes from that recent judgement that the Poot/ABP rule, which is severe and unfavourable for shareholders, also applies in cases in which an executive director of a company has failed in his duties to the company. The mere fact that a foreseeable consequence was that as a result of the unlawful conduct of that executive director the shareholder was disadvantaged, does not, according to the Supreme Court, mean that said executive director violated the required specific standard of care vis-à-vis that shareholder. The latter applies even if the executive director of the company unnecessarily and deliberately caused the bankruptcy for his own gain, according (paraphrased) to the Supreme Court. Only if additional circumstances have been alleged, such as the intention to disadvantage that shareholder in this way, can, in the district court's understanding, according to the Supreme Court the specific standard of care vis-à-vis those shareholder(s) have been violated.

4.11 The foregoing forms the judgement framework for this application case submitted by the applicants and respondents to the district court for a decision, to be followed by an action on the substance of the case in which the duped minority shareholders of the bankrupt company KPNQwest (the investing public) wish to institute their own proceedings for compensation against third parties (in short all possible relevant policymakers of KPNQwest, the majority shareholders KPN and Qwest and both of their parent companies KPN NV and Qwest Inc).

4.12 Against the background of this jurisprudence, on reading and re-reading the substantial application plus evidence, the district court has to find that the applicants argue or assume all in all in very many respects, but in all cases only in general terms that the policymakers and the majority shareholders acted unlawfully towards the creditors and the other (minority) shareholders of the listed company KPNQwest, which unexpectedly went bankrupt in May 2002. Even if it is taken into account in this context that this is "as yet only" a request to hold a provisional examination of witnesses, in the opinion of the district court the applicants do not yet establish sufficiently specifically (as is required for the

intended action on substance to have a chance of success) which specific standard of due care is alleged to have been or could have been violated by the policymakers and majority shareholders concerned vis-à-vis them as investing shareholder public. In the judgement of the district court the misleading of the investing shareholder public, named by the applicants, has in an exceptional case such as this also been insufficiently specifically asserted, despite the fact that on this point the applicants must now have access to sufficient public, written evidence about which because of specific circumstances to be alleged by them witnesses should undergo further examination. The only example named to date in the jurisprudence and the literature of the required exception from violation of a specific standard of care (in short the malicious intent of the third parties to be summonsed to strike and disadvantage specifically precisely the shareholder(s) of the company) has not been alleged in this case of the policymakers of KPNQwest and is also scarcely conceivable.

4.13 In the light of the above-mentioned jurisprudence of the Supreme Court, the sole, regrettable fact that the many shares held by the investing public in KPNQwest have become worthless and the "social harm" may be substantial, is also not of sufficient significance to allow the requested provisional examination of witnesses. This total loss in value of shares is in principle also an inherent risk in investing in shares, which must remain for the account of minority shareholders, unless specific standards of caution have been violated vis-à-vis them or specifically alleged misleading of the investing public has occurred. In the opinion of the district court the applicants have not complied in this application or during the hearing with that exceptional obligation to furnish facts in a written pleading in an exceptional case such as this.

4.14 What weighs heavily in these circumstances and is decisive is the interests of the proposed 33 witnesses, the counterparties and the district court in not being burdened with the provisional examination of witnesses requested in the application (which is substantial and exhaustive, but as yet makes little sense for the intended claim by the applicants) with regard in fact to all the details of the rise and fall of KPNQwest from 1999 to May 2002 and the possible unlawful role of its policymakers therein. To this extent (given that it has not been determined with any degree of specificity what specific misleading of the investing public is presumed to have taken place or what specific standard of care could have been violated by the policymakers and majority shareholders for purposes of restricting the topics of the provisional examination of witnesses relevant in law) this application has the character of a virtually unlimited "fishing expedition", which is very onerous for virtually all those involved and is to be regarded on the basis of current criteria as inadmissible for a provisional examination of witnesses.

4.15 Considering everything the district court comes to the conclusion that in the special circumstances of this specific case it should reject this request in this application. Given the content of the case documents and its decisions the district court decides that each of the parties will bear its own legal costs. As the unsuccessful party the applicants must be ordered to pay the legal costs of the respondent KPN (…; ed.).

Decisions
The district court:
- rejects the request for the holding of this provisional examination of witnesses;
- orders the applicants Verhoef and the VEB KPNQwest campaign foundation jointly and severally to pay the legal costs of the respondent KPN BV (…; ed.);
- orders that the applicants and the respondent Qwest BV pay their own costs.