UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, | 07 Civ. 6176 (LTS)(DME) |
| Plaintiffs, | ECF CASE |
| -against- | **SUPPLEMENTAL DECLARATION OF STEPHEN WILSON** |
| IMAGESAT INTERNATIONAL N.V., *et al.*, | |
| Defendants. | |

STEPHEN WILSON declares as follows:

1.  I am a Plaintiff in this action. I submit this Supplemental Declaration in further opposition to Defendants' motions to dismiss the Complaint.

2.  I was the first non-IAI promoter and organizational executive leader of the "EROS" Joint Venture beginning in June 1994. I was the founding CEO of West Indian Space, Ltd. when the joint venture was incorporated in 1997 and thereafter until the middle of 2000, when the enterprise became ImageSat International, N.V. (collectively, the "Company"). As detailed in my prior Declaration filed January 30, 2008, I led the Company's extensive outside financing activities and investor relations throughout the entire period. I worked closely with its industrial shareholders Defendants Israel Aircraft Industries (IAI) and ElOp (Elbit) and with the Israeli Ministry of Defense (IMOD) to define the policies and procedures applicable to the commercialization of the Israeli military satellite program from the formal approval and inception of the initiative.

3.  Concurrent with the March 1994 Presidential Decision Directive 23, which dramatically changed United States policy related to the commercialization of U.S. government spy satellite technology, IAI personnel were permitted to expose prospective investors to the

IMOD's earth observation satellite program for the first time. As the then-CEO of Core Software Technology (CST), a California corporation, I was among the first such prospective investors. I first toured the previously top-secret IAI/MBT Space Technologies Directorate ("STD") facilities in May 1994, including its satellite integration facility and the ground control and reception station operated by IAI personnel on behalf of the IMOD. Although I was told that other foreign nationals had visited these facilities previously, I was given to understand that no one had ever before been given such access for the purpose of soliciting private investments.

4. Subsequent to the signing of the June 1994 Memorandum of Understanding memorializing the formation of the EROS Joint Venture between IAI and CST, I was permitted extensive access to STD facilities, often moving about the MBT plant in Yehud, Israel outside of Tel Aviv without an escort. Although I was no doubt vetted to some degree, in light of my extraordinary access at that early date, I was never interviewed by security personnel of the IMOD or IAI related to my exposure to previously "secret" information, nor was I granted or even asked to apply for a security clearance at any time. Indeed, I was never asked to agree to any form of confidentiality, written or verbal, other than "commercial confidentiality".

5. During the early development stage of the Company (through year-end 1996), I invited and accompanied many non-Israeli guests to the plant from the United States, Russia, Taiwan, South Korea, Australia, Japan, and Italy (among other countries) in connection with the Company's efforts to obtain investment financing or in connection with the creation of its global commercial ground receiving (imagery acquisition), archiving, and distribution (AAD) network. None of the Company's guests were ever required to provide any personal or background information other than their names, nationality and passport numbers. ***During my tenure as CEO, no invited guest was ever denied access to the MBT/STD facilities or to any information related to the Company's satellites, systems or business plans.***

6.      In 1997, in connection with the formal incorporation of West Indian Space, Ltd. and the opening of the Company's office in downtown Tel Aviv, my colleagues (and current Plaintiffs) Dr. Moshe Bar-Lev and Dr. Patrick Rosenbaum and I inquired as to whether any security measures need be taken in connection with the use of sensitive information related to the development of the Company's business. A representative of the IMOD's security organization, MALMAB, visited our office in response to our inquiry and informed us that *no facility or individual clearances would be required related to the Company's business and no special security procedures needed to be implemented.* Consistent with MALMAB's directive, no special security measures were ever taken in connection with the Company's business development or operations outside of the ground station at the MBT plant. The latter exception ("outside of the ground station") relates only to the independent operations of the Ofeq 3 military satellite conducted in the same building by the IMOD and IAI, despite which IAI guaranteed access to our personnel, clients, and guests

7.      While aspects of the operation of the IMOD (Ofeq 3) satellite were classified, the operation of the Company's satellites and the technology required to operate them were not. The Company agreed to purchase satellite command and control (TT&C) services for the operation of its first (EROS A) satellite from IAI/MBT and to contract for the use of the existing ground receiving station at MBT. However, this requirement did not originate as a confidentiality issue, but rather to instill confidence among the Company's investors that we possessed the infrastructure and experience to operate our satellites and would be able to do so in the most cost-effective and least capital-intensive manner practicable. Further, the March 1997 Joint Venture Agreement (JVA) between IAI and CST provided that *"[t]he TT&C services for subsequent Satellites shall also generally be ordered by the New Company from IAI/MBT unless the Board of Directors determine it is materially advantageous to the business*

3

*development of the New Company, the New Company may order the placement of certain TT&C services outside of Israel. In such event and if it is deemed desirable to have a third party or the JVC perform the TT&C based in part upon IAI/MBT technology, the JVC and IAI/MBT will negotiate in good faith the licensing of such IAI/MBT technology under terms and a compensation formula to be mutually agreed."* (Emphasis added.) It was thus understood at least as early as 1997 that non-Israeli personnel -- who, as stated in the Declaration of Yair Sherman submitted by Defendant IAI, were not eligible to hold Israeli security clearances -- would ultimately have access to the technology underlying all aspects of the operation of the Company's EROS A and B satellites, which satellites are substantially identical in every aspect to the IMOD's "Ofeq A and B" class satellites.

8.  Extensive disclosure, and thus declassification, of previously classified technology and related information in connection with the commercialization initiative was contemplated by all parties including IAI and the IMOD and memorialized in the same 1997 JVA. Section 8.4(b) of the JVA, captioned "Information Transfer", provides that "IAI/MBT shall have obtained all approvals and/or permits necessary to be obtained from any Government of Israel authority to effect the transfer conveyance, grant, and licensing of Patents and Technology to the New Company contemplated by this Agreement that are not, as of the date of such letters, prohibited or restricted by the United States laws or regulations." Uncleared Company personnel (i.e., persons without security clearances of any kind) engaged in sales, training, and installation of ground systems, some of which were previously classified and still are export-controlled (licensed for export) by the IMOD but were sold to and operated by foreign personnel with no security screening whatsoever by the IMOD or IAI.

9.  The EROS A and EROS B satellites were to be, and still are, independently controlled from SOP customer ground control stations worldwide (including one such program

4

in a Middle Eastern country with which Israel does not currently have diplomatic ties) using IAI/MBT-built ground systems or subsystems that are identical to those used to control the IMOD's Ofeq satellites. The EROS A and EROS B satellites were delivered from Israel to Siberia, where they were integrated by ImageSat and IAI employees working together with Russian military and civilian personnel who were not required to undergo any security screening by the IMOD or IAI whatsoever and who were necessarily exposed to all the technical details of the satellites.

10. In 1998, the Company engaged Merrill Lynch in New York to act as its investment banker, leading ultimately to the $91 million Pegasus-led investment closing in New York in July 2000. In early October 1998, Merrill sent more than a dozen bankers, analysts, and consultants (including some senior personnel and others barely out of college) to Tel Aviv to "kick off" extensive technical and financial due diligence. As was by then customary, the Company submitted only the names and passport numbers of Merrill's multinational team prior to arrival in Israel. All individuals who planned to attend were approved, including Omar Jaffrey, a permanent U.S. resident but a Pakistani national at that time. In addition to an extensive tour of the satellite integration facilities at MBT, in which the military satellite integration activities are also conducted, *all* of the attendees were taken to the IMOD ground station, where they witnessed a real-time Ofeq 3 satellite pass over the ground station, and *all attendees were allowed to view Ofeq 3 imagery*.

11. In early 1999, the Company held its second international AAD ground station conference in Tel Aviv, where we hosted attendees from more than 20 countries. As with the Merrill due diligence visit the preceding year, all attendees were approved subject only to our submission of their names and passport numbers. Again, all were given extensive access to the satellite facilities at MBT and the ground station, and all were permitted to view Ofeq 3 imagery.

12. In 1999 and again in 2000, the Company, IAI, and ElOp formally agreed with investors that in the event of any future dispute among them, dispute resolution in New York, including litigation in the courts located in New York, was appropriate and feasible and they submitted to the exclusive jurisdiction of the courts in New York for this purpose. The IMOD, under the signature of its then-Director General, Ilan Biran, supported the Pegasus-led closing and acknowledged the Company's plans to "go public" on a U.S.-based stock exchange and its inability to control the ownership and control of the Company and the satellite technology at the foundation of its business thereafter. The associated investment documentation irrefutably contemplated that any and all dispute resolution, including litigation, would occur in New York. Rather than being told that secrecy and national security concerns would preclude litigation in New York, investors received binding written assurances that no such barrier existed.

13. Throughout the history of the Company, the relevant documentation concerning ImageSat's satellites, ground systems and business was shared with literally hundreds of non-Israelis holding no clearances of any kind, ranging from junior American analysts and commercial launch insurance personnel to junior and senior officials of foreign governments. No ImageSat document was ever deemed to be classified and none were marked as other than "Company Confidential". Company communications were routinely transmitted to third parties worldwide by e-mail and fax.

14. Documentation relating to other technical subjects at issue in this lawsuit was also widely shared with non-Israelis. For example, a key subject-matter of this litigation is IAI's entry into a $1.6 billion contract (WSJ 04/12/07) to supply synthetic aperture radar (SAR) satellites and technology in a business venture with Northrop-Grumman, in what Plaintiffs contend is a blatant violation of the ImageSat-IAI Master Agreement of July 2000. Defendants seek to prevent disclosure through discovery of the facts related to IAI's improper SAR and

electro-optical imaging commercialization initiatives, suggesting that the facts surrounding the satellite technology and financing related to it are "classified" state secrets that, if disclosed, would be damaging to the national security of the State of Israel. However, extensive documentation concerning the technology underlying the SAR (radar imaging) satellite as well as IAI's commercialization plans and technology development financing for it was shared with Northrop-Grumman, an American company, as well as Northrop's competitors. For example, IAI made similar improper commercialization proposals to Lockheed Martin for both SAR and electro-optical imaging satellites developed for the IMOD under the "OFEQ" and "ETGAR" (SAR) programs. In 2005, Menashe Broder, then CEO of ImageSat, initiated negotiations with IAI/MBT to purchase such a SAR imaging satellite for ImageSat based on the ETGAR technology. Extensive technical disclosures were made to ImageSat personnel in connection with these discussions, although Broder was terminated for asserting ImageSat's rights in connection with the commercialization of the SAR technology before a satellite purchase contract was concluded. In May 2006, Broder's replacement (the former Deputy CEO of IAI) Defendant Shimon Eckhaus reported to ImageSat's Board of Directors and multinational board observers on direct discussions between ImageSat and the IMOD related to the SAR technology *"… which will provide an answer to the Company's requirements for a satellite after EROS B, instead of the EROS C satellite…."* The satellite that was referred to in the May 2006 board minutes as "ETGAR-C" was the TECSAR satellite that was launched *by IAI* in January 2008 as a *"commercial imaging satellite"* on an Indian PSLV commercial launch vehicle. Like the Russian commercial launches of EROS A and B, this commercial launch by Indian personnel would have involved detailed technical disclosures to non-Israeli nationals not eligible to hold Israeli security clearance and not subject to Israeli security procedures or screening. And finally, facts surrounding the joint satellite research and development satellite financing initiatives with

both Singapore and India were disclosed to me by both IAI and IMOD personnel in 1998, 1999, and 2000 and have been published in the defense industry press.

15. No information other than that previously disclosed to ImageSat, Northrop Grumman, Lockheed Martin, and other third parties without Israeli security clearances worldwide should be required to litigate Plaintiffs' claims related to the commercialization of the SAR imaging capability or any other claim detailed in Plaintiffs' lawsuit.

16. As addressed in greater detail in the Supplemental Declaration of one of my fellow Plaintiffs, General Haim Yifrah, who had a distinguished 34-year military career in the IMOD culminating as Chief of the IDF Intelligence Corps, documents that were shown by the IMOD and/or IAI or with their knowledge and consent to persons without Israeli security clearance, even if previously classified, have been effectively declassified through the act of such purposeful disclosure and further dissemination. This extends to each and every one of the subject-matters that is at issue in this lawsuit. It is an affront to the judicial system that Defendants have been willing consistently since 1994 to share documents and information, and perhaps undertake the required declassification procedures, so that they could participate in commercial ventures with ImageSat and its investors, the Singapore and Indian aerospace communities, and more recently Northrop Grumman, and to raise private U.S. or foreign capital in connection with the same technology development, but are not now willing or able to defend this litigation in which they are accused of breach of fiduciary duty, fraud, self-dealing, breach of contract, fraudulent conveyance, and breach of the anti-racketeering statute.

17. In their joint reply memorandum, Defendants attempt to confuse and mislead the court by citing Dr. Bar-Lev's reluctance at his recent deposition to testify about secret Israeli military programs, plans and financing mechanisms undertaken by the IMOD and IAI during the 1980's and early 1990's while he was an IAI employee. All of the cited testimony related to

matters or events that took place *prior to* the IMOD/IAI decision to commercialize the military satellite programs and in advance of the initiation of the EROS Joint Venture. The transparency that the IMOD permitted after the decision to commercialize was a response to the need to finance the initiative with private capital and the reasonable expectations of sophisticated investors that they would have access to all information, including detailed technical information reasonably and routinely required in due diligence.

18.   While it is understandable that Defendants – as well as the IMOD as the 100% owner of Defendant IAI – would prefer to see this case litigated in Israel, where they hope to conceal their own long and regrettable history of misconduct in connection with ImageSat, they are not entitled to such a result. That Defendants would prefer to control the damage to their public image and to the willingness of future investors to participate in further privatizations in the Israeli defense sector, does not provide a basis for invoking the national security interests of Israel as a barrier toward litigation of this action in this Court, which, for all the reasons discussed in Plaintiffs' initial submissions, is the most suitable and previously agreed-upon forum.

I declare under penalty of perjury that the foregoing is true and correct. Executed at San Juan, Puerto Rico this 21st day of April, 2008.

_____
STEPHEN WILSON