UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN M. WILSON, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> IMAGESAT INTERNATIONAL N.V., *et al.*, <br><br> Defendants. | 07 Civ. 6176 (LTS)(DME) <br><br> ECF CASE <br><br> **SUPPLEMENTAL DECLARATION OF HAIM YIFRAH** |

HAIM YIFRAH declares as follows:

1. I am one of the Plaintiffs in this action. I submit this Supplemental Declaration in further opposition to Defendants' motions to dismiss the Complaint, for the purpose of responding to Defendants' contention that Israeli document classification, secrecy, or national security considerations preclude litigating this action in the courts of the United States.

2. I am a citizen of Israel. I was the founding Vice President for Defense Systems of West Indian Space Ltd. ("WIS"), later Defendant ImageSat International, N.V. (collectively, the "Company"). I served in this capacity from 1999 until 2006. From 1964 until 1998, I served in the Israeli Defense Forces, working my way through the ranks until I retired in 1998 with the rank of Brigadier General.

3. Throughout most of my military career, I served in the Intelligence Corps. My final active-duty assignment, from 1995 to 1998, was as Chief Intelligence Officer of the Israel Defense Forces (IDF). I was responsible, among other things, of the

implementation of the military Ofeq satellite program. I still perform military duties in the Israeli Defense Forces as a reserve officer.

4. Through my years of military service, I am fully familiar with Israeli procedures concerning designation of certain information under the control of the Israeli Defense Forces or the Israeli Ministry of Defense (IMOD) as classified. Although the rules and regulations governing classification and declassification of documents are quite complicated, in general it can be said that if a document is classified, it may not be shown to or discussed with anyone who does not hold the required and many times specific Israeli security clearance. However, the converse of this statement is also true: *If a document has lawfully been disclosed to someone who does not hold Israeli security clearance, then presumptively the document is non-classified, either because it was never classified, or because it was declassified before it was released.*

5. When I joined the Company, I observed that there were no security procedures in place for dealing with classified information or documents, nor for ensuring that employees had security clearances or underwent background checks. I also noticed that NON Israelis had the keys to the office and could use them at any time to clean the office when it was unoccupied by ImageSat staff. When I asked about the matter, I was told that the Company had previously been advised by officers of MALMAB, which is the office within the IMOD responsible for security matters of the IMod and defense related installations, that there is no need for MALMAB procedures at ImageSat because the Company was not and would not be in possession of any classified documents or information. This situation never changed during my seven years at the

Company.  *As I testified at my recent deposition in this case, nothing about ImageSat or its operations was ever classified.*

6.     In illustration of this, many of the Company's Israeli employees were new immigrants to Israel who had never previously held a position requiring a security check nor did they undergo one while at ImageSat.  When I first joined the Company in December 1998, many of the Company's senior personnel and advisers were from the United States, including the CEO, Stephen Wilson, the CFO, Michael Morris, as well as many of the Company's attorneys, investment advisors, and other professionals.  There were no restrictions on the types of documents or information that the Company could share with any of these persons, either Israeli or non-Israeli.  Moreover, prior to my retirement from the IDF, in October 1998 I participated in the meetings and presentations at the IAI MBT plant including in particular a tour of the IMOD's ground station there, where imagery from the Ofeq 3 earth observation satellite was presented to all of the American and other attendees.

7.     From 1999 to 2003, the Company's headquarters was physically located in Cyprus, and its central imagery archives were maintained at that location.  The information maintained at the Cyprus location included access to all the EROS satellite images and related data as well as all the technical information needed for tracking and tasking the satellite.  This facility was operated by foreign nationals from Argentina, Italy, South Africa, and the United States and other non-Israelis, without clearances and without the implementation of any Israeli government security procedures.  It was never even visited by MALMAB or any other Israeli security authority.

8. Before the EROS A satellite was launched in 2000, complete information concerning the satellite's technical aspects was furnished to representatives of the British firm that insured the launch, whose personnel were non-Israeli, including at least one person who I believe originated in a country with which Israel does not enjoy diplomatic relations. In preparation for the launch itself, every aspect of the satellite's technical specifications was made available to the Russian military unit in charge of its launch. The Company was responsible for the air and ground transport of the satellite as well as its pre-launch security. The Israeli, Russian, and other personnel involved in the launch were selected by the Company with no security checks run by MALMAB or any other IMOD entity. All of this was fully known to the IMOD and to IAI, its wholly owned subsidiary which was and is the Company's largest shareholder.

9. Every type of information concerning all technical aspects of the satellite, its operations, and its performance capabilities were presented in many international conferences on commercial imaging satellites, the operation and performance of the ground stations used to receive the imaging data, was given to literally hundreds of non-Israelis all over the world. These included representatives of dozens of investors and prospective investors, financial analysts, as well as customer countries and potential customer countries from five continents. None of these people underwent Israeli background scrutiny. It would have been impermissible to show genuinely classified documents or to discuss their contents with any of these persons.

10. In summary, ImageSat was not required to obtain security clearances for any of its employees or consultants before hiring them, nor were there restrictions on what individuals could visit ImageSat's corporate offices or its other facilities around the

4

world. Prior to operating its own station at MBT/IAI compound, ImageSat was guaranteed access for its visitors at IAI's space facilities including the ground station at MBT, from which both IMOD Ofeq and the Company's EROS satellites were operated. ImageSat was free to share documents and information in its possession with those persons to whom there was a legitimate reason to communicate them – ranging from attorneys, accountants, and financial analysts to defense personnel of various foreign governments to whom we were seeking to sell satellite services. Again, no security clearances were required for any ImageSat personnel due to work performed on behalf of ImageSat.

11. ImageSat did establish responsible and reasonable internal procedures to protect information that the Company considered confidential or proprietary. However, this was done by the Company to safeguard proprietary business information only. It was not a result of any requirements under Israeli law or regulations, and it was not the result of any request received from the IMOD or any other government agency, nor from IAI or any other corporation.

12. In their joint reply memorandum, Defendants attempt to confuse and mislead the court by citing the deposition testimony of my respected colleague (and co-plaintiff) Dr. Moshe Bar-Lev in which Dr. Bar-Lev declined to testify about secret Israeli military programs, plans, and financing mechanisms that were employed by the IMOD and IAI while he was an IAI employee. All of the matters about which Dr. Bar-Lev declined to answer took place *prior to* the IMOD/IAI decision to commercialize those programs and in advance of the initiation of the EROS Joint Venture. Commercialization and the related widespread disclosure of all necessary technical information related to the

imaging satellite programs completely changed the nature of the IMOD's military earth observation satellite program. I was present throughout Dr. Bar-Lev's deposition and observed that Dr. Bar-Lev was showing far more circumspection in declining to answer certain questions on the record than IAI's counsel showed in asking them. IAI's counsel was accompanied at the deposition by a senior IAI official and asked these questions in asking them in a room full of people and in front of a stenographer and a video camera, with the obvious intent of intimidating the witness with the threat of possible subsequent persecution or prosecution by IAI. I consider Defendants' attempt to entrap Dr. Bar-Lev in this manner to be offensive.

13. In my professional and personal opinion, Defendants have committed a grave breach of decorum by misusing Israel's recognized and legitimate need to maintain its national security in an attempt to shield their behavior from scrutiny in a purely commercial dispute and to seek a litigation advantage in such a dispute.

14. I am a loyal Israeli citizen and would never do or say anything that would damage the national security of the State of Israel. However, I am not aware of any documents or information relating directly or indirectly to ImageSat that would damage Israeli national security if they were disclosed in a legal proceeding in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Ramat Hasharon, Israel this 13 day of April, 2008.

_____
HAIM YIFRAH