UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
STEPHEN M. WILSON, BRW ENGINEERING :
LTD., WIS PARTNERS LTD., MOSHE BAR-LEV, :
PATRICK ROSENBAUM, MICHAEL MORRIS, :
HAIM YIFRAH, TOP DOWN PARTNERS, LLC, : Filed Electronically
JOEL LEVINE, MORRIS TALANSKY, :
ABRAHAM MOSHEL, MAGMA : 07 Civ. 6176 (LTS)
INTERNATIONAL SERVICES, LTD., ALBERT :
REICHMANN, HEXAGRAM & CO., and :
POLYBUTES COMPANY, :
:
                      Plaintiffs, :
:
              -against- :
:
IMAGESAT INTERNATIONAL N.V., ISRAEL :
AEROSPACE INDUSTRIES LTD., ELBIT :
SYSTEMS LTD., MOSHE KERET, IZHAK :
NISSAN, JACOB WEISS, MENASHE BRODER, :
SHIMON ECKHAUS, MICHAEL FEDERMAN, :
ESTATE OF JACOB TOREN, JOSEPH :
ACKERMAN, JOSEPH GASPAR, GINO :
PIPERNO-BEER, JAMES DEPALMA, DAVID :
ARZI, YOAV CHELOUCHE, and YEHOSHUA :
ELDAR, :
:
                      Defendants. :
:
------------------------------------------------------------X

**PLAINTIFFS' SUR-REPLY MEMORANDUM OF LAW IN FURTHER
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

                                              GANFER & SHORE, LLP
                                              360 Lexington Avenue
                                              New York, New York 10017
                                              (212) 922-9250
                                              (212) 922-9335 (facsimile)
                                              *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ...................................................................................................................1

ARGUMENT..........................................................................................................................3

    A.    The Documents and Testimony Needed to Litigate This Case
           Are Not Classified and There Is No Impediment To Their Use ..............................4

    B.    Even If Litigating This Case Could Involve Disclosure of
           Classified Information as Claimed, the Court Would Assess the
           Need for Disclosure and Dismissal of the Action Would Be
           Unwarranted..............................................................................................................10

CONCLUSION......................................................................................................................15

## TABLE OF AUTHORITIES

**Cases**      **Page**

Alfadda v. Fenn, 149 F.R.D. 28 (S.D.N.Y. 1993) ...................................................................11, 12

Bokkelen v. Grumman Aerospace Corp.,
   432 F. Supp. 329 (E.D.N.Y. 1977) ........................................................................................9

British Int'l Ins. Co. v. Seguros La Republica,
   No. 90 Civ. 2370, 2000 WL 713057 (S.D.N.Y. June 2, 2000).............................................14

Compagnie Française d'Assurance pour le Commerce Exterieur v. Phillips
Petroleum Co.,
   105 F.R.D. 16 (S.D.N.Y. 1984) ...........................................................................................12

DiRienzo v. Philip Services Corp.,
   294 F.3d 21 (2d Cir. 2002)................................................................................................1, 14

First Nat'l City Bank v. Internal Revenue Serv.,
   271 F.2d 616 (2d Cir. 1959).................................................................................................12

Freeford Ltd. v. Pendleton, 2008 WL 962626 (1st Dep't Apr. 10, 2008) ......................................14

Inter-American Development Bank v. Nextg Telecom Ltd.,
   503 F. Supp. 2d 687 (S.D.N.Y. 2007)....................................................................................9

Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah,
   184 F. Supp. 2d 277 (S.D.N.Y. 2001)..................................................................................15

Lyondell-Citgo Refining LP v. Petroleos de Venezuela, S.A.,
   No. 02 Civ. 0795, 2004 WL 2698218 (Nov. 19, 2004), later opinion, 2005 WL 356808
   (S.D.N.Y. Feb. 15, 2005) .....................................................................................................11

Madanes v. Madanes,
   186 F.R.D. 279 (S.D.N.Y. 1999) .........................................................................................14

Reino de España v. American Bureau of Shipping,
   03 Civ. 3573, 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005)......................................13, 14, 15

Securities & Exchange Comm'n v. Euro Security Fund, 98 Civ. 7347, 1999 WL 182598
   (S.D.N.Y. Apr. 2, 1999).......................................................................................................12

Securities & Exchange Comm'n v. Renert,
   01 Civ. 1027, 2002 WL 32503671 (D. Conn. June 17, 2002).............................................12

Société Nationale Industrielle Aerospatiale v. United States District Court,
   482 U.S. 522 (1987).......................................................................................................11, 12

**Page**

United States v. First Nat'l City Bank,
  396 F.2d 897 (2d Cir. 1968) ............................................................................................12

**Statutes and Rules**

Fed. R. Civ. P. 26(c) ............................................................................................................7

Restatement (Third) of the Foreign Relations Law of the United States § 442 (1987) ...........12, 13

### PLAINTIFFS' SUR-REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Pursuant to leave granted by this Court, Plaintiffs respectfully submit this sur-reply memorandum of law in further opposition to Defendants' motions to dismiss the Complaint in this action. Also submitted herewith are the Supplemental Declarations of Stephen Wilson, Moshe Bar-Lev, Haim Yifrah, and Adv. Joseph Tamir.

### BACKGROUND

When Defendants initially moved to dismiss this action, they argued among other things that the litigation should take place in Israel rather than the United States under the doctrine of *forum non conveniens*. Defendants' motion papers, filed October 15, 2007, addressed factors typically addressed on a *forum non conveniens* motion, such as Plaintiffs' and Defendants' locations, the convenience of witnesses, the situs of various events underlying the litigation, and the potentially applicable choice of law.

On January 30, 2008, Plaintiffs filed their opposition papers on the motions to dismiss. Plaintiffs urged, among other things, that their choice of the Southern District of New York as the forum is entitled to deference because this is a "home forum" for many Plaintiffs, and that the case should be heard here because Plaintiffs and others invested in ImageSat as a result of extensive solicitations by Defendants and their American advisors in the United States. See generally DiRienzo v. Philip Services Corp., 294 F.3d 21, 32-33 (2d Cir. 2002) (denying dismissal where, among other things, "Plaintiffs [we]re involved in this lawsuit precisely because of aggressive selling techniques by [the corporate defendant] *within* the United States that targeted United States investors as potential purchasers of its stock").

Perhaps because they recognized how badly their arguments for a *forum non conveniens* dismissal had been undermined in Plaintiffs' opposition, Defendants' reply papers seek to change the

subject. Defendants' Reply Memorandum of March 25, 2008, submitted jointly on behalf of all Defendants except James DePalma, leads off with and heavily emphasizes a substantially new argument seeking dismissal based upon alleged Israeli secrecy and document classification requirements. To support this argument, Defendants have submitted the Declarations of Yair Sherman, Arie Halsband, Eric S. Goldstein, Esq., and Supplemental Declaration of Adv. Dror Vigdor. Annexed to the Goldstein Declaration are an unsworn letter from in-house counsel for Defendant IAI to the Director-General of the Israel Ministry of Defense (IMOD), requesting IMOD's views on whether this case should be litigated in the United States, and a letter from the Director General of the IMOD opining that the IMOD would prefer for the case to be litigated in Israel. (Goldstein Decl. Ex. "A", "B")

The gist of Defendants' position is that many documents that might be relevant to this litigation are classified under Israeli law, so that either they could not be produced in this action or their production would be made substantially more complicated by having first to comply with Israeli declassification procedures. Relatedly, Defendants contend that witnesses employed by Defendant Israel Aerospace Industries, Ltd. ("IAI") might be unable to testify in this action. As a result, Defendants claim, the Southern District of New York is not the best forum for the litigation, and Plaintiffs should instead be relegated to pursuing their claims in a court in Israel.

Even apart from the fact that Defendants have improperly presented a substantially new argument in their Reply Brief, their position is without substance. First of all, as demonstrated in the accompanying Supplemental Declarations, this case is not founded upon documents designated as confidential or secret in Israel. To the contrary, ImageSat from its inception was organized and run as a purely commercial entity and neither that company, nor its satellites and operating systems, nor any documents in ImageSat's possession, were ever classified or covered by any Israeli security

2

restrictions. All types of documents relating to these matters were routinely disclosed to hundreds of persons without security clearances or vetting of any kind.

Moreover, Defendants have failed to demonstrate with particularity that litigation of this action would require the use or disclosure of Israeli classified documents. The Declarations that Defendants have submitted are vague and lacking in detail. They merely announce Defendants' conclusion that confidential or secret documents will be at issue in this litigation, without making any serious attempt to demonstrate the fact. Even assuming that this were the case, Defendants, including government-owned IAI, make no effort to show that the documents, many of which are years old, could not be declassified if necessary to the litigation. Moreover, the IMOD's unsworn assertion that it would prefer to shield its wholly owned commercial company IAI from litigation in the United States is entitled to no weight, particularly in view of many of the Plaintiffs' having invested in ImageSat in the United States, and having been told at the time of their investments that dispute resolution, including any needed litigation, would take place in the United States.

Defendants have made no factual showing that this litigation could not and should not be heard and determined in this Court. Moreover, the portion of Defendants' Reply Memorandum addressing their new argument that document classification issues warrant dismissal of this action is unsupported by any authority at all, and the caselaw confirms that this litigation can and should proceed in the United States. Accordingly, Defendants' motions to dismiss should be denied.

## ARGUMENT

Defendants' conclusory assertion that this case should not be litigated in the Southern District of New York because many of the relevant documents are classified under Israeli law fails for a host of reasons, both legal and factual.

### A. The Documents and Testimony Needed to Litigate This Case Are Not Classified and There Is No Impediment to Their Use

To begin with, as a factual matter, Defendants have failed to establish that litigating this case would require the production or use of any Israeli classified documents. As discussed below, even if classified foreign documents were at issue in this case, this would not warrant dismissal of the action. Instead, the Court would address discovery requests that implicated Israeli law on a case-by-case basis applying a well-established balancing test. But in this case, that issue need not even be reached, because Defendants have not demonstrated that this litigation will require material access to classified documents or testimony.

The litigation primarily concerns Defendants' acts and omissions regarding ImageSat and its predecessors (collectively, the "Company"). The Company was founded as, and it is supposed to remain today, a *multi-national independent commercial vehicle* for the commercialization of Israel's space technology programs. Defendants do not argue, nor could they argue, that any aspect of ImageSat, or any information relating to ImageSat's satellites, ground systems, business plans, or operations, was classified in any way under Israeli law or otherwise.

As attested in the accompanying Supplemental Declarations, information about the Company has been widely shared with hundreds if not thousands of people around the world, the vast majority of whom never held an Israeli security clearance or was subjected to any background check. This *lack of secrecy* concerning ImageSat's operations began in the mid-1990's, when the Company was formed as a joint venture between IAI and an American corporation, Core Software Technologies. During the tenure of Plaintiff Stephen Wilson as CEO of the Company, from 1995 to 2000, no invited guest was ever denied access to the relevant IAI facilities or to any information related to the Company's satellites, systems, or business plans. (Wilson Suppl. Decl. ¶ 5) To the contrary, when West Indian Space was formally incorporated and opened its office in Tel Aviv in 1997, Mr. Wilson

4

and two of the other Plaintiffs inquired whether any security measures needed to be taken in connection with the use of sensitive information in developing the Company's business, only to be told by a representative of the IMOD security agency that no facility or individual clearances would be required related to the Company's business and no special security procedures needed to be implemented – and indeed, none were. (Id. ¶ 6) Moreover, it was understood from the outset of the Company's operation that numerous non-Israeli personnel (including customer and potential customer governments) would have access to the technology underlying all aspects of the Company's satellites, for the purpose of among other things operating them from ground stations around the world. The parties' written agreements reflect that everyone (including IAI and the IMOD) contemplated that this would occur. (Id. ¶¶ 7-8)

Access to every sort of information concerning the Company was also provided in connection with the Company's fundraising, which led to the investment of tens of millions of dollars by American investors, including several Plaintiffs. (See id. ¶ 9) Documentation concerning ImageSat's satellites, ground systems, and business was shared with literally hundreds of non-Israelis holding no clearances of any kind, ranging from junior American analysts and commercial launch insurance personnel to junior and senior officials of foreign governments. (Id. ¶ 13) No ImageSat documents were ever classified. (Id.; Bar-Lev Suppl. Decl. ¶ 3)

Documentation relating to other issues in this lawsuit was also widely shared with non-Israelis. For example, documents concerning IAI's development of commercial synthetic aperture radar (SAR) satellite technology, which IAI has agreed to supply in a business venture with Northrop-Grumman which Plaintiffs contend violates IAI's contractual obligations to ImageSat, were shared with Northrop-Grumman as well as Northrop's competitors such as Lockheed-Martin. (Wilson Suppl. Decl. ¶ 14) Extensive disclosures were also made by IAI to ImageSat in 2005-2006

5

in connection with negotiations in which ImageSat sought to purchase a SAR imaging satellite. (Id.) No information other than that previously disclosed to ImageSat, Northrop Grumman, Lockheed Martin, and other parties without Israeli security clearances worldwide should be required to litigate this claim. (Id. ¶ 15) There has also been significant press coverage on these matters. (Id. ¶ 14)

The fact that there has already been pervasive disclosure of documents relating to ImageSat's business, operations, satellites, and ground systems as well as the other issues in this case over a period of many years demonstrates the fallacy of Defendants' assertion that such documents must be classified. One of the Plaintiffs in this action is Haim Yifrah, who served in the Israel Defense Forces (IDF) for 34 years before joining ImageSat, retiring with the rank of Brigadier General after four years of service as Chief Intelligence Officer of the IDF. (Yifrah Suppl. Decl. ¶ 4) In his accompanying Supplemental Declaration, General Yifrah states:

> Through my years of military service, I am fully familiar with Israeli procedures concerning designation of certain information under the control of the Israeli Defense Forces or the Israeli Ministry of Defense (IMOD) as classified. Although the rules and regulations governing classification and declassification of documents are quite complicated, in general it can be said that if a document is classified, it may not be shown to or discussed with anyone who does not hold the required and many times specific Israeli security clearance. However, the converse of this statement is also true: ***If a document has lawfully been disclosed to someone who does not hold Israeli security clearance, then presumptively the document is non-classified, either because it was never classified, or because it was declassified before it was released.***
>
> When I joined the Company, I observed that there were no security procedures in place for dealing with classified information or documents, nor for ensuring that employees had security clearances or underwent background checks. I also noticed that non-Israelis had the keys to the office and could use them at any time to clean the office when it was unoccupied by ImageSat staff. When I asked about the matter, I was told that the Company had previously been advised by officers of MALMAB, which is the office within the IMOD responsible for security matters of the IMOD and defense related installations, that there is no need for MALMAB procedures at ImageSat because the Company was not and would not be in possession of any classified documents or information. This situation never changed during my seven years at the Company. ***As I testified at my recent***

6

> *deposition in this case, nothing about ImageSat or its operations was ever classified. . . .*
>
> Every type of information concerning all technical aspects of the satellite, its operations, and its performance capabilities were presented in many international conferences on commercial imaging satellites, the operation and performance of the ground stations used to receive the imaging data, was given to literally hundreds of non-Israelis all over the world. These included representatives of dozens of investors and prospective investors, financial analysts, as well as customer countries and potential customer countries from five continents. For example, during my final years with the Company during which ImageSat worked to complete an initial public offering (IPO) in the United States, the Company's senior management and in-house counsel constantly worked with the underwriters and various attorneys, none of whom were Israeli and none of whom had Israeli security clearances (from MALMAB or anyone else), but who nonetheless were shown all of the documents regarding the satellite technical capabilities, the ground stations, and the Company's customers. None of these people underwent Israeli background scrutiny. It would have been impermissible to show genuinely classified documents or to discuss their contents with any of these persons.

(Yifrah Suppl. Decl. ¶¶ 4-5, 9; see also id. ¶¶ 6-8, 10; Bar-Lev Suppl. Decl. ¶ 3)[1] The key documents relating to substantially every issue in this case have already been disclosed to numerous people around the world, both Israeli and non-Israeli. They are not classified or secret.

Moreover, the vast majority of those who have had access to the various documents and the information derived therefrom over the past 12 years did not hold Israeli security clearances. In fact, one of the Declarations submitted by IAI confirms that *"[o]nly Israeli citizens are eligible to receive such security clearances."* (Sherman Decl. ¶ 4 (emphasis added)) It thus follows that any non-Israeli who received any documents relating to this matter did so without holding security clearance and would not have been authorized to view any classified or secret Israeli government documents.

---

[1] To the extent that ImageSat established internal procedures to protect information that the Company considered confidential or proprietary, this was done by the Company on its own initiative to safeguard proprietary *business* information only, not government-classified secrets. (Yifrah Suppl. Decl. ¶ 11) Moreover, if the evidence or testimony in this action includes any of these types of materials, or any other material genuinely requiring confidential handling, the parties' interests can be protected through the entry of a garden-variety confidentiality stipulation and protective order pursuant to Fed. R. Civ. P. 26(c), which Plaintiffs have already sought to negotiate with Defendants' counsel, and does not require or support relegating the litigation to another country.

As emphasized by General Yifrah, "[i]f a document has lawfully been disclosed to someone who does not hold Israeli security clearance, then presumptively the document is non-classified, either because it was never classified, or because it was declassified before it was released." (Yifrah Suppl. Decl. ¶ 4) Thus, none of the documents that have been shared with uncleared ImageSat personnel and/or with the dozens of non-Israeli third parties is classified. The tens of thousands of pages of documents about ImageSat that have been disclosed to uncleared persons all over the world over the past dozen years will provide an ample foundation upon which the parties can litigate this action, without implicating the concerns raised by Defendants in their papers.

In contrast to Plaintiffs' specific and detailed showing that documents concerning ImageSat and the issues in this case were freely disclosed by Defendants, Defendants have offered only conclusory assertions that documents significant to the case remain classified. First, the Sherman Declaration contains a general discussion of Israeli procedures concerning classification and declassification of documents, but does not identify a single allegedly classified document having relevance to this case. Significantly, the Sherman Declaration does acknowledge that if any classified documents were relevant to the case, procedures exist within the IMOD to seek their declassification. (Sherman Decl. ¶ 11) While it is claimed that there exists "certain information" that would not qualify for declassification (id.), absolutely no detail is provided.

The Halsband Declaration offers no greater assistance to the Court. It asserts that Mr. Halsband is not permitted even to identify which of the Complaint's allegations implicate classified information, but that "information necessary to defend against [some of the Complaint's] allegations is classified," and contains an admittedly "very general" listing of topics. (Halsband Decl. ¶ 6) The Halsband Declaration does not address the role that allegedly classified documents would play in this litigation as compared with the substantial quantity of key documents that either never were

8

classified or must have been declassified before they were disclosed to the Company's non-cleared Israeli and non-Israeli employees (from the CEO on down), professional advisors, customers, prospective customers, ground system personnel, launch personnel, attorneys, accountants, underwriters, insurance experts, and thousands of other people from dozens of countries.

Defendants have also submitted a letter from the Director-General of the IMOD (Goldstein Decl. Ex "A"), written at the request of Defendant Itzhak Nissan, the President and CEO of Defendant IAI (which is 100% owned by the IMOD). To begin with, this letter is unsworn and is not even eligible for consideration by the Court  See, e.g., Inter-American Development Bank v. Nextg Telecom Ltd., 503 F. Supp. 2d 687, 696 (S.D.N.Y. 2007) (letter contending that foreign government had prevented defendant from performing under a contract was inadmissible hearsay); Bokkelen v. Grumman Aerospace Corp., 432 F. Supp. 329, 331 (E.D.N.Y. 1977) (letter from foreign government official explaining reasons for government's refusal to grant certain import permits was inadmissible in action charging defendant with wrongfully causing the foreign government to refuse to issue the permits). Moreover, the letter does not contain anything approaching the level of detail that would be required to invoke the Israeli Evidence Ordinance upon which Defendants rely as a basis for asserting secrecy of documents at issue in this case. (See Tamir Suppl. Decl. ¶¶ 2-5) And even if all these defects were overlooked, the IMOD letter fails to support its stated preference for litigation in Israeli rather than the United States by referencing a single specific category of documents or piece of information whose disclosure would supposedly cause harm to Israel were this case to be litigated in the United States.

Last – and certainly least – Defendants misleadingly cite out of context deposition testimony recently provided by Plaintiff Moshe Bar-Lev. At his deposition, Dr. Bar-Lev declined to answer certain questions asked by IAI's counsel regarding secret Israeli military programs, plans, and

9

financing mechanisms that were employed by the IMOD and IAI while he was employed at IAI. (See Def. Reply Mem. 6-7; IAI Reply Mem. 8) Unmentioned by Defendants is the fact that all the questions that Dr. Bar-Lev declined to answer related to events that took place *before* the IMOD and IAI decided to commercialize those programs by establishing the commercial EROS Joint Venture that became ImageSat, and to accept the greater transparency required when funding a commercial venture with millions of dollars to be contributed by sophisticated investors who would require access to all relevant information. (See Wilson Suppl. Decl. ¶ 17; Yifrah Suppl. Decl. ¶ 12; Bar-Lev Suppl. Decl. ¶ 4) Defendants have not shown, or even alleged in other than a purely conclusory fashion, that any of the topics on which Dr. Bar-Lev opined he should not testify are relevant to any issue in this case. It is apparent that these questions were asked, not to elicit relevant factual information within the scope of the deposition, but to put Dr. Bar-Lev to the unfair choice between answering the questions (in which case he would have been accused by IAI of violating his obligation of confidentiality as a former employee) and not answering them (in which case his testimony would be misused, as it has been, to support Defendants' contention that the case cannot fairly be litigated in the United States). It would be highly unfair to use Dr. Bar-Lev's sense of honor and respect for the Israeli national interest against him or any of his fellow Plaintiffs.[2]

### B. Even if Litigating This Case Could Involve Disclosure of Classified Information as Claimed, the Court Would Assess the Need for Disclosure and Dismissal of the Action Would Be Unwarranted

Even assuming *arguendo* that Defendants had established that litigating this case would require disclosure of a significant quantity of documents classified under foreign law, this fact would

---

[2] Frankly, Dr. Bar-Lev showed far more circumspection in declining to answer certain questions posted by IAI's counsel on the record than IAI's counsel showed in asking them. The questions were asked by IAI's counsel (with a senior IAI official sitting nearby to advise him) in a room full of people, in front of a stenographer and a video camera, and without any advance discussion or arrangements regarding confidentiality or related issues.

10

neither mandate dismissal of the case nor even require that Plaintiffs be denied access to such documents in discovery. Rather, the Court would address Plaintiffs' need for discovery on any specific topic or of any specific group of documents on an individualized basis, taking into account all relevant factors including the parties' need for the documents and the foreign country's interest in protecting such material from disclosure.

Relevant principles for this situation were outlined by the late Judge Motley in Lyondell-Citgo Refining LP v. Petroleos de Venezuela, S.A., No. 02 Civ. 0795, 2004 WL 2698218 (Nov. 19, 2004), later opinion, 2005 WL 356808 (S.D.N.Y. Feb. 15, 2005). In that case, one of the defendants was a Venezuelan government-owned oil company. Defendant contended that producing relevant documents would "force[] it to grant plaintiff unrestricted access to classified information and state secrets that it is prohibited from disclosing under Venezuelan law." 2005 WL 356808, at *2. Judge Motley rejected this sweeping assertion of immunity from disclosure, holding:

> [T]o sustain defendant's objection on the basis of general statements about the need to protect the national security and public interest of Venezuela, without providing any specific information about whether the documents being withheld contain such information, would be to give any government or government-related party an unfair advantage over its adversary.

Id. at *3.

It is well-settled that where necessary, "an American court [has] the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate [foreign law]." Société Nationale Industrielle Aerospatiale v. United States District Court, 482 U.S. 522, 544 n.29 (1987). A party's assertion that this is the case will be subjected to the Court's balancing of relevant interests, but at the outset of the analysis, "it is worth remembering that the party relying on the foreign law as an excuse bears the burden of demonstrating that such law actually bars production or testimony at issue." Alfadda v. Fenn, 149 F.R.D. 28, 34 (S.D.N.Y. 1993); accord

11

Securities & Exchange Comm'n v. Renert, 01 Civ. 1027, 2002 WL 32503671, at *2 (D. Conn. June 17, 2002); see also United States v. First Nat'l City Bank, 396 F.2d 897, 903 (2d Cir. 1968); First Nat'l City Bank v. Internal Revenue Serv., 271 F.2d 616, 620 (2d Cir. 1959). Defendants' reliance on the mere existence of Israeli laws and procedures for classifying documents fails to demonstrate their actual application to the matters at hand, especially at this early stage of the litigation where discovery has been limited and confined almost exclusively to jurisdictional issues. See Alfadda, 149 F.R.D. at 34; Securities & Exchange Comm'n v. Euro Security Fund, 98 Civ. 7347, 1999 WL 182598, *3 (S.D.N.Y. Apr. 2, 1999).

Rather, to meet their burden of showing that discovery in this case must be limited – and *a fortiori*, to establish that discovery would be so extraordinarily damaging or impracticable that the case cannot reasonably be heard in the United States at all – Defendants must "provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." Alfadda, 149 F.R.D. at 34; Compagnie Française d'Assurance pour le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16, 24-25 (S.D.N.Y. 1984). Here, as noted above, Defendants have done no such thing. That failure is sufficient to resolve the present motions.

In balancing the need for production of any documents that Plaintiffs might seek and which Defendants asserted could not be produced without violating Israeli law, the Court would balance the interests of the parties utilizing the standards articulated in the Restatement (Third) of the Foreign Relations Law of the United States § 442 (1987), which the Supreme Court endorsed in Société Nationale, 482 U.S. at 544 n.28. Under these standards,

> In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the

12

> information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the requests would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement (Third) § 442(c)(1). Moreover, "[i]f disclosure of information located outside the United States is prohibited by a law [or] regulation . . . of the state in which the information or prospective witness is located, or of the state of which a prospective witness is a national, *a court or agency in the United States may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available.*" Id. § 442(c)(2)(a). Thus, although IAI and the other Defendants would be permitted to assert that Israel's interest in securing the secrecy of classified documents should outweigh Plaintiffs' need for particular documents in a given instance, IAI would first be required to exercise reasonable good-faith efforts to obtain declassification of the relevant documents or permission to disclose them.

IAI has acknowledged that "a comprehensive process for declassifying information exists." (Sherman Decl. ¶ 11) While Plaintiffs believe the case can be litigated without extensive recourse to a substantial body of still-classified documents that have not already been disclosed to third parties, there is no reason that IAI should be unable either to achieve the declassification of any documents that prove material or to explain why such declassification would not be appropriate. Similarly, to the extent that IAI asserts that its present and former employees could not provide testimony in the litigation, IAI would have the ability to secure permission for all of its present and former employees to provide testimony on the subject-matters at issue in this action, which largely involve ImageSat's commercial, non-classified operations rather than military matters. See Reino de España v. American Bureau of Shipping, 03 Civ. 3573, 2005 WL 1813017, at *5 (S.D.N.Y. Aug. 1, 2005) (court rejected claim that Spanish law prohibited access to files of a Spanish government

13

commission where "hundreds of persons" had been given access to the files and "many reports by the Spanish press" had appeared regarding their contents).

The analysis would also call for comparing "the extent to which noncompliance would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." See, e.g., British Int'l Ins. Co. v. Seguros La Republica, No. 90 Civ. 2370, 2000 WL 713057, at *9 (S.D.N.Y. June 2, 2000); Madanes v. Madanes, 186 F.R.D. 279, 286 (S.D.N.Y. 1999). In this case, not only does the United States have the ever-present "interest in the full and fair adjudication of matters before its courts," but it has an especial interest in protecting the interests of providing full recourse to American investors who were solicited to make investments in the United States. See DiRienzo v. Philip Services Corp., 294 F.3d at 32-33 (see also cases cited at Pl. Mem. 31) While Plaintiffs respect the need to protect the national security interests of the State of Israel, in this case, in 1999 and again in 2000, the Company, IAI, and ElOp/Elbit formally agreed with investors that in the event of any future dispute among them, dispute resolution in New York, including litigation in the federal and state courts located in New York, was appropriate and feasible, and they submitted to the exclusive jurisdiction of courts located in New York for this purpose.[3] Defendants cannot reasonably argue that they can produce documents for purposes such as raising millions of dollars from American investors, but not to address litigation brought in the agreed-upon forum by some of those same investors. Any legitimate concerns concerning the confidentiality of documents in this litigation can be addressed

---

[3]  In Plaintiffs' Memorandum in Opposition, Plaintiffs argued that the forum-selection and consent to jurisdiction clauses in the various agreements should be construed broadly and applied to certain parties to this action who did not expressly sign such agreements and as to certain claims in addition to those arising directly from the agreements. (See Pl. Mem. 27, 50) The very recent Appellate Division decision in Freeford Ltd. v. Pendleton, 2008 WL 962626 (1st Dep't Apr. 10, 2008), addresses the scope of such clauses in detail and we believe it is relevant to the analysis of this issue. Because this case does not fall within the ambit of the Court's order authorizing Plaintiffs to file sur-reply papers, we merely cite it here without argument, in lieu of drawing the Court's attention to it by a separate letter. If a supplemental memorandum of no more than 5 pages regarding this case would assist the Court, we would be pleased to file one.

through a confidentiality stipulation and protective order such as is entered in countless litigations in this Court, both domestic and international, every year. See Reino de España, 2005 WL 1813017, at *5.

Under all the circumstances, Defendants have failed to demonstrate "exceptional circumstances" that could warrant relegating Plaintiffs and their claims to a distant foreign court. Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277 (S.D.N.Y. 2001) (cited in IAI Reply Mem. at 8).

## CONCLUSION

For all the foregoing reasons, and those set forth in Plaintiffs' earlier Memorandum in Opposition, Defendants' motions to dismiss the Complaint should be denied in all respects.

Dated: New York, New York
April 22, 2008

        GANFER & SHORE, LLP

        By: _____
        Ira Brad Matetsky (IM1881)
        William A. Jaskola
        360 Lexington Avenue
        New York, New York 10017
        (212) 922-9250
        (212) 922-9335 (facsimile)
        imatetsky@ganshore.com
        *Attorneys for Plaintiffs*